EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ─────────────────── x | | |
| GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, Individually and on Behalf of all Others Similarly Situated, | : : : | Civil Action No. CLASS ACTION |
| | : | COMPLAINT |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| AT&T INC., JOHN STANKEY, RANDALL L. STEPHENSON, PASCAL DESROCHES, and JOHN STEPHENS, | : : : : | |
| | : | |
| Defendant. | : | |
| ─────────────────── x | | |

Plaintiff General Retirement System of the City of Detroit ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding AT&T Inc. ("AT&T" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded AT&T securities between November 2, 2018 and July 26, 2023, inclusive (the "Class Period").  Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the

subsequent damages took place in this judicial district and the securities of AT&T which form the subject of this action trade in this judicial district.

5.    In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.    Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased AT&T securities during the Class Period and was economically damaged thereby.

7.    Defendant AT&T is a telecommunications company.  AT&T common stock trades in this judicial district on the New York Stock Exchange ("NYSE") under the ticker symbol "T."

8.    Defendant John Stankey ("Stankey") has served as the Company's Chief Executive Officer ("CEO") since July 2020.

9.    Defendant Randall L. Stephenson ("Stephenson") served as AT&T's CEO and Chairman of the Board (the "Board") from 2007 through June 30, 2020.

10.    Defendant Pascal Desroches ("Desroches") has served as the Company's Chief Financial Officer ("CFO") since April 1, 2021.

11.    Defendant John Stephens ("Stephens") served as the Company's CFO from 2011 to April 1, 2021.

12.    Defendants Stankey, Stephenson, Desroches, and Stephens are collectively referred to herein as the "Individual Defendants."

13.    Each of the Individual Defendants:

    (a)    directly participated in the management of the Company;

- 2 -

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     Defendant AT&T and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

17.     Defendant AT&T is a telecommunications company.  During the Class Period, Defendants failed to disclose that the Company was responsible for an extensive network of lead cables that had been previously laid in many areas around the country, causing harm and posing the risk of further harm to the environment, Company employees, and surrounding communities. Defendants omitted the truth and instead materially misrepresented AT&T's efforts to upgrade its network, mitigate environmental harms, protect employees, and safeguard the communities in which it operated.  When the truth was revealed, AT&T investors suffered substantial damages under the federal securities laws.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED
## DURING THE CLASS PERIOD

15. The Class Period begins on November 2, 2018. On that date, the Company filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2018 (the "3Q18 Form 10-Q"). Attached to the 3Q18 Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Stephenson and Stephens attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

16. The 3Q18 Form 10-Q contained the following statements regarding the Company's retirement of its copper cable network and transition to updated infrastructure:

**Depreciation and amortization** expense increased in the third quarter and for the first nine months of 2018.

- *Depreciation expense increased $159, or 3.2%, in the third quarter and $191, or 1.3%, for the first nine months of 2018, primarily due to WarnerMedia results as well as ongoing capital spending for network upgrades and expansion offset by lower expense resulting from our fourth-quarter 2017 abandonment of certain copper network assets.*

- Amortization expense increased $1,965 in the third quarter and increased $2,031, or 57.9%, for the first nine months of 2018, primarily due to the amortization of intangibles associated with WarnerMedia….

**Depreciation** expenses decreased in the third quarter and for the first nine months of 2018, *primarily due to our fourth-quarter 2017 abandonment of certain copper network assets,* partially offset by ongoing capital spending for network upgrades and expansion….

**Depreciation** expense increased in the third quarter and decreased for the first nine months of 2018. The increase in the third quarter was primarily due to increases in capital spending for network upgrades and expansion. *The decrease in the first nine months was primarily due to updates to the asset lives of certain network assets and our fourth-quarter 2017 abandonment of certain copper network assets.*

(Emphasis added).

17.     These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables abandoned by the Company were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

18.     On February 20, 2019, the Company filed with the SEC its 2018 Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Annual Report").  Attached to the 2018 Annual Report were certifications pursuant to SOX signed by Defendants Stephenson and Stephens attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

19.     The 2018 Annual Report contained the following statement regarding the Company's retirement of its copper cable network and transition to updated infrastructure:

> *Internet Protocol (IP) Technology* IP is generally used to describe the transmission of data, which can include voice (called voice over IP or VoIP), using a software-based technology rather than a traditional telephone network. ***Software-based technology presents cost-savings and growth opportunities by using bandwidth more efficiently than a legacy copper wire network and by improving our ability to provide data and video services to both fixed locations and mobile devices. We are rapidly converting to a software-based network and managing the migration of wireline customers to services using IP; we expect to continue this transition through at least 2020. Software-based technologies align with our global leadership in software defined network (SDN) and network function virtualization (NFV). This network approach, of which we are a global leader in our commitment to virtualize 75% of our network by 2020, delivers a demonstrable cost advantage in the deployment of next-generation technology over the traditional, hardware-intensive network approach.*** Our virtualized network will be able to support next-generation applications like 5G and IP-based services quickly and efficiently.

(Emphasis added).

20.     This statement was materially false and misleading because, at the time it was made, many of the legacy copper cables abandoned by the Company were covered in lead, a known

neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

21.     On February 20, 2020, the Company filed with the SEC its 2019 Annual Report on Form 10-K for the year ended December 31, 2019 (the "2019 Annual Report").  Attached to the 2019 Annual Report were certifications pursuant to SOX signed by Defendants Stephenson and Stephens attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

22.     The 2019 Annual Report contained the following statements regarding the Company's retirement of its copper cable network and transition to updated infrastructure:

> ***We have begun initiatives at both the state and federal levels to obtain regulatory approvals, where needed, to transition services from our older copper-based network to an advanced IP-based network****…*

> **Operations and support expenses** increased in 2019, primarily due to our 2018 acquisition of Time Warner and ***the abandonment of certain copper assets that will not be necessary to support future network activity*** (see Note 7). The increase was partially offset by lower costs in our Communications segment, specifically fewer subscribers contributing to lower content costs, lower upgrades driving a decline in wireless equipment costs and our continued focus on cost management….

> *Wireless and Broadband* Since November 2017, the FCC has adopted four significant rulings designed to accelerate broadband infrastructure deployment. ***In November 2017, the FCC updated and streamlined certain rules governing pole attachments, copper retirement, and service discontinuances.*** In March 2018, the FCC eliminated lengthy environmental, historical and tribal reviews for most small cell deployments and streamlined processes that must be followed when those reviews are required. The D.C. Circuit Court of Appeals vacated the FCC's finding in this Order that small cell facilities do not require environmental, historical and tribal reviews, but left intact all other processes adopted to streamline review when required. In August 2018, the FCC adopted more comprehensive pole attachment reform, including by simplifying the attaching process (i.e., one-touch make-ready) and clarified that the Communications Act precludes local governments from imposing moratoria on the deployment of communications facilities. And, in September 2018, the FCC restricted the ability of state and local governments to impede small cell deployments in rights-of-way and on government-owned structures, through exorbitant fees, unreasonable aesthetic requirements and other actions. ***These decisions will remove regulatory barriers and reduce the costs of***

*the infrastructure needed for 5G deployment, which will enhance our ability to place small cell facilities on utility poles and to replace legacy facilities and services with advanced broadband infrastructure and services.* Appeals of the August and September 2018 Orders remain pending in the 9th Circuit Court of Appeals….

