# EXHIBIT 3

**Pages 1 - 58**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

STEVEN A. MULLEN, individually )
and on behalf of all others    )
similarly situated,            )
                               )
          Plaintiff,           )
                               )
   VS.                         )      **NO. C 20-07674 WHA**
                               )
WELLS FARGO & COMPANY, C.      )
ALLEN PARKER, TIMOTHY J. SLOAN,)
and JOHN R. SHREWSBERRY,       )
                               )
          Defendants.          )
                               )

San Francisco, California
Thursday, February 4, 2021

**TRANSCRIPT OF TELEPHONIC PROCEEDINGS**

**APPEARANCES BY TELEPHONE:**

For Movant Hawaii Employees' Retirement System:
                    POMERANTZ LLP
                    600 Third Avenue - 20th Floor
                    New York, New York  10016
               BY:  **JEREMY A. LIEBERMAN, ATTORNEY AT LAW**

                    POMERANTZ LLP
                    1100 Glendon Avenue - 15th Floor
                    Los Angeles, California  90024
               BY:  **JENNIFER PAFITI, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

**APPEARANCES BY TELEPHONE**:   (CONTINUED)

For Movant Norfolk County Council as Administrating Authority of the Norfolk Pension Fund:

ROBBINS, GELLER, RUDMAN & DOWD LLP
655 West Broadway - Suite 1900
San Diego, California  92101
BY:  **DANIELLE S. MYERS, ATTORNEY AT LAW**
**MARK SOLOMON, ATTORNEY AT LAW**

For Movant Saran Roley:

KAHN, SWICK & FOTI LLC
912 Cole Street - Suite 251
San Francisco, California  94117
BY:  **RAMZI ABADOU, ATTORNEY AT LAW**

For Defendants Wells Fargo & Company, John R. Shrewsberry, and C. Allen Parker:

JONES DAY
555 California Street - 26th Floor
San Francisco, California  94104
BY:  **JOHN C. TANG, ATTORNEY AT LAW**

JONES DAY
3161 Michelson Drive - Suite 800
Irvine, California  92612
BY:  **ROBERT M. TIEFENBRUN, ATTORNEY AT LAW**

For Defendant Timothy J. Sloan:

CLARENCE, DYER & COHEN LLP
899 Ellis Street
San Francisco, California  94109
BY:  **ADAM F. SHEARER, ATTORNEY AT LAW**

Also Present:        **Elmira Tsang, Deputy Attorney General representing the Hawaii Employees' Retirement System**
**Alex Younger, Head of Funding and Investment for the Norfolk County Council as Administrating Authority for the Norfolk Pension Fund**

**Thursday - February 4, 2021**                    **8:05 a.m.**

                    **P R O C E E D I N G S**

                         **---oOo---**

     **THE CLERK:**  This Court is now in session.  The Honorable William Alsup presiding.

     Calling Civil matter 20-7674, Mullen vs. Wells Fargo & Company.

     Starting with plaintiffs, will counsel please state your appearances.

     **MR. LIEBERMAN:**  Good morning, Your Honor.  Jeremy Lieberman, Pomerantz LLP, on behalf of the Hawaii Employees' Retirement System.  With me is my partner Jennifer Pafiti.  In addition, counsel for the Hawaii Employees' Retirement System is here, Elmira Tsang.

     **THE COURT:**  Okay.  Welcome.

     **MS. MYERS:**  Good morning, Your Honor.  This is Danielle Myers of Robbins, Geller, Rudman & Dowd.  With me on the phone are my partner Mark Solomon and Mr. Alex Younger, who is the head of funding and investment for the Norfolk County Council as administrating authority for the Norfolk Pension Fund.

     **THE COURT:**  Good morning to you as well.

     And who else?

     **MR. ABADOU:**  Good morning, Your Honor.  This is Ramzi Abadou from Kahn, Swick & Foti here in San Francisco on

behalf of Saran Roley.

THE COURT:  On behalf of who?

MR. ABADOU:  Saran Roley, R-O-L-E-Y.

THE COURT:  All right.  Thank you.

Go ahead.

MR. ABADOU:  Thank you, Your Honor.

MR. TANG:  Good morning, Your Honor.  It's John Tang with the Jones Day law firm appearing on behalf of defendant Wells Fargo, defendant Shrewsberry, and defendant Parker.

MR. SHEARER:  Good morning, Your Honor.  Adam Shearer from Clarence, Dyer & Cohen on behalf of defendant Timothy Sloan.

THE COURT:  Okay.  Anyone else?

MR. TANG:  Your Honor, it's Mr. Tang again on behalf of defendants Wells Fargo, Shrewsberry, and Parker.

Forgive me.  I neglected to mention that my colleague Robert Tiefenbrun also of Jones Day is entering an appearance as well.

THE COURT:  Okay.  How many candidates do we have?

MS. MYERS:  Your Honor, this is Danielle Myers.

MR. LIEBERMAN:  Your Honor --

MS. MYERS:  There are three candidates still pending.

THE COURT:  Okay.  Tell me who they are.

MS. MYERS:  Your Honor, my client, the Norfolk Pension Fund, is one of the candidates; another candidate is the Hawaii

State Employees' Retirement System; and the final candidate is the individual Ms. Roley.

**THE COURT:**  How do you spell Roley?

**MS. MYERS:**  R-O-L-E-Y, Your Honor.

**THE COURT:**  Okay.

All right.  What I think we should do is evaluate all three.  So let's start with the Hawaii fund.  I think the easiest way to do it is instead of the lawyer for the Hawaii speaking first, I'll let the opponent speak first and then Hawaii gets to go last.  I want to use the LIFO method -- L-I-F-O -- LIFO method so keep that in mind.

Let's hear Robbins Geller first on your criticisms of Hawaii.

**MS. MYERS:**  Thank you, Your Honor.  Again, this is Danielle Myers with Robbins Geller on behalf of the Norfolk Pension Fund.

Your Honor, since you noted that your preference is to use the LIFO method -- L-I-F-O -- I'd like to focus my argument on really the essence of the dispute, and there's really a very simple question presented this morning and it's this:  Should Hawaii be permitted to use a disaggregated LIFO method such that it can ignore the receipt of millions of dollars in proceeds from shares sold at inflated prices during the class period thereby claiming a larger disaggregated LIFO loss than the Norfolk Pension Fund?

And, Your Honor, we respectfully submit that the answer is no, and there are several reasons why.

**THE COURT:**  Okay.

**MS. MYERS:**  If the Court adopts this disaggregated LIFO method -- and what I mean by that, Your Honor, is on an account-by-account basis instead of a grossed-up basis -- there are three problems with Hawaii's accounts.  Two of the accounts, Your Honor, are what's called net sellers/net gainers.  And what that means is that within the confines of the class period and ignoring all preclass period shares, Your Honor, which is why you adopt the LIFO method is to ignore preclass period shares, so within the confines of the class period, the Hawaii pension fund has two accounts in which it sold far more shares than it purchased and it received millions of dollars more at inflated prices than it expended, Your Honor.

And there are numerous decisions, including by Judge Koh in the *Perlmutter* case -- it's P-E-R-L-M-U-T-T-E-R -- which is cited in our papers, which articulate the concern in appointing accounts and movants that are called net sellers/net gainers, even, Your Honor, if they have a FIFO or a LIFO loss.

And the reason that Judge Koh articulated is that they benefited from the artificial inflation during the class period, and that's a concern that defendants could raise at the class certification stage because the whole point, of course,

of the securities laws is to make sure that you're compensating someone who was harmed by the alleged fraud, not benefited from it.

And, Your Honor, we pointed out that accounts to and for for Hawaii are massive net gainers to the tune of 9 million and almost $5 million, Your Honor, and those numbers are not accounted for in their disaggregated LIFO account.

Now, in their reply brief, Hawaii says that it's irrelevant that they were a net seller or net gainer because, again, they have an overall loss and this case involves multiple partial disclosures.  And they cite Your Honor's *Network Associates* decision and also Judge Breyer's decision in the *Nicolow* -- N-I-C-O-L-O-W -- vs. *Hewlett Packard* case; but, Your Honor, neither case stands for that proposition.

