**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| IN RE AT&T INC. SECURITIES LITIGATION | Case No. No. 3:24-cv-01196-N |
|  | CLASS ACTION |
|  | JURY TRIAL DEMANDED |

**FIRST AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................. 6

PARTIES .................................................................................................................................. 7

NON-PARTY CONFIDENTIAL WITNESSES ................................................................... 9

FACTS ................................................................................................................................... 13

    A.   Relevant Background ................................................................................... 13

        1.   Overview of AT&T and Its Corporate History ........................... 13

        2.   AT&T's Wireline Infrastructure ................................................... 21

        3.   AT&T's EHS Reporting and Internal Structure............................ 23

        4.   The Recent History of Safety and Environmental Violations by AT&T ............... 27

    B.   Lead Is a Heavily Regulated, Highly Toxic Material ................................. 28

        1.   Lead Is a Brittle Heavy Metal Extremely Harmful to Human Health ................. 28

        2.   History of Lead Use and Regulation in the United States........................ 30

        3.   Individuals Who Work With Lead Face the Prospect of Lead Poisoning ............. 35

        4.   Lead Poses Significant Threats to the Environment ............................... 39

    C.   AT&T Owns A Sprawling Network of Old Telecommunication Cables That Are Encased In Decaying Lead ............................................................. 42

        1.   Origins of Lead in the National Telecommunications Network ............................ 42

        2.   AT&T's Acquisition of Lead-Covered Cables ........................................ 43

        3.   The Vast Amounts of Lead Encased Cables That Remain in AT&T's Legacy Copper Wire Network ................................................. 44

        4.   AT&T Maintained Sophisticated Information Systems That Provide Detailed Information on the Lead In Its Copper Cable Network ......................................... 47

    D.   AT&T Decides to Maintain and Retire Its Toxic Lead Cables In a Manner That Exposes It to Costly Liabilities and Damaging Reputational Harm ............................. 49

        1.   The Failure to Monitor Compliance with the OSHA Lead Standard Exposes Workers and Surrounding Communities to AT&T's Lead .................................... 49

        2.   As a Matter of Standard Practice, AT&T Chose To Abandon Lead Cable In Place To Decay Into the Environment As It Remained Unused ............................ 53

    E.   AT&T and Its Senior Leaders Have Known for Years That The Lead Cables In Its Vast Network Were Harmful to Employees and the Environment ...................... 56

        1.   EHS Insiders Openly Discussed the Dangers Associated with Decaying Lead Cables at Industry Meetings Attended by Senior AT&T Officials ........................ 56

        2.   AT&T Officials Opposed Proposed EPA Regulations That Would Create Additional Burdens For Owners of Lead-Sheathed Cables .................................... 64

i

3. Defendants Knew That Mismanaging Lead Could Harm AT&T and Its Proper Handling of Lead Was of Great Interest to Investors.............................................. 67

4. Proposed Changes to OSHA Rules That Would Impose Lower Lead Exposure Standards Were Actively Tracked and Opposed by AT&T.................................... 70

5. AT&T Reported the Company's Disposal of Lead to the Federal Government As a Hazardous Waste Under the RCRA.................................................................. 75

6. AT&T Reported Its Retirement of Copper Cables, Including Lead Sheathed Cables, to the Federal Government Under Rules It Opposed ................................. 79

7. The Risk of Abandoning Toxic Lead Cables Across the Country Manifests in Lawsuits Brought by Aggrieved Landowners in Texas .......................................... 81

8. Another Lawsuit Is Filed Against AT&T for Abandoning Lead Cables in Lake Tahoe and Brought Directly to the Attention of Its Executives.............................. 84

F. The Public Learns That AT&T Has a Vast Network of Decaying Lead Cables That Are Corroding Into the Environment and Harming Front-line Workers .............. 92

1. The Wall Street Journal 'S Thorough Two-Year Investigation .............................. 92

2. Publication of the *WSJ*'s Series on Lead Telecom Cables..................................... 96

3. AT&T's Immediate Response.................................................................................... 101

4. Government Response and Related Fallout ........................................................ 103

5. AT&T Backs Out of Its Agreement to Remove the Eight Miles of Decaying Lead Cable That It Discarded At the Bottom of Lake Tahoe ............................... 106

6. AT&T Finally Discloses the Magnitude of Its Lead Cable Problem.................... 108

G. Post Class-Period Developments ..................................................................................... 111

1. Continued Interest by Regulators and Lawmakers .............................................. 111

2. New Mass Liability Lawsuits Arising from AT&T's Lead Cables ...................... 116

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ................. 117

A. Cost Savings of Transitioning Away from Copper ....................................................... 117

B. Environmental Stewardship .............................................................................................. 135

C. Employee Health and Safety ............................................................................................ 143

D. EHS Contingencies and Risks.......................................................................................... 150

AT&T'S STOCK PRICE DECLINES AS THE TRUTH EMERGES ...................................... 157

A. July 9, 2023 .......................................................................................................................... 157

B. July 11-12, 2023 .................................................................................................................. 158

C. July 14, 2023 ........................................................................................................................ 159

D. July 17, 2023 ........................................................................................................................ 161

E. July 26, 2023 ........................................................................................................................ 162

ADDITIONAL FACTS PROBATIVE OF SCIENTER...................................................................... 163

A.  Defendants Had An Affirmative Legal Obligation to Protect Workers from Lead Exposure and the Environment from Lead Contamination............................................ 164

B.  Defendant Stankey Was Admittedly Aware of the Lead Cables in AT&T's Sprawling Copper Wire Network.................................................................... 165

C.  The Individual Defendants Were Repeatedly Made Aware Of the Dangers of Lead Through Lead Paint Disclosure Requirements.......................................... 166

D.  Defendants Engaged in a Multi-Month Review of AT&T's Legacy Network Assets to Identify Ways In Which To Remove Costs from It...................................... 171

E.  AT&T Was Required to Confirm the Salvage Value of Copper Assets That Were Retired Prior to the End of Their Economic Life ........................................ 173

F.  Defendants Had Powerful Incentive to Suppress All Information About Its Perilous Network of Decaying Lead-Covered Cables .................................. 175

G.  Defendants Were Motivated to Hide Lead Liabilities to Protect Their Outsized Incentive Compensation ................................................................ 177

H.  Stephenson and Stankey Repeatedly Professed To Be Tuned In To Sustainability, the Environment, and Employee and Community Health.............................. 182

I.   AT&T's Telecommunications Network Is Admittedly At the Core of Its Business ... 183

J.   Defendants' SOX Certifications Support An Inference of Scienter ........................... 185

K.  *Respondeat Superior* and Agency Principles Apply .................................. 186

LOSS CAUSATION............................................................................. 186

PRESUMPTION OF RELIANCE.............................................................. 188

NO SAFE HARBOR .......................................................................... 189

CLASS ACTION ALLEGATIONS ............................................................ 191

COUNT I .................................................................................... 192

COUNT II ................................................................................... 195

PRAYER FOR RELIEF ....................................................................... 196

DEMAND FOR TRIAL JURY ................................................................ 196

Court-appointed lead plaintiffs Teachers' Retirement System of the City of New York, the New York City Employees Retirement System, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, and the Board of Education Retirement System of the City of New York ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their First Amended Class Action Complaint against defendant AT&T Inc. ("AT&T" or the "Company"), and defendants Randall L. Stephenson, John T. Stankey, John J. Stephens, Pascal Desroches, and Jeffrey S. McElfresh (collectively, the "Individual Defendants," and, together with AT&T, "Defendants"), allege the following on personal knowledge as to their own acts and on information and belief as to all else based upon the investigation by counsel, which has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, news reports, documents and other information secured through government information requests, and other publicly available information issued by or about AT&T or the industry in which it operates, interviews with persons knowledgeable about relevant events, including former employees of AT&T, and expert consultation.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a class action against AT&T and its senior-most officials for violations of the anti-fraud provisions of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder on behalf of all persons and entities other than Defendants that purchased or otherwise acquired AT&T securities between July 28, 2018, and July 26, 2023, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").

2.      Investors have long considered AT&T's securities to be safe investments that provided a steady income, as the Company has historically distributed its profits to shareholders in regular, robust dividend payouts, made possible by the fact that its business centers on one of the most fundamental human activities: communication.  By the start of the Class Period, AT&T began to move forward with a new plan to shift away from the traditional services provided on its old copper telephone lines and grow a new network of fiber optic cables as demand for high-speed service accelerated.  By all accounts, this appeared to present an opportunity for significant growth and the Company did not appear to be saddled with environmental, regulatory, or market risks that many other high-yield investments face.  But AT&T's deceptive conduct underlying this lawsuit lulled investors into a false sense of security, which was shattered during the second half of 2023.

3.      In July of 2023, a series of articles by the *Wall Street Journal* (the "*WSJ*") revealed that the nation is covered in tens of thousands of miles of highly toxic, lead-leaching copper telephone cables left behind by telecommunications companies who previously used them for standard telephony services, like voice transmission, the heart of AT&T's historic business model.  As the *WSJ* reported in painstaking detail following a two-year investigation, copper telephone cables were covered, or "sheathed," in lead for the better half of a century as the nation's telephone network was being built, until the severe health consequences associated with lead became better understood and the industry phased it out.  But those cables remained in use, and they were acquired by today's modern day telecommunication companies, including AT&T.

4.      Today, these lead-sheathed cables snake across the country in myriad locations.  They are buried underground and entrenched in manholes.  They line riverbeds and lakes.  They dangle just feet above the ground, drooping from old utility poles in densely populated metropolitan communities.  Incredibly, these lead-sheathed cables are, for the most part, no longer

2

in use.  As AT&T transitioned to more advanced technologies, including highly profitable fiber optic cables, it simply left the old lead cables in place, abandoning them with little care for the environmental and human health dangers they created by doing so.  Still, they are owned by AT&T, and therefore, any liability associated with them belongs to AT&T.

5.      This is no small matter.  Since the story first broke, AT&T has admitted that there are still some ***200,000 miles*** of lead-covered cables remaining in its nationwide network of legacy wires.  To put this into perspective, that is enough lead cable to wrap around the entire Earth more than ***eight times***.  Worse still, over 65,000 miles of those lead cables lay barren on utility poles above busy city streets or submerged in waterways, as opposed to protected conduits or subsoil trenches.  Based on expert testimony and real-world examples, including estimates agreed upon by AT&T, the cost to remove and remediate just the exposed aerial and underwater cables would cost anywhere from $2.3 billion to $4.6 billion, with full-scale remediation ranging anywhere from $31.7 billion, on the low end, to a staggering $115.7 billion, on the high end.

6.      AT&T cannot defend its failure to disclose the extent of its lead-sheathed cables and related financial exposure from environmental, health, and regulatory risks to investors.  Its longstanding knowledge of the enormous risks at play is beyond dispute, as a few examples show:

- Preeminent environmental executives from AT&T repeatedly warned their peers about the environmental and occupational safety dangers associated with lead telephone cables for years in an industry-wide trade association as they realized the mess they had on their hands.

- Defendants were previously told ***by AT&T investors*** that failing to properly manage the disposal of spent lead from its other operations could harm AT&T and ensuring that the Company did not do so was of great interest to investors.

- AT&T has been embroiled in a series of lawsuits arising from its abandonment of lead cables on private property and in public waterways, including a source of public drinking water next to a home owned by AT&T's CEO which he donated substantial sums to conserve in the years before and after the lawsuit.

3

- Like almost any homeowner, the Individual Defendants routinely certified, acknowledged, signed, and reviewed lead hazard forms in connection with their purchase and sale of real property before and during the Class Period.

- AT&T, for years, has reported its disposal of lead to the federal government as a "hazardous waste" subject to exacting environmental laws because of its toxic impact on the ecosystem and human health.

7.    Despite the steady drum beat of known risks posed by AT&T's vast network of toxic lead cables, AT&T elected to simply abandon this ancient hardware in place to decompose over time in locations where people live, work, play, or go to school, including in the air above schools, bayous where children play, or underground in manholes and conduits that sometimes exit into public water bodies because, simply put, it was the cheapest thing to do.

8.    Consistent with its ostrich-like approach to decommissioning its lead-sheathed cables, AT&T has publicly swept this issue under the rug.  It has concealed its extensive web of lead-covered cables, while proclaiming its commitment to employee safety and environmental stewardship as well as the cost savings of transitioning its customer base away from copper lines. For example, AT&T boasted that it was "taking proactive measures to reduce our footprint and be a better steward of the environment" and, in that regard, assured that it had protocols to "recover and recycle" retired network infrastructure, including, in particular, its "copper" telephone wires. It even represented that "[w]hen AT&T vacates facilities and outside plant infrastructure, *our teams remove all regulated materials* and coordinate with vendors to recycle and dispose of the materials in an appropriate manner."  That could not be further from the truth.  AT&T was simply littering its highly regulated lead sheathing across the United States once it decided the cables it covered no longer served a useful purpose.  AT&T also assured that it was taking cost *out* of the business by "removing" its legacy copper wire infrastructure as it was "replaced" with high-speed fiber lines.  But it made no mention of the fact that it was leaving obsolete lead cables behind in a manner that exposed it to costly liabilities—many of which is it now facing—including potential

4

remediation or abatement, protracted regulatory scrutiny, personal injury litigation, personal property claims, environmental lawsuits, expert consultation, and damaging reputational harm.

9.    The first bombshell dropped on July 9, 2023, when the *WSJ* published the first in a series of investigative reports and articles disclosing that: (1) modern-day telecommunications companies, including AT&T, acquired the lead cables, some dating to the late 1800s, by acquiring former "Baby Bell" companies established when the Bell System was broken up by the federal government in 1984; (2) the lead cables are leaching lead into the environment, resulting in lead levels far in excess of the EPA's standard, including at schools and bodies of water used by the general public; (3) former cable splicers and line workers who regularly came into contact with the lead cables have elevated levels of lead in their bodies, and suffer from severe adverse health effects years after their last contact; (4) AT&T has known not only about these lead cables but also about the potential harms they pose for well over a decade; and (5) telecommunication companies have largely abandoned their network of lead cables across the United States, notwithstanding these known risks.  The market learned more as the *WSJ* released new stories as part of its series.

10.    AT&T's stock price dropped precipitously in response to the *WSJ*'s reporting and related developments.  Indeed, AT&T's common stock traded down to its lowest level in ***three decades*** as investors began to absorb the extent of the Company's financial and legal exposure. An article published on July 18, 2023 rejected the notion that the sharp sell-off was an "overreaction," considering "how little is known about the true extent of the problem, or what the ultimate financial exposure may be for telecom carriers holding legacy networks that are more than a century old in some cases."  That same article continued, "Wall Street is so far unanimous on one thing: No one really knows anything yet" and, if anything, "[i]t seems unlikely that the matter will be resolved quickly—or cheaply."

11.     Numerous government bodies are now investigating the environmental and human health hazards resulting from AT&T's lead-sheathed cables.  In particular, the Environmental Protection Agency ("EPA") has invoked its powers under the Superfund law to initiate a multistage review and deemed its investigation into lead cables a "high priority."  AT&T has confirmed it is cooperating with the EPA on this issue.  As part of its investigation, the EPA has found more than 100 soil and sediment readings with lead that exceed its safety guideline for children at sites identified by the *WSJ* in three states, including several with lead cables owned by AT&T.  Indeed, by December 2023, the EPA informed the Company that whether "AT&T's lead-sheathed cables contributed to a release to the environment" continues to be part of its ongoing investigation and has held discussions with it about developing "***a long-term remediation solution***."  Congress, the Department of Justice ("DOJ"), and several other federal and state agencies are also investigating.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b), 78t(a), and the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a).  At all relevant times, AT&T has maintained its principal executive offices at 208 S. Akard Street, Dallas, Texas, located in this judicial district.  Defendants therefore transact business in this judicial district and a substantial

part of the events or omissions giving rise to the claims asserted herein, including the dissemination of materially false and misleading statements to the investing public, occurred in this judicial district. Indeed, Defendants concede that "[t]he claims arose in the Northern District of Texas" and have submitted to venue in this judicial district by moving to have this matter transferred to this judicial district for all further proceedings ECF No. 43, 43-1 at 1.

15. In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, the facilities of a national securities market, and interstate telephonic and digital communications systems.

## PARTIES

16. Plaintiffs acquired AT&T securities at artificially inflated prices during the Class Period, as set forth in the Certifications previously filed with the Court (ECF No. 14-6), and were damaged thereby, as set forth herein.

17. Defendant AT&T is a corporation organized under the laws of the state of Delaware. Its principal executive offices are located at 208 S. Akard Street in Dallas, Texas. During the Class Period, AT&T's securities traded on the New York Stock Exchange ("NYSE") under various ticker symbols beginning with the prefix T. AT&T's common stock is represented by the standalone ticker symbol T.

18. Defendant Randall L. Stephenson ("Stephenson") served as AT&T's Chief Executive Officer ("CEO") and as a member of AT&T's Board of Director's from June 2007 to June 2020. He previously held a series of leadership roles at the Company since starting at one of its predecessors in 1982, including Chief Operating Officer ("COO") of AT&T from April 2004 to June 2007, and Chief Financial Officer ("CFO") of AT&T from August 2001 to May 2004.

7

19.    Defendant John J. Stephens ("Stephens") served as AT&T's CFO from June 2011 to April 2021. He previously held various leadership roles in AT&T's finance department since joining the Company in 1992, including Senior Vice President & Controller from 2001 to June 2011, with responsibility for all financial reporting and operational reporting, regulatory reporting, and accounting policy. Before joining the Company, Stephens held positions at several public accounting firms, including Ernst & Young.

20.    Defendant John T. Stankey ("Stankey") has served as AT&T's CEO and as a member of AT&T's Board of Directors since July 1, 2020. He previously served as the Company's COO from October 2019 through June 2020. Before then, Stankey held various leadership roles at the Company since starting with one of its predecessors in 1985, including, most notably, CEO of AT&T's Entertainment Group from July 2015 to June 2018, where he was responsible for its consumer wireline services; Chief Strategy Officer ("CSO") of AT&T from January 2012 to July 2015; CEO of AT&T's Business Solutions Group from September 2010 to January 2012, where he was responsible for its enterprise wireline services; President of AT&T's Telecom Operations Group from 2007 to 2008; and as CEO of SBC Southwest from October 2001 to October 2004, where he was responsible for all business market sales and customer service in Arkansas, Kansas, Missouri, Oklahoma, and Texas. Earlier in his career, Stankey was responsible for the Company's advanced communications network and local wholesale operations in California.

21.    Defendant Pascal Desroches ("Desroches") has served as AT&T's CFO since April 2021. He previously served as CFO of AT&T's WarnerMedia division after the Company acquired it in July 2018. Before then, he held various leadership roles in the finance department of WarnerMedia's predecessor since joining the Company in January 2008. Before joining the

8

Company, Desroches worked at accounting firm KPMG and served as Professional Accounting Fellow with the Office of the Chief Accountant at the SEC.

22.    Jeffrey S. McElfresh has served as COO of AT&T since April 2022.  He previously held various leadership positions since joining the Company in April 2002, including, most recently, CEO of AT&T Communications from October 2019 to May 2022, where he was responsible for all wireline services offered by AT&T in the United States.

## NON-PARTY CONFIDENTIAL WITNESSES

23.    CW1 was a Technician for AT&T from June 2015 to mid-2022.  From June 2015 to 2019, CW1 worked in Dallas, Texas, and, from 2019 to mid-2022, CW1 worked in the Arlington-Fort Worth area of Texas.  In these roles, CW1 primarily worked on installation and frequently handled AT&T's old copper cables, including those covered in lead sheathing.

24.    CW2 held several positions at AT&T from 1989 to December 2022.  As relevant here, CW2 worked as an Installation and Repair Technician from 1991 to 1997, and a Cable Splicer from 1997 to December 2022.  In these roles, CW2 was responsible for performing repairs on AT&T's copper wires in "any Bell or AT&T city" in and around Kansas City, Kansas, including Kansas City, Manhattan, Lawrence, and Ottawa, Kansas.

25.    CW3 held a series of positions with AT&T and/or its predecessors from September 1988 to July 2020.  In particular, CW3 worked as a Lineman and a Cable Splicer for Ameritech from 1990 to 1999, when it was acquired by AT&T.  CW3 was then a Cable Splicer for AT&T from 1999 to 2022 in the Chicago suburbs of Bridgeview and Glenwood, Illinois.  CW3 frequently worked on lead cables in these positions.  Beginning in approximately 2010, CW3 was placed in the Digital Electronics Group, which was responsible for installing and maintaining digital telephone equipment, but CW3 still encountered traditional copper telephone cables in this role.

26.     CW4 worked for AT&T from January 1998 to February 2019 in Milwaukee, Wisconsin.   From January 1998 to December 2012, CW4 was an Installation and Repair Technician.   From January 2013 to February 2019, CW4 was a Cable Splicer in AT&T's Construction group, during which CW4 frequently worked with lead cables in its wireline network.

27.     CW5 was an Installation and Repair Technician for AT&T in Dallas, Texas from 2012 to 2021.  In this position, CW5 worked in and out of customer's homes, servicing AT&T's copper wire network as needed, and frequently encountered cables covered in lead.

28.     CW6 worked for AT&T off and on from July 2000 to May 2022 in and around Birmingham, Alabama.  From July 2000 to July 2012, CW6 served as an Electronic Technician, and then from December 2020 to May 2022 as an Outside Plant Technician.  In these roles, CW6 was responsible for maintaining AT&T's wireline network and repairing various components, equipment, and systems, including lead-covered cables.

29.     CW7 worked at AT&T from 2007 to June 2020.  From 2007 to March 2013, CW7 was a Cable Splicer based primarily in St. Louis, Missouri, and Birmingham, Alabama.  From April 2014 to June 2020, CW7 was an Outside Plant Technician in the Atlanta, Georgia metropolitan area.  In these roles, CW7 maintained AT&T's legacy copper cable network and retired lead cables in place for AT&T.

30.     CW8 worked at AT&T in several different roles from 2014 to March 2021.  CW8 worked as Cable Splicer in St. Louis, Missouri from 2014 to 2016, and then as an Installation and Repair Technician in Nevada, Missouri, until leaving the Company in March 2021.  CW8 frequently worked on lead cables in both positions.

31.     CW9 spent over 40 years working for AT&T and its predecessors from 1973 to 2004 and from 2006 until 2018.  CW9 began as a Cable Repair Technician in St. Louis, Missouri

and McAllen, Texas.  From 1979 to 2004, CW9 was a Cable Repair Technician and Customer Service Technician in Nevada, Missouri.  From August 2006 to 2014, CW9 was a Cable Splicing Technician in Joplin, Missouri.  From 2014 to May 2018, CW9 was a Customer Service Technician based out of Nevada, Missouri.  In each of these positions, CW9 was responsible for maintaining AT&T's network of copper cables, including those covered in lead.

32.     CW10 was a Wire Technician at AT&T from March 2014 to June 2023.  In this role, CW10 was responsible for installing internet and phone services, running cables, and climbing poles for repair work.  CW10 was based on Phenix City, Alabama, but often did work in Columbus, Georgia, on the other side of the river that ran across Phenix City, Alabama.

33.     CW11 worked at AT&T and its predecessors from June 1998 to December 2022 in the Columbus, Ohio area.  CW11 started at Ameritech in June 1998, which was acquired by AT&T in 1999.  From June 2006 to June 2013, CW11 was a Network Operations Manager.  From June 2013 to December 2022, CW11 was a Senior EHS Administrator.  As Senior EHS Administrator, CW11 was responsible for the health and safety of all outside field workers in central and southern Ohio, including technicians, splicers, installers, and other employees who worked outside.

34.     CW12 worked at AT&T and its predecessors from February 1979 to September 2016.  CW12 started at BellSouth in 1979 and held a series of leadership roles, including Chief Technology Officer from 2001 until BellSouth was acquired by AT&T in 2007.  From January 2007 to October 2007, CW12 was Senior Vice President of AT&T's Network Operations for the Southeast.  From October 2007 to March 2008, CW12 served as Executive Vice President, Shared Services, with responsibility for AT&T's mass market and enterprise operations, including regional wireline planning.  From March 2008 to January 2010, CW12 held the position of President, Local Network Operations.  In January 2010, CW12 was promoted to President, AT&T

Network Operations, where CW12 was responsible for all network-related operations across AT&T's global business, including network planning and engineering. CW12 worked directly with, and alongside, Defendants Stephenson and Stankey.

35.    CW13 held various roles at AT&T and its predecessors from 1977 to July 2018. From November 1991 to July 2018, CW13 worked as an Outside Plant Design Engineer in and around Chicago, Illinois. In this position, CW13 was responsible for the design and layout of AT&T's copper cable network, both aerial and underground, including cables covered in lead.

36.    CW14 worked for AT&T in California from January 2000 to August 2019. From January 2000 to December 2004, CW14 was a Cable Splicer. From January 2005 to August 2011, CW14 was an Outside Plant Technician. CW14 was promoted to Outside Plant Engineer in September 2011, a position CW14 held until August 2019. As an Outside Plant Technician, CW14 placed and repaired copper cables. As an Engineer, CW14 was responsible for the design and layout of AT&T's copper wire network across nine regional wireline centers in California.

37.    CW15 held several positions with AT&T from March 2000 to April 2022. From June 2018 to April 2022, CW15 was a Manager in AT&T's Environment, Health & Safety ("EHS") group in Akron, Ohio, where CW15 was primarily focused on occupational safety.

38.    CW16 held several different roles with AT&T from January 1994 to August 2018. From 1994 to 2000, CW16 was a Lineman. From 2000 to 2012, CW16 was a Network Manager, Construction & Engineering, with responsibility for several counties in Connecticut before AT&T sold that business to Frontier Communications. From 2012 to August 2018, CW16 was Area Manager, Construction & Engineering, in Florida. In CW16's last two roles, CW16 oversaw teams responsible for building plants, placing and removing cables, and anything else to do with constructing or deconstructing AT&T's wireline network.

## FACTS

### A.    Relevant Background

#### 1.    Overview of AT&T and Its Corporate History

39.    AT&T is a global telecommunications company headquartered in Dallas, Texas, which, at present, offers communication services in the United States through its wireline assets, *i.e.*, technologies that transmit information through wires or cables, and its wireless assets, *i.e.*, technologies that transmit information through space without the use of wires or cables. As of the start of the Class Period, AT&T was the world's largest telecommunications company, with approximately $160 billion in annual revenue, and the second largest wireless carrier in the United States by number of subscribers, trailing only Verizon Communications Inc. ("Verizon").

40.    Modern-day AT&T dates back to the formation of the Bell Telephone Company ("Bell") in July 1877 after Alexander Graham Bell invented the telephone. In March 1880, Bell changed its name to American Bell Telephone Company ("American Bell"). Bell, and later American Bell, operated by granting licenses to companies across the country who provided local telephone services, including, as relevant here, several in Missouri and Kansas that were ultimately acquired by the Missouri and Kansas Telephone Company ("MKTC"), formed in August 1882. Through this model, American Bell rapidly expanded into new territories across the United States.

41.    In 1881, American Bell acquired majority control of the Western Electric Company, then the largest manufacturer of electrical equipment in the United States. Doing so gave American Bell the power to control the production and pricing of the components needed to build the physical infrastructure for its telephone systems and Western Electric soon became the primary manufacturer, supplier, and purchasing agent for American Bell.

42.    With a fully integrated supply chain through Western Electric, American Bell formed the American Telephone and Telegraph Company ("Legacy AT&T") in March 1885 as a

wholly-owned subsidiary in New York to focus on an ambitious project to create a nationwide long-distance network by interconnecting all the local exchanges scattered across the United States. Legacy AT&T built its first line from New York, New York to Philadelphia, Pennsylvania in 1886. By 1892, Legacy AT&T installed wire connecting New York, New York with Chicago, Illinois. In January 1915, Legacy AT&T opened its first line connecting New York and California.

43.     In December 1899, Legacy AT&T assumed all the assets of American Bell as part of a corporate reorganization to gain access to New York's more favorable corporate laws and, as a result, Legacy AT&T became the parent of the Bell network of companies.

44.     Bell and its licensees were the only ones permitted to operate telephone systems in the United States during the early years of its corporate history, but a wave of competition entered the market when its final patent for the telephone expired in 1894. Between 1894 and 1904, over 6,000 independent telephone companies went into business, with the number of telephones skyrocketing from 285,000 to over 3.3 million. This provided many previously unwired areas with access to telephone systems. However, there was no interconnection between these many telephone systems, and subscribers to one system could not call subscribers on another system.

45.     By 1907, Legacy AT&T's new President, Theodore Vail, formed the view that the telephone industry would operate most efficiently as a monopoly providing a universal service. Vail wrote in Legacy AT&T's 1907 annual report that government regulation was an acceptable substitute for competition, "provided it is independent, intelligent, considerate, thorough and just." He soon coined a new corporate slogan "One Policy, One System Universal Service." Accordingly, Legacy AT&T began to aggressively acquire competing local telephone companies.

46.     Legacy's AT&T's new strategy captured the attention of antitrust regulators. Legacy AT&T reached an out-of-court agreement with the government in December 1913, known

as the Kingsbury Commitment, which effectively endorsed Legacy AT&T's philosophy of providing one "universal system" and authorized it to operate as a vertically integrated monopoly, subject to certain conditions. Among other things, Legacy AT&T agreed to allow independent local telephone companies to interconnect to its growing long-distance network.

47.    Around this time, Legacy AT&T began to consolidate its many local companies under larger regional operating companies, typically by state or region. In March 1912, the local Bell telephone companies operating exchanges in Arkansas, Kansas, Missouri, Oklahoma, and Texas, including MKTC, were consolidated under a single operating unit within Legacy AT&T known as the Southwestern System. Effective January 1917, MKTC formally acquired the other Bell telephone company operating local exchanges in Missouri and changed its name to Southwestern Bell Telephone Company ("Southwestern Bell"). In April 1920, Southwestern Bell formally acquired the other companies in Legacy AT&T's Southwestern System.

48.    Legacy AT&T continued to operate as a legally authorized vertical monopoly for most of the twentieth century and, in doing so, grew to become the largest corporation in the world. It carried out its business through 22 operating companies which provided local telephone services to most of the United States, including Southwestern Bell. It also held a near-total monopoly over long-distance calling through its "Long Lines" division. By the 1970s, 70% of all local calls and approximately 95% of all long-distance calls in the United States were carried by Legacy AT&T and its consolidated subsidiaries. This monopoly was known as the "Bell System" and Legacy AT&T, as the head of the monopoly, was commonly referred to as "Ma Bell." By the end of 1983, the Bell System had assets of approximately $150 billion (equivalent to $440 billion in 2023).

49.    Regulators became concerned that Legacy AT&T was using its size and control to stifle competition, particularly in the field of telecommunications equipment, and the DOJ filed an

15

antitrust suit to disband Legacy AT&T in 1974.  By the time of the lawsuit, the equipment and infrastructure used in the Bell System, all the way down to the phones used by customers, were supplied almost exclusively by Western Electric.  Among other things, the DOJ sought to compel Legacy AT&T to divest its ownership of Western Electric.

50.     The Bell System was ultimately broken up in 1984.  Mid-way through the trial in the antitrust lawsuit brought by the DOJ, Legacy AT&T agreed to settle the matter by divesting the 22 operating companies in the Bell System that provided local telephone service in the United States as an alternative to divesting its Long Lines division or Western Electric, which was beginning to develop technology in the emerging field of computer science.  On January 1, 1984, its 22 member companies were divided by geography among seven newly-formed independent regional operating companies, referred to as the "Baby Bells," including American Information Technologies Corporation ("Ameritech"), Bell Atlantic Corporation ("Bell Atlantic"), BellSouth Corporation ("BellSouth"), NYNEX Corporation ("NYNEX"), Pacific Telesis Group ("Pacific Telesis"), Southwestern Bell Corporation ("SBC") and US WEST Communications, Inc. ("US WEST"), as displayed in the graphic below:



Consistent with the settlement reached with the DOJ, Legacy AT&T continued as a going concern and retained possession of its other assets, including its long-distance lines and Western Electric.

51.     SBC held only one Bell operating company, Southwestern Bell, but grew to become the largest Baby Bell through a series of mega-mergers with other wireline companies after Congress cleared the way to do so with the passage of the Telecommunications Act of 1996 (the "Telecommunications Act"), which removed many of the restrictions imposed by the breakup in 1984.  After moving its headquarters from St. Louis, Missouri to San Antonio, Texas in 1993, SBC changed its name to SBC Communications, Inc. and it began to acquire other wireline companies, including other Baby Bells.  On April l2, 1997, it acquired Pacific Telesis for $16.7 billion.  At the time, Pacific Telesis controlled the wireline assets of the two Bell operating companies that it inherited in 1984, Pacific Bell Telephone Company ("Pac Bell") and Nevada Bell Telephone Company ("Nevada Bell").  On October 8, 1999, SBC acquired Ameritech for $75 billion.  At the time, Ameritech owned the Bell wireline assets that it inherited from Illinois Bell Telephone Company ("Illinois Bell"), Indiana Bell Telephone Company ("Indiana Bell"), Michigan Bell Telephone Company ("Michigan Bell"), Ohio Bell Telephone Company ("Ohio Bell"), and Wisconsin Bell, Inc. ("Wisconsin Bell").  The acquisition formed the nation's largest local wireline company since the Bell System, with control over roughly one-third of the nation's telephone lines.

52.     Meanwhile, Legacy AT&T struggled to gain a foothold in a new growth platform. The settlement with the DOJ freed Legacy AT&T to enter other areas of business, and it invested heavily in computer technology, but those ventures flopped.  In addition, Western Electric was not profitable without the guaranteed customers provided by the Bell System.  With the rise of dial-up internet, Legacy AT&T decided to focus on its core wireline business for data transmission and spun off both its computer assets and Western Electric (renamed Lucent Technologies) in 1996

and 1997.  In the years that followed, Legacy AT&T also took steps to re-enter the local telephone service business to establish direct local connections to retail and business customers.  But even with these moves, its leaner corporate structure made it a prime target for a potential acquisition.

53.    On November 18, 2005, SBC acquired Legacy AT&T in a transaction valued at approximately $16 billion, joining its wireline assets back together with those of their former Bell System parent.  In connection with this transaction, SBC took Legacy AT&T's better-known name and branding, changing its name to AT&T (AT&T Inc.) to distinguish it from Legacy AT&T (AT&T Corporation), and Legacy AT&T became a subsidiary for its long-distance landline assets. The transaction created the largest telecommunications company in the United States, offering a range of voice and data transmission services over its traditional wireline network, newer broadband infrastructure, and cellular technology.

54.    On January 3, 2007, new AT&T continued to grow its footprint by acquiring the last remaining Baby Bell, BellSouth, in a transaction valued at approximately $86 billion.  At the time of the transaction, Bell South still held the wireline assets that it assumed from Bell operating companies Southern Bell Telephone and Telegraph Company ("Southern Bell") and South Central Bell Telephone Company ("South Central Bell").  The transaction brought those wireline assets together with those already owned by AT&T through its other recent mergers, reconstituting five of the eight companies created by the breakup of the Bell System in 1984, as displayed below:



Notably, this provided AT&T with control over approximately **half** of the telephone lines in the United States. The transaction also consolidated ownership of Cingular Wireless, previously a joint venture between BellSouth and SBC, and then the largest wireless carrier in the United States.

55. In early 2007, AT&T began to unveil a new "three-screen" business strategy to seamlessly offer a range of services across television, computer, and mobile phones through its wireline and wireless networks. At the time, AT&T offered not only home internet and cellar service but also home television through its new "U-Verse" product. On June 27, 2008, AT&T announced that it would move its corporate headquarters from San Antonio, Texas, to Dallas, Texas, home to one of the largest concentrations of technology suppliers in the United States.

56. As part of its "three-screen" strategy, AT&T sought to expand its television entertainment and media offerings. On July 24, 2015, AT&T completed the acquisition of DIRECTV, a leading paid satellite television provider, for $67.1 billion, including the assumption of $18.6 billion in debt. The transaction made AT&T the largest paid television provider in the world. On June 14, 2018, AT&T also acquired Time Warner, Inc. ("Time Warner"), the parent company of Warner Bros. studio and several prominent cable networks including CNN, HBO, TBS and TNT, in a transaction valued at $108.7 billion, including the assumption of $23.3 billion in debt. Upon completing the transaction, AT&T renamed the company WarnerMedia.

57. The DIRECTV and WarnerMedia transactions proved to be disastrous. The two transactions increased the Company's debt to an astronomical $180.4 billion. But between the time of the two transactions, the media landscape also changed dramatically as customers chose to leave paid television in record numbers to view programming directly over the internet through online streamlining services like Netflix and Disney+. Indeed, from July 2015 to June 2019, AT&T's base of television subscribers steadily **declined** from 26 million to 21.6 million. In

September 2019, an activist shareholder sent a letter to AT&T's Board which took issue with its recent history of acquisitions, including DIRECTV and Time Warner, and outlined a plan to improve its share value by divesting those non-core assets. As *The Dallas Morning News* observed in June 2020, "AT&T has been under pressure to reduce costs and sell assets to help pay down debt." The COVID-19 pandemic only made matters worse. AT&T lost 3 million more television subscribers in 2020 alone and WarnerMedia was impacted by studio shutdowns and cinema closures throughout the country. On January 27, 2021, AT&T announced that it booked asset impairments of more than $16 billion to account for these issues.

58. In the first half of 2021, AT&T decided to exit the entertainment and media business. On February 25, 2021, AT&T announced that it was spinning off its entire television division into a separate business jointly owned by AT&T and the private equity firm TPG Capital which implied an enterprise value of $16.25 billion, including debt, a dramatic discount of more than $50 billion to the $67.1 billion it paid for DIRECTV *alone* less than six years earlier. On May 17, 2021, AT&T announced that it agreed to sell WarnerMedia in a merger with Discovery, Inc. for $43 billion, including debt, representing another staggering discount of more than $65 billion to the $108.7 billion it paid for WarnerMedia just three years earlier.

59. After completing the separation of DIRECTV and WarnerMedia, AT&T was left with just two reporting segments focused on its core competencies: Communications and Latin America. The Communications segment provides wireline and wireless products and services to retail customers in the United States and business customers globally and is further subdivided by Mobility (*i.e.*, wireless), Business Wireline, and Consumer Wireline.

60. Through its many acquisitions, AT&T operated a number of subsidiaries throughout the United States during the Class Period under various names, including a variety with

"Bell" or "AT&T" in their names. As of December 31, 2018, it owned approximately 36 entities identified as subsidiaries. For simplicity, this Complaint uses the term "AT&T" to refer to AT&T and its consolidated subsidiaries, as well as their predecessors, including, but not limited to, Legacy AT&T, unless the name of a specific subsidiary or predecessor is helpful for clarity.

### 2.    AT&T's Wireline Infrastructure

61.    By the start of the Class Period, AT&T offered its retail and business customers a mix of products and services that relied on its vast wireline network to transmit information, including, most notably, local and long-distance calling, broadband internet access, television and video programming, and various enterprise network services such as virtual private networks (VPN), ethernet, hosting, secure conferencing, and the like.

62.    At this time, AT&T's wireline network was comprised of both old copper wire cables as well as newer fiber optic cables. Copper wire was the material traditionally used for standard telephony transmission for the bulk of the twentieth century and, as such, it is often referred to by AT&T as its "legacy" infrastructure. Unlike copper cable, which transmits information through electrical pulses, fiber optic cable is a newer technology that uses glass to transmit data close to the speed of light. Fiber is not only orders of magnitude faster than copper, it is generally more reliable and offers equal upload and download speeds.

63.    AT&T owned an extensive amount of copper cable through its many acquisitions of Bell System companies, including Legacy AT&T's nationwide network of long-distance copper cables, and direct-to-consumer copper cables in at least 21 states, including Alabama, Arkansas, California, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Michigan, Missouri, Mississippi, North Carolina, Nevada, Ohio, Oklahoma, South Carolina, Tennessee, Texas, and Wisconsin, as displayed in the following map published by AT&T in approximately 2018:

21



During the Class Period, AT&T used its copper cables to offer customers in these states standard telephone service as well as broadband internet access using asynchronous digital subscriber line ("DSL") technology. DSL technology refers to a family of products that are used to transmit digital computer data over copper telephone cables by using frequency bands not used by standard telephone service. DSL is considered a form of "broadband," or high-speed, access because it offers speeds much faster than using a dial-up connection over standard telephone frequencies.

64.    AT&T and its predecessors installed fiber optic cables at various times since the technology was first introduced but it made a big push to meaningfully upgrade its network with fiber cables in 2004 as customers began to express interest in higher-speed services. By no later than 2005, AT&T initiated a project to install fiber optic trunk cables in key areas to neighborhood "nodes," which then relied on existing copper wire connections to relay the signal over the "last mile" to each household using digital internet protocol ("IP") technology. This type of architecture is known as a fiber-to-the-node ("FTTN") network, and AT&T referred to it as its IP Broadband ("IPBB") service. The back-end fiber lines make this type of connection much faster than a pure DSL connection. In April 2014, AT&T announced a new initiative to extend its fiber lines to reach customer locations (also known as fiber-to-the-premises or FTTP) in 100 cities after completing a

successful test run of the service. In July 2015, AT&T agreed to expand its FTTP project to reach 12.5 million new locations by mid-2019, for a total of 14 million, as a condition to acquiring DIRECTV. By the start of the Class Period, AT&T had deployed direct, fully-fiber connections in at least 71 metropolitan areas in each of the states where it offered legacy service. Defendant Stephenson has called this "the most aggressive fiber deployment program probably in the United States." As of June 30, 2018, approximately 93% of AT&T's broadband data subscribers chose a broadband option that required a fiber connection in full or part, including IPBB or 100% FTTP.

65.    Despite the shift in consumer preference for faster broadband connections, AT&T was required by law to maintain its copper wireline infrastructure in certain locations rather than remove it. To introduce competition to the telecommunications market following the breakup of the Bell System in 1984, the Telecommunications Act required the Baby Bells and their successors, each designated as an incumbent local exchange carrier ("ILEC"), to not only maintain their copper wireline network but also open it to any other companies wishing to use it, each designated as a competitive local exchange carrier ("CLEC"), through interconnection agreements.

66.    Accordingly, by the start of the Class Period, AT&T had laid over 1 million route miles of fiber in the 21 states where it had ILEC assets, but it still had ***over 2 million*** sheath miles of standard copper telephone cables spread across that 511,000 square mile area.

### 3.    AT&T's EHS Reporting and Internal Structure

67.    "ESG" is an umbrella term that refers to a management and analysis framework to understand and/or assess the robustness of a company's governance mechanisms and its ability to effectively manage its environmental and social impacts. ESG has become an increasingly important topic for investors in recent years. As far back as 2010, the SEC recognized that there have been "increasing calls for climate-related disclosures by shareholders of public companies." 75 Fed. Reg. 6290 (2010). In March 2022, the SEC proposed a new rule that would ***require***

companies to include certain climate-related disclosures in their registration statements and periodic reports because of growing demand from investors to secure more information related to environmental risks that affect the public companies they own. *See* 87 Fed. Reg. 21334 (2022). The rule was approved on March 6, 2024. *See* 89 Fed. Reg. 21668 (2024).

68.     AT&T has recognized the growing importance of ESG issues from the very beginning. Since 2006, following its formation in the merger between SGC and Legacy AT&T, the new AT&T has published an annual report under different names generally known as its corporate sustainability report ("CSR") documenting its corporate citizenship on a range of topics, including employee well-being and environmental topics like how it handles "hazardous waste" regulated by federal law. In its 2018 CSR, released in September 2019, AT&T's Chief Sustainability Officer, Charlene Lake, stated: "Now more than ever, people and investors are demanding more from companies. We recognize that in addition to meeting our business objectives, we have a responsibility to develop strategies and programs that will benefit society and help create a more sustainable world." The 2018 CSR also referred extensively to the term "ESG" itself. By early 2022, AT&T added a disclosure to its periodic SEC filings admitting that "investors and other stakeholders are increasingly focusing on environmental issues, including climate change, water use, deforestation, plastic waste, and other sustainability concerns."

69.     In fact, AT&T regularly boasts about the accolades it has received for its ESG programs. For example, in early 2020, AT&T highlighted that it receive an award for "Best ESG Reporting" by Corporate Secretary magazine. Since then, AT&T has listed dozens of ESG awards, rankings, and top ratings in its ESG disclosure materials.

70.     Every two to three years, AT&T conducts an ESG "materiality assessment" to identify the most important ESG themes to focus on by engaging a range of stakeholders. For

purposes of this assessment, AT&T defines materiality as those aspects of its business that "reflect the organization's significant economic, environmental and social impacts; or substantively influence the assessments and decisions of stakeholders." Its most recent assessment was based on feedback received from nearly 500 individuals across 8 internal and external global stakeholder groups. Since at least 2016, this review has expressly included the topics of (1) management of hazardous & solid waste and (2) employee health, safety & well-being.

71.    Since at least 2015, AT&T has published an "Issue Brief" on its website for each of the main topics identified through its materiality assessment and other points of interest as a supplement to its CSR with additional information on the topic or point of interest, including its "management approach of the issue and details of company action." Indeed, each CSR that AT&T issued during the Class Period expressly referred investors to its Issue Briefs for additional ESG disclosures. From 2019 through 2022, AT&T stated on its website that its issue briefs "provide additional details on topics identified as most important by our stakeholders." Since then, AT&T has stated that its issue briefs "provide additional details on *priority* topics identified as most important by our stakeholders." Every year during the Class Period, AT&T has published an Issue Brief on the topics of "Waste Management" and "Environment, Health & Safety."

72.    AT&T has adopted an environment, health, and safety management system (the "EHS Management System") that is purportedly based on the principles of International Standards Organization (ISO) 14001 and Occupational Health and Safety Assessment Series (OHSAS) 18001. AT&T claims that this system "provides a framework for [it] to systemically manage its environmental risks and health and safety hazards." It includes standards for the planning, implementation, operation, and continuous review of AT&T's health and safety programs. Among other things, the EHS Management System requires AT&T to provide EHS "training" to fulfill its

25

EHS needs, including training to make employees aware of adverse EHS consequences associated with work activities, and to establish procedures to "monitor and measure" performance.

73.     The foundation of AT&T's EHS Management System is its EHS Policy, which went into effect when it was signed by Defendant Stephenson on August 13, 2008.  The policy statement in the EHS Policy reads in full: "It is the policy of AT&T's operating companies (collectively, "AT&T") to operate and to provide products and services in an environmentally responsible and sustainable manner. It is also AT&T's policy to protect the health and safety of our employees and the public."  Consistent with that policy, the EHS Policy further memorialized AT&T's "commitment" to various matters, including, among others:

- complying with all applicable environment, health and safety laws and regulations and maintaining and improving management systems throughout the company to meet our compliance obligations;

- promoting pollution prevention, including recycling and minimizing wastes;

- supporting our employees in meeting their environment, health and safety obligations by providing them necessary and appropriate training, job aids and resources to facilitate compliance with environment, health and safety laws; and

- evaluating our environment, health and safety performance through regular reviews and audits.

AT&T issued a new version of the EHS Policy in March 2020.

74.     Within AT&T, the Company's EHS department is charged with responsibility for managing regulated waste generated by various AT&T operations and ensuring that workers comply with relevant safety laws, regulations, and internal standards.  The group is led by AT&T's Assistant Vice President – EHS, which has been Jalayna Bolden since March 2022.  The head of the EHS group reports to Ken Lear, AT&T's Vice President of Global Real Estate.

### 4.    The Recent History of Safety and Environmental Violations by AT&T

75.    In the years leading up to the Class Period, AT&T suffered a series of damaging EHS complaints, suggesting that its EHS Management System was not serving its stated function and elevating the importance placed on its EHS disclosures by the investment community.

76.    In February 2014, the United States Department of Labor sued AT&T for retaliating against employees who reported workplace injuries.  According to the lawsuit, an investigation uncovered that AT&T sent workers home without pay after reporting that they sustained an injury on the job on 13 separate occasions in Ohio between 2011 and 2013.

77.    In November 2014, AT&T reached an agreement with the California Attorney General's office and the Alameda County District Attorney's office to settle allegations that AT&T improperly disposed of hazardous waste, including lead batteries, at over two hundred of its facilities in California over a nine-year period, for a civil penalty of $23.8 million and a commitment to spent $28 million to implement enhanced environmental compliance measures. The case arose in 2011, when state regulators conducting a routine inspection of AT&T's dumpsters found that it was routinely sending hazardous materials to local landfills not permitted to receive such materials.  An article on the settlement published by *Forbes* on November 28, 2014 observed that the "issue of e-cycling is relatively high on the radar screen of average U.S. adults— approximately 82% think it's important or very important."

78.    In May 2017, reports emerged that AT&T field technicians held a demonstration in Bakersfield, California to protest occupational safety conditions.  The workers said they were regularly exposed to class III lasers while installing fiber optic cable without protective goggles. According to a story by *ABC*, these field technicians had been "pleading with the wireless provider to provide the proper safety equipment" but "those requests have gone unanswered."

79.     In November 2017, AT&T reached another agreement with the California Attorney General's office and the Alameda County District Attorney's to settle allegations that AT&T again disposed of "large volumes" of hazardous waste, including lead batteries, at its facilities in California, for $9.5 million.  As in the previous matter it settled, inspectors found that AT&T routinely sent hazardous waste to local landfills that were not permitted to receive such materials.

**B.     Lead Is a Heavily Regulated, Highly Toxic Material**

80.     Lead has been heavily used in industry for more than a century and its dangers were well-understood long before the start of the Class Period, as evidenced by its extensive regulation and the science on which those regulations are based.

**1.     Lead Is a Brittle Heavy Metal Extremely Harmful to Human Health**

81.     Lead is a naturally occurring blue-grey heavy metal with several unique physical properties.  Despite its heavy density, lead is relatively soft and malleable.  In addition, lead has a low melting point compared to other metals at approximately 621.5 degrees Fahrenheit.  Finally, lead is orders of magnitude more resistant to electrical current than other common metals, like aluminum, copper, or steel.  Accordingly, lead can be easily fabricated into different shapes and acts as an effective shield against electrical interference in a range of environments.

82.     Because lead is soft and brittle at room temperature, lead-bearing objects can shed undetectable and odorless particles when they are subject to friction, which become airborne or deposit on surrounding surfaces.  These particles enter the body primarily through inhalation or inadvertent ingestion of contaminated food or consumables, or by touching contaminated surfaces.  According to studies accepted by the Centers for Disease Control and Prevention (the "CDC"), anywhere from 20% to 70% of ingested lead is absorbed into the body, depending on a variety of factors, including particulate size, nutritional status, health, age, and stomach content.  However, almost *all* inhaled lead is absorbed into the body in the lower respiratory tract, including the lungs.

28

83.     Once in the human body, lead can cause irreversible brain damage and adversely affect nearly every other major system in the body.  Lead particles pass through the lungs or stomach into the bloodstream, which carries them to other parts of the body where they accumulate in bone and soft tissues, including organs.  These lead particles interfere with the function of innate enzymes which mistake them for other metals that take part in natural biologic processes, like calcium, iron, and zinc, and prevent them from catalyzing normal reactions.  Because lead mimics calcium, it is also able to cross the blood-brain barrier.  Once in the central nervous system, lead particles destroy neurons and interfere with neurotransmission, especially in the parts of the brain responsible for emotional regulation, impulse control, attention, and verbal reasoning.

84.     Lead stored in soft tissues can remain in the body for several months or more, but bones can store lead for decades.  Under certain circumstances, lead from these inert stores will sporadically leave bone tissue and reenter the bloodstream, where it can be redistributed to other soft tissues.  Consequently, these long-term reserves pose special risk because they are a potential endogenous source of lead that can continue to harm the body long after exposure has ended.

85.     The effects of lead exposure vary due to the manner it is dispersed throughout the body and can depend on many individualized factors, including, most notably, age, amount of exposure, and length of exposure.  Ailments range from acute to chronic and from minor to severe, including severe abdominal pain, headaches, vomiting, coma, anemia, interstitial kidney fibrosis, reproductive toxicity, hypertension, and a range of neurological issues, including, impaired concentration and memory, decreased cognition, impulsiveness, behavioral and emotional disorders, fatigue, and an overall reduction in reaction time and fine motor skills.  Lead has been linked to lung and stomach cancer.  Lead can cause birth defects and miscarriages in pregnant women.  At high concentrations, exposure to lead can be lethal.  Indeed, exposure to levels of 100

29

microgram per cubic meter of air ($\mu g/m^3$) is considered immediately dangerous to life and health (IDLH), a designation developed by the National Institute for Occupational Safety and Health ("NIOSH") to refer to an airborne contaminant that is "likely to cause death or immediate or delayed permanent adverse health effects or prevent escape from such environment."

86.    Children are particularly vulnerable. Their bodies absorb more lead than adults and their nervous systems are more sensitive to the pernicious effects of lead. Even low levels of lead can inhibit brain development, leading to long-lasting issues that can curtail academic and socio-economic advancement, including lower IQ, decreased attention, aggression, and impulsivity, among many others. Infants and small children are also at higher risk for lead exposure because they often put their hands and other objects that can carry lead particles in their mouth.

87.    Because many of the health problems described above appear slowly or can be caused by a number of other reasons, lead poisoning may go undiagnosed for a prolonged period of time, if at all. Similarly, the effects of lead can go unnoticed in children until years after exposure, when academic performance and learning disabilities become more pronounced in later stages of life. For this reason, lead is often referred to as a "silent killer."

## 2.    History of Lead Use and Regulation in the United States

88.    Due to its unique physical properties and ready supply, lead became a popular material during the Industrial Revolution and its use continued to increase thereafter as a common commodity. By the start of the 1900s, the production of lead reached an all-time high and the United States, in particular, was the global leader in lead production and use. During this time, lead was used extensively in construction, plumbing, soldering, and a range of industries as a barrier against electrical interference and radiation (*e.g.*, x-rays). Lead or lead compounds were also used extensively as an additive to enhance the performance or appearance of various products,

including, most notably, as an anti-knocking agent in gasoline and as a pigment supplement in residential paint to accelerate drying, increase durability, and inhibit corrosion.

89.    Through its ubiquitous use, humans became exposed to increasingly elevated levels of lead and research began into the effect of lead intake on the human body.  Over time, consensus grew that it was highly toxic even in small concentrations.  Reports of widespread lead poisoning were made throughout the 1950s.  By the mid-1960s, research showed that the average blood lead level in the United States was extremely elevated, suggesting that the average citizen was subject to chronic exposure, and many industries began to voluntarily phase lead out of use.  However, the countless sources of lead already in commercial use remained outstanding, including, for example, lead paint in residential houses and lead piping in municipal water systems.

90.    Growing concern over lead poisoning in children from repeated ingestion of lead paint prompted the federal government to take action.  In 1971, Congress passed the Lead-Based Poisoning Prevention Act ("LBPPA"), which directed the U.S. Department of Housing and Urban Development ("HUD") to prohibit the use of lead-based paint in federally-sponsored residential structures.  In 1976, Congress amended to LBPPA to direct the U.S. Consumer Product Safety Commission ("CPSC") to take steps to regulate lead-based paint more broadly.  *See* Pub. L. No. 94-317 (1976).  In 1977, the CPSC notoriously banned the use of lead paint by decreasing the acceptable limit of lead in paint to 0.06%, effective February 1978.  *See* 42 Fed. Reg. 44193 (1977). This was further reduced by the CPSC in 2008 to 0.009%.  *See* 73 Fed. Reg. 77492 (2008).

91.    While the CPSC's efforts effectively banned the use of lead paint moving forward, the federal government remained concerned that over 80% of all residential houses built before 1978 still contained lead paint. To further protect families from lead exposure, Congress passed the Residential Lead-Based Paint Hazard Reduction Act of 1992 as Title X of the Housing and

Community Development Act of 1992, commonly referred to as "Title X."  Pub. L. No. 102-550

(1992) § 1001 *et seq.*  Title X directed both HUD and the EPA to promulgate regulations requiring

sellers of residential properties built before 1978 to disclose if the property has any lead paint

hazards.  *Id.*  In March 1996, the two agencies jointly promulgated the new rule, known as the

"Lead Disclosure Rule."  *See* 61 Fed. Reg. 9064 (1996).  As codified in 24 C.F.R. §§ 35.80-

35.1355 (HUD) and 40 C.F.R. §§ 745.100-745.119 (EPA), the Lead Disclosure Rule required

sellers of such properties to (i) disclose if the property has any lead paint or lead paint hazards; (ii)

provide purchasers with a lead paint hazard pamphlet approved by the EPA; and (iii) include and

a lead warning statement as an attachment to any property sale contract to be signed by the seller

and purchaser and certified as true and accurate.  Purchasers, in turn, must acknowledge receipt of

the lead disclosure and EPA-approved pamphlet in the lead warning statement before signing it.

92.     Among other things, the EPA-approved pamphlet, *Protect Your Family from Lead
in Your Home*, warns that lead can be extremely harmful to children and adults and further cautions

that anyone who works with lead as part of their job can be exposed and bring it home:



In addition, the lead warning required by HUD and EPA to be included as an addendum to any sale contract subject to the Lead Disclosure Rule must include the following language:

> Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. ***Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women.***

24 C.F.R. § 35.92, 40 C.F.R. § 745.113(a)(1) (emphasis added).

93.     The EPA and HUD have developed a form addendum to use in sale contracts that satisfies the elements described in ¶¶ 91-92, titled *Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards*. Among other things, this form addendum, which must be signed by all sellers and purchasers, includes the language excerpted in ¶ 92 under the heading "Lead Warning Statement" and requires: (i) the sellers to disclose any known lead paint hazards; (ii) the purchasers to acknowledge receipt of the EPA-approved pamphlet described in ¶ 92; and (iii) all parties to state that they "have reviewed the information above and certify, to the best of their knowledge, that the information that they have provided is true and accurate."

94.     At around the same time as its lead paint measures, the federal government also took steps to remove lead from gasoline. In response to public concern over visible smog in many of the nation's cities and industrial centers, Congress passed amendments to the Clean Air Act (the "CAA") in 1970. *See* Pub. L. No. 91-604 (1970). These amendments (1) effectively required cars to use of catalytic converters by no later than 1975 to reduce exhaust emissions; and (2) authorized the EPA to regulate pollution from cars. Because lead was corrosive to catalytic converters, the EPA promulgated regulations requiring gas stations to offer at least one grade of unleaded gasoline and car manufacturers to affix permanent labels reading "Unleaded Gasoline Only" on all cars made after 1974, including one on the dashboard. *See* 38 Fed. Reg. 1254 (1973). The EPA also

issued regulations requiring a phased reduction in lead from gasoline for cars by 1980.  *See* 38 Fed. Reg. 33734 (1973).  The EPA further reduced the acceptable limit in 1985.  *See* 50 Fed. Reg. 9386 (1985).  In 1990, Congress amended the CAA to permanently ban the use of lead in motor vehicle fuel beginning in 1996.  *See* Pub. L. No. 101-549 (1990).  The EPA subsequently eliminated the need for the "Unleaded Gasoline" label in cars.  *See* 61 Fed. Reg. 3832 (1996).

95.    The phase-out of lead in motor vehicle fuel was a major success.  According to the EPA, air lead levels decreased by 94 percent between 1980 and 1999.  By the time the ban took effect in 1996, the average blood lead level in adults declined by approximately 80% and the average blood level in children declined by approximately 70%.  In a press release announcing the EPA's final rule on the ban, EPA Administrator Carol Browner declared that, in the United States, "[t]he elimination of lead from gas is one of the ***greatest environmental achievements of all time***."

96.    The federal government also took steps to eliminate the use of lead in household plumbing and public water supplies.  By the 1980s, there was sufficient evidence that lead-bearing materials in public water supply systems were leaching lead into drinking water due to corrosion, particularly when exposed to "soft" water with high acidity or low mineral content.  In 1986, Congress passed amendments to the Safe Drinking Water Act of 1974, which, among other things, (1) prohibited the use of pipes, solder, or flux for any public water system or plumbing connected thereto, including schools, that is not "lead free," and (2) directed the EPA to establish a maximum contaminant level goal ("MCLG") for lead in drinking water.  *See* Pub. L. No. 99-339 (1986).  The ban on lead-bearing pipes and fittings became effective in June 1988.  In 1991, the EPA published a rule setting the MCLG for lead and copper, known as the Lead and Copper Rule.  *See* 56 Fed. Reg. 26460 (1991).  As codified in 40 C.F.R. § 141.51, the Lead and Copper Rule established a

MCLG for lead of zero. *Id.* The EPA set the MCLG at zero in part due to lead being a probable carcinogen and there being no clear threshold for some non-carcinogenic health effects. *Id.*

97.    Nevertheless, these measures did not eliminate the presence of lead in water systems built with older components. In early 2016, a public health crisis in Flint, Michigan received national attention after it was determined that residents, including thousands of children, were exposed to elevated levels of lead in the city's drinking water after a recent change to its source, and government officials declared a state of emergency.

98.    Through these measures and related events, the dangers of lead have become widespread public knowledge and there is almost universal public consensus that lead is extremely harmful to human health. Numerous government agencies responsible for public health, including EPA, the Centers for Disease Control and Prevention ("CDC"), and the U.S. Food and Drug Administration ("FDA"), as well as a variety of preeminent independent health organizations, including the World Health Organization ("WHO") and the American Medical Association ("AMA"), have all independently advised that there is *no safe level of lead in a human body*. As recently as March 28, 2023, EPA Administrator, Michael S. Regan, emphatically stated in a joint press release with the United States Department of Health and Human Services that "*[t]he science is clear: there is no safe level of lead exposure, especially for children*."

### 3.    Individuals Who Work With Lead Face the Prospect of Lead Poisoning

99.    Despite the efforts by the federal government to reduce and/or eliminate the use of lead, workers in certain industries continue to encounter lead-based materials in the normal course of business. As explained above, there remains an extensive number of lead-bearing objects in industry due to lead's widespread use during the 19th century and early 20th century, especially in construction. Indeed, the federal government estimated that, as of 1978, there were *at least* 120 occupations in which workers are exposed to lead. Workers in these positions are at heightened

risk for lead poisoning due to the manner in which lead particles are often unknowingly dispersed into the air and surrounding surfaces from lead-bearing objects (¶ 82). Accordingly, the CDC has indicated that occupational exposure continues to be one of the leading sources of lead poisoning.

100.    The Occupational Safety and Health Administration ("OSHA") is the government agency that is charged with responsibility for setting and enforcing workplace health and safety standards. It was established by the Occupational Safety and Health Act of 1970 (the "OSH Act"), during a time when workplace accidents were soaring. *See* Pub. L. No. 91-596 (1970). The purpose of this legislation was to ensure that employers provide employees with an environment free from recognized hazards, including toxic substances and unsanitary conditions.

101.    Section 18 of the OSH Act encourages individual states to develop and operate their own worker safety and health program for private sector and state or local government employees within their jurisdiction (each a "State Plan"). OSHA approves and monitors each State Plan and provides up to 50% of the funding for each such program. However, any State Plan must be at least as effective as OSHA's federal guidelines. Most OSHA-approved State Plans therefore adopt the OSHA federal standards into their own rules and provide additional protections or cover additional hazards addressed by federal OSHA guidelines. There are currently 29 states or territories with OSHA-approved State Plans that cover private sector and/or state or local government employees, including California, Michigan, Oregon, and Washington.

102.    In November 1978, OSHA issued a final rule establishing standards for lead exposure in general industry (the "OSHA Lead Standard"). *See* 43 Fed. Reg. 52951 (1978) (Parts I-V), 43 Fed. Reg. 54353 (1978) (Part VI). As codified in 29 C.F.R. § 1910.1025, the OSHA Lead Standard established, among other things, a permissible exposure limit ("PEL") of 50 $\mu g/m^3$ of lead over an eight-hour time weighted average as well as an "action level" of 30 $\mu g/m^3$, at which

an employer must begin specific compliance activities, including free medical surveillance for exposed workers. *Id.* § 1910.1025(c), (j). Employers are required to ensure compliance with these airborne concentration levels through regular monitoring, *i.e.*, sampling, while the employee is exposed to lead. *Id.* § 1910.1025(d). The PEL was set at 50 μg/m$^3$ based on available evidence that workers exposed to concentrations above that amount suffer severe adverse health effects.

103.    The OSHA Lead Standard also requires the employer to carry out a comprehensive program to reduce or maintain worker exposure within the PEL, including, among other things, training and education on lead exposure, the establishment of a written compliance program, the use of engineering controls (*e.g.*, mechanical ventilation) and administrative controls (*e.g.*, recordkeeping), as well as the use of personal protective equipment ("PPE"), such as a respirator and other full-body coverings. *Id.* § 1910.25(e), (f), (g), (l). Notably, the written compliance program required by the OSHA Lead Standard requires each employer to include "[a] description of ***each operation in which lead is emitted***, e.g. machinery used, material processed, controls in place, crew size, employee job responsibilities, operating procedures" and the like. *Id.* 1910.25(e)(3)(ii)(A) (emphasis added). In addition, each employer who has a workplace where there is a potential exposure to lead ***at any level*** must ensure that each employee is informed about the contents of the OSHA Lead Standard, including Appendices A and B, which specifically advise that "[c]hronic overexposure to lead may result in severe damage to your blood-forming, nervous, urinary and reproductive systems" and can be "fatal." *Id.* § 1910.25(l)(1), App'x A-B.

104.    Pursuant to their inherent power to issue standards more protective than those afforded by OSHA at the federal level, several states have initiated proceedings to consider revisions to the occupational lead standards set forth in their State Plan based on emerging scientific evidence that exposure to lead at levels below 50 μg/m$^3$ has the potential for significant

harm.  For example, California OSHA ("Cal/OSHA") made such recommendations in 2010 and 2011 and has since held numerous meetings to discuss the potential changes.  On February 15, 2024, it approved a new lead standard for general industry, effective January 1, 2025, drastically reducing the PEL from 50 $\mu g/m^3$ to 10 $\mu g/m^3$ and, the action level from 30 $\mu g/m^3$ to 2 $\mu g/m^3$ in order to keep employee BLLs below 10 $\mu g/dL$.  Similarly, Washington's Division of Occupational Safety and Health ("Washington DOSH") initiated rulemaking proceedings with participation from various stakeholders to consider amending its lead standard in 2016.  The latest discussion draft, published June 2019, proposed using 20 $\mu g/m^3$ as the PEL and an airborne lead action level of 10 $\mu g/m^3$.  Oregon OSHA convened a PEL advisory committee in 2016 to consider whether to adopt Washington DOSH's proposal.  In 2018, Michigan OSHA ("MIOSHA") officially revised its lead standards to require medical removal when an employee's BLL reaches 30 $\mu g/dL$, and the employee may not return to work involving lead exposure until the BLL falls below 15 $\mu g/dL$.

105.    On June 28, 2022, OSHA published a notice in which it indicated that it was considering updating the OSHA Lead Standard based on medical findings since it was first published that adverse health effects in adults can occur at BLLs lower than those set forth in therein.  *See* 87 Fed. Reg. 38343 (2022).  Indeed, OSHA has publicly stated that "[r]ecent studies have provided evidence that lead can cause health effects at blood levels [BLLs] lower than those established by OSHA's 1978 Lead standard."  In particular, OSHA now believes that regular exposure to lead resulting in BLLs as low as 10 mg/dL in adults are associated with impaired kidney function, high blood pressure, nervous system and neurobehavioral affects, and cognitive dysfunction later in life, and exposures between 20mg/dL and 40 mg/dL can cause adverse effects on sperm/semen quality and conception, and are associated with deficits in visuomotor dexterity and lower reaction times.  According to OSHA, levels above 60 mg/dL can cause coma or death.

38

### 4.     Lead Poses Significant Threats to the Environment

106.    Lead poses a variety of significant threats when released into the environment. Because lead is often imperceptible to the naked eye, it can pose a risk to humans who unknowingly come in contact with lead particles deposited in the environment.  Environmental lead can also compete with other metals found in and on plant surfaces, potentially inhibiting photosynthesis and plant growth and survival, resulting in a change of plant life and biodiversity. In addition, the presence of lead on soils and plants can allow it to proliferate through the food chain, affecting microorganisms and animals that form part of that ecosystem, including, ultimately, humans.  As stated by EPA, "[e]levated lead in the environment can result in decreased growth and reproduction in plants and animals, and neurological effects in vertebrates."

107.    Lead is especially dangerous in nature because of the way it is distributed and deposited throughout the environment.  When lead is released into the air, it may travel long distances before settling to the ground, where it usually sticks to soils and particles and can remain for hundreds to thousands of years.  Even worse, lead can move from soil into ground water depending on the type of lead compound and the characteristics of the soil.

108.    The EPA is an independent agency that was formed in 1970 to consolidate the environmental responsibilities of several government agencies under one roof.  Its mission is to protect human health and the environment.  The EPA is responsible for maintaining and enforcing national standards under various environmental laws, including those described below.

109.    There have been a number of landmark environmental laws passed by Congress since the formation of the EPA in 1970 that govern the handling or disposal of lead or have prompted the EPA issue regulations governing the handling or disposal of lead, including the Resource Conservation and Recovery Act of 1976 (the "RCRA").  *See* Pub. L. No. 94-580 (1976). The RCRA is the principal federal law governing the disposal of "hazardous waste" in the United

States.  It was enacted as an amendment to the Solid Waste Disposal Act of 1965.  Among other things, the RCRA set national standards for the treatment, storage, and disposition of hazardous waste, and imposed various reporting requirements for facilities that generate or handle such waste.

110.    Lead is classified as a "hazardous waste" under the RCRA.  Section 1004 of the RCRA defines "hazardous waste" as any solid waste "which, because of its quantity, concentration or physical, chemical, or infectious characteristics may . . . pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed."  42 U.S.C. § 6903(5).  Pursuant to the RCRA, the EPA has promulgated several lists of such materials, including a list of materials that are hazardous because they are toxic, also known as toxic waste.  *See* 40 C.F.R. § 261.24.  The EPA has stated that toxic wastes "present a concern as they may be able to leach from waste and pollute groundwater."  The EPA's list of toxic waste contaminants contains eight heavy metals known to be highly toxic at small concentrations, commonly referred to as the "RCRA 8," including "lead."  *Id.* tbl. 1.  Other RCRA 8 metals include arsenic and mercury.  Under EPA regulations, concentration of lead above 5.0 mg/L is considered toxic and, thus, hazardous for purposes of the RCRA.  *Id.*

111.    In 1992, Title X of the Housing and Community Development Act of 1992 added Title IV to the Toxic Substances Control Act of 1976 (the "TSCA").  *See* Pub. L. No. 102-550 (1992) § 1021.  As amended by Title X, Section 403 of the TSCA required the EPA to promulgate regulations that identify what constitutes lead-contaminated soil for purposes of Title X.  Section 401 of the TSCA defines lead-contaminated soil as "bare soil on residential real property that contains lead at or in excess of levels determined to be hazardous to human health."  In January 2001, the EPA promulgated a final rule which established that lead is a hazard to human health

when it equals or exceeds 400 parts per million (μg/g) (ppm) in play areas or 1,200 ppm elsewhere. *See* 66 Fed. Reg. 1206 (2001) (codified at 40 C.F.R. § 745.65(c)).

112.    Other environmental laws provide the EPA with the power to regulate the cleanup of hazardous materials that are released into the environment, including lead.  The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), also known as "Superfund," is the primary federal law governing the cleanup of contaminated sites.  *See* Pub. L. No. 96-510 (1980).  As amended, CERCLA provides the EPA with broad authority to investigate and remediate the release, or threatened release, of hazardous substances into the environment and makes certain classes of parties connected thereto financially liable for response costs and natural resource damages, known as potentially responsible parties.  Section 101 of CERCLA defines "hazardous substance" to include any material designated as a "hazardous waste" under the RCRA. Accordingly, EPA regulation identifying the hazardous substances subject to CERCLA expressly includes "lead" as that term is used in EPA's toxic waste list.  *See* 40 C.F.R. § 302.4 tbl. 302.4.

113.    Several other federal laws give the EPA "emergency powers" to issue orders for abating contaminants that enter ground or surface water, including lead.  For example, Section 1431 of the Safe Drinking Water Act ("SDWA") grants the EPA "emergency powers" to issue orders for abating an imminent and substantial endangerment to public health when (1) a contaminant "is present in or is likely to enter a public water system or an underground source of drinking water" and (2) the appropriate state and local authorities have not acted to protect public health.  Section 504 of the Clean Water Act also grants the EPA "emergency powers" to issue orders for mitigating a discharge of a pollutant into waters, if warranted, to abate an imminent and substantial endangerment to human health or the welfare of persons.  Lead is specifically identified

on the EPA list of toxic pollutants and/or contaminants subject to each of these laws.  *See* 40 C.F.R.

§ 141.51 (SDWA), 40 C.F.R. §§ 116.4, 401.15 (Clean Water Act).

## C.    AT&T Owns A Sprawling Network of Old Telecommunication Cables That Are Encased In Decaying Lead

114.    Despite its professed robust commitments to environmental stewardship, AT&T

has long—and largely outside the public's view—owned, operated, and maintained a massive,

decaying web of copper telecommunication cables encased with lead, a hazardous toxic

contaminant that presents significant public health and environmental protection risks.

### 1.    Origins of Lead in the National Telecommunications Network

115.    Before 1887, there were numerous types of cable used for telephone wire.  In 1887,

a conference was held between various companies to establish uniform standards for such cables.

The standard, issued in 1888, called for a pair of 18-gauge copper wires twisted around each other,

also known as the "twisted pair cable," covered with at least two layers of oil-soaked cotton, placed

in a protective alloy covering consisting of 97% lead and 3% tin.  Soon thereafter, strips of waxed

paper were introduced as a more effective insulation.  By 1891, the lead-covered, paper-insulated

copper cable was the standard for telephone wire.

116.    The manufacturing arm of the Bell System, Western Electric, was an early adopter

of the paper-insulated lead sheathed copper telephone cable.  It maintained at least six factories

across the United States which continuously manufactured this cable-type *en masse* and then

loaded them onto wooden spools for distribution to Bell System operating companies on demand.

By 1956, the Bell System was using around 100 million pounds of lead a year, according to internal

documents.  As the *WSJ* observed, "[t]hat's heavier than more than 6,660 male African elephants."

117.    Lead continued to be used pervasively by Western Electric as a protective sheathing

until approximately the 1950s, when it was phased out after a new type of plastic sheathing was

42

developed. But by that point, the damage had already been done. Because the Bell System had a near-total monopoly over the telephone industry for the first half of the twentieth century, Western Electric's equipment was widespread across the country, including its lead phone lines. By the 1950s, approximately 90% of all telecommunications wire was sheathed in lead.

118.    Even after lead cables were phased out for plastic sheathing, the expansive network of existing lead cables remained in the network and were maintained by the Bell System, as it previously admitted to the federal government. On December 29, 1978, soon before the 1984 breakup, AT&T and associated Bell System companies petitioned OSHA to reconsider the OSHA Lead Standard in a proceeding styled *In the Matter of Promulgation of Final Standard on Occupational Exposure to Lead (29 CFR S 1910.1025)*. The OSHA petition acknowledged the continued use of lead sheathed cables in the Bell System:

> Petitioners' use of lead products has been primarily in the form of lead-sheathed cables and the various lead sleeves and solders necessary to make moisture and airtight the entire cable from end-to-end. Very little new lead-sheathed cable is placed in service today. However, the existing lead-sheathed cables must be maintained. . . . The maintenance and on-going removal of these facilities require that technicians work with the lead from time to time as well as work in the vicinity of lead at other times even though the lead-sheathed cable is not actually involved.

In fact, the petition emphasized the extent of such cables above and below ground in an effort to overturn the OSHA Lead Standard: "There are millions of poles carrying lead cable . . . . There are some 700,000 manholes in the Bell System many of which house lead cable." Nevertheless, the petition assured that, "*[u]ltimately, these cables will be removed and the metals recycled*." As explained below, AT&T did not carry through on that commitment. On the contrary, it took affirmative steps to neither remove nor recycle those cables.

## 2.    AT&T's Acquisition of Lead-Covered Cables

119.    AT&T has had lead-covered cables in its telephone network since the very beginning. As detailed more fully above (¶¶ 50-54), modern day AT&T was formed in 1984 as

43

one of the Baby Bells to assume the assets of Southwestern Bell, including, necessarily, its extensive network of copper telephone cables supplied by Western Electric.

120.    AT&T took on even more lead sheathed wireline assets by acquiring other former Bell System companies.  As detailed more fully above (¶¶ 50-54), AT&T acquired several other Baby Bells in the years following the enactment of the Telecommunications Act in 1996, including Pacific Telesis, Ameritech, and BellSouth, along with all of the copper wire infrastructure they inherited from the Bell System, and also acquired Legacy AT&T, including its nationwide network of long-distance telephone cables built with materials from Western Electric.

### 3.    The Vast Amounts of Lead Encased Cables That Remain in AT&T's Legacy Copper Wire Network

121.    To this day, there remains vast amounts of lead covered cables in AT&T's massive wireline network of copper cables, which its frontline workers frequently encountered in the normal course of business.  In fact, there are heavy concentrations of these cables hanging in the air in older urban areas, where AT&T maintains its central switching offices into which all local lines run, as these were often the parts of the telephone network was first built.

122.    As detailed more fully below (¶¶ 155-156), a high-ranking senior official from AT&T's EHS department confirmed during a presentation made to peers that AT&T's network continued to contain lead-clad cables in 2010 and 2013 and that there are large concentrations of these cables in downtown metropolitan areas, noting "[s]ome older metropolitan areas may still have over 50% lead cable."  This is especially alarming because older metropolitan areas are often densely populated with large numbers of people who maintain businesses and residences in close proximity to the utility poles that carry telephone lines.

123.    This continued to be the case during the Class Period.   A collection of former employees confirmed that they frequently encountered lead cables prior to and during the Class Period in the geographies that span AT&T's legacy network, including metropolitan areas:

- CW1 worked with lead cables in Dallas, Texas and Fort Worth, Texas "almost every day," sometimes "twice a day."  All the lead cables that CW1 came across were hung on utility poles.  CW1 added that "[t]here is a lot of lead cable in Dallas," estimating roughly 80% of the cables CW1 encountered there were covered in lead.

- CW2 reported that there are "tons" of lead cables in and around Kansas City, Kansas. CW2 primarily worked with lead cables in underground vaults but confirmed that "they're still in the air and underground today."

- CW3 confirmed that there were lead cables "all over the place" in the Chicago suburbs. CW3 estimated that about half of them were on aerial cables on utility poles and the other half were in underground vaults but clarified that most of the aerial cables were in heavily populated neighborhoods.  These cables were so pervasive that CW3 still encountered them through 2020 when installing digital equipment on AT&T's network.

- CW4 worked with lead cables in Milwaukee, Wisconsin.  CW4 recalled seeing lead cables "whenever you went into a manhole" but confirmed there is still "quite a bit" hanging aerially as well.  CW4 said there is more lead in "older" parts of the city, estimating 50% of the cables downtown were covered in lead.

- CW5 indicated that there are "a lot" of lead cables hanging on utility poles in Dallas, especially the "older neighborhoods."  CW5 reported encountering these cables "the majority of my day because I worked in the lower income areas."  CW5 added that the lead cables still remain in these locations, even after AT&T brought fiber to Dallas. CW5 was also given a tour of AT&T's corporate central office in downtown Dallas by a colleague and confirmed that it still has lead cables underneath it.

- Encountering lead cables underground was "almost a daily thing" for CW6 in Birmingham, Alabama.  CW6 added "most of the underground had it."

- CW7 saw lead cable above ground in St. Louis, Missouri and Birmingham, Alabama, but stressed that it was "all over the place" in manholes throughout Atlanta, Georgia.

- CW8 recalled working with lead cables every other day in Nevada, Missouri and Lamar, Missouri.  CW8 estimated that 30-40% of the telephone cables in those areas were covered in lead, adding it was "quite a substantial amount" and "a lot of it was aerial."  CW8 also worked on lead cables in St. Louis, Missouri, recalling that the oldest cable encountered was from 1904 "because it had a stamp that was embedded into the case."

124.    Knowledge of these lead cables was not confined to AT&T's frontline workers, but well known to its operations professionals, including Defendant John Stankey.  CW12 who led AT&T's network operations, stated that "anyone in the network or operations side of the house knew there were lead cables" and "I'm sure Stankey did."  CW12 explained that "[h]e [Stankey] came up through the operations side" and "he's a very knowledgeable operations executive," which CW12 knew because "I worked with him for years."  Consistent with the above, CW13, who was a network engineer for AT&T, said lead cables were "common" and "normal" in the older parts of the network, adding that "[l]ead cables were certainly a big part of what we had out there" in the air and underground.  CW14, another engineer, reported that there are "thousands of miles" of lead cable underground and in the air.  CW15, who worked in AT&T's EHS group, also confirmed that colleagues within the EHS group were fully aware that AT&T had lead-covered cables in its network.  Indeed, CW16 reported "[t]here is not one person at that company who doesn't know that there are lead cables in the ground or in the air."

125.    That AT&T's "legacy" network continues to contain an extensive amount lead during the Class Period is not subject to debate.  As provided more fully below (¶ 262), AT&T has admitted that, as of July 18, 2023, approximately "10% of its copper footprint of roughly two million sheath miles of cables" are still wrapped in lead casing.  In other words, AT&T still owns approximately 200,000 sheath miles of lead cables.  That is almost enough lead cable to wrap around the Earth more than *eight times*.  As explained below (¶ 211), one of the lead cables laid by AT&T contained approximately 3.39 pounds of lead in each foot of cable.  Thus, AT&T continues to own approximately *3.58 billion pounds* (almost 1.8 million tons) of lead that is sitting across the United States.  By comparison, AT&T's primary wireline competitor, Verizon, has admitted owning just 8,400 miles of lead in its network.  Even more concerning, AT&T

represented in the same filing that approximately "two-thirds of its lead-clad cabling is either buried or in conduit," as opposed to being exposed on utility poles or in water bodies. In other words, there remain roughly **_66,666 route miles_** of aerial and underwater cables, many of which sit or hang in close proximity to human activity.

### 4.    AT&T Maintained Sophisticated Information Systems That Provide Detailed Information on the Lead In Its Copper Cable Network

126.    As expected for any large telecommunications company, AT&T and its predecessor maintained proprietary engineering maps detailing the layout and composition of its legacy copper cable network, including the portions thereof that contained lead.

127.    CW13 and CW14 advised that AT&T's Engineers maintained detailed maps of AT&T's copper wire network in a system called Aramis. According to CW13, Aramis was akin to a computer-aided design (CAD) tool that allowed engineers to make real-time updates to the maps as they approved any changes to the network. CW14 indicated that the system is now called Waldo. CW13 confirmed that these maps contained detailed information on each cable in the network, including wire gauge, type of sheathing, year placed, and the total length of each segment. CW14 reported that "[w]e even had a symbol for a cable that was never removed and retired in place—there would be X's through it [the line] and would say RIP" for retired in place.

128.    AT&T gave frontline workers access to read-only versions of the maps from the engineering database. When CW9 started in 1973, these records were "paper documents" in "huge books" maintained by AT&T's network engineers but all these records were "computerized" later in CW9's career. CW3 also recalled that the maps went from physical prints to laptops. CW1, CW3, CW4, CW5, CW6, and CW8 all reported that they were given access to read-only versions of the maps maintained by the Engineers through their laptop, smartphone, or tablet. CW1 and CW5 reported that access to these network maps was provided through two programs: Waldo and

TransLore.  CW2 and CW6 recalled accessing the maps with Waldo.  Field technicians showed CW10 the maps in TransLore.  CW8 explained that the database contained read-only maps of AT&T's entire network, showing "every cable" in "every town."  Similarly, CW6 said "[i]t's basically an electronic blueprint of what the network looks like."

129.    These read-only maps contained detailed information about AT&T's copper wire network.  CW6 explained that a green line was used for underground cables, and a blue line was used for aerial cables on utility poles.  CW2, CW4, CW6, CW8, CW10, and CW16 also specified that these maps displayed the location of each cable and included an alphanumeric code for each segment of cable that relayed detailed information about the cable, including gauge, pair count, and length.  According to CW2, CW4, CW6, CW8, CW9, CW10, and CW16 the alphanumeric code for each segment of cable *indicated whether the cable had lead sheathing*.  CW2, CW4, CW8, and CW9 all stated that if, for example, the alphanumeric code began with "XX" that the cable contained lead.  CW3 advised that codes ending with "L" designated lead sheathing as well.  CW2, CW3, CW4, and CW5 all reported that the database displayed the year each cable was installed.  This was notable, said CW5, because if the cable was installed before 1958, it was likely covered in lead sheathing "nine out of ten times."  CW6 also confirmed that Waldo specified if a cable was "dead."  CW3 agreed that, if a cable was retired, "you would see the dark line of the cable" with "little Xs all over it" along with the letters "RIP" for retired in place.

130.    CW8 also indicated that if there were any changes made different from those that were planned, "you would send notes to an engineer" and "they modified the maps." It was "fairly instantaneous," added CW8.  CW3 and CW9 followed the same protocol.  As CW3 explained, if no changes were relayed to the network engineers, "they assumed it [the job] was done according to what their plan was."

**D.    AT&T Decides to Maintain and Retire Its Toxic Lead Cables In a Manner That Exposes It to Costly Liabilities and Damaging Reputational Harm**

**1.    The Failure to Monitor Compliance with the OSHA Lead Standard Exposes Workers and Surrounding Communities to AT&T's Lead**

131.    Given the extensive amount of lead-sheathed lines that remain in AT&T's legacy infrastructure, it employs a large number of frontline workers who are exposed to this form of lead in the course of their day-to-day work.  Despite the known dangers presented to these employees by lead and binding OSHA occupational safety standards, AT&T has largely failed to properly protect its workers from the dangers lead exposure.

132.    The number of employees in AT&T's workforce whose job responsibilities could require them to come into contact with lead is staggering.  As detailed more fully below (¶ 187), AT&T represented to the state of California in April 2023 that "***AT&T has 30,000 employees who could come in contact with lead cable***."  In fact, AT&T specified that "[i]n 2022, 1,209 technicians worked on an assignment at a worksite that had lead-sheathed cable" in California alone.

133.    Many former frontline workers reported that they were directly exposed to significant lead hazards while working for AT&T without adequate protection, including minimum requirements provided in the OSHA Lead Standard, endangering not only the workers but the surrounding community:

- CW5 said some of the lead cables in Dallas, Texas were kept under $CO_2$ pressure "to keep the lead from breaking down as fast as it ordinarily would."  As CW5 explained, once a lead cable is opened to the elements it can deteriorate fast, and the cables CW5 encountered were "already deteriorating."  CW5 described that the cables would "flake" upon touch and said "we would call it glitter."  Nevertheless, CW5 was not told to wear any special PPE beyond the hardhat and safety glasses used for all work and ***was not told to change into different clothes after finishing such work***.

- CW1, who worked in Dallas and Fort Worth, Texas, said working with lead sheathing on aerial cables often produced lead dust.  There was no special PPE for lead work beyond a hardhat and safety glasses so CW1 "would either quickly take a deep breath, hold my breath . . . or raise my shirt up and put my nose in there."  CW1 said that ***"[i]f there is a breeze then it [the lead dust] just blows it away" to the ground below***.  CW1

49

reported having a cough after working with lead and ***still experiences headaches in the morning to this day.***

- CW8 was not provided with any additional PPE for working with lead beyond what was provided for everyday work with any cables. Even though lead dust was released "all the time" when CW8 worked on lead cables, CW8 was never provided a mask or other PPE to avoid inhaling it. CW8 added that "***when you're up in the air it's [the lead dust] just catching the breeze and blowing away in the wind***."

- When working on lead cables underground, CW7 said there were no air quality tests performed in advance and no additional PPE was provided. CW7 indicated "you didn't really have much of a choice" but to inhale the lead dust as "it was right in your face." CW7 remarked, ***"we were not equipped or prepared to work on it [lead] the way it was supposed to be worked on"*** and was ***"pretty sure"*** the exposure to lead dust ***caused sickness***.

- There were no masks provided when CW6 worked in underground vaults with lead cables. CW6 wore the same glasses and gloves technicians always wear, which are "aerated, meaning if they get wet on the outside, you're going to feel the wetness on the inside" and "lead is going to make its way inside" too. ***CW6 was never told to change his clothing after handling lead***.

- CW3 confirmed that working on lead cables released lead dust into the air. But CW3 was only taught to wear standard coveralls and the same gloves used for other type of work in underground vaults. CW3 was "sure" lead dust was inhaled during this work. CW3 was not told take any precaution with the coveralls used in this work and ***brought them home roughly every six months to wash them at home***. As for aerial cables, CW3 recalled that the ***lead dust went "wherever the wind or breeze would take it," confirming it landed on the ground below***.

- CW4 indicated that there was no additional PPE that needed to be worn for working with lead sheathing. CW4 recalled working on aerial cables produced more lead dust than in manholes because the area where the repair was performed needed to be ***"brushed" to get all the dirt off***.

- CW9 advised that there was no special PPE for working with lead at any point during 40 years with the Company. This was so even though CW9 was confronted lead dust "all the time" while working with lead cables. In fact, CW9 said that "I would ***come home filthy from it [lead]*** if I had been working with lead cable all day."

- CW2 explained that some lead cables in underground locations were "pressurized" with nitrogen to prevent water from entering but if there was a leak, it could fill the vault with nitrogen, which is deadly. AT&T used blowers to "push the nitrogen out." But this meant that when CW2 sanded lead cables underground there was a machine "blowing down on top of your cable . . . just blowing all those [lead] particles everywhere." Nevertheless, CW2 advised that there were never any air tests performed

before or during work in these locations.  Asked about the risk of inhaling lead, CW2 confessed *"I would kind of worry about that, I'm not going to lie."*

- CW14 recalled that, as a field Technician, "I would watch guys . . . working in *a cloud of lead dust* up on the poll."

134.    Many of these former employees were never even told in advance if a job required working with lead.  CW8 said "you never were told what you were going to be working on," lead or otherwise.  CW1 was never told in advance whether an assignment involved lead, noting "you would find out once you got there."  This is corroborated by CW5, who said "I found out on the job" because there was no advance warning.  CW6 received "no warnings that a cable may contain lead in it, or this case may contain lead."  CW10 agreed that "your work instruction won't include any of that" and, instead, the way technicians would find out was "you'd get your assignment, go to it, and see there was a metal box and then you knew it was lead."  Similarly, CW3, CW4, and CW9 were never told in advance if an assignment on any given day involved lead cables.

135.    Indeed, many of these former employees reported that they never received any lead safety training.  CW1 verified that AT&T never provided any formal lead training safety in Dallas or Fort Worth, Texas.  CW5 also reported not receiving any training on lead safety in Dallas, Texas.  CW6 said AT&T is "pretty adamant" about safety briefings but emphasized "there was never ever, not one time was it mentioned, that we may be coming across lead cable, lead cases, or lead tags in this town and this is the proper way to handle it."  CW9, who worked with the Company for *40 years*, reported that there were no established lead cable safety protocols at any point and there was not *any* official training on handling lead.   Even as of 2018, CW9 had not received any form of training.  Similarly, CW10 did not recall receiving any training on working with lead-sheathed cables in 10 years with the Company.

136.    To the extent AT&T provided any training on working with lead, multiple former employees confirmed that the Company had *no control measures* to ensure they were followed

51

and took **no effort** to check if they were.  CW2 confirmed that "[n]o one ever followed up or enforced the lead safety protocols."  With respect to lead sheathing, CW8 said "it was never reinforced how to work with it, treat it, or dispose of it," and "never discussed," adding "the only reason I knew how to work with it was learning from some of the old guys."  CW3 confirmed "it was not an enforced safety measure" and did not recall receiving any direction to follow any protocols specific to lead cables at any point since 1990. Because there was no oversight, CW10 explained that "wire technicians were left to their own devices" when working with lead cables.

137.    These accounts are corroborated by those who were in AT&T's operational groups. According to CW11, "really all the lead protocols were taken away" after Ameritech merged with SBC.  Whereas before the acquisition lead was a "major concern" and "the guys [workers] had to be tested" quarterly, CW11 was informed that the protocols and training were taken away because "there is no lead cable in Ohio."  But as CW11 confirmed, there is lead "everywhere" in Ohio to this day.  Since CW11 started working in EHS in 2013, "there was no formal courses or training for lead exposure" and "no requirements for lead PPE" other than the gloves and glasses workers wear for "everything."  CW11 even specified that the yearly training for technicians included approximately "twenty courses" but they had "nothing to do with lead."  CW16, who oversaw teams of frontline workers, did not recall anyone being tested for lead exposure, and said there were no mandates from EHS to wear special clothing when working with lead.  Notably, CW15 confirmed that AT&T executives were sent EHS reports every week or month that contained safety data metrics, including "monthly coverages for what was required . . . to roll out to the technicians."

138.    CW16 added "any kind of lead safety protocol was not enforced."  As CW14 put it:  "That is the AT&T way, 'coverage.'  Throw out this 15 minute video that everybody clicks through or one guy through trial and error passes the quiz at the end and hands the answer key to

the rest of the crew just so we can get out there and climb polls." In fact, field workers who asked for additional protections for working with lead were removed from the job because there were others willing to do so without them. CW14 recounted that when a technician asked about additional PPE, "the next thing you knew he was working on another project" as the mindset was "we'll let someone else handle the lead."

### 2. As a Matter of Standard Practice, AT&T Chose To Abandon Lead Cable In Place To Decay Into the Environment As It Remained Unused

139. Long before the start of the Class Period, AT&T began to install fully-fiber connections to accommodate the increase in demand for high-speed services. As detailed more fully above (¶ 64), AT&T announced in April 2014 that it planned to bring fully-fiber connections to 100 cities after its pilot run of the product went exceptionally well and then agreed in July 2015 to pass at least 12.5 million additional customer locations by mid-2019 with fully-fiber connections as part of the DIRECTV acquisition. The interest in fiber continued when Defendant John Stankey became CEO in July 2020. As Pascal Desroches explained in January 2023, "since John Stankey took over as CEO" his outlook has been "[l]et's focus the company on wireless and fiber, that's going to be the future of AT&T." The day that AT&T announced it was spinning off WarnerMedia in May 2021, Stankey said that his plans for "the new AT&T are simple and straightforward," and included *doubling* its fully-fiber footprint to 30 million customers by 2025.

140. As "legacy" copper cables—many of which were encased in lead—became increasingly obsolete across its vast ILEC network, AT&T was forced to consider for the first time what should be done with the ancient hardware that previously served as the backbone of its business. Where possible, it removed the sections not encased in lead to harvest the endless strands of valuable copper for scrap resale. But it decided to simply discard the sections covered in lead by leaving them in place, sometimes taking the affirmative step of cutting the cable at both ends

to ensure it was taken off the grid. Worse still, because these cables no longer served a useful purpose, AT&T ceased to maintain them, allowing them to atrophy over time under changing environmental conditions. These lead cables hang aerially on utility poles, above densely populated areas frequented by children, remain buried in the ground, either in conduits or directly in the soil, and sometimes pass through bodies of water, including sources of public drinking water.

141.    AT&T was initially motivated to do so because of the *cost* involved in removing such cables in compliance with applicable law. Braden Allenby, the former Vice President for AT&T's EHS group from 1997 to 2004, when Stankey was CEO of its Southwest division, told the *WSJ* that AT&T considered the potential costs and environmental concerns "daunting" when the issue previously arose, adding "[w]e kept the discussion internal and informal." Allenby said "[i]t was standard operating procedure to abandon those [lead] cables in place."

142.    Former employees confirm that this practice continued unabated throughout the Class Period:

- CW7 was responsible for removing or retiring lead cables in place across Atlanta, Georgia from approximately 2018 to June 2020. According to CW7 lead cables were regularly retired in place if the "duct" they were in was no longer needed. "It was a huge part of my job every week," said CW7. CW7 estimated that about 30% of the cables that were retired were retired in place.

- CW5 confirmed that AT&T retired lead cables in place in Dallas, Texas. CW5 described that the practice was to "cut it dead" and then "leave it in the ground." CW5 was told multiple times by area managers that *the decision to retire lead cables in place was "a CEO choice, not our choice"* and a *"cost saving" measure*.

- CW4 was regularly asked to retire lead cable in place in Milwaukee, Wisconsin. In manholes, CW4 recalled simply cutting the ends where it exited either side of a duct. CW4 said "[e]verything was left in the ground," adding the team was never told to "take it out."

- CW3 was regularly told to retire lead cables in place earlier in CW3's career. CW3 confirmed that many of these cables were in underground ducts, but confirmed that some were "buried" directly in dirt and could not rule out the possibility that aerial cables were sometimes retired in place.

54

- CW6 said that no one would physically retire a cable, explaining "the engineer would put in paperwork to state that this is no longer being used" and that was the end of it.

143.    These accounts are corroborated by construction managers and network engineers that were responsible for the design and layout of this infrastructure during the Class Period. CW13, who decided how to retire copper cable, verified "[t]here was a lot retired in place." CW13 explained that that "buried" cables were always retired in place and many peer engineers chose to retire aerial and conduit cables in place too.   CW14 said "leave it in place" was common for lead cable in California.   CW14 recalled that "[w]e would come up on jobs to put new cable along and we would see old lead cable up there [on poles] just cut off at the end" and has been told by former colleagues that AT&T is still "just cutting it [lead cable] and leaving it up there" to this day.   CW16, who oversaw network construction, explained that "we would be told to abandon in place by design."   CW16 said that "the mindset of leadership" was "keep the cables in place until that duct was needed . . . so there is a lot of plant that is abandoned out there with lead cable."   CW16 added, "[t]o my knowledge, they have never removed any cables that are directly buried."   CW15 also advised that professionals throughout AT&T's EHS group were aware lead cable was retired in place rather than removed at the end of its life.   Indeed, CW11, also from the EHS group, confirmed that AT&T retired lead cables in place, especially underground, adding "[i]t's pretty bad."

144.    Notably, the decision to retire in place remained purely financial and ***never*** accounted for environmental concerns.   CW12, who led AT&T's global network operations, said abandoning lead-sheathed wireline was a "fairly routine decision" made by engineers that was "always based on cost and practicality."   CW12 added that "***there was absolutely no discussion about any environmental hazard at the time***."   Consistent with that account, CW13 was "never" told to take environmental factors into account when deciding whether to retire lead cables in place.   Instead, said CW13, Engineers "didn't differentiate lead versus non lead."   CW13 added

that the only requirement was that approval was needed if the *cost* to remove exceeded a certain amount, and also added "[i]t was a lot cheaper to leave it in the ground than it is to pull it out." Similarly, CW14 reported that there were no special guidelines for lead cable and was "never told we can't leave lead cable in the air or on the ground." In fact, CW14 said "we didn't have to notify EHS or anything like that" either. On the contrary, CW14 was told "if it's too expensive or too much of a pain, keep it in." CW16 confirmed that leaving lead cables in place was a "cost-saving measure" and "nobody ever cared" about the consequences of leaving lead in the environment. CW16 added "I cared, I had concerns," especially around farmland, "but we do as we're told" by the Engineers.

### E. AT&T and Its Senior Leaders Have Known for Years That The Lead Cables In Its Vast Network Were Harmful to Employees and the Environment

#### 1. EHS Insiders Openly Discussed the Dangers Associated with Decaying Lead Cables at Industry Meetings Attended by Senior AT&T Officials

145. The Environmental, Health & Safety Communications Panel ("EHSCP") is a consortium of communications environmental, health, and safety professionals dedicated to promoting employee safety and health and preventing accidents throughout the communications industry. Formerly the National Telecommunications Safety Panel, the group traditionally served as the primary forum for safety professionals in the telecommunications to openly discuss current topics. As of 2011, its "member companies" included Alcatel-Lucent, AT&T, CenturyLink (now known as Lumen Technologies), Ericsson, Cincinnati Bell, NextG Networks, Sprint Nextel, T-Mobile, Verizon, Verizon Wireless, and Windstream Communications.

146. The organization's purpose has always been "to encourage consistent and coordinated safety policies throughout the telecommunications industry, and to present a unified voice for the industry in response to government regulatory actions." The group was first formed as an internal council for safety staff from each of the regional Bell System operating companies

across the United States to meet and discuss safety issues facing the telephone business. Following the breakup of the Bell System in 1984, members from the operating companies who participated in this council decided that they wanted to continue to establish consistent safety practices and decided to establish the group as a national forum open to the entire telecommunications industry.

147.    The EHSCP is a private group generally closed to the public. Only companies that operate in the communications industry are eligible to apply and must be accepted by a two-thirds vote of the membership. Once accepted as a member, employees of the "member company" may register to gain access to EHSCP's exclusive members-only content, including an exclusive members-only newsletter and access to materials presented at past and upcoming ICS conferences.

148.    AT&T has been deeply involved in the EHSCP, particularly in the decade before the Class Period. As explained below, its employees have led the group, served on its leadership council, sat on subject matter-specific committees, and attended its annual symposium every year since 2010, and the Company itself has hosted several annual symposiums during that time.

149.    From at least 2010 through the end of the Class Period, a number of senior leaders from AT&T's EHS group have served on the EHSCP's leadership council, its most senior governing body, including Don Harris (Director – EHS Field Support), Elizabeth Leach-Bohan (Director – Worldwide EHS Compliance), John Malone (Senior Manager – EHS Technical Support), Barbara Patton (Senior Manager – EHS), Michael Porpora (Senior Manager – EHS Specialized Services), Marie Robinson (Area Manager – EHS), and Jay Weir (Senior Manager - EHS). In fact, Marie Robinson served as Chairperson from 2009 to 2011 and Barbara Patton served as Chairperson from 2013 to 2015. The extent of AT&T's representation on this governing body was far greater than any other member company during the same period.

150.    To carry out its mission, the EHSCP has organized several subject matter committees to keep members updated on current events and coordinate advocacy activity in their respective area, including the (i) Environmental Committee; (ii) Industrial Hygiene Committee; and (iii) Occupational Safety Committee.

151.    The EHSCP formed the Industrial Hygiene Committee in early 2011.  It was established "to provide a forum among [EHSCP] member companies to identify industrial hygiene concerns and issues in the communications industry, and assist member companies in addressing those concerns through shared experience and knowledge."  Among other subjects, one of the "proposed committee topics" from the outset of its formation was "Lead Safety – (cable & battery straps)."  The Committee meets at least four times each year.  Since 2011, AT&T has been represented on the Committee by John Malone and Kathy Turner (Senior Manager - EHS).  In fact, John Malone has served as Chair of the Industrial Hygiene Committee since its formation.

152.    Senior AT&T EHS professionals participated on other EHSCP Committees as well. For example, Jay Weir and Marshall Berry (Senior Manager – EHS) have both continuously served on the Occupational Safety Committee since its formation in 2012 until approximately 2019, with Jay Weir serving as the Committee Chair.  Michael Porpora has served as the Chair of the Occupational Safety Committee since 2020.  In addition, a rotating group of specialists from the Company's EHS group participated as members of the Environmental Committee every year since 2010, including Julianne Barnum (Area Manager – EHS), Barbara Patton, and Geoff Smith.  Since 2019, the Environmental Committee has also included Cheryl Allen (Senior Director – EHS), George Huggins, John Malone, and Michael Perry (Area Manager – EHS).

153.    In addition to committee activity, the EHSCP hosts a well-known, three-day annual conference known as the International Communications Symposium ("ICS"), which has

historically included presentations by nationally known safety experts from industry, academia, and government along with opportunities for member companies to present details from relevant safety programs at their business. The Company hosted several of the EHSCP's annual ICS events. For example, the annual meeting in 2009, from September 15, 2009 to September 17, 2009, was hosted by AT&T in Fort Worth, Texas, close to its new headquarters in Dallas, Texas. Similarly, AT&T hosted the 2018 conference that took place September 18, 2018 to September 20, 2018, in Arlington, Texas, in between Dallas and Fort Worth.

154.    EHS employees from the Company regularly attended the annual ICS conference. Marie Robinson attended the ICS conferences held in 2009, 2010, 2011, 2012, 2013, 2014, 2016, and 2017. Don Harris attended the ICS conferences held in 2009, 2010, 2012, 2013, 2014, 2015, 2016, and 2018. Barbara Patton attended the ICS conferences held in 2009, 2010, 2011, 2012, 2014, 2016, and 2019. John Malone attended the ICS conferences held in 2010, 2012, 2013, 2016, 2017, and 2018, and participated in the virtual ICS conference in 2020. Jay Weir attended the ICS conferences held in 2009, 2010, 2012, and 2016. Michael Porpora attended the ICS conferences held in 2016, 2017, 2018, and 2019. Many other AT&T personnel attended each of these events, particularly the ones hosted by AT&T in Texas near its headquarters in Dallas. Indeed, Suzanne Montgomery, AT&T's Vice President of Compliance, attended the ICS conference in 2018.

155.    As far back as 2010, influential EHSCP Committee members were sounding alarm bells about dangers posed by the lead sheathing used on cables in nation's telecommunications infrastructure. At the 2010 ICS hosted by Qwest Communications in Denver, Colorado, John Malone, Senior Manager of EHS at AT&T, gave a presentation titled "Lead Exposure in Outside Plant Operations" in which he discussed the EHS concerns raised by continued use and/or abandonment of such cables. One of the slides cautioned that "[s]ome older metropolitan areas

may still have over 50% lead cable." The presentation explained that a variety of lead-based compounds can "leach" to the surface of the sheathing over time and become "airborne," posing a risk to employees working on the cable and the surrounding environment. Indeed, the slides emphasized that "*soils retained between 83 and 98 percent of the released lead within 2 inches*" from such cables, and "*[u]nderground cable presents real possibilities for overexposure.*" According to the *Wall Street Journal*, Malone "worked for AT&T for more than two decades and is considered an industry lead expert."

156.    Three years later, at the 2013 ICS held between September 10, 2023 and September 12, 2023, Joe Malone provided a detailed, 48-page presentation dedicated to the topic of "Managing Lead Exposure During Cable Removal Operations." The presentation explained that "[w]hen lead-sheathed cable is removed, abrasion can cause surface lead compounds to rub off, and some become airborne," and displayed exactly how those particles can enter a worker's body:



A presenter's note accompanying this slide provides that "*airborne particles are easily inhaled by any worker in the vicinity of the point of generation*." Even worse, Malone confessed to his peers that *workers were being exposed to lead in amounts that exceeded the OSHA standards*:



Malone observed that the "OSHA standard is designed around lead abatement jobs," not those where workers who regularly work on non-hazardous materials occasionally encounter lead-based objects, and therefore suggested posting prominent signs around the job site with a POISON warning:



Malone also suggested that, when reclaiming lead cables from underground sources, workers should "install plastic sheeting to prevent lead particles from settling onto the ground" around the manhole or entry point. Finally, Malone emphasized that any amount of lead should be treated as "Hazardous Waste," a term of art under environmental laws, for purposes of disposing it.

157.    At the 2014 ICS, which was attended by Don Harris, Barbara Patton, and Marie Robinson from AT&T's EHS group, senior EHS leaders from CenturyLink (now known as Lumen Technologies) gave a presentation about a recent OSHA investigation into employee exposure to lead while working on lead cables in underground vaults in Minnesota.  The presentation, titled "Working with Lead," featured the following cover page:



CenturyLink openly acknowledged that the OSHA investigation was triggered by an employee who learned he or she "had elevated levels of lead" after working with lead cables, and that OSHA observed employees using what it called a "legacy Company Practice" with minimal safeguards:



Subsequent slides revealed that OSHA found at least seven "serious" violations of the OSHA Lead Standard and included what appeared to be excerpts from the citation itself:



Thus, senior leaders in the Company's EHS department, were on notice by no later than September 2014 that continued work on lead cables not only posed a threat to the employees handling those cables but could also result in regulatory enforcement action against the Company.

158.    The EHSCP continued to regularly speak about lead exposure and environmental risks in Committee meetings and ICS conferences through early 2020, when attention shifted to working in a world with COVID-19 as the pandemic spread across the globe. For example, at the 2015 ICS conference, held from September 22, 2015 to September 24, 2015, the Industrial Hygiene Committee—which was chaired by John Malone—provided an update on its work year to date. One of the slides prepared for the presentation identified "lead sheathed cable" as an accomplishment and stated that "*management of lead-sheathed cable . . . is an issue for most member companies*" and Committee members were attempting to "share best practices":



2014-15 Accomplishments

Lead Sheathed Cable
• Continue to compare data and practices on management of lead-sheathed cable. This is an issue for most member companies and we are attempting to consolidate our knowledge database and share best practices.

**EHSCP**
Environmental, Health & Safety Communications Panel

In fact, Tom Wangerin, a renowned environmental consultant and then Director of the Asbestos and Lead Program at University of California at Berkley, led a breakout session during the second day of the 2015 ICS on the topic of "Lead & Asbestos Regulations." Similarly, during the 2018 ICS, John Malone led a breakout session called "Lead in the Communication Industry." As explained more fully below (¶¶ 176-177, 179-180), lead exposure and regulation was also discussed by EHSCP Committees and/or at the ICS conference in 2015, 2016, 2019, and 2020, all of which included or were attended by EHS leaders from AT&T.

> ## 2. AT&T Officials Opposed Proposed EPA Regulations That Would Create Additional Burdens For Owners of Lead-Sheathed Cables

159. Because hazardous waste is considered a form of solid waste under the RCRA (¶ 110), materials that do not qualify as "solid waste" are not subject to regulation under Subtitle C of the RCRA. The RCRA defines solid waste as any "discarded material . . . resulting from industrial, commercial, mining, and agricultural operations." 42 U.S.C. § 6903(27).

160. The EPA interpreted the term "solid waste" to include hazardous waste that will be recycled. On May 19, 1980, the EPA promulgated an interim definition for solid waste that established criteria for the term irrespective of whether the material is destined for recycling. *See* 45 Fed. Reg. 33084 (1980). On January 4, 1985, the EPA overhauled its definition of solid waste

to provide that hazardous waste which will ultimately be recycled, also referred to as "hazardous secondary material," is considered solid waste unless it satisfies a handful of limited exceptions or exclusions. *See* 50 Fed. Reg. 614 (1985). In 1997, the EPA amended its solid waste rule to add an exclusion for certain forms of "scrap metal" that are recycled, codified in 40 C.F.R. § 261.4(a)(13). *See* 62 Fed. Reg. 25998 (1997).

161.     In response to a series of legal challenges raised in response to the EPA's broad definition of "solid waste," on October 30, 2008, the EPA revised its definition of that term to exclude certain hazardous secondary materials reclaimed for recycling (the "2008 DSW Rule"), including hazardous secondary material recycled under the control of the generator (the so-called generator-controlled recycling exclusion), and hazardous secondary material transferred to a third party for recycling (the so-called transfer-based recycling exclusion). *See* 73 Fed. Reg. 64667 (2008). The rule was scheduled to become effective on December 29, 2008. *Id.*

162.     On or around January 29, 2009, the Sierra Club submitted an administrative petition requesting that the EPA repeal the 2008 DSW Rule on grounds that, among other things, hazardous waste recycling causes substantial harm to human health and the environment. On September 7, 2010, the EPA entered into a settlement agreement with Sierra Club pursuant to which the Sierra Club agreed to withdraw its administrative petition and the EPA agreed to prepare a new rule that would address the issues raised in the Sierra Club's petition.

163.     As a result, on July 22, 2011, the EPA published a notice which proposed a variety of changes to the 2008 DSW Rule (the "2011 DSW Proposal"). *See* 76 Fed. Reg. 44094 (2011). Among other things, the 2011 DSW Proposal outlined potential revisions to the generator-controlled recycling exclusion from the EPA's definition of solid waste, and requested public comment on additional revisions under consideration that would codify enhanced recordkeeping

and notification requirements for the preexisting exclusions, including the exclusion for the forms of scrap metal covered in 40 C.F.R. § 261.4(a)(13), adopted in 1997.  *Id.*  By subsequent notice, the EPA extended the comment period to October 20, 2011.  *See* 76 Fed. Reg. 53376 (2011).

164.     On October 20, 2011, Grif Bond, who was then serving as the Chair of the EHSCP, submitted a comment letter on behalf of the EHSCP in response to the 2011 DSW Proposal which evidenced his knowledge of lead-sheathed telecommunication cables and their status as a RCRA regulated waste when not recycled.  The letter acknowledged that the 2011 DSW Proposal outlined potential revisions to the EPA's solid waste rules under the RCRA, including the exclusions contained therein.  In a section of the letter bearing the heading "Impacts to generators of recyclable materials covered by existing exclusions and exemptions," Bond explained that "[t]he proposed rule would apply to several types of recyclable materials that are ***commonly generated by EHSCP member companies***," including "***lead-sheathed telecommunications cable***."  He then explained that the EHSCP opposed the new administrative requirements because of the potential burdens they would impose on member companies like AT&T who maintained lead-sheathed cables in their network:

> ***An even greater challenge would be posed by regulating lead-sheathed telecommunication cable.  Such cable is removed from the ground, for example, when a road-widening project requires a buried cable to be moved, in which case it is replaced with new cable.  The removed cable typically is brought back to a company or contractor facility, from which a contracted hauler transports it to a metal reclamation facility.***  Regulating such activity could turn every roadside into a regulated generating site, creating enormous registration and paperwork burdens for no environmental benefit.

> ***We suspect that there are other businesses with comparable situations.***  We are concerned both with the administrative burden to us and with the impact of applying paperwork requirements to numerous small businesses that may not have the resources available to comply and may thus be encouraged toward less environmentally sound management options.

The letter was signed by Grif Bond as "Chair" of the EHSCP.

165.    Shortly after EHSCP filed the letter described above on October 20, 2011, AT&T submitted a letter in response to the 2011 DSW Proposal.  The letter explained that AT&T "operates thousands of facilities that from time to time generate recyclable materials such as . . . scrap metal" and thus opposed the elements of the proposed rule that applied to "facilities that only generate recyclable materials and ship them off-site for recycling . . . ('generator-only' facilities)."  More particularly, AT&T said it "adopts and hereby incorporates by reference the concerns and recommendations more specifically expressed" by the EHSCP in its letter, a copy of which was enclosed therein.  Such a close level of coordination would be unlikely unless the EHSCP letter was shared with AT&T and Verizon before it was filed.  The letter was sent by "***AT&T Inc., on behalf of itself and its affiliates***" and signed by Cecilia M. Martaus, General Attorney for AT&T.

### 3.    Defendants Knew That Mismanaging Lead Could Harm AT&T and Its Proper Handling of Lead Was of Great Interest to Investors

166.    In December 2011, *The New York Times* published a story "Lead From Old U.S. Batteries Sent to Mexico Raises Risks," which reported that the United States was contributing to a significant contamination of lead in Mexico by sending used vehicle and industrial lead batteries to the country for recycling, where the lead is often extracted for smelting using crude methods prohibited in the United States that expose workers to dangerous levels of the toxic metal and emit lead fumes into surrounding communities.  AT&T uses a large amount of lead batteries primarily as a backup power source in data centers and cellular telephone sites and in its many vehicles.

167.    In response to these reports, a group of AT&T shareholders led by Boston Common Asset Management, LLC ("Boston Common") sent a letter to AT&T on October 1, 2012 to inquire about the policies and procedures used by AT&T to purchase and recycle the lead batteries that it uses in the normal course of business, including not only whether it adopted any such policies but

whether it carried out any "audit" to determine if those standards were satisfied.  The letter requested that AT&T respond by November 1, 2012.

168.    After receiving no response to its initial letter, Boston Common sent another letter to AT&T on November 9, 2012, to formally request that it submit a proposed resolution on the topic for consideration at the next annual shareholders' meeting under SEC Rule 14a-8.  Rule 14a-8 requires public companies to include shareholder proposals in proxy materials so they can be voted upon at the annual shareholder meeting under certain circumstances.  *See* 17 C.F.R. § 240.14a-8.  The proposed resolution expressly stated that "***the neurotoxic and development impacts of lead have been well-established for decades, leading to global action to eliminate lead in paint and gasoline***," and "***poor management of [lead] batteries in our company's supply chain can pose reputational and legal risks to our company***," and therefore directed AT&T to issue a report by November 1, 2013, on potential "policies and practices AT&T can adopt to reduce the occupational and community health hazards from manufacturing and recycling lead batteries in the company's supply chain," including those to "assess . . . recycler performance against such environmental and occupational performance standards."

169.    On December 21, 2012, Paul M. Wilson, General Attorney for AT&T, submitted a letter to the SEC requesting that Boston Common's proposal be excluded from its 2013 proxy materials under Rule 14a-8.  Specifically, the letter sought to omit the matter under the exclusion for matters relating to the company's "ordinary business operations" provided in 17 C.F.R. § 240.14a-8(i)(7) on the ground that it relates to the management of AT&T's suppliers and does not focus on a significant policy issue.  The letter was submitted "on behalf of AT&T, Inc."

170.    On February 7, 2023, the SEC sent a letter to AT&T denying the request to exclude Boston Common's shareholder proposal from its 2013 proxy materials.  The SEC stated that "[w]e

68

are unable to concur in your view that AT&T may exclude the proposal under rule 14a-8(i)(7)" because "the proposal focuses primarily on the environmental and public health impacts of AT&T's operations," not simply its supplier relationships, and "does not seek to micromanage the company to such a degree that exclusion of the proposal would be appropriate."

171.    Accordingly, on March 11, 2013, AT&T published its Notice of Annual Meeting of Stockholders and Proxy Statement and filed a copy on Form DEF14A with the SEC that same day (the "2013 Proxy Statement"), which reproduced the text of the lead battery shareholder proposal from Boston Common.  Notably, the 2013 Proxy Statement advised shareholders that "*[t]he Board*"—which, at the time, included Defendant Randall L. Stephenson—"*recommends you vote AGAINST this proposal*."  The statement from the Board explained "AT&T" is "deeply committed to environmental sustainability and . . . taking meaningful steps to minimize harmful environmental impacts" and directed investors to the commitment in its EHS Policy to promote "pollution prevention through recycling."  The supporting statement also advised that "the Board believes that this proposal is unnecessary because AT&T has already undertaken a comprehensive review of its lead battery practices" and is "developing a policy related to our use of lead batteries" which it will publish soon.  In other words, *the Board read Boston Common's proposal* and *performed a comprehensive review of its lead battery practices* as a result of it.

172.    Defendants Stephenson, Stephens, Stankey, and McElfresh were fully informed about these matters.  As shareholders of AT&T as of the record date for the 2013 annual meeting, copies of the 2013 Proxy Statement were sent to Defendants Stephenson, Stephens, Stankey, and McElfresh and they were asked to vote on all shareholder matters presented therein, including the proposal from Boston Common set forth above.  In addition, a statement in favor of Boston

Common's proposal was ***read out loud*** at the shareholders at the ensuing shareholders meeting in Cheyenne, Wyoming on April 26, 2013, which Randall Stephenson attended and participated in.

173.    Sure enough, AT&T ultimately adopted a lead-acid battery policy in October 2013 bearing the title AT&T Statement on Lead-Acid Batteries (the "Lead Battery Policy").  The Lead Battery Policy provided in relevant part:

> AT&T's responsible management of its network, products and services can provide environmental benefits and help promote more sustainable decisions by AT&T's stakeholders.  As part of this effort, AT&T is minimizing its own environmental impact by reducing waste and ensuring exhausted materials are handled in an appropriate and responsible manner. . . .  Concerns have been raised about increasing exports of lead-acid batteries from the United States to recycling operations in Mexico and other countries, where lower standards can have a significant impact on environmental safety and public health.  ***Recognizing these concerns***, AT&T is working to ensure it does not export used lead-acid batteries outside the United States for disposition and recycling.  Specifically, by the end of 2014, AT&T intends:

> - To prohibit suppliers contracted to manage its used lead-acid batteries from shipping such batteries outside the United States for recycling or other disposition.
> - To require suppliers contracted to manage its used lead-acid batteries to maintain appropriate records to demonstrate safe shipping, handling and recycling of such batteries.
> - To monitor such suppliers to ensure they understand and comply with the above requirements.

In other words, ***AT&T recognized that substandard handling of lead or its release into the environment can have a "significant impact" on "environmental safety and public health," and it was "appropriate and responsible" to prohibit that activity***.  AT&T made a copy of the Lead Battery Policy available on its investor-facing sustainability website.  On that page, it explained that "***[l]ead-acid batteries represent a*** primary, reclaimed ***regulated waste*** stream."

### 4.    Proposed Changes to OSHA Rules That Would Impose Lower Lead Exposure Standards Were Actively Tracked and Opposed by AT&T

174.    As explained above (¶ 104), in recent years, several states have initiated proceedings to consider changing their OSHA-approved State Plan to adopt lead exposure

standards more restrictive than those set forth in the OSHA Lead Standard based on a growing body of scientific evidence that exposure to lead at levels below 50 μg/m³ has the potential for significant harm, including California, Michigan, Oregon, and Washington. AT&T officials and/or EHSCP Committees on which they sat actively monitored these regulatory changes and, in certain instances, directly participated in the rulemaking process.

175.    In June 2010, a lead poison prevention program within the California Department of Public Health ("CDPH") transmitted to Cal/OSHA health-based recommendations for revisions to California's lead standard for general industry (the "California Lead Standard"). The recommendation explained that the California Lead Standard was based on the 1978 OSHA Lead Standard and "[c]urrent medical information clearly demonstrates harmful effects of chronic and low-level exposures to lead in adults . . . at sustained blood lead levels well below those currently allowed by the standard." In response, Cal/OSHA convened an advisory committee to consider proposed changes with input from stakeholders, which held six meetings between February 23, 2011, and November 10, 2015. The second meeting of that body, held on January 17, 2012, was attended by Jay Weir of AT&T's EHS department. During a discussion about providing BLL monitoring for all employees who work with lead, Weir said "they [AT&T] have similar concerns with the number of times they would have to test blood" because *they [AT&T] have about 4,000 employees that could touch some lead cable" in California alone*. Jay Weir attended each of the four subsequent meetings. At a meeting on April 21, 2015, Weir reiterated without more that "[t]he 'threshold amount of lead' [for BLL monitoring] is a problem." At the final meeting on November 10, 2015, Weir continued to object to the proposed changes and emphasized that "*AT&T has 30,000 employees who could come in contact with lead cable*" across the country.

176.    Similarly, Washington DOSH began holding meetings with stakeholders on potential changes to the lead standard set forth in its OSHA-approved State Plan in October 2015 and formally initiated the rulemaking process in 2016.  Washington DOSH held a series of public meetings to consider the proposed changes with input from stakeholders beginning on July 18, 2017.  Meetings held on May 4, 2018, and May 9, 2018, were attended by an unidentified representative from AT&T.

177.    EHSCP Committees on which high-ranking AT&T EHS personnel sat actively tracked these regulatory developments.   The EHSCP's 2015 ICS, held between September 22, 2015, and September 24, 2015, which was attended by AT&T EHS leader Don Harris, included a presentation by Mike Manieri, Principal Safety Engineer for the Cal/OSHA standards board, entitled "Updates on California Standards."  One media article covering the 2015 ICS described it as a "series of high-profile sessions focused on key industry safety and health topics . . .attended by stakeholders representing prominent companies from throughout the wireless ecosystem." Likewise, the EHSCP's 2016 ICS, held from September 13, 2016 to September 15, 2016, featured a panel discussion on the "Washington State Standard" led by a group that included Jay Weir, who, by then, was already participating in the potential changes to the California Lead Standard (¶175).

178.    Meanwhile, the rulemaking process for the changes to the California Lead Standard continued to play out.  In February 2019, a standardized regulatory impact analysis of the proposed changes was sent to California's Department of Finance for review.  Then, in June 2019, the California legislature passed Senate Bill 83 which, among other things, added a new section to the Labor Code which required Cal/OSHA to submit a rulemaking proposal to revise the California Lead Standard, consistent with scientific research and findings.

179.    By mid-2019, lead exposure regulation was a hot topic within the EHSCP.  For example, slides presented by the Industrial Hygiene Committee at the 2019 ICS, held from September 17, 2019 to September 19, 2019, stated that topics addressed in 2019 by the Committee, which included AT&T EHS officials John Malone and Katy Turner, included "Lead Regulations – California, Oregon, Washington, & Michigan" and further stated that one of the Committee's objectives is to "[p]rovide responses to proposed regulations affecting the industry."  Similarly, at the 2019 ICS, which was attended by AT&T EHS officials Barbara Patton and Michael Porpora, an OSHA presentation by a regulatory consultant noted that "CA OSH Standards Board to complete rulemaking for revised lead PEL by 2/1/20" and included a slide summarizing major milestones by Cal/OSHA in connection with its lead PEL rulemaking:



In addition, the Occupational Safety Committee, which in 2019 included AT&T EHS leader Jay Weir, presented slides at the 2019 ICS which confirmed that one of the main topics it addressed that year was "Lead Regulations."

180.    EHSCP Committee interest in the proposed changes to lead exposure standards continued until the onset of the COVID-19 pandemic in early 2020.  For example, the Q1 2020 edition of the EHSCP's quarterly newsletter, *The Wire*, said that the Industrial Hygiene Committee

chaired by John Malone was "closely following" the proposed changes to the California Lead Standard, noting that it "is going to have a huge impact on work with lead-sheathed cable in California."

181.    The proposed rule amending the California Lead Standard was delayed due to the COVID-19 pandemic, but on March 3, 2023, Cal/OSHA's Occupational Safety and Health Standards Board ("OSHSB") (i) published its proposed rule; and (ii) set a public hearing for April 20, 2023, to consider any comments on the proposal from the public.  OSHSB also opened the proposed changes to the California Lead Standard to written comment in advance of the hearing.

182.    On the morning of April 20, 2023, John Malone from AT&T's EHS department transmitted a letter commenting on the California Lead Standard from AT&T in an email with the subject "AT&T Comments on Proposed Lead Regulation."  The letter stated that "***AT&T does not challenge the epidemiological, medical, and toxicity data which led CDPH to conclude that BLLs of employees should not exceed 5-10 µg/dL***," but, rather, sought an "exception" to the proposed rule for telecommunication employees given their limited exposure to lead relative to other industries like construction.  In support, the letter represented that "***AT&T employs approximately 3,824 technicians in California that perform repair and installation work where they may potentially encounter lead-sheathed cable***" and, "***[i]n 2022, 1,209 technicians worked on an assignment at a worksite that had lead-sheathed cable***" in California alone.  The letter also attached the results of a simulation performed by a third-party to estimate the BLL of such workers.  According to that attachment, "***AT&T provided . . . a spreadsheet***" with detailed data from "***39 IH [industrial hygiene] surveys***" that were conducted "***during lead-sheathed cable repair and maintenance by AT&T technicians from March 2017 through October 2021***," including "***a***

74

*description of the cable servicing task*" and "*airborne lead concentrations*."   The letter was signed by Marc D. Blakeman, President of AT&T California.

183.    At OSHSB's public hearing held later that same day, Dave Fehr, Senior Manager – EHS at AT&T, provided similar testimony in opposition to the proposed amendments to the California Lead Standard and submitted a hard copy of AT&T's comment letter for "the record." Among other things, Fehr reiterated that "*AT&T appreciates and understands the need to update the lead and construction standards*" and "*we're not here to challenge the data which led CDPH to conclude that blood lead levels of employees should not exceed 5 to 10 micrographs per deciliter*."   He too advocated for an "exception" to the rule for telecommunication workers.

### 5.    AT&T Reported the Company's Disposal of Lead to the Federal Government As a Hazardous Waste Under the RCRA

184.    AT&T and its EHS leadership were aware for years, including throughout the Class Period, that lead was a hazardous material dangerous to the environment and the surrounding community as a result of its reporting obligations under relevant environmental laws.

185.    Also as explained more fully above (¶ 110), lead is classified as a "hazardous waste" by the EPA for purposes of the RCRA because its severe toxicity.   The EPA has assigned the hazardous wastes on its table of toxic contaminants EPA hazardous waste numbers D004 through D043.   *See* 40 C.F.R. § 261.24 tbl. 1.   Lead is assigned EPA hazardous waste number "D008."   *Id.*

186.    Subtitle C of the RCRA authorized the EPA to establish rules for handling hazardous waste.   The EPA promulgated such rules, which are now codified at 40 C.F.R. §§ 260-273.   Because these rules govern the management of hazardous waste from creation through final disposition, they are often referred to as the EPA's "cradle to grave" rules.   Among other things, the EPA's cradle to grave rules require that any facility which handles hazardous waste to first

obtain a permit from the EPA before it may do so, and subjects such facilities to various record-keeping and reporting requirements. *See* 40 C.F.R. §§ 262.18(d), 262.40-44, 264.70-77, 270.

187.    To secure a hazardous waste permit from the EPA, the owner of a facility must submit an application to the EPA containing the information set forth in 40 C.F.R. § 270.13 and applicable parts of 40 C.F.R. §§ 270.14 - 270.29. *See* 40 C.F.R. §§ 270.1(b), 270.10(d). The application is divided into Part A and Part B. *Id.* Part A consists of the information called for by 40 C.F.R. § 270.13 and is submitted on EPA Form 8700-23, which includes a RCRA Subtitle C Site Identification Form as well as a Hazardous Waste Permit Part A Form. Part B of the application contains the information called for by 40 C.F.R. §§ 270.14 - 270.29, and is submitted in narrative form. Among other things, the RCRA Subtitle C Site Identification Form requires that the applicant (i) list the EPA hazardous waste code of every regulated waste handled at the site (*e.g.*, D001, D002, etc.); (ii) provide a site contact for the facility; and (iii) certify that the information contained therein is true, accurate, and complete, based on a system designed to assure that qualified personnel properly gather and evaluate all such information. Similarly, the Hazardous Waste Part A Form requires the applicant to provide a permit contact and specify by EPA hazardous waste number all forms of regulated waste handled at the site. The narrative for Part B is often lengthy and generally includes a description of numerous topics, including how the facility will be operated to be protective of public health and the environment and how potential emergencies and/or spills will be addressed. Notably, a formal modification must be requested to introduce a new hazardous waste at an existing facility. *See* 40 C.F.R. § 270.42.

188.    Permitted facilities must also furnish various reports to the EPA on a periodic basis. Among other things, such facilities are required to "re-notify" the EPA regarding their activity status by filing an updated RCRA Subtitle C Site Identification Form on a two to four year cycle

and/or a biennial report on Form 8700-13.  *See* 40 C.F.R. §§ 262.18(d), 262.41, 264.75.  The RCRA Subtitle C Site Identification Form requires all of the information set forth in the preceding paragraph.  The biennial report on Form 8700-13 is otherwise known as a Hazardous Waste Report and requires even more detailed information about the regulated waste managed at the facility, including, much like the RCRA Subtitle C Site Identification Form, the EPA hazardous waste number for all forms of regulated waste handled at the site during the reporting cycle.

189.    AT&T and/or its consolidated subsidiaries have operated at least 5,562 facilities that handled hazardous waste, including approximately 2,567 of which were listed as "active" as of June 7, 2024.  From 2010 through the present, at least 65 of these facilities reported that one of the regulated wastes handled at the site was "Lead," using the EPA-specific hazardous waste number "D008," as specified more fully in the table below:

| EPA Site ID | Site Name | City | State | Zip |
|---|---|---|---|---|
| CAR000009597 | Ameritech Ind Inc | Redding | CA | 96002 |
| NYD070955828 | AT&T | White Plains | NY | 10601 |
| DCD980551097 | AT&T | Washington | DC | 20024 |
| FLD982103939 | AT&T | Gainesville | FL | 32606 |
| NYR000044099 | AT&T | Cold spring | NY | 10516 |
| FLR000012849 | AT&T | Jacksonville | FL | 32218 |
| DCD980714034 | AT&T - 13th Street | Washington | DC | 20005 |
| NJD980527766 | AT&T Camden 2 LL Central Office | Camden | NJ | 08102 |
| FLR000010702 | AT&T Central Office bgfiflmae87 m2620 | Big Pine Key | FL | 33043 |
| FL0000790451 | AT&T Central Office KYWSFLMA M2655 | Key west | FL | 33040 |
| FLR000015560 | AT&T Central Office MRTHFLVE M2616 | Marathon | FL | 33050 |
| FL0000207423 | AT&T Central Office NKLRFLMA M2647 | Key Largo | FL | 33037 |
| SCD987571825 | AT&T Charleson | Charleston | SC | 29403 |
| CAT080015050 | AT&T Communications of California | San Bernardino | CA | 92401 |
| NJD061073409 | AT&T Corp | Newark | NJ | 07102 |
| NJR000029710 | AT&T Corp | Florham Park | NJ | 07932 |
| NJD106795156 | AT&T Corp - W Passaic St | Rochelle park | NJ | 07662 |
| ILD980614317 | AT&T Services Inc | Chicago | IL | 60607 |
| ILD980999551 | AT&T Services Inc | Chicago | IL | 60641 |
| ILR000121319 | AT&T Services Inc | North Chicago | IL | 60064 |
| ILR000210344 | AT&T Services Inc | Chicago | IL | 60617 |
| ILD980994834 | AT&T Services Inc EHS | Rockford | IL | 61108 |
| SCR000770594 | AT&T South Carolina 91723 | Batesburg | SC | 29006 |

| TNR000003038 | AT&T Southeast | Nashville | TN | 37201 |
|---|---|---|---|---|
| NYR000246678 | AT&T Switching Center 22nd Fl & Roof – MTA NYCT Bus Radio System | New York | NY | 10019 |
| FLR000019471 | AT&T Work Center KYLRFL M2646 | Key largo | FL | 33037 |
| FLR000020560 | AT&T Work Center KYWSFL M2636 | Key west | FL | 33040 |
| FLR000015800 | Bellsouth DNLNFLVS 31359 | Dunnellon | FL | 34430 |
| FLD991304742 | Bellsouth Dunnellon ESS #36004 | Dunnellon | FL | 34432 |
| LAD985228543 | Bellsouth J2828 | Hammond | LA | 70401 |
| GAR000080663 | Bellsouth TeleCommunications Inc DBA AT&T Southeast - F5570 | Conyers | GA | 30012 |
| SCR000782383 | Bellsouth TeleCommunications Inc DBA AT&T Southeast 91243 | Columbia | SC | 29206 |
| ILD079736575 | IL Bell Tel DBA AT&T | Chicago | IL | 60606 |
| ILD981000425 | IL Bell Tel DBA AT&T | Naperville | IL | 60540 |
| ILR000110213 | IL Bell Tel DBA AT&T | Cicero | IL | 60650 |
| ILD039345277 | IL Bell Tel DBA AT&T | Chicago | IL | 60606 |
| ILD047611686 | IL Bell Tel DBA AT&T | Chicago | IL | 60606 |
| ILD980897649 | IL Bell Tel DBA AT&T | Bellwood | IL | 60104 |
| ILD980997472 | IL Bell Tel DBA AT&T | Lombard | IL | 60148 |
| ILD981001159 | IL Bell Tel DBA AT&T | Libertyville | IL | 60048 |
| ILD981089352 | IL Bell Tel DBA AT&T | Chicago | IL | 60637 |
| ILD984791178 | IL Bell Tel DBA AT&T | Hinsdale | IL | 60521 |
| ILD984804716 | IL Bell Tel DBA AT&T | La Grange | IL | 60525 |
| ILD984805978 | IL Bell Tel DBA AT&T | Blue island | IL | 60406 |
| ILD980793848 | Ill Bell Tel DBA AT&T | Chicago | IL | 60631 |
| ILD980616874 | Illinois Bell DBA AT&T | Chicago | IL | 60653 |
| ILD984906917 | Illinois Bell DBA AT&T | Chicago | IL | 60605 |
| INT190013128 | Indiana Bell DBA AT&T Indiana | Gary | IN | 46402 |
| OKD980627384 | OKC Melrose (OKCY OK ME-AT&T) | Oklahoma City | OK | 73109 |
| CAR000286229 | Pacific Bell DBA AT&T of CA | San Diego | CA | 92154 |
| CAT080014756 | Pacific Bell Telephone Co DBA AT&T California | Butte City | CA | 95920 |
| CAT080016579 | Pacific Bell Telephone Co DBA AT&T California | Elk Creek | CA | 95939 |
| CAT080016017 | Pacific Bell Telephone Company DBA AT&T California | Hamilton City | CA | 95951 |
| CAT080025596 | Pacific Bell Telephone Company DBA AT&T California | Laguna Niguel | CA | 92677 |
| CAT080029275 | Pacific Bell Telephone DBA AT&T ca | West Sacramento | CA | 95691 |
| CAT080016819 | Pacific Bell Telephone DBA AT&T California | East Nicolaus | CA | 95659 |
| CAT080023179 | Pacific Bell Telephone DBA AT&T California | Los Angeles | CA | 90038 |
| CAC002901958 | Pacific Bell Telephone Company DBA AT&T CA | Orlando | CA | 95963 |

| ARR000029348 | Southwestern Bell Telephone Company of Arkansas | Stamps | AR | 71860 |
| MOP000508283 | Southwestern Bell Telephone LP | Grover | MO | 63040 |
| WID980701353 | Wisconsin Bell Inc PH0107 | Milwaukee | WI | 53213 |
| WID980901292 | Wisconsin Bell Inc PV4107 | Evansville | WI | 53536 |
| WID981101934 | Wisconsin Bell Inc PW0109 | Madison | WI | 53704 |
| WIT560011504 | Wisconsin Bell Inc PW0110 | Madison | WI | 53705 |
| WIR000149765 | Wisconsin Bell Telephone Co DBA AT&T WI | Brookfield | WI | 53045 |

190.    Thus, AT&T filed a permit application for each of the facilities in the table above to handle lead and continued to re-notify the EPA or otherwise disclose in a biennial report that the facility continued to handle such material from 2010 through the present.  Indeed, the nine sites highlighted in grey submitted such reports *during the Class Period*.

### 6.    AT&T Reported Its Retirement of Copper Cables, Including Lead Sheathed Cables, to the Federal Government Under Rules It Opposed

191.    As the telecommunications industry transitioned from legacy copper lines to wireless technology, the Federal Communications Commission ("FCC") grew concerned that customers still reliant on copper wires would not be properly serviced by the major carriers.  In 2003, the FCC set rules governing the retirement of copper wires.  *See Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, 18 FCC Rcd. 16978 (2003) (the "Triennial Review Order").  Among other things, the Triennial Review Order required ILECs to provide public notice of any proposed retirement of copper wireline.  *Id.* ¶ 281.  These notification requirements have since been codified in the FCC's regulations at 47 C.F.R. § 51.325(a).

192.    In response to "fiber becoming the preferred choice for new greenfield deployments" and causing the "the pace of copper retirement [to] accelerate[]", the FCC initiated a new rulemaking process in November 2014 to consider revisions to the Triennial Review Order in order "to help guide and accelerate the technological revolutions that are underway."  *See*

*Ensuring Customer Premises Equipment Backup Power for Continuity of Communications, Notice of Proposed Rulemaking and Declaratory Ruling*, 29 FCC Rcd. 14968, 14974-75 (2014) ("NPRM").  Among other things, the NPRM proposed updating the FCC's rules to require notice to consumers of any copper retirement.  *Id.* ¶ 5.  In addition, the FCC specifically noted that there were "allegations in the record that in some cases carriers are allowing copper networks to deteriorate prior to retirement" and sought comment on potential changes to the definition of "copper retirement" that could make such practices, if true, less likely to occur, including *de facto* retirement arising from a failure to maintain copper wireline.  *Id.*

193.    On February 5, 2015, AT&T filed a filed a comment to the NPRM that categorically opposed the rule change, including, specifically, the enhanced notification requirements and proposed change to the definition of "copper retirement" proposed by the FCC in the NPRM.  *See* Comments of AT&T Services, Inc., PS Docket No. 14-174 (filed Feb. 5, 2015).

194.    In August 2015, the FCC issued its final rule on the retirement of copper by ILECs. *See Technology Transitions, et al.*, Report and Order, Order on Reconsideration, and Further Notice of Proposed Rulemaking, 30 FCC Rcd. 9372 (2015).  The final rule clarified that retirement includes both "removal ***or disabling***" of copper wires as well as *de facto* retirement, *i.e.*, failure to maintain the copper facilities.  *Id.* ¶ 80 (emphasis added).  Indeed, the FCC explained therein that "[w]e adopt this change to ensure incumbent LECs are aware that intentional neglect of copper facilities triggers their notification responsibilities."  *Id.* ¶ 90.  It also required additional notice to be provided to consumers and impacted CLECs, codified in a new section of the FCC's regulations at 47 C.F.R. § 51.332.  *Id.*  ¶¶ 38-78.

195.    In November 2017, the FCC reversed course and repealed 47 C.F.R. § 51.332.  *See In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure*

*Investment*, 32 FCC Rcd. 11128 (2017).  However, the FCC retained the definition of copper retirement as covering both "removing *or disabling*" and incorporated that definition directly into the definition of 47 C.F.R. § 51.325(a) (emphasis added).  *Id.*

196.    AT&T and its consolidated subsidiaries have filed at least *499* notices pursuant to these rules between September 1, 2015 and December 31, 2023 under the expanded definition of "copper retirement," including at least 357 such notices during the Class Period.

197.    In addition, as explained by numerous CWs, AT&T, like any major carrier, maintains a technical database of its cable network that contains detailed information on each segment of cable, including whether the sheathing is made of lead, which is actively updated to incorporate any changes to the network, including the retirement of any sections of cable (¶¶ 126-130).  Therefore, as AT&T retires copper cables, and provides public notice thereof, it confronts and acknowledges the extent of its copper cable network which is sheathed in lead and that it has decided to leave behind to degrade in the environment over time.

### 7.    The Risk of Abandoning Toxic Lead Cables Across the Country Manifests in Lawsuits Brought by Aggrieved Landowners in Texas

198.    The risk that AT&T could be required to remediate and/or remove its crumbling lead cable infrastructure, subject to regulatory or criminal investigations, the focus of public scrutiny, or otherwise liable to property owners for its abandonment of lead cables became even more concrete when it was sued by landowners for abandoning such cables in Texas.

199.    On February 12, 2016, the executor of the estate of Doyce Cook brought a lawsuit against AT&T in the United States District Court for the Southern District of Texas in a matter captioned *Cook v. AT&T Corp.*, No. 4:16-cv-00381 (S.D. Tex.) (the "*Cook* Action").  The lawsuit alleged that AT&T was granted an easement to install communication systems on a strip of land running across a 71 acre tract of land owned by the estate in Walker County, Texas, in the 1950s

and, thereafter, made use of the easement by "burying a 4 to 6 inch copper line, encased in lead, underground" and "installed small-cinder-block buildings and subterranean concrete rooms complete with manhole covers displaying [AT&Ts] logo, as well as poles with similar signage." The lawsuit further alleged that, in approximately 2010, "Defendant removed all of its signage and logos from the easement and poles" and "has ceased utilizing the space" but nevertheless "left the unused cable on Plaintiff's property" without his consent. The lawsuit sought a declaration that AT&T has abandoned the easement and is responsible for the cost of removal and repair, and brought claims for trespass and nuisance to recover damages to return the land to its natural state, including decontaminating the land. It also sought punitive damages, stating as follows:

> Defendant failed to report to the landowner that the cable at issue is sheathed in a toxic substance, and tried to quietly leave the cable buried beneath his property without any notice of the potential harm to his land, its value or himself and most importantly the health of his family and community.

The complaint noted that the entire easement granted to AT&T for the cable "spans from Dallas-Fort Worth to Houston."

200.    On March 1, 2016, a group of six other landowners brought a class action lawsuit against AT&T in the United States District Court for the Southern District of Texas in a matter captioned *Cook v. AT&T Corp.*, 4:16-cv-00542 (S.D. Tex.) (the "Texas Class Action") on behalf of all individuals or entities who currently own real property situated between Houston, Texas and Dallas-Fort Worth, Texas encumbered by an easement granted to AT&T in approximately 1950 based on similar allegations. The lawsuit sought damages of no less than $5 million.

201.    A hearing was held on May 20, 2016 to hear argument on motions to dismiss filed by AT&T in both the *Cook* Action and the Texas Class Action. The hearing was attended by Jennifer Evans Morris, Vice President & Associate General Counsel at AT&T. At the time, Ms. Morris was responsible for all commercial, labor, and employment litigation at AT&T. During

82

the hearing, counsel for the plaintiffs informed the court that "the cable is also seeping lead" and

"the continuing presence of the cable, as well as the lead, is a continuing harm."

202.    Plaintiffs in both the *Cook* Action and the Texas Class Action filed amended

complaints in early June 2016.  The amended complaint in both lawsuits alleged as follows:

> Corrosion of the lead sheath on this type of cable is a mechanism that can result in
> lead being released to the environment.  Such corrosion is a common occurrence
> with older cables, especially when the cable is cut or damaged.  Cables of the type
> used on [p]laintiffs' property require routine inspection and maintenance.  If the
> cover surrounding the lead is damaged, the lead will contaminate the immediate
> area.  The Environmental Protection Agency has stringent rules for the storage and
> disposal of lead.

The plaintiffs alleged that covering of the cable was "badly damaged", and that the lead was

"directly contacting the soil" on their land.  Specifically, the plaintiffs alleged that the lead cable

was continuing to deteriorate and "contaminate the subsurface of the [p]laintiffs' real property."

203.    A hearing was held on August 12, 2016 to hear argument on renewed motions to

dismiss filed by AT&T in both the *Cook* Action and the Texas Class Action.  The hearing was

attended by Len Briley, Assistant Vice President & Senior Legal Counsel at AT&T.  At the time,

Mr. Briley was responsible for all complex commercial litigation in southern Texas at AT&T.

During the hearing, counsel for the plaintiffs informed the court that it "hired an expert just to

confirm . . . yes, in fact, there was and is contamination, and not just a little bit, a lot."  Counsel

continued:  "We have to deal with decontaminating our land.  We have to dispose of some of this

material that the federal government regulates.  They've caused us a major problem."

204.    On March 27, 2017, and March 28, 2017, the Court entered Orders denying

AT&T's motions to dismiss in both actions.  In the orders, the Court determined that the allegations

of contamination adequately stated a claim for trespass and the complaints pled facts sufficient to

allege that AT&T had abandoned the cables.  The Court subsequently consolidated the *Cook*

Action with and into the Texas Class Action for all further proceedings.

205.    The plaintiffs in the Texas Class Action retained several experts, including Bryan Vento, an expert on the subject of environmental site assessments, and David Howell, an expert on the subject of the removal of abandoned pipeline and cable.  At the time of his engagement, Mr. Vento's company, Environmental Evaluations & Consulting, had over 20 years of experience collecting and testing soil and groundwater.  At the time of his engagement, Mr. Howell's company, Pipeline Equities, had removed over 12 million feet of retired, abandoned, or out of use pipeline and cable.  Mr. Vento collected sediment and water from the inside of an underground vault through which one of AT&Ts lead cables passed, both of which showed concentrations of lead that exceeded Texas state standards.  Mr. Howell opined that the cost to remove the lead cables along the entire easement was approximately $33.43 per foot.  Mr. Howell formed this opinion by considering expenses for: mobilization equipment and labor to prepare for removal; excavation, removal, cut and load 3-inch cable; land and title work for right of way; damages to landowners; transportation of hazardous waste to a certified land fill; disposal of hazardous waste at a licensed land fill; removal of underground vaults and soil remediation and replacement.

206.    AT&T sought to have the opinions of Mr. Vento and Mr. Howell excluded in the Texas Class Action and moved for summary judgment on the declaratory relief and trespass claims asserted against it.  On August 15, 2019, the Court entered two orders denying AT&T's motion to exclude and denying AT&T's motion for summary judgment.

207.    The case was proceeding to trial when the plaintiffs abruptly dismissed their claims in February 2020.

### 8.    Another Lawsuit Is Filed Against AT&T for Abandoning Lead Cables in Lake Tahoe and Brought Directly to the Attention of Its Executives

208.    Lake Tahoe is a large freshwater lake in the Sierra Nevada mountain range that straddles the border between California and Nevada, northeast of Sacramento, California, and

southwest of Reno, Nevada.  The lake is approximately 22 miles long and 12 miles wide.  By volume, it is the largest freshwater lake in the United States behind only the five Great Lakes.  The lake is surrounded on all sides by mountains which feature over a dozen ski resorts, making the area around the lake a popular tourist and vacation destination.  Over 75% of the basin surrounding the lake is national forestland protected by the United States Forest Service.  As an alpine lake fed by a protected watershed and direct rainwater, Lake Tahoe is renowned for its clear, sky blue water.  Many of the communities on both the Nevada and California side of Lake Tahoe source their municipal drinking water directly from lake's surface water.

209.    Defendant John T. Stankey and/or trusts that he operated as trustee have owned property in Nevada on the coast of Lake Tahoe since at least August 1997.  In August 1997, Stankey purchased a condominium in Incline Village, Nevada, an upscale town along the northeast edge of Lake Tahoe, for approximately $225,000.  In August 2004, Stankey purchased a residential property with a single-family home in Incline Village, Nevada, for approximately $1 million.  In March 2012, a trust operated by Stankey as trustee purchased an 11-acre residential property with the largest single-family home in Incline Village, Nevada, for approximately $5.9 million.  The home on this property sits on a hill overlooking the shore of Crystal Bay, Lake Tahoe.  Stankey continued to hold an ownership interest in this property through the end of the Class Period.

210.    In approximately 2012, two professional divers with an environmental consulting firm were performing work for the Tahoe Regional Planning Agency at the bottom of an inlet on the southwestern edge of Lake Tahoe known as Emerald Bay when they discovered an old decaying cable sticking out of the sand on the lakebed.  They took a segment of the cable for further analysis.  Testing confirmed that the cable consisted of several layers of different material, including solid copper wireline covered by several layers of paper and twine in its core surrounded

by a rolled 0.188-inch layer of lead wrapped with 27 strands of 0.25-inch-thick steel rod encased in tar-treated jute, as can be seen in the following photograph of the cable:



211.    Over several years, the team performed additional dives and found approximately 8 miles of similar cable on the floor of Lake Tahoe, including several cables that ran across the mouth of Emerald Bay, and one that stretched nearly 7.5 miles along the west shore of Lake Tahoe in shallow waters past Emerald Bay.  Further testing confirmed that there was approximately ***3.39 pounds of lead per foot***, meaning there was ***over 70 tons of lead*** in the waters of Lake Tahoe.  One of the cables submerged in Emerald Bay was physically cut at one end and the long cable that ran up the coast of Lake Tahoe exited the water and was physically severed on land.  All cables were generally in a state of disrepair with noticeable wear and damage at various points from boat anchors, other debris, fraying from lakebed rocks, age, or corrosion, exposing the interior of the cable, including the lead sheath under the strands of steal coil, directly to the waters of Lake Tahoe:



Signage indicated that two of these submerged cables, including the lengthy 7.5-mile cable, were telecommunication cables from the 1920s owned by AT&T predecessor Pac Bell. Research and historic records confirmed that these three cables were installed and operated by Pac Bell.

212. After learning about these submerged cables, on or around August 20, 2020, a group of lawyers for the California Sportfishing Protection Alliance ("CSPA") formally served a letter on the CEO of Pac Bell, Rhonda J. Johnson, providing notice (1) that Pac Bell's abandonment and disposal of the lead cables violated the RCRCA and California law; and (2) of the intent to sue after the applicable notice period if no action is taken to remove the cables. A copy of the letter was also provided to various government bodies, including the Administrator of the EPA, the Director of the California Department of Resources, Recycling and Recovery, the District Attorney for El Dorado County, California, and the District Attorney for Placer County, California. The letter provided the coordinates for the start and end of each segment of cable and advised that "when Lake Tahoe water contacts the lead sheathing in the Cable, the water dissolves lead from the sheathing," as confirmed by a test performed by CSPA on one of AT&T's cables:

> CSPA submerged a sample of Cable A in a plastic container filled with Lake Tahoe water. After 24 hours, a sample was taken of the water and sent to a state-certified laboratory for analysis, which showed that enough lead had leached from the piece

87

of the Cable to bring the concentration of lead in the water to 650 micrograms per liter. After seven days, another sample of the water was taken and sent to the same laboratory for analysis, which showed that the concentration of lead in the water had risen to 1,500 micrograms per liter. This is evidence that lead is leaching from the Cables into Lake Tahoe.

The letter also summarized the many ways that lead is toxic to humans and the environment even at low levels and advised that its discharge into the waters of Lake Tahoe poses a significant threat to health of local citizens who swim or dive in Lake Tahoe for recreation, drink water from Lake Tahoe, or eat fish caught in its waters.

213.    On November 13, 2020, *Moonshine Ink*, the independent newspaper of North Lake Tahoe with circulation limited to the towns surrounding Lake Tahoe and Reno, Nevada, ran a story that broke the news about the submerged cables and the demand letter titled "The Cables Leaking Lead in Lake Tahoe." Jim Kimberly, Director of Corporate Communications at AT&T with responsibility for crisis communications and issues management, provided a statement for the story in which he said: "These are very old cables and we are investigating to determine who owns them . . . . We will take appropriate action as the facts become known."

214.    On January 14, 2021, the CSPA filed a lawsuit against Pac Bell in the United States District Court for the Eastern District of California in a matter captioned *California Sportfishing Protection Alliance v. Pacific Bell Telephone Company*, 2:21-cv-00073 (E.D. Cal.) (the "Lake Tahoe Action"). The CSPA alleged the same facts from its demand letter described more fully above (¶ 212) and asserted claims under the private enforcement provisions of the RCRA and the California State Drinking Water and Toxic Enforcement Act of 1986 ("Prop 65"). The suit sought injunctive relief and civil penalties of $2,500 per day until Pac Bell no longer causes lead to be released from the cables into Lake Tahoe. According to the complaint, there are approximately 41,600 feet (7.9 miles) of lead cables owned by Pac Bell located at the bottom of Lake Tahoe which "contain approximately 137,000 pounds (more than 68 tons) of lead."

215.    AT&T publicly denied the allegations of the lawsuit. In a statement provided to *Law360* for an article reporting on the filing of the Lake Tahoe Action, AT&T representative Jim Kimberly "told Law360 . . . that the company disagrees with the lawsuit's allegations." Similarly, Kimberly provided another statement to *Moonshine Ink* on or around February 12, 2021, in which he said "[w]e disagree with the allegations in this lawsuit and hope to resolve it soon."

216.    News of the lead cables and the lawsuit against AT&T caught the attention of local environmental groups, including The League to Save Lake Tahoe, also known by their iconic slogan "Keep Tahoe Blue." Founded in 1957, the League is Lake Tahoe's oldest and largest nonprofit environmental advocacy organization. It is dedicated to protecting and restoring the environmental health, sustainability, and scenic beauty of the Lake Tahoe basin.

217.    Stankey and AT&T have both donated to the League to Save Lake Tahoe for years. Stankey and his wife donated between $2,500 - $5,000 in 2013, between $5,000 - $10,000 in 2015, between $2,500 - $5,000 in 2016, between $2,500 - $5,000 in 2017, between $2,500 - $5,000 in 2018, between $5,000 - $10,000 in 2019, and between $5,000 - $10,000 in 2020. Similarly, AT&T donated over $10,000 in 2015, over $10,000 in 2016, over $10,000 in 2017, over $10,000 in 2018, over $10,000 in 2019, and over $10,000 in 2020. Ironically, AT&T's contribution of more than $10,000 qualified it for the highest membership tier referred to as "Emerald Bay" status. Beginning in 2021, *i.e.*, after the commencement of the Lake Tahoe Action, AT&T ceased making donations and Stankey and his wife began to donate over $10,000, including in 2021 and 2022.

218.    AT&T has other financial ties to the League to Save Lake Tahoe. In 2018 and 2019, AT&T sponsored an ornate luncheon for the League's annual fashion show fund raiser on the shores of Lake Tahoe. In 2020, when the fashion show was cancelled, a grant by AT&T

allowed the League to set up a new website to serve as a single source of information for all environmental education activities relating to Lake Tahoe.

219.    The League to Save Lake Tahoe used its close ties to AT&T and its senior officers to facilitate a settlement in the Lake Tahoe Action.  The League was aware of the submerged cables by no later than the end of 2020, following the publication of the initial news story by *Moonshine Ink* in November 2020.  A spokesperson for the League told the *WSJ* that it worked to have the cables removed as quickly as possible and expressly stated, "***[b]ecause we've received donations from AT&T in the past, we had access to their senior leadership, which we used to voice our concerns and push them to remove the cables***."  Because of his many donations and well-known residence on the shore of Lake Tahoe, as well as the importance of ESG to AT&T brand, image, and reputation, it is reasonable to infer that the League spoke with John Stankey or its concerns were communicated to him.  By no later than April 2021, the parties to the Lake Tahoe Action began to discuss a potential settlement to resolve the suit.

220.    On September 13, 2021, the CSPA filed a Motion to Approve Settlement and for Entry of Consent Decree.  The moving papers explained that the parties reached a conditional agreement to settle its claims in the form of a Consent Decree.  As stated therein, Pac Bell agreed to "pursue any necessary approvals required for the removal of the Cables and to remove them so long as the removal costs do not exceed $1.5 million."  Specifically, Pac Bell agreed to remove the cables within 90 days of securing all necessary permits or authorizations.  If all necessary approvals were not secured within six months, the parties agreed to confer about extending the timeline to do so.  An executive from AT&T, Shannon Settle, Assistant Vice President of Access – Construction & Engineering, signed the Consent Decree on behalf of Pac Bell.  On November 5, 2021, the court overseeing the Lake Tahoe Action approved the Consent Decree as amended.

221.    Nevertheless, AT&T continued to vigorously deny the allegations lodged in the Lake Tahoe Action.  For example, the Consent Decree signed by AT&T stated that "Defendant contends that it stopped using the Cables in or around the 1980s . . . and [thus] ***Defendant no longer owns the Cables***" and reiterated that "Defendant disputes Plaintiff's allegations."   On December 10, 2021, Jim Greer, AT&T's Assistant Vice President of Corporate Communications & Public Relations, provided a statement to *Moonshine Ink* in which he said "[w]e have agreed to remove these cables because they are no longer in use" but emphasized that "we dispute any notion that they were a source of pollution."  However, he stated that "we are committed to preserving one of the most scenic freshwater lakes in the Sierra Nevada."

222.    While the above events were ongoing, AT&T and/or Pac Bell took steps to conceal its ownership of the cables publicly.  As noted above, signage on the shores of Lake Tahoe near the cables indicated that they were installed or operated by Pac Bell (¶211).  By no later than August 2022, that signage had been removed.

223.    Almost a year after the Court approved the Consent Decree, the parties began filing a series of stipulations in which they agreed to extend the deadlines under the Consent Decree in order to allow provide additional time for regulatory approvals.  On October 19, 2022, the parties filed a stipulation to extend the deadlines by 90 days, which indicated that Pac Bell had submitted applications to various public agencies to remove the cables but all such applications remained pending.  On January 12, 2023, the parties filed stipulation to extend the deadlines by 90 days, which indicated that Pac Bell received approval from the Lahontan Regional Water Quality Control Board but all others remained outstanding.  On April 17, 2023, the parties filed a stipulation to extend the deadlines by another 45 days, which indicated that Pac Bell "has secured all needed Approvals except for a Temporary Special Use Permit from the U.S. Forest Service."

224.    On April 28, 2023, Pac Bell secured the one remaining permit needed from the U.S. Forest Service, thus clearing the way for AT&T to begin removing the lead cables submerged at the bottom of Lake Tahoe in accordance with the terms of the Consent Decree.

**F.    The Public Learns That AT&T Has a Vast Network of Decaying Lead Cables That Are Corroding Into the Environment and Harming Front-line Workers**

225.    The public first began to learn the shocking truth about AT&T's lead cables and their effects on the environment, particularly the fact that they are placing lead contaminants in the surrounding air, water, and land, through a series of blockbuster stories published by the *Wall Street Journal* in July 2023.  As detailed more fully below, the *Wall Street Journal*'s reports were the product of a thorough 18-month investigation involving scientific sampling, field inspections, interviews with former telecommunication executives, and more.  This reporting led to a series of events that revealed more details about AT&T's lead cables and its related exposure.

**1.    The Wall Street Journal 'S Thorough Two-Year Investigation**

226.    Founded in 1889, the *WSJ* is one of the world's leading newspapers primarily covering business and financial news.  The *WSJ* had an estimated average circulation of over 3.9 million as of August 2023.  Its intended audience includes business professionals as well as active investors.  As part of its mission, it endeavors to provide its audience with "facts, data and information, not assertions or opinions." Since its founding, the *WSJ* has won numerous awards for its work and publications.  It is known for having high standards of journalistic integrity.

227.    The *WSJ* investigation into abandoned lead cables began with an anonymous tip that AT&T was removing an old lead cable in Lake Tahoe.  This was of particular interest because, according to Shalini Ramachandran ("Ramachandran"), a *WSJ* correspondent who has covered the telecom industry for many years, the use of "lead" in telecommunications cables was almost unheard of.  Ramachandran said that she "***had covered cable and telecom for a long time and had***

*never heard of lead cables in the telecom networks*." Ramachandran and colleague Susan Pulliam ("Pulliam") began to ask how many of these cables are still out there.

228.    To locate cables in waterways, *WSJ* staff secured permits—some of which were over a century old—from the U.S. Army Corps of Engineers and its various district offices, and made similar requests from 30 states and the U.S. Bureau of Reclamation.  They wrote code to process the aged records.  The *WSJ* only included permits and records from before 1965, which was when it estimated the Bell System phased out its use of lead, unless later permits referenced earlier cables that were not present in the database.  Army Corps officers told the *WSJ* that many permits were likely lost or discarded over the years.  The *WSJ* also obtained maps of water bodies from the U.S. Geological Survey and created a computer program that identified the shortest path across the water in order to approximate the likely path of the cable from bank to bank.

229.    The team also extracted images from Google Street View in front of each school in the nation's five most densely populated states, 16 of the 20 most densely populated counties, and a random sampling of nearly 10,000 NJ Transit bus stops in New Jersey, the most densely populated state in the country.  A machine-learning algorithm was used to detect if there were lead-sheathed cables in these images. Whenever the algorithm recognized the existence of lead-sheathed cables in the images, *Journal* employees would then manually review the images to verify the existence of lead-sheathed cables.  Over 100,000 images were analyzed and those flagged as featuring lead-sheathed cables were manually reviewed by *WSJ* staff.  A former AT&T EHS professional reviewed a sample of the images and confirmed the validity of the analysis.

230.    Through these investigative efforts, the *WSJ* identified approximately 1,700 underwater cables and 450 aerial cables, most of which run next to schools, bus stops, parks, and homes.  But *WSJ* investigators stressed that both figures likely represent only a "fraction" of those

still remaining given the sampling used to conduct its investigation, limited as it was.  Notably, the *WSJ* shared with the EPA these identified locations, and learned that approximately 330 sites were located at what was called a "Source Water Protection Area" which provide drinking water.

231.    To confirm the existence of these cables, and their threat to the environment and surrounding communities, *WSJ* reporters drove to approximately 300 sites they identified across the country with research divers, university scientists, and environmental consultants, and found cables, or evidence of them, in nearly every site they visited, including bayous in Louisiana.

232.    Interested in whether lead was leaching from the cables hanging from utility poles, Pulliam met with researchers from New York University led by Dr. Jack Caravanos ("Caravanos") to investigate a site located in Wappingers Falls, a town in the Hudson Valley of New York.  In the neighborhood where the site was located, they found cables sheathed in lead running along and around a playground called Temple Park.  Next to the playground, close to a sign that said "Children at Play," Dr. Carvanos performed an X-ray fluorescence test and found that the area close to the cable indicated a rating of 1,000 ppm for lead.  As indicated above (¶ 111), the EPA's threshold is 400 ppm for areas where children play.  The park has since been dubbed "toxic park."

233.    Pulliam also investigated a site at New Iberia, Louisiana frequented by locals.  This location was situated by the bank of Bayou Teche, and there was an AT&T cable protruding from the ground.  The investigation demonstrated levels of lead that were 14 times the EPA's maximum level that is safe for play areas.  A woman living in the area, who said she had been unaware of the cable, told the *WSJ* that "kids come down here and play all the time on the edge of the bayou."

234.    The *WSJ*'s general protocol for extracting samples required that all containers to be used for sample collection be cleaned and rinsed with deionized water before being used.  The team also needed to wear single-use nitrile gloves, which had to be changed whenever multiple

samples were to be collected. Sediment and soil samples were collected using clean stainless-steel scoops. Samples were collected up to 6 inches from cables, and double bagged. Lead cable scrapings were taken and double bagged after soil and water sample collections were completed.

235.    For underwater locations, the *WSJ* collaborated with an organization called Marine Taxonomic Services, led by Seth Jones ("Jones") and Monique Ridell ("Ridell") to identify underwater lead cables and collect samples for testing. With the *WSJ* team, Jones and Ridell collected a sample of water next to the cable in Lake Tahoe. They also collected water samples from other locations where lead cables were present, including Michigan and Oregon.

236.    In collecting samples from cables found submerged under deep waters, divers like Jones would collect the water sample using a clean plastic syringe from a distance of less than an inch from the cable. Samples from shallow water were likewise collected from a distance of less than an inch from the cable, through the use of a clean plastic syringe and in accordance with the general operating procedure outlined above.

237.    The *WSJ* team took water samples around AT&T's underwater cable in Lake Tahoe, and confirmed that there were "very high" levels of lead. Lead was also found moving away from the cables toward the beach, confirming that lead was, in fact, leaching from the severed ends of the cable. Other samples tested were taken from areas where people swim, camp and boat. One sample was more than *2,500* times the level that the EPA says is safe for drinking water.

238.    Since lead is a naturally occurring metal, the *WSJ* used several methods to connect the lead found in soil and water to the cables. To ensure that the lead was indeed sourced from the cable and not a natural occurrence, "background" samples were collected at various distances from the cables to test the naturally occurring lead levels in the vicinity. As interpreted by experts, a higher lead reading closer to the cables indicated the high likelihood of the cables being the cause

of the contamination.  As mentioned above, Dr. Caravanos' findings in New York were similar: that lead contamination in the soil was the highest in the area directly beneath or adjacent to the cables, within up to two feet, which indicated that the cable's exposure to the elements caused it to bleed lead onto the ground, where lead accumulated over time.

239.    Several sets of samples were provided to Professor Bruce Nelson, a geochemistry professor at the University of Washington, who operates a laboratory that performed isotopic analyses of the samples.  This analysis links the lead from the cables to the lead in the ground or water.  Professor Nelson used a mass spectrometer, which measures the four common atomic masses that constitute lead, giving each sample a specific fingerprint.  Professor Nelson concluded that the samples selected by the *WSJ* team from cables in New Iberia, Louisiana, and Coal Center, Pennsylvania were the likely source of lead contamination found in the nearby soil.

240.    Gordon Binkhorst, an environmental consultant and expert on lead sampling, reviewed the sampling methods used by the *WSJ* and said they were appropriate techniques for basic testing of whether lead was present in the soil and water near the cables, using a certified environmental testing lab.

## 2.    Publication of the *WSJ*'s Series on Lead Telecom Cables

241.    The *WSJ* released its first story in its series about the decaying lead cables dispersed throughout the country, titled "America Is Wrapped in Miles of Toxic Lead Cables," on July 9, 2023.  The story stated, in pertinent part:

> *AT&T, Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.*

> The lead can be found on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey, according to the Journal's tests of samples from nearly 130 underwater-cable sites, conducted by several independent laboratories.  The metal

96

has tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey.

***The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination—more than 2,000 lead-covered cables—that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.***

***Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency.*** At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. "We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.

***For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.***

*    *    *

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. The samples were analyzed for lead content by Pace Analytical Services, an accredited environmental-testing lab. A researcher at the University of Washington who analyzed the chemical fingerprint of lead at some of those sites verified that the lead contaminating the water and soil likely originated from the cable.

**Among the findings:**

—Roughly 330 of the total number of underwater cable locations identified by the Journal are in a "source water protection area," designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal.

—Aerial lead cabling runs alongside more than 100 schools with about 48,000 students in total. More than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable, according to a Journal analysis using data from research firm MCH Strategic Data.

—In New Jersey alone, more than 350 bus stops are next to or beneath aerial lead-covered cables, a Journal analysis of NJ Transit data found.

—Roughly 80% of sediment samples taken next to underwater cables, which the Journal tested, showed elevated levels of lead. It isn't known if the level of leaching is constant; experts say old cables tend to degrade over time.

Ben Grumbles, executive director of an association of state environmental regulators, called the Journal's findings disturbing. "This is a type of toxic exposure that isn't on the national radar and it needs to be," he said. "There is a need to act and clean it up."

**An ancient network**

American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water. For underwater cables, steel cords sometimes surround the lead for further protection.

When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

*      *      *

**The known risks**

AT&T has previously noted the risks from its cables. ***"Underground cable presents real possibilities for overexposure"* for workers removing them, AT&T said in a 2010 presentation about employee safety at an industry conference. *"Some older metropolitan areas may still have over 50% lead cable,"* it added.**

***The company considered the potential cost and environmental impact of removing the cables daunting, said Braden Allenby, a former top AT&T environmental health and safety official, now a professor at Arizona State University. "It was standard operating procedure to abandon those cables in place," he said. "We kept the discussion internal and informal. We didn't try to quantify the problem or speak to the economics overall."***

*      *      *

AT&T has been involved in litigation over cables in Lake Tahoe. In 2021, the California Sportfishing Protection Alliance, an environmental group, sued AT&T over two cables in the lake, more than 6 miles long in total, according to permits.

98

In a 2021 settlement, in which AT&T didn't admit wrongdoing, the company agreed to remove the cables at a cost of up to $1.5 million. The company said it had stopped using the cables, no longer owned them and that its easements, or legal rights to cross the lake, had ended.

The cleanup has been delayed repeatedly. AT&T's contractor has cited logistical issues including that removal could "disrupt nesting birds (bald eagles, Peregrine falcon, osprey)," according to an email reviewed by the Journal.

The Journal, through Marine Taxonomic Services, tested water samples from Lake Tahoe and found high levels of lead in several locations. Samples taken in March at either end of a severed cable in Emerald Bay, an inlet in Lake Tahoe known for its turquoise water, showed lead at 5,510 parts per billion and 38,000 parts per billion. Marine Taxonomic Services isn't a party to the AT&T lawsuit.

The EPA says chronic exposure to more than 2.5 parts of lead per billion in fresh water poses risks to aquatic life. While it doesn't have any guidelines for safe levels of lead in natural bodies of water, the EPA can advise local authorities to alert the public if drinking water out of the tap registers 15 parts of lead per billion or higher. (One part per billion is equal to about one drop of water in a swimming pool, environmental researchers say.)

Parts of Lake Tahoe are used for drinking water, though any potential risk would be for swimmers ingesting water near the cables. ***Compared with the EPA's guideline for water out of the tap, the March tests in Emerald Bay were 367 times and 2,533 times the threshold, respectively.***

In May, the Journal also found high lead levels in roughly the same locations in Emerald Bay at 7,410 parts per billion and 1,390 parts per billion, respectively.

(Emphasis added.)

242.    The *WSJ* published another article on July 12, 2023, titled "What AT&T and Verizon Knew About Toxic Lead Cables." That article provided in pertinent part:

> ***At a gathering of telecom officials more than a decade ago, John Malone, a senior AT&T manager, cautioned the group about a little-known danger crisscrossing the nation.***
>
> His topic was lead-covered cables, which once carried phone service and had long been obsolete. Weren't these ancient cables gone?
>
> "NO," his slide presentation said. ***"Some older metropolitan areas may still have over 50% lead cable,"*** the slide said. ***In some places, they posed risks for phone-company workers and the surrounding environment, Malone concluded.***

99

*For decades, AT&T, Verizon and other firms dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.*

They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show. *Environmental records from an AT&T smelting unit in the 1980s show contamination in the soil.* . . .

*Over the years, AT&T officials themselves expressed concern about possible worker exposure to lead.* Risks include kidney issues, heart disease and reproductive problems in adults, according to U.S. health agencies.

Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. The telecom industry's lead-covered cables have been largely unknown to the public. The industry doesn't have a program to remove or assess their condition. Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.

*In the 2010 presentation, Malone acknowledged the environmental impact, saying that "soils retained between 83 and 98 percent of the released lead within 2 inches" from the cables.*

"They knew the risks, but they didn't want to do a lot to mitigate it," said James Winn, who worked as a cable splicer among other jobs for several Bell System companies for 45 years. Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

*       *       *

While regulations and lead bans drove down exposure across the population, there were still more than 40,000 telecom employees working with lead in 1983, according to a Bell System document. Even though companies stopped deploying new lead-sheathed cables in the 1960s, the existing network still needed to be maintained, and lead-based solder has remained in use.

**SMELTING HEADACHES**

In the mid-1980s, AT&T was recycling large amounts of materials as it updated its systems and retired tons of lead used throughout the network.  The company did the work using its AT&T Nassau Metals division, part of Western Electric.

The smelting unit, which an AT&T executive said at the time received about 50 million pounds of lead-sheathed cable a year in Gaston, S.C., received citations

100

from the state's labor department for safety violations that affected, among others, "150 melt shop employees who are overexposed to lead."

Environmental records show lead contamination in the soil next to the site. An inspection document from 1985 said workers there were exposed to airborne lead nearly 17 times OSHA's safety standard. And a handwritten table by an AT&T official showed that among 90 workers tested that year, the average blood lead level was 33.7 micrograms per deciliter, more than twice average levels back then and nearly 10 times what's considered high today.

Under U.S. Environmental Protection Agency and state scrutiny, AT&T agreed to help clean up the site, including properly containing waste and environmental monitoring.

(Emphasis added.)

243.    As detailed more fully below (¶¶ 270, 400, 404, 406, 408), the *WSJ* published a number of other stories as part of its series on lead-sheathed telecommunication cables.

### 3.    AT&T's Immediate Response

244.    AT&T provided a written statement to the *WSJ* ahead of the first story, in which it said the *WSJ*'s conclusions ***"conflict[] not only with what independent experts and longstanding science have stated about the safety of lead-clad telecom cables but also our own testing."*** In the initial article in the series, published on July 9, 2023, the *WSJ* said that "AT&T, Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes" and that "they follow regulatory safety guidelines for workers dealing with lead."

245.    By no later than the evening of July 9, 2023—the same day the *WSJ* published its first story—the United States Telecom Association ("USTelecom"), an industry trade association for telecommunications-related businesses, created a website dedicated to lead cables disputing the environmental and public health impacts titled "Telecom Cable Facts."  AT&T is a member of USTelecom.  Among other things, the site declared in bold letters ***"We have not seen, nor have***

101

***U.S. regulators identified, evidence that legacy lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue***." It added that "[t]he presence of lead in soil, sediment, or water is not sufficient to conclude that the source of lead is telecom cables." The site also maintained that "[r]isks associated with legacy lead-sheathed telecom cables are mitigated by the nature of the material, their location, coatings on them, conduits surrounding them, and other factors" and most "are generally in locations that minimize the potential for public contact." Finally, the site asserted that, "in some situations, telecom cables are appropriately left in place when no longer in current use and may stand by to be used if and when needed," as "with many other types of infrastructure, such as rail lines or pipelines."

246.    Later on July 9, 2023, AT&T also established a page on its press release website dedicated to lead cables, which reiterated under the heading "Our Statement" that "*The Journal*'s reporting conflicts not only with what independent experts and long-standing science have stated about the safety of lead-clad telecom cables but also our own testing, which we have made available to the public and shared with *The Journal*" and "reliable studies in the U.S. and abroad give no reason to believe that these cables pose a public health issue or a risk to workers when appropriate safety measures are in place." It also directed visitors to the USTelecom website for the "facts" about lead cables.

247.    Soon thereafter, USTelecom provided a statement to the *WSJ*, which it included in a story that it ran on July 11, 2023. In the statement, USTelecom declared as follows: "We have not seen, nor have regulators identified, evidence that legacy lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue." As indicated in the preceding paragraphs, this is a direct quote from the "Telecom Cable Facts" website it launched days earlier.

### 4.    Government Response and Related Fallout

248.    The response by lawmakers to the *WSJ*'s initial report was swift.  On July 11, 2021, Senator Markey, an author of the Telecommunications Act and a nationally-recognized leader on telecommunications policy, sent a letter to USTelecom in which he said the indifference shown by its member companies to the known risks of lead was "corporate irresponsibility of the worst kind" and posed a series of questions including "[w]hy have the companies that knew about the cables— and the potential exposure risks they pose—failed to monitor them or act?"  He added that the companies responsible for the cables have "a duty—both civic and legal—to ensure that they do not put Americans in harm's way."  Later that day, Representative Frank Pallone of New Jersey posted on the social media platform X that "There is no safe level of lead exposure—*none*—which is why I'm so disturbed by these reports of lead cable lines throughout the country."

249.    Representative Pat Ryan, responsible for the district where Temple Park is located, was particularly outspoken.  On July 11, 2023, he told the *WSJ* that telecommunication companies should "do the right thing and clean up their mess."  At a Congressional hearing on July 13, 2023, he urged EPA representatives testifying at the hearing to compel a cleanup of any contamination caused by lead cables.  On July 20, 2023, Representative Ryan wrote to USTelecom, demanding answers about the location of the lead cables and their plans for remediation.  On July 26, 2023, Jonathan Spalter, President and CEO of USTelecom, sent a response which large reiterated verbatim text from the USTelecom website on lead cables and said "[w]e will work diligently both to pursue the facts, and to coordinate closely with regulators and local authorities to make appropriate determinations regarding where and whether removal best serves public health and safety."  On July 28, 2023, Representative Ryan issued a press release indicating that Spalter "did not address either of [his] concerns" and called upon fellow lawmakers to have telecommunication company CEOs testify in a public hearing before Congress.

250.    A mix of regulators sprang into action as well.  By no later than July 11, 2023, the EPA and FCC were evaluating various enforcement options.  Immediately after the publication of the first article by the *WSJ* on July 9, 2023, FCC staff convened with the EPA and the White House Council on Environmental Quality to discuss interagency coordination.  By July 17, 2023, the EPA was actively coordinating with the FCC.  On July 20, 2023, FCC Chairwoman Jessica Rosenworcel publicly stated that "[w]e want to discuss with them [EPA staff] what their plans are and want to figure out how we can assist them going ahead."  In addition, the FCC met with the President's interagency Task Force on Environmental Health Risks and Safety Risks to Children.

251.    At this point, the extent of AT&T's exposure was still unknown.  On July 12, 2023, New Street Research issued a note to clients in which lead U.S. analyst Jonathan Chaplin estimated that it could cost the telecommunications industry as much as ***$59 billion*** to clean up the lead cables remaining in the nation's telephone network.  Among other things, the note advised that "AT&T likely has the highest [financial] exposure overall" by owning approximately ***half*** of the copper wireline in the nation's legacy infrastructure.  By comparison, primary wireline competitors Verizon and Lumen Technologies were estimated to own only 15.9% and 13.1%, respectively.

252.    Early on July 14, 2023, J.P. Morgan analyst Phil Cusick downgraded AT&T from Overweight to Neutral and decreased the price target from $22 to $17 due to the uncertainty around potential lead cable liabilities.  In the accompanying text, Cusick said "[w]e have discussed the copper lead sheathing situation with many industry contacts and have been unable to find a reasonable way to calculate any potential liability, but believe that AT&T will have the largest exposure give its massive LEC business (~40% of homes in the US) as well as owning the original AT&T long haul network" and expected it to be a "long-term overhang for the stock."

253.    Late on the evening of July 16, 2023, three environmental groups sent an email to EPA Administrator, Michael S. Regan, urging him to take immediate action to protect communities from the dangers posed by abandoned lead cables.  In particular, the group appealed to Regan to use the Agency's authority under CERCLA and the Safe Drinking Water Act.  This email was followed by a written letter to Regan containing a copy of the message on July 17, 2023.

254.    On the morning of July 17, 2023, Citigroup analyst Michael Rollins followed suit and downgraded the recommendation for AT&T from Buy to Neutral, decreased the price target from $22 to $16 and designated the stock as "High-Risk."  The note provided that the "historical use of lead sheathed cabling is likely to remain an overhang for the stocks and valuation for at least a few months and potentially longer until the market can better measure the financial risk."

255.    On July 20, 2023, New York Governor Kathy Hochul directed the New York Department of Public Service ("NYDPS"), the body that regulates telecommunications in New York, and several other state agencies to investigate the presence of lead cables in New York and their potential danger.  That same day, those agencies sent letters to AT&T Communications of New York, Inc., and AT&T Long Distance in which they requested an "full inventory" of all "lead-containing aerial and buried cable, both on land and below water, owned by your company for both cable still in use . . . and cable that is no longer being used but has yet to be removed."

256.    By no later than July 26, 2023, the U.S. Attorney's Office for the Southern District of New York had launched a civil inquiry into whether telecommunication companies had knowledge of the potential risks to their workers and the environment when they left behind the lead cables.  In addition, the EPA formally launched an investigation into the potential environmental impact of the lead cables using Superfund authority under CERCLA.  In a press

statement, the EPA said it takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution."

     5.    **AT&T Backs Out of Its Agreement to Remove the Eight Miles of Decaying Lead Cable That It Discarded At the Bottom of Lake Tahoe**

257.    By mid-May 2023—less than two months before the *WSJ*'s exposé—AT&T began to stall its efforts to remove the lead cables at the bottom of Lake Tahoe. After failing to reach agreement on the content of a joint status update, Pac Bell filed its own in the Lake Tahoe Action on May 19, 2023, which stated that it secured all necessary permits but that they "prohibit[ed] work during the peak recreation season" from Memorial Day to Labor Day and, accordingly, "the next opportunity to remove the Cables is after the end of the peak recreation season" in mid-September 2023. The CSPC filed a response on May 22, 2023, clarifying that the parties disagreed on this point and noting that Pac Bell was required to complete removal within 90 days of securing all permits. By May 19, 2023, it is likely that AT&T directly or indirectly learned about the *WSJ*'s investigation. Indeed, AT&T was asked by the *WSJ* to comment on its ownership of lead cables before the first story was published, and the *WSJ* was actively contacting regulatory agencies throughout the country about AT&T's lead cables by no later than March 20, 2023.

258.    AT&T continued to stall in the weeks that followed. On May 23, 2023, it filed a regulatory request to remove the cables between September 6, 2023 and October 31, 2023, even though it was aware that the CSPC believed that this activity could occur much sooner. On June 2, 2023, the CSPC advised that it contacted the two agencies that issued the permits which purportedly contained the seasonal restriction referenced by Pac Bell and they both confirmed, in writing, that their permits did not create any prohibition on the removal of the cables between Memorial Day and Labor Day. Nevertheless, Pac Bell's counsel refused to discuss logistics for removing the cables during that time period and declared that "the cables present no danger

106

whatsoever to the environment."  On June 15, 2023, Pac Bell reported that the parties continued to disagree as to when it could permissibly begin removing the cables and stressed that the 90-day provision from the Consent Decree allowed for "flexibility" and did not impose a "hard deadline."

259.    A status conference was held in the Lake Tahoe Action on June 19, 2023.  In response to questioning as to whether removal could begin within the 90-day window, counsel for AT&T argued that removal operations should not begin until September because of boating safety. Based on representations by Pac Bell's counsel that it committed to begin removal operations on September 6, 2023, the CSPC agreed to September 6, 2023 as the commencement date.  Thereafter, the parties held a meet-and-confer on July 10, 2023.  During that meet-and-confer, counsel for Pac Bell affirmed that plans were in place to begin removal operations on September 6, 2023.

260.    Soon after the *WSJ* published its first story in the lead cable exposé, Pac Bell indicated that it would no longer honor its agreement to remove the lead cables it discarded at the bottom of Lake Tahoe.  On July 18, 2023, Pac Bell filed an update in the Lake Tahoe Action which brought the *WSJ*'s reporting to the attention of the court and stated that it now wished to preserve "the status quo" in order to "develop a further record rather than remove the Lake Tahoe cables." A letter attached to the filing sent by AT&T earlier that day asserted, in contrast to its prior statements (¶ 221), that "in 2021, AT&T agreed to remove [the lead cables in Lake Tahoe] simply to avoid the expense of litigation."  The letter continued, "AT&T had every intention of removing the cables in Lake Tahoe" but explained that "the landscape has changed dramatically" in the wake of the *WSJ*'s reporting.  In other words, AT&T was reneging on its agreement in the wake of the *WSJ*'s exposé.  As its basis for doing so, AT&T relied on the same 90-day requirement from the Consent Decree that it previously argued allowed it to begin work 90 days *after* securing all necessary approvals:  "As you know, the Consent Decree allows either party to terminate the

107

agreement if the cables are not removed within 90 days after all regulatory approvals are obtained"
and "AT&T anticipates exercising its contractual right to vacate the Consent Decree and resume
this litigation" if the parties cannot reach agreement before then.

261.    On July 27, 2023, Pac Bell filed a Notice in the Lake Tahoe Action to inform the
Court that it has formally elected to exercise its contractual right to "vacate" the Consent Decree,
given that the parties remain at an impasse over when the cables should be removed and 90 days
have elapsed since it secured all necessary approvals to do so.  The Notice highlighted that Pac
Bell decided to exercise this right "especially in light of the recent reporting by the *Wall Street
Journal*."  On August 1, 2023, the Judge overseeing the Lake Tahoe Action entered an order
formally vacating the Consent Decree pursuant to the Notice filed by Pac Bell.

**6.    AT&T Finally Discloses the Magnitude of Its Lead Cable Problem**

262.    In the filing that AT&T made in the Lake Tahoe Action on July 18, 2023
announcing its intention to walk away from the settlement, the Company provided new details on
the extent of lead remaining in its legacy network.  In a footnote, AT&T revealed for the first time
that it still owned approximately 200,000 route miles of lead cables, at least one-third of which
remaining hanging on utility poles:

> Based on its records, AT&T estimates that lead-clad cables represent less than 10%
> of its copper footprint of roughly two million sheath miles of cable, the
> overwhelming majority of which remains in active service. More than two thirds of
> its lead-clad cabling is either buried or in conduit, followed by aerial cable, and
> with a very small portion running underwater.

The financial markets took immediate note of this new information.  Within an hour of the filing,
*Bloomberg* reported that AT&T made this disclosure.  Industry publication *Fierce Network*
published an article stating that AT&T "revealed . . . in a Tuesday court filing" that lead "represents
roughly 200,000 miles of its two million miles of copper cabling."  Even *The Dallas Morning
News* ran a story on AT&T's disclosure the day it was made.  With this new information, analysts

scrambled to calculate AT&T's exposure. For example, in a note to clients with the heading "Lead-Clad Cables <10% of 2m Mile Copper Footprint, 2/3 buried," J.P. Morgan analyst Philip Cusick noted an estimated removal cost of approximately $2 to $4 billion for just the aerial and underwater lead cables in AT&T's network. In a note titled "AT&T Network Disclosure Starts To Frame the Lead Issue," Morningstar analyst Michael Hodel estimated removal costs of $2.2 billion to $4.5 billion for the same universe of cables, but cautioned that "[t]he scope of any required environmental remediation work and legal liability also remains unknown" and "would probably take years to settle."

263.    On July 26, 2023, AT&T held its first earnings call since the story about lead cables first broke earlier that month. Before opening the call to questions from analyst, Defendant Stankey provided a lengthy statement on "the handling of lead-clad cables in our networks." Stankey that the "industry began to phase out placement of new lead-clad telecom cables in the 1950s" but "they continue to be used . . . in our industry" because they are so durable and reiterated that "lead-clad cables make up a small part of our network, with the majority underground and cased and protective [sic] conduit." Stankey continued to dispute that these lead cables posed any public health issue but admitted that AT&T was performing additional testing and cooperating with requests for information from the EPA:

> Independent experts, long-standing science have given us no reason to believe these cables pose a public health risk. And our own prior testing, which we shared publicly confirms the established science. Still, to be responsive to any concerns raised by recent reporting, ***we're doing additional testing at selected sites***, and ***we're working cooperatively with the Environmental Protection Agency to provide them the information needed to conduct a thorough assessment of the issue*** using the most up-to-date reliable science.

(Emphasis added.) Later on the call, analyst David William Barden with Bank of America, asked if any government entities have raised an issue with AT&T's lead cables over the past 50 to 70

years.  Stankey gave a response that not only acknowledged the existence of the Lake Tahoe Action but confirmed that regulators had previously spoken to AT&T about its lead cables:

> I'm limited in how much I can say.  I'll try to be somewhat responsive . . . but you also have to understand ***we're in a unique position that we do have actual litigation pending right now on some of this out in Lake Tahoe***, and that maybe puts us in a little bit different place.  So I need to be somewhat sensitive around that. . . .  ***[W]e've had relationships with federal state regulators on all safety issues for a very long time, lead being one of them***.  We work with our workplace regulators.  We work with external environmental regulators.  And as you know, we are a big company, and we do an awful lot. . . . .  We have those relationships. We communicate. We share data. . . .  And I think, to answer your question, in those normal cycles and those interactions, has anybody come in and said, hey, we've got issues around what you're doing with lead cables or you're not handling this correctly?  The answer is no.  ***Have we—as part of that rigorous enforcement that goes on—have we had circumstances where compliance with a particular thing maybe has popped up, and we've had to go in and demonstrate compliance or do things? Of course.***  That's what regulators do, and that's what workplace safety people do.  And I think we're proud of our track record in what we've been able to do.  And I think the constructive relationship that we have with our labor union around workplace safety and the fact that we're constructively working through this issue with them right now is indicative of something that's been in place and has just been kind of the DNA of what we do.
>
> ***We haven't disclosed anything out publicly about claims because there hasn't been anything material to disclose is what I would tell you.***  And I don't know that I would go any further than that.

(Emphasis added.)

264.    In a quarterly report on Form 10-Q filed by AT&T the next day, the Company reported that it was adding a new disclosure to the "risk factors" set forth in its periodic filings which describe the events or uncertainties that could cause actual results to differ materially from those in any forward-looking statements relating on the topic of its lead-clad cables.  Specifically, that filing stated in relevant part as follows:

> Recent Wall Street Journal reports regarding lead-clad cables.
>
> In July 2023, the *Wall Street Journal* published a series of articles alleging that lead-clad telecommunications cables are a public-health hazard.  We anticipate that, in light of these assertions, ***we may be subject to litigation, government investigations and potentially new regulation or legislation relating to lead-clad***

*cables. We may incur significant expenses defending such suits or government actions or complying with any new regulation or legislation, and may be required to spend amounts that are material to AT&T.*

(Emphasis added.)

### G.    Post Class-Period Developments

#### 1.    Continued Interest by Regulators and Lawmakers

265.    Recent activities by regulators and lawmakers indicate that the initial interest in the presence of lead in old telecommunications wires has not waned and authorities remain focused on holding their owners responsible and that AT&T's corresponding woes are far from over.

266.    During the month immediately following the Class Period, AT&T performed a full review of its lead-sheathed cable footprint in New York in response to the request for information from New York regulators.  On August 21, 2023, AT&T provided a written response to the New York regulators explaining that, even though it does not operate as a local carrier in New York, it identified over 688 miles of lead-covered "interconnection" cables through its review.  On October 23, 2023, NYDPS held a Webex meeting with representatives of AT&T to discuss the matter. AT&T conducted an additional review into the ownership and access to its facilities in New York where it may have "above-ground" lead cables.  On November 6, 2023, AT&T provided a supplemental written response to NYDPS describing the results of that review.

267.    By no later than August 31, 2023, the EPA had requested that major telecommunications companies provide it with the results of any inspections that they have performed along with any sampling data and established a national technical working group to consider next steps in its investigation into lead-sheathed telecommunications cables.  In fact, the Mayor of West Orange, New Jersey—one of the locations where the *WSJ* identified lead-covered aerial cables hanging above a school—informed residents on September 1, 2023 that EPA

representatives have "advised the Township that ***discussions are occurring with the various telecommunication providers involved to develop a long-term remediation solution.***"

268.    On September 20, 2023, a group of 12 U.S. Senators, including Senator Markey, sent separate letters to Administrator of the EPA, Michael Regan, and the Chair of the FCC, Jessica Rosenworcel.  In the letter to the FCC, the Senators expressed "great concern" about the lead cables reported by the *WSJ* and asked the FCC to provide answers to a series of questions so they could understand the full scope of the issue.  In the letter to the EPA, the Senators "urge[d] the EPA to investigate and ascertain the scope of this problem and move swiftly to hold any potentially responsible parties accountable and ensure they engage any needed remediation activities to mitigate harms affecting communities, families and children, current and former employees and contractors, and ecosystems that were exposed to lead-sheathed telecommunications cables."  On November 14, 2023, the EPA provided a written response which confirmed that it was "vigorously engaged" in work to better understand the issue and had established a national working group to "guide longer-term actions related to lead-covered cables."  The letter also advised that the EPA remained committed to "using our enforcement authorities to hold parties accountable to address the threats from dangerous contaminant release associated with lead-covered cables" and was "coordinating with the Department of Justice and with the Federal Communications Commission to determine how we can harness our respective authorities."  On December 21, 2023, the FCC also provided a written response which confirmed that it "has continued to follow reports on this issue" and had "directed the Commission's Wireline Competition Bureau to contact the carriers identified in the media reports to discuss their testing and any remediation effort, and to encourage carrier cooperation with the federal and state authorities."  In addition, the FCC also said it had "engaged with the General Services Administration and the Department of Justice" on the topic.

269.    By no later than November 10, 2023, the Attorney General for the state of Arizona, Kris Mayes, opened an investigation into lead-covered cables that may be present in Arizona.  On November 10, 2023, Kris Mayes sent a letter AT&T Nevada to request a "full inventory of lead-covered cables located in Arizona that AT&T Nevada or its predecessors used to provide telecommunications services" along with details on each such cable.  As Kris Mayes specified in the letter, "I recently learned that in 1949, Bell Telephone Company of Nevada was issued an Army Corps of Engineers permit to cross the Colorado River with a lead-covered cable into Mohave County, Arizona."  The Attorney General's Office issued a press release about the investigation on November 29, 2023.  The release announced that Kris Mayes "sent letters to 200 telecommunications operators" to request information on lead-covered cables they may own in Arizona as well as a "separate letter to AT&T" about the cable it placed across the Colorado River.

270.    Congress is also continuing to evaluate its legal options for addressing the lead cables now that the issue is in the spotlight.  On December 26, 2023, Congressional Research Service issued a briefing titled "Legacy Lead-Sheathed Telecommunications Cables: Status and Issues for Congress."  CRS "operates solely at the behest of and under the direction of Congress."  The lead cable briefing noted that "EPA may take CERCLA response actions to investigate and remediate the release, or substantial threat of a release, of lead into the environment under the Superfund program at sites on nonfederal lands."  The CRS Issue Brief noted that "[i]f lead derived from lead-sheathed telecommunication cables were to migrate into groundwater or surface water, enforcement actions under two other federal statutes might be used to mitigate potential impacts on water quality," and cited the Safe Drinking Water Act and the Clean Water Act.

271.    On December 11, 2023, the EPA sent AT&T a letter which confirmed that the EPA was continuing to move forward with its investigation into the environmental impacts of AT&T's

lead cables.  Specifically, the letter stated that the EPA was contacting AT&T to schedule an in-person meeting at EPA headquarters in January 2024 "to discuss technical issues that will inform *EPA's ongoing work* to protect the public and the environment from potential lead pollution." Indeed, the letter expressly stated that the information it wished to review at the meeting "bears on *whether AT&T's lead-sheathed cables contributed to a release* to the environment, which *is part of EPA's ongoing investigation*."

272.    On January 11, 2024, the *WSJ* reported that the EPA was accelerating its Superfund review and designating it investigation as "high priority," in continued coordination with the DOJ, after the EPA completed its initial review of three sites identified by in the *WSJ*'s reporting:

> The Environmental Protection Agency sent letters requesting telecom companies to meet with the agency about their lead-sheathed phone cables, *in a new phase of an investigation in the EPA's efforts to protect the public from potential lead hazards.*

> The agency's move comes on the heels of the EPA finding more than 100 soil and sediment readings with lead above the regulator's safety guideline for children at some phone lead-cable sites identified by the *Wall Street Journal* in three states.

> "*This is lead that could be concerning*" based on factors like "exposure and pathways" into the body, *said Clifford Villa, head of the EPA's "Superfund" office that cleans up contaminated sites*, in an interview with the Journal.  *The preliminary data from the agency's sampling supports the EPA determination that the investigation of lead telecom cables is a "high priority," said Grant Cope, senior counselor to EPA Administrator Michael Regan*.  Both officials are helping oversee the EPA's investigation.

>        \*     \*     \*

> AT&T, Verizon and other telecom companies with legacy lead cables have said the cables pose no public health hazard and aren't a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. . . . *EPA testing in three states near some telecom lead-cable locations identified by the Journal found 101 results, or 41% of the samples taken near lead cables, exceeded the EPA's lead safety guideline for children.*

>        \*     \*     \*

*The EPA is coordinating closely with the Justice Department*, whose Southern District of New York is investigating whether telecom companies had knowledge of any potential risks to their workers and future environmental impact when they left behind the lead cables, the Journal previously reported. *The DOJ has requested data from the companies, including a list of their lead-cable locations around the country, a person briefed on the investigation said.*

According to the *WSJ*, the EPA is engaging in a "multistep Superfund review process" that will "examine[] whether any other longer-term remedies should be remediation" and the initial site tests were only the "first stage" in that process.  In response to this news, *Bloomberg* reported that the EPA was "increasing its probe" and "step[ping] up" its Superfund review.  The following day, technology publication *Ars Technica* issued a story titled "EPA expands 'high priority' probe into AT&T, Verizon lead-contaminated cables."

273.    Less than a week later, on January 17, 2024, *the EPA announced that it was decreasing the acceptable limit for lead in residential play areas for the first time in 30 years from 400 ppm to 200 ppm*.  The release announcing this news stated that "EPA expects to investigate more residential properties for potential cleanup under the Superfund law" as a result of this action.  It also reiterated the same message EPA published years earlier: "The science is clear:  there is no known safe blood lead level in children."  In response, on January 18, 2024, Representative Pat Ryan demanded that Verizon and AT&T "immediately disclose the locations of all lead cables in New York, and commit to robust lead testing at high risk sites across the state." The release noted that "Verizon and AT&T have refused multiple requests from Congressmen Ryan to tell the public the location of these lead cables."

274.    On February 5, 2024, Senator Markey—the first lawmaker to speak out in the wake of the *WSJ*'s first story—held a site visit in Chicopee, Massachusetts, which revealed unsafe levels of lead in soil under aerial lead-covered cables and hosted a roundtable event with state and local lawmakers to discuss the issue.  At the event, Senator Markey stated "[w]e need to protect the

families in the 21st century from corporate decisions made in the 19th and 20th centuries."  He

added, "Telecommunications companies own these cables, and now they must own the solutions."

275.    Most recently, on February 26, 2024, the Chief of the FCC's Wireline Competition

Bureau sent a letter to the President of the National Association of Regulatory Utility

Commissioners ("NARUC"), a national association representing state public service

commissioners who regulate essential utility services, to offer assistance with interagency

coordination and exchange of information between its members and the EPA and other federal and

state agencies with jurisdiction over the matter.  The letter indicated that "EPA and other federal

authorities have been working to determine which carriers may have used lead-sheathed cables,

the extent of these remaining cables, and where these cables are located."  It further provided as

follows: "[T]he FCC and your state public utility commission (PUC) members have a shared

responsibility for the communications services that were, or may continue to be, provided via these

cables in each state.  Accordingly, I expect that we have similar interest in ensuring information

sharing and interagency coordination to support efforts to identify and remediate any ongoing

environmental and public health danger from these cables."

## 2.    New Mass Liability Lawsuits Arising from AT&T's Lead Cables

276.    On approximately November 6, 2023, a class action petition was filed against a

group of telecommunication companies, including AT&T, Legacy AT&T, and AT&T subsidiary

BellSouth Telecommunications, LLC, on behalf of Louisiana homeowners for damaging property

values by abandoning their obsolete lead cables on property throughout the State.  The suit seeks

damages and injunctive relief for a collection of state law claims, including negligence, breach of

the duty owned by owners of rights-of-way, abuse of right, trespass, nuisance, and remediation

under the Louisiana Ground Water Act.  On December 12, 2023, the case was removed to the

United States District Court for the Western District of Louisiana, where it is now pending under

the caption *Blum v. AT&T Corp.*, No. 6:23-cv-01748 (W.D. La.).  The parties recently requested that the Court approve a protective order for purposes of exchanging discovery.

277.   On January 11, 2024, a class of shareholders filed a derivative action on behalf of AT&T against its directors and officers for the liabilities created by their failure to disclose the Company's extensive use and abandonment of lead-sheathed cables in the United States District Court for the District of Delaware.  *See Miller v. Stephenson et al.*, No. 1:24-cv-00032 (D. Del.).

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

278.   As provided more fully below, Defendants made materially false and misleading statements during the Class Period on the topics of:  (i) the financial benefits associated with transitioning from copper cables to newer broadband technologies; (ii) discontinuance of copper assets; (iii) employee health and safety; (iv) environmental stewardship; and (v) EHS contingencies and risk.  Plaintiffs assert that all statements set forth below in bold and italicized text are materially false and misleading for the reasons stated therein.  Statements that are not bolded and italicized are included for context.

### A.   Cost Savings of Transitioning Away from Copper

279.   On December 12, 2019, Defendant McElfresh attended the Barclays Global Technology, Media, and Telecommunications Conference hosted by Barclays Bank analyst Kannan Venkateshwar.  Asked about the cost reduction program led by Bill Morrow and John Stankey, Defendant McElfresh said:

> Well, we're early into it.  I mean I'm about 90 days into this job, and we've got new eyes on the portfolio.  But invariably, as you look at a company as large as AT&T that's got such diversified revenue across so many different product lines, you arrive and you see that you've got areas of your copper network where the subscribers have already migrated to, let's say, maybe fiber or to wireless or to some other more advanced technology and your efficiency of that copper network might be underutilized.  So we have maintained that network for many years.  ***And so we're working through looking at ways to optimize, geographically, areas of our network where we might be able to reclaim that.  We do shrink our footprint,***

117

*lower expenses, maybe have the opportunity to monetize some physical real estate in that part of our footprint would be some examples.*

280.    The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because AT&T was neither "reclaiming" its lead-encased copper cables nor "shrinking" its network of them but, rather, abandoning them in place across the United States.  In addition, these statements gave the false impression that AT&T's legacy infrastructure would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm, but failed to disclose that: (i) its legacy wireline network contained hundreds of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company thereafter; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions; and, thus, (v) it was reasonably likely that the Company would incur substantial costs in connection with legislative actions, regulatory enforcement, investigative efforts, removal, remediation, litigation, and/or related penalties.  Indeed, AT&T has already faced (i) a number of private lawsuits arising from its use and/or abandonment of lead-covered cables; (ii) requests for information about its lead-covered cables by New York state regulators and the Arizona Attorney General's Office; (iii) a civil inquiry by the DOJ into its abandonment of lead-covered cables; and (iv) a multistage Superfund investigation by the EPA into its lead-covered cables in which the EPA has informed AT&T that it seeks to develop "a long-term remediation solution."  Further, AT&T has admitted that it may be subject to additional

litigation, government investigations and potentially new regulation or legislation relating to lead-clad cables that could have a material adverse effect on its reputation and/or financial condition.

281.    On April 22, 2020, AT&T held a conference call with analysts to discuss its financial results for the quarter ended March 31, 2020, with Defendants Stephenson, Stephens, and Stankey in attendance.  During the opening presentation, Defendant Stankey spoke on the cost reduction initiative, stating:

> As I shared previously, **we're working on 10 broad areas of opportunity that we expect will deliver $6 billion in cost savings over the next 3 years** and improve market effectiveness, everything from IT and field operations to call centers and retail distribution.  Leaders and teams are in place to work the portfolio of opportunities.  And we have a solid senior governance structure to guide and resource this work.  Since our last update, I'd like to highlight 2 initiatives that are now underway to yield over $1 billion in recurring cost improvement and improve our overall customer experience. . . .  **The second initiative is focused on our field operations, which will benefit from** our product evolution to customer self-install, **the shift of our broadband base to lower-cost fiber** and improved systems and AI capabilities that will reduce truck rolls and eliminate second visits.  These efficiencies will enhance our ability to continue to invest in our key growth initiatives.

282.    The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about how moving away from legacy broadband products in terms of "cost savings."

283.    On January 27, 2021, AT&T held a conference call with analysts to discuss its financial results for the quarter and year ended December 31, 2020, with Defendants Stephens and Stankey in attendance.  During the opening presentation, Defendant Stankey spoke on the cost reduction initiative, stating:

> **Our second priority is the same as last year, and that's continuing to transform our operations to be more effective and efficient.  We're** restructuring businesses, **sunsetting legacy networks**, reducing corporate staffing levels and overall benefit costs.  As a result, we're positioned to enter the post-pandemic world as a more agile and efficient company.

284. The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about "sunsetting" AT&T's legacy networks, which included its web of lead-sheathed copper cables, in terms of making the business more cost "efficient." Indeed, AT&T was sunsetting its lead-sheathed legacy wireline in a manner that exposed it to costly scrutiny, liability, and reputational harm.

285. On February 25, 2021, AT&T filed its annual report on Form 10-K for the fiscal year ended December 31, 2020 (the "2020 Form 10-K"). The 2020 Form 10-K was signed by Defendants Stankey and Stephens. In a section on "2021 Expenses Trends," the 2020 Form 10-K stated:

> *We continue to transform our operations to be more efficient and effective, reinvesting savings* into growth areas of the business. *We are* restructuring businesses, *sunsetting legacy networks*, improving customer service and ordering functions through digital transformation, sizing our support costs and staffing with current activity levels, *and reassessing overall benefit costs*. *We expect continued savings from these initiatives* and through our WarnerMedia merger synergy program. Cost savings and non-strategic asset sales aligns with our focus on debt reduction.

286. The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about "sunsetting" legacy networks, which included its web of lead-sheathed copper cables, in terms of its "cost" benefits and "savings." Indeed, AT&T was sunsetting its lead-sheathed legacy wireline in a manner that exposed it to costly scrutiny, liability, and reputational harm.

287.    On April 22, 2021, AT&T held a conference call with analysts to discuss its financial results for the quarter and year ended March 31, 2021, with Defendants Stankey and Desroches in attendance.  During his opening remarks, Defendant Desroches said:

> Our cost efforts are also evident in Business Wireline.  ***Cost management has helped expand EBITDA margins as customers transition away from higher-margin legacy services and products***.  But the product simplification and the resulting cost savings have been key to delivering solid EBITDA**.**

288.    The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in  ¶ 280 insofar as they speak about transitioning away from AT&T's legacy services and products, which were provided through its network of copper cables, in terms of its "cost" benefits.  Indeed, AT&T was sunsetting its lead-sheathed legacy copper cables in a manner that exposed it to costly scrutiny, liability, and reputational harm.

289.    On May 24, 2021, Defendant Stankey attended the JPMorgan Global Technology, Media and Communications Conference hosted by JPMorgan Chase & Co. analyst Phillip A. Cusick.  Asked whether 5G and fiber investment is the key to revenue and EBITDA growth forecast by AT&T, Defendant Stankey responded:

> 100%.  We want this business to grow.  I want 3 businesses growing when this is all said and done.  I want a consumer fixed business growing.  I want an enterprise business that's growing.  And I want a wireless business that's growing.  And so the investment levels we're talking about here is to reposition all 3 segments to be able to grow and grow EBITDA. . . .  ***And so some of this investment that we started last year, when you think about when I came into the role in July, the purpose behind that stepped-up investment internally was to improve our operating profile; start making some of those hard decisions on the infrastructure that we needed to reengineer in this company; shutting down long-held systems that were serving products that were at the mature end of their stage and needed to ultimately be brought and cleaned from the portfolio that ultimately, over time, while maybe in the short term might put some pressure on cash, would improve our agility and improve our cost structure.***  And we've started to demonstrate some

momentum there. We've got a couple of years of work to finish up and really make sure we complete and do it effectively, but that's all part of the formula.

290.    In response to a question about growing the fiber network to the same size as

AT&T's legacy ILEC network, Defendant Stankey responded:

I don't expect that fiber will ever be the solution for all of the ILEC footprint, but that's where being a great wireless provider comes in . . . what we do believe is that fixed wireless plays a role in other parts of our footprint. And there's no question where we've had lower-speed DSL offers in the market, that a fixed wireless solution that outdoor reaches what used to be ILEC footprint, could be a good solution for us and for those customers. . . . *And, more importantly, it allows us to shut down some infrastructure over time.* We have a voice replacement service now that can be in there. *And so that allows us to look at our options around footprint that used to be in place and fixed costs that used to be there and begin the work of starting to shed some of that footprint and reduce the number of square miles that have that fixed infrastructure in place that really you're never going to have an incentive to ultimately upgrade to fiber.* I shouldn't say never, but the next several years, during the time frame you're talking about. And the best way to serve them is really with robust wireless infrastructure and stepped-up investment in that case, and we'll do that. So, look, I think when it's all said and done, we'll use our assets in the way they should be used. *And it will allow us to still meet the needs of all of our customers and be really competitive but have a different cost structure* and have greater agility in the market and have more flexibility as to how we go forward.

291.    Subsequently, analyst Cusick said "*You've talked about—mentioned a couple of

times—removing legacy products that are sort of out of date*" including "*old homes that used to

get DSL and can't buy that anymore*" and asked if there would be a point where the majority of

the population had access to another form of service. Defendant Stankey responded:

*Yes*. I would expect with our stepped-up investment, you'll see that happen in what I would call more ubiquitous fashion. Starting in '23s, you get into the majority of the U.S. population.

292.    The statements identified in bold and italicized text in the paragraphs above were

materially false or misleading when made, otherwise omitted to state material facts necessary to

make them not misleading, or failed to correct a false impression for all the reasons set forth in

¶ 280 insofar as they speak about "shutting down" the mature network that provided DSL service,

which included its copper wireline infrastructure, in terms "cost" benefits. The statements were also materially false and misleading because AT&T was neither reducing the "square miles" of lead-sheathed cable in place nor "removing" those cables but, rather, abandoning them in place across the United States.

293. On June 2, 2021, Defendant McElfresh attended the Sanford C. Bernstein Strategic Decisions Conference hosted by Sanford C. Bernstein & Co. analyst Peter Lawler Supino. Asked if AT&T's transition to new broadband technology would drive meaningful revenue for AT&T Communications, Defendant McElfresh said:

> [S]omething we very rarely talk about—and it's hard to connect the dots on—is the 90 metro markets where we're building this fiber is in areas where we're filling in the footprint of our existing fiber franchise. You can either edge out of your current territory. You can fill in particular pockets where it makes economical sense to deploy the fiber. And ***doing that enables my team to shut down the aged copper network. And as we do that, I mean, as of today, we're probably about 2,000 square miles of our copper network that's been decommissioned as part of this new market focus, and that takes cost out that helps grow margin, helps us deliver our $20 billion in free cash flow guidance, helps us reinvest in things like fiber.***

294. The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the decision to "shut down" or "decommission" AT&T's legacy copper network, which included its copper wireline infrastructure, in terms of its "cost" benefits. Indeed, AT&T was shutting down its lead-sheathed legacy wireline in a manner that exposed it to costly scrutiny, liability, and reputational harm.

295. On September 21, 2021, Defendant Stankey attended the Goldman Sachs Communacopia Conference hosted by Goldman Sachs Group analyst Brett Joseph Feldman. Asked about AT&T's penetration with fiber, Defendant Stankey said:

And as I've said, my goal is I feel very comfortable, we have places we can go to build 30 million homes right now on an owned and operated basis. They have very attractive returns in the mid- to upper teens. We're demonstrating every day with our existing base that we can operate that more effectively. We've now crossed over places where we have scale, where *we are taking cost out of the business based on fiber replacement to old infrastructure*.

296.    The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar they speak about fiber as a "replacement" for AT&T's old infrastructure, which includes its copper wireline, in terms of its "cost" savings. Indeed, AT&T was shutting down its lead-sheathed legacy wireline in a manner that exposed it to costly scrutiny, liability, and reputational harm.

297.    On November 17, 2021, Defendant Desroches attended the Morgan Stanley Technology, Media & Telecom Conference hosted by Morgan Stanley analyst Simon William Flannery. In response to a question about key focus areas for AT&T, Defendant Desroches said:

And then Business Wireline, *we're in the midst of a several year transition where we are rationalizing low-profit margin products and taking a lot of costs out of the business, so still generating high levels of absolute profit margins. But over time, the growth vector for these businesses is going to come from fiber connectivity to small and midsized businesses as well as new products and services to enterprises.* That's what we think it looks like. But, overall, when you put that all together, it translates into low single-digit revenues.

298.    The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar they speak about "rationalizing" AT&T's legacy products, which were provided through its network of copper cables, in terms of its "cost" benefits. Indeed, AT&T was shutting down its lead-sheathed legacy wireline in a manner that exposed it to costly scrutiny, liability, and reputational harm.

299.    On January 26, 2022, AT&T held a conference call with analysts to discuss its financial results for the quarter and year ended December 31, 2021, with Defendants Stankey and Desroches in attendance.  In response to an analyst question about optimizing the wireline footprint, Defendant Stankey responded:

> We spend a lot of time far back as 2012 and constantly revisiting and relooking how we wanted to work through the transition of our business.  And I'm not a big believer right now that us going out and taking the less utilized parts of our wireline footprint; and sending them out to somebody at a steep discount, and continuing to have to do things like operationally provide services to that entity for many, many years to come on infrastructure, IT systems, et cetera, that have to be maintained, is the right thing for a healthy and sustainable business.  ***My point of view is that***, as a management team that runs networks and what we do around here, ***our job should be to rationalize those assets in an effective way and do it in the best interest of our shareholders***. And you've heard me talk about that. ***When I talk about transformation and shutting down products and thinking about how we become a company that offers products on fiber, what's going on behind the scenes on that is actually backing away and moving deliberately through a process of taking products that served us incredibly well that have been the mainstay of this company for a period of time, and doing in a very, very smart and tactical way this shutdown and sunset of those.  And as we sunset them, take the high cost operating model that supports them away.  And so when we talk about transformation and we talk about getting savings from shutting down applications and IT infrastructure and product sunset, that's really synonymous with us actually walking away from square miles and infrastructure and costs and all the things that have seen their better day.***  And so we intend to ultimately capture that value and return it to the shareholder.

300.    The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about how the decision to "shutdown" and "sunset" the infrastructure for legacy products, which includes its copper wireline, in terms of its "cost" savings.  Indeed, AT&T was shutting down its lead-sheathed legacy wireline in a manner that exposed it to costly scrutiny, liability, and reputational harm, contrary to the best interests of AT&T's shareholders.

301.     On February 16, 2022, AT&T filed its annual report on Form 10-K for the fiscal year ended December 31, 2021 (the "2021 Form 10-K").  The 2021 Form 10-K was signed by Defendants Stankey and Stephens.  In a section on "2022 Expense Trends," the 2021 Form 10-K stated:

> ***We continue to transform our operations to be more efficient and effective***, reinvesting savings into growth areas of the business. ***We are*** restructuring businesses, ***sunsetting legacy networks,*** improving customer service and ordering functions through digital transformation, sizing our support costs and staffing with current activity levels, ***and reassessing overall benefit costs.*** Cost savings and asset sales align with our focus on debt reduction.

302.     The same, or substantially similar, statements as those quoted in the paragraph above were made in AT&T's annual report on Form 10-K for the fiscal year ended December 31, 2022, filed on February 16, 2023 (the "2022 Form 10-K").[1]  The 2022 Form 10-K was signed by Defendants Stankey and Desroches.

303.     The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about "sunsetting" legacy networks, which included its web of lead-sheathed copper cables, in terms of its "cost" benefits and efficiencies.  Indeed, AT&T was sunsetting its lead-sheathed legacy wireline in a manner that exposed it to costly scrutiny, liability, and reputational harm.

304.     On March 11, 2022, AT&T held an Analyst & Investor Day with Defendants Stankey, Desroches, and McElfresh in attendance.   During the presentation titled "Cost Transformation: Sharpening Our Focus," Defendant McElfresh stated as follows:

> Our ability to fuel these areas of growth comes from cost and operating efficiencies we're delivering as part of our transformation program that we announced 2 years ago. . . . ***I've mentioned simplicity and focus. These are good ways to think about***

---

[1] The 2021 Form 10-K removed the phrase "reinvesting savings into growth areas of the business" but otherwise contained identical text.

*what we're doing to transform our legacy or copper network footprint and all the fixed and variable costs that go along with running and maintaining a very large copper network that's carried the load for decades.* It's widely known that our highly profitable legacy revenues that are served by this network are declining. Now controlling the timing and profitability curve while we migrate customers to our next-generation fiber and 5G services is essential to our transformation. It's a big reason why we launched the transformation program and why we've chosen to do this work internally as opposed to seek other options for this legacy component of our business. *Reducing the legacy fixed cost and associated trailing expenses and migrating these customers to fiber and 5G solutions maintains our margins, it enables simpler operations and creates a better experience for our customers and for our employees.* We plan to reduce our copper footprint 50% by 2025. In doing so, we are rationalizing a cost base of $6 billion. *This program is in the early days of gaining scale, and we're getting to the point where the cost savings are materializing. To date, we've turned down or decommissioned over 900,000 network elements programmed to date.* We've reduced over 4 billion in annualized kilowatt hours program to date. And we've seen a 16% reduction in copper maintenance trouble ticket repairs. *These actions* not only *drive cost efficiencies*, but they're opening up more opportunity that is meaningful for our future.

305.    Asked by an analyst for more details on the cost savings realized from copper decommissioning, Defendant McElfresh said:

In the areas where we're building our fiber, we are taking winning share. Our fiber product is the premium superior product in the market, and we're able to grow as a result of that, not only in our broadband business, but our wireless business. *And so in those areas, we are reclaiming copper, removing copper and cost,* but that's not the only area of our copper sunset and optimization strategies. *We have many square miles outside of our fiber footprint, that we have very little to no demand that's existing in this part of our footprint, and we've made the necessary filings and the cooperation work with the local authorities and the SEC [sic] to begin to unwind and remove that copper infrastructure out of that footprint.* And, in those parts of the market, we're going in with cash products, transitioning customers that are in that part of the footprint, to a better product served by wireless in many instances. *As we make increasing speed and pace in our copper sunset activities across our entire footprint, those costs begin to mount up, and those savings start to reveal themselves on the bottom line of our multiyear plan.*

306.    In response to an analyst question about converting customers from copper to fiber services, Defendant Stankey said:

Brett, maybe *let me fill in 2 thoughts that might help you as we look at how we do the turn down of some of the legacy services.* It's not something we're necessarily going to provide you discrete guidance on. *But as we measure it internally, our*

*goal is to equate a square mile of turn down to our cost structure. And that's kind of how we look at it. So as we've been working through our transformation estimates with you, we now have enough experience to understand when we are able to take down a certain number of square miles what we can ultimately pull down from a cost structure perspective.* And the team has objectives in working through that over the course of the next several years in the way that Jeff described. *And so that's how we kind of equate our transformation and our ultimate achievement of the cost structure objectives to what we're doing in copper, either replacement turn down and then supplement of the wireless network.*

307.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the decision to "decommission" or "turn down" AT&T's legacy network assets, which included its web of lead-sheathed copper cables, in terms of its "cost" benefits. Indeed, AT&T was decommissioning its lead-sheathed legacy network assets in a manner that exposed it to costly scrutiny, liability, and reputational harm. The statements were also materially false and misleading because AT&T was neither "reclaiming" nor "removing" its lead-sheathed copper cables but, rather, abandoning them in place across the United States.

308.    On March 14, 2022, Defendant Desroches attended the Deutsche Bank Media, Internet and Telecom Conference hosted by Deutsche Bank A.G. analyst Bryan D. Kraft. Asked about free cash flow based on AT&T's product evolution, Defendant Desroches said:

Consumer wireline is the business that is going to scale this year as we—last year, we added 2.6 million new fiber homes, fiber locations. This year, we're expecting 3.5 million to 4 million. And with that, we're going to have an acceleration of net adds and top line and profit trends. The profits are going to improve. *So those are going to be the 2 growth vectors underpinned by transformation savings, including shutting down legacy copper network, modernizing our infrastructure used to support customers*; using AI, machine learning to really help better service customers through the retail channel; as well as improve our fiber deployment and how we service customers going forward.

309.    The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary

to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the decision to "shut down" AT&T's legacy copper network, which included its web of lead-sheathed copper cables, in terms of its cost "savings."  Indeed, AT&T was decommissioning its lead-sheathed legacy copper cables in a manner that exposed it to costly scrutiny, liability, and reputational harm.

310.   On May 23, 2022, Defendant Stankey attended the JPMorgan Global Technology, Media & Communications Conference hosted by JPMorgan Chase & Co. analyst Philip A. Cusick. Asked about AT&T's recent moves to streamline the business, Defendant Stankey said:

> We're focused on *restructuring the business to take cost out of it* and ensure that we lean into what is the opportunity in the golden age of connectivity that Fred outlined.  But at the same time, *we have a lot of infrastructure from maybe the past era that has to be pulled away and reengineered to take cost out and reposition the business*.

311.   The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about "pulling away" AT&T's legacy infrastructure, which included its web of lead-sheathed copper cables, in terms of its "cost" benefits.  Indeed, AT&T was decommissioning its lead-sheathed legacy copper cables in a manner that exposed it to costly scrutiny, liability, and reputational harm. The statements were also materially false and misleading because AT&T was not "pulling away" its lead-sheathed copper cables but, rather, abandoning them in place across the United States.

312.   On September 12, 2022, Defendant Stankey attended the Goldman Sachs Communicopia + Technology Conference hosted by Goldman Sachs Group analyst Brett Joseph Feldman.  Asked about AT&T's $6 billion cost reduction program, Defendant Stankey said:

> Our business is a little bit different than some in our peer group.  I'd probably say our business is a little bit different than all in our peer group.  *We have a legacy cost structure on parts of our business that performed very well for many years,*

129

*that now has seen its best days and ultimately needs to be terminated and shut down. And the costs that go along with that need to come out of the business. So we're working really hard on that front.* So specifically, as we look at embedded copper infrastructure that spread broadly geographically around our operating territory, that we're now seeing density levels get to a point where either we can replace with fiber, if it's in a metropolitan or suburban area that warrants investment, or replace with a robust wireless network that has broader coverage than anybody else in the industry today and that we've been able to make more bulletproof and stronger with our FirstNet investments than have ever been there before. *We now have the opportunity to reengineer that part of our business, remove customers from that infrastructure and restructure costs as a result of that.* And I think that is, when you think about our cost structure as an aggregate reporting company, is very different than many people in our peer group. *And those costs are real and they're significant and they're broadly distributed.*

313.    In response to a subsequent question about adopting fixed wireless technologies,

Defendant Stankey said:

I would also tell you, look, I think there's places where fixed wireless is a great technology, and it will make sense. There are going to be places where I want to *deploy fixed wireless to clean up my copper infrastructure*, to be able to move customers and *get them onto the wireless network to take that cost out that you referred to.*

314.    The statements identified in bold and italicized text in the paragraphs above were

materially false or misleading when made, or otherwise omitted to state material facts necessary

to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the

decision to "shut down" AT&T's legacy infrastructure, which included its web of lead-sheathed

copper cables, and transition customers to new technologies in terms of their "cost" benefits.

Indeed, AT&T was decommissioning its lead-sheathed legacy copper cables in a manner that

exposed it to costly scrutiny, liability, and reputational harm.

315.    On January 4, 2023, Defendant Desroches attended the Citi Communications,

Media & Entertainment Conference hosted by Citigroup Inc. analyst Michael Ian Rollin. Asked

for an update on the Company's $6 billion cost reduction initiative, Defendant Desroches said:

We had said since late 2020 on that we were going to be—we were reinvesting much of our transformation savings back into the business. And that we would

130

begin to drop more and more of the savings to the bottom line beginning in the second half of 2022.  You saw that in Q3, and I would expect that to continue for the balance of '22.  And we're going to give guidance next year.  But, look, we have to make sure AT&T has a competitive cost structure.  And, in my mind, that is a journey, not a destination.  We're not going to stop at $6 billion.  ***There are plenty of opportunities, especially we have an enormous legacy footprint that is declining.  As that declines, there is lots of infrastructure and costs that are related to it that have to come out of the company, and that is going to be part of the continued journey . . . .***

316.    The statements identified in bold and italicized text in the paragraph above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the winding down AT&T's legacy infrastructure, which included its web of lead-sheathed copper cables, in terms of its "cost" benefits.  Indeed, AT&T was decommissioning its lead-sheathed legacy copper cables in a manner that exposed it to costly scrutiny, liability, and reputational harm.

317.    On January 25, 2023, AT&T held a conference call with analysts to discuss its financial results for the year and quarter ended December 31, 2022, with Defendants Stankey and Desroches in attendance.  In his opening remarks, Defendant Stankey stated as follows:

In addition to growing customer relationships, we've executed some of the most challenging actions associated with repositioning our operations.  We've doubled down on our cost transformation.  We've now achieved more than $5 billion of our $6 billion plus cost savings run rate target. . . .  Our teams did an excellent job implementing pricing actions and business efficiencies to offset continued inflationary impacts, the impacts we anticipate will be with us in the near to midterm.  Part of tapping into these efficiencies entails improving acquisition costs and further streamlining our operations and distribution.  ***Another part entails rationalizing our wireline copper infrastructure and reinvesting those savings into fiber and wireless where we're seeing improving returns***.

318.    Asked by an analyst to elaborate on the benefits of "copper decommissioning," Defendant Stankey responded:

I think I've been on this theme for a little while.  I mean, we've been working this issue pretty aggressively since the day I came into the job, and I would say we had to start formulating the plans when I came in, but now we have a very robust and functioning organization that we're doing this kind of day in and day out.  And I

spend more time talking about investing in the new business and the growth that we can get on sustainable fiber and a 5G infrastructure than I do on talking about what we are taking out of service, but ***we are taking stuff out of service.*** And so when we start managing things like our energy costs down, it's because ***we're decommissioning equipment and taking it off the copper grid.*** When we are able to manage our dispatches down and show you improvements in our operating dynamics on dispatches, it's because ***we have a smaller footprint to manage. We are doing this day in and day out. And our pace at which we're doing it is accelerating.*** We've—I've given you some hints along the way about the number of products that we've shuttered ***and when we shuttered those products, it starts to take operating costs out of the business.*** This is part of what we have in our forecast to you to continue to improve our operating costs. ***So you're seeing this operating leverage start to come into the business, and it's partly contributed to the fact that we're managing through these legacy costs.***

319.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the "rationalizing" or "decommissioning" AT&T's copper wireline infrastructure, which included its web of lead-sheathed copper cables, in terms of its "cost" benefits and "savings." Indeed, AT&T was decommissioning its lead-sheathed legacy copper cables in a manner that exposed it to costly scrutiny, liability, and reputational harm. The statements were also materially false and misleading because AT&T was neither taking its lead-sheathed copper cables "off the copper grid" nor reducing its "footprint" but, rather, abandoning those cables in place across the United States.

320.    On March 8, 2023, Defendant McElfresh attended the Morgan Stanley Technology, Media & Telecom Conference hosted by Morgan Stanley analyst Simon William Flannery. Asked about the costs associated with the fiber build, and if the federal government's Broadband Equity Access and Development (BEAD) program helps in that regard, Defendant McElfresh stated:

BEAD does. BEAD gives you the opportunity to probably fill in areas that economically you might not have had high on the priority list. It gives you an opportunity, if you're an AT&T where you operate a 511,000 square mile copper network that has a carrying cost associated with it in low revenues because it's pretty legacy. ***And, as you think about AT&T's cost transformation,*** investments in fiber, having 3 legs to the fiber stool, BEAD being the third of that. ***You should***

*expect AT&T as we go to make our copper transformation occur at certain distribution areas, about half of that square mileage footprint I just quoted, will be covered with fiber or served another way. And the cost that we pull out of the business as a result of no longer serving that copper footprint* and putting that investment into the things like fiber, what we're seeing here 2, 2.5 years in is the cost to maintain fiber *is actually exceeding our expectations in terms of efficiency*.

321.    Asked about the "big buckets . . . of savings" from the cost initiative, Defendant McElfresh said:

> We announced in the fourth quarter that we had achieved over $5 billion of the $6 billion cost takeout target. And I can recognize how that's kind of like a black box for a lot of investors. I don't really understand how, where that comes from. *I'd say the way I would think about it is a 1/4 came out of our network*, 1/4 came out of our customer-facing operations, think distribution. And about half of that is coming from what I might call support, back office or parent and overhead.

322.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the transitioning away from AT&T's copper infrastructure, which included its web of lead-sheathed copper cables, in terms of its "cost" benefits. Indeed, AT&T was decommissioning its lead-sheathed copper cables in a manner that exposed it to costly scrutiny, liability, and reputational harm.

323.    On April 20, 2023, AT&T held a conference call with analysts to discuss its financial results for the quarter ended March 31, 2023, with Defendants Stankey and Desroches in attendance. In his prepared remarks, Defendant Stankey spoke about the cost reduction program:

> While we've largely delivered what we set out to accomplish 3 years ago, our journey has only raised our confidence that we can continue to evolve and improve. In fact, *we believe we can further accelerate cost take-outs as we progress through the year. Part of this entails transforming our network as we ultimately replace our copper services footprint with best-in-class fiber connectivity*, and where it makes sense for customers, replacement products built on our wireless network.

324.    In a response to a question about the costs caused by storms on the west coast and progress on the cost initiative, Defendant Stankey said:

> So John, west coast, I think, is pretty well publicized in what went on out there relative to the rains, and *we still have a large, I'll call it, legacy footprint that ultimately we're spending a lot of time and energy and working our way out of.* And you see what happens still when you get a lot of wetness on copper, it just doesn't work well.  And I think this is one of the things that gives us a high degree of confidence we have opportunities for additional cost takeout in this business.  As we reposition to 5G and fiber, that cost structure we still carry.  And I'm really pleased we made some changes about a year ago in how we organize within the business and how we focus on our operating cost structure that is putting the right kind of exposure on how we execute around that cost migration.  So this is partly an answer to your question of what was unusual and also what we expect to do moving forward beyond the $6 billion.  *We will now start to see some momentum build in that regard as we begin to shutter legacy costs in the business*, and I think we're making the steps that need to be made to be able to do that on a geography basis, as opposed to we don't need to see the last customer disappear before costs start to come out of the business.

325.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the "shuttering" legacy costs as AT&T transitions away from its legacy network, which included its web of lead-sheathed copper cables.  Indeed, AT&T was shuttering its lead-sheathed copper cables in a manner that exposed it to costly scrutiny, liability, and reputational harm.  The statements were also materially false and misleading because AT&T was not "replacing" its lead-sheathed legacy copper cables with fiber but, rather, abandoning them in place across the United States.

326.    On May 22, 2023, Defendant Stankey attended the JPMorgan Global Technology, Media and Communication Conference hosted by JPMorgan Chase & Co. analyst Phillip A. Cusick.  Asked by Cusick about AT&T's "pretty substantial cost-cutting program," Defendant Stankey said:

> I would tell you, when you look at kind of where we are, we set out an initial target of $6 billion.  We just passed the $5 billion of the $6 billion.  We'll finish the

balance of that over the course of this year. I don't expect we're stopping, to my point. ***I think our next chapter is to move into some of the legacy infrastructure on the copper base and what we're going to do to start sunsetting and retiring a lot of those legacy products and services that we have***.

327.    Asked about AT&T's plan for the next three years, Defendant Stankey said:

I think the next 3 years is really about perfecting that set of plays. It's about getting that asset base to industry-best return characteristics, customer best metrics, brand best support in the market. So it is about getting all those things that I think we've put a lot of time and effort in and how we needed to reposition and restructure the business and refining the plays to excellence. And in addition to having to do it that way, ***part of refining the plays to excellence is getting the next level of distraction out, which is backing away from those legacy historic products and the legacy captive infrastructure that served us well, has been great for the business, but adds a degree of complexity and drag into the business that as we start to sunset square mileage, central offices, products, we become a lot more agile in what we can do because a lot of the stuff that comes along with maintaining that and operating that and having to worry about that drops away and you get a more and more focused business moving forward***.

328.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 280 insofar as they speak about the "sunsetting" or "retiring" AT&T's legacy infrastructure, which included its web of lead-sheathed copper cables, in terms of its cost benefits. Indeed, AT&T was sunsetting its lead-sheathed copper cables in a manner that exposed it to costly scrutiny, liability, and reputational harm.

### B.    Environmental Stewardship

329.    On August 20, 2018, AT&T published a Waste Management Issue Brief on the Social Responsibility section of its website. Under the heading "Our Action," the brief stated:

***We are committed to reducing waste in our operations and responsibly handling the waste that we produce.***

330.    The Issue Brief further stated:

Investment Recovery
At AT&T, the Investment Recovery (IR) group in our Supply Chain organization leads the way in establishing our best-in-class practices for minimizing the impact

135

of our waste on the environment. ***IR works across all entities and affiliates of the company to reuse, sell and recycle materials (including operational waste, network materials and scrap) that are considered solid waste.*** In 2017, the group sent less than 4.9% of the materials it received to landfills.

The 95% landfill diversion rate for IR is an example for the rest of AT&T of how productive uses can be generated out of our waste. ***In 2017, IR handled more than 57.5 million pounds of operational waste and kept more than 54.7 million pounds of these materials from landfills, including:***

- ***Copper and copper cable: 14.2 million pounds***

331.    The Issue Brief also provided as follows:

Internal E-Waste
***AT&T is committed to managing electronic waste in a responsible manner.*** Directed by policy, the AT&T Global Supply Chain Investment Recovery group directs e-waste collected for recycling to vendors that are R2 certified.  AT&T internal electronic waste is responsibly recycled to the R2 standard.  In 2017, more than 12 million pounds of e-waste were managed for recovery and recycling, including 70,000 computers, monitors, servers and other office equipment for sale and/or recycling.  ***Additionally, we manage programs to reclaim and divert high-value network resources such as copper telecommunications wire . . . .***

332.    The statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, AT&T failed to disclose that: (i) its legacy wireline network contained hundreds of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company thereafter; and (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions.  Indeed, AT&T neither "reclaimed" nor "recycled" its lead-encased copper cables but, rather, abandoned them in place across the United States.  In addition, these statements gave the

false impression that AT&T would properly dispose of its regulated waste at the end of its economic life and not leave it sitting in the environment after it was retired.

333.    On March 11, 2019, AT&T filed a proxy statement on Form DEF 14A (the "2019 Proxy Statement"). In the section on "Corporate Social Responsibility," AT&T stated:

> Striving to better manage our operational impacts, including energy, water and waste, is a key focus. ***We are taking proactive measures to reduce our footprint and be a better steward of the environment.***

334.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 332. Indeed, far from "taking proactive measures to reduce our footprint" or "be a better steward of the environment," AT&T routinely decided to retire its lead-encased copper wires in a manner that ***disregarded***, or at the very least never considered, their impact on the environment.

335.    By no later than September 29, 2019, AT&T updated the Waste Management Issue Brief on the Social Responsibility section of its website. The updated Issue Brief stated:

> ***We are committed to reducing waste in our operations and responsibly handling the waste that we produce.***

336.    The Issue Brief further stated:

Investment Recovery
***At AT&T, the Investment Recovery (IR) group in our Global Connections and Supply Chain organization leads the way in establishing our best-in-class practices for minimizing the impact of our waste on the environment. IR work supports network infrastructure assets and materials of wireline and mobility operations for AT&T Comm. Co,*** and also supports domestic office locations. In 2018, the group sent less than 5.7% of the materials it received to landfills.

The 94% landfill diversion rate for IR is an example for the rest of AT&T of how productive uses can be generated out of our waste. In 2018, IR handled more than 23,341 MT of operational waste and kept more than 22,033 MT of these materials from landfills.

*In 2018, the group continued to expand its program and expertise to assist international groups, wireless and other AT&T entities in the proper disposal of electronic, network, cable and other assets.*

337.    The Issue Brief also provided as follows:

Hazardous and Other Regulated Waste

To best manage the hazardous waste we generate, we work to identify the most economical and compliant waste management for what is generated. ***Hazardous waste is disposed in landfills, incinerated and recycled.*** The primary types of hazardous waste materials generated by AT&T are cylinders, acidic wastes, batteries, contaminated soils and contaminated liquids. We do not include e-waste in our hazardous waste numbers reported here.

338.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading for all the reasons set forth in ¶ 332.  Indeed, AT&T did not reclaim its lead-encased copper cables and dispose of them in in landfills, incinerate them, or recycle them but, rather, abandoned them in place across the United States.

339.    On March 11, 2020, AT&T filed its 2020 proxy statement on Form DEF 14A (the "2020 Proxy Statement").  In the section "Corporate Responsibility," AT&T stated:

In addition to investing in renewable energy, ***we also work to make our company more efficient*** through energy and emissions reductions projects and ***by incorporating environmentally sustainable practices into our daily operations.***

340.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 332.  Indeed, far from taking steps to "make our company more efficient" by "incorporating environmentally sustainable practices into our daily operations," AT&T routinely decided to retire its lead-encased copper wires in a manner that ***disregarded***, or at the very least never considered, their impact on the environment.

138

341.    By no later than November 21, 2020, AT&T updated the Waste Management Issue

Brief on the Social Responsibility section of its website.  The updated Issue Brief stated:

*We are committed to reducing waste in our operations and responsibly handling the waste that we produce.*

342.    The Issue Brief further stated:

Investment Recovery
*The AT&T Global Supply Chain Investment Recovery (IR) group leads the way in establishing our practices for minimizing the impact of our waste on the environment.  IR works to recover and recycle network infrastructure assets, including materials from wireline and mobility network operations, such as copper* and fiber-optic telecommunications wire and central office equipment.  In 2019, IR handled more than 24,735 MT of operational waste and kept more than 23,342 MT of these materials from landfills, for a diversion rate of 94.4%.

*In 2019, the group continued to expand its program and expertise by working with vendors leading the way to reuse, repurpose and recycle material to assist international groups, wireless and other AT&T entities in the proper disposal of electronic, network, cable and other assets.*

343.    The Issue Brief also provided as follows:

Hazardous and Other Regulated Waste
*AT&T is committed to complying* with all applicable environment, health and safety laws and regulations *and to promoting pollution prevention, including through recycling and minimizing wastes*. . . .   Our primary hazardous waste streams are compressed gas cylinders, aerosol cans, acidic wastes, batteries, contaminated soils and contaminated liquids. To minimize impacts of hazardous waste, we look first to find ways to reduce the amount generated.  *For hazardous waste generated, our highest priority is always recycling;* we have implemented battery and aerosol recycling programs to divert those waste streams from landfills. *Where there is no recycling option, hazardous waste is either incinerated or disposed of in a landfill.*

344.    The statements identified in bold and italicized text in the paragraphs above were

materially false or misleading when made, or otherwise omitted to state material facts necessary

to make them not misleading for all the reasons set forth in ¶ 332.  Indeed, AT&T did not reclaim

its lead-encased copper cables and dispose of them in in landfills, incinerate them, or recycle them

but, rather, abandoned them in place across the United States.

139

345.    By no later than June 5, 2021, AT&T updated the Waste Management Issue Brief on the Social Responsibility section of its website.  The updated Issue Brief stated:

> **We are committed to reducing waste in our operations and responsibly handling the waste that we produce.**

346.    The Issue Brief further stated:

Investment Recovery
**The AT&T Global Supply Chain Investment Recovery (IR) group leads the way in establishing our practices for minimizing the environmental impact of our internal waste and e-waste.  IR works with our contracted R2-certified vendors to recover and recycle network infrastructure assets.**  Materials are dismantled, sorted and baled by commodity in preparation for sale or recycling.  **Scrap materials processed by IR include copper** and fiber-optic telecommunications wire and central office equipment.

347.    The Issue Brief also provided as follows:

Hazardous and Other Regulated Waste
**AT&T is committed to complying with all applicable environment, health and safety laws and regulations, and to promoting pollution prevention, including through recycling and minimizing waste. . . .**  AT&T's primary hazardous waste includes compressed gas cylinders, aerosol cans, acidic wastes, batteries, contaminated soils and contaminated liquids.  To minimize the impacts of hazardous waste, we look first to find ways to reduce the amount generated.  **Our highest priority is always recycling,** and we have implemented battery and aerosol recycling programs to divert those waste streams from landfills.  **Where there is no recycling option, hazardous waste is either incinerated or disposed of in an appropriate landfill as a last resort.**

348.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading for all the reasons set forth in ¶ 332.  Indeed, AT&T did not reclaim its lead-encased copper cables and dispose of them in in landfills, incinerate them, or recycle them but, rather, abandoned them in place across the United States.

349.    By no later than March 25, 2022, AT&T updated the Waste Management Issue Brief on the Social Responsibility section of its website.  The updated Issue Brief stated:

*We are committed to reducing waste in our operations and responsibly handling the waste that we produce*.

350.    The Issue Brief further stated:

Investment Recovery
*The AT&T Global Connections and Supply Chain IR group leads the way in establishing practices that minimize the environmental impact of our internal waste and e-waste.  IR works with our contracted R2-certified vendors to recover and recycle network infrastructure assets.*  The R2 certification is a comprehensive global certification awarded to facilities that adhere to responsible electronics recycling standards.  Materials are dismantled, sorted and baled by commodity in preparation for sale or recycling.  *Scrap materials processed by IR include copper and fiber-optic telecommunications wire and central office equipment. . . .  When AT&T vacates facilities and outside plant infrastructure, our teams remove all regulated materials and coordinate with vendors to recycle and dispose of the materials in an appropriate manner.  We remove aerial cables and process underground cables based on municipality-specific rules.*  Our material removal process varies by site to adhere to specific local waste removal regulations and guidelines.

351.    The Issue Brief also provided as follows:

Hazardous and Other Regulated Waste
*AT&T is committed to complying with all applicable environment, health and safety laws and regulations and to promoting pollution prevention through strategies like recycling* and minimizing the generation of hazardous waste. . . .  AT&T's primary hazardous waste includes compressed gas cylinders, aerosol cans, acidic wastes, batteries, contaminated soils and contaminated liquids.  To minimize the impacts of hazardous waste, we first look to reduce the amount generated.  *Once hazardous waste is generated, our highest priority is always recycling*, and we have implemented recycling programs for batteries and aerosol cans to divert those waste streams from landfills.  *Where there is no recycling or reuse option, hazardous waste is physically treated, incinerated or disposed of in an appropriate landfill as a last resort.*

352.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading for all the reasons set forth in ¶ 332.  Indeed, AT&T neither "removed" nor "recycled" the regulated waste from its lead-encased copper cables but, rather, abandoned it in place across the United States.

141

353.    On April 6, 2022, AT&T published its March 2022 ESG Summary.  The summary stated:

> ***AT&T is committed to reducing and responsibly handling the waste we produce from our operations and the products we sell.***  Our operations generate various types of waste – including general solid waste, e-waste, retired network infrastructure and office furnishings, and hazardous waste.  ***Our approach to waste management involves reuse and recycling programs, as well as initiatives to reduce our overall waste footprint.***

354.    The summary also stated, under the heading "Reducing Infrastructure Waste:"

> ***The AT&T Global Connections and Supply Chain Investment Recovery group establishes practices that minimize the environmental impact of our internal waste and e-waste. This team works with R2-certified vendors to recover and recycle network infrastructure assets.***  Network materials such as copper wire, fiber-optic cable and central office equipment ***are dismantled, sorted and baled by commodity in preparation for sale or recycling.***

355.    The same, or substantially similar, statements as those quoted in the paragraphs above were made in a July 2022 ESG Summary published by AT&T on August 8, 2022.

356.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading for all the reasons set forth in ¶ 332.  Indeed, these statements gave the false impression that AT&T would not dispose of its regulated waste by leaving it sitting in the environment and on utility poles across the United States when, in fact, it was.

357.    By no later than May 17, 2023, AT&T updated the Waste Management Issue Brief on the Social Responsibility section of its website.  The updated Issue Brief stated:

> Issue Summary
> Material consumption and waste disposal can have serious impacts on our environment, communities and health.  ***AT&T is committed to reducing, reusing and recycling waste in our operations and responsibly handling the waste we produce.***

358.    The Issue Brief further stated:

> Hazardous & Other Regulated Waste

142

Hazardous waste has the potential to harm people and the environment if not disposed of responsibly. AT&T's primary hazardous waste includes compressed gas cylinders, aerosol cans, acidic wastes, batteries, contaminated soils and contaminated liquids. ***We are committed to responsibly managing these materials.*** This includes complying with all applicable environment, health and safety laws and regulations. ***We also promote pollution prevention through strategies like recycling*** and minimizing the generation of hazardous waste. . . . To minimize the impacts of hazardous waste, we first look to reduce the amount generated. ***If hazardous waste is generated, our highest priority is recycling,*** and we have implemented recycling programs for batteries and aerosol cans to divert those waste streams from landfill. ***Where there is no recycling or reuse option, hazardous waste is physically treated, incinerated or disposed of in an appropriate landfill as a last resort.***

359.    The Issue Brief also provided as follows:

Asset Recovery & Sustainability
***The AT&T Wireline Transformation and Asset Recovery group establishes practices that minimize the environmental impact of our company-generated waste and e-waste*** . . . . ***Asset Recovery works with our contracted vendors, all of whom are R2 certified, to recover and recycle network infrastructure assets.*** The R2 certification is a comprehensive global certification awarded to facilities that adhere to responsible electronics recycling standards. Materials are dismantled, sorted and baled by commodity in preparation for sale or recycling. ***Scrap materials processed by Asset Recovery include copper*** and fiber-optic ***telecommunications wire and central office equipment. . . . When AT&T vacates facilities and outside plant infrastructure, our teams remove all regulated materials and coordinate with vendors to recycle and dispose of the materials in an appropriate manner. We remove aerial cables and process underground cables based on municipality-specific rules.*** Our material removal process varies by site to adhere to local waste removal regulations and guidelines.

360.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading for all the reasons set forth in ¶ 332. Indeed, these statements gave the false impression that AT&T would not dispose of its regulated waste by leaving it sitting in the environment and on utility poles across the United States when, in fact, it was.

## C.    Employee Health and Safety

361.    By no later than July 29, 2018, AT&T published an Environment, Health & Safety Issue Brief on the Social Responsibility section of its website. The Issue Brief stated:

*We are committed to complying with all applicable environment, health and safety laws and regulations and to maintaining and improving management systems throughout the company to ensure environmental responsibility and employee safety.*

362.     Under the heading "Our Action," the Issue Brief provided as follows:

We take our environmental, health and safety (EHS) stewardship seriously, and *we evaluate our EHS performance through regular reviews and audits.*  When issues are identified, we partner with federal, state and local agencies to reach resolutions that are in the best interest of the environment, our customers and the citizens of our communities.

*         *         *

*We train all employees on our EHS system, and we conduct specialized training based on job tasks and the hazards an employee is likely to encounter in his or her position.*

363.     The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, AT&T failed to disclose that: (i) its legacy wireline network contained hundreds of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many workers were not given any advance notice that the job they were sent out to perform involved lead sheathing; (iv) many workers who worked on lead-sheathed cables did not receive training on the dangers of lead exposure; (v) AT&T neither implemented any controls to reasonably assure that employees who worked with lead complied with its policies and procedures for doing so nor had any system in place to monitor worker compliance with applicable laws and regulations, including the OSHA Lead Standard; and, accordingly, (vi) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions.  Indeed,

these statements gave the false impression that AT&T provided training to workers whose job responsibilities required them to work with hazardous materials on how to properly do so, and that AT&T regularly reviewed performance by these workers to enhance its safety protocols and ensure that the practices complied with applicable occupational safety standards.

364.    By no later than September 29, 2019, AT&T issued a new Issue Brief on the topic of Environment, Health & Safety Compliance on the Social Responsibility section of its website. The Issue Brief stated:

> **We are committed to complying with all applicable environment, health and safety laws and regulations, and to maintaining and improving management systems to ensure environmental responsibility and employee safety.**

365.    Under the heading "Our Action," the Issue Brief provided as follows:

> **We train all employees on our EHS system, and we conduct specialized training based on job tasks and the hazards an employee is likely to encounter in his or her position.**  We have created a training plan that includes job aids, videos, web-based courses and leader-led activities.  **A training matrix is used to ensure that all employees receive health and safety training at appropriate frequencies and commensurate with their roles.**

366.    Under the heading "Our Action," the Issue Brief also made the following representations:

> We take our EHS stewardship seriously, and **we evaluate our EHS performance through regular reviews and internal and external audits**, the frequency of which depends on the level of risk identified.
>
> \*        \*        \*
>
> **We ensure that safety and environmental responsibility become part of every employee's standard operating procedure, by:**
>
> **. . .**
>
> - **Monitoring performance through regular updates on relevant leading and lagging indicators, including accident data and organizational performance toward meeting targets set in each business unit's EHS plan.**
>
> \*        \*        \*

145

> *AT&T evaluates our EHS performance in varying frequency from monthly to quarterly, depending on the business unit and type of work performed. Our evaluations* analyze key performance measures and metrics covering most of AT&T, and *review business operations that impact EHS.*

367.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 363.

368.    By no later than November 20, 2020, AT&T updated the Environment, Health & Safety Compliance Issue Brief on the Social Responsibility section of its website.  The updated Issue Brief stated:

> *We are committed to complying with all applicable environment, health and safety laws and regulations, and to maintaining and improving management systems to ensure environmental responsibility and employee safety.*

369.    Under the heading "Our Action," the Issue Brief provided as follows:

> *We train employees on our EHS system, and we conduct specialized training based on job tasks and the hazards an employee is likely to encounter in his or her position.* We have created a training plan that includes job aids, videos, web-based courses and leader-led activities.  *A training matrix is used to ensure that all employees receive health and safety training at appropriate frequencies and commensurate with their roles*. . . .

370.    Under the heading "Our Action," the Issue Brief also made the following representations:

> *We evaluate our EHS performance through regular reviews and internal assessments of our operations.*  The frequency of these assessments depends on the level of risk identified after evaluating the potential for personal injury, property damage, and community and financial impact.
>
> *                *                *
>
> *We ensure that safety and environmental responsibility become part of every employee's standard operating procedure by:*
>
> *. . .*

- ***Monitoring performance through regular updates on relevant leading and lagging indicators, including accident data and organizational performance toward meeting targets set in each business unit's EHS plan.***

*    *    *

***AT&T evaluates our EHS performance in varying frequency from monthly to quarterly, depending on the business unit and type of work performed. Our evaluations*** analyze key performance measures and metrics covering most of AT&T, and ***review business operations that impact EHS.***

371.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 363.

372.    By no later than June 5, 2021, AT&T updated the Environment, Health & Safety Compliance Issue Brief on the Social Responsibility section of its website.  The updated Issue Brief stated:

***We are committed to complying with all applicable environment, health and safety laws and regulations, and to maintaining and improving management systems to ensure environmental responsibility and employee safety.***

373.    Under the heading "Our Action," the Issue Brief provided as follows:

***We train employees on the use of EHS systems relevant to their job responsibilities. Additionally, we provide specialized training based on job tasks and the hazards an employee is likely to encounter in their position.*** Our training plan includes job aids, videos, web-based courses and leader-led activities.  ***We have developed and implemented a training matrix to ensure that all employees receive health and safety training commensurate with their roles and at appropriate frequencies.***

374.    Under the heading "Our Action," the Issue Brief also made the following representations:

***We evaluate our EHS performance through regular reviews and internal assessments of our operations.*** The frequency of these assessments depends on the level of risk identified after evaluating the potential for personal injury, property damage, and community and financial impact.

*    *    *

147

*We ensure that safety and environmental responsibility become part of every employee's standard operating procedure by:*

*. . .*

- *Monitoring performance through regular updates on relevant leading and lagging indicators, including accident data and organizational performance toward meeting targets set in each business unit's EHS plan.*

\*       \*       \*

*AT&T evaluates our EHS performance in varying frequency from monthly to quarterly, depending on the business unit and type of work performed. Our evaluations* analyze key performance measures and metrics covering most of AT&T, and *review business operations that impact EHS.*

375.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 363.

376.    By no later than March 25, 2022, AT&T updated the Environment, Health & Safety Compliance Issue Brief on the Social Responsibility section of its website.  The updated Issue Brief stated:

*We are committed to complying with all applicable environment, health and safety laws and regulations and to maintaining and improving management systems to ensure environmental responsibility and employee safety.*

377.    Under the heading "Our Action," the Issue Brief provided as follows:

*We train employees on the use of EHS systems relevant to their job responsibilities.  Additionally, we provide specialized training and job aids based on job tasks and the hazards an employee is likely to encounter in their position. And we've implemented a training matrix to ensure that all employees receive health and safety training commensurate with their roles and at appropriate frequencies.*

378.    Under the heading "Our Action," the Issue Brief also made the following representations:

*We evaluate our EHS performance through regular reviews and internal assessments of our operations.*  The frequency of these assessments depends on

148

the level of risk identified after evaluating the potential for personal injury, property damage, and community or financial impact.

*        *        *

***AT&T evaluates our EHS performance in varying frequency from monthly to quarterly, depending on the business unit and type of work performed. Our evaluations*** analyze key performance measures and metrics covering most of AT&T and ***review business operations that impact EHS.*** Monitoring for health and safety performance is outlined in each business unit's annual EHS plan. When incidents or nonconformities with laws or company standards are identified, we have formal systems established to identify corrective actions and track these actions until they are completed.

*        *        *

***We ensure that safety and environmental responsibility are part of every employee's standard operating procedure by:***

**. . .**

- ***Monitoring performance through regular updates on relevant leading and lagging indicators, including accident data and organizational performance toward meeting targets set in each business unit's EHS plan.***

379.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 363.

380.    By no later than May 10, 2023, AT&T updated the Environment, Health & Safety Compliance Issue Brief on the Social Responsibility section of its website. The updated Issue Brief stated:

***EHS considerations, such as minimizing and recycling waste, are integrated into our business processes to conserve natural resources and prevent pollution.***

381.    The brief also stated:

We implement EHS plans by setting targets and deadlines, assigning clear responsibility and accountability for EHS performance, and defining roles and responsibilities within the EHS organization. ***We provide EHS information and resources both within and outside the enterprise by training AT&T employees*** and communicating EHS expectations to our vendors and contractors. This includes

149

providing employees with resources and information on best practices to prevent workplace exposure to COVID-19 and other transmittable diseases. We encourage managers to directly engage with and hold their teams accountable for supporting employee participation in EHS program development activities.

382.    The Issue Brief also stated:

**AT&T evaluates EHS performance with varying frequency**, from monthly to quarterly, depending on the business unit and type of work performed. **Our evaluations** analyze key performance measures and metrics covering most of AT&T and **review business operations that impact EHS**. If we identify incidents or noncompliance with laws or company standards, we have formal systems in place to identify corrective actions and track these actions until they are completed.

*        *        *

**We evaluate our EHS performance through regular reviews and internal assessments of our operations. The frequency of these assessments depends on the level of risk identified after evaluating the potential for personal injury, property damage and community or financial impact**.

383.    The statements identified in bold and italicized text in the paragraphs above were materially false or misleading when made, or otherwise omitted to state material facts necessary to make them not misleading, for all the reasons set forth in ¶ 363.

**D.    EHS Contingencies and Risks**

384.    On February 20, 2018, AT&T filed an annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 Form 10-K"), signed by Defendants Stephenson and Stephens.  In Part I, Item 1A, the 2017 Form 10-K expressly incorporated by reference the information "under the heading 'Risk Factors' on pages 44 through 47" of AT&T's most recent Annual Report to Stockholders, published on or around February 12, 2018 (the "2017 Annual Report").  Pages 44 to 47 of the 2017 Annual Report described certain matters which "could" materially affect AT&T's business, including the following:

**Continuing growth in and the converging nature of wireless, video and broadband services will require us to deploy increasing amounts of capital and require ongoing access to spectrum in order to provide attractive services to customers.**

150

Wireless, video and broadband services are undergoing rapid and significant technological changes and a dramatic increase in usage, in particular, the demand for faster and seamless usage of video and data across mobile and fixed devices. *We must continually invest in our networks in order to improve our wireless, video and broadband services to meet this increasing demand and remain competitive*. . . .  In order to stem broadband subscriber losses to cable competitors in our non-fiber wireline areas, we have been expanding our all-fiber wireline network. . . .  *Network service enhancements and product launches may not occur as scheduled or at the cost expected due to many factors, including delays in determining equipment and wireless handset operating standards, supplier delays, software issues, increases in network and handset component costs, regulatory permitting delays for tower sites or enhancements, or labor-related delays*.

385.    The same, or substantially similar, statements as those quoted in the paragraph above were made on pages 55 to 56 of AT&T's Annual Report to Stockholders for the fiscal year ended December 31, 2018, published on or around February 6, 2019 (the "2018 Annual Report"); Part I, Item 1A of AT&T's annual report on Form 10-K for the fiscal year ended December 31, 2019, filed February 20, 2020 (the "2019 Form 10-K") under the heading "Industry-wide Factors"; Part I, Item 1A of AT&T's 2020 Form 10-K under the heading "Industry-wide Factors"; Part I, Item 1A of AT&T's 2021 Form 10-K under the heading "Industry-wide Factors"; and Part I, Item 1A of AT&T's 2022 Form 10-K under the heading "Industry-wide Factors."  AT&T expressly referred readers to the risk factors in its 2017 Form 10-K in its quarterly report on Form 10-Q for the quarterly period ended June 30, 2018, filed August 2, 2018 (the "2Q 2018 Form 10-Q") and its quarterly report on Form 10-Q for the quarterly period ended September 30, 2018, filed November 2, 2018 (the  "3Q 2018 Form 10-Q").  AT&T expressly incorporated by reference the information "under the heading 'Risk Factors' on pages 54 through 58" of AT&T's 2018 Annual Report in Part 1, Item 1A its annual report on Form 10-K for the fiscal year ended December 31, 2018, filed February 20, 2019 (the "2018 Form 10-K").  AT&T expressly referred readers to the risk factors in its 2018 Form 10-K in its quarterly report on Form 10-Q for the quarterly period ended March 31, 2019, filed May 6, 2019 (the "1Q 2019 Form 10-Q"), its quarterly report on Form

10-Q for the quarterly period ended June 30, 2019, filed August 5, 2019 (the "2Q 2019 Form 10-Q"), and its quarterly report on Form 10-Q for the quarterly period ended September 30, 2019, filed November 5, 2019 (the "3Q 2019 Form 10-Q"). AT&T expressly referred readers to the risk factors in its 2019 Form 10-K in its quarterly report on Form 10-Q for the quarterly period ended March 31, 2020, filed May 6, 2020 (the "1Q 2020 Form 10-Q"), its quarterly report on Form 10-Q for the quarterly period ended June 30, 2020, filed August 5, 2020 (the "2Q 2020 Form 10-Q"), and its quarterly report on Form 10-Q for the quarterly period ended September 30, 2020, filed November 5, 2020 (the "3Q 2020 Form 10-Q"). AT&T expressly referred readers to the risk factors in its 2020 Form 10-K in its quarterly report on Form 10-Q for the quarterly period ended March 31, 2021, filed May 6, 2021 (the "1Q 2021 Form 10-Q"), its quarterly report on Form 10-Q for the quarterly period ended June 30, 2021, filed August 5, 2021 (the "2Q 2021 Form 10-Q"), and its quarterly report on Form 10-Q for the quarterly period ended September 30, 2021, filed November 4, 2021 (the "3Q 2021 Form 10-Q"). AT&T expressly referred readers to the risk factors in its 2021 Form 10-K in its quarterly report on Form 10-Q for the quarterly period ended March 31, 2022, filed May 3, 2022 (the "1Q 2022 Form 10-Q"), its quarterly report on Form 10-Q for the quarterly period ended June 30, 2022, filed August 4, 2022 (the "2Q 2022 Form 10-Q"), and its quarterly report on Form 10-Q for the quarterly period ended September 30, 2022, filed November 3, 2022 (the "3Q 2022 Form 10-Q"). AT&T expressly referred readers to the risk factors in its 2022 Form 10-K in its quarterly report on Form 10-Q for the quarterly period ended March 31, 2023, filed May 1, 2023 (the "1Q 2023 Form 10-Q"). The 2018 Form 10-K and 2019 Form 10-K were signed by Defendants Stephenson and Stephens. The 2Q 2018 Form 10-Q, 3Q 2018 Form 10-Q, 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, 1Q 2020 Form 10-Q, 2Q 2020 Form 10-Q, and 3Q 2020 Form 10-Q were signed by Defendant Stephens. The 1Q

2021 Form 10-Q, 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, 3Q 2022 Form 10-Q, and 1Q 2023 Form 10-Q were signed by Defendant Desroches.

386.     The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, AT&T failed to disclose that: (i) its legacy wireline network contained hundreds of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company thereafter; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions; and, thus, (v) the risk that the Company would not complete the upgrades to its network at an acceptable cost were not merely hypothetical.  Indeed, at the time of these statements, AT&T was already defending several lawsuits arising from its use and/or abandonment of lead-covered cables and another telecommunications company was fined by OSHA for failing to provide adequate oversight.  In addition, AT&T added a new disclosure to the risk factors in its periodic reports beginning on July 27, 2023, after the *WSJ* published its series of stories, which acknowledge that its use and/or abandonment of lead-covered cables may subject it to "litigation, government investigations and potentially new regulation or legislation related to lead-clad cables" and it "may incur significant expenses defending such suits or government actions or complying with any new regulation or legislation," including amounts "material to AT&T."

387.     In its 2020 Form 10-K, AT&T added a new disclosure to the discussion of matters that "could" materially affect its business in Part 1, Item 1A of that filing, which read as follows:

**We may not realize or sustain the expected benefits from our business transformation initiatives, and these efforts could have a materially adverse effect on our business, operations, financial condition, results of operations and competitive position.**

We have been and will be undertaking certain transformation initiatives, which are designed to reduce costs, streamline distribution, remove redundancies and simplify and improve processes and support functions. . . .  We intend for these efficiencies to enable increased investments in our strategic areas of focus which consist of improving broadband connectivity (for example, fiber and 5G), developing software-based entertainment (such as HBO Max and AT&T TV) and utilizing WarnerMedia's storytelling legacy to engage consumers and gain insights across multiple distribution points.  *If we do not successfully manage and execute these initiatives, or if they are inadequate or ineffective, we may fail to meet our financial goals and achieve anticipated benefits, improvements may be delayed, not sustained or not realized and our business, operations and competitive position could be adversely affected.*

388.    The same, or substantially similar, statements as those quoted in the paragraph above were made in Part I, Item 1A of AT&T's 2021 Form 10-K; and Part I, Item 1A of AT&T's 2022 Form 10-K.  As described more fully in ¶ 385, certain of these statements were referred to in AT&T's 1Q 2020 Form 10-Q, 2Q 2020 Form 10-Q, 3Q 2020 Form 10-Q, 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, 3Q 2022 Form 10-Q, and 1Q 2023 Form 10-Q.

389.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, as detailed more fully above, AT&T failed to disclose that one of the measures to reduce costs as part of its transformation initiative was to retire lead cables by abandoning them in place and no longer maintain them and, thus, the risk that the transformation initiatives may fail to yield cost savings was not merely hypothetical for all the reasons described in ¶ 386.

390.    In its 2020 Form 10-K, AT&T added a new disclosure to the discussion of matters that "could" materially affect its business set forth in Part 1, Item 1A, which read as follows:

**Incidents leading to damage to our reputation, and any resulting lawsuits, claims or other legal proceedings, could have a material adverse effect on our business.**

We believe that our brand image, awareness and reputation strengthen our relationship with consumers and contribute significantly to the success of our business. . . . *Acts of misconduct by any employee, and particularly by senior management, could erode trust and confidence and damage our reputation. Negative public opinion could result from actual or alleged conduct by us or those currently or formerly associated with us, and from any number of activities or circumstances, including operations,* employment-related offenses (such as sexual harassment and discrimination), *regulatory compliance* and actions taken by regulators or others in response to such conduct. *We have in the past been, and may in the future be, named as a defendant in lawsuits, claims and other legal proceedings that arise in the ordinary course of our business based on alleged acts of misconduct by employees*. . . . The outcome of any allegations, lawsuits, claims or legal proceedings is inherently uncertain and could result in significant costs, damage to our brands or reputation and diversion of management's attention from our business.

391.    The same, or substantially similar, statements as those quoted in the paragraph above were made in Part I, Item 1A of AT&T's 2021 Form 10-K; and Part I, Item 1A of AT&T's 2022 Form 10-K.  As described more fully in ¶ 385, certain of these statements were referred to in AT&T's 1Q 2020 Form 10-Q, 2Q 2020 Form 10-Q, 3Q 2020 Form 10-Q, 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, 3Q 2022 Form 10-Q, and 1Q 2023 Form 10-Q.

392.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because AT&T was on notice that its employees, including senior management, engaged in acts that could be viewed as misconduct for all the reasons described in ¶ 386 and that the misconduct described in ¶ 386 was not limited to the locations at issue in the private lawsuits filed against the Company for its use and/or abandonment of lead-covered cables and, thus, the risk that it could face additional proceedings arising from its use and/or abandonment of lead-covered cables was not merely hypothetical.

155

393.    The 2017 Annual Report also stated as follows on page 46:

**Unfavorable litigation or governmental investigation results could require us to pay significant amounts or lead to onerous operating procedures.**

*We are subject to a number of lawsuits both in the United States and in foreign countries*, including, at any particular time, claims relating to antitrust; patent infringement; wage and hour; personal injury; customer privacy violations; regulatory proceedings; and selling and collection practices.  *We also spend substantial resources complying with various government standards, which may entail related investigations and litigation*.  In the wireless area, we also face current and potential litigation relating to alleged adverse health effects on customers or employees who use such technologies including, for example, wireless devices.  *We may incur significant expenses defending such suits or government charges and may be required to pay amounts or otherwise change our operations in ways that could materially adversely affect our operations or financial results.*

394.    The same, or substantially similar, statements as those quoted in the paragraph above were made on page 57 of AT&T's 2018 Annual Report; Part I, Item 1A of AT&T's 2019 Form 10-K; Part I, Item 1A of AT&T's 2020 Form 10-K; Part I, Item 1A of AT&T's 2021 Form 10-K; and Part I, Item 1A of AT&T's 2022 Form 10-K.  As described more fully in ¶ 385, certain of these statements were referred to or expressly incorporated by reference in AT&T's 2Q 2018 Form 10-Q, 3Q 2018 Form 10-Q, 2018 Form 10-K, 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, 1Q 2020 Form 10-Q, 2Q 2020 Form 10-Q, 3Q 2020 Form 10-Q, 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, 3Q 2022 Form 10-Q, and 1Q 2023 Form 10-Q.

395.    The statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because, the risks that the Company would incur substantial expenses defending legal or regulatory proceedings and/or change its operations in ways that could materially adversely affect its financial results were not merely hypothetical for all the reasons described in ¶ 392.

156

**AT&T'S STOCK PRICE DECLINES AS THE TRUTH EMERGES**

396.    As detailed more fully above, the *WSJ* published a series of stories in July 2023 on the widespread existence of decaying lead cables left behind by telecommunications companies, which prompted a series of actions by lawmakers and regulators and, ultimately, AT&T to confess to the exposure it faces as a result of its continued ownership of such cables.  Each of these reports revealed, for the first time, new facts about the lead cables in AT&T's wireline network and its related exposure to various risks.  Investors had been in the dark about the lead cables and, thus, as this news was released and investors were able to consider the ramifications of AT&T's extensive network of lead cables, the price of AT&T's stock dropped.

### A.    July 9, 2023

397.    As detailed more fully above (¶ 241), on Sunday, July 9, 2023, the *WSJ* released an article entitled "America is wrapped in miles of toxic lead cables" which revealed that major telecommunication companies who inherited copper line assets from Bell System companies have left behind a sprawling web of abandoned lead cables across the country, including AT&T, and summarized the results of the *WSJ*'s investigation, which indicated that these cables were leaching life-threatening lead into waterways and communities where people live, work, and play.

398.    The *WSJ*'s story took many—including those intimately familiar with the telecommunications industry—by surprise.  For example, *Fierce Telecom*, a publication dedicated to the telecommunications industry, ran a story on July 10, 2023, about the *WSJ*'s report, which stated that "the lead-covered telco cables seem to have flown under the radar, until now."  Analyst Craig Moffett of SVB MoffettNathanson, who covered the industry for more than 20 years, said "we had never previously encountered the topic of lead in telecom networks."  Brett Feldman, a senior analyst with Goldman Sachs, later told *Yahoo! Finance* on July 28, 2023, that "[t]his was a surprising issue to investors," adding "[i]t's not something that had been talked about by the

157

companies." As Defendant John Stankey later admitted on September 6, 2023, the *WSJ*'s reporting included the type of information that "***causes one to take note***."

399.    On this news, AT&T's stock fell 2.18% to close at $15.27 on July 10, 2023, damaging investors. Many drew a direct connection between the stock decline and the *WSJ* lead cable story. On July 10, 2023, *Bloomberg* reported that "Telecom giants AT&T Inc. and Verizon Communications Inc. are declining after a Wall Street Journal report that the firms left behind a network of cables covered in toxic lead that stretches across the U.S."

### B.    July 11-12, 2023

400.    After the close of trading on July 11, 2023, the *Wall Street Journal* published another story in its series on lead cables titled "Lawmakers Demand Telecom Firms Act on Toxic Lead Cables After the *Wall Street Journal*  Investigation." That article revealed that a number of Congressmen were demanding that the owners of the lead telecom cables take immediate action to protect Americans and revealed that regulators were evaluating enforcement options. The article read in part:

> Lawmakers are demanding that telecom firms act to ensure that Americans are safe after a Wall Street Journal investigation revealed that phone companies have left behind a network of cables covered in toxic lead, tainting water and soil in some locations.
>
> "***This is corporate irresponsibility of the worst kind***," Sen. Edward Markey, a Massachusetts Democrat, said in a letter Tuesday to USTelecom, the industry group representing telecom companies, including giants AT&T and Verizon.
>
> "The telecommunications companies responsible for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects. ***The members of USTelecom that are responsible for these lead-sheathed cables have a duty—both civic and legal—to ensure that they do not put Americans in harm's way***."
>
> *            *            *
>
> "Exposure to lead in our soil and water can significantly harm public health, especially for children in frontline communities," Sen. Tom Carper (D., Del.),

chairman of the Environment and Public Works Committee, said in a statement. "As we learn more about the impact of these abandoned lead cables across our country, we must ensure that we are taking all the necessary steps and actions to protect communities from lead exposure."

401.    As detailed more fully above (¶ 242), the *WSJ* released a follow-up article about lead telecommunication cables on the morning of July 12, 2023, which revealed that AT&T executives had long-standing knowledge of the human health and environmental dangers posed by the lead in its legacy network.  In fact, the article quoted from a presentation given by an AT&T EHS executive which concluded that the lead-clad cables "posed risks for phone-company workers and the surrounding environment" and that such dangers were brought directly to the attention of AT&T's senior leadership through two lawsuits filed against it for abandoning lead cables.

402.    As described more fully above (¶ 251), mid-day on July 12, 2023 before the market closed, New Street Research issued a research note estimating that AT&T could be liable for approximately **half** of a $59 billion cleanup, far more than any telecommunications company.

403.    On this news, AT&T's stock tumbled from $15.23 on July 11, 2023, to close at $15.12 on July 12, 2023, damaging investors.  Many drew a direct link between the steady decline in the value of telecommunication company stocks and the *WSJ*'s initial three stories.  For example, Citigroup analyst Michael Rollins cited the *WSJ*'s findings in a note to investors, warning that stocks with exposure to wireless networks with lead could trade lower in the near-term because of uncertainty and risk related to the lead cable issue.

### C.    July 14, 2023

404.    As discussed more fully above (¶ 252), before market open on the morning of July 14, 2023, J.P. Morgan analyst Phil Cusick downgraded the recommendation and decreased the price target for AT&T over concerns about potential lead cable liability.  Soon after market open on July 14, 2023, the *WSJ* released another article in the series, "I Was Really Sick and I Didn't

Know From What."  The story featured profiles of at least seven current and former frontline workers, including two AT&T employees who revealed they were exposed to lead through unsafe work practices during the Class Period and suffered adverse health consequences.  For example, a current AT&T employee by the name of Cynthia Martinez said she "worked for six years melting lead solder while wearing fingerless gloves and no mask" California and confirmed that "***[t]here was no formal training***" on lead and, instead, the practices she followed were "taught to me out in the field."  According to the article, Martinez filed a workers' compensation claim against AT&T in 2022 for kidney cancer, which AT&T denied.  The story also described a former AT&T employee by the name of Jody Fischer, who "worked with lead solder for 40 years until retiring in 2020" in San Diego, California, where "[w]orkers . . . said abandoned cables had a dusting of silvery lead so soft people would at times scribble messages in it."  The article explained that Fischer "had anemia, severe anxiety and brain fog, plus kidney-related ailments 'all the time.'"

405.    On this news, the price of AT&T's stock declined by $0.62, or 4.1%, to close at $14.50 on July 14, 2023, damaging investors.  The financial markets linked the decline directly to the downgrade and the *WSJ*'s continued reporting.  On July 14, 2023, *Bloomberg* highlighted that AT&T fell 2.1% in premarket trading "following a downgrade to neutral from overweight at JPMorgan, with the bank citing the telecom operator's potential liability following recent the *Wall Street Journal*  reports over toxic sheathing."  Later that day, the business section of the *WSJ* ran a story stating "AT&T shares are down more than 6% this week, trading at levels not seen in 20 years, as Wall Street analysts raised questions about liabilities related to the [lead] cables."  In the opening line of an analyst note to clients, Oppenheimer stated that "AT&T and Verizon are down ~10% ($25B) since the *WSJ* articles on lead contamination . . . Part IV of the *WSJ*'s lengthy exposes [sic] hit on Friday; it included graphic pictures of very sick former Bell employees."

Similarly, *The Motel Fool* published a story "Why AT&T Stock Fell on Friday," in which it observed that the decline was driven by "a high-profile series of articles from the *Wall Street Journal* this week, highlighting health and environmental concerns from legacy telephone lines sheathed in lead."

### D.   July 17, 2023

406.   As detailed more fully above (¶ 253), before market open on the morning of July 17, 2023, Citigroup analyst Michael Rollins downgraded the recommendation and decreased the price target for AT&T over concerns about potential lead cable liabilities.  Later in the morning of July 17, 2023, the *WSJ* released an article entitled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables."  The article stated, in pertinent part:

> **Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.**
>
> In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.
>
> \*      \*      \*
>
> **The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.**
>
> \*      \*      \*
>
> In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.
>
> "Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water. **Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC on this so we are happy to follow up in the coming weeks."**

161

407.    On this news, the price of AT&T's stock tumbled by $0.97 on unusually heavy volume to close at a multi-decade low of $15.23 on July 17, 2023, and continued to slide on unusually heavy volume the following day to close at $13.45, its lowest level since *March 1993*. Media linked the continued decline to the mounting signs that the Company faced significant exposure for its lead cables.  For example, *Bloomberg* reported that "AT&T shares extended a selloff to a multi-decade low on Monday, as concerns over the company's potential risk related to lead cabling spurred a downgrade from Citi."  Similarly, *Fast Company* observed in a story that same day that "telecom investors are racing for the exists over fears that AT&T, Verizon, and other industry giants could be on the hook for potential health risks posed by decades-old infrastructure." In a story titled "Telco stocks take a tumble amid lead contamination concerns," *Fierce Telecom* noted that three environmental groups "submitted a letter to the EPA today, calling on the agency to investigate" the issue.  Bill Dendy, a financial expert with Alicorn Investment Management, told *ABC* on July 17, 2023 that the recent news about AT&T "has caused concern among investors."  *Investing.com* published a story later that day explaining that "***the stock market reaction is understandable given that the market likely wasn't aware of the issue***."  On July 18, 2023, the *WSJ* printed a similar article in which it too said the selloff by AT&T investors was not an "overreaction" considering "how little is known about the true extent of the problem, or what the ultimate financial exposure may be."

### E.    July 26, 2023

408.    After the close of trading on July 26, 2023, the *WSJ* released another article in its lead cable series titled "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article stated, in pertinent part:

> ***The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead- sheathed telecom cables across the U.S.***

*The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry.*

*The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days.* Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.

A Wall Street Journal investigation recently revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

*The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.*

409.    On this news, AT&T's stock tumbled 2.55% to close at $14.51 on July 27, 2023.

*Bloomberg* reported later that evening that "AT&T shares fall 1% post market" in response to the news that the "[DOJ] and [EPA] are investigating the potential health and environmental risks from lead-covered telecom cables across the US."

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

410.    As detailed more fully above, the Individual Defendants received information reflecting the true facts regarding AT&T and its operations and business practices, and had control over and/or received the Company's materially misleading statements before they were issued to the investing public. Accordingly, the Individual Defendants acted with scienter because at the time they issued public documents and other statements in AT&T's name, they knew, or were severely reckless in not knowing, that such statements were materially false and misleading.

411.     Indeed, the ongoing fraud described herein could not have been perpetrated without the knowledge and/or severe recklessness and complicity of personnel at the highest level of AT&T, including the Individual Defendants.  The Individual Defendants knew such statements would be disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly or recklessly participated in the dissemination of such statements and documents to the investing public.  Thus, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.

412.     These facts, in conjunction with the additional indicia of scienter alleged below, collectively support a strong inference that, throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded, that their statements were materially false and misleading.

### A.     Defendants Had An Affirmative Legal Obligation to Protect Workers from Lead Exposure and the Environment from Lead Contamination

413.     Throughout the Class Period, AT&T was under a known legal obligation to ensure that its work environment and practices comply with the OSHA Lead Standard and applicable state lead standards (¶¶ 102-104).  In addition, the Company was obligated to ensure that hazardous wastes such as lead were properly disposed at a certified waste disposal or recycling site in accordance with the RCRA (¶¶ 108-110, 184-186).

414.     The Individual Defendants were aware that they were directly responsible for carrying out these obligations under AT&T's EHS Management System and aware of their corresponding obligations.  According to that document, "AT&T's top management shall take ultimate responsibility for environment, health and safety and its environment, health and safety management system."  Indeed, Defendant Stephenson personally signed the EHS Policy at the outset of his tenure as CEO in 2008, and repeatedly professed compliance with its principles in AT&T's CSRs.  Similarly, Stankey explained on July 26 2023, "we've had relationships with

federal state regulators on all safety issues for a very long time, lead being one of them . . . . We work with a variety of different substances and materials that are regulated, and we have infrastructure inside of our business of health and safety organizations that do this stuff professionally."

415.    Defendants Stankey and McElfresh were also aware of the AT&T values and commitments set forth in its Code of Business Conduct, established in January 2022.  In an updated Issue Brief on Environment, Health & Safety Compliance published no later than May 2023, AT&T stated as follows:  "From our part-time workers to our CEO, employees are responsible for reviewing the AT&T Code of Business Conduct (COBC) annually and understanding its provisions.  EHS considerations, such as minimizing and recycling waste, are integrated into our business processes to conserve natural resources and prevent pollution."  Indeed, the COBC itself begins with a "Message" from John Stankey describing its purpose.

**B.    Defendant Stankey Was Admittedly Aware of the Lead Cables in AT&T's Sprawling Copper Wire Network**

416.    On the very first call where AT&T's senior executives spoke since the *WSJ*'s stories about lead cables first broke, held on July 26, 2023, Stankey provided a statement on the lead cables in which he admitted having long-standing knowledge about the lead-clad cables in AT&T's network and their dangers to employees.  Specifically, Stankey stated:

> As background, ***it's well understood that lead-clad cables are used broadly in*** our nation's infrastructure today.  From power cables to ***telecommunication cables***, lead has been used to protect interior wires from exposure to the elements because lead is very stable and it doesn't rust.  ***The practice has long been known and its risks of exposure to those in close contact to it has been regulated by federal and state authorities for decades.***

(Emphasis added.)  Indeed, *Yahoo! Finance* reporter Brian Sozzi held an interview with John Stankey approximately one month later during which Sozzi asked for an update on the lead cable

situation and stated, "[m]y interpretation from the last earnings call" was that this was "something you've been monitoring for many years."

417.    Stankey's long-standing knowledge of AT&T's toxic cables is fully consistent with his work history at the Company.  As detailed more fully above (¶ 20), Stankey has held a series of positions within AT&T with direct responsibility for the management of the services offered on its wireline network, including *head of the telecommunications division*.  Numerous CWs, including the former head of AT&T's network operations, independently confirmed that all employees in these divisions were aware that AT&T's legacy network contained lead (¶ 124).

### C.    The Individual Defendants Were Repeatedly Made Aware Of the Dangers of Lead Through Lead Paint Disclosure Requirements

418.    Like most any homeowner in the United States, many of the Individual Defendants were made aware of the dangers of lead before making any of the misstatements during the Class Period through real estate disclosure requirements.

419.    In addition to the lead paint disclosures mandated by HUD and the EPA (¶¶ 91-93), sellers of residential property in many states are required to provide disclosures that identify lead as an *environmental* hazard.  As relevant here:

- Since 1996, Oklahoma has required sellers of residential property to furnish a disclosure statement approved by the Oklahoma Real Estate Commission covering a number of matters, including the "existence of hazardous or regulated materials and other conditions having an environmental impact."  OKLA. STAT. tit. 60 § 833(B).  The form promulgated by that body asks the seller under the heading "Environmental" to respond to the questions "Are you aware of the presence of lead-based paint?" and requires such sellers to confirm that the responses are "true and accurate" by signing the form.

- Beginning in 1994, sellers of residential property in California have been required to complete and furnish a standardized disclosure statement, referred to as Form TDS.  *See* CAL. CIVIL CODE § 1102 *et seq.*  By no later than 2000, Form TDS has required such sellers to affirmatively state if there are "any . . . [s]ubstances, materials, or products which may be an environmental hazard such as . . . lead-based paint" and certify that the responses therein are "true and correct" by signing the form.

- As the Florida Supreme Court held in 1985, sellers of real property in Florida have a common law duty to disclose all facts materially affecting the value of the property that are not readily observable or known to the buyer and Florida passed a law in 1997 requiring all real estate agents to disclose the same. *See* FLA. STAT. § 475.278. Agents, in turn, use form language approved by the Florida Association of Realtors, which has, since 1998, asked the seller under the heading "Environment" if they are aware of "any substances . . . which may be an environmental hazard such as . . . lead-based paint" and to certify that the responses are "accurate and complete" by signing the form.

- Missouri amended its property laws in 1996 to require all real estate agents representing a seller of real property to disclose all "adverse material facts" they should know about, including "[e]nvironmental hazards affecting the property." MO. REV. STAT. §§ 339.710, 339.730. Agents, in turn, have used a seller disclosure statement approved by the Missouri Association of Realtors to comply with that obligation, which has, since at least 2006, asked sellers under the heading "Hazardous Substances/Other Environmental Concerns" to respond to the questions "Are you aware of the presence of any lead hazards (e.g. paint, water supply lines, etc.) on the Property?" and "Are you aware of the presence of any lead in the soils?" and acknowledge that the responses provided therein are "true and accurate" by signing the form.

- Like Florida, sellers in Arizona have a common law duty to disclose any information that materially affects the value of the property and the Arizona Department of Real Estate has promulgated rules requiring real estate agents to do the same. *See* ARIZ. ADMIN. CODE § 4-28-1101(B). Agents have used a form disclosure statements known as the SPDS, which, as of February 2008, asked the seller under the heading "Environmental Information" to answer if they are "aware of the presence of any of the following on the Property, past or present . . . Lead-based paint" and to certify that the answer provided are "true and complete" by signing the form.

420.    Before or during the Class Period, Defendant Randall L. Stephenson entered into a number of real estate transactions to acquire a residential property that included a home built before 1978. In April 2002, Stephenson purchased a residential property in San Antonio, Texas for approximately $940,000 that included a single-family home originally built in 1928. In July 2008, Stephenson purchased a residential property in Dallas, Texas for approximately $2.2 million that included a single-family home originally built in 1912. In April 2009, Stephenson purchased another residential property in Dallas, Texas for approximately $4 million that included a single-family home originally built before 1957. In November 2010, Stephenson purchased a residential property adjacent to one he purchased in April 2009 for an undisclosed amount which included a

167

single-family home originally built in 1950. In April 2011, Stephenson purchased a second residential property adjacent to one he purchased in April 2009 for an undisclosed amount which included a single-family home originally built in 1949. In June 2013, Stephenson purchased another residential property in Dallas, Texas for approximately $2.5 million. Finally, in June 2020, Stephenson repurchased one of the residential properties adjacent to the one he purchased in April 2009 after selling it to his daughter in December 2012 (¶ 421). Accordingly, in connection with each of the preceding transactions, Stephenson was required by federal law to sign a lead paint addendum to the sale contract in which he acknowledged receiving the EPA-approved lead paint pamphlet described more fully in ¶ 92 and certified that he reviewed the statement explaining that lead poses significant health hazards and received notice of any lead paint hazards from the seller.

421. Stephenson also sold a number of residential properties before or during the Class Period in transactions that were subject to lead disclosure rules, including the federal Lead Disclosure Rule. In July 2008, Stephenson sold the property described in the preceding paragraph that he purchased in April 2002. In April 2009, Stephenson sold the property described in the preceding paragraph that he purchased in July 2008. In December 2012, Stephenson also sold the property described in the preceding paragraph that he purchased in November 2010 to his daughter. Because each of these properties included a home originally built before 1978, Stephenson was required by federal law to sign a lead paint addendum to the sale contract in which he certified that he reviewed the statement explaining that lead poses significant health hazards and disclosed all known lead paint hazards to the buyers. Stephenson also sold a property that he owned in Oklahoma City, Oklahoma in August 2018. Accordingly, Stephenson was required by applicable state law to sign a disclosure statement in connection with the sale in which he certified whether

he was aware of any environmental hazards, including lead-based paint, and, thus, on notice that lead posed a threat to the environment.

422.    Before the Class Period, Defendant John J. Stephens sold a number of properties in Missouri and Texas that were subject to lead disclosure rules, including at least one that was subject to the federal Lead Disclosure Rule.  Specifically, in June 2005, Stephens sold a residential property that he owned or otherwise had authority to sell in St. Louis, Missouri which included a single-family home originally built in 1936.  Because this property included a home originally built before 1978, Stephens was required by federal law to sign a lead paint addendum to the sale contract in which he certified that he reviewed the statement explaining that lead poses significant health hazards and disclosed all known lead paint hazards to the buyers.  In addition, Stephens was required by applicable state law to sign a disclosure statement in connection with the sale in which he certified whether he was aware of any environmental hazards, including lead-based paint, and, thus, on notice that lead posed a threat to the environment.

423.    Before or during the Class Period, Defendant John T. Stankey and/or trusts that he operated as trustee entered into real estate transactions to acquire a residential property that included a home built before 1978.  In July 2003, Stankey purchased a residential property in San Antonio, Texas for an undisclosed amount that included a single-family home originally built in 1938.  In April 2010, a trust operated by Stankey as trustee purchased a residential property in Dallas, Texas for an undisclosed amount that included a single-family home originally built in 1952.  Accordingly, in connection with each of the preceding transactions, Stankey was required by federal law to sign a lead paint addendum to the sale contract in which he acknowledged receiving the EPA-approved lead paint pamphlet described more fully in ¶ 92 and certified that he

169

reviewed the statement explaining that lead poses significant health hazards and received notice of any lead paint hazards from the seller.

424.    Stankey and/or partnerships that he operated as its manager also sold several residential properties before or during the Class Period in transactions that were subject to lead disclosure rules, including the federal Lead Disclosure Rule.  In March 2000, Stankey sold a residential property in Lafayette, California that included a single-family home originally built in 1941.  In April 2010, Stankey also sold the residential property described in the preceding paragraph that he purchased in July 2003.  Because each of these properties included a home originally built before 1978, Stankey was required by federal law to sign a lead paint addendum to the sale contract for each of the preceding transactions in which he certified that he reviewed the statement explaining that lead poses significant health hazards and disclosed all known lead paint hazards to the buyers.  In addition, a partnership that Stankey operated as its manager sold several residential properties in Palm Desert, California, including one in July 2014 and another in August 2019.  Accordingly, Stankey was required by applicable state law to sign a disclosure statement in connection with each of the preceding sales in which he certified whether he was aware of any environmental hazards, including lead-based paint, and, thus, on notice that lead posed a threat to the environment.

425.    Defendant Jeffrey S. McElfresh and/or trusts that he operated as its trustee sold several residential properties before the Class Period in transactions that were subject to lead disclosure rules.  In September 1998, McElfresh sold a residential property in Jacksonville, Florida.  In addition, in December 2008, a trust that McElfresh operated as its trustee sold a residential property in Scottsdale, Arizona.  Accordingly, McElfresh was required by applicable state law to sign a disclosure statement in connection with each of the preceding sales in which he

certified whether he was aware of any environmental hazards, including lead-based paint, and, thus, on notice that lead posed a threat to the environment.

### D. Defendants Engaged in a Multi-Month Review of AT&T's Legacy Network Assets to Identify Ways In Which To Remove Costs from It

426. By the start of the Class Period, AT&T had taken on over $180 billion in debt to acquire two new businesses facing intense competitive pressures (¶¶ 56-57). These missteps were publicly criticized in a letter from activist letters in September 2019 which highlighted that these decisions led to a deterioration in the performance of AT&T's stock. In direct response, on October 28, 2019, Defendants Stephenson and Stephens announced that AT&T kicked off a three-year "enterprise-wide cost-reduction initiative" led by then-COO Defendant Stankey and former telecommunications CEO Bill Morrow, both of whom Stephenson praised as "process improvement hawks." The team also included the head of AT&T's Communications division, Jeff McElfresh. Stephenson assured that he would personally oversee the work of this group "myself."

427. The cost reduction initiative was informed by a detailed review performed by Morrow and Stankey's team between October 2019 and April 2020. Defendant Stephens explained several months later that this team was "fully engaged . . . doing data analysis . . . doing the comparisons . . . analyzing those—all aspects of our operations" for opportunities to cut costs.

428. The cost-cutting analysis performed by this team closely reviewed the costs associated with AT&T's copper wireline network and the materials used in it. On December 10, 2019, Stankey confirmed that that AT&T's "wireline business" was one of the areas that presented an opportunity to "take out layers of cost." Expanding on this topic just two days later, Jeff McElfresh explained that "you've got areas of your copper network where the subscribers have already migrated to, let's say, maybe fiber or to wireless . . . so we're working through looking at ways to optimize geographically areas of our network where we might be able to reclaim that" and

"shrink our footprint, lower expenses, **maybe have the opportunity to monetize some physical real estate in that part of our footprint**," *i.e.* copper.  On March 3, 2020, Stankey confirmed that the review concluded and identified 10 broad initiatives to drive up to $10 billion in savings over three years, including "cost efficiencies in our very, very broad infrastructure."

429.    Both Stankey and McElfresh shared details about the origin of the copper retirement cost initiatives that only someone personally involved from the outset would know. Indeed, McElfresh gave a detailed presentation on the "cost transformation" project during AT&T's Analyst & Investor Day on March 22, 2022, titled "Cost Transformation: Sharpening Our Focus."  On that call, McElfresh admitted that "controlling the timing and profitability curve" associated with AT&T's highly profitable legacy revenues from its copper network was "**a big reason why we launched the transformation program and why we chose to do this work [cost reduction] internally as opposed to seek other options**," such as an asset sale.  Stankey echoed these comments almost a year later.  In response to a question about "copper decommissioning" in January 2023, Stankey stated that "we've been working this issue pretty aggressively since the day I came into the job [CEO]," and explained "I'm choosing to do it organically internally, not through a front-end private equity transaction that puts a little bit of cash [in] my pocket but ultimately has the value of it accrue to someone else over the hard work of 3, 4 and 5 years."

430.    Stankey and McElfresh also showed that they remained involved in the copper retirement cost reduction initiative throughout the Class Period.  Discussing copper retirement in January 2023, Stankey noted "I would say we had to start formulating the plans when I came in [as CEO], but **now we have a very robust and functioning organization** that we're **doing this kind of day in and day out**."  After explaining the benefits of "taking it [decommissioned cables] off the copper grid," he reiterated "[w]e are doing this day in and day out."  Similarly, in March 2023,

McElfresh highlighted that "we had achieved over $5 billion of the $6 billion cost takeout target" and specified that about "a fourth came out of our network." Elaborating on this point, McElfresh explained that "if you think about the actual carrying cost of an underutilized copper network that is across 511,000 square miles . . . think about all the maintenance and support . . . think about all the energy that we use." Commenting on removing costs from AT&T's legacy network, Stankey reflected in April 2023 "I'm really pleased we made some changes about a year ago in how we organize within the business and how we focus on our operating cost structure that is putting the right kind of exposure on how we execute around that cost margin."

### E.    AT&T Was Required to Confirm the Salvage Value of Copper Assets That Were Retired Prior to the End of Their Economic Life

431.    Throughout the Class Period, AT&T claimed that the financial statements in its periodic SEC filings were prepared in accordance with generally accepted accounting principles ("GAAP"). GAAP refers to the conventions, rules, and procedures promulgated by the Financial Accounting Standards Board ("FASB") that define accepted accounting practices in the United States. The FASB has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC").

432.    Like any other assets, the value of AT&T's property, plant, and equipment, including its copper telephone cables, must be recorded on its balance sheet at their carrying value and adjusted, or "depreciated," over the course of their useful economic lives. Under GAAP, assets have value because they have the capacity to generate future cash flows and the carrying value of each such asset is therefore predicated on those expected cash flows. Such assets must be depreciated to reflect the fact that the expected cash flows decline as they age. *See* ASC 360-10-35. Typically, a company's physical property, plant, and equipment is considered a "long-lived" asset. AT&T treated its property, plant, and equipment as a long-lived asset for purposes

of its balance sheet, including, in particular, its copper cable infrastructure. AT&T used "straight-line" methods to depreciate the value of its property, plant, and equipment over the course of their estimated economic lives. This method takes the cost basis of an asset less salvage value at the end of its expected life and depreciates the net amount ratably over its estimated useful life.

433.    If a long-lived asset is "abandoned" before the end of its previously estimated useful life, ASC 360-10-35-47 instructs that the depreciation amount must be revised to reflect its truncated economic life. In particular, ASC 360-10-35-48 provides that "[w]hen a long-lived asset ceases to be used, the carrying amount of the asset should equal its salvage value, if any." "Abandonment" in this context does not refer to the act of physically leaving the asset behind but, rather, "when it ceases to be used." ASC 360-10-35-47. Thus, investors understand disclosures about "abandonment" in the context of long-lived assets to mean that the asset is no longer being used, not that it has been physically left in place.

434.    Consistent with ASC 360-10-35-47, AT&T recognized approximately $5.5 billion in charges for abandoning copper wireline assets outside the normal course of business in 2017, 2019, and 2022. In the fourth quarter of 2017, AT&T recorded a pre-tax charge of more than $2.8 billion for abandoning certain copper wire assets that it no longer planned to use to support network activity due to "planned fiber deployment." In the fourth quarter of 2019, AT&T recorded a pre-tax charge of almost $1.3 billion to abandon copper wire assets that it no longer planned to use "due to the pace at which [its] customers have migrated to fiber." In December 2022, AT&T recorded another pre-tax charge of more than $1.4 billion to abandon certain conduits that it no longer planned to use as a result of its ongoing "rationalization" of its copper assets. Accordingly, AT&T was required to confirm the salvage value (if any) of these retired assets for purposes of

calculating the appropriate impairment charge.  To do so, AT&T's accounting group necessarily needed to know if those assets were left in place or removed and, if removed, their composition.

**F.    Defendants Had Powerful Incentive to Suppress All Information About Its Perilous Network of Decaying Lead-Covered Cables**

435.    By the start of the Class Period, the Company increased its net debt to over $180 billion to acquire two financially disastrous businesses facing intense competitive pressures (¶¶ 56-57).  As of July 24, 2018, the Communications segment of AT&T was already executing on a several "cost management initiatives" that, by then, drove 13 straight quarters of cost reductions.  As explained above (¶ 426), formalized an even broader three-year cost reduction initiative in October 2019 to remove up to $10 billion from the business in response to criticisms leveled by activist shareholders over the Company's recent acquisitions.  Call after call, Defendants stressed that they were focused on reducing costs from the Company's copper footprint, and analysts repeatedly asked questions about the Company's progress on the initiative (*e.g.*, ¶¶ 279-328).  As of January 2023, Defendant Desroches confirmed that AT&T was still engaged in "disciplined cost management . . . using all free cash flows after dividends to pay down debt."

436.    The costs associated with lead cable removal and remediation were fundamentally incompatible with the Company's public commitment to reduce costs.  Indeed, this is precisely why AT&T as a matter of practice knowingly retired copper cable wires in place when they reached the end of their economic life rather than incur the cost of safety removing them from the environment, even in densely populated urban locations with large numbers of children, much less addressing the enormous web of previously-retired lead cables littered across the country.

437.    Because of its unique corporate history and business strategies, AT&T owned more copper wireline than any other telecommunications company in the United States and, thus, had by far had the most lead sheathing remaining in its network.  As detailed more fully above, as of

July 18, 2023 (¶ 262), it owned roughly 200,000 route miles of copper cables covered in lead, approximately 133,333 miles of which were either buried or in subterranean conduit and 66,666 miles of which were either aerial or submerged in water. In the same filing in which AT&T made that disclosure, it cautioned that "[t]here are varying costs of . . . removal by cable type (aerial, buried, buried in conduit, underwater)."

438.    Others have previously estimated the real-world costs to remove lead-sheathed cables buried in soil and/or conduit, including those owned by AT&T. In August 2010, Northeast Utilities Service Company informed the EPA that it would cost approximately $800 million to remove all 1,200 miles of its paper insulated lead cable within its underground electric distribution system. This represents a cost of approximately $666,666.66 per mile. Not even accounting for inflation, applying this real-world estimate to the 166,666 miles of lead-covered cable remaining in AT&T's legacy network that are buried in soil or conduit, the total cost to remove and remediate those cables would be $111.11 billion. As described more fully above (¶ 203), an expert retained by landowners in the Texas Class Action against AT&T estimated that it would cost approximately $33.43 per foot to remove lead cables buried on the landowners' property, which is equivalent to $176,510.40 per mile. Applying this estimate to the 166,666 miles of lead-covered cable remaining in AT&T's legacy network that are buried in soil or conduit, the total cost to remove and remediate those cables would be $29.4 billion.

439.    AT&T has itself estimated the cost to remove non-buried lead-covered cable. In the Lake Tahoe Action, AT&T agreed in the Consent Decree that the approximate cost of removing the eight miles of lead-sheathed cable sitting at the bottom of Lake Tahoe would cost between $275,000 to $550,000, representing a range of $34,375 to $68,750 per mile. Apply this estimate to the 66,666 miles of aerial and underwater lead-covered cable remaining in AT&T's legacy

network, the total cost to remove those cables would be $2.3 billion to $4.6 billion. Notably, this is consistent with analyst estimates. After AT&T disclosed the breakdown of lead-sheathed cable in its legacy network on July 18, 2023, J.P. Morgan analyst Phil Cusick estimated that it would cost $2 to $ 4 billion for AT&T to remove the aerial and underwater cables. Similarly, Morningstar analyst Michael Hotel projected the cost to remove those cables was $2.2 to $4.5 billion.

440.     In other words, it would cost AT&T anywhere from ***$31.7 billion to $115.7 billion*** to appropriately remove and remediate all the lead cables that admittedly remained in its legacy network as of July 18, 2023, or, at the very least, approximately ***$2.3 billion to $4.6 billion*** to appropriately remove and remediate just the aerial and submerged lead cables that admittedly remained in its legacy network as of July 18, 2023.

### G.     Defendants Were Motivated to Hide Lead Liabilities to Protect Their Outsized Incentive Compensation

441.     During the Class Period, Defendants were motivated to hide the substantial exposure to liabilities from lead cables to increase their outsized incentive compensation. AT&T's executive compensation plan had three main components: base salary, short-term cash incentives (a portion of which may be deferred as stock), and long-term incentives, half of which were cash and half of which were paid as restricted stock units. The incentive components far outweighed the salary component, by up to as much as sixteen and a half times, or ***1,646%***.

442.     AT&T's 2018 executive compensation is described in its 2019 Proxy Statement. The short-term incentives were tied to earnings-per-share ("EPS"), free cash flow ("FCW"), and specific corporate accomplishments ("Collaboration") measured annually.  EPS, net income divided by the number of outstanding shares, and FCW, cash left after paying operating and capital expenditures, both decline when the Company incurs additional expenditures. The short-term incentives were weighted 60% EPS, 30% FCW, and 10% Collaboration. The long-term incentives

were tied to return on invested capital ("ROIC") and total stockholder return ("TSR"), measured over a three-year period. ROIC, net operating profit after tax divided by the amount of invested capital, declines as costs increase without corresponding profit, and TSR, the change in stock price and amount of dividends paid, decreases when any factor negatively impacts the stock price, including costs and reputational damage. The long-term incentives were weighted 75% ROIC and 25% TSR. Thus, both short-term and long-term incentives would be significantly damaged if AT&T announced a massive nationwide environmental liability and/or recorded a charge for it.

443. As reported in the 2019 Proxy Statement, in 2018, Defendant Stephenson was granted more than $17 million in incentive compensation, or 947% more than his base salary, Defendant Stephens was granted more than $5.9 million in incentive compensation, or 720% more than his base salary, and Defendant Stankey was granted more than $8.6 million in incentive compensation, or 519% more than his base salary.

444. AT&T's 2019 executive compensation is described in its 2020 Proxy Statement. The 2019 executive compensation plan was identical to the 2018 plan except for a change to the short-term incentive metrics. At the beginning of 2019, the Collaboration and FCF metrics were replaced with a ratio of Net Debt to Adjusted EBIDTA, which was adopted "to further align management's focus on AT&T's stated strategy to reduce debt." After this change, short-term incentives were weighted 80% EPS and 20% Net Debt to Adjusted EBIDTA.

445. As soon as AT&T's Board realigned compensation to focus on reducing debt, the Defendants began to aggressively manage legacy assets to meet these goals. On January 29, 2020, AT&T hosted a conference call to discuss earnings for the quarter and year ended December 31, 2019. Defendant Stephenson began by saying "I told you that our top priority for 2019 was to reduce our debt . . . We gave you the formula for exactly what it would take to get to this debt

level. . . . [W]e would need to monetize nonstrategic assets." Looking ahead, Defendant Stephenson said that the goal would be "to deliver another $1.5 billion in additional cost savings," which he said would come "from thinning our product portfolio," among other initiatives.

446.    As reported in the 2020 Proxy Statement, in 2019, Defendant Stephenson was granted more than $23.7 million in incentive compensation, or 1,322% more than his base salary, Defendant Stephens was granted more than $9.5 million in incentive compensation, or 852% more than his base salary, Defendant Stankey was granted more than $14.8 million in incentive compensation, or 519% more than his base salary, and Defendant McElfresh was granted more than $845,000, or 149% more than his base salary.

447.    AT&T's 2020 executive compensation is described in its 2021 Proxy Statement, filed on Form DEF 14A on March 11, 2021 ("2021 Proxy Statement"). The 2020 executive compensation plan was identical to the 2019 plan except for a change to the short-term incentive metrics.  At the beginning of 2020, the Net-Debt-to-Adjusted-EBIDTA was removed from short-term incentives and replaced with FCW.  Defendant McElfresh, newly elevated to executive status as CEO of AT&T Communications, had short-term incentives based on AT&T Communications' Operating Contribution (80%) and corporate FCF (20%).  After the scope of the COVID-19 pandemic became apparent, Defendant Stankey's salary was reduced by 50% for the period where he was CEO in 2020 and his short-term incentives for 2020 were capped at 50% attainment. Defendant Stephenson's salary was eliminated for the period of 2020 where he was no longer CEO and his 2020 short-term incentives were capped at 50% attainment.  As a result, both Stankey and Stephenson's executive compensation in 2020 was even more incentive based.

448.    As reported in the 2021 Proxy Statement, in 2020, Defendant Stephenson was granted more than $14.8 million in incentive compensation, or 1,646% more than his base salary,

Defendant Stephens was granted more than $10.2 million in incentive compensation, or 896% more than his base salary, and Defendant Stankey was granted more than $8.3 million in incentive compensation, or 513% more than his base salary. Defendant McElfresh was granted more than $2.3 million in incentive compensation, or 271% more than his base salary.

449.    AT&T's 2021 executive compensation is described in its 2022 Proxy Statement, filed on Form DEF 14A on March 22, 2022 ("2022 Proxy Statement"). The 2021 executive compensation plan was identical to the 2020 plan except for a change to the short-term incentive metrics. At the beginning of 2021, a new qualitative "strategic" metric was added to incentivize "business strategy transformation within the framework of its cultural pillars." This metric would include factors such as "putting stockholder value above specific operating entity performance" and "demonstrating leadership behaviors in the achievement of results that are consistent with the Company's stated culture and values." Clearly, if information came to light that executives oversaw a program to reduce costs by discarding an environmental contaminant across the United States or put subject frontline employees to severe health problems by failing to provide safeguards against known health hazards, the award could very well be withheld. After these changes, for Defendants Stankey, Desroches, and Stephens short-term compensation was weighted 60% EPS, 20% FCW, and 20% Strategic and Defendant McElfresh's short-term compensation was weighted 20% Corporate FCW, 20% Strategic, and 60% AT&T Communications EBIDTA, described in the 2022 proxy as "[c]lear measurement of operating profitability."

450.    As reported in the 2022 Proxy Statement, in 2021, Defendant Stankey was granted more than $12.9 million in incentive compensation, or 540% more than his base salary, Defendant Desroches was granted more than $5.7 million in incentive compensation, or 505% more than his base salary, and Defendant McElfresh was granted more than $4.4 million in incentive

compensation, or 446% more than his base salary.  To justify awarding all Defendants 100% of the Strategic measure, the 2022 Proxy Statement cited how AT&T executives "[m]ade critical structure and capital allocation decisions to prioritize initiatives that . . . enabled next generation services," "[r]eached more than $3 billion of $6 billion run-rate cost savings target," [p]roactively rationalized our portfolio of low-margin products," and acted "[c]onsistent with our over-arching ESG objectives."

451.    AT&T's 2022 executive compensation is described in its 2023 Proxy Statement, filed on Form DEF 14A on April 3, 2023 ("2023 Proxy Statement"). The 2022 executive compensation plan was identical to the 2021 plan except for a change to the short-term and long-term incentive metrics.  At the beginning of 2022, EPS was transferred from the short-term incentives to long-term incentives.  For short-term incentives, EPS was replaced by Adjusted Operating Income ("OI"), which adjusts operating income for certain costs, including asset impairment costs and gains and losses related to asset dispositions. After these changes, Defendants' short-term incentives were based on 60% OI, 20% FCW, and 20% Strategic, and long-term incentives were based on 37.5% EPS, 37.5% ROIC (with an adjustment based on TSR), and 25% based on common stock price performance only.

452.    As reported in the 2023 Proxy Statement, in 2022, Defendant Stankey was granted more than $13.8 million in incentive compensation, or 575% more than his base salary, Defendant Desroches was granted more than $3 million in incentive compensation, or 247% more than his base salary, and Defendant McElfresh was granted more than $11.9 million in incentive compensation, or 496% more than his base salary.  In the 2023 Proxy Statement, the Strategic measure was described to include "[a]chieving results in a way that is consistent with our company's culture and values, including how we operate in the communities we support, [and]

advancing our ESG priorities, especially worker health and safety." To justify awarding Defendants 115% of the Strategic measure, the 2023 Proxy Statement cited how AT&T executives delivered "free cash flow of 14.1 billion," executed projects "consistent with our over-arching ESG objectives," "[a]chieved more than $5 billion of $6 billion-plus run-rate cost savings target," and "[r]estructured AT&T and lowered corporate overheads . . . and focused daily operations on both legacy transformation and growth."

### H.    Stephenson and Stankey Repeatedly Professed To Be Tuned In To Sustainability, the Environment, and Employee and Community Health

453.    Throughout the Class Period, Defendants Stephenson and Stankey repeatedly professed to be tuned into sustainability, the environment, and employee and community health. Both served as the spokesperson for the Company's all-important ESG efforts. This further supports an inference of scienter of the wrongs alleged herein.

454.    Stephenson repeatedly professed his commitment to ESG goals. For example, Stephenson has worked with hundreds of CEOs from across the country as part of a Business Roundtable ("BRT") to promote a thriving U.S. economy, especially in the communities where AT&T operates. On August 9, 2019, the BRT released a new statement on the "Purpose of a Corporation" signed by 181 CEOs, including Stephenson, who agreed to lead their companies not just for the benefit of shareholders, but "all stakeholders," including customers, employees, and communities. In an AT&T press release announcing the update that same day, Stephenson said "it's our goal at AT&T to invest in our people and communities to help create a future that better serves us all." Similarly, during an appearance at a CEO Speaker Series hosted by the Council on Foreign Relations on September 18, 2019, Stephenson stated that "[s]ome would say it's too paternalistic, but I worry about the healthcare of our employees . . . . I think it's important that we as CEOs and companies have a vested interest in the health of our people."

455.    Stankey took on the role of being the face of sustainability for all corporate stakeholders when he was promoted to CEO.  For example, in a letter to shareholders in AT&T's annual report in February 2020, Stankey wrote as follows:

> For us, the priorities I've just outlined are more than just matters of public policy. They are part and parcel of our commitment to operate our business in a responsible manner.  In these areas and beyond, we're doing our part as a company to create sustainable solutions to issues that face our communities, our nation and the world. . . . And let me be clear on a further point: We are deeply committed to our people. We invest in them and in our communities with well-paying jobs, excellent benefits and industry-leading skills development programs that open up advancement opportunities.

Similarly, upon being named one of the World's Most Ethical Companies in March 2022, Stankey commented "[e]thical decision-making is embedded in everything we do" and emphasized that "[f]ocusing on ethics, integrity, and building trust . . . adds to our competitive advantage."

## I.    AT&T's Telecommunications Network Is Admittedly At the Core of Its Business

456.    The Individual Defendants' knowledge of the practices discussed herein can be inferred from the fact that AT&T's cable network was core to the operation of AT&T's business throughout the Class Period and the focus of great attention during its transition to fiber and the associated cost reduction initiatives.

457.    As of December 31, 2018, AT&T's Communications segment, which included its wireless, consume wireline, and business wireline product offerings, accounted for approximately 84% of its overall operating revenues.  As stated in AT&T's 2018 Form 10-K, wireline services (both business and consumer) combined for 50.6% of the revenues for the segment, meaning that they represented approximately *42%* of the $170 billion in revenue reported by AT&T that year.

458.    Although AT&T was making a major push towards fiber at the beginning of the Class Period, AT&T's services were predominately delivered by its legacy copper network.  As of June 30, 2018, *i.e.*, just a month before the start of the Class Period, only 2.2 million of its 13.7

million broadband subscribers had fully fiber connections.  In other words, AT&T's legacy copper cables continued to provide service to approximately *84%* of its wireline customers.

459.    Furthermore, the transformation of AT&T's network from legacy copper to fiber cables was at the core of its corporate strategy.  At the beginning of the Class Period, on the earnings call for the second quarter of 2018, Defendant Stephenson outlined that a "primary focus for us this year and the next few years is deleveraging the business" from debt used to merge with Time Warner.  At the beginning of 2019, this objective was reinforced by the Board of Directors, who pegged a portion of executive pay to a goal of reducing the ratio of debt to EBIDTA.  That month, Defendant Stephenson outlined a strategy to meet these goals through "monetiz[ing] nonstrategic assets" to "deliver another $1.5 billion in additional cost savings" by "thinning our product portfolio."  On the earnings call for the first quarter of 2020, Defendant Stankey announced an ambitious $6 billion cost reduction initiative, which would require "rationalizing" the operating footprint for AT&T's copper network.

460.    As important as AT&T's legacy network was at the beginning of the Class Period, it only became more critical after Defendants decided to strategically focus on communications by spinning off DIRECTV and WarnerMedia.  At the conference call announcing the spinoff of WarnerMedia, held on May 17, 2021, Defendant Stankey touted that these divestments would then have "additional flexibility to invest in an equally compelling opportunity, becoming the preeminent U.S. broadband provider."  By the end of 2022, after the divestments were complete, the Communications segment accounted for *97% of the company's operating revenues*.

461.    Indeed, Defendants chose to highlight how critical it found the transition from legacy networks to new broadband technologies, holding an Analyst & Investor Day on March 11, 2022, where the company would "Lay[] Out Growth Strategy for Company" by "outlin[ing] a

strategy for long-term growth driven by 5G, fiber." In sessions titled "Cost Transformation: Sharpening our Focus" presented by Defendant McElfresh and another session titled "Financial Outlook: Path to Sustainable Growth" presented by Defendant Desroches, investors were told how the cost savings from retiring legacy networks would finance the critical modernization of the networks and make the company more efficient.

### J. Defendants' SOX Certifications Support An Inference of Scienter

462. Following a series of high-profile financial scandals that occurred in the early 2000s at large public companies, Congress enacted the Sarbanes-Oxley Act of 2002 ("SOX") to protect investors by improving the accuracy and reliability of corporate disclosures.

463. Among other things, Section 404 of SOX directed the SEC to prescribe rules which effectively required all public companies to establish and maintain a system of internal controls over financial reporting ("ICFR"), and to assess the effectiveness of those controls on a periodic basis. As provided in Rules 13a-15 and 15d-15 of the Exchange Act, management must not only maintain ICFR but evaluate the effectiveness of ICFR annually and evaluate any change that is reasonably likely to materially affect ICFR each quarter. Other provisions of SOX require the CEO and CFO of any such company to certify compliance with SOX in each annual and quarterly report filed with the SEC on Form 10-K or Form 10-Q, including that it complies with GAAP.

464. During the Class Period, Stephenson, Stephens, Stankey, and/or Desroches included such SOX certifications in each Form 10-K and Form 10-Q that AT&T filed with the SEC. Specifically, each signed SOX certifications accompanying the filings in the table below:

| Defendant | Filings Including a SOX Certification |
|---|---|
| Stephenson | 2Q 2018 Form 10-Q, 3Q 2018 Form 10-Q, 2018 Form 10-K, 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, 2019 Form 10-K, and 1Q 2020 Form 10-Q |
| Stephens | 2Q 2018 Form 10-Q, 3Q 2018 Form 10-Q, 2018 Form 10-K, 1Q 2019 Form 10-Q, 2Q 2019 Form 10-Q, 3Q 2019 Form 10-Q, 2019 Form 10-K, 1Q 2020 Form 10-Q, 2Q 2020 Form 10-Q, 3Q 2020 Form 10-Q, and 2020 Form 10-K |
| Stankey | 2Q 2020 Form 10-Q, 3Q 2020 Form 10-Q, 2020 Form 10-K, 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, 2021 Form 10-K, 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, 3Q 2022 Form 10-K, and 1Q 2023 Form 10-Q |
| Desroches | 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, 3Q 2021 Form 10-Q, 2021 Form 10-K, 1Q 2022 Form 10-Q, 2Q 2022 Form 10-Q, 3Q 2022 Form 10-Q, 2022 Form 10-K, and 1Q 2023 Form 10-Q |

465.    Among other things, the SOX certifications accompanying each of these filings certified that the signatory was "responsible for establishing and maintaining disclosure controls and procedures" and that such controls and procedures were designed "to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared."

## K.    *Respondeat Superior* and Agency Principles Apply

466.    AT&T is liable for the acts of Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all wrongful acts alleged herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of Defendants and other Company officers, employees, and agents is imputed to AT&T under such principles.

## LOSS CAUSATION

467.    At all relevant times, AT&T securities traded in an open, well-developed, and efficient market which promptly digested new information about the Company from all reasonably accessible public sources and reflected such information in the price of its securities.  As described

above, Defendants made false and misleading statements throughout the Class Period which misrepresented and/or failed to disclose the adverse facts detailed herein. Defendants' false and misleading statements caused AT&T securities to trade at artificially inflated prices throughout the Class Period and, thus, operated as a fraud or deceit on Plaintiffs and other members of the Class who purchased or otherwise acquired such securities before such the inflation was removed.

468.    As detailed herein, the price of AT&T securities fell precipitously in response to disclosures made on July 9, 2023, July 11, 2023, July 12, 2023, July 14, 2023, July 17, 2023, and July 26, 2023. The price of AT&T securities fell in response to each such disclosure by revealing information that removed part of the inflation introduced by Defendants' previous misstatements and omissions, causing real economic loss to Plaintiffs and other members of the Class who purchased such securities during the Class Period at inflated prices.

469.    Each decline in the price of AT&T securities referenced above was a direct and proximate result of Defendants' misstatements or omissions being revealed to the market and/or the materialization of risks concealed by the fraud. The timing and magnitude of each such price decline negates any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to the fraud alleged herein.

470.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. Accordingly, Defendants' wrongful conduct directly and proximately caused Plaintiffs and other members of the Class to suffer economic losses, *i.e.,* damages under the federal securities laws.

## PRESUMPTION OF RELIANCE

471.    Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts necessary to make the statements that were made not misleading during the Class Period;

(b)    the misrepresentations and/or omissions were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiffs and other members of the Class purchased AT&T securities between the time that Defendants misrepresented or failed to disclose material facts necessary to make the statements that they made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

472.    At all relevant times, the market for AT&T securities was efficient for the following reasons, among others:

(a)    AT&T's securities met the requirements for listing on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, AT&T filed periodic public reports with the SEC;

(c)    throughout the Class Period, AT&T's common stock was highly liquid, with an average daily trading volume over 39.7 million shares;

(d)    AT&T regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)    AT&T was followed by numerous securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and, thus, entered the public marketplace; and

(f)    new, company-specific information was reflected and incorporated into the stock price for AT&T's securities.

473.    As a result of the foregoing, the market for AT&T securities promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of AT&T's securities.  Under these circumstances, all purchasers of AT&T securities during the Class Period suffered similar injury through their purchase of AT&T securities at artificially inflated prices and the presumption of reliance applies.

474.    In addition, a presumption of reliance is also appropriate under *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated on the omission of material facts for which there was a duty to disclose.  As this action involves Defendants' failure to disclose material adverse information regarding AT&T's operations, forecasts, and business prospects—information that Defendants were obligated to disclose in light of the statements they made on these very topics and/or applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

## NO SAFE HARBOR

475.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged herein to be false or misleading.

476.    None of the statements alleged herein to be false or misleading are forward-looking statements.  Rather, the statements alleged herein to be false or misleading all relate to facts and

conditions existing at the time the statements were made or prior to the time the statements were made. Furthermore, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

477.    To the extent certain of the statements alleged to be false may be characterized as forward-looking, they were neither identified as such when made nor accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  To the extent Defendants issued any statements designed to "warn" or "caution" investors of certain risks, those statements were not meaningful because they warned only of theoretical future risks at times when such risks were not merely hypothetical and/or identified risks that already began to materialize. Thus, the boilerplate and abstract cautionary statements made by Defendants were themselves false and misleading and insufficient to insulate Defendants from liability.

478.    In addition, Defendants are liable for any forward-looking statements because, at the time each such statement was made, the speaker knew that the forward-looking statement was false or misleading or had actual knowledge of material facts undermining the statement, and/or the forward-looking statement was authorized or approved by an executive officer of AT&T who knew that the statement was materially false or misleading when made or had actual knowledge of material facts undermining the statement.

## CLASS ACTION ALLEGATIONS

479.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants, members of the immediate families of the Individual Defendants, the Company's subsidiaries and affiliates, any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period, any entity in which such excluded party has or had a controlling interest, and the legal representatives, heirs, successors, or assigns of any such excluded party.

480.    The members of the Class are so numerous and geographically dispersed that joinder is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, AT&T's securities were actively traded on the NYSE.  As of October 25, 2023, there were approximately 7,150,020,118 shares of AT&T's common stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are many thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in class actions arising under the federal securities laws.

481.    Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act, as complained of herein.

482.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class.

483.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a)    whether the acts described herein violated the Exchange Act and/or SEC rules promulgated thereunder;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts or omitted material facts necessary to make the statements made, in the circumstances under which they were made, not misleading;

(c)    whether Defendants acted with the requisite level of scienter;

(d)    whether the material misstatements and omissions alleged herein artificially inflated the market price of AT&T securities during the Class Period;

(e)    whether the Individual Defendants were controlling persons; and

(f)    whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

484.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other reasons, joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

485.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.  This Count is brought pursuant to Section 10(b) of the Exchange Act,

192

codified at 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, codified at 17 C.F.R. § 240.10b-5, on behalf of the Class against all Defendants.

486.    Throughout the Class Period, Defendants, individually and in concert, directly or indirectly, by means or instrumentalities of interstate commerce, including but not limited to the mails and the internet, and/or the facilities of a national securities exchange, carried out a plan, scheme, or course of conduct in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC, in that they:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of AT&T securities during the Class Period.

487.    Specifically, throughout the Class Period, Defendants made or caused AT&T to issue untrue statements of material fact and/or omit material facts from its public disclosures that were necessary to make the statements that were made, in light of the circumstances under which they were made, not misleading, including those specified above, which were intended to, and did, as alleged herein:  (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially inflate and maintain the price of AT&T securities; and (iii) cause Plaintiffs and members of the Class to purchase AT&T securities at artificially inflated prices. Defendants are individually and collectively responsible for making such statements by virtue of having made the public statements or otherwise prepared, approved, signed, and/or disseminated documents that contained those statements to the investing public.

488.    The Individual Defendants made the false and misleading statements and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased AT&T securities during the Class Period.

489.    As a result of disseminating the materially false and misleading statements specified above, the market price for AT&T securities was artificially inflated during the Class Period.  Relying directly or indirectly on those statements or upon the integrity of the market price for AT&T securities, Plaintiffs and other members of the Class purchased AT&T securities at prices that were artificially inflated by the fraud described herein.  As set forth herein, Plaintiffs and other members of the Class suffered damages as a direct and proximate result of Defendants' wrongful conduct when the true facts were subsequently disclosed or the risks concealed by the misstatements materialized and the inflation was removed from the price of such securities.

490.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of the fact that they were materially false or omitted material facts necessary to make them not misleading, and believed them to be true.  Plaintiffs and the other members of the Class would not have purchased AT&T securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by the false and misleading statements and/or the material adverse facts which the Defendants did not disclose.

491.    By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

492.     Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.  This Count is brought pursuant to Section 20(a) of the Exchange Act, codified at 15 U.S.C. § 78t(a), on behalf of the Class against the Individual Defendants.

493.     As alleged herein, the Individual Defendants, and each of them, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omitting material facts necessary to make the statements that were made not misleading in connection with the purchase or sale of the Company's securities and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

494.     Throughout the Class Period, the Individual Defendants, as AT&T's most senior executives, had direct involvement in the day-to-day operations of the Company, and conducted and participated, directly and indirectly, in the conduct of AT&T's business affairs.

495.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to AT&T's business operations, financial condition, and prospects.  In this capacity, the Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be false or misleading prior to and/or shortly after those statements were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  The Individual Defendants, therefore, were "controlling persons" of AT&T within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they actively participated in the unlawful conduct alleged.

496.     Because of their senior positions, the Individual Defendants knew of or recklessly disregarded the adverse, non-public information about AT&T's business practices, financial

195

condition, and prospects. The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute culpable participation in the primary violation.

497. By reason of the foregoing, the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives and Plaintiffs' counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D. Granting such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  July 8, 2024

POMERANTZ LLP

*/s/ Justin D. D'Aloia*
Jeremy A. Lieberman (admission pending)
Justin D. D'Aloia
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

THE BRISCOE LAW FIRM

*/s/ Willie C. Brisco*
Willie C. Briscoe
12700 Park Central Drive, Suite 520
Dallas, Texas  75251
Telephone: (972) 521-6868
Facsimile: (281) 254-7789
wbriscoe@thebriscoelawfirm.com

*Local Counsel for Plaintiffs*

197