**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |
|---|---|
| IN RE AT&T INC. SECURITIES LITIGATION | Case No. No. 3:24-cv-01196-N<br><br>CLASS ACTION |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

    A.    AT&T's Corporate History and Business....................................................................3

    B.    Lead Is a Well-Known Toxin Extremely Harmful to Human Health.....................3

    C.    The Sprawl of Lead Hidden In AT&T's Legacy Copper Network .........................4

    D.    AT&T Misled The Investing Public About Its Practices As It Publicly Touted Its Decision to Transition to Fiber and Execute Its Cost Reduction Plan................5

    E.    Investors Are Harmed as the Truth Emerges............................................................6

STANDARD OF REVIEW .....................................................................................................8

ARGUMENT............................................................................................................................8

I.    PLAINTIFFS STATE A SECTION 10(B) CLAIM.............................................................8

    A.    The AC Adequately Alleges Misstatements and Omissions of Material Fact..........................................................................................................................8

        1.    Defendants Mischaracterize the Allegations of the AC...............................9

        2.    The AC Pleads an Array of Facts Which Establish That Defendants' Misstatements Were False or Misleading When Made.........10

        3.    Defendants' Remaining Challenges Are Meritless....................................18

    B.    The AC Raises a Strong Inference of Scienter .......................................................20

        1.    Defendants Misstate the Proper Standard for Scienter .............................20

        2.    The AC's Allegations Offer Compelling Direct Evidence of Scienter ....................................................................................................21

        3.    The AC Pleads Strong Circumstantial Evidence of Severe Recklessness ..............................................................................................26

        4.    The Inference of Scienter Is Overwhelming.............................................30

    C.    The AC Adequately Pleads Loss Causation ...........................................................31

II.    PLAINTIFFS STATE A CONTROL PERSON CLAIM..................................................32

III.    DISMISSAL IS NOT WARRANTED BUT SHOULD BE WITHOUT
        PREJUDICE ....................................................................................................................32

CONCLUSION...................................................................................................................................32

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*ABC Arbitrage Plaintiffs Grp. v. Tchuruk*,
   291 F.3d 336 (5th Cir. 2002) ....................................................................................10, 11

*Acticon AG v. China Ne. Petroleum Holdings Ltd.*,
   692 F.3d 34 (2d Cir. 2012)...............................................................................................7

*In re Alamosa Holdings, Inc. Sec. Litig.*,
   382 F. Supp. 2d 832 (N.D. Tex. 2005) ............................................................19, 27

*Alaska Elec. Pension Fund v. Asar*,
   768 F. App'x 175 (5th Cir. 2019) ...................................................................26, 30

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
   572 F.3d 221 (5th Cir. 2009) ...........................................................................31

*Allen v. Hays*,
   65 F.4th 736 (5th Cir. 2023) ...........................................................................18

*In re Apache Corp. Sec. Litig.*,
   2022 WL 4277350 (S.D. Tex. Sept. 15, 2022) ..............................................19, 20

*Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) ...........................................................................28

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................8

*In re BP p.l.c. Sec. Litig.*,
   843 F. Supp. 2d 712 (S.D. Tex. 2012) ............................................................14, 29

*Brendon v. Allegiant Travel Co.*,
   412 F. Supp. 3d 1244 (D. Nev. 2019)..............................................................14

*Brody v. Zix Corp.*,
   2006 WL 2739352 (N.D. Tex. Sept. 26, 2006).................................................23

*In re Cassava Scis., Inc. Sec. Litig.*,
   2023 WL 3442087 (W.D. Tex. May 11, 2023) .........................................11, 16, 20

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   2016 WL 215476 (S.D. Tex. Jan. 19, 2016) ....................................................32

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   2017 WL 2608243 (S.D. Tex. June 15, 2017)..................................................32

*In re Concho Res. Inc. Sec. Litig.*,
    2023 WL 2297425 (S.D. Tex. Feb. 23, 2023) ...........................................................16, 17, 29

*Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
    620 F. Supp. 3d 603 (S.D. Tex. 2022) .............................................................................30

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)........................................................................................................8, 31

*In re Eastman Kodak Co. Sec. Litig.*,
    632 F. Supp. 3d 169 (W.D.N.Y. 2022) ...........................................................................9

*Edgar v. Anadarko Petroleum Corp.*,
    2019 WL 1167786 (S.D. Tex. Mar. 13, 2019)..................................................................21

*Edwards v. McDermott Int'l, Inc.*,
    2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) ..................................................................12

*In re Fleming Cos. Sec. & Deriv. Litig.*,
    2004 WL 5278716 (E.D. Tex. June 16, 2004)..............................................................22, 32

*Franklin v. Kaypro Corp.*,
    884 F.2d 1222 (9th Cir. 1989) ........................................................................................10

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    514 F. Supp. 3d 942 (S.D. Tex. 2021) ............................................................................22

*Hall v. Rent-A-Center, Inc.*,
    2017 WL 6379334 (E.D. Tex. Dec. 14, 2017)..................................................................27

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
    791 F.3d 90 (D.C. Cir. 2015) ..........................................................................................17

*Heinze v. Tesco Corp.*,
    971 F.3d 475 (5th Cir. 2020) ..........................................................................................9

*Home Solutions of Am. Inv. Grp. v. Fradella*,
    2008 WL 1744588 (N.D. Tex. Mar. 24, 2008) ................................................................24

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*
    45 F.4th 1236 (10th Cir. 2022) .......................................................................................11

*Irvin v. S. Snow Mfg., Inc.*,
    517 F. App'x 229 (5th Cir. 2013) ...................................................................................8

*Jacobowitz v. Range Res. Corp.*,
    596 F. Supp. 3d 659 (N.D. Tex. 2022) ...........................................................................27

*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
　920 F.2d 262 (5th Cir. 1990) ........................................................................................10

*Linenweber v. Sw. Airlines Co.*,
　693 F. Supp. 3d 661 (N.D. Tex. 2023) ...........................................................11, 16, 32

*Lipow v. Net1 UEPS Techs., Inc.*,
　131 F. Supp. 3d 144 (S.D.N.Y. 2015)..............................................................................9

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes*,
　810 F.3d 951 (5th Cir. 2016) ........................................................................................29

*Lormand v. US Unwired, Inc.*,
　565 F.3d 228 (5th Cir. 2009) ................................................................................ *passim*

*In re Lumen Tech., Inc. Sec. Litig.*,
　2024 WL 4637293 (W.D. La. Sept. 30, 2024)...............................................................19

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
　601 U.S. 257 (2024).........................................................................................................8

*Magruder v. Halliburton Co.*,
　359 F. Supp. 3d 452 (N.D. Tex. 2018) .........................................................................19

*Marcus v. J.C. Penney Co.*,
　2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) .............................................................17

*Markman v. Whole Foods Mkts., Inc.*,
　2016 WL 10567194 (W.D. Tex. Aug. 19, 2016)......................................................11, 16

*Meyer v. JinkoSolar Holdings Co.*,
　761 F.3d 245 (2d Cir. 2014)..........................................................................................12

*Nathenson v. Zonagen Inc.*,
　267 F.3d 400 (5th Cir. 2001) ..................................................................................20, 26

*In re Nature's Sunshine Prods. Sec. Litig.*,
　486 F. Supp. 2d 1301 (D. Utah 2007)...........................................................................25

*Neiman v. Bulmahn*,
　854 F.3d 741 (5th Cir. 2017) ........................................................................................27

*In re OCA, Inc. Sec. & Deriv. Litig.*,
　2006 WL 3747560 (E.D. La. Dec. 14, 2006).............................................................28, 30

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
　58 F.4th 195 (5th Cir. 2023) ................................................................................ *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ...................................................................................................9, 16

*Ong. v. Sears, Roebuck & Co.*,
459 F. Supp. 2d 729 (N.D. Ill. 2006) ...................................................................31, 32

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ...............................................................21, 25, 26, 27

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
245 F. Supp. 3d 870 (S.D. Tex. 2017) ..........................................................................14

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
307 F. Supp. 3d 583 (S.D. Tex. 2018) ..........................................................................13

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ........................................................................................26

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys*,
769 F.3d 313 (5th Cir. 2014) ........................................................................................31

*Ramirez v. Exxon Mobil Corp.*,
334 F. Supp. 3d 832 (N.D. Tex. 2018) ...................................................................30, 32

*Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
935 F.3d 424 (5th Cir. 2019) ...................................................................................20, 21

*Rougier v. Applied Optoelectronics, Inc.*,
2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)..........................................................19, 22, 28

*Simons v. Dynacq Healthcare, Inc.*,
2006 WL 1897270 (S.D. Tex. July 10, 2006)..........................................................................13

*In re SolarWinds Corp. Sec. Litig.*,
595 F. Supp. 3d 573 (W.D. Tex. 2022)..........................................................................13, 29

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
365 F.3d 353 (5th Cir. 2004) ...................................................................................25, 26

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ........................................................................18, 20, 21, 27

*Taubenfeld v. Hotels.com*,
385 F. Supp. 2d 587 (N.D. Tex. 2004) ........................................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................................20

*Todd v. STAAR Surgical Co.*,
   2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .........................................................................21

*United States v. Health Mgmt. Sys., Inc.*,
   2022 WL 976161 (N.D. Tex. Mar. 31, 2022) ..........................................................................18

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ..........................................................................12

*In re Venator Materials PLC Sec. Litig.*,
   547 F. Supp. 3d 624 (S.D. Tex. 2021) ....................................................................................23

*Whitworth v. Mouser Elecs., Inc.*,
   2010 WL 4628068 (N.D. Tex. Nov. 8, 2010).........................................................................32

*York Cnty. v. HP Inc.*,
   2024 WL 1327247 (N.D. Cal. Mar. 27, 2024).........................................................................18

*Yoshikawa v. Exxon Mobil Corp.*,
   2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)................................................................ *passim*

*Zagami v. Natural Health Trends Corp.*,
   540 F. Supp. 2d 705 (N.D. Tex. 2008) ...................................................................................12

**Statutes**

15 U.S.C. § 78u-4 .............................................................................................................8, 10, 20

15 U.S.C. § 78u-5(c).................................................................................................................18