*In 2017, as a result of planned fiber deployment, we recorded a noncash pre-tax charge of $2,883 to abandon certain copper assets that we did not plan to utilize to support network activity. Largely due to the pace at which our customers have migrated to fiber, which exceeded previous forecasts, we identified additional copper assets that we no longer expect will be utilized to support future network activity. In the fourth quarter of 2019, we recorded a noncash pre-tax charge of $1,290 to abandon these copper assets. Each of these abandonments is considered outside the ordinary course of business.*

(Emphasis added).

23.    These statements were materially false and misleading because, at the time they were made, many of the legacy copper cables abandoned by the Company were covered in lead, a known neurotoxin, and were harming and posed further risk of harm to the environment, Company employees and the public.

24.    In March 2020, AT&T updated its Environmental, Health and Safety Policy, which is located on its website and applies to the entire Company.  It states, in pertinent part:



---

**Environment, Health and Safety Policy**                                    **AT&T Enterprise-wide**

*AT&T Creed - No job is so important, and no service is so urgent that we cannot take time to perform our
work safely and in an environmentally responsible manner*

AT&T is committed to providing a safe working environment and to delivering products and services in a
safe, environmentally responsible and sustainable manner. This policy applies to all operations and facilities
enterprise-wide.

**AT&T is committed to:**

- Complying with applicable environment, health and safety laws and regulations;
- Measuring environment, health and safety performance and driving continuous improvement;
- Supporting employees in meeting their environment, health and safety obligations by providing
  necessary and appropriate training, job aids and resources;
- Preventing environment, health and safety incidents at our operations, and responding quickly to protect
  employees and the public should they occur;
- Using natural resources in a sustainable manner;
- Promoting pollution prevention and recycling, and managing waste responsibly;
- Integrating environment, health and safety considerations into our business processes and encouraging
  our suppliers, service providers and contractors do the same;
- Managing distribution and logistics activities to minimize risk to employees, the public and the
  environment;
- Conducting appropriate environment, health and safety due diligence and investigation in connection
  with mergers and acquisitions;
- Participating with government entities and stakeholders in shaping sound environment, health and
  safety policies, laws and regulations: and
- Engaging and communicating with relevant stakeholders, including our employees, about opportunities
  to address environment, health and safety performance.

**Owner**
Corporate Social Responsibility

**Date**
Effective: August 2008
Updated: March 2020

25.     The statements contained within this policy, in particular that AT&T is committed
to "[s]upporting employees in meeting their environment, health and safety obligations by
providing necessary and appropriate training, job aids and resources," "[p]reventing environment,
health and safety incidents at our operations, and responding quickly to protect employees and

the public should they occur," and "[e]ngaging and communicating with relevant stakeholders, including our employees, about opportunities to address environment, health and safety performance," were materially false and misleading because, at the time this policy was updated, the Company was responsible for cables covered in toxic lead, causing harm to everyday people, Company employees, and the environment.

26.    On February 25, 2021, the Company filed with the SEC its 2020 Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report").  Attached to the 2020 Annual Report were certifications pursuant to SOX signed by Defendants Stankey and Stephens attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

27.    The 2020 Annual Report contained the following statement regarding Employee Safety:

> **Employee Safety**
>
> ***We provide our employees access to flexible and convenient health and welfare programs and workplace accommodations***.  In response to the COVID-19 pandemic, we consulted with medical professionals to institute policies that best protected our employees and their families.  We have prioritized self-care and emphasized a focus on wellness, providing personal protective equipment, flexible scheduling or time-off options and implementing technologies to enhance the necessary remote-work environment.  As we look to life and operations beyond the pandemic, we are revising our business models to support flexible office space and at-home productivity for many employees on a permanent basis.

(Emphasis added).

28.    This statement was materially false and misleading because, at the time it was made, the Company was failing to provide employees with proper safety training or equipment to protect them from the toxic lead which was present on certain Company-owned cables, or adequately warn these employees of the presence of the toxic lead.

29.     On February 16, 2022, the Company filed with the SEC its Annual Report on Form 10-K for the Year ended December 31, 2021 (the "2021 Annual Report").  Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Stankey and Desroches attesting to the accuracy of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

30.     The 2021 Annual Report included the following statement on employee safety:

**Employee Safety**

***We provide our employees access to flexible and convenient health and welfare programs and workplace accommodations***.  In response to the COVID-19 pandemic, we consulted with medical professionals to institute policies that best protected our employees and their families, including a policy that requires the vast majority of our employees to be vaccinated.  We have prioritized self-care and emphasized a focus on wellness, providing personal protective equipment, flexible scheduling or time-off options and implementing technologies to enhance the necessary remote-work environment.  As we look to life and operations beyond the pandemic, we are revising our business models to support flexible office space and at-home productivity for many employees on a permanent basis.

(Emphasis added.)

31.     This statement was materially false and misleading because, at the time it was made, the Company was failing to provide employees with proper safety training or equipment to protect them from the toxic lead which was present on certain Company-owned cables, or adequately warn these employees of the presence of the toxic lead.

32.     The 2021 Annual Report included the following statement on environmental issues:

Further, customers, consumers, investors and other stakeholders ***are increasingly focusing on environmental issues, including climate change, water use, deforestation, plastic waste, and other sustainability concerns***.  Concern over climate change or other environmental, social and governance (ESG) matters may result in new or increased legal and regulatory requirements to reduce or mitigate impacts to the environment and reduce the impact of our business on climate change.  Further, climate change regulations may require us to alter our proposed business plans or increase our operating costs due to increased regulation or environmental considerations, and could adversely affect our business and reputation.

- 10 -

(Emphasis added).

33.     This statement was materially false and misleading because, at the time it was made, the Company owned cables that were covered in toxic lead all over the country, which posed significant risks in terms of the Company's reputation, litigation risk, and potential regulatory risk related to current or future regulations or laws.

34.     On February 13, 2023, the Company filed with the SEC its 2022 Annual Report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report").  Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Stankey and Desroches attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

35.     The 2022 Annual Report contained the following statement regarding environmental risk:

> Further, customers, consumers, investors and other stakeholders are increasingly focusing **on environmental issues, including climate change, water use, deforestation, plastic waste and other sustainability concerns.**  Concern over climate change **or other environmental, social and governance (ESG) matters may result in new or increased legal and regulatory requirements to reduce or mitigate impacts to the environment and reduce the impact of our business on climate change**.  Further, climate change regulations may require us to alter our proposed business plans or increase our operating costs due to increased regulation or environmental considerations, and could adversely affect our business and reputation.