Your Honor's *Network Associates* case did not even address the question of whether a movant was a net seller or net gainer and neither did Judge Breyer's decision in the *Hewlett Packard* case because the question was mute -- sorry -- was moot.

Hawaii's reply brief also says, "Well, we have a FIFO loss or a LIFO loss," but that's apples to oranges, Your Honor. Again, as I explained, the whole point of the net seller/net gainer analysis looks at what you expended and received within the confines of the class period without regard to the preclass period transactions.  So there's no offset in the net seller/net gainer analysis.

And if you received more money during the class period than you expended, you are a net gainer; and that's why -- these factors that the Hawaii fund urges in their reply brief that Your Honor look to, that's why they are, in fact, relevant, they're objective, you only look to class period transactions, and they can reveal unique defenses like the net gainer status.

And Judge Koh's *Perlmutter* decision really hits on the problem and why this is disqualifying because they artificially benefited from the artificial inflation.

So, Your Honor, because of this problem, we urge you to adopt the actual LIFO method; and under the actual LIFO method, my client, the Norfolk Pension Fund, has a $6.1 million loss where Hawaii has a $5.7 million loss.  So my client, the Norfolk Pension Fund, actually has the largest financial interest.

And importantly, Your Honor, even under the disaggregated LIFO method that Hawaii prefers, which is the account-by-account LIFO method, when you exclude the two accounts that are net gainers and the account that only had sales, therefore, it only gained, again, my client has a larger financial interest.  Norfolk's interest is $6.1 million no matter how the loss is calculated:  Under FIFO, actual LIFO, or Hawaii's disaggregated LIFO method.

Hawaii's loss fluctuates.  It's either $3.5 million, which

again is less than my client's, on the disaggregated LIFO when you exclude the two net gainer accounts and the third account that just had gains, or it's $5.7 million on the actual LIFO method.

And, again, the reason we argue you should adopt the actual LIFO method is because Hawaii itself has historically used this method in every single lead plaintiff motion it has ever filed, Your Honor.  It has moved for lead plaintiff eight prior times and in every single one it used the actual LIFO method, not an account-by-account method.

In addition, Your Honor, the Hawaii fund, the state statute establishing it establishes that the fund itself is, in fact, one fund.  The Hawaii annual report that reports its financial status for the year says that the pension trust is considered a single plan for accounting purposes.  That means everything is fungible, Your Honor.

And because Hawaii has never separated its financial interests by account in any of its eight prior lead plaintiff motions, Your Honor, we looked at one of them, which was the *Petrobras* case, which was a fairly recent and large settlement. Hawaii was a class representative in that case.

And on the claim form, Your Honor, they actually say that a single proof of claim form should be submitted on behalf of one legal entity even if transactions were made by separate accounts.  And in the plan of allocation, Your Honor, the plan

of allocation says that an authorized claimant's net gain or loss is calculated as the total amount paid for all securities purchased minus the total proceeds received from sales.

So even in settling --

THE COURT: Let me interrupt. What is it you're reading? I followed everything up until -- I lost it where you were reading from something, but I can't -- I want to know what it is.

MS. MYERS: Yes, Your Honor. It's the *Petrobras* claim form. We attached it as Exhibit 10. It's ECF Number 54-10, and I'm reading from page 4, paragraph 5.

THE COURT: But why is that relevant?

MS. MYERS: It's relevant, Your Honor, because it shows that even in settling litigation, Hawaii itself uses a grossed-up or the actual LIFO or FIFO accounting method, Your Honor. It does not conduct an account-by-account methodology.

THE COURT: Oh, okay. So this was -- all right. Let me -- I'm not familiar with the form, but you're -- I think what I'm inferring is that in some other case where Hawaii was the lead plaintiff, the settlement procedure followed in that case by the lead plaintiff forced an aggregated system on the claimants.

MS. MYERS: Yes, Your Honor. The only clarification I have is that Hawaii was a class representative in that case.

There were three or four class representatives that had been certified when the case settled.

But, yes, Your Honor, that's exactly right.  They forced on the class --

THE COURT:  You're confusing me.  I said was Hawaii the lead plaintiff or a lead plaintiff in that case.

MS. MYERS:  No, Your Honor.  The lead plaintiff was a fund from the U.K. called USS.  Hawaii was one of four or five class representatives in that case along with the lead plaintiff USS.

THE COURT:  Okay.  I'm just not familiar with that system.  I just appoint one lead plaintiff.  I don't have an amen chorus in my cases so I don't know what -- what good does that do you if they weren't the lead plaintiff?  I thought you were saying they were the lead plaintiff.

MS. MYERS:  Your Honor, the settlement was approved and endorsed by Hawaii as a class representative.  Once it got to the class certification stage, Hawaii was a speaker for the class, Your Honor, akin to a lead plaintiff.

THE COURT:  All right.  While I'm interrupting, let me ask.  I want to make sure I understand your basic point.  I get the point that Hawaii had I think it's five accounts internally and it traded in the stock in question, and then it -- and some of those accounts benefited because they were net sellers; but by -- I guess what I'm trying to say is when you -- you want to

merge all of the five accounts together, consolidate them, and then use the LIFO method; and when you do that, I think you said you come out to 5.7 million loss as opposed to yours would be 6.1.  Is that -- do I have it right?

MS. MYERS:  Yes, Your Honor.

THE COURT:  Okay.  Now, is there any case where a disaggregated method was used to select the lead plaintiff?

MS. MYERS:  No, Your Honor, and they have not cited any.

And, Your Honor, I reviewed all of your prior lead plaintiff decisions, and you have never approved of a disaggregated method.  You have only approved of the actual LIFO method; or in the *Network Associates* case, which was before the *Cavanaugh* decision, you did look to net shares, but that was a fairly unique circumstance in which the methods didn't make sense.

And, Your Honor, there was also one other example, the *Geron* case -- G-E-R-O-N -- and that involved a situation in which there was a husband, a wife, and they had separate legal accounts because they were separate legal entities, and they had a joint account.  And so in that instance, because there were separate legal entities or people who moved, those were separate accounts and Your Honor approved of that.

However, here Hawaii, as the local state statute provides, is one retirement system and Hawaii presents itself to the

public and internally as a single plan for accounting purposes. They are not separate legal entities.

In their reply brief, Your Honor, they noted that my law firm has represented another entity in a case called *American Realty Capital Properties*. The entity there was TIAA, which Your Honor may be familiar with, and they say, "Well, Your Honor, look at that lead plaintiff in that case and Robbins Geller represented somebody with separate accounts."

Your Honor, in that case TIAA is actually a trade name. It is not the legal entity. There are separate accounts and legal entities and each one of those was separately represented in that case and separately named as lead plaintiff and class representatives.

So that's another apples-to-oranges comparison, Your Honor. When separate legal entities move, of course you represent their accounts on an account-by-account basis. When one legal entity, like the Hawaii Employees' Retirement System or my client, the Norfolk pension system, moves, you present the information on a grossed-up aggregate basis not account-by-account.

**THE COURT:** Okay. Let me -- I may give you more time, but let me hear from Hawaii.

Well, wait. First, who is it that's representing Roley?

**MR. ABADOU:** It's me, Your Honor, Ramzi Abadou from Kahn Swick here in San Francisco.

**THE COURT:** All right. Do you want to speak against Hawaii?

**MR. ABADOU:** Your Honor, I don't want to speak necessarily against anyone, but I will point out something that I thought was notable in reviewing the papers, and I reviewed them carefully and am familiar with all the arguments that are being made.

And I would point Your Honor to Document 53, which is I believe the Norfolk opposition, and Footnote 7 of that brief lists numerous cases -- I think there are eight, including *LendingClub* before this Court -- where Hawaii presented its losses according to what Norfolk says it should have done here.

On reply, I looked at Norfolk's -- I'm sorry -- Hawaii's papers to see if they'd respond to that argument, and I couldn't find any argument. So from Ms. Roley's perspective, that's somewhat troubling that they didn't respond to that argument, but that's all I have.

My client, Your Honor, is well aware that she could stand back and allow somebody else to serve as lead plaintiff, presumably Norfolk I think here, but she's an individual investor. This was her retirement egg. She wanted to press forward with her application given that Judge Armstrong and Judge Illston had previously in this district appointed individual investors alongside institutions.