28 U.S.C. § 1658(b) ..................................................................................................................18

**Regulations**

17 C.F.R. § 240.10b-5(b)..........................................................................................................8, 9

**Procedural Rules**

Fed. R. Civ. P. 8.........................................................................................................................31

Fed. R. Civ. P. 9.........................................................................................................................8, 10

**TABLE OF DEFINED TERMS**

| Defined Term | Definition | Cross Reference |
|---|---|---|
| AC | First Amended Class Action Complaint for Violations of the Federal Securities Laws | Doc. No. 64 |
| Ameritech | American Technologies Corporation | AC ¶ 51 |
| AT&T | AT&T Inc. | AC at 1 |
| Baby Bells | Seven independent regional operating companies formed in connection with the breakup of the Bell System in 1984 | AC ¶ 50 |
| BellSouth | BellSouth Corporation | AC ¶ 50 |
| Bell System | The monopoly of local telephone operating companies operated by Legacy AT&T | AC ¶ 48 |
| CEO | Chief Executive Officer | AC ¶ 18 |
| CERCLA | The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 | AC ¶ 112 |
| Class | All persons or entities other than Defendants that purchased or otherwise acquired AT&T securities during the Class Period | AC ¶ 1 |
| Class Period | November 8, 2018 to October 31, 2023, both dates inclusive | AC ¶ 1 |
| COO | Chief Operating Officer | AC ¶ 18 |
| CSPA | California Sportfishing Protection Alliance | AC ¶ 212 |
| CSR | Corporate sustainability report | AC ¶ 68 |
| CW | Confidential Witness | AC ¶¶ 23-38 |
| Defendants | AT&T and the Individual Defendants | AC at 1 |
| Desroches | Defendant Pascal Desroches | AC ¶ 21 |
| DIRECTV | DirecTV, LLC | AC ¶ 56 |
| DOJ | U.S. Department of Justice | AC ¶ 11 |
| EHS | Environmental, health, and safety | AC ¶ 37 |
| EPA | Environmental Protection Agency | AC ¶ 11 |
| ESG | Environmental, social, and governance | AC ¶ 67 |
| Exchange Act | The Securities Exchange Act of 1934 | AC ¶ 1 |
| Exhibits | Exhibits attached to the accompanying Declaration of Justin D. D'Aloia | n/a |
| FCC | Federal Communications Commission | AC ¶ 191 |
| GAAP | Generally accepted accounting principles | AC ¶ 431 |
| Individual Defendants | Defendants Stephenson, Stankey, Stephens, and Desroches | AC at 1 |
| Issue Brief | ESG disclosures published by AT&T on topics identified as most important by its stakeholders | AC ¶ 71 |
| Lake Tahoe Action | *California Sportfishing Protection Alliance v. Pacific Bell Telephone Company*, 2:21-cv-00073 (E.D. Cal.) | AC ¶ 214 |
| Legacy AT&T | American Telephone and Telegraph Company | AC ¶ 42 |
| McElfresh | Defendant Jeffrey S. McElfresh | AC ¶ 22 |
| Motion | Defendants' Motion to Dismiss First Amended Class Action Complaint and Brief in Support | Doc. No. 70 |

| OSHA | Occupational Safety and Health Administration | AC ¶ 100 |
|---|---|---|
| OSHA Lead Standard | OSHA's final rule establishing standards for lead exposure in general industry, codified at 29 C.F.R. § 1910.1025 | AC ¶ 102 |
| Pacific Telesis | Pacific Telesis Group | AC ¶ 50 |
| Plaintiffs | Teachers' Retirement System of the City of New York, the New York City Employees Retirement System, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, and the Board of Education Retirement System of the City of New York | AC at 1 |
| PSLRA | Private Securities Litigation Reform Act of 1995 | n/a |
| RCRA | The Resource Conservation and Recovery Act of 1976 | AC ¶ 109 |
| SBC | Southwestern Bell Corporation | AC ¶ 50 |
| SEC | U.S. Securities and Exchange Commission | AC at 1 |
| SOX | Sarbanes-Oxley Act of 2002 | AC ¶ 462 |
| Superfund | Informal name for CERCLA | AC ¶ 112 |
| WarnerMedia | Warner Media, LLC | AC ¶ 56 |
| *WSJ* | *Wall Street Journal* | AC ¶ 3 |

## INTRODUCTION

This case involves what lawmakers have described as "corporate irresponsibility of the worst kind." In July 2023, the *WSJ* published a series of reports after a two-year investigation revealing— to the surprise of many, including the nation's own telecom regulator—that AT&T owns a vast web of obsolete copper telephone cables covered in highly toxic lead, which it chose to simply leave scattered across the country as it built a new network using more lucrative fiber optic technology.[1] As investors absorbed this news, AT&T's stock price plunged to its lowest level in three decades.

AT&T historically provided landline services to customers in 21 states, including Texas, using an extensive network of old copper telephone cables leftover from the Bell System. By 2018, it was building a new network of fiber optic cables to meet growing demand for high speed services. However, AT&T's cash management was under intense scrutiny after it spent vast sums to enter the media and entertainment space. To sell investors on the shift to fiber, Defendants repeatedly assured AT&T was *removing* copper cables as they were displaced by fiber and, in doing so, shedding the associated costs from its book. This was buttressed by AT&T's CEO-approved ESG disclosures, which stated that it took active steps to protect the environment, including to (i) *recover and recycle* its copper lines upon retirement and (ii) provide *all* employees with training on job-specific hazards.

Unknown publicly, vast amounts of AT&T's "legacy" network were encased in lead and, unlike the other cables in that network, simply *abandoned* to rot in place across the United States upon retirement. AT&T also exposed frontline workers to severe health issues by failing to provide training to those who worked with the lead remaining in its network on the perils of doing so. These practices are inexcusable. Defendants have known for years, like any casual observer, that the lead on this cable plant was an environmental contaminant extremely hazardous to human health.

---

[1] All capitalized terms have the same meaning ascribed to them in the First Amended Class Action Complaint for Violations of the Federal Securities Laws, filed July 8, 2024 [Doc. No. 64] (the "AC"), as reproduced in the Table of Abbreviations set forth above. Citations to "Ex." refer to the exhibits attached to the accompanying Declaration of Justin D. D'Aloia. Unless otherwise noted, all internal citations are omitted and all emphasis is added.

While the Motion barely acknowledges as much, AT&T has admitted there are *200,000 miles* of lead remaining in its legacy network, including over 65,000 miles that hang exposed in busy cities like Dallas. AT&T has also admitted that it is now subject to government action that could require it to incur material expenses. Indeed, the EPA is conducting an ongoing Superfund investigation in which it has asked AT&T to develop a "long-term remediation solution" to this widespread problem. Faced with these facts, Defendants attempt to turn the tables by urging that this is a case about predicting the future. It is not. In fact, the plain words of the AC upend that contention.

For example, Defendants protest that the securities laws only impose liability for omitting facts, not opinions about future liability. But Plaintiffs do not fault them for doing so. The AC pleads that Defendants failed to disclose an array of *existing facts—e.g.*, that AT&T was leaving tons of spent lead across the country—germane to the market's assessment of Defendants' public commentary and the risk of investing in AT&T. Nor does the AC solely allege omissions. To state the obvious, none of Defendants' statements directly refer to lead cables because their existence was concealed. But that does not mean that those statements cannot be false, and the AC pleads that many were, including, for example, the representation that "[w]hen AT&T vacates . . . outside plant infrastructure, our teams remove *all* regulated materials," such as lead. It admittedly did not.

Defendants also presume that they cannot act with scienter unless they forecasted that AT&T would, in fact, incur future liabilities from its lead cable practices. But it has long been the law that scienter exists when defendants are aware of the facts that make their statements misleading, as their own authority confirms. Here, Defendants confess that they are alleged to know that lead poses various risks, AT&T used lead cables, and it faced lawsuits for abandoning those cables. *See* Mot. at 17. That is a glaring concession that scienter is adequately alleged—and the AC pleads much more.

Defendants' remaining attempt to disprove loss causation suffers from similar infirmities.

At its core, the Motion is a transparent ploy to raise the standard for pleading valid claims far above the PSLRA because Plaintiffs do so with exacting particularity. The Motion should be denied.

### STATEMENT OF FACTS

#### A.     AT&T's Corporate History and Business

Formerly known as SBC, AT&T is a telecommunications company formed in connection with the breakup of the Bell System in 1984 as one of the so-called "Baby Bells." AC ¶¶ 39, 50, 53. It historically provided a range of services through the network of copper cables it inherited from the Bell System and grew to become the world's largest telecom company through acquiring Legacy AT&T and other Baby Bells, including Pacific Telesis, Ameritech, and BellSouth. *Id.* ¶¶ 39, 51-54.

As demand for traditional wireline services waned, AT&T launched a major initiative in April 2014 to lay new, high-speed fiber optic cables across the 21 states it served over the next five years. *Id.* ¶¶ 64, 139. CEO Randall Stephenson claimed it deployed more fiber than anyone else. *Id.* By the start of the Class Period, AT&T built a fiber network consisting of 1 million miles of cable, but it still had a "legacy" network consisting of over 2 million miles of copper cable. *Id.* ¶ 66.

AT&T also entered the media and entertainment space. In July 2015, it paid $67 billion to acquire DIRECTV and, in June 2018, it paid $108 billion to acquire WarnerMedia. *Id.* ¶ 56. But these businesses performed poorly, and shareholders demanded action. *Id.* ¶ 57. In response, AT&T launched a multiyear $10 billion cost reduction project headed by COO John Stankey. *Id.*

Once appointed CEO in July 2020, John Stankey decided that fiber and cellular were AT&T's "future." *Id.* ¶ 139. By mid-2021, AT&T agreed to sell DIRECTV and WarnerMedia at a substantial loss, leaving it with its traditional wireline and cellular assets. *Id.* ¶¶ 58-59.

#### B.     Lead Is a Well-Known Toxin Extremely Harmful to Human Health

Lead is a brittle heavy metal that can release unnoticeable particles on contact. AC ¶¶ 81-82. In this form, lead is a potent neurotoxin that can cause catastrophic damage to nearly every major

- 3 -

body system, especially in children. *Id.* ¶¶ 85-86. Because it accumulates in the body over time and may go undetected for years, lead is commonly referred to as the "silent killer." *Id.* ¶¶ 84, 87.