(Emphasis added).

36.     The 2022 Annual Report contained the following statement on worker safety:

**Employee Safety**

> We provide our employees access to flexible and convenient health and welfare programs and workplace accommodations.  We have prioritized self-care and emphasized a focus on wellness, providing personal protective equipment, flexible scheduling or time-off options and implementing technologies to enhance the remote-work environment.

(Emphasis added.)

37.    The statements in paragraphs 35-36 were materially false and misleading because at the time the Company owned cables that were covered in toxic lead and leading to environmental damage while harming everyday citizens and the Company's own employees.

38.    Then, on June 8, 2023, the Company updated the Environmental, Health & Safety Compliance Section of its website (the "EHS Compliance Section").  In pertinent part, the EHS Compliance Section said the following:

> ***Being part of a community means taking care of each other and our environment.*** For AT&T, this means we are committed to complying with all applicable environment, health and safety (EHS) laws and regulations pertaining to our operations and the geographies where we work.  ***It also means developing and maintaining the right systems to protect our environment and our employees***.
>
> \*          \*          \*
>
> ***Everyone at AT&T has a role to play in protecting our environment and upholding safety standards.  From our part-time workers to our CEO, employees are responsible for reviewing the AT&T Code of Business Conduct (COBC) annually and understanding its provisions***.  EHS considerations, such as minimizing and recycling waste, are integrated into our business processes to conserve natural resources and prevent pollution.  We also encourage our suppliers and contractors to integrate EHS considerations into their processes through our contract language and our requirement to adhere to the AT&T Principles of Conduct for Suppliers. [. . .]

(Emphasis added).

39.    The AT&T Code of Business Conduct, as referenced in the EHS Compliance Section and posted on the Company's website during the Class Period, states, in pertinent part, the following:

> **We operate responsibly toward the environment.**
>
> We are committed to operate and to provide products and services in an environmentally responsible and sustainable manner.  We follow applicable laws and regulations related to the environment.  ***We strive to follow best practices and minimize our environmental impact in ways that are relevant to our business and important to the communities we serve.***

(Emphasis added).

40. The statements contained in paragraphs 38-39 were materially false and misleading because the Company endangered its employees, everyday citizens, and the environment through its ownership of cables covered in toxic lead around the United States, in stark contrast to what it represented in its Code of Business Conduct and the EHS Compliance Section.

41. The statements contained in ¶¶15-16, 18-19, 21-22, 24, 26-27, 29-30, 32, 34-36, 38-39 were materially false and misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and misleading statements and failed to disclose that: (1) AT&T was responsible for cables around the country that are highly toxic due to their being wrapped in lead, a known neurotoxin, which has harmed and posed the risk of further harming the environment, exposed Company employees, and the general public; (2) AT&T faces potentially significant litigation risk, regulatory risk, and reputational harm as a result of its responsibility for these lead-covered cables and the health risks stemming from their presence around the United States; (3) AT&T was warned about the damage and risks presented by these cables but did not disclose them as a potential threat to employee safety or to everyday people and communities; and (4) as a result, Defendants' statements about AT&T's business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis in fact at all relevant times.

42. In addition, throughout the Class Period, AT&T's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or

- 13 -

revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [AT&T] speculative or risky" and an explanation of "how [the] risk affecte[d] [AT&T]." Defendants' failure to disclose that AT&T was responsible for lead cables harming and posing risk of further harm to the environment, Company employees and the public violated Item 303 because these activities represented known trends and uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results. Furthermore, Defendants' failure violated Item 105, because these adverse facts created significant risks that were not disclosed even though they were some of the most significant facts that made an investment in AT&T speculative or risky.

<strong>THE TRUTH BEGINS TO EMERGE</strong>

43. On Sunday, July 9, 2023, *The Wall Street Journal* ("WSJ") released an article entitled "America is Wrapped in Miles of Toxic Lead Cables" (the "July 9 Article"). This was the first in a series of articles from a WSJ investigation in which it determined that "[t]elecom companies laid them (toxic lead cables) decades ago and thousands were left behind, posing a hidden health hazard today[.]"

44. The article stated, in pertinent part:

AT&T [. . .] and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles ahead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.

*   *   *

The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination – more than 2,000 lead-covered cables – that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.

\*       \*       \*

For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.

\*       \*       \*

Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Even without further exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

\*       \*       \*

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago. Removing Army Corps-approved cables at any time would routinely require a permit or be noted in the original paperwork, officials say. The Journal tally of abandoned lead cables is sure to be an undercount.

\*       \*       \*

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood – more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6.

"A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood, said Jack Caravanos, an

- 15 -

environmental public-health professor at New York University, who assisted the Journal in its research.  "We never knew about it so we never acted on it, unlike lead in paint and pipes."

## THE KNOWN RISKS

AT&T has previously noted the risks from its cables.  "Underground cable presents real possibilities for overexposure" for workers removing them, AT&T said in a 2010 presentation about employee safety at an industry conference.  "Some older metropolitan areas may still have over 50% lead cable," it added.

***The company considered the potential cost and environmental impact of removing the cables daunting, said Braden Allenby, a former top AT&T environmental health and safety official, now a professor at Arizona State University.  "It was standard operating procedure to abandon those cables in place," he said.  "We kept the discussion internal and informal.  We didn't try to quantify the problem or speak to the economics overall."***

AT&T didn't respond to requests for comment on Allenby's assertions. [. . .]

\*          \*          \*

In the Journal's testing at Lake Tahoe, lead was found not just near the cables, but also moving away from the severed Emerald Bay cable toward the beach.  On the south side, samples ranged from nearly five times the EPA limit for drinking water to more than eight times, or 132 parts per billion, at a sample taken 20 feet away from the cut end.

Experts say it is common to find varying results at different times when testing water for lead, depending on numerous factors including movement in the water and temperature.

A young child swimming for an hour in water and swallowing some of it, with lead content equivalent to that measured by the Journal in May, could add 7.4 micrograms per deciliter of lead to his or her blood, according to Caravanos, using an EPA lead-exposure model to estimate such risks.  To help determine whether medical or environmental follow-up are recommended, the Centers for Disease Control and Prevention uses a level of 3.5 micrograms per deciliter, which is higher than that of 97.5% of young children surveyed nationwide.

\*          \*          \*

## MISSISSIPPI BLUES

On the bank of the Mississippi near New Orleans' Bywater neighborhood, tourists recently walked on a bridge with a cable sticking out below.  Lead was flaking off into a spot where homeless people have set up camp.  Lead in the sediment there was 19.8 times the EPA guideline for where children could congregate.