I know it's not this Court's preference or practice to do

so, but there is safety in numbers oftentimes, and I think she would lend a unique perspective to the litigation and suffered a substantial $885,000 loss, which for an individual retiree is significant, and I think she would bring an interesting perspective and motivation to the case if the Court were inclined to appoint an individual investor alongside Norfolk.

**THE COURT:** Well, okay. Thank you for those comments.

Let me hear now from Hawaii.

**MR. LIEBERMAN:** Yes, Your Honor. Jeremy Lieberman from Pomerantz on behalf of the Hawaii Employee Retirement Systems.

Your Honor, it's very simple. In the accounting literature, from the IRS guidance, from guidance that we cited from Wolters Kluwer, simply from a 1099 form, that when you apply LIFO, that is an inventory methodology and you apply that when you file your tax return, you apply it on an account-by-account basis.

Your Honor, there's no real -- there's no great question. It's a matter of when you're matching purchases and sales, you ask yourself: I have a bunch of purchases and sales and now I'm making a sale of part of my accounts. Which transaction do I match my sale to? Which purchase?

Now, the Norfolk Pension Fund is saying you should match your sale to a purchase in an entirely different account. Your Honor, that eludes basic common sense. If you ask any tax

guidance, and as we showed from the claims administrator from Paul Mulholland, who has done dozens of transactions, when any claim form comes in or when you have a -- when you file any tax return, it is understood in the accounting literature, it's understood by the IRS that when you match purchases and sales, you match a purchase and a sale in each and every account.  You don't start -- here in our particular situation, you have five accounts, five different investment managers.  One could be Blackrock.  One could be AllianceBernstein just as an example.

What Ms. Myers is saying is the sale by the AllianceBernstein share should be matched to a purchase by the Blackrock share.  That simply makes little sense.  It's an -- LIFO is an inventory methodology so it talks about -- you talk about barrels of wine in a storehouse and various barrels are coming in to different rooms in that storehouse and you say, "Well, I'm selling this barrel of wine."  And you're saying, "Which barrel am I selling?  How am I going to match this sale to which barrel that came in?  Do I look at the first one or do I look at the last one that came in?"  And you say, "I look at the last one that came in."  But you don't go looking at a barrel of wine that came in a different room.  You look at all the barrels in the same room.

It's simply if this Court would make a ruling that is inappropriate to look at LIFO and FIFO from an account-by-account basis, Ms. Myers is wrong.  There's no court

that is on record that has analyzed that she is taking the issue up as a matter of a question of law and said -- and turned the LIFO definition on its head and said, "When we match, we're going to throw all of the transactions into one big mosh and now we're going to do the last-in-first-out methodology."

Ms. Myers does not cite to one case on record that's addressed that question and looked at that question and said, "Okay.  No, we've got to throw all the accounts into one, ignore that they're separate accounts, ignore that they're separate investment managers, and now we're going to match as one big glom."  That makes -- that defies common sense.

When I want to see which share I'm purchasing and which one I'm selling, I look at the account that I have and I say, "I'm" -- it's not clear to me when I'm selling a share, am I selling, you know, a share that was the most recently purchased or am I selling one that was purchased first.

And when I look at that, I look at the accounts.  I can't sell a share that's in a different account.  That's not how you match it.  You can only sell a share that's in your account.  And when you're coming up with LIFO/FIFO, you're coming up with the best way to come up with a calculation and a matching methodology for the inventory of shares that you have.

This is -- LIFO and FIFO is not made up with the PSLRA lead plaintiff financial interest consideration.  This is an

accounting methodology that has lasted for decades, for I would say over 100 years, and the IRS has a clear guidance of how this is treated and accounting literature has guidance how it's treated.

Ms. Myers has not cited to one piece of guidance that says you don't look at it by account by account.  Common sense tells you when you want to sell a share, you can only sell a share in your account.  I can't cross accounts, particularly when accounts are run by different investment managers.  So it has to be done by an account-by-account basis.  There's no other way to do LIFO.

THE COURT:  You're talking so fast I can't get a word in edgewise.  I've got a question.  I'm sorry.

MR. LIEBERMAN:  Sure.

THE COURT:  Can you hear me?

MR. LIEBERMAN:  Yes.

THE COURT:  All right.  Explain to me the names of the -- I want to get the details here so give me the names of the five managers in Hawaii who actually work for Hawaii.  Then I'm going to give some follow-up questions.

MR. LIEBERMAN:  Your Honor, I can get that for you, but I don't have it in my pile of papers.  I can run and have my analyst quickly get it.  But one is Blackrock.  I don't know -- I don't have offhand the names of the other investment managers on me, but they were separate --

THE COURT:  Wait.  Wait.  Blackrock.  You're telling me that Blackrock works for Hawaii?

MR. LIEBERMAN:  Yeah, the Hawaii investment manager, sure.

THE COURT:  I don't get it.  I thought Blackrock was a mutual fund; it had nothing to do with Hawaii.

MR. LIEBERMAN:  They had investment advisory services where pension funds like Hawaii will retain them to manage their money and make purchases and sales of securities on their behalf.

THE COURT:  All right.  So let's say we've got Blackrock.  We'll start with that one while maybe one of your associates gets the others.

So did Blackrock just invest in Wells Fargo or did it invest in other securities too?

MR. LIEBERMAN:  Oh, no, it would be investing in different securities on behalf of Hawaii as an investment manager.  I would imagine that Norfolk has its own investment managers and that most institutional investors don't have in-house investing.  When they are purchasing securities, they are usually tasking a variety of investment managers to make -- within guidelines provided by Hawaii, by the investment fund, to invest them according to those instructions.

THE COURT:  Wait.  Wait.  You're veering off into your talking points and not answering my question.

All right.  Let me come at it a different way.  Within Hawaii itself, within the lead plaintiff itself, is there a name or names of the five people who were running the five accounts?

MR. LIEBERMAN:  Yeah, we can provide names of the investment managers that made the purchasing decisions as an agent for Hawaii.

THE COURT:  Were they employees of Hawaii?  What were they?

MR. LIEBERMAN:  No.  They're retained outside investment managers by Hawaii to make investment decisions according to the mandates and instructions given by Hawaii; and that is typical, my understanding, Your Honor, of 80 percent of the institutional investors in the United States and abroad. You typically don't have an internal investment team making purchases and sales decisions.  You typically will find -- you retain various investment managers to make investment decisions on your behalf based on general instructions that you provide to that investment manager.

THE COURT:  Who was it at Hawaii who interacted with the Blackrocks and the investment managers on the outside to give them instructions?

MR. LIEBERMAN:  It would be their investments -- it would be the investment -- maybe Ms. Tsang can give the precise answer, but it would be the -- Elmira, do you have an answer to

that question?

THE COURT:  I'd like a name.  I'd just like Joe Jones or Mary Smith.  You know, what was the name of the person in Hawaii?

Come on, you should know this.  You're coming in here and asking for a big position and you don't know the basic facts.  Who was it at Hawaii, the name of the person, who interacted with Blackrock?

MR. LIEBERMAN:  Your Honor, I personally can't answer that question at this moment.

THE COURT:  All right.  Is there somebody on the line with you that could answer that?

(Pause in proceedings.)

THE COURT:  Hello?  Earth to caller.

MR. LIEBERMAN:  Your Honor, it doesn't -- we don't -- I don't have that precise information at this moment.  It would be the --

MS. TSANG:  Oh, hi.  I apologize.  I was on mute.  I'm sorry, Your Honor.  This is Elmira Tsang.  I'm a Deputy Attorney General with the State of Hawaii, and I work with the Employees' Retirement System of the State of Hawaii.

We have an investment manager -- I mean, investment officer that is an employee of the State of Hawaii, and his name is Anthony Goo and he works with what we hire called investment managers, and the investment managers in this case

were Blackrock.  It was also Longview and it was also the acronym on the account listings I have is AB MID, and then there's also a GTWY -- and they're in acronyms -- and then we have a transition manager which I think is Pavilion, and then we also have Barrow Hanley.