Lead was used ubiquitously in industry until its dangers became better understood in the mid-twentieth century. *Id.* ¶¶ 88. Since the 1970s, the U.S. government has taken a series of well-known steps to protect the public from lead and eradicate its continued use. *Id.* ¶¶ 90-96. Among other things, it banned the use of lead in residential paint, gasoline, and pipes in public water systems. *Id.*

Nevertheless, because of its widespread use, there remains a significant amount of lead in certain lines of work. *Id.* ¶ 99. As such, OSHA has promulgated stringent occupational safety standards for workers who handle lead. *Id.* ¶¶ 102-03. The rules are technical but necessary: it is recognized that occupational exposure is one of the leading causes of lead poisoning. *Id.* ¶ 99.

For similar reasons, lead is subject to several laws governing the disposal of environmental contaminants, including the RCRA. *Id.* ¶¶ 106-07, 109-10. Lead is subject to the RCRA because the EPA has classified it as a "toxic" waste, a type of material that "may be able to leach from waste and pollute groundwater." *Id.* ¶ 110. Other forms of toxic waste include arsenic and mercury. *Id.* As a toxic waste, the EPA has broad power to investigate and order the cleanup of any lead released into the environment under its "Superfund" law, also known as CERCLA. *Id.* ¶ 112.

C.     **The Sprawl of Lead Hidden In AT&T's Legacy Copper Network**

Until it was phased out in the 1950s, lead was the industry standard protective covering, or "sheathing," for telephone cables and used extensively as such by the Bell System as it built out the nation's telephone network. AC ¶¶ 115-17. By then, 90% of all such cables were coated in lead. *Id.*

As a Baby Bell, AT&T has had lead-encased copper cables in its network since its inception, and continued to add more as it acquired other Baby Bells. *Id.* ¶¶ 119-20. Indeed, through these acquisitions, it reconstituted over half of the copper cable network from the Bell System. *Id.* ¶ 54. In fact, AT&T has recently admitted it there are *200,000 miles* of lead remaining in its nationwide

- 4 -

network of copper telephone cables and it has *30,000 employees* who could come into contact with those cables in the course of their work. *Id.* ¶¶ 125, 132. Indeed, frontline workers frequently encountered lead cables in the 21 states where AT&T operates, especially older metropolitan areas with dense residential bases, including Dallas. *Id.* ¶¶ 121-23. This ancient hardware sits in piles in underground vaults, hangs on utility poles overhead, and runs directly into residential buildings. *Id.*

### D. AT&T Misled The Investing Public About Its Practices As It Publicly Touted Its Decision to Transition to Fiber and Execute Its Cost Reduction Plan

As they became increasingly obsolete with the adoption of fiber, AT&T retired its lead cables by simply abandoning them in place across the country. AC ¶¶ 140-43. In fact, Defendants Stankey and McElfresh performed a comprehensive review of the ways to retire copper as part of a $10 billion cost reduction project that was launched in September 2019 after investors raised concerns about AT&T's spending. *Id.* ¶¶ 57, 426-29. Through that review, they decided to "reclaim" retired copper for resale but—consistent with AT&T's historic practice—those covered in lead were left in place. *Id.* ¶¶ 142, 428-30. The decision was purely financial. *Id.* ¶¶ 140, 144. Stankey and McElfresh continued to oversee this work through the end of the Class Period. *Id.* ¶ 430.

Despite the vast amount of lead in AT&T's network, many frontline workers who handled it during the Class Period also reported they never received any training on doing so and AT&T took no steps to monitor their work. AC ¶¶ 133-38. As such, there was rampant noncompliance with the OSHA Lead Standard. *Id.* Many now suffer from a host of associated health conditions. *Id.* ¶ 404.

These actions are inexplicable. AT&T routinely reported lead as a "hazardous waste" under the RCRA. *Id.* ¶¶ 184-90. Defendants repeatedly attested that they understood the human health and environmental dangers associated with lead. *Id.* ¶¶ 374-81. They were told by investors that mismanaging lead could expose AT&T to extensive liabilities. *Id.* ¶¶ 166-73. Indeed, AT&T faced lawsuits for abandoning its lead cables in public waterways or private land, at least one of which, the

Lake Tahoe Action, was brought to the attention of CEO John Stankey. *Id.* ¶¶ 198-224. Defendants also received regular reports documenting the type of training that technicians received. *Id.* ¶ 137.

Despite this, Defendants consistently concealed these risky practices as they boasted about AT&T's efforts to realize cost savings and its ESG leadership throughout the Class Period. On call after call, they told investors that they were "removing" legacy wireline as it was displaced by fiber and that doing so yielded substantial savings. AC ¶¶ 279-328. Meanwhile, in its ESG disclosures, AT&T proclaimed that it was "taking proactive measures to reduce [its] footprint and be a better steward of the environment," and had programs in place for "responsibly handling the waste we produce," including "hazardous waste." *Id.* ¶¶ 329-60. It even specified that "[w]hen AT&T vacates . . . outside plant infrastructure, our teams remove *all* regulated materials and coordinate with vendors to recycle and dispose of [it] in an appropriate manner." *Id.* AT&T also repeatedly touted its commitment to employee safety. *Id.* ¶¶ 361-383. As part of this commitment, AT&T advised that *all* employees receive job-specific training based on hazards they may encounter and that it conducts regular reviews to ensure *every* employee incorporates those standards into their work. *Id.*

### E. Investors Are Harmed as the Truth Emerges

In July 2023, the *WSJ* published a series of stories on the lead cables scattered across the country based on an exhaustive 18-month investigation into the matter. AC ¶¶ 226-42, 272, 400, 404, 406, 408. The investigation uncovered thousands of miles of lead-sheathed cables scattered around the country, including near homes, playgrounds and parks; environmental contamination exceeding permissible lead standards near such cables, especially exposed aerial cables; and extensive evidence showing that the large telecommunication companies, including AT&T, were fully aware of the environmental and human health hazards posed by these cables. *Id.* ¶¶ 226-42.

News of these cables took everyone by surprise, even veteran industry experts. Senior telecom analysts said they "never" encountered the topic before. *Id.* ¶ 398. Four former chairs of

- 6 -

the FCC, the nation's wireline regulator, said they were unaware of these cables. *Id.* ¶ 242. Indeed, the *WSJ* investigation was launched because the reporter who first learned of the issue "never heard of lead cables in . . . telecom." *Id.* ¶ 227. Unsurprisingly, investors were shocked too. *Id.* ¶ 398.

Lawmakers and regulators responded with similar alarm. A senior Congressman deeply involved in telecom policy described the indifference shown by AT&T as "corporate irresponsibility of the worst kind." *Id.* ¶ 248. Another called on these companies to "clean up their mess." *Id.* ¶ 249. Within weeks, the DOJ and the EPA both launched investigations into lead cables. *Id.* ¶ 256.

The market's reaction was severe: AT&T's stock price sharply declined after each of these disclosures. *Id.* ¶¶ 397-409. All told, it traded down to its lowest level in *30 years*. *Id.* ¶¶ 10, 407.

To downplay this harm, Defendants note that AT&T's stock price "rebounded" several months later. Mot. at 5. But as expected for any company that regularly releases new news to the market, that is legally irrelevant. *See Acticon AG v. China Ne. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012). And to be sure, Defendants do not challenge loss causation on this ground.

Similarly, Defendants claim that the news has not generated a "flood" of losses. Mot. at 5, 13. The facts prove otherwise. The DOJ inquiry remains ongoing, and the EPA investigation has entered a new phase in which it commenced discussions with AT&T about a "long-term remediation solution" for its lead cables. AC ¶¶ 267, 271-72. AT&T has responded to investigations in New York and Arizona. *Id.* ¶ 266, 269. It is facing a class action by landowners across Louisiana for damage to their property. *Id.* ¶ 276. Since then, another landowner class action has been filed. Ex. 1. Moreover, AT&T recently agreed to spend up to $1.5 million to remove the cables it left at the bottom of Lake Tahoe. Ex. 2. In fact, AT&T has recently filed a case against its insurance carriers to cover its losses in these matters because they denied coverage under nearly 100 policies on several grounds, including that they are subject to an exclusion for pollution. Ex. 3.

## STANDARD OF REVIEW

To survive dismissal, a complaint need only plead facts sufficient to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In making this assessment, the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

## ARGUMENT

### I.     PLAINTIFFS STATE A SECTION 10(B) CLAIM

To state a claim under Section 10(b) and Rule 10b-5 promulgated thereunder, a plaintiff must allege: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). As with any averment of fraud, claims of this type must satisfy the heightened pleading requirements of Rule 9(b). *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 206 (5th Cir. 2023). In addition, the PSLRA requires that a plaintiff must specify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(1), (b)(2).

Defendants dispute only elements (1), (2), and (6), thus conceding Plaintiffs have adequately pled all others. *See Irvin v. S. Snow Mfg., Inc.*, 517 F. App'x 229, 231 (5th Cir. 2013) (argument not raised in opening brief is waived). As set forth below, Defendants' arguments lack merit.

### A.     The AC Adequately Alleges Misstatements and Omissions of Material Fact

As Defendants accept (Mot. at 20), Rule 10b-5 prohibits not only statements of material fact that are "untrue" on their face, but the omission of any material facts needed to make statements that are made "not misleading." 17 C.F.R. § 240.10b-5(b). Thus, once a company chooses to speak on a topic, Rule 10b-5 imposes a duty to tell the "full truth" about it. *Six Flags*, 58 F.4th at 217; *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024) (Rule 10b-5

- 8 -

prohibits "half-truths" and demands disclosure of all facts needed to make statements "clear and complete"). In other words, statements that are literally true can still mislead by virtue of what they omit. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 192 (2015) ("[L]iteral accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another."). Such statements will do so if they "create[] an impression of a state of affairs that differ in a material way from the one that actually exists." *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *16 (N.D. Tex. Sept. 29, 2022) (*Exxon I*).