Atop a levee in Donaldsonville, La., along the Mississippi, families often stroll near two abandoned cables, one smashed on the ground and the other with a splice box, a large lead casing used to connect cables, sealed with molten lead.

A reading by Caravanos using the XRF showed lead in the sediment next to the smashed cable and splice box at 2,850 and 2,880 parts per million, respectively—both seven times the EPA guideline for play areas.

Across the street from the park in a yard strewn with children's toys, an extension of a lead-covered cable and a lead splice box sit in the front of the house of Diane Gros, a 60-year-old mail carrier who has 10 grandchildren.

The XRF showed a reading of more than 4,000 parts per million at the site of the cable.

*The New Iberia cable on Bayou Teche was laid in 1940 by Southern Bell, which is now part of AT&T, and has an estimated 500 pounds of buried lead to encase telephone wires, based on an assay of a similar cable.  The town uses the area near the cable for a gumbo cook-off and an annual canoe race.*

A sample of water from the bayou at the cable site showed lead at a level of

7.4 parts per billion.  "Kids come down here and play all the time on the edge of the bayou," said Wilma Subra, an environmental consultant in New Iberia who had been unaware of the cable.

**FINGERPRINTING LEAD**

At selected sites, the Journal took the extra step to confirm that lead stemmed from the cables and not another source.  Reporters worked with a researcher to perform an isotopic analysis, a procedure that determines a specific fingerprint for the lead involved.  The testing by Bruce Nelson, a geochemistry professor at the University of Washington who specializes in the field, linked the lead found in samples most likely to the specific cables – as opposed to, say, lead from a factory or from paint.

Among those high-lead samples Nelson linked to the cables was one in New Iberia. Assuming the current levels of lead in the sediment, playing at that spot as a child could have raised the lead in the blood of someone like Tyrin Jones, who has fished for years in that spot, to more than eight times the current CDC threshold, according to the EPA model used by Caravanos.

Another lead-sheathed cable juts out of a swampy pond next to Bayou Teche in Franklin.  An analysis of the water sample from the pond showed lead at 471 parts per billion.  In a nearby backyard of a home owned by Anthony Peck, his 7-year-old granddaughter, Stella Peck, gathers clover flowers to make into bouquets and necklaces.

- 17 -

AT&T didn't respond to requests for comment on the cables in New Iberia and surrounding areas.

(Emphasis added).

45.     Then, on Monday July 10, 2023, during market hours, the WSJ released a follow-up article entitled "Bayou Teche is an Epicenter of America's Lead Cable Problem." As discussed in the July 9 Article, the lead cables in Bayou Teche, a waterway in south central Louisiana, were laid by Southern Bell, now owned by AT&T. The article stated, in pertinent part:

> Across the country, telecom companies have left behind more than 2,000 cables containing lead, a Wall Street Journal investigation has found, part of a decaying network installed under the old Bell System.
>
> Reporters found cables protruding from banks, resting under bridges, snaking under water and drooping from the air at dozens of sites. Testing showed that many are leaching toxic metal into the ground and water.
>
> Southern Louisiana's 125-mile-long Bayou Teche flows through a region particularly dense with cables. Southern Bell filed permits with the U.S. Army Corps of Engineers starting in the 1930s to place more than a dozen cables across the bayou.
>
> Journal reporters, with the assistance of environmental researchers, tested the water in nine places along the bayou and the sediment in three of them. Of those 12 tests, eight showed elevated levels of lead. A sediment sample near the cable in New Iberia exceeded the safety recommendation set by the Environmental Protection Agency for areas where children play.
>
> ***Southern Bell is now part of AT&T, which didn't respond to requests for comment on the cables in New Iberia and surrounding areas***. AT&T said in a written statement it doesn't believe lead-sheathed cables pose a public- health issue. "The health, safety and well-being of our people, our customers, and our communities is of paramount importance," it said. "For decades, we have managed legacy lead-clad cables in compliance with applicable laws and regulations."
>
> Here's how the contamination happens:
>
> (1)     Rainwater hits the lead, causing small amounts to dissolve.
>
> (2)     Here, the lead has leached into the ground, where it bonds to organic material in the soil.
>
> (3)     Journal tests linked the lead found in the soil to that in the cable, indicating it likely didn't come from some other source.

Further downstream, in Franklin, another cable sticks up from a small muddy pond next to 7-year-old Stella Peck's backyard. ***The Journal tested a sample of water from the pond and found levels of lead that exceeded the level at which the EPA recommends taking action for drinking water. Although the pond isn't used for drinking water, part of the bayou upstream is.***

Wilma Subra, an environmental consultant who lives in New Iberia, said cables like the one in her town, sticking up from the ground on the bank, are a potential attraction for children.

***They "don't know it's lead," she said. "There is no warning sign."***

(Emphasis added).

46.   On this news, the price of AT&T stock fell by $0.34 per share, or 2.2%, to close at $15.27 on July 10, 2023.

47.   Then, on July 12, 2023, the WSJ released an article entitled "What AT&T and Verizon Knew About Toxic Lead Cables." The article stated the following:

At a gathering of telecom officials more than a decade ago, John Malone, a senior AT&T manager, cautioned the group about a little-known danger crisscrossing the nation.

His topic was lead-covered cables, which once carried phone service and had long been obsolete. Weren't these ancient cables gone?

"NO," his slide presentation said. "Some older metropolitan areas may still have over 50% lead cable," the slide said. In some places, they posed risks for phone-company workers and the surrounding environment, Malone concluded.

For decades, AT&T, Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.

They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show. Environmental records from an AT&T smelting unit in the 1980s show contamination in the soil. Government agencies have conducted inspections, prompted by worker complaints, that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.

***Over the years, AT&T officials themselves expressed concern about possible worker exposure to lead. Risks include kidney issues, heart disease and reproductive problems in adults, according to U.S. health agencies.***

- 19 -

Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead.  The telecom industry's lead-covered cables have been largely unknown to the public.  The industry doesn't have a program to remove or assess their condition.  Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.

***In the 2010 presentation, Malone acknowledged the environmental impact, saying that "soils retained between 83 and 98 percent of the released lead within 2 inches" from the cables.***

"They knew the risks, but they didn't want to do a lot to mitigate it," said James Winn, who worked as a cable splicer among other jobs for several Bell System companies for 45 years.  Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

A Wall Street Journal investigation has revealed that telecom companies left behind more than 2000 potentially dangerous lead-covered cables under water, in soil and overhead.  Many more are likely to exist.

***Doctors say that no amount of lead is safe, whether ingested or inhaled, particularly for children's physical and mental development.  Without further exposure, lead stays in the blood for only about two or three months, but it can be stored in organs longer and in bones even for decades, according to Dr. Philip Landrigan, director of the program for global public health and the common good at Boston College***.