And we hire -- we hire these investment managers to basically buy stocks according to our investment structure, and we don't -- our investment officer, Mr. Goo, does not look at the stocks individually but he tells them what the ERS mandates; and then within the mandates, the investment managers we hire have discretion within a box to purchase individual stocks.

THE COURT:  All right.  I think you gave me -- go through the list of the investment managers again.  Blackrock?

MS. TSANG:  Okay.  So Blackrock.  We also have a transition manager.  We had a transition manager because we transitioned our investment strategy, and I think our transition manager may have been Pavilion.  It's listed in these transactions simply as transition so I have to confirm that for you.

We also have a BOH, and I'm not sure who that is.  I think that's a Bank of Hawaii.

We also have a GTWY.  And I couldn't tell you what that acronym stands for at the moment.

We also have Barrow Hanley.

We also have Longview.

And then, of course, we have Blackrock.

THE COURT:  What was it?  Barrell, B-A-R-R-E-L-L?

MS. TSANG:  Oh, Barrow, which is B-A-R-R-O-W.  Hanley is --

THE COURT:  What was it?

MS. TSANG:  Barrow, B as in boy, A as in alpha, R as in Ryan, R as in Ryan, O as in Oliver, W as in Walter.

THE COURT:  Okay.  And the second name was what?

MS. TSANG:  Hanley, H as in Harry, A as in alpha, N as in Nancy, L as in Larry, E as in echo, Y as in yes.

THE COURT:  Okay.  Thank you.

MS. TSANG:  And then I also have a C.S. McKee that I forgot to mention.  So we have about -- we have about 10 accounts here and they appear that sometimes these managers have more than one account.  Maybe they establish different accounts for us under different mandates.

THE COURT:  Well, I thought there were only five accounts that had traded in the Wells Fargo stock.  So which of these were the ones that -- of these accounts are the ones that had Wells Fargo?

MS. TSANG:  All of these -- all of these accounts had a Wells Fargo.  So, let's see, Account 1 would be Blackrock.

Account 2 is Longview.

Account 3 is AB MID LG.

Account 4 is GTYW -- I mean, I'm sorry; I have a bit of dyslexia -- GTWY.  That's Account 4.

Account 5 is our transition account.  I think that is Pavilion.

Account 6 is Barrow Hanley.

Account 7 is C.S. McKee.

Account 8 is BOH, and I think that stands for Bank of Hawaii.

Account 9 again is GTWY.

Account 10 again is a transition manager.

**THE COURT:**  Is that Pavilion?

**MS. TSANG:**  Yes.  We might have hired different transition managers for different times of transition, but I believe this was Pavilion; but on our list of accounts the way our -- the way our custodian bank listed is as transition.

**THE COURT:**  Well, here's what I'm -- I'm sure there's an easy answer, but I thought there were just five accounts that Hawaii was advancing as relevant, and now you're telling me there are 10.

**MR. LIEBERMAN:**  Your Honor, there's five accounts with relevant transactions and Wells Fargo common stock.  There's Blackrock, Longview, there's transition, and AB Mid Long.  I believe that's AllianceBernstein.

**THE COURT:**  Well, I thought Ms. Tsang was telling me that Wells Fargo stock was traded in all 10 accounts.

Ms. Tsang, what's the answer to that?

**MS. TSANG:**  Yes, Your Honor, I am looking at a list that was attached to our motion, and it's a list from our -- I think -- correct me if I'm wrong, Mr. Lieberman -- this is a list generated from our custodian bank that counsel has -- we put them in touch with to have them obtain the information.

**THE COURT:**  Well, my question is:  During the relevant class time period, did all 10 of these accounts hold a purchase or hold Wells Fargo stock?

**MS. TSANG:**  I would have -- I'm going to defer to Mr. Lieberman.

**MR. LIEBERMAN:**  The custodian of records are provided and we've checked with Hawaii as well.  Only the five accounts had 11 transactions in Wells Fargo common stock and that would be Blackrock Alpha, Longview, AB Mid Long -- I assume AB is AllianceBernstein -- Gateway, and a transition account.

**THE COURT:**  Okay.

**MR. LIEBERMAN:**  And then if we're going to the topic of how do we do LIFO and how do we match inventory, it makes -- there is -- given that -- and this is the structure that one large pension fund would outsource its investment management or its stock picking, as it were, to an investment manager is typical for the overwhelming majority of institutional investors.  And I would -- Norfolk will speak for itself, but I believe they do as well.

But -- so then when we're speaking of matching, you're talking about, well, according to Ms. Myers, we would match a purchase of Blackrock to -- or a sale of Blackrock to a purchase of AllianceBernstein; and there's just no accountant, accounting firm, no tax authority, nobody would say that that's appropriate. That's just -- that defies --

THE COURT: On that point, there must be -- if you're correct, there must be an accounting board, FASB or something like that, that explains that when you're applying the LIFO, that you stick with one account and you don't mix and match accounts. Is there such an accounting board statement?

MR. LIEBERMAN: Sure. Your Honor, we provided PwC guidance that says when you're looking at generally doing LIFO and FIFO, you look at each pool, you look at separate pools. Then we provided tax guidance, the IRS form itself that we provided, as well as the Wolters Kluwer guidance said when you are doing your FIFO for purposes of taxes, you only consider the account you're doing a transaction on. You do not consider transactions in other accounts when you perform that.

THE COURT: Well, you didn't answer my question. When you say PwC, do you mean Price Waterhouse?

MR. LIEBERMAN: That's correct. That's correct.

THE COURT: Price Waterhouse is just an accounting firm. I asked you is there an accounting standard from the Accounting Standards Board or FASB that backs up what you're

telling me.

MR. LIEBERMAN: Other than the IRS guidance that was provided, I don't have the -- I don't -- I didn't -- we didn't cite any FASB and I don't have anything on record, but we did cite to the IRS form in the brief. We attached that as an exhibit, and there it clearly says you don't look at the transactions outside of the accounts. When you perform FIFO, you go to the transactions in the account that you're performing the calculation for.

And I would provide all --

THE COURT: Let ask a different question. I want to -- somehow I have an intuitive feeling, but it must be incorrect, that whenever you disaggregate versus aggregate, somehow when you -- you still have to add the numbers up at the end and somehow the numbers ought to come out the same.

So I want you to give me a simple example, hypothetical example. I may have to get the other side to do it because you're motivated not to. I'd like to get a simple example before me.

Let's just, say, take two accounts, a hypothetical where you have two accounts and explain why it would not come out to be exactly the same either way.

MR. LIEBERMAN: Because basically -- I mean, we can come -- we can come up with a scenario but at the end of the day, you're trying to figure out, you know, which shares are

purchased and sold during the class period and which is preclass period.

So you have a certain amount of preclass period shares and so if it's 100,000 shares and you're selling only 50,000 and then you're asking, "Well, which 50,000 did I sell?  Did I sell my most recent purchase or did I sell, you know, the first of my first purchase?"  And so when you're doing that, it will depend on if you're isolating by account.  Then you're matching certain transactions to certain purchases within that account first and then you aggregate the ultimate loss.

And the difference here, you know, is as stated, between 8.6 million to 5.7 million, but those types of matchings do make a difference if you cross accounts.

And so that --

**THE COURT:**  Let me take an example.  Let's say you have Account A and Account B, and Account A starts with before the class period 100 shares and Account B has zero shares.  And then the class period starts, and then in Account A there's -- nothing happens for a while but at the very start of the class period, one day later class -- sorry -- in Account B 100 shares are purchased.  So now both accounts have 100 shares.

And then you go to near the end of the class period and let's say 20 shares are sold in Account A.  Then the class period ends and Account A still has 80 and over at Account B, it still has 100.

I don't know if this is going to illustrate the problem or not, but I'm trying to learn.  So if you take the -- let's say that the shares in the preclass period are not inflated but that the shares in Account B, which were purchased in the class period, were inflated by let's say 10 percent.  So if you were to -- if you were to deduct -- I don't know.

All right.  Who is it that represents Norfolk?

**MS. MYERS:**  This is Danielle Myers, Your Honor.

**THE COURT:**  Yeah.  I want you to illustrate your point with the example that I just gave so that I can see the point you're trying to make so that I don't just talk out loud.