### 1. Defendants Mischaracterize the Allegations of the AC

As is the case throughout their Motion, Defendants proceed from the false premise that they cannot be held liable under Rule 10b-5 for omitting opinions about AT&T's future liabilities, as opposed to facts. *See* Mot. at 20-21. But this contention rests on a self-serving paraphrasing of the AC that fundamentally misapprehends, if not misrepresents, its core allegations.

Unlike the cases they cite,[2] Plaintiffs do not fault Defendants for failing to predict future events. As detailed more fully in Point I.A.2, the AC pleads that Defendants' statements were false or misleading for failing to disclose *existing facts* bearing directly on the subject being discussed. In fact, three of the four paragraphs that Defendants cite to support their sweeping argument are devoid of any reference to potential liabilities. AC ¶¶ 332, 363, 386. Even as to the final paragraph, Defendants overreach. Contrary to their spin, it alleges that the stated facts made it "*reasonably likely* that the Company would incur substantial costs" defending or correcting its actions. *Id.* ¶ 280. That the stated facts are alleged to expose AT&T to the *risk* of such losses hardly disqualifies them as such and, if anything, reinforces why it was misleading to omit them. Indeed, that is the very

---

[2] *See Heinze v. Tesco Corp.*, 971 F.3d 475, 482 (5th Cir. 2020) (projections not misleading under SEC Rule 14a-9 for failing to disclose plaintiffs' own "speculative predictions" about future events); *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169 (W.D.N.Y. 2022) (no duty to disclose "speculative" outcomes not supported by facts); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170-71 (S.D.N.Y. 2015) (party not liable for failing to "speculate" about future regulatory scrutiny or outcome of pending litigation absent any other pleaded facts).

essence of a securities fraud claim. *See Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 267-68 (5th Cir. 1990) (the "clear intent of the securities laws [is] to foster informed investing based upon disclosed information"); *see also Franklin v. Kaypro Corp.*, 884 F.2d 1222, 1227 (9th Cir. 1989) (purpose of Exchange Act is to promote "public disclosure of facts sufficient to permit prudent investors to understand the risks assumed when purchasing a security") (citing legislative history).

### 2.    The AC Pleads an Array of Facts Which Establish That Defendants' Misstatements Were False or Misleading When Made

The PSLRA's heightened pleading requirements were enacted to filter out "frivolous strike suits" but not "facially valid claims." *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002). Accordingly, Plaintiffs need only "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent" to satisfy Rule 9(b) and 15 U.S.C. § 78u-4(b)(1). *Id.* at 350.[3] The AC identifies dozens of misstatements made by Defendants during the Class Period about: (1) environmental stewardship; (2) employee health and safety; (3) the cost benefits of transitioning from a copper to fiber; and (4) EHS contingencies. AC ¶¶ 279-395. Defendants do not dispute that the AC identifies the statements, speakers, and settings with adequate specificity but, instead, maintain that these statements are not adequately alleged to be actionable. Defendants are wrong.

**Environmental stewardship**. AT&T consistently praised its environmental citizenship in its ESG disclosures. It boasted that it was "taking proactive measures to reduce our footprint and be a better steward of the environment" and professed its commitment to "responsibly handling the waste that we produce" and "promoting pollution prevention . . . through recycling." AC ¶¶ 329-60. The Issue Briefs AT&T released on Waste Management supplemented that message by specifying

---

[3] The PSLRA also states that, "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The Fifth Circuit has joined other Circuits in holding that this simply means "*sufficient* facts" to support the allegations. *ABC*, 291 F.3d at 351-53. Accordingly, it does not "require the pleading of detailed evidentiary matter." *Id.* at 356.

that it took steps to (i) "recover and recycle network infrastructure" upon retirement, including its "copper" wire, and (ii) dispose of any hazardous waste through three means:  recycling, incineration, or transfer to a landfill.  *Id.*  But contrary to these representations, and the sterling image it projected, AT&T not only utilized an extensive network of lead-encased cables in the communities it served, but routinely littered that toxic hardware across the country once it had no more use for it.  *Id.* ¶ 332.

Defendants primarily argue that these statements are not alleged to be false.  Mot. at 26, 27. The AC demonstrates otherwise.  The lead cables AT&T abandoned were part of its copper wire network, and lead is classified as a "hazardous waste" under federal regulations.  AC ¶¶ 110, 119-25. Indeed, AT&T referred to lead as a "hazardous waste" both internally and externally.  *Id.* ¶¶ 173, 189.  Thus, it neither recovered these copper wires nor disposed of the hazardous waste on them as set forth in its disclosures.  It is no excuse that leaving cable in place is purportedly a "proper method of retirement."  Mot. at 27.  For one thing, the cited allegation says no such thing.  But even if it did, AT&T represented that it disposed of hazardous waste in one of three ways, none of which included abandonment in place.  Moreover, the section of the Issue Brief containing these statements was later updated to specify that, "[w]hen AT&T vacates . . . outside plant infrastructure," which includes its old copper wireline, "our teams remove *all* regulated materials."  AC ¶¶ 350, 359.  That was untrue.

In any case, it is "well-settled" that "literal truth" is no defense because such statements can still *mislead* by omission.  *In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *8 (W.D. Tex. May 11, 2023); *see also Ind. Pub. Ret. Sys. v. Pluralsight, Inc.* 45 F.4th 1236, 1251 (10th Cir. 2022) (that statements are not "*literally* false" is "beside the point"). [4]  Here, the AC specifically pleads that AT&T's statements gave the "false impression" that it was not leaving its regulated waste across the country as a matter of standard practice, much less thousands of miles of it.  AC ¶ 332.

---

[4] Defendants' cases (Mot. at 26) do not hold otherwise.  *See Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 678 (N.D. Tex. 2023) (mere *failure to prevent* four discrete compliance issues not inconsistent with statement that Southwest "has" compliance policies and employees are "responsible" for it); *Markman v. Whole Foods Mkts., Inc.*, 2016 WL 10567194, at *8 (W.D. Tex. Aug. 19, 2016) (statements not misleading because omitted facts were *unrelated*).

In an apparent attempt to sidestep this allegation, Defendants stress that the statements do not "suggest, much less affirmatively assert" that the stated measures applied to "every part" of AT&T's network. Mot. at 27. Nor, for that matter, did they say that the measures applied to only part of it. Regardless, literal accuracy is irrelevant. In contrast to the case they rely on, AT&T's detailed disclosures on the steps it was taking "gave comfort" that it was at least *attempting* to avoid pollution and dispose of waste, not acting directly to the contrary. *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). Defendants also ignore that, by issuing glowing descriptions about its environmental choices, AT&T was obligated to disclose "a 'mix of information'" on that topic "that is not misleading." *Six Flags*, 58 F.4th at 217; *see also In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *12-13 & n.15 (E.D.N.Y. May 20, 2020) (ignoring signs that one of several hundred dams faced increased risk of collapse incompatible with statements touting "sustainability" and "commitment to . . . preserve the environment" as core values). As alleged, a multiyear scientific investigation found that lead was discharging from lead cables, including cables owned by AT&T. *Id.* ¶¶ 155, 232-40. Defendants may, for litigation reasons, dispute those findings—vigorously so—but as this Court recently held, "Plaintiffs need not set forth facts disproving Defendants' theories" on a motion where "the Court takes all of Plaintiffs' alleged facts as true, so long as there is a sufficiently particularized basis for their contentions," as is the case here. *Exxon I*, 2022 WL 4677621, at *14.

Equally flawed is the contention that the statements extolling AT&T's "commitment" to sound environmental practices are inactionable puffery. Mot. at 25-26. As a concept rooted in materiality, whether a statement is puffery turns heavily on "context." *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421609, at *8 (S.D. Tex. Apr. 13, 2021); *see also Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 710 (N.D. Tex. 2008) ("Materiality is not judged in the abstract, but in light of the surrounding circumstances."). Thus, a statement that may be seen as puffery "standing

alone" can be material if "used to emphasize and induce reliance" in context.  *Simons v. Dynacq Healthcare, Inc.*, 2006 WL 1897270, at \*2 (S.D. Tex. July 10, 2006).  However immaterial similar statements may be in Defendants' cases, they were critical to *AT&T* investors.  By the start of the Class Period, two investigations found that AT&T failed to properly dispose of hazardous waste. AC ¶¶ 75-79.  Indeed, AT&T thereafter devoted an Issue Brief to waste management, confirming that it was a topic "most important" to stakeholders.  *Id.* ¶ 71.  That these statements were designed to quell investor concern is evident the fact that they were repeatedly stated in that Issue Brief and directly followed by the specific actions AT&T was taking to fulfill them.  *See In re SolarWinds Corp. Sec. Litig.*, 595 F. Supp. 3d 573, 587 (W.D. Tex. 2022) (assuring that issuer was "focused" on cybersecurity not puffery when "repeated" and specific steps identified in "surrounding statements").

Employee safety.  In a separate Issue Brief on EHS, AT&T stated that it was committed to complying with all workplace safety laws and, as such, provided employees with appropriate training and periodically reviewed its operations to enhance compliance.  AC ¶¶ 361-83.  However, a cross section of employees who worked with lead cables confirmed that AT&T *never* provided them any training on doing so, much less assess their performance, and as, a result, there was widespread non-compliance with the OSHA Lead Standard across its footprint.  *Id.*; *see also id.* ¶¶ 131-38, 404.

Recognizing the tension in these allegations, Defendants liken this to a case where isolated departures from policy are insufficient to undercut statements about an issuer's general practice. Mot. at 28.  But even the authority they rely on cautioned that the issue is different when the "representations" provide greater "specificity."  *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 630 (S.D. Tex. 2018) (*Plains II*).  Here, AT&T specified in its statements that "[w]e train *all* employees" based on "job tasks and [likely] hazards" and assured "*all* employees receive health and safety training . . . commensurate with their roles."  AC ¶¶ 362, 364, 369, 373, 377.

AT&T also advised that safety is "part of *every* employe's standard operating procedure" because it evaluates the "business operations that impact EHS." *Id.* ¶¶ 366, 370, 374, 378, 382.