Like asbestos, lead must either be sealed away or removed completely to eliminate the risks.  USTelecom, a trade group that represents companies in the industry, said "the scientific literature and available studies" on lead- sheathed cables show they aren't a public-health issue or a risk to workers when precautions are used.

\* \* \*

***In a 2013 presentation, Malone described how workers should be protected in the field, saying "POISON" signs needed to be placed visibly for technicians working with lead, and that workers handling the toxic metal should wear respirator masks and disposable Tyvek coveralls***.

\* \* \*

### LEAD ROOTS

After the invention of the telephone in the 1870s, the first lines to go up were single-line connections strung on poles, connecting one point to another.  Tangles of wires soon filled city skies.  In the late 19th century, companies began using cables

containing bundles of wires that delivered more capacity and better transmission. Sheathing the cable in lead cut electromagnetic noise in the wires and kept water out.  By 1940, the majority of the phone network was in lead-covered cables.

There were signs at the dawn of the industry that lead could harm workers.  Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925 book "Industrial Poisons in the United States."

By 1956, the Bell System was using around 100 million pounds of lead a year, according to a Bell document.  That's heavier than more than 6,660 male African elephants.

The industry began to deploy more cables that used plastics and alternative metals instead of lead over roughly the next decade, and moved away from installing new lead cables completely, as technology improved.  Workers still maintained the old cables using molten lead and, at times, removed them.

In the 1970s, the U.S. began restricting lead in gasoline and banned lead- based paint in residential homes.  The Occupational Safety and Health Administration drafted its first standards on worker exposure to lead and other hazards.

*       *       *

A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers at Western Electric, then the manufacturing arm of the Bell System.  Based on testing, it estimated that the workers had blood- lead levels in the range of 24 to 45 micrograms per deciliter.  Those levels were as high as triple the average level of the population at the time.  Bell scientists concluded the workers were "not being exposed to a lead hazard" because a control group of Western Electric office workers also had high estimated lead levels.

Blood tests showed high lead levels in another group of workers—cable splicers, who fixed and maintained cables.  *A 1978 letter between Communications Workers of America union officials said that AT&T "has confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."*

The average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, and 29% reported central nervous system symptoms, according to a 1980 paper by Mount Sinai, Bell Labs and New York City's health department.

While regulations and lead bans drove down exposure across the population, there were still more than 40,000 telecom employees working with lead in 1983, according to a Bell System document.  Even though companies stopped deploying new lead-sheathed cables in the 1960s, the existing network still needed to be maintained, and lead-based solder has remained in use.

- 21 -

**SMELTING HEADACHES**

In the mid-1980s, AT&T was recycling large amounts of materials as it updated its systems and retired tons of lead used throughout the network. The company did the work using its AT&T Nassau Metals division, part of Western Electric.

The smelting unit, which an AT&T executive said at the time received about 50 million pounds of lead-sheathed cable a year in Gaston, S.C., received citations from the state's labor department for safety violations that affected, among others, "150 melt shop employees who are overexposed to lead."

Environmental records show lead contamination in the soil next to the site. An inspection document from 1985 said workers there were exposed to airborne lead nearly 17 times OSHA's safety standard. And a handwritten table by an AT&T official showed that among 90 workers tested that year, the average blood lead level was 33.7 micrograms per deciliter, more than twice average levels back then and nearly 10 times what's considered high today.

Under U.S. Environmental Protection Agency and state scrutiny, AT&T agreed to help clean up the site, including properly containing waste and environmental monitoring.

\*     \*     \*

The cleanup has been delayed repeatedly. AT&T's contractor has cited logistical issues including that removal could "disrupt nesting birds (bald eagles, Peregrine falcon, osprey)," according to an email reviewed by the Journal.

Testing in Lake Tahoe by the Journal in March and May of this year showed high levels of lead near the cables. AT&T said the Journal's tests conflict with its own results from March 2021. [. . .]

48.     On July 14, 2023, the WSJ released an article entitled "I was Really Sick, and I Didn't Know From What," which detailed the dangers telecom workers face as a result of handling objects covered in lead, and focused on former and current AT&T employees. It said, in pertinent part:

Many telecom employees who worked with lead over the years say they didn't know about the risks. Some have illnesses that can be linked to exposure.

Tracy Fitchhorn worked with lead solder. Her husband, Dan Fitchhorn, spliced lead cables. Her father, Peter Hopkins, handled lead as an installer and repairman. All worked for decades for telecom companies. All are now sick.

The Fitchhorns, like tens of thousands of workers at American Telephone & Telegraph and its successor companies, were exposed to lead on the job over many years.  Current and former workers say they often felt left in the dark about their exposure and how to stay safe.

Some of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure.  There's no way to determine what triggered specific ailments.  Doctors say no amount of lead is safe.

The lead, which those workers handled for decades, is a potential health risk for communities across the U.S.  The cables sheathed in the toxic metal are the subject of a Wall Street Journal investigation that has detailed how AT&T [and other telecom giants] left behind a sprawling network of cables, many of which are leaching lead into the environment.  Children are especially vulnerable to the effects of lead exposure.

AT&T dismissed "anecdotal, non-evidence-based linkages to individuals' health symptoms," saying those symptoms "could be associated with a vast number of potential causes." [. . . ]

Current and former workers described scant precautions.  Many said they learned how to handle lead on the job and weren't given respirators or regular blood tests.

Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. [. . .].

The old Bell System of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers.  They kept detailed medical records.  AT&T declined to provide anonymized blood-lead testing data about employees and retirees, including from its archives.

A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continue on their jobs," according to letters among union officials. [. . .]

AT&T [. . .] declined to comment on the studies.

49.    The article quoted Cynthia Martinez, a current AT&T cable splicer, as saying "[l]ead was taught to me out in the field.  There was no formal training, and we felt it was not a danger since everyone worked on it with no mask."  The article then stated that, "Martinez filed a workers' compensation case against AT&T last year, arguing that her work caused medical

- 23 -

troubles including kidney cancer.  AT&T denied her claim, citing a lack of supporting medical

information, according to a document it sent her."

50.     The article also stated, in pertinent part:

Martinez worked for six years melting lead solder while wearing fingerless gloves and no mask.  She later became a cable splicer, working at least once a week with aerial or underground lead-sheathed cables.  *Martinez last year had a kidney removed after a resurgence of cancer.  Lead is classified as a probable human carcinogen by health agencies*.

(Emphasis added).

51.     The article profiled Jody Fischer, a former AT&T employee.  It stated, in pertinent

part:

Jody Fischer, 69, worked with lead solder for 40 years until retiring in 2020.  *She said she couldn't get pregnant and had anemia, severe anxiety and brain fog, plus kidney-related ailments "all the time."  All have been associated with lead exposure*.