**MS. MYERS:**  Sure, Your Honor.

Well, the point that you just made about Account A and Account B where Account A had 100 shares before the class period, Account B had zero shares before the class period, Account B then purchased 100 shares at the beginning of the class period and Account A sold 20 shares at the very end of the class period, Your Honor, this perfectly illustrates the problem that Hawaii is trying to avoid, and they're trying to avoid the economic reality to Hawaii of these transactions and trying to manipulate how their overall financial interest is presented.

Let's assume that those 20 shares that were sold were sold at $1,000, Your Honor, and that those 100 shares were purchased at $1.  They would have you ignore that $900 benefit that they

received during the class period at artificially inflated prices and say that, "No, no, no. Only the 100 is relevant."

Your Honor, that's not the economic reality of what happened to Hawaii itself. Hawaii is the entity. The state statute makes that clear. It is the legal entity and all of its funds are fungible as to Hawaii. They're in one pot, Your Honor, and they're available for all pensioners. They're not separate.

**THE COURT:** Wait. Stop. Stop. I'm not following. I want to understand -- you're making a speech in running for Congress and that's not helping me right now. I want to understand the math.

Go back to the -- give me a more realistic -- people don't buy stock for $1 and sell it for 1,000 later. Let's say on Account A you buy it before the class period so by definition there's no inflation. It's bought -- it's a fair price but it is sold in the class period -- 20 shares are sold in the class period and by definition there's going to be some inflation. What I'm trying to understand is -- let's do the math on this.

So let's say there's going to be some inflation in that and -- so I guess your point is -- I'm trying to understand your point.

Your point is that those 20 shares were sold and got the benefit of the inflated price because it occurred during the class period.

Let me stop there and say, I've got another question, but is that much correct in your view?

MS. MYERS:  Yes, Your Honor.  And their Account 4 -- if you want to look at it in a concrete way instead of a hypothetical way, Document 47-3, which is the Hawaii loss chart filed with their motion, Account Number 4 illustrates this point that we're talking about in the abstract but in a concrete way.

THE COURT:  All right.  I don't have that in front of me.

MR. LIEBERMAN:  Your Honor, may I interject?

THE COURT:  No.  No.  No.  No.

MR. LIEBERMAN:  Okay.

THE COURT:  I'm going to come to you.

MR. LIEBERMAN:  Okay.  Great.  I'd like to address the point regarding inflation and that selling because we haven't discussed that yet because that's an important point I'd like to address.

THE COURT:  I'll come back to you.

MR. LIEBERMAN:  Okay.  Thanks.

THE COURT:  I want to stick with Norfolk for a second.

All right.  Now, I can see the point that under A, Account A, got the benefit of the inflation.

All right.  So now let's say if we have moved that 20 to the other account so that the 100 shares that were purchased

were inflated and then there is 20 that we brought that over, that would be a net of 80, that would still be a net purchaser.

So I don't know.  This is -- I guess I'm not coming up with an example that would show a net seller during the class period.

**MS. MYERS:**  That example, Your Honor, would show the net gain, which is the problem.  The net seller in and of itself, Your Honor, everyone agrees is not a problem.  The law is very clear on that, Your Honor.

It is only when you are what's called a net gainer that there is a problem, and this example captures that because what Mr. Lieberman would have you do by doing the account-by-account basis is ignore the benefit from selling during the class period at artificially inflated prices when there are not purchases in that account as well.

So when there are only shares sold in the account, you just ignore them.  That's not what Your Honor held in the *Sipex* case as to why we look at the economic reality and LIFO.  We don't want to allow movants to distort their true financial interest.  Ignoring all of the sales during the class period in an account when, again, all of the money is Hawaii's in one big account, it makes no economic sense, Your Honor.

And if I can touch on the IRS point that Mr. Lieberman raised, he made a big deal about the forms that they attached and the tax return forms, the 1099 form.  Your Honor, Hawaii is

a public retirement system.  They're not subject to the individual income tax.  So it's just a completely inapposite reference to a secondary source.  It's just not applicable to Hawaii itself.

And, again, Hawaii has never done this before so the artificiality of this approach is highlighted by all eight of their prior motions.

And Mr. Lieberman said that there wasn't a case that we pointed to but, Your Honor, *Petrobras* is that case.  And when you look at Document 44-13, which is the claim form and plan of allocation in that case, it not only says that each entity, regardless of how many accounts they have or managers that they have, submits one claim form; but the recognized claim and the plan of allocation says that an authorized claimant's gain or loss is calculated as the total amount paid for all securities minus the total proceeds received.  It doesn't say on an account-by-account basis.  It says "all," Your Honor, and "total."  These are not done on an account-by-account basis.

It further has an instruction that says (reading):

"For authorized claimants who make multiple purchases or sales of the stock in the class period, the earliest sale is matched against the first purchase."

And they're matched chronologically thereafter, Your Honor.  It doesn't say that you go account by account.

And, again, Hawaii was one of the class representatives.

In Ms. Tsang's questionnaire she says they were a lead plaintiff but, in fact, they were a class representative.

That is the perfect illustration, Your Honor, of this concept.

THE COURT:  All right.

MS. MYERS:  And, again --

THE COURT:  Mr. Lieberman, you wanted to respond.

MR. LIEBERMAN:  Yeah.  Your Honor, there's a lot of discussion, you know, because we've been talking about LIFO/FIFO and how to do it.  Your Honor, the 1099 form from the IRS is clear.  The Wolters Kluwer guidance is clear.  The PwC guidance is clear.

If this Court would rule that the proper way to do LIFO is as Ms. Myers suggests, it quite frankly would be in direct contradiction as to the -- as to all the guidance we've said and to the commonsense way.

THE COURT:  But how do you answer the point that in that other case, I think it was called *Petrobras*, I don't know for sure, but that you yourself, or at least your client, told the class members they had to aggregate and put the total and they could not do it account by account?  That seems to be --

MR. LIEBERMAN:  Your Honor, the portion cited in the brief, I don't have -- I'll try to look at the claim form Ms. Myers now is citing to, but the portion cited in the brief said that each claimant needs to file one claim form.  It

didn't say you're forbidden from calculating your LIFO/FIFO account by account.

But that being said, Hawaii was not only plaintiff, they were class representative, and how the *Petrobras* class allocation might have been organized is clearly not binding on this Court.

As we put in by, you know, Paul Mulholland, who's done hundreds of claims administrations, if he would get a claim form by a client, particularly if it's done by different investment managers, and he would get even one claim form but it would show different accounts -- Account 1, Account 2, 3, and 4 -- he would look at each one separately.  And the reason why he would do that is because he's familiar with tax guidance, he's familiar with Wolters Kluwer guidance, and he's familiar with the guidance cited by PwC.

So all of a sudden Ms. Myers is going to now take a leap and say, "Well, this is all fungible."  It's not fungible. Blackrock can't sell AllianceBernstein's shares.  They cannot. They had no ability to do so.

And so if this Court is going to ignore the reality -- or Ms. Myers is suggesting the Court ignore the reality of the transactions here.  Under no circumstance can Blackrock sell an AllianceBernstein share.  And if the Court then is looking at the reality of how you can purchase and match a share, you have to look account by account particularly by different investment

managers.

There's been a lot of discussion about the inflation and gains by Hawaii of inflation, and I haven't had an opportunity to address that because I think it's very important to understand that the complaint alleged by -- the Mullen complaint alleged by Ms. Myers, there are multiple corrected disclosures.

And so what Ms. Myers is saying is, "Well, certain accounts may have benefited."  Not Hawaii as a whole because Hawaii as a whole is a net seller by over a million dollars so they've -- they've -- excuse me -- they're a net purchaser by over a million dollars.  They purchased $11 million more during the class period than they sold.

However, just looking at the accounts, they want to all of a sudden look at the net seller, or net gainers as they say, on an account-by-account basis.  Look at Account 2, all of the sales of Account 2 of Hawaii, which begin on July 6, 2020, each and every sale, and there's 612,000 shares sold, were all after the first alleged corrected disclosure.  They're not a net gainer.  They're losing.  They're losing serious money after each and every alleged corrected disclosure.