As such, it is beside the point that AT&T provided *some* training and *some* oversight. *See* Mot. at 28. Such pointed assertions are untrue if "all" are not treated as stated, as Judge Rosenthal held in an earlier decision in Defendants' case for statements that the issuer made repairs "on *all* of its pipelines." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 245 F. Supp. 3d 870, 900 (S.D. Tex. 2017) (*Plains I*). Here, Plaintiffs allege that many employees who worked with lead never received any training on the perils of doing so, as AT&T represented, and the allegations Defendants selectively quote do not suggest otherwise. To the contrary, they make clear, when read in full, that the twenty courses in AT&T's training program had "nothing to do with lead" and the topic was "never" mentioned in safety briefings provided to those who worked with it (AC ¶¶ 135, 137), much less monitored. *See In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 758 (S.D. Tex. 2012) (specifying that safety reforms were "implemented" belied by "failure to train employees properly" and "a lack of oversight"); *see also Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1258 (D. Nev. 2019) (similar for statements that company provided its employees with "comprehensive training").

**Benefits of converting from copper to fiber**. On investor calls throughout the Class Period, Defendants routinely spoke about the benefits of retiring copper cables as AT&T retrofitted its network with fiber lines. AC ¶¶ 279-328. Defendants (i) reported—consistent with the disclosures in AT&T's Issue Briefs—that AT&T was "removing" these cables for "replacement" with fiber; and (ii) repeatedly stated that doing so yielded substantial savings because AT&T was taking the costs associated with those assets "out of the business." *Id.* But far from removing those cables or their associated costs, AT&T was leaving the copper cables sheathed in lead *in place*, allowing this highly regulated toxic material to decompose into the environment, exposing it to a host of costly risks. *Id.*

Unable to refute the abandonment allegations, Defendants claim they never suggested that AT&T was removing "all" such cables when they advised that "*some* copper was 'reclaimed' or 'removed.'" Mot. at 24. But they never said that. Unlike the statements specifying the square miles of copper wires that were *retired*—which they cite to make this argument—the statements on copper *removal* were not so limited. In them, Defendants proclaimed that AT&T was "reclaiming copper, removing copper" in "the areas where we're building our fiber," *i.e.*, wherever it was displaced by fiber. AC ¶ 305. Regardless, the market informed Defendants that was how exactly it understood the repeated references to copper retirement and replacement in context. *Id.* ¶ 291 (quoting analyst).

Equally inapt is the attempt to argue that statements about cost savings are literally accurate. Mot. at 24-25. Plaintiffs specifically allege that Defendants' repeated assurance that they were purging costs from the portfolio by retiring copper "gave the false impression that AT&T's legacy infrastructure . . . would not be phased out in a manner that would *create* costly scrutiny, liability, and reputational harm." AC ¶ 280. Yet, AT&T's strategy to retire lead-encased copper wire in place significantly *increased* its exposure to such losses. *Id.* Lead is classified as a "toxic waste" by the EPA because it is known to leach into surrounding materials. *Id.* ¶ 110. This toxic waste sits in public waterways and hangs exposed above busy city streets. *Id.* ¶ 140. No competent environmental regular (much less the EPA) would sit idle with these facts and the risk of further losses was more than foreseeable. At the time of the statements, AT&T was already engaged in litigation for leaving lead cables in just two of countless locations. *Id.* ¶¶ 198-224. Indeed, the potential for broader liability is apparently why AT&T backed out of its agreement to remove the lead cables it left in Lake Tahoe once its risky strategy became national news. *Id.* ¶¶ 257-61. Sure enough, AT&T has since faced a series of costly government investigations and private lawsuits, including a multistage Superfund investigation by the EPA in which there is ongoing discussion of a

"long-term remediation solution" to address the lead it left behind.  *Id.* ¶¶ 255-72, 276-77.

Accordingly, the AC neither demands clairvoyance nor runs afoul of the truism that there is no duty to "cast the business in a pejorative light."  Mot. at 24.  Defendants became obligated to provide a complete picture—both good and bad—once they chose to speak about the cost benefits of shuttering AT&T's copper network, including how AT&T decided to retire cables covered in lead. *See Lormand*, 565 F.3d at 248-49 (when party speaks about "benefits" of plan it must disclose "firm-specific adverse facts that affect the validity or plausibility" of plan to avoid misleading investors).[5]

To shore up their argument, Defendants claim that the handful of statements predicting *future* savings are opinions that are not actionable under *Omnicare* and its progeny.  Mot. 22-23.  Such statements are actionable if they (i) are not honestly held; or (ii) do not "fairly align[] with the information in the issuer's possession."  *Omnicare*, 575 U.S. at 185-89.  But many statements Defendants cite are not opinions at all.  As the Supreme Court explained, "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."  *Id.* at 183.  In many of the cited disclosures, Defendants describe *existing* cost savings as a matter of fact, *e.g.*, "we are taking stuff out of service . . . we have a smaller footprint to manage" and "[t]hese actions drive cost efficiencies."  AC ¶¶ 279, 283, 285, 289, 297, 304, 310, 318. In any case, any statements opining on continued cost savings fundamentally conflict with the undisclosed facts outlined above.  *See In re Concho Res. Inc. Sec. Litig.*, 2023 WL 2297425, at *10, *15 (S.D. Tex. Feb. 23, 2023) (opinion that project would "maximize ultimate recovery" actionable when "Defendants knew their gamble was far riskier and subject to greater undisclosed costs"), *aff'd in part and rev'd in part on other grounds*, 2023 WL 4146278 (S.D. Tex. June 23, 2023).

---

[5] The holdings Defendants cite (Mot. at 25) are inapposite.  *See Linenweber*, 693 F. Supp. 3d at 678 (no duty to disclose facts not alleged to be "significant" to investors); *Markman*, 2016 WL 10567194, at *8 (no duty to disclose use of faulty food weight labels because no statements made "relate to weights and measures" or "pricing more generally").  Here, the market's severe reaction when the truth emerged dispels any suggestion the omitted facts were *unimportant* to AT&T investors.  *See Cassava Scis.*, 2023 WL 3442087, at *8 ("materiality" of omitted facts "supported by the drops in stock price").  And Defendants spoke directly about the cost benefits associated with copper cable retirement.

**EHS Contingencies and Risks**.  In AT&T's SEC filings, Defendants stated that (i) its network upgrades "may" be more expensive than expected; (ii) its cost transformation initiatives "may" fail to produce their stated savings if they are not managed carefully; and (iii) it "may" incur significant expenses defending its action if its employees engage in misconduct.  AC ¶¶ 384-95.  But these risks were far from hypothetical.  *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015) (warning of "potential risk" in the abstract "implies that no such problems [are] on the horizon").  The manner in which AT&T retired lead cable across the nation significantly *increased* the danger that extensive losses would materialize as discussed above and, indeed, were already beginning to emerge at the time the statements were made.  AC ¶¶ 386, 389, 392, 395.

These disclosures are not inactionable because they address the "very risk" that came to pass. Mot. at 29.  Statements in which an issue is "glossed over as a future risk" are misleading if they fail to warn about "certain dangers," especially ones that "had already begun to materialize." *Marcus v. J.C. Penney Co.*, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015); *see also Concho*, 2023 WL 2297425, at *14 (improper to warn about "ability to efficiently execute large-scale development" without disclosing that it "overexposed Concho's asset portfolio" to high costs).  Were it otherwise, any issuer could escape liability by simply claiming that such a risk is *possible*.  That is not the law. *Lormand*, 565 F.3d at 249 ("To warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible . . . when they have already occurred is deceit.").

Defendants' outcry over *future* legal action is a sideshow.  Mot. at 29-30.  As detailed in AC ¶¶ 198-224, AT&T "was *already* defending several lawsuits arising from its use and/or abandonment of lead-covered cables" at the time of these disclosures.  AC ¶ 386.  And once "risks have already begun to materialize, it is no longer sufficient to generally warn of the possibility of these risks in the future." *Marcus*, 2015 WL 5766870, at *3; *see also Lormand*, 565 F.3d at 246-47 (same).

### 3.     Defendants' Remaining Challenges Are Meritless

**Statute of Repose**.  Defendants posit that the five year statute of repose codified in 28 U.S.C. § 1658(b) bars Plaintiffs from pursuing all claims based on misstatements in AT&T's 2017 Form 10-K, 2017 Annual Report, and July 2018 EHS Issue Brief because each was published before July 28, 2018, *i.e.*, five years before this suit was filed.  Mot. at 31.  Not so.  As alleged, the misstatements in the 2017 filings were expressly incorporated in quarterly reports made by AT&T on August 2, 2018, and November 2, 2018 (AC ¶ 385), and, thus, made in filings published *after* July 28, 2018.  *See York Cnty. v. HP Inc.*, 2024 WL 1327247, at *8 (N.D. Cal. Mar. 27, 2024) (statement outside repose period actionable when "incorporated by reference" in SEC filing within repose period).  As for the Issue Brief, Defendants would have this Court believe that the document "indisputably" shows that it was published on June 29, 2018.  Mot. at 31.  It does not.  The Issue Brief states that its content was "*updated* on" June 29, 2018, without any mention of when it was *published*.  Defs.' Ex. N at 52.  If discovery reveals the Issue Brief was, in fact, published before July 28, 2018, Plaintiffs will dismiss this aspect of their claim, but it would be premature and improper to accept that as incontrovertible fact at this stage.  *See Allen v. Hays*, 65 F.4th 736, 742 n.3 (5th Cir. 2023) (document referenced in pleading cannot be used to negate facts if "nothing in it clearly contradicts" them); *United States v. Health Mgmt. Sys., Inc.*, 2022 WL 976161, at *16 (N.D. Tex. Mar. 31, 2022) (judicial notice not proper when court "cannot accurately and readily determine" fact from source).