In AT&T's San Diego central offices, Fischer worked maskless, melting lead solder to connect wire.  Workers there said abandoned cables had a dusting of silvery lead so soft people would at times scribble messages in it.

(Emphasis added).

52.     The article also profiled Dan Fitchhorn, a former AT&T cable splicer.  It stated that

"Dan Fitchhorn, 70, described feeling woozy and lightheaded after working long hours with lead

in manholes.  He often washed his work clothes at home.  Regulatory standards require employers

to provide for cleaning work clothing that has been exposed to lead.  Fitchhorn has had multiple

procedures to correct heart-rhythm problems."  Fitchhorn himself was quoted as saying, "[y]ou

think about doing your job and getting a paycheck and taking care of your family.  The lead was

way, way, way in the back of my mind."

53.     On this news, the price of AT&T stock declined by $0.62 per share, or 4.1%, to

close at $14.50 on July 14, 2023.

54.     On July 17, 2023, *investing.com* released an article entitled "Telecom stocks' cuts continue on risks tied to toxic lead cables; AT&T at 29-year lows."  The article highlighted how analysts had downgraded AT&T as a result of the foregoing revelations about lead covered cables, and stated, in pertinent part:

> U.S. telecom stocks fell sharply late last week in response to the Wall Street Journal investigation about U.S. phone companies leaving behind a network of cables covered in toxic lead.
>
> Shares in AT&T Inc (NYSE: T) hit a fresh 29-year low on Friday following the WSJ report. [. . .].
>
> AT&T['s] stock selloff was accelerated on Friday after JPMorgan analysts downgraded to Neutral.
>
> "Potential copper lead sheathing liability is unquantifiable at this time, but will be a substantial long-term overhang on AT&T and the industry," they said.
>
> The in-depth WSJ investigation showed that phone companies have left behind more than 2,000 old lead-encased phone cables.  Analysts now worry that the investment needed to clean up this mess is measured in the tens of billions of dollars.
>
> As a result, Citi analysts downgraded AT&T stock to Neutral, with a "High Risk" designation. [. . .].
>
> "After the past week of discussions and research, we have concluded the industry's historical use of lead sheathed cabling is likely to remain an overhang for the stocks and valuation for at least a few months and potentially longer until the market can better measure the financial risk (if anything material) for each firm," analysts said in a client note.
>
> Similarly, Goldman Sachs analysts say the telecom stocks are now facing a new "fundamental" risk related to lead-sheathed telecom cables.
>
> The stock market reaction is understandable given that the market likely wasn't aware of the issues, say analysts.
>
> "The primary potential fundamental risk that this issue raises, in our view, is that it may take the major wireline telcos longer, and cost them more, to decommission legacy networks based on copper cables that may have lead sheathing.  Further, it may be necessary to divert capital from their fiber upgrades towards legacy network decommissioning, which could delay the timeline for completing these projects," analysts wrote in a note.

55.     Also on July 17, 2023, the WSJ released an article entitled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables."  The article stated, in pertinent part:

Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.

In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground.  The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.

A Wall Street Journal investigation revealed that AT&T [and other telecom companies] have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

"Without EPA intervention, we expect that the risk posed by the cables will increase as they further deteriorate and release lead into the environment," according to the letter by the three nonprofit organizations, the Environmental Defense Fund, Clean Water Action and Below the Blue.

The Journal used testing including isotopic analyses and control sampling to confirm that the contaminating lead in some locations most likely came from the cables.  Below the Blue's co-founders, who also work at Marine Taxonomic Services, helped the Journal with environmental sampling for its investigation.

The EPA and its administrator, Michael S. Regan, didn't immediately respond to a request for comment.

The Journal found lead leaching into soil directly underneath aerial lead cables, according to test results by independent accredited laboratories.  The Journal identified about 250 aerial lead cables alongside streets and fields next to schools and bus stops.  There are likely far more throughout the country.

"If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible, followed by removal," according to the letter, which was viewed by the Journal.  "EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered."

Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed for the Journal.

The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.

- 26 -

In response to the Journal's reporting, AT&T, [and US Telecom], an industry group, said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead.  They declined to provide a full accounting of the number of lead cables in their networks to the Journal.  They said they would work together to address any concerns related to lead cables.

***Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.  The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.***

Lead from cables and from junction boxes where cables are spliced is "accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed," the letter said.

Following the Journal investigation, a Wall Street analyst estimated it could cost $59 billion to remove all the lead cables nationwide.

Noting the EPA's limited resources, the groups urged the agency to tap telecom companies responsible for the most lead cables "to support the assessment and actions needed to protect the public from potential exposure."

In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables.  In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.

***"Does the EPA plan on compelling clean up action from these telecom companies?"  Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water.***

***Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC [Federal Communications Commission] on this so we are happy to follow up in the coming weeks."***

(Emphasis added).

56.     On the same day, the WSJ released an article entitled "Telecom Stocks Extend Losses After WSJ Toxic Lead Investigation."  The article stated, in pertinent part, the following:

Shares of AT&T [and other telecommunications companies] extended their losses on Monday as analysts responded to an investigation by The Wall Street Journal

- 27 -

that revealed U.S. phone companies have left behind a network of cables covered in toxic lead.

*     *     *

Monday's declines extend losses in the sector from last week.  AT&T [and other telecom companies] shed a combined $18 billion in market cap since the WSJ's story were first published, and that was before Monday's declines, Moffett athanson analysts Craig Moffett and Nick Del Deo said earlier Monday.

***"We could see what amounts to a general telecom buyer's strike for some time,"*** ***the analysts said.*** [. . .]

(Emphasis added).

57.     On this news, AT&T stock fell by $0.97 per share, or 6.7%, to close at $13.54 per share, on unusually high trading volume.

58.     Between July 7, 2023 (the last trading day before the WSJ exposé on lead cables was first published) and the close of trading on July 18, 2023, the price of AT&T shares fell 13.8%.

59.     Then, on July 26, 2023, after the market closed, the WSJ released an article entitled "Justice Department and EPA Probe Telecom Companies Over Lead Cables."  The article stated, in pertinent part:

The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead-sheathed telecom cables across the U.S.

***The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry***.

The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday ***directed [AT&T] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days***.  Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.

A Wall Street Journal investigation recently revealed that AT&T [. . .] and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

***The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement***.

"We are collaborating with the EPA and will provide any information requested, including our recent testing in Lake Tahoe and Michigan," an AT&T spokeswoman said.

*     *     *

***In a letter to AT&T reviewed by the Journal, the agency specifically asked for information relating to, among other things, AT&T's lead-sheathed cables in Bayou Teche, La., cited in the Journal investigation***.  The EPA said such data is "needed to evaluate the nature and extent of releases or threatened releases of lead from telecommunications cables, splice boxes, and associated equipment, whether abandoned or in use."