And in Account 2, four -- all their shares were held through four of the five alleged corrected disclosures.  Based on their own pleadings in Ms. Myers' complaint, she can't say that Hawaii is a net gainer.  First of all, they don't have the

transactions before the class period to show whether they gained or lost.  They have lost money on their preclass period transactions.  We actually provide that to the Court and that argument has been made.  We even went back to 2014 and there's been no allegation of a net gainer.

But if you look at during the sales, the overwhelming majority of sales, even under this account-by-account basis, which is a fabrication, are all after the first alleged disclosure and they're all after four of the five alleged disclosures.  That is getting seriously damaged by the fraud.

So to say here that we have a net gain by Hawaii is simply -- all of a sudden to ask the Court -- this would be the first Court to look at a net gain or net loss on an account-by-account basis, but it would ignore the basic pleadings of this complaint, which allege that starting April 2020 the stock starts to get hurt by the disclosure of the alleged fraud.  Hawaii is getting damaged each time it sells.  After that date, they're getting hurt and damaged by the deflation in the share price and nearly all of their sales that are in the class period are after that date even using an account-by-account basis.

So Ms. Myers is asking this Court to take a great leap -- two great leaps:  One, ignore standard definitions of LIFO/FIFO, create a new one for the PSLRA.  We're going to ignore we have five investment managers who were not able to

sell each other's stock and now we're going to fake pretend they could have and let's create a fiction for the PSLRA.

Then Ms. Myers wants you to take another leap and say, "No, in addition to that we need to look at net gain and net loss.  Ignore the fact that Hawaii has 11 million in a net loss, ignore that basic fact and now let's look at it account by account."

And when she says that to you, she's asking you to ignore one other thing.  She's asking you to ignore that all of the overwhelming majority of the sales occurred after the first alleged disclosure.  There's no -- there's no gaining on the inflation to stock here.  There's no net gainer here.  They're getting seriously damaged, and so there's no credible argument that Hawaii here has any gains.  There's no credible argument that LIFO/FIFO should be performed on an aggregated basis versus account by account, and there's simply no credible basis to say that Norfolk has a larger financial interest.

**THE COURT:**  In any of these five accounts did they hold this common stock at Wells Fargo prior to the start of the class period?

**MR. LIEBERMAN:**  Yes.  Yes.  They have preclass holdings in Account 2 of 388,700 shares, but Your Honor should note that they sold 612,000 shares after the first alleged corrected disclosure.  Account 3 we don't show preclass; and Account 4 we show preclass but, again, a significant amount of

shares are sold after the first alleged disclosure.

And account --

THE COURT:  Wait.  Wait.  Wait.  Under your approach, if there is a net gain in an account, do we just ignore that or does it somehow get factored into the analysis?

MR. LIEBERMAN:  Well, what do we call a gain?  A gain would be you know the purchase price and you know the sale price.  You can't call it a net gain just because you sold shares that you owned before the class period.  That's not a gain.  That's ignoring that there was a purchase price.

And so would you --

THE COURT:  Wait.  Well, you'd know -- I'm saying this:  Let's say before the class period you buy the shares -- buy 100 shares and each share is bought at let's say $100 and then the class period starts and there's inflation so the price, let's say, goes up to 150.  And then there's a disclosure.  It drops down to 130, and then you sell at 130; but compared to the 100 that you bought it at, that's a gain of 30 per share.

MR. LIEBERMAN:  Okay.  And --

THE COURT:  How do you figure that into your over -- your approach is just ignore that.

MR. LIEBERMAN:  Well, under the facts and circumstances of this case, you're not ignoring it because overwhelming majority of these shares that you're discussing

that were sold -- these, quote/unquote, "gains" -- were sold after the fraud hammered the price of Wells Fargo stock.  So where's the gain?

I mean, Ms. Myers hasn't come up with a calculation showing --

THE COURT:  It depends on whether there was still inflation.  By definition you yourself are saying there was still inflation so it probably was inflated above the purchase price that was preclass period, but isn't it true that -- maybe I'm wrong.

I want -- if an account under your system did, in fact, sell stock that was purchased before the class period and even though it was sold after the first disclosure and there was a gain, you just ignore that gain.

MR. LIEBERMAN:  The way that the LIFO is presented on account by account, it may be ignored; but on the overall basis, the Court has that information.  The Court sees in all five accounts there's an overall loss.  Even purchases versus sales Hawaii still has an $11 million -- if we're only talking about looking for that, so then we want to then shift from LIFO/FIFO because LIFO/FIFO is going to do that; it's going to be ignoring some preclass period holdings.  That's what matching methodology does.

But then if you want to shift to a net gain versus net loss, I don't mind going into that territory, Your Honor, but

then we have to look at the overall transactions of Hawaii and we've got an $11 million net loss.

Look at all the purchases and all the sales -- who cares when those purchases were; who cares when the sales were made -- matched to the purchase.  They might have been preclass; but if I'm just comparing the purchases and sales during the class period, we had over an $11 million loss.  So that's relevant and that is why courts look at net sales.

If that's relevant, we still have an $11 million loss; but we can't all of a sudden start slicing accounts and saying, "Well, I'm going to ignore the entire losses on an entire account because they overall may have had some preclass shares they sold."  That makes --

THE COURT:  I would hate to rule against you because I just don't understand you, but you are masterful at not answering my question.

MR. LIEBERMAN:  I apologize.

MS. MYERS:  Your Honor --

THE COURT:  Wait.  Now --

MS. MYERS:  Your Honor, this is --

MR. LIEBERMAN:  Let me try again.  Let me try again.

THE COURT:  No, no.  Let me try again and then you answer my question.

Let's say you have two accounts and in one of them there is a gain, net gain, of $1,000 because the shares were sold --

they were preclass period shares and they were sold at a gain because of the inflation.  Now, let's say that gain is X.  And then there's a second account where the shares were purchased in the class period and held to the end and there's a net loss of 1,000 -- of X.

Now, to my mind those ought to balance out and be a zero -- zero out.  On one account it was X gain, on the other account it was a loss of X, and to my mind that ought to balance out.

And you seem to be saying, "No, no, no, Judge.  You ignore the one that made money.  You know, that one you just ignore that and you just go with the one where there was a net loss."

I mean, I'm talking about even whenever you go with your method on an account by account, you seem to be saying heads you win, tails you lose; and so I --

Okay.  Use my --

**MR. LIEBERMAN:**  Can I answer that question?

**THE COURT:**  Yes.

**MR. LIEBERMAN:**  If Your Honor is looking -- asking that question, my only response is that is inevitable if you're dealing with LIFO and FIFO.

That being said, in answer to that question, if Your Honor wants to look at that factor and say, "Well, I want to compare gainful losses," certain accounts you might be ignoring it, then look at all of them and you're going to show -- the net

purchases versus the net sales are going to show $11 million loss. We have $11 million in net -- in more money spent than more money sold during the class period, and so that -- if the Court wants to look at it.

But if the Court is asking how you apply LIFO/FIFO, automatically even when you're doing it by an aggregated basis, you're going to be -- you run the issue of ignoring preclass holdings. And so that's fine. I understand the Court wants to consider that and consider potential gains.

It should consider that most of the sales in Account Number 2 and in Account Number 5 were post-corrected disclosures; but even if it doesn't want to look at that, there's still an $11 million net loss over all accounts.

And so either way you slice it, we do -- it is heads we win, and tails we lose only here because we have the numbers across all accounts.

And so then what Ms. Myers is saying, "Well, ignore just, you know, certain accounts and then apply LIFO," which then you're going to then get through to the scenario where you're only looking at certain transactions on its own, but that can't be done. Once you do LIFO/FIFO, you run the risk of --

**THE COURT:** That's not the answer. Let me ask Ms. Myers.

Ms. Myers, I don't want any speeches. I don't want you to run for Congress. I want an honest answer to my question, and

I want you to tell me how you understand the other side, meaning how Hawaii has put together its numbers.

If there is one account that had preholdings -- by "pre," I mean before the class period -- and they got sold in the class period and there was a full profit under the LIFO method in that one -- and I want you to use account by account. I don't want to you merge them for my purposes right now.