**PSLRA Safe Harbor**.  Defendants also argue that the statements predicting continued cost savings are protected by the PSLRA safe harbor. Mot. at 23-24.  The safe harbor is limited by its terms to "forward-looking statement[s]," 15 U.S.C. § 78u-5(c), and, thus, does not protect any part of a "mixed present/future statement" that "refers to the present." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014).  But many statements Defendants cite refer to *present* facts, such as "we're decommissioning equipment . . . day in and day out" and "we're in the midst of

- 18 -

. . . taking a lot of costs out of the business." AC ¶¶ 289, 297, 304, 310, 312, 318. Even those that anticipate "continued" savings (*id.* ¶¶ 283, 285) relay that it is doing so presently. *See Exxon I*, 2022 WL 4677621, at *12 ("continued strong well performance" not forward looking). To the extent any are forward-looking, the warnings Defendants cite cannot shield them from liability because they were incomplete and misleading for the reasons in Point I.A.2. *See In re Apache Corp. Sec. Litig.*, 2022 WL 4277350, at *5 (S.D. Tex. Sept. 15, 2022) (misleading risk warnings are not "meaningful" under safe harbor), *aff'd*, 2022 WL 17324439 (S.D. Tex. Nov. 29, 2022). In addition, the safe harbor offers no protection because the statements were known to be false or misleading (Point I.B).

**Puzzle Pleading**. Defendants' half-hearted attempt to label the AC as a "puzzle pleading" (Mot. at 21-22) is unsupported by the cases they rely on and contradicted by their Motion. In their cases, the pleading did not even "specify *which* of the various statements" in the passages it quoted were actionable, claimed all manner of statements were false or misleading based on the *same* "summary paragraph" of undisclosed facts, and did not "attempt to explain *why*" the statements were misleading, thus "leav[ing] it to the Court to guess." *In re Alamosa Holdings, Inc. Sec. Litig.*, 382 F. Supp. 2d 832, 857 (N.D. Tex. 2005); *see also Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 464 (N.D. Tex. 2018) (similar). Defendants level no such charges, nor could they. To minimize redundancy, the AC groups misstatements by category, uses bold and italics to specify the language that is actionable, alleges that each group is false or misleading for distinct reasons, and states exactly why those misstatements gave a "false impression." AC ¶¶ 278-395. That is more than sufficient. *See In re Lumen Tech., Inc. Sec. Litig.*, 2024 WL 4637293 at *26 (W.D. La. Sept. 30, 2024) (pleading why a "collection of statements is false or misleading" is not a puzzle pleading that requires guesswork), *aff'd*, 2024 WL 4633496 (W.D. La. Oct. 30, 2024); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at *8 (S.D. Tex. Mar. 27, 2019) (using the "same

- 19 -

boilerplate reasons" to allege statements misleading not improper when reasons "logically correspond" to the statements).  Indeed, the Motion itself demonstrates that "Defendants were able to identify the statements and the reasons" with relative ease.  *Cassava Scis.*, 2023 WL 3442087, at *6.

### B.	The AC Raises a Strong Inference of Scienter

Scienter is a state of mind embracing "intent to deceive, manipulate, or defraud" as well as "severe recklessness."  *Lormand*, 565 F.3d at 251; *see also Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408-09 (5th Cir. 2001) (confirming recklessness survived passage of the PSLRA).  Severe recklessness arises when there is "a danger of misleading buyers or sellers which is either known . . . or is so obvious that the defendant must have been aware."  *Spitzberg*, 758 F.3d at 684.

To qualify as "strong" under 15 U.S.C. § 78u-4(b)(2), the inference of scienter must be "cogent and at least as compelling as any opposing inference" drawn from the facts alleged.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The test is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference . . . not whether any individual allegation, scrutinized in isolation" does so.  *Id.* at 323.  Notably, the inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible.'"  *Id.* at 324.  Rather, a "tie" among competing inferences "favors the plaintiff."  *Six Flags*, 58 F.4th at 214.  Here, the AC pleads a host of facts that, individually and in concert, raise an overwhelming inference of scienter for each Defendant.

### 1.	Defendants Misstate the Proper Standard for Scienter

As above, the thesis of Defendants' argument is scienter cannot be pled absent allegations that they believed AT&T would incur material losses from lead cables in the future.  Mot. at 2, 7, 13-15.  That fundamentally misunderstands the law and the facts.  As their own authority states, scienter arises when defendants are "aware of facts that . . . render [their] statements misleading."  *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 430 (5th Cir. 2019); *see also Apache*, 2022 WL 4277350, at *8 (same when party "knew facts or had access to information suggesting that

their public statements were not accurate"). Further to Point I.A.2, none of the misstatements turn on *predictions* about future liability, including the statements on the cost benefits of retiring copper.

Defendants' attempt to fashion such a rule from the three cases in their Motion is unfounded. Mot. at 13-14. Those allegations were needed in *Pier I* because the company disclosed the known facts—high inventory—and allegedly omitted only that there was a "substantial" markdown risk. 935 F.3d at 432. Similarly, the bank in *Owens v. Jastrow*, 789 F.3d 529 (5th Cir. 2015), reported all "red flags" as they arose without disclosing that its mortgage portfolio was allegedly overvalued. *Id.* at 540-44. Those holdings have no import here. *See Spitzberg*, 758 F.3d at 684 (whether defendants "actually believed" oil could be found at site in future is "irrelevant" to whether they knew facts that made statements about present state of site misleading); *see also Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *14 (C.D. Cal. Apr. 12, 2016) ("[T]he PSLRA does not require Plaintiffs to show that Defendants were capable of predicting the future."). Defendants' remaining case is not to the contrary. Scienter was lacking because none of the safety issues reported to the parties provided notice that they amounted to violations of relevant law, the subject of their public statements. *See Edgar v. Anadarko Petroleum Corp.*, 2019 WL 1167786, at *13-17 (S.D. Tex. Mar. 13, 2019).

### 2.  The AC's Allegations Offer Compelling Direct Evidence of Scienter

As provided below, Defendants were aware of the facts that made their statements inaccurate.

**Environmental Stewardship**.  CEO John Stankey openly admitted that the use of lead cables was "well understood" and "has long been known" at AT&T, consistent with the account of CW12 and other operations executives. AC ¶¶ 124, 416. Further, Defendants Stephenson, Stankey, and McElfresh personally analyzed the materials used in AT&T's legacy network to decide whether to "reclaim" them. *Id.* ¶¶ 426-29. Defendants do not—and could not credibly—deny that they knew that AT&T's legacy network had lead cables. Instead, they contend that the AC does not allege that anyone *told* them that these cables were "toxic" or "leaching." Mot. at 4, 11, 14. It need not do so.

The AC pleads many independently knew lead was an environmental toxin.  Stephenson, Stephens, Stankey, and McElfresh were presented with such information in connection with a shareholder proposal on AT&T's lead battery disposal practices for its annual meeting in April 2013, attended by Stephenson.  ¶¶ AC 166-72.  All these Defendants also repeatedly signed lead paint disclosures certifying to this effect in connection with their real estate transactions.  *Id.* ¶¶ 418-25.

Defendants strain to limit the concerns raised in these materials to "an entirely different context" or "certain circumstances" not involving lead cables (Mot. at 15, 16), but fail to draw a meaningful distinction.  The shareholder proposal arose from a report on how the disposal of lead batteries in Mexico was afflicting the local community and AT&T couched its response in terms of "harmful environmental impacts."  *Id.* ¶¶ 166, 171.  In addition, the property disclosures these Defendants signed described lead paint as an "environmental hazard."  *Id.* ¶¶ 419-25.  Thus, they were undeniably on notice that lead, even in its raw form, was an environmental contaminant.

In addition, Defendants were undoubtedly aware that AT&T left lead cables in place rather than recycle them to save money.  Stankey and McElfresh led the team that decided to "reclaim" copper as it was replaced by fiber.  AC ¶¶ 426-29.  The "data analysis" they ran before making that decision necessarily covered the cost of removing the sections covered in lead.  Indeed, frontline workers were told that the decision to retire lead cable in place was "cost saving measure" directed by the "CEO."  *Id.* ¶ 142.[6]  Their "active involvement" in these acts establishes their scienter. *Rougier*, 2019 WL 6111516, at *12; *see also In re Fleming Cos. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *30-31 (E.D. Tex. June 16, 2004) ("personal participation" in misdeeds shows scienter). As stated in AC ¶ 426, the fact that Stephenson personally "monitored and/or oversaw" this project supports the inference he knew too. *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,

---

[6] Defendants assail the CWs, including the CW who provided this statement, for not having any direct contact with the Individual Defendants.  Mot. at 10-11.  The Fifth Circuit has made clear that contact is not needed. *Six Flags*, 58 F.4th at 216 n.18.  CW testimony need only be "connected" to defendants in a persuasive way to raise an inference of scienter. *Id.*  And Defendants do not argue that this CW, or any other, was not in a position to possess the facts provided.

514 F. Supp. 3d 942, 956 (S.D. Tex. 2021).  To the extent Stankey did not know from the outset, he certainly did no later than early 2021, when he learned about the Lake Tahoe Action.  AC ¶ 219.

**Employee Safety**.  Consistent with the falsity allegations, the AC pleads that Defendants were fully aware of the severe health hazards posed by lead, if not from common knowledge, then the lead battery shareholder proposal and their property disclosures, and, further, received regular reports documenting the lack of appropriate training for those who worked with it.  AC ¶¶ 98, 137, 168-72, 420-25.  To the extent Defendants address these facts, they fail to muster a viable response.

In this regard, Defendants' efforts to distinguish the substance of the shareholder proposal and their property disclosures are especially misplaced.  Mot. 15-16.  The shareholder proposal stated that "the neurotoxic and development impacts of lead"—not just lead batteries—were "well-established."  AC ¶ 168.  Similarly, the property forms they signed verified they reviewed a similar disclosure mandated by federal law or, in the case of Stephenson and Stankey, received a lead pamphlet which provided that one source of lead is "*Your Job,*" and cautioned, "*[i]f you work with lead, you could bring it home on your body or clothes*" in the form of dust.  *Id.* ¶¶ 92, 420-24.

Of course, an internal report will support an inference of scienter *by itself* only if there are "corroborating details regarding [its] contents" and it is "connected to the executive in a persuasive way."  *Six Flags*, 58 F.4th at 215-16.  But that rule is satisfied when, as here (AC ¶¶ 135-38), a CW provides a "factual basis" for what a report on a relevant topic would show.  *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 664 (S.D. Tex. 2021); *see also Brody v. Zix Corp.*, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (similar).  Nor is this an instance of pleading mere "access" to the internal reports.  *Exxon I*, 2022 WL 4677621, at* 6.  The safety reports here were sent to all executives, including Stephenson and Stankey, and both were charged with "ultimate responsibility" for employee safety as CEO.  AC ¶ 414.  As such, on a motion to dismiss, it is

reasonable to infer Stephenson and Stankey reviewed those reports as part of their job.