The EPA said a priority would be "evaluating areas with vulnerable communities and sites closely linked with children, such as schools and playgrounds."  The EPA said its Office of Land and Emergency Management and regional offices are coordinating with state environmental agencies to assess potential contamination at the sites identified by the Journal.

The Journal also has reported that AT&T has previously noted the potential risks from its lead cables in industry safety presentations in 2010 and 2013.  Current and former workers at telecom companies stemming from Ma Bell said they learned lead work on the job and didn't receive respirators or regular blood testing, the Journal has reported.

In response to the Journal's reporting, AT&T [. . .] and USTelecom, an industry group, have said they don't believe cables in their ownership are a public-health hazard or a major contributor to environmental lead.  They said they follow regulatory safety standards for workers dealing with lead.

In a statement Wednesday, USTelecom said the industry "prioritizes the health and safety of our communities and workers" and continues to "engage with policymakers on this important matter."

In an earnings call Wednesday, AT&T Chief Executive John Stankey said the company is "working cooperatively with the Environmental Protection Agency to provide them the information needed to conduct a thorough assessment of the issue using the most up-to-date reliable science."

- 29 -

AT&T has said the 2010 and 2013 presentations were about worker safety and aren't "an acknowledgement that lead-clad cables pose a general public health issue.  As reflected in these presentations, we follow best practices to maintain this legacy infrastructure in a way that's safe for all based on established science."

*After the Journal's articles, AT&T disclosed last week that lead-clad cables represent less than 10% of its copper footprint of roughly two million sheathed miles.  Analysts have estimated that to be about 200,000 miles of lead cable.  AT&T has expanded blood lead testing offered to workers after the Journal's articles*.

\* \* \*

*Last week, Gov. Kathy Hochul directed three state departments to "immediately investigate" lead cabling in New York, directing telecom providers to provide an inventory of all lead cable locations in the state.*  Hochul also directed state inspectors to conduct sampling for lead in the Wappingers Falls playground where a lead cable and contamination were identified by the Journal.

"We will hold the telecommunication companies responsible and take swift action to remediate any problems," Hochul said in a statement.

*Rep. Pat Ryan, a New York Democrat, wrote to Verizon, AT&T and USTelecom demanding they remove the lead cables*.  He also asked the companies how many miles of lead-sheathed cables they are responsible for, and about any plans to protect workers, provide access to blood and bone testing for lead, and remediate any risk.

*The Manhattan U.S. attorney's office in recent years has brought a series of civil cases related to alleged environmental wrongdoing*.  In 2021, the office announced a settlement with Toyota Motor, in which the company paid a $180 million civil penalty for failing to comply with Clean Air Act reporting requirements.  The company acknowledged that for a decade it either failed to file required emissions reports or filed them late.

(Emphasis added).

60.     On this news, the price of AT&T stock fell $0.38 per share, or 2.6%, to close at $14.51 on July 27, 2023.

61.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

**CLASS ACTION ALLEGATIONS**

62.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who acquired AT&T securities publicly traded on NYSE during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of AT&T, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

63.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AT&T securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

64.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

65.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

66.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of AT&T;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused AT&T to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of AT&T securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

67.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

68.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- AT&T shares met the requirements for listing, and were listed and actively traded on NYSE, an efficient market;

- As a public issuer, AT&T filed periodic public reports;

- AT&T regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- AT&T's securities were liquid and traded with significant volume during the Class Period; and

- AT&T was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

69.     Based on the foregoing, the market for AT&T securities promptly digested current information regarding AT&T from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

70.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

73.     During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

74.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- 33 -

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of AT&T securities during the Class Period.

75.     Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of AT&T were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents, as primary violations of the securities laws. These Defendants, by virtue of their receipt of information reflecting the true facts of AT&T, their control over, and/or receipt and/or modification of AT&T's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning AT&T, participated in the fraudulent scheme alleged herein.

76.     Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other AT&T personnel to members of the investing public, including Plaintiff and the Class.

77.     As a result of the foregoing, the market price of AT&T securities was artificially inflated during the Class Period.  In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of AT&T securities during the Class Period in purchasing AT&T securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

- 34 -

78.     Had Plaintiff and the other members of the Class been aware that the market price of AT&T securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased AT&T securities at the artificially inflated prices that they did, or at all.

79.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

80.     By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of AT&T securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against All Defendants

81.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

82.     During the Class Period, the Individual Defendants participated in the operation and management of AT&T, and conducted and participated, directly and indirectly, in the conduct of AT&T's business affairs.  Because of their senior positions, they knew the adverse non-public information about AT&T's false financial statements.

83.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AT&T's financial condition and results of operations, and to correct promptly any public statements issued by AT&T which had become materially false or misleading.

84.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which AT&T disseminated in the marketplace during the Class Period concerning AT&T's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause AT&T to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of AT&T within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they culpably participated in the unlawful conduct alleged, which artificially inflated the market price of AT&T securities.

85.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by AT&T.

86.     AT&T controlled the Individual Defendants and all of its employees and culpably participated in the fraudulent scheme as alleged herein.  By reason of this conduct, AT&T is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Individual Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)   awarding Plaintiff and the Class reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

(d)   awarding Plaintiff and other members of the Class such other and further

relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  August 18, 2023                    ABRAHAM, FRUCHTER
                                             & TWERSKY, LLP
                                           MITCHELL M.Z. TWERKSY
                                           JACK G. FRUCHTER
                                           ATARA TWERSKY
                                           LAWRENCE D. LEVIT


                                               s/ Mitchell M.Z. Twersky
                                           MITCHELL M.Z. TWERSKY

                                           450 Seventh Avenue, 38th Floor
                                           New York, NY 10123
                                           Telephone: (212) 279-5050
                                           Fax: (212) 279-3655
                                           mtwersky@aftlaw.com
                                           jfruchter@aftlaw.com
                                           atwersky@aftlaw.com
                                           llevit@aftlaw.com

                                           *Attorneys for Plaintiff*

                                           VANOVERBEKE, MICHAUD
                                             & TIMMONY, P.C.
                                           MICHAEL VANOVERBEKE
                                           79 Alfred Street
                                           Detroit, MI 48201
                                           TEL: (313) 578-1200
                                           FAX: (313) 578-1201
                                           mvanoverbeke@vmtlaw.com

                                           *Additional Counsel for Plaintiff*

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO THE FEDERAL SECURITIES LAWS

I, David Cetlinski, as Executive Director of the General Retirement System of the City of Detroit ("Detroit GRS"), having the authority to enter into and execute this Certification on behalf of Detroit GRS, hereby certify as follows:

1.      I have reviewed the complaint against AT&T Inc. prepared by counsel in the above-captioned case and have authorized its filing and a motion for Detroit GRS's appointment as lead plaintiff.