So let's say in Account Number A there was a net gain but taking into account the holdings before the class period and then in Account B there was the sale -- the purchases were in the class period and they were held to the bitter end but it just happens to be that the amount of the loss is exactly what was the gain in the other account.

Now, before you answer, do you understand my scenario?

**MS. MYERS:** I do.

**THE COURT:** All right. Now, putting yourself in the shoes of your opponent, who will not give me a clear-cut answer, is his method that those would zero out to zero or is his method that you ignore the gain in the first account and just go with the loss in the second?

**MS. MYERS:** Your Honor, his method is the latter. You would ignore the gain in Account 1 and you would go with the loss in Account 2.

**THE COURT:** All right. Now, I don't think that's right, but I'm also not sure that you would merge the two

accounts.

It seems -- why isn't it best to say, okay, in account -- in the first account there was a gain and in the second account there was a loss; and then we net those out and we try to figure out whether overall the Hawaii was -- what its net loss was overall?  Why is -- but that would necessarily merge the accounts into a single account.  So what's wrong with that?

MS. MYERS:  Your Honor, there's nothing wrong with that.  That is entirely our position.

And to that point, Your Honor, Mr. --

THE COURT:  No, no.  Wait.

MR. LIEBERMAN:  Your Honor --

THE COURT:  Wait.  Wait.  No.

MR. LIEBERMAN:  I'm sorry.  Sorry.

THE COURT:  No.  I'm talking now to Ms. Meyer.

MR. LIEBERMAN:  Okay.

THE COURT:  Your opponent said that your position was that you merged the five accounts together as if it had been one account and then you redo the LIFO as if it had been one account.  Is that your position?

MS. MYERS:  Yes, Your Honor.

THE COURT:  Well, see, I don't think I necessarily agree with that either.

It seems to me what's wrong with saying we've got five accounts; let's treat each one individually and see if there

was a net loss -- no, no -- a loss or a gain in that particular account?  And then let's say three of them had a loss and two of them had gains, and then you subtract the gains from the three losses and let's say there's a net of X million dollars. To me that's a practical way to go here.

**MR. LIEBERMAN:**  Your Honor, we say we win under that methodology.  We're going to add all purchases and sales across all accounts.  We are going to have an $11 million loss.

**THE COURT:**  Okay.  You say that comes out to 11 million.

Ms. Myers, is he correct that if you do it the way I just suggested, that Hawaii comes out at 11 million?

**MS. MYERS:**  I'm not sure where he's coming out at 11 million, Your Honor.  I think if he's doing that, he's looking at without regard to the class period at all.  His loss number in his loss chart is 8.6 million; but, again, that ignores entirely Account 4, Your Honor, which Account 4 had $9.3 million in gains during the class period and they treat that as zero.  That can't be, Your Honor.  Hawaii is the movant here.  Not Blackrock.  Blackrock is the manager.  Hawaii is the movant.  This is Hawaii's money.

During the class period in Account Number 4, they sold over 182,000 shares.  They received $9.3 million, Your Honor. And I'm looking at Document 47-3.  On their loss chart, Your Honor, that is represented as zero.  It's not zero,

Your Honor.  That's not the economic reality of that transaction.  Hawaii received $9.3 million during the class period.  It cannot be zero.

**THE COURT:**  Wait a minute.  Okay.  Just wait.  I think I see your point.  This is Account Number 4?

**MS. MYERS:**  Yes, Your Honor.

**THE COURT:**  All right.  Let's just focus on that one account and tell me what -- and I don't want you mixing and matching accounts.  Just stick with that one account as if it was the only one and tell me what happened.  And, you know, were the shares preclass period?  What?  Go through it slowly so I can understand Account 4.

**MS. MYERS:**  Yes, Your Honor.  Account Number 4 only sold shares during the class period.  100 percent of the 182,790 shares were purchased before the class period.  So during the class period, Account Number 4 sold shares at an artificially inflated price and Hawaii received the benefit of $9.3 million but treats that receipt as zero because no shares were purchased to match those against.

**MR. LIEBERMAN:**  And, Your Honor, if I can respond.

**THE COURT:**  You can, but first I want to say, Ms. Myers, assuming that you have been, you know, forthright, which I am assuming, that was a very clear statement.  It may be the clearest statement that any lawyer has made in this case.

Mr. Lieberman, I'm going to give you a chance to respond, but I want to tell you that I think you have been misleading me throughout this entire thing, or at least I cannot understand what you're trying to tell me.  So you may respond.  Just stick with Number 4.  Did she tell me the truth on Number 4?

MR. LIEBERMAN:  Your Honor, we received $9 million in proceeds in Account 4, that is correct.  But, Your Honor, the question is:  Under what methodology shall we be treating that as a $9 million gain?

There's no allegation that these shares were inflated by $130 per share by each and every dollar that was sold.  So if we're -- what I'm trying to say is -- and I apologize if -- I have not been trying to mislead this Court whatsoever; but if Ms. Myers is saying we should -- when it comes to LIFO/FIFO what you're doing is you're matching a purchase and a sale.

If now we're saying when it comes to -- when it comes to accounts that don't have class period transactions, we're not going to match against anything and we're just going to assume that the entire sale amount is a gain.  That's what Ms. Myers is doing and that is misleading.

THE COURT:  Okay.  Wait.  That may be a good point.

Was the 9.3 million the gross proceeds or was that the net profit?

MR. LIEBERMAN:  Gross, Your Honor.  Not at all net profit.

**THE COURT:** All right. So that is --

**MS. MYERS:** That is --

**THE COURT:** Wait. Wait. Wait. Wait.

So how much did that account pay for those preclass period shares? 8 million? 3 million? How much? What did it pay for those shares earlier?

**MR. LIEBERMAN:** Your Honor, we would have to -- that's something then -- and that would be me -- something unique. We would have to go through the analysis and we could do that, and Norfolk would have to provide that information as well to the extent it had preclass holdings because you have to go back preclass period to -- you have to go back preclass period to go back and see what was the cost basis.

So I can't -- I don't have that answer for you. I can tell you overall, over all five accounts during the class period Hawaii spends 11 more million dollars than it sold. It purchased 11 more million dollars than it sold during the class period very clearly.

The reason why you come up with different numbers, you have this $9 million that Ms. Myers is saying you should deduct from the losses, is because she's not matching that to a purchase. She's saying that's $9 million of pure profit; and that, Your Honor, is misleading. That is incorrect and false.

**THE COURT:** All right. Well, I think I agree that the gross doesn't matter.

Let me go back to you, Ms. Myers.  The 9.3 is gross so what was -- in your view, how much of that was profit or gain?

**MS. MYERS:**  Your Honor, I'm not going to give a political speech so please don't misunderstand me.

But Mr. Lieberman is conflating two concepts. Mr. Lieberman is conflating the concept of Hawaii's net interest without regard to the confines of the class period and Hawaii's net interest with regard to the class period and he's using them interchangeably, and I think that is leading to confusion for the Court.

With regard to the confines of the class period, which is of course what Your Honor has to look at, within the confines of the class period, when all of Hawaii's purchases and sales during the class period are matched on a LIFO basis, which is what Your Honor said the preference was of the Court, and Your Honor said in the *Sipex* case when someone holds class periods at the outset of the class period but in addition buys and sells shares during the class period, the gains received must be used to reduce the losses incurred, otherwise the investor reaps a windfall.

So when all of Hawaii's class period purchases and sales are matched on a LIFO basis, their loss is $5.7 million, Your Honor.  That is less than Norfolk's actual LIFO loss of $6.1 million.

**THE COURT:**  You're making a speech and I'm now

disappointed in you, Ms. Myers.

All right.  I'm going to bring this to a close and not make a decision.  I'm going to require the following:  I would like both of you to resubmit and stick with the following methodology.

And, Ms. Myers, you should submit both for Norfolk and you should submit for Hawaii.  In other words -- and, Mr. Lieberman, you do the same and I want to see how they compare.

Does Norfolk have more than one account?  Or how many accounts does Norfolk have?