**Cost Savings**.  Stankey and McElfresh were previously told that the careless disposal of lead "can pose reputational and legal risks" to AT&T.  AC ¶ 168.  As explained above, both were also aware that AT&T littered obsolete lead cables across the nation and that the material covering them is a regulated contaminant extremely harmful to human health.  Try as they may to argue otherwise (Mot. at 17), these facts give rise to an obvious risk of adverse action and, hence, losses on a grand scale.  Analysts warned that AT&T faced $59 billion in potential cleanup costs *three days* after the first *WSJ* article and downgraded the stock because of that very risk.  AC ¶¶ 251-54.  Within weeks of this news, AT&T faced a series of government investigations, including a Superfund investigation by the EPA and civil inquiry by the DOJ.  *Id.* ¶¶ 255-56.  Indeed, the potential for broader liability is seemingly why AT&T repudiated its agreement to pull the lead cables out of Lake Tahoe once it caught wind that the extent of its remaining lead cables would become national news.  *Id.*  ¶¶ 257-61.  To claim Stankey and McElfresh did not appreciate the *risk* of these losses—particularly when the lead was disposed in a manner contrary to AT&T's ESG disclosures—strains credulity.  Finally, Desroches provided frequent and detailed disclosures about the cost benefits of removing copper (AC ¶¶ 297, 299, 308, 315), showing he had "substantial familiarity" with the topic.  *Home Solutions of Am. Inv. Grp. v. Fradella*, 2008 WL 1744588, at *9 (N.D. Tex. Mar. 24, 2008).

**EHS Contingencies**.  For the same reasons, Defendants knew AT&T faced a more than theoretical risk that it could incur considerable expenses defending or correcting its actions which would, in turn, alter the cost structure of its network upgrades.  Stankey saw that this risk was starting to manifest when he learned about the Lake Tahoe Action.  AC ¶ 219.  Defendants feign that he could not be aware that AT&T faced broader risk from an "isolated lawsuit."  Mot. at 16-17.  But Stankey knew AT&T's lead cables were not confined to Lake Tahoe, and Defendants candidly admit

elsewhere that the Lake Tahoe Action "indicat[ed] that AT&T's lead-clad cables crossed the country and could be the subject of litigation." Mot. at 4 n.2. Nor is it of any consequence that the Lake Tahoe Action was "public." Mot. at 16. In the case Defendants cite, the alleged "red flags" were disclosed to the public *by defendants*, negating an inference they intended to deceive. *Owens*, 789 F.3d at 540. Here, in contrast, the facts were raised by the CSPA and AT&T publicly *denied* them. AC ¶ 221. In fact, AT&T's removal of all cable tags around Lake Tahoe identifying it as owner after the matter was brought to the attention of Stankey (AC ¶¶ 211, 222) is further evidence of scienter. *See In re Nature's Sunshine Prods. Sec. Litig.*, 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter.").

**Corporate Scienter**. To determine if a corporate defendant acted with scienter, courts look to the state of mind of the individual who made, issued, or approved a statement rather than "the collective knowledge of all . . . employees." *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004). Thus, the AC pleads scienter for AT&T to the extent it pleads scienter for any individual who made a misstatement, and Defendants do not argue otherwise.

Nevertheless, Defendants submit that *no one* can be liable for the statements in the Issue Briefs because those publications are not "attributed" to anyone other than AT&T. Mot. at 9. Defendants misstate the record. Each formal CSR issued by AT&T during the Class Period began with a personal letter from Defendant Stephenson or Stankey that introduced it, with Stankey's letters all referring to the contents of "[t]his report" or otherwise inviting all to "read on." Exs. 4-8. As alleged, each of these CSRs expressly referred readers to the Issue Briefs on AT&T's website for additional information and, thus, incorporated them into the CEO-approved CSR. AC ¶ 71. In fact, the 2021 and 2022 CSRs all included direct hyperlinks to the Waste Management and/or EHS Issue Briefs containing the misstatements at issue here. Ex. 7 at 260, 268; Ex. 8 at 306.

Even if *arguendo* the Issue Briefs were unattributed, AT&T is still culpable.  AT&T itself told the government that it has "nearly 30,000 employees" who could contact lead cable in its network.  AC ¶ 175.  AT&T itself reported every stretch of copper wire that it retired to the FCC. *Id.* ¶¶ 191-96.  AT&T itself reported the lead handled at its facilities as a RCRA-regulated hazardous waste to the EPA.  *Id.* ¶¶ 189-90.  And AT&T itself told regulators that it accepted the scientific literature on the harmful effects of lead.  *Id.* ¶¶ 182-83.  Plaintiffs respectfully submit that holding AT&T liable under these circumstances is not inconsistent with *Southland*.  The misstatements were made *by AT&T* and the above admissions were made *by AT&T*.  *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 700 (5th Cir. 2005) (representations in government filings that contradict public statement "strengthen[s]" inference that "IPaxess intended to deceive").  Were the Court to hold otherwise, companies would have broad license to issue misrepresentations in "unattributed" publications—a result that cannot be squared with the remedial policies that undergird the federal securities laws.

*    *    *

In sum, there is no merit to Defendants' "group pleading" arguments.  Mot. at 8-11.  As their own authority makes clear, "[t]he fact that . . . allegations pertain to more than one person does not make them group pleading." *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 184 (5th Cir. 2019).  The detailed, party-specific allegations discussed above dispel any suggestion that the AC relies on improper "general allegations of scienter." *Id.*; *see also Owens*, 789 F.3d at 538 n.4.

### 3.    The AC Pleads Strong Circumstantial Evidence of Severe Recklessness

"Congress plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence." *Nathenson*, 267 F.3d at 410.  And because "[t]he PSLRA neither mandated nor prohibited *any* particular method of establishing a strong inference of scienter" *any* competent form of "circumstantial evidence" can support such an inference, including allegations of motive to defraud.  *Id.*  The AC pleads such evidence in spades.

**First**, while a motive to defraud is *not* required to raise a strong inference of scienter, *Spitzberg*, 758 F.3d at 685, this form of circumstantial evidence can "meaningfully enhance the strength of the inference of scienter" when "considered together with other allegations." *Owens*, 789 F.3d at 539-40. "To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the . . . nondisclosures alleged." *Six Flags*, 58 F.4th at 215. Notably, the Fifth Circuit recently confirmed that such benefits need not be "pecuniary" in nature to provide an adequate motive. *Id.* at 218. The AC pleads that Defendants had ample motive to conceal AT&T's ownership of a 200,000 mile environmental hazard (1) given the unthinkable cost to clean up an issue of such scope; and (2) to protect their outsized incentive compensation. AC ¶¶ 435-52.

The first is not, as Defendants claim, a generic motive "universally held" by all executives. Mot. at 11. Far from simply striving to "pay down debt," as would any officer, Defendants sought to avoid triggering a nationwide environmental liability specific to AT&T. AC ¶¶ 436-40. Moreover, a motive, even a common one, is not generic when facts show it was "more than routine" for the company. *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017); *see also Owens*, 789 F.3d at 539 (need to raise capital was "not merely desirable, but necessary" for survival of business). Thus, courts have upheld the motive to "avoid a . . . write-down which would have erased the Company's entire annual profit." *Hall v. Rent-A-Center, Inc.*, 2017 WL 6379334, at *12 n.8 (E.D. Tex. Dec. 14, 2017).[7] Given the sheer scope of this issue, the cleanup costs here almost eclipsed AT&T's annual *revenue* (AC ¶ 39), much less profit. In addition, a desire to stay consistent with the repeated message that AT&T was eliminating legacy network costs is no different than the motive to "save face" on earlier representations recently affirmed by the Fifth Circuit. *Six Flags*, 58 F.4th at 218; *see also Spitzberg*, 758 F.3d at 686 ("pressure" to "substantiate" prior statements supported scienter).

---

[7] Neither of Defendants' cases (Mot. at 11) categorically refused to accept the desire to avoid an unusually large liability as a proper motive. *See Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 690 (N.D. Tex. 2022) (motive to not designate oil wells as abandoned reflected generic desire to "increase profits" held by every company); *Alamosa*, 382 F. Supp. 2d at 859 (same for motive to sell shares to "pay down Alamosa's debt").

As for the second, there is no brightline rule that incentive pay cannot supply proper motive. Mot. at 11-12. To the contrary, "performance-based compensation can establish motive" when "the potential bonus is extremely high and other allegations support an inference of scienter." *Six Flags*, 58 F.4th at 215. As shown in Exhibit 9, Defendants received awards totaling 247% to 1,646% of their base pay based on the achievement of metrics tied directly to cost containment or AT&T's stock price. AC ¶¶ 441-52. That is well within the range considered extremely high. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir. 2005) (175% of base pay is adequate to plead motive); *see also See Six Flags*, 58 F.4th at 215 (same for 300% to 600% of base pay). Defendants' attempt to argue their pay was not unusual "for executives of a Fortune 10 company" (Mot. at 12) imposes a requirement that does not exist and exposes the folly of their position.

**Second**, the inference that Defendants were aware not only of the lead cables in AT&T's network but that they were being retired in place is supported by the "core operations" doctrine. Four factors may "tip the scales" in favor of inferring that top executives have scienter, including: (1) a company's size; (2) if the matter at issue was "critical to the company's continued vitality"; (3) if the omitted information would be "readily apparent" to the speaker; and (4) the internal consistency of the public statements. *Six Flags*, 58 F.4th at 219. No single factor is dispositive. *Id.*

AT&T is undoubtedly a large company, but all other factors weigh heavily in favor. By the start of the Class Period, AT&T's legacy network provided service to 84% of its wireline customers and accounted for a substantial part of its overall revenue (AC ¶¶ 457-58). *See Rougier*, 2019 WL 6111516, at *12 (product representing 50% of revenue supports inference); *In re OCA, Inc. Sec. & Deriv. Litig.*, 2006 WL 3747560, at *18 (E.D. La. Dec. 14, 2006) (same for "most significant asset"). What is more, the transition from copper to fiber was at the heart of AT&T's growth strategy during the Class Period and became its *sole* focus after its media assets were disbanded (AC ¶¶ 459-60).

*See Concho*, 2023 WL 2297425, at \*20-21 (importance of "transition" to new business strategy for future growth supports inference).  As such, Stephenson, Stankey, and McElfresh *personally reviewed* the composition of AT&T's legacy network and AT&T's accounting group booked charges in excess of $1 billion for retiring copper—an amount unlikely to be publicly reported without scrutiny by Stephens or Desroches—based on its *salvage value* (AC ¶¶ 426-30, 434-44), "implying they knew details" on those topics.  *Six Flags*, 58 F.4th at 219.  Reinforcing the inference, AT&T flip-flopped on its commitment to remove the lead cables it left at the bottom of Lake Tahoe once news broke about the extent remaining in its network.  AC ¶¶ 220-24, 257-62.  AT&T also previously said it "no longer owns the cables" there (AC ¶ 221), but later admitted did.  *See* Ex. 10.

Defendants are wrong to suggest that this doctrine applies *only* to small companies.  Mot. at 18.  Their own cases explain that all factors—including the size of the company—are needed for this principle to establish scienter *by itself*.  *See Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes*, 810 F.3d 951, 958 (5th Cir. 2016).  The Fifth Circuit's decision in *Six Flags* confirms that such allegations can "contribute" to a scienter inference for a large company based on two of the three remaining factors.  58 F.4th at 219.  All three remaining factors are present here.

**Third**, Stephenson and Stankey held themselves out as the face of AT&T's all-important ESG programs.  AC ¶¶ 464-65.  This supports the inference they were aware AT&T was leaving its toxic cables across the country to decompose into the environment or reckless in not knowing.  *See BP*, 843 F. Supp. 2d at 783 (acting as "spokesperson and champion for BP's reform efforts weigh[s] strongly in favor of the inference that [defendant] paid special attention to BP's process safety" or was "reckless in not doing so"); *see also SolarWinds*, 595 F. Supp. 3d at 584 (similar).

**Fourth**, AT&T is now embroiled in several government investigations, including a civil inquiry by the DOJ into whether it had *knowledge* about the environmental and human health risks

posed by lead cables.  AC ¶ 256.  That these investigations remain ongoing (AC ¶ 272) is "relevant" to the scienter analysis.  *Exxon I*, 2022 WL 4677621, at \*4; *see also Del. Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 630 (S.D. Tex. 2022) (collecting cases).

**Fifth**, Defendants signed SOX certifications attesting that they designed controls to *ensure* that material information was provided to them for each filing.  AC ¶¶ 411-12.  While not indicative of scienter on their own, such certifications can be if "the officer who signed [them] had a reason to know" that the filing contained misleading information due to "red flags."  *Asar*, 768 F. App'x at 187.  As stated above, the Individual Defendants were aware of glaring red flags that AT&T's risk disclosures were misleadingly incomplete.  *See OCA*, 2006 WL 3747560, at \*22 (SOX certification can contribute to inference of scienter, "when combined with [other] allegations"); *see also Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 854 (N.D. Tex. 2018) (similar).

### 4.      The Inference of Scienter Is Overwhelming

Unable to offer a coherent, much less compelling, explanation to the mountain of evidence against them, Defendants reason that lead cables were used for decades, not hidden from regulators, discussed at private conferences with other lead cable owners, and the lead cable lawsuits AT&T faced did not open the floodgates to further litigation.  Mot. at 19.  But none of those matters bear a metaphorical thread to whether they intended to deceive *public investors*.  Indeed, several were only possible because the public had *no idea* about the cables until July 2023.  AC ¶¶ 242, 398.  And while AT&T told regulators that some lead cables remained in its network, it assured that they would ultimately be "removed" and either "recycled" or sent to a "reclamation facility."  *Id.* ¶¶ 118, 164.  Stripped of Defendants' conjecture, the facts alleged all point to the commonsense inference that Defendants fully understood the dangers posed by lead but chose to abandon AT&T's lead-covered infrastructure as a cost-cutting expedient to protect their outsized contingent pay during AT&T's capital investment in fiber and hid this from all—investors and regulators alike—to avoid exposing a

nationwide source of potential contamination.   Indeed, it is difficult to divine *any* competing inference for why Defendants would conceal these facts and make representations to the contrary.

### C.   The AC Adequately Pleads Loss Causation

Loss causation refers to the "causal connection" between the misstatements and plaintiffs' losses.   *Dura*, 544 U.S. at 342. Because such allegations are subject to Rule 8 notice pleading, a plaintiff need only allege that the stock price declined after a "relevant truth" concealed by the fraud became known.   *Pub. Emps. Ret. Sys. of Miss. v. Amedisys*, 769 F.3d 313, 320 (5th Cir. 2014).   Such a disclosure need not "mirror an earlier misrepresentation" or "reveal that [it] was fraudulent." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230-31 (5th Cir. 2009).   Indeed, the relevant truth can leak out "in a series of partial disclosures."   *Lormand*, 565 F.3d at 261 & n.31.

Defendants do not deny that Plaintiffs plead loss causation for AT&T common shares and, thus, concede that each decline was preceded by the disclosure of a new "relevant truth."   Instead, they ask the Court to categorically dismiss Plaintiffs' claims as to all AT&T *bonds* because there is purportedly no indication "the price of any of the bonds dropped."   Mot. at 32.   Thus, Defendants challenge Plaintiffs' *losses*, not their *cause*.   The same argument was rejected in *Ong. v. Sears, Roebuck & Co.*, 459 F. Supp. 2d 729 (N.D. Ill. 2006).   The Court held that specific declines in Sears' common stock coupled with the allegation of a general decline in its debt securities was "more than sufficient to give . . . 'some indication of the loss'" under Rule 8 even though "Plaintiffs have not alleged specific price declines in [two debt] Offerings" they purchased in.   *Id.* at 746.   So too here. In addition to the specific declines in AT&T common stock, the AC alleges that "the price of AT&T securities," not just common stock, "fell in response to each such disclosure," and Plaintiffs "acquired AT&T securities at artificially inflated prices . . . and were damaged thereby" as set forth in their certifications, which detail substantial losses on the AT&T bonds they purchased.   AC ¶¶ 16, 468.   Further, Exhibit 11 shows that the price of the 52 bonds they purchased during the Class Period

- 31 -

dropped after many of the corrective disclosures.  *See Linenweber*, 693 F. Supp. 3d at 674 (courts

may take notice of stock prices).  For example, the bonds ending RGD8, RKB7, and RKJ0 sustained

declines on *all* the same dates as AT&T common stock.  Ex. 11.  But even declines that take more

than a day to surface are sufficient at the pleading stage.  *See Lormand*, 565 F.3d at 266 n.33.[8]

## II.    PLAINTIFFS STATE A CONTROL PERSON CLAIM

A claim under Section 20(a) of the Exchange Act requires a primary violation and control

over that person.  *Ramirez*, 334 F. Supp. 3d at 859.  Conceding control, Defendants move to dismiss

solely for failure to plead a primary violation.  Mot. at 32.  Plaintiffs do so as set forth above.

## III.    DISMISSAL IS NOT WARRANTED BUT SHOULD BE WITHOUT PREJUDICE

In the Motion, Defendants demand that the Court dismiss the AC with prejudice because the

defects "cannot be cured."  Mot. at 3, 7, 32.  Nonsense.  While Plaintiffs respectfully submit that

dismissal is not warranted for all the reasons above, the vast majority of arguments that Defendants

raise—tenuous as they are—seek dismissal on the ground that the AC fails to plead *sufficient facts*.

Accordingly, any dismissal should be without prejudice.  *See Whitworth v. Mouser Elecs., Inc.*, 2010

WL 4628068, at *3 (N.D. Tex. Nov. 8, 2010) ("insufficient factual allegations" can be "cured" by

amendment); *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 595 (N.D. Tex. 2004) (dismissing

without prejudice when "it is possible that Plaintiffs could amend . . . to state a claim").

### CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' Motion in its entirety.

---

[8] To the extent Defendants are suggesting Plaintiffs must plead a decline in *every* AT&T bond included in the Class, they are mistaken.  It is well-established that a lead plaintiff may bring claims on behalf of purchasers of *other* securities when, as here, the claims arise from "the same material misstatements."  *Fleming*, 2004 WL 5278716, at *37 n.7; *see also In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 WL 2608243, at *3 (S.D. Tex. June 15, 2017) ("[S]tock purchasers can represent purchasers of debt instruments" they did not buy "and vice versa").  But that does not mean that such a plaintiff "must further allege specific price declines in every . . . outstanding debt series" that it neither bought nor suffered.  *Ong*, 459 F. Supp. 2d at 745.  Indeed, *Cobalt* and *Fleming* each held that the plaintiff—who brought claims on behalf of purchasers of common stock *and* notes—pled loss causation by alleging declines in the price of the common stock it purchased without any mention of the price of notes purchased by absent class members.  *See In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 WL 215476, at *6 (S.D. Tex. Jan. 19, 2016); *Fleming*, 2004 WL 5278716, at *42.

Dated:  November 5, 2024                           Respectfully submitted,

**POMERANTZ LLP**                                  **THE BRISCOE LAW FIRM**

 */s/ Jeremy A. Lieberman*                          */s/ Willie C. Brisco*
Jeremy A. Lieberman                                Willie C. Briscoe
Justin D. D'Aloia                                  12700 Park Central Drive, Suite 520
600 Third Avenue, 20th Floor                       Dallas, Texas  75251
New York, New York 10016                           Telephone: (972) 521-6868
Telephone: (212) 661-1100                          Facsimile: (281) 254-7789
Facsimile: (917) 463-1044                          wbriscoe@thebriscoelawfirm.com
jalieberman@pomlaw.com
jdaloia@pomlaw.com                                 *Local Counsel for Plaintiffs*

*Counsel for Plaintiffs and Lead Counsel for
the Class*

- 33 -