2.      Detroit GRS did not engage in transactions of the AT&T Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under the Securities Exchange Act of 1934 (the "1934 Act").

3.      Detroit GRS is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.      Detroit GRS's transactions during the relevant period in the AT&T Inc. securities that are the subject of this action are set forth in the attached Schedule A.

5.      During the three-year period preceding the date of this Certification, Detroit GRS has sought to serve as a representative party on behalf of a class in the following cases filed under the 1934 Act: *Allegheny County Employees Retirement System v. Energy Transfer LP et al.*, No. 2:20-cv-00200-GAM (E.D. Pa.); *In re Allergan PLC Sec. Litig.*, No. 18 CIV. 12089 (CM) (GWG) (S.D.N.Y.); *City of Fort Lauderdale Police and Firefighters Retirement System v. Pegasystems Inc., et al.*, No. 1:22-cv-11220-WGY (D. Mass.); and *Rammohan v. Stanley Black & Decker, Inc.*, No. 3:23-cv-00369-KAD (D. Conn.).

6.      Detroit GRS will not accept any payment for serving as a representative party on behalf of the class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this  18th  day of August, 2023.

**DAVID CETLINSKI**
Executive Director
General Retirement System of the City of Detroit

## Schedule A

General Retirement System Of The City Of Detroit
Transactions in AT&T Inc.

| Ticker | Trade Date | Transaction | Number Shares | Price / Share |
|--------|-----------|-------------|---------------|---------------|
| T | 11/27/2018 | BUY | 5,816 | 30.2580 |
| T | 12/14/2018 | BUY | 332 | 30.1959 |
| T | 12/14/2018 | BUY | 127 | 30.1430 |
| T | 12/18/2018 | SELL | (22,600) | 29.7500 |
| T | 12/21/2018 | BUY | 500 | 28.3100 |
| T | 01/16/2019 | BUY | 240 | 30.5600 |
| T | 01/16/2019 | SELL | (3,213) | 30.5225 |
| T | 03/13/2019 | SELL | (3,842) | 30.2800 |
| T | 04/04/2019 | SELL | (9,214) | 32.0128 |
| T | 04/11/2019 | BUY | 8,058 | 32.1824 |
| T | 05/07/2019 | SELL | (4,104) | 30.5300 |
| T | 05/22/2019 | BUY | 541 | 32.3672 |
| T | 06/04/2019 | BUY | 300 | 31.4800 |
| T | 06/19/2019 | SELL | (3,804) | 32.4100 |
| T | 07/10/2019 | BUY | 130 | 33.7600 |
| T | 07/12/2019 | BUY | 781 | 33.5729 |
| T | 07/15/2019 | BUY | 781 | 33.6645 |
| T | 07/17/2019 | BUY | 667 | 33.4347 |
| T | 07/17/2019 | BUY | 667 | 33.4410 |
| T | 07/17/2019 | BUY | 1,111 | 33.4499 |
| T | 07/17/2019 | BUY | 889 | 33.4684 |
| T | 07/17/2019 | BUY | 1,111 | 33.4480 |
| T | 08/27/2019 | BUY | 217 | 34.8307 |
| T | 09/09/2019 | SELL | (6,070) | 36.9983 |
| T | 10/01/2019 | BUY | 300 | 37.4500 |
| T | 10/25/2019 | BUY | 7,192 | 36.9477 |
| T | 11/11/2019 | BUY | 4,950 | 39.2484 |
| T | 11/22/2019 | SELL | (32,824) | 37.7500 |
| T | 11/26/2019 | BUY | 15,057 | 37.0350 |
| T | 12/20/2019 | BUY | 427 | 39.1500 |
| T | 02/24/2020 | SELL | (6,004) | 38.0500 |
| T | 03/02/2020 | BUY | 196 | 36.5889 |
| T | 03/20/2020 | BUY | 325 | 28.4500 |
| T | 03/23/2020 | BUY | 345 | 27.1951 |
| T | 05/12/2020 | BUY | 150 | 29.0150 |
| T | 06/17/2020 | SELL | (1,904) | 30.2600 |
| T | 06/24/2020 | SELL | (4,915) | 29.4601 |
| T | 06/24/2020 | SELL | (13,558) | 29.4093 |

| Ticker | Trade Date | Transaction | Number Shares | Price / Share |
|---|---|---|---|---|
| T | 06/25/2020 | SELL | (1,977) | 29.5525 |
| T | 06/26/2020 | SELL | (1,304) | 29.0800 |
| T | 09/18/2020 | BUY | 122 | 28.9300 |
| T | 10/14/2020 | SELL | (9,074) | 27.4900 |
| T | 11/23/2020 | SELL | (3,092) | 28.6200 |
| T | 12/09/2020 | SELL | (23,215) | 31.4085 |
| T | 02/04/2021 | BUY | 4,543 | 28.8900 |
| T | 03/31/2021 | BUY | 16,556 | 30.7300 |
| T | 03/31/2021 | BUY | 960 | 30.2700 |
| T | 03/31/2021 | SELL | (16,556) | 30.7300 |
| T | 04/06/2021 | BUY | 108 | 30.8500 |
| T | 05/07/2021 | BUY | 4,773 | 32.1600 |
| T | 06/18/2021 | SELL | (574) | 28.6500 |
| T | 06/25/2021 | SELL | (193) | 28.8900 |
| T | 06/30/2021 | SELL | (21,041) | 28.7342 |
| T | 10/22/2021 | BUY | 110 | 25.5150 |
| T | 12/17/2021 | SELL | (1,169) | 23.7800 |
| T | 12/17/2021 | SELL | (2,361) | 23.7800 |
| T | 03/18/2022 | BUY | 1,275 | 23.2200 |
| T | 03/18/2022 | BUY | 40 | 23.2200 |
| T | 06/17/2022 | BUY | 3,556 | 19.3800 |
| T | 09/16/2022 | BUY | 8,606 | 16.7400 |
| T | 12/14/2022 | BUY | 293 | 18.9000 |
| T | 12/16/2022 | BUY | 8,161 | 18.4900 |
| T | 02/09/2023 | SELL | (2,815) | 18.9700 |
| T | 02/22/2023 | SELL | (913) | 19.3800 |
| T | 03/17/2023 | BUY | 8,676 | 18.1300 |
| T | 03/27/2023 | SELL | (1,954) | 18.8700 |
| T | 04/11/2023 | SELL | (5,138) | 19.6900 |
| T | 04/25/2023 | SELL | (919) | 17.5100 |
| T | 06/16/2023 | BUY | 17,718 | 16.0600 |
| T | 07/11/2023 | SELL | (1,363) | 15.2300 |