**MS. MYERS:**  Norfolk had four accounts, Your Honor.

**THE COURT:**  All right.  Well --

**MR. LIEBERMAN:**  [Unintelligible.]

**THE COURT:**  What?

**MR. LIEBERMAN:**  Excuse me.  Sorry.  I apologize.

**THE COURT:**  All right.  What I would like to know is this.  I'll just put it in terms of Hawaii.  Take all five accounts, including any that had all of them that started with this common stock prior to the class period and keep track of the cost basis and then go through on a LIFO basis within each account, not mixing the accounts together yet, but do it -- get a bottom-line number per account as to whether it was gained and how much the gain was.

And if the -- and the 9.3 is not the gain, that's the

gross.  So you need to say, okay, there was 9.3 gross sales during the class period but -- I'm making a number up -- the cost basis was 8 million so the gain was 1.3.

And then we will have five numbers, some pluses and some minuses, and I want to see how that number works out as a total.  As a total.

So that means you're going to have to take into account where there was a -- you start -- your account starts by holding shares that were preclass period shares, and then do the same for Norfolk.  So both of you should give me a number for each -- what you think the number will be for the other side.

To me, that is a tentative way I'm going to decide this. You can also put in all the arguments you want that I'm wrong, but that's the tentative way that I would do this.

**MR. LIEBERMAN:**  Your Honor, Jeremy Lieberman here from Pomerantz.

I don't -- the reason why that's hard for us to do for Norfolk is we don't have their preclass period transactions so we don't know their cost basis preclass period.

**THE COURT:**  Well, then, I'm going to order both sides to tell the other what your preclass period numbers were and your basis.

**MR. LIEBERMAN:**  Okay.

**THE COURT:**  That ought to be easy to come up with.

**MR. LIEBERMAN:** So to be clear -- I want to make sure I understand, Your Honor. So to be clear, you want to know the cost basis for all the preclass period shares held at the start of the class period and then compare that to the sales?

**THE COURT:** Yes, but I also want you to do a complete -- no. I want more than that. I do want that, but I want more than that. I want you to run the complete analysis for each account individually taking into account whether or not it made money or lost money during the class period on the sales and purchases during the class period.

**MR. ABADOU:** Your Honor, this is Ramzi Abadou. If I could interject. I've been listening carefully to all of this and I have --

**THE COURT:** Who do you represent? I forgot.

**MR. ABADOU:** I represent Ms. Roley, Your Honor.

**THE COURT:** Oh, yeah.

**MR. ABADOU:** And I've been paying attention to your questions and the answers. I think we have a view on, you know, the leadership here and what's in the best interest of the class. I don't think it's necessarily going to turn on the losses, but we'd also like permission to put in a short brief as well, with the Court's permission, to kind of deal with some of this as well.

**THE COURT:** What do you mean "some of this"? If it's going to be on this mathematics issue, that's fine; but if it's

a political speech like Norfolk because you've got a side deal with Norfolk, no, I'm not going to do that.

MR. ABADOU:  Your Honor, there's no side deal with Norfolk.  We have no agreements.  Ms. Roley is fine, as is my firm, to stand back and have no role in the case whatsoever, but I think that the statutory scheme that Congress enacted in 1995 provides an answer that might enable the Court to get to where it wants to get, which is to find a presumptive lead plaintiff.

I think a lot of questions have been raised today about the uniqueness of how Hawaii has calculated its losses here vis-a-vis how it's calculated its losses in other cases, including LendingClub before this Court.

And so I think even if the Court determines that Hawaii's loss is incrementally larger than Norfolk's, I think that the colloquy today has kind of indicated that there's a unique defense as to Hawaii that would enable Norfolk to rebut that presumption just given the uniqueness of how Hawaii has calculated its losses in this case and others.

THE COURT:  All right.  Well, here's another -- while we're on those kind of general subjects, here's a concern that I have.  In my review, Norfolk has served as lead plaintiff three times, according to my law clerk anyway, and every single time has selected Robbins Geller as the lawyer.  To me, that looks like pay-to-play.  Retirement system of Hawaii has had

six prior suits but has not had Pomerantz as its lawyer in those other lawsuits.  So I believe that -- we haven't even gotten to that point.  I was going to raise it later, but it disturbs me that someone always shows up with the same lawyer.

Now, there are two answers.  One is the good one, "Oh, we love this lawyer because they do a great job."  The other is pay-to-play, and I don't -- and I'm very suspicious in these securities cases and it's a real concern that pay-to-play is underway.

So maybe you can help me with that point too by addressing all of that.

MS. MYERS:  Your Honor, this is Danielle Myers.  If I can have Mr. Alex Younger address that directly, please.

THE COURT:  Yes.  Go ahead.

MR. YOUNGER:  Yes, that's right.  Good morning, Your Honor.

Well, I guess on that point we use two firms to monitor our portfolio.  It happens that the cases that have arisen where we've had the lawsuits have been identified by Robbins Geller.  I mean, it would be true to say we are very happy with Robbins Geller.  We believe, and this is as a class representative, they are absolutely committed to taking cases to their full conclusion; and I think the example of that would be our experience with them in the trial judgment at *Puma*.  So I guess we've done that.

I think what we've also spoken to you about, and this was in front of Your Honor on the *Symantec* case, we made it very clear that we were happy to participate in an exercise for selection of lawyers which you regard to the best interest of the class both around the quality of that submission by that legal firm but also the appropriateness of those fees in the market because we absolutely understand in respect to both lawyers and counselor investment managers that any fees are essentially a tax on the return to our pensions.

We don't in the U.K. have any provisions for political donations or anything of that sort that would indicate the ability of a legal firm to, I guess, gain favor with a U.K. public client.

So I think -- I would hope that we can put your mind at rest on that one, but we would certainly be committed to the full process of the identification of the appropriate accounts on behalf of the class should we be appointed lead in this particular case.

**THE COURT:**  All right.  Well, that at least sounds like what I wanted to hear so I -- but it's still true that you've always selected Robbins Geller and even though you went through the interview process with me.

All right.  Here's the thing.  I've got to go to another case and I want you lawyers to -- I have a ton of work and it is bone crushing here, and I need the help of the lawyers.

Instead of doing little gimmicks to slide stuff passed me, you know what I'm trying to get at here and I want you to help me with it and to give me the honest accounting based upon the formula that I gave you a moment ago.

All right.  That's the best I can do.  I'm not making any ruling.  We'll have another hearing in due course.  How long do you need to get me this information?  Can you do it in one week?

**MR. LIEBERMAN:**  Yes, Your Honor.

**MS. MYERS:**  Yes, Your Honor.

**THE COURT:**  Great.  Within one week from today please file your comparative statements.  Both of you should do what you think the other side did so you'll be giving me two statements, and then each of you get three days to reply to the other.  And the individual investor is free to say whatever he would like on this subject --

**MR. ABADOU:**  Thank you, Your Honor.

**THE COURT:**  -- on the same schedule.

**MR. TANG:**  Your Honor?

**THE COURT:**  Yes?

**MR. TANG:**  It's John Tang on behalf of defendant Wells Fargo.

I don't mean to interrupt but if I could have 30 seconds, I just wanted to comment on one scheduling question about the February 18 case management conference, which remains on

calendar but seems premature.

THE COURT:  I'm sorry.  What was that supposed to address?

MR. TANG:  Well, that's really the question.  Earlier in this matter Your Honor may recall Docket 17 entering an order on the parties' stipulation basically continuing the initial CMC until the entire lead plaintiff/lead counsel decision had been reached and there was a briefing schedule for a motion to dismiss.

THE COURT:  I'll vacate that.

MR. TANG:  Thank you.

THE COURT:  But I'm going to charge you personally with the duty to remind me that whenever we sort this out on lead plaintiff, that we'll have such a conference.

MR. TANG:  Yes, Your Honor, will do.  And thank you for taking the February 18th CMC off calendar.  It did seem premature, Your Honor.

THE COURT:  Yeah.  I think you're right.

All right.  You-all hang up now.  I need to go to the next case, also a class action.  So have a good day.  Bye-bye.

MR. TANG:  Bye-bye.

(Proceedings adjourned at 9:35 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Friday, February 5, 2021

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter