**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| IN RE AT&T INC. SECURITIES LITIGATION | Case No. No. 3:24-cv-01196-N<br><br>CLASS ACTION |

**APPENDIX IN SUPPORT OF
PLAINTIFFS' MOTION FOR LEAVE TO FILE
<u>SUPPLEMENT TO APPENDIX IN OPPOSITION TO MOTION TO DISMISS</u>**

Court-appointed lead plaintiffs Teachers' Retirement System of the City of New York, the New York City Employees Retirement System, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, and the Board of Education Retirement System of the City of New York (collectively, "Plaintiffs") submit this Appendix in Support of Plaintiffs' Motion for Leave to File Supplement to Appendix in Opposition to Motion to Dismiss.

| Exhibit | Description | Pages |
|---|---|---|
| N/A | Declaration of Justin D. D'Aloia | n/a |
| A | The Class Action Complaint and Demand for Jury Trial, as filed in *Wappinger, NY v. Verizon Communications Inc. et al.*, No. 160566/2024 (N.Y. Sup. Ct.) | 1-97 |
| B | The Plaintiff's Verified Shareholder Derivative Complaint, as filed publicly in a redacted form in *Roy v. Stephenson et al.,* No. 2024-1156 (Del. Ch.) | 98-162 |

Dated:  November 27, 2024                          Respectfully submitted,

**POMERANTZ LLP**                                 **THE BRISCOE LAW FIRM**

*/s/ Jeremy A. Lieberman*                          */s/ Willie C. Brisco*
Jeremy A. Lieberman                               Willie C. Briscoe
Justin D. D'Aloia                                 12700 Park Central Drive, Suite 520
600 Third Avenue, 20th Floor                      Dallas, Texas  75251
New York, New York 10016                          Telephone: (972) 521-6868
Telephone: (212) 661-1100                         Facsimile: (281) 254-7789
                                                  wbriscoe@thebriscoelawfirm.com

Facsimile: (917) 463-1044
jalieberman@pomlaw.com                          *Local Counsel for Plaintiffs*
jdaloia@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for the
Class*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| IN RE AT&T INC. SECURITIES LITIGATION | Case No. 3:24-cv-01196-N<br><br>CLASS ACTION |

## DECLARATION OF JUSTIN D. D'ALOIA

I, Justin D'Aloia, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.　　I am a partner at Pomerantz LLP, counsel for court-appointed lead plaintiffs Board of Education Retirement System of the City of New York, New York City Employees' Retirement System, New York City Fire Department Pension Fund, New York City Police Pension Fund, and the Teachers Retirement System of the City of New York (collectively, "Plaintiffs"), and I am admitted to appear before the Court *pro hac vice* as counsel for Plaintiffs in the above-captioned action (the "Action").  I have personal knowledge of the matters set forth herein and, if called upon, would testify thereto.

2.　　Attached as Exhibit A is a true and correct copy of The Class Action Complaint and Demand for Jury Trial, as filed on November 12, 2024, in the matter captioned *Wappinger, NY v. Verizon Communications Inc. et al*, No. 160566/2024 (N.Y. Sup. Ct.).

3.　　Attached as Exhibit B is a true and correct copy of The Plaintiff's Verified Shareholder Derivative Complaint, as filed publicly in redacted form on November 15, 2024, in the matter captioned *Roy v. Stephenson et al,* No. 2024-1156 (Del. Ch.).

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of November, 2024, in New York, New York.

　　　　　　　　　　　　　　　　　　　　　　*/s/ Justin D. D'Aloia*

　　　　　　　　　　　　　　　　　　　　　　Justin D. D'Aloia

1

# EXHIBIT A

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

TOWN OF WAPPINGER, NY, ON BEHALF OF ITSELF
AND ALL OTHERS SIMILARLY SITUATED
   *Plaintiff,*

-*vs* -

VERIZON COMMUNICATIONS INC., VERIZON NEW
YORK, INC., MCIMETRO ACCESS TRANSMISSION
SERVICES LLC, MCI COMMUNICATIONS SERVICES
LLC dba VERIZON BUSINESS SERVICES,
METROPOLITAN FIBER SYSTEMS OF NEW YORK,
INC., XO COMMUNICATIONS SERVICES, LLC;
AMERICAN TELEPHONE AND TELEGRAPH COMPANY,
AT&T ENTERPRISES, LLC, AT&T COMMUNICATIONS
OF NEW YORK, INC., SBC LONG DISTANCE, LLC, TC
SYSTEMS, INC.; FRONTIER TELEPHONE OF
ROCHESTER, INC., FRONTIER COMMUNICATIONS OF
SENECA-GORHAM, INC., OGDEN TELEPHONE
COMPANY, FRONTIER COMMUNICATIONS OF
SYLVAN LAKE, INC., FRONTIER COMMUNICATIONS
OF AUSABLE VALLEY, INC., CITIZENS
TELECOMMUNICATIONS COMPANY OF NEW YORK,
INC., FRONTIER COMMUNICATIONS OF AMERICA,
INC., FRONTIER COMMUNICATIONS OF NEW YORK,
INC., FRONTIER COMMUNICATIONS OF ROCHESTER,
INC.; CHAUTAUQUA & ERIE COMMUNICATIONS, INC
dba CHAUTAUQUA & ERIE TELEPHONE
CORPORATION; CONSOLIDATED COMMUNICATIONS
OF NEW YORK COMPANY dba TACONIC TELEPHONE
CORPORATION; WINDSTREAM NEW YORK, INC.;
ONTARIO & TRUMANSBURG TELEPHONE
COMPANIES dba TRUMANSBURG TELEPHONE
COMPANY, INC.; DFT COMMUNICATIONS
CORPORATION dba DUNKIRK AND FREDONIA
TELEPHONE COMPANY; and DOE DEFENDANTS 1-20,

   *Defendants.*

Index No.

**CLASS ACTION
COMPLAINT AND DEMAND
FOR JURY TRIAL**

Trial by jury is desired in the
County of New York

Venue is designated pursuant to
CPLR § 503(a) & (c) in that the
causes of action occurred in this
county.

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

**2**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 2

JURISDICTION AND VENUE ..................................................................................................... 8

PARTIES ...................................................................................................................................... 13

    A.   PLAINTIFF........................................................................................................................ 13

    B.   VERIZON DEFENDANTS................................................................................................ 15

    C.   AT&T DEFENDANTS ...................................................................................................... 17

    D.   FRONTIER DEFENDANTS.............................................................................................. 18

    E.   CONSOLIDATED COMMUNICATIONS DEFENDANTS ........................................... 20

    F.   WINDSTREAM NEW YORK, INC. ............................................................................... 21

    G.   TRUMANSBURG TELEPHONE COMPANY, INC ...................................................... 22

    H.   DUNKIRK AND FREDONIA TELEPHONE COMPANY ............................................ 22

    I.   DOE DEFENDANTS 1-20................................................................................................ 23

FACTUAL ALLEGATIONS ....................................................................................................... 25

    A.   DEFENDANTS' TOXIC LEAD CABLES ..................................................................... 25

    B.   LEAD POSES SIGNIFICANT HEALTH RISKS............................................................ 57

    C.   EXPOSURE TO DEFENDANTS' LEAD-SHEATHED CABLES PUTS THE PUBLIC AT A HEIGHTENED RISK OF DEVELOPING FUTURE LEAD-RELATED CONDITIONS 62

    D.   DEFENDANTS WERE AWARE OF THE RISKS PRESENTED BY THE TOXIC LEAD CABLES BUT DID NOT TAKE MEANINGFUL ACTION. ...................................... 64

    E.   LAWMAKERS ARE DEMANDING THAT DEFENDANTS TAKE ACTION TO REMEDIATE THE SIGNIFICANT RISKS POSED BY THEIR TOXIC LEAD CABLES ... 66

    F.   PLAINTIFF AND CLASS MEMBERS MUST BE MEDICALLY MONITORED FOR FUTURE LEAD-RELATED CONDITIONS................................................................. 67

    G.   THE AVOIDABLE CRISIS NEEDS TO BE RECTIFIED ............................................ 68

TOLLING / FRAUDULENT CONCEALMENT ........................................................................ 70

SUCCESSOR LIABILITY ........................................................................................................... 72

ALTER EGO LIABILITY ............................................................................................................ 73

CLASS ACTION ALLEGATIONS ............................................................................................. 73

CAUSES OF ACTION ................................................................................................................. 78

    COUNT 1: Negligence (Including Gross Negligence) ........................................................ 78

    COUNT 2: Negligence Per Se ............................................................................................. 83

COUNT 3: Common Law Public Nuisance..................................................................... 84

COUNT 4: Restitution ................................................................................................. 88

COUNT 5: Indemnification ......................................................................................... 89

PRAYER FOR RELIEF................................................................................................... 91

JURY DEMAND ............................................................................................................ 93

iii

**4**

Plaintiff TOWN OF WAPPINGER, NY ("Plaintiff"), on behalf of itself and all others similarly situated, by and through the undersigned counsel, hereby files this Class Action Complaint, on behalf of itself and all others similarly situated, against Defendants, VERIZON COMMUNICATIONS INC., VERIZON NEW YORK, INC., MCIMETRO ACCESS TRANSMISSION SERVICES LLC, MCI COMMUNICATIONS SERVICES LLC dba VERIZON BUSINESS SERVICES, METROPOLITAN FIBER SYSTEMS OF NEW YORK, INC., XO COMMUNICATIONS SERVICES, LLC; AMERICAN TELEPHONE AND TELEGRAPH COMPANY, AT&T ENTERPRISES, LLC, AT&T COMMUNICATIONS OF NEW YORK, INC., SBC LONG DISTANCE, LLC, TC SYSTEMS, INC.; FRONTIER TELEPHONE OF ROCHESTER, INC., FRONTIER COMMUNICATIONS OF SENECA-GORHAM, INC., OGDEN TELEPHONE COMPANY, FRONTIER COMMUNICATIONS OF SYLVAN LAKE, INC., FRONTIER COMMUNICATIONS OF AUSABLE VALLEY, INC., CITIZENS TELECOMMUNICATIONS COMPANY OF NEW YORK, INC., FRONTIER COMMUNICATIONS OF AMERICA, INC., FRONTIER COMMUNICATIONS OF NEW YORK, INC., FRONTIER COMMUNICATIONS OF ROCHESTER, INC.; CHAUTAUQUA & ERIE COMMUNICATIONS, INC dba CHAUTAUQUA & ERIE TELEPHONE CORPORATION; CONSOLIDATED COMMUNICATIONS OF NEW YORK COMPANY dba TACONIC TELEPHONE CORPORATION; WINDSTREAM NEW YORK, INC.; ONTARIO & TRUMANSBURG TELEPHONE COMPANIES dba TRUMANSBURG TELEPHONE COMPANY, INC.; and DFT COMMUNICATIONS CORPORATION dba DUNKIRK AND FREDONIA TELEPHONE COMPANY and DOE DEFENDANTS 1-20, fictitious names whose present identifies are unknown (collectively "Defendants"), and alleges, upon information and belief, as follows:

1

**5**

## <u>INTRODUCTION</u>

1.      This is a Class Action brought on behalf of Plaintiff individually, and on behalf of all others similarly situated, for relief in the form of abatement of nuisance, actual damages, treble or multiple damages and civil penalties as allowed by statute, punitive damages, exemplary damages, disgorgement of unjust enrichment, equitable and injunctive relief, forfeiture, disgorgement, restitution and/or divesture of proceeds and assets, and for attorneys' fees, costs of expenses of suit, and pre- and post-judgment interest, by Plaintiff and Class Members for injuries arising from the intentional, knowing, reckless and/or negligent acts and/or omissions of Defendants in their negligent operation, assessment, and disposal of a sprawling network of toxic lead-sheathed telecommunications cables, which resulted, and continues to result, from Defendants using Plaintiff and Class Members as part of a massive, undisclosed human health experiment without the knowledge and/or consent of Plaintiff or Class Members. Plaintiff's allegations are based on either personal knowledge, as to allegations focusing on the experience of Plaintiff, or on investigation by counsel based on publicly available information, as to all other allegations.

2.      Under New York common law, a public nuisance claim exists for conduct that amounts to a substantial interference with the exercise of a common right of the public, thereby offending public morals, interfering with use by the public of a public place, or endangering or injuring the property, health, safety, or comfort of a considerable number of persons.

3.      Defendants' conduct has created, contributed to, and maintained a statutory and common law public nuisance and a condition that endangers the safety, health and wellbeing of the public in the communities governed by Plaintiff and Class Members. The public is exposed to

2

**6**

dangerous lead poisoning, the extent of which would be reduced in New York if Defendants followed prudent decommissioning policies.

4. Lead is a hazardous substance on New York State's list of hazardous substances (6 NYCRR Section 597.3).

5. This case is about one thing: corporate greed. Defendants put their desire for profits above the health and well-being of residents in the geographic area of Plaintiff and Class Members—at the cost of Plaintiff and Class Members. Defendants' profit-driven decision to leave dangerous lead cables in place, even after they became outdated and obsolete, violates New York law. That decision endangered—and endangers—the public, including those whose work brings them in constant direct physical contact with these lead cables. Defendants have known about this danger to the public for decades but have made a decision to put profit above people, and to expose countless numbers of residents to dangerous levels of lead.

6. Plaintiff and Class Members each spend enormous sums each year to provide and pay for health care, services, pharmaceutical care and other necessary services and programs on behalf of residents who are indigent or otherwise eligible for services. Plaintiff and Class Members also provide a wide range of other services to their residents, including services for families and children, and public assistance. Plaintiff and Class Members are also responsible for either partially or fully funding a medical insurance plan for their employees. In recent years, Plaintiff and Class Members have been forced to expend exorbitant amounts of money, described further below, as a direct result of the actions of Defendants.

7. Lead is toxic to humans – and no amount of contact with lead is safe. Lead exposure presents many significant health risks, including damage to the central nervous system, kidney problems, cardiovascular problems, reproductive problems, cancer, and behavior and learning

3

7

problems. Individuals exposed to lead may or may not show contemporaneous symptoms. Lead can cause health problems shortly after exposure. However, lead can also be stored inertly in the bones and other locations in the body for decades without causing immediate symptoms, and be released from those locations back into circulation years or decades later, causing lead-related health problems long after the initial exposure. Furthermore, exposure to lead impairs development of the central nervous system in species that have central nervous systems, including birds, fish and mammals (including humans), at blood lead levels as low as can be measured. The Department of Health and Human Services and the Environmental Protection Agency have both determined that exposure to lead delays the onset of puberty in female mammals, including female humans, and that exposure to lead causes sterility in male mammals (including humans).

8.      At various times since before the 1960s, Defendants owned, operated and managed telecommunications networks in New York State. The infrastructure owned, operated and managed by Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

9.      Defendants' predecessors—including corporate affiliates of the Bell Telephone Company and American Telephone & Telegraph Company (AT&T)—laid nearly all the cables in question, as they built out telephone service across the U.S. The cables have a thick jacket of lead for insulation, to prevent corrosion and to keep out water. After the breakup of the Bell telephone system in the 1980s, Defendants took ownership and control of the lead-sheathed cables in the locations in which they operated, including New York. When technology advanced and Defendants turned to plastic sheathing and, later, fiber optics, they abandoned many of the old lead-sheathed cables in place, as well as the lead that washed off the cables into the surrounding environment – rather than properly disposing of those materials as required by New York law.

**8**

10.     For many years, Defendants have known that the lead-covered cables existed, that lead was potentially leaching into the environment surrounding the cables, and that the cables created significant risks of human and animal exposure. Defendants, however, have not meaningfully acted to mitigate the health risks to the individuals who work near the cables, nor made adequate efforts to monitor or dispose of the cables.

11.     Defendants' toxic lead cables have been poisoning the surrounding environment for decades, and individuals who come into contact with the cables and surrounding environment are at a heightened risk of lead exposure. For example, telecom workers have reported that lead-sheathed telecommunications cables often have a dusting of silvery lead so soft and thick that people would at times scribble messages in it, and numerous studies over the past 50 years have shown that utility workers who work with or near the cables have elevated levels of lead in their bodies and a number of significant health issues. Further, as the lead in the cables degrades, it leaches into the surrounding soil, water and sediment, exposing those who come in contact with that environment to a heightened risk of lead poisoning. According to recent reporting by the *Wall Street Journal*, independent testing of water and soil samples near Defendants' and other similar lead-sheathed telecommunications cables shows that the cables are tainting the environment in and around many communities, including near schools and children's play areas.

12.     Defendants' failure to properly assess and dispose of the cables and the lead that has leached off the cables into the surrounding environment has caused a public health crisis by unnecessarily exposing individuals in New York and other states to toxic lead. Defendants have thus significantly contributed to, and continue to contribute to, the existence of a public nuisance that injures the community living in the communities governed by Plaintiff and Class Members, and surrounding areas. Defendants also failed to warn the public or consumers of its potential to

5

**9**

contribute to pollution in the soil and waterways and failed to warn the public or consumers of the potential harms caused by their actions and inaction. Defendants' repeated and persistent omissions and misleading statements relating to the actual and threatened harms caused by lead-sheathed cables in New York also violate New York General Business Law § 349.

13.     Defendants have betrayed their obligations under New York law through a persistent course of misconduct, all while failing to take the necessary steps—or any steps at all—to prevent toxic lead poisoning in this state. Indeed, there are numerous commonsense, scientifically grounded policies and practices that, if implemented, would reduce the harms posed by this environmental catastrophe.

14.     The population in the Town of Wappinger and other geographic areas in New York have been exposed to lead from these toxic cables for years. That exposure has significantly increased the public's risk of developing lead-related health conditions, and thus Plaintiff and Class Members require a program of medical surveillance for those residing and working within their geographic areas, to permit the earliest possible diagnosis of illnesses, which could lead to improved outcomes, prolongation of life, relief of pain, and minimization of disability.

15.     The causes of action and claims for relief of Plaintiff and Class Members arise from the injuries occurring within the State of New York; the injuries were caused by actions either in the State of New York or by Defendants' acts or omissions outside of the State of New York; each of the Defendants regularly did business, and/or solicited business and/or engaged in other persistent courses of conduct within the State of New York; each of the Defendants derived substantial revenues from goods and/or services consumed and/or used in the State of New York; and each of the Defendants abandoned or failed to decommission or take other remedial steps as to the lead-sheathed telecommunications cables which are the subject of this litigation.

6

**10**

16.     Through this Class Action Complaint, Plaintiff, individually and on behalf of the Class (defined below), seeks relief in the form of [1] compensatory, punitive and treble damages in an amount sufficient to fairly and completely compensate Plaintiff and Class Members for all damages; [2] penalties, costs of suit, including reasonable attorneys' fees, as provided by law; [3] injunctive relief to prevent future violations of New York law; [4] medical monitoring to permit early detection of future lead-related conditions among persons living and working within the communities governed by Plaintiff and Class Members; and [5] abatement, to remove and properly dispose of the lead-sheathed cables in New York and the surrounding lead contamination.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to New York Constitution, article VI, § 7(a) and CPLR 301 and 302.

18.     This action is non-removable because there is no complete diversity of citizenship, and no substantial federal question is presented.

19.     As discussed more fully in the body of this Complaint, this lawsuit relates to Defendants' unlawful conduct that has created, perpetuated, contributed to, and maintained, a serious public health crisis throughout New York state. The Defendants must be held accountable to abate the nuisances they have caused in communities across the state. This lawsuit does not seek damages related to the federal government or for conduct undertaken pursuant to contracts with the federal government, nor does it challenge conduct by Defendants acting under, or approved by, any federal government agency, including the Federal Communications Commission (FCC), Communications Security, Reliability, and Interoperability Council (CSRIC) Working Groups, U.S. Environmental Protection Agency (EPA), U.S. Department of Agriculture, Bureau of Land Management, U.S. Department of Defense, U.S. Army Corps of Engineers (USACE), advisory committees to the federal government and/or other agencies, departments or programs, their officers, employees, experts or others with regards to the installation, operation, maintenance, protection and/or management of the sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water in New York.

20.     Plaintiff expressly disclaims and disavows any and all claims for damages against any Defendant whose conduct, whether by omission or commission, was engaged in as a federal government contractor, at the behest of the United States or any agency or person acting under him and/or under color of such office to the extent that such a claim would implicate federal court

jurisdiction – including any conduct as a fiscal intermediary on behalf of the federal government, conduct governed or managed by a federal officer or federal government contracting offer, or basic governmental tasks or jobs fulfilled or carried out by a Defendant on behalf of the federal government, conduct considered to be undertaken by any Defendant as a statutorily authorized alter ego and/or contractor of the federal government, conduct by any Defendant to assist or help carry out the duties and tasks of a federal officer and/or to perform jobs that the federal government otherwise would have performed, conduct by Defendants in accordance with military specifications, requirements of the Federal Aviation Administration or other specifications created and/or administered by the Department of Defense or its units; and/or any equipment designed, tested and/or manufactured by Defendants for the federal government; and/or any provisions of warnings by the federal government related to the lead-sheathed copper cables at issue; and/or any contract that provides and/or requires federal government subjection, testing, guidance and/or control over a Defendant's performance; and/or any conduct by Defendants under a federal officer by virtue of joint or simultaneous negotiations with third parties on behalf of, or to the benefit of, Defendants' federal and non-federal or private customers.

21.     Plaintiff is not seeking relief relating to any and all conduct by the federal government, its departments, agencies, officers and/or employees regarding federal regulations, subsidy programs or funding, including conduct that allowed Defendants to extend broadband networks into unserved areas without considering or requiring that Defendants remove existing toxic lead-sheathed copper cables. This lawsuit does not seek damages related to any lead sheathed cables located on residential, commercial, industrial, agricultural, recreational properties and/or undeveloped lands owned, operated or managed by the federal government nor New York military installations, buildings and lands; properties owned, operated or managed by the Department of

9

13

Defense; nor does it involve any federal programs or for conduct undertaken pursuant to contracts with the federal government, including but not limited to any remedies that would interfere with or affect the management policies and programs, or administration of any remedial federal action plan.

22. Furthermore, it does not seek to recover monies paid by the federal government pursuant to any Federal Employees Health Benefits Act ("FEHBA"), TRICARE-governed health benefits plan or any other federal plan. As such, the Complaint does not seek relief from any Defendant that is available pursuant to any claim(s) involving a federal government agency, federal officer or federal government contracting officer associated with any FEHBA or TRICARE-governed health benefits plan or federal health insurance program, nor remedies that would interfere with or otherwise affect any federal plan, the uniform administration of the TRICARE program or the provision of healthcare services to U.S. military servicemembers, veterans, and their beneficiaries. This lawsuit does not contain claims against the Defendants that are federal in character nor remedies that would interfere with or otherwise affect any federal plan; or provision directed towards the U.S. military servicemembers, veterans, and their beneficiaries.

23. Plaintiff is not seeking relief for any and all claims for damages against any Defendant whose conduct whether by omission or commission, was engaged in at the behest of the United States or any agency or person acting under him or under color of such office to the extent that such a claim would implicate federal court jurisdiction under 28 U.S.C. § 1442(a)(1), predicated on preemption by any federal statute or the government contractor's defense articulated in Boyle v. United Technologies Corp., 487 U.S. 500 (1998). All such claims that legitimately implicate such defenses, in the unlikely event that they exist and are factually supported, are not asserted and are hereby expressly and preemptively disclaimed. Plaintiff hereby puts any

10

**14**

Defendant who may nonetheless assert such defenses as a basis for federal jurisdiction over this case on notice that Plaintiff seeks no recovery for injuries as a result of conduct that meets the three-prong Boyle test and constitutes actions of a federal officer sufficient to trigger jurisdiction under 28 U.S.C. § 1442(a)(1). Plaintiff specifically advises all Defendants of their position that such an express, clear and unequivocal disclaiming of exposures and of claims implicating the Boyle defense, as well as any other claims that legitimately implicate 28 U.S.C. § 1442(a)(1), render any potential future removal of this case to federal court on one of these clearly-disclaimed bases objectively unreasonable under Martin v. Franklin Capital Corp., 546 U.S. 132 (2005).

24.     Jurisdiction is proper under CPLR 302(a)(1) because each Defendant transacts substantial business within the State.

25.     Jurisdiction is also proper under CPLR 302(a)(3) because each Defendant has committed tortious acts outside New York State that caused injury to persons or property within New York State, and because each Defendant (1) has regularly solicited business in New York State, (2) has engaged in persistent conduct towards New York State consumers, (3) has derived substantial revenue from goods used or consumed in New York State, and (4) expects or should reasonably expect that its actions and inaction have consequences in New York State, and derives substantial revenue from interstate commerce.

26.     This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with New York, including, among other things, purposefully installing, maintaining, servicing, owning and/or operating lead-sheathed cables in New York that they subsequently abandoned, and because they have the requisite minimum contacts with New York necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

11

**15**

27.     In addition and/or in the alternative, Defendants and/or their agents or alter egos each have significant contacts with New York because they own and operate telecommunications networks, including the lead-sheathed cables at issue, in New York, and have derived revenue from their operation of those networks in New York through the purposeful direction of their activities to New York and purposeful availment of the protections of the laws of New York, such that personal jurisdiction would be proper in New York under traditional notions of fair play and substantial justice.

28.     Plaintiff and Class Members bring causes of action based solely on and arising under common law negligence, negligence per se and public nuisance. The claims of Plaintiff and Class Members are claims for violations of New York law. These claims arise from Defendants' actions and inaction that has produced consequences in New York State. Plaintiff makes no claim arising under federal law in this action.

29.     Venue is proper in this District under CPLR §503 (a) because it is the county in which one of the parties resided when it was commenced.

30.     Venue is also proper in this District under CPLR 503(a) and 509 because it is the county designated by Plaintiff.

## PARTIES

### A. PLAINTIFF

31.     Plaintiff Town of Wappinger, NY, is a town located within the Hudson River Valley National Heritage Area in Dutchess County, New York, with a population of approximately 28,000 residents. Plaintiff is a town organized under the laws of the State of New York.

32.     During all times relevant herein, residents of the Town of Wappinger, NY, and members of the public were in direct and regular contact with Defendants' lead-sheathed cables and ingested and inhaled lead from Defendants' lead-sheathed cables.

33.     Plaintiff provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

34.     Plaintiff has all the powers possible for a government unit to have under the constitution of the State of New York and the laws of the State of New York.

35.     Plaintiff has standing to bring this action to protect the public health, safety, and welfare of its citizens.

36.     Due to direct and regular exposure to Defendants' lead-sheathed cables, both residents of, and visitors to, the communities governed by Plaintiff and Class Members suffered a present injury that has caused them to develop or has increased the risk that they will eventually develop, the catastrophic health consequences described below.

37.     Residents of the communities governed by Plaintiff and Class Members are exposed to a serious risk of death or injury from abandoned lead-sheathed cables. The extent of that exposure would be reduced in New York if Defendants followed more safety-conscious decommissioning policies.

13

**17**

38.     The public in New York has been exposed to lead-sheathed cables and are at an increased risk of health effects, including damage to the brain, nervous system, kidneys, and cardiovascular system, as well as decreased fertility, neurological issues and cognitive impairment. The public in the communities governed by Plaintiff and Class Members has a legitimate fear of developing additional injuries as a result of their exposure to lead-sheathed cables, including but not limited to effects on children, negatively impacting their brain development and causing behavioral and cognitive problems.

39.     Plaintiff directly and foreseeably sustained all economic damages alleged more fully herein. Plaintiff and Class Members, like all local governments, endeavor in good faith to provide a wide variety of necessary services on a limited budget, funded with taxpayer dollars. Defendants' conduct has imposed an extraordinary burden on the limited resources of Plaintiff and Class Members, for which they seek relief.

40.     Defendants' conduct is beyond anything Plaintiff could have prepared for, predicted, or avoided. It is a repeated course of conduct that did, does, and will continue to result in recurring and ongoing harm to Plaintiff and Class Members. Defendants' conduct is especially pernicious when one considers the harm it has wreaked on governmental entities such as Plaintiff and Class Members. It would be unreasonable, unjust, and inequitable not to shift the burden of the additional governmental expenses, and any other costs associated with the harms Defendants' wrongful conduct has caused, to the actual parties responsible for creating the need for the resources to be expended as they are and were.

41.     Defendants' conduct has created, contributed to, and maintained the public nuisance described herein.

**18**

B. **VERIZON DEFENDANTS**

42.     The term "**Verizon Defendants**" refers collectively to Defendants Verizon Communications Inc., Verizon New York, Inc., MCIMetro Access Transmission Services LLC, MCI Communications Services LLC, Metropolitan Fiber Systems of New York, Inc. and XO Communications Services, LLC.

43.     At all times relevant to this action, the Verizon Defendants owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by the Verizon Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

44.     **Defendant Verizon Communications Inc. ("Verizon Communications")** is a Delaware corporation with headquarters in New York City, New York. Acting through its subsidiaries, Verizon provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

45.     **Defendant Verizon New York, Inc. ("Verizon New York")** is a New York corporation with its principal place of business in New York. Verizon New York is a wholly owned subsidiary of Verizon Communications, and Verizon's principal operating subsidiary in New York. Verizon New York provides exchange telecommunication services and exchange access services, which includes local private line voice, data, and Centrex services, and linking transmission facilities to other telecommunication carriers.

46.     **MCIMetro Access Transmission Services LLC ("MCIMetro Access")** is a Delaware limited liability company with its principal place of business in New Jersey. MCIMetro Access is a wholly owned subsidiary of Verizon Communications. MCIMetro Access provides

15

**19**

telecommunications services, specializing in data and voice transmission, internet services, private lines, and virtual private networks (VPNs).

47.    **MCI Communications Services LLC dba Verizon Business Services ("MCI Communications")** is a Delaware limited liability company with its principal place of business in New Jersey. MCI is a wholly-owned subsidiary of MCI International LLC ("MCI International"), which is a limited liability company wholly owned by Verizon Business Network Services, LLC ("VBNS"). MCI Communications provides wired and wireless telecommunication services, long distance telephone communications, conferencing, and data and IP services.

48.    **Metropolitan Fiber Systems of New York, Inc. ("Metropolitan Fiber")** is a Delaware corporation with its principal place of business in New Jersey. Metropolitan Fiber is a wholly owned subsidiary of Verizon Communications. Metropolitan Fiber provides telecommunication services, fiber-optic network services, data, voice, and internet services.

49.    **XO Communications Services, LLC ("XO")** is a Delaware company with its principal place of business in New Jersey. XO is a wholly owned subsidiary of Verizon Communications. XO provides telecommunication solutions, managed IP, data, and end-to-end communication solutions. XO provides telecommunication services. XO focuses on local and long-distance voice, Internet access, virtual private networking, ethernet, webhosting, and integrated voice and data services.

50.    The Verizon Defendants own, and improperly assessed and disposed of, the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

**20**

## C. AT&T DEFENDANTS

51.     The term "**AT&T Defendants**" refers collectively to Defendants American Telephone and Telegraph Company, AT&T Enterprises, LLC, AT&T Communications of New York, Inc., SBC Long Distance, LLC and TC Systems, Inc.

52.     At all times relevant to this action, the AT&T Defendants owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by the AT&T Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

53.     **Defendant American Telephone and Telegraph Company** is a Delaware corporation with its principal place of business in Texas. Acting through its subsidiaries, AT&T provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

54.     **Defendant AT&T Enterprises, LLC** is a Delaware limited liability company. Its sole member is AT&T Wireline Holdings, LLC, the sole member of which is AT&T DW Holdings, Inc., a New York corporation with its principal place of business in Texas. Effective May 1, 2024, AT&T Corp. was converted into AT&T Enterprises, LLC. AT&T Enterprises, LLC is thus the successor-in-interest to AT&T Corp.

55.     **Defendant AT&T Communications of New York, Inc. ("AT&T New York")** is a New York domestic business corporation with its principal place of business in New Jersey. AT&T New York is a wholly owned subsidiary of AT&T. AT&T New York provides intrastate telecommunication services, technology and entertainments products and services.

17

**21**

56.     **Defendant SBC Long Distance, LLC d/b/a AT&T Long Distance ("AT&T Long Distance")** is a Delaware limited liability company with its principal place of business in New York. AT&T Long Distance is a wholly owned subsidiary of AT&T. AT&T Long Distance offers long distance calling card service and value card plus service, which allows customers to place intrastate, interstate and/or international calls.

57.     **Defendant TC Systems, Inc. ("TC")** is a Delaware corporation with its principal place of business in New Jersey. TC is a wholly owned subsidiary of AT&T. TC provides intrastate local private line services, telecommunication services, phone services, cabling solutions, network installation and maintenance, and traffic control system services.

58.     The AT&T Defendants own and improperly assessed and disposed of the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

### D. FRONTIER DEFENDANTS

59.     The term "**Frontier Defendants**" refers collectively to Defendants Frontier Telephone of Rochester, Inc., Frontier Communications of Seneca-Gorham, Inc., Ogden Telephone Company, Frontier Communications of Sylvan Lake, Inc., Frontier Communications of AuSable Valley, Inc., Citizens Telecommunications Company of New York, Inc., Frontier Communications of America, Inc., Frontier Communications of New York, Inc., Frontier Communications of Rochester, Inc. and XO Communications Services, LLC.

60.     At all times relevant to this action, the Frontier Defendants owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by the Frontier Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

61.    **Defendant Frontier Telephone of Rochester, Inc.** is a New York corporation with its principal place of business in New York. Frontier Telephone of Rochester, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

62.    **Defendant Frontier Communications of Seneca-Gorham, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of Seneca-Gorham, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

63.    **Defendant Ogden Telephone Company ("Ogden")** is a New York corporation with its principal place of business in New York. Ogden provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

64.    **Defendant Frontier Communications of Sylvan Lake, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of Sylvan Lake, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

65.    **Defendant Frontier Communications of AuSable Valley, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of AuSable Valley, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

66.    **Defendant Citizens Telecommunications Company of New York, Inc** is a New York corporation with its principal place of business in New York. Citizens Telecommunications

Company of New York, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

67.    **Defendant Frontier Communications of America, Inc.** is a Delaware corporation with its principal place of business in New York. Frontier Communications of America, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

68.    **Defendant Frontier Communications of New York, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of New York, Inc., provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

69.    **Defendant Frontier Communications of Rochester, Inc.** is a New York corporation with its principal place of business in New York. Frontier Communications of Rochester, Inc. provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

70.    The Frontier Defendants own, and improperly assessed and disposed of, the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

**E.    CONSOLIDATED COMMUNICATIONS DEFENDANTS**

71.    The term "**Consolidated Communications Defendants**" refers collectively to Defendants Chautauqua & Erie Communications, Inc. d/b/a Chautauqua & Erie Telephone Corporation and Consolidated Communications of New York Company d/b/a Taconic Telephone Corporation.

72.    At all times relevant to this action, the Consolidated Communications Defendants owned, operated, maintained and managed telecommunications networks in New York State and

20

**24**

the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by the Consolidated Communications Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

73.    **Defendant Chautauqua & Erie Communications, Inc. d/b/a Chautauqua & Erie Telephone Corporation and/or Consolidated Communications** is a New York corporation with its principal place of business in New York. Chautauqua & Erie Telephone Corporation d/b/a Consolidated Communications, provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

74.    **Defendant Consolidated Communications of New York Company d/b/a Taconic Telephone Corporation and/or Consolidated Communications** is a New York corporation with its principal place of business in New York. Taconic Telephone Corporation d/b/a Consolidated Communications, provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

75.    The Consolidated Communications Defendants own and improperly assessed and disposed of the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

F. **WINDSTREAM NEW YORK, INC.**

76.    **Defendant Windstream New York, Inc. ("Windstream")** is a New York corporation with its principal place of business in Arkansas. Windstream provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

77.    At all times relevant to this action, Windstream owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by Windstream

21

**25**

includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

78.    Windstream and/or its predecessor companies have operated in the State of New York for nearly 100 years.

79.    Windstream owns, and improperly assessed and disposed of, the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

### G. TRUMANSBURG TELEPHONE COMPANY, INC

80.    **Defendant Ontario & Trumansburg Telephone Companies d/b/a Trumansburg Telephone Company, Inc. ("Trumansburg")** is a New York corporation with its principal place of business in New York. Trumansburg provides communications, technology, information and entertainment products and services to consumers, businesses, and government entities.

81.    At all times relevant to this action, Trumansburg owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by Trumansburg includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

82.    Trumansburg owns, and improperly assessed and disposed of, the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

### H. DUNKIRK AND FREDONIA TELEPHONE COMPANY

83.    **Defendant DFT Communications Corporation d/b/a Dunkirk and Fredonia Telephone Company ("Dunkirk")** is a New York corporation with its principal place of business in New York. Dunkirk and Fredonia Telephone Company provides communications, technology,

22

**26**

information and entertainment products and services to consumers, businesses, and government entities.

84.    At all times relevant to this action, Dunkirk owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by Dunkirk includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water.

85.    Dunkirk owns, and improperly assessed and disposed of, the lead-sheathed telecommunications cables at issue in this Class Action Complaint.

## I.  DOE DEFENDANTS 1-20

86.    Doe Defendants 1-20 are unidentified entities or persons whose names are presently unknown and whose actions, activities, omissions (a) may have permitted, caused and/or contributed to the contamination of Plaintiff's soil, water sources or supply wells; or (b) may be vicariously responsible for entities or persons who permitted, caused and/or contributed to the contamination of Plaintiff's soil, water sources or supply wells; or (c) may be successors in interest to entities or persons who permitted, caused and/or permitted, contributed to the contamination of Plaintiff's soil, water sources or supply wells. After reasonable search and investigation to ascertain the Doe Defendants actual names, the Doe Defendants' actual identities are unknown to Plaintiff as it is not linked with any of the Defendants on any public source.

87.    At all times relevant to this action, Doe Defendants 1-20 owned, operated, maintained and managed telecommunications networks in New York State and the communities governed by Plaintiff and Class Members. The infrastructure owned, operated and managed by Doe Defendants 1-20 includes a sprawling network of cables covered in toxic lead, on poles

23

**27**

overhead, in the soil, in buildings, and under water. Doe Defendants 1-20, either in their own capacity or through an entity or entities for whom they are liable, improperly installed, maintained, serviced, owned and/or operated lead-sheathed cables, or failed to timely and properly carry out necessary and reasonable response and remedial measures to prevent the release of lead and/or their chemical precursors into the environment in the communities governed by Plaintiff and Class Members.

88.    All Defendants, at all times material herein, acted by and through their respective agents, servants, officers and employees, actual or ostensible, who then and there were acting within the course and scope of their actual or apparent agency, authority or duties. Defendants are liable based on such activities, directly and vicariously.

89.    Defendants represent all or substantially all of the market of telecommunication companies that owned, operated, maintained, improperly assessed and disposed of lead-sheathed telecommunications cables at issue in this Class Action Complaint.

24

## FACTUAL ALLEGATIONS

### A.  DEFENDANTS' TOXIC LEAD CABLES

90.      Defendants own and operate a sprawling network of telecommunications cables covered in toxic lead that stretches across New York and many other states—on poles overhead, in the soil, in buildings, and under the water.

91.      Since at least 1888, telephone cables with lead outer sheathing were produced and widely used in the United States—well before the dangers of lead in the environment were understood. Lead cables were first replaced with cables using plastic sheaths and paper insulators, and eventually the industry transitioned to cables with polyethylene insulation.[1]

92.      Defendants' predecessors—corporate affiliates of the Bell Telephone Company and AT&T—laid nearly all the cables in question prior to the 1960s as they built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, are wrapped in a thick jacket of toxic lead.

93.      In the 1970s there was a movement to remove and replace lead cables as part of routine upgrades and maintenance. Many smaller telecommunications companies slowly replaced these lead cables, but larger companies refused to upgrade or even maintain their copper cables, electing instead to simply leave them in place.

94.      After the breakup of the Bell telephone system in the 1980s, Defendants took ownership and control of the lead-sheathed cables in the locations in which they operated. When technology advanced and Defendants turned to plastic sheathing and, later, fiber optics, they abandoned many of the old lead-sheathed cables in place, and also abandoned the lead that washed

---

[1]   *See* Copper Development Association, Inc., *The Evolution of Telephone Cable.* Available at: https://www.copper.org/applications/telecomm/consumer/evolution.html.

off of the cables into the surrounding environment, rather than properly storing and disposing of those materials as required by New York law.

95.    Large telecommunications companies such as Defendants AT&T and Frontier have chosen to upgrade to fiber systems, lashing fiber onto existing telephone cables and leaving the old, dead copper wires in place. Individuals with knowledge of the industry, such as Doug Dawson of CCH Consulting, have warned about this for years, stating recently that: "I've never heard of any telephone company that has tried to retrieve buried telephone cables at the end of economic life. The cables are cut dead and abandoned underground. The idea of digging lead cables out of the ground sounds unrealistic since doing so will invariably disturb and break water, gas, electric, and telecom lines.[2]" For years, Mr. Dawson had been writing about the industry's need to properly decommission abandoned cables.

96.    Numerous cities across the country have lead-covered telecom lines buried beneath their streets and sidewalks. It is estimated that around 2,000 of these lines extend across approximately 66,000 miles nationwide – including lead cables crossing under bodies of water and overhead. In some areas, the lead sheathing is found on deteriorating overhead phone lines, such as those near a playground in Wappingers Falls, pictured below[3]:

---

[2] *See* Doug Dawson, *Unveiling the Lead Legacy: Addressing the Challenges of Abandoned Telephone Cables* (August 02, 2023). Available at: https://circleid.com/posts/20230802-unveiling-the-lead-legacy-addressing-the-challenges-of-abandoned-telephone-cables

[3] *See* Rick Karlin, *New York battles telecom firms over lead-sheathed lines*, Times Union (January 21, 2024). Available at: https://www.timesunion.com/business/article/new-york-state-battles-telecom-firms-18613027.php

26

**30**



97.     The lead from Defendants' cables in New York can transfer to humans and cause significant health issues.

98.     Testing by independent laboratories indicates that lead from Defendants' cables is polluting the surrounding environment and causing significant health risks to many individuals.

99.     In 2022, Marine Taxonomic Services, Ltd. ("MTS") was contacted by the *Wall Street Journal ("WSJ")* to participate in an investigation as to abandoned lead-sheathed cables in the United States. The Environmental Defense Fund ("EDF") funded an initial study to validate the locations of abandoned cables and perform environmental sampling at locations adjacent to the cables. MTS and the WSJ visited the cable locations that were identified by the WSJ. MTS, alongside WSJ reporters, investigated numerous locations in six regions across the U.S, where the WSJ provided permit records showing historical cable locations within rivers, streams, and lakes. Verification of permit records included determining if cables were present at those locations and visually assessing the composition of telecom and power cables. Screening samples of water,

sediment, and soil in the immediate vicinity were collected and tested for lead. Samples from the

surface of the lead cable were collected, when present, to confirm its identity.[4]

100.    As described by MTS, a typical telecommunication line sheathed in a lead pipe

consists of varying substances, as follows:

> "The outer most layer appears to be a petroleum-based tar-impregnated fiber or asphaltic material. The layer below that is composed of ¼" thick steel rods twisted around the cable core. There are typically numerous layers of tar-impregnated twine or asphaltic material under the steel rods. The core is separated from these outer protective layers with a lead pipe that is roughly 1/5" thick. Inside the lead pipe, the core is made up of copper wire pairs wrapped in paper insulation. Each of the paper-wrapped wire pairs is bundled with a string."[5]

101.    Various general regions were chosen for the investigations, including New York

state as a priority state, based on the review of thousands of records, historical permits, NOAA

navigational charts and the presence of geographic indicators.

102.    The locations identified in New York state include the Hudson River and the

geographic area of Plaintiff, among others. Certain points of interest were identified, including

signs, manholes, utility poles with cables, lead splice box, or other indicators that would help to

identify the presence of a lead sheathed cable, with the goal of documenting the presence and

condition of lead sheathed cables.[6]

103.    Through diver-assisted collections and surface collections, MTS and the WSJ

obtained screened samples of water, sediment, soil, cable and other materials within and adjacent

---

[4] *See* Marine Taxonomic Services, Ltd.'s "*Lead Cable Investigation*" report (June 30, 2023). Available at https://www.edf.org/sites/default/files/2023-07/MTS_EDF%20Lead%20Cable%20Investigation_Final.pdf

[5] *Id* at 8.

[6] *Id* at 51.

**32**

to water bodies where lead-containing cables were identified. The methodology was explained in detail in MTS's report entitled *"Lead Cable Investigation,"* dated June 30, 2023.[7]

104. In January of 2023, MTS and the WSJ conducted an investigation of data points along the Hudson River, Harlem River, Wappingers Falls and the Townships of New Windsor, Newburgh, Highland Falls, and the Palisades. MTS screened a total of twenty-three different site locations across the state of New York with a total of thirty-seven points of interest containing GPS data. Fourteen points with visible lead sheathed cables were found in Orange County (Highland Falls Township, New Windsor and Newburgh), Wappingers Falls (Dutchess County) and the Hudson River (Palisades Neighborhood in Rockland County).[8]

105. In Wappinger Falls, MTS found three points with visible lead-sheathed cables, including an overhead lead sheathed cable near a grassy play area, a damaged lead-sheathed cable (which looks to be out of service) and splice box at the base of a telephone pole, as pictured[9] below:

 

---

[7] *Id* at 2.

[8] *Id* at 51-52.

[9] *Id* at 58.

106.    Furthermore, four points of interest were recorded with Bell Systems manholes with a total of four manholes and a potential vault; leaving the remaining points of interest being a combination of old telecommunication signage and old telephone poles. Signs that remained standing within the cable corridors and those tacked into old telephone poles, suggest that the primary telecommunications company for this area was Bell Systems, New York Telephone and Verizon. MTS identified plastic umbrella coverings, known as "squirrel guards," that were purported to prevent squirrels from eating the cables, but did not cover the entire cable [10]

107.    A Verizon worker in Newburgh mentioned that "lead was a concern in the area, but that the company was understaffed and unable to address those concerns."[11]

108.    Due to the "visible lead sheathed submarine cables and an increasing number of observed, overhead, lead sheathed telecommunication cables[,] MTS recommend[ed] more thorough investigation of all areas with overhead bare lead sheathed cables, to map locations and determine if there are health and safety risks that may be present for the residents.[12]"

109.    The WSJ paid for the laboratory analysis conducted by Pace Analytical Laboratories out of Huntsville, NC, including the 14 total samples collected from 11 sites in New York.[13]

110.    On Sunday, July 9, 2023, the WSJ published an article titled, "America is Wrapped in Miles of Toxic Lead Cables," which reported that telecom companies laid lead cables across the nation decades ago, with thousands being left behind and posing a hidden health hazard. The *WSJ* highlighted the health risks that involve roughly 2,000 lead-covered cables from the old Bell

---

[10] *Id* at 51-52.

[11] *Id* at 51.

[12] *Id* at 52.

[13] *Id* at 5 and 53.

**34**

System's regional telephone network. The telecom industry responded by stating that it "stands ready to engage constructively on this issue."

111.    According to the article, testing conducted by several independent laboratories revealed that lead levels in the environment near Defendants' lead-sheathed telecommunications cables (and similar lead-sheathed cables owned by other telecommunications companies) exceed safety recommendations set by the U.S. Environmental Protection Agency.

112.    "The report's findings 'suggest there is a significant problem from these buried lead cables everywhere," Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, told the *WSJ*. Worse, she said, "it's going to be everywhere and you're not even going to know where it is in a lot of places."

113.    "And yet lead exposure remains persistent, especially in young children." As the WSJ notes, a Quest Diagnostics study from 2021 revealed that one in two American kids under six have detectable levels of lead in their blood. "A new, uncontrolled source of lead like old telephone cables may partly explain" this phenomenon, Jack Caravanos, an environmental public-health professor at New York University who assisted with the report, told the *WSJ*. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

114.    In its reporting, the WSJ discovered a vast network of more than 1,750 under water lead-covered cables, while an analysis of the country's five most populated states and over a dozen of its most populated counties revealed about 250 aerial lead-covered cables, often located next to schools and bus stops. Per the newspaper, most of the cables had been laid by American Telephone & Telegraph—AT&T's predecessor—in the late 1800s through the 1960s, and there are likely many more leaded cables to be discovered across the nation. Of these thousands of cable sites, *WSJ* reporters visited about 300. Hundreds of environmental samples were independently tested,

31

and researchers were reportedly able to confirm that the lead they contained likely came from cables.

115.    The EPA's recommendation for the levels of lead in the soil for areas where children play is 400 parts per million.

116.    In Wappingers Falls, N.Y., an aerial lead-sheathed cable hangs above the perimeter of a town playground, with a jungle gym, a swing set and a basketball court. Near a "CHILDREN AT PLAY" sign, lead in the soil measured more than 1,000 parts per million. At the corner of the playground, lead in the soil measured 850 parts per million.

117.    According to the *WSJ*'s reporting, other telecommunications companies that, like Defendants, own portions of the old Bell system have also abandoned similar lead-sheathed cables in other locations around the country. Independent testing of the environment surrounding those cables showed that, like the environment surrounding Defendants' cables, there were elevated levels of lead attributable to the telecommunications cables.

118.    On July 12, 2023, *Telecompetitor* published an article[14] noting that, "[i]f action is needed to remediate alleged dangers posed by old lead-encased copper telecom cabling, the cost could be in the range of $60 billion, according to an estimate from New Street Research." As stated by a New Street Research policy advisor, "[i]f I were a governor, I'm not sure how I would feel about giving a company several million dollars, knowing that they haven't told me yet whether or not they're poisoning some of my citizens." The estimate is based on research that found that "[t]here are ~44M U.S. housing units that may have lead exposure (based on number of units built before 1960 minus those targeted for BEAD or where copper has been removed)."

---

[14] *See* Telecompetitor, *Telecom Lead Remediation Cost Estimated at $60B; Could Impact BEAD Plans* (July 12, 2023). Available at: https://www.telecompetitor.com/telecom-lead-remediation-cost-estimated-at-60b-could-impact-bead-plans/.

119.    The estimated remediation costs for incumbent local exchange carriers (ILEC) demonstrate the gravity of the situation, as demonstrated in the following graphics from New Street Research[15]:





120.    Defendants AT&T, Verizon, Frontier, Consolidated Communications and others have evidently allowed or caused a nationwide crisis of abandoned lead sheathed cables, to which a spokesperson for USTelecom merely remarked that:

---

[15] *Id.*

33

**37**

"Many considerations go into determining whether legacy lead-sheathed telecom cables should be removed or should be left in place, including those regarding the safety of workers who must handle the cables, potential impacts on the environment, the age and composition of the cables, their geographic location, and customer needs as well as the needs of the business and infrastructure demands…."

The decades of abandoning these lead-sheathed telecom cables have now caught up to Defendants.

121.    On July 13, 2023, staff from several New York State agencies participated in sampling of soil for lead at the Temple Park Playground and adjacent areas in Wappingers Falls in response to the WSJ's article. [16] These areas are in the portion of Wappingers Falls located in the Town of Wappinger, as seen in the below aerial photographs[17]:



---

[16] *See* New York State Department of Health (NYSDOH), Bureau of Toxic Substance Assessment, *Sampling Report for Lead in Soil at Temple Park Playground and Adjacent Areas, Dutchess Terrace and Market Street, Wappingers Falls, New York, July 27, 2023.* Available at: https://health.ny.gov/press/releases/2023/docs/wappingers_falls_report.pdf

[17] *Id* at 5 and 6.

34

38



122.    The results of multiple X-Ray fluorescence (XRF) screenings, including with a Viken PB200i XRF, and 25 discrete soil samples taken at these areas show multiple results of lead concentration over 100 ppm, including as follows:

| Sample Number | Sample Location Description | Lead Concentration (ppm) | Notes |
|---|---|---|---|
| A1 | Market St. and Dutchess Ter. Intersection next to utility pole (under cable) | 288 | Directly under cable, outside the playground |
| A3 | Market St. near second utility pole (under cable) | 111 | Directly under cable, outside the playground |

35

| | | | |
|---|---|---|---|
| A4 | Market St. by park hours sign (under cable) | 137 | Directly under cable, outside the playground |
| A6 | Market St. by children at play sign (under cable) | 113 | Directly under cable, outside the playground |
| A7 | Market St. by pets must be leashed sign (under cable) | 410 | Directly under cable, outside the playground |
| A8 | Market St. by third utility pole (under cable) | 180 | Directly under cable, outside the playground |
| A9 | Market St. by fourth utility pole (under cable) | 161 | Directly under cable, outside the playground |
| A10 | Market St. past fourth utility pole (under cable) | 189 | Directly under cable, outside the playground |
| B4 | Five feet in from Market St. in line with children at play sign | 185 | 5 feet south of cable |
| B5 | Five feet in from Market St. in line with third utility pole | 224 | 5 feet south of cable |
| B6 | Five feet in from Market St. in line with fourth utility pole | 248 | 5 feet south of cable |
| C3 | Ten feet in from Market St. in line with pets must be leashed sign | 109 | 10 feet south of cable |
| C4 | Ten feet in from Market St. between third and fourth utility pole | 283 | 10 feet south of cable |
| G2 | Behind Industrial Park sign (under cable) | 302 | Cable comes to ground level at this location |
| G3 | Center of soccer field | 199 | Within Temple Park but |

36

**40**

| | | | considered background location |
|---|---|---|---|
| | | | |

123.    At the time, the NYSDOH determined that the results were within the then-applicable soil guidance values for children's play areas of 400 ppm, citing NYS Department of Environmental Conservation (2006, December 14). Division of Environmental Remediation. 6 NYCRR 375-6.8 and U.S. Environmental Protection Agency (2020, August) Lead in Soil.[18]

124.    On July 13, 2023, before the market opened, the WSJ released an article[19] entitled "I Was Really Sick, and I Didn't Know From What" stating, in pertinent part:

> "Verizon said it has "a robust safety and health program to provide training, materials and resources," and that workers can get lead testing at any time at no cost.
>
> Current and former workers described scant precautions. Many said they learned how to handle lead on the job and weren't given respirators or regular blood lead tests.
>
> Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. James Innes said his taste changed, which can be a sign of lead exposure. […]
>
> A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continue on their jobs," according to letters among union officials. A small study last year of lead in Verizon workers' bones showed that exposures continued."

125.    On July 14, 2023, JPMorgan downgraded AT&T shares due, in part, to concerns about potential lead sheathing business risks. It was estimated that AT&T's local exchange carrier business covers roughly 40% of the homes in the U.S. and maintains a significant presence via its

---

[18] *Id* at 7.

[19] *See* Wall Street Journal, *I Was Really Sick, and I Didn't Know From What*, (July 13, 2023). Available at: https://www.wsj.com/articles/lead-cables-exposure-workers-ca6d67f0

37

41

long-haul network.[20] The WSJ also estimated that it could cost $59 billion to remove the lead cables left behind by Defendants and other telecom companies.[21]

126.    On July 17, 2023, EDF published an article pertaining to its investigation, the WSJ article and the submission of a letter to the EPA seeking further investigation.[22]

127.    On July 17, 2023, the shares in Defendants AT&T (NYSE: $T) and Frontier Communications (NASDAQ: $FYBR) were cut to neutral/high risk amid concerns regarding the fact that their copper networks may contain significant amounts of toxic lead sheathing. AT&T's shares fell nearly 7% to hit their lowest level in 30 years.[23]

128.    The next day, AT&T admitted in public filings and internal emails that it maintained lead-clad cables, stating that less than 10% of its two million miles of nationwide copper-wire telecom network had such cables sheathed in lead. AT&T indicated that 2/3 of its lead-covered cables are "either buried or in conduit" followed by aerial cable, and a "very small portion" running under water. It is estimated that 25% of cables are aerial, 63% is buried in conduit, 7% percent buried directly without the protection of conduit, and the remaining 5% percent is under water.

129.    On July 20, 2023, New York Governor Kathy Hochul directed the Department of Public Service ("DPS"), Department of Health, and Department of Environmental Conservation

---

[20] *See* Seeking Alpha, *AT&T stumbles as J.P. Morgan downgrades, citing worries over wireless, broadband* (July 14, 2023). Available at https://seekingalpha.com/news/3987632-att-slips-jp-morgan-downgrades-citing-worries-wireless-broadband.

[21] *See* Wall Street Journal, *AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables* (July 14, 2023). Available at https://www.wsj.com/articles/at-t-other-telecom-stocks-sink-in-wake-of-wsj-investigation-on-toxic-lead-cables-7f0f9293.

[22] *See* Environmental Defense Fund, *Environmental Groups Call on U.S. EPA to Investigate Potential Harms of Lead Telecom Cables* (July 17, 2023). Available at https://www.edf.org/media/environmental-groups-call-us-epa-investigate-potential-harms-lead-telecom-cables-0

[23] *See* Articles available at https://seekingalpha.com/news/3987939-citi-downgrades-att-frontier-telephone-and-data-systems-lead-cable-worries and https://www.reuters.com/business/media-telecom/att-shares-hit-three-decade-low-lead-cables-risks-weigh-2023-07-17/.

**42**

to immediately investigate a recent report of old lead-covered cables left by telecommunication companies and the potential public health risks associated with exposure to those cables.[24]

130.    AT&T announced a policy that will allow employees who may have been exposed to lead as part of their work to receive paid time off in order to be tested for lead levels.

131.    The Federal Communications Commission's chair, Jessica Rosenworcel, reached out to the EPA and White House Council of Environmental Quality to discuss lead-cable concerns.

132.    On July 20, 2023, former Ulster County Executive and current U.S. Representative Pat Ryan of New York also wrote to the CEOs of Verizon, AT&T and industry group USTelecom to demand that they remove lead cables from New York's Hudson Valley and across the United States.[25]

133.    The New York State Department of Public Service ("DPS") immediately initiated an investigation entitled *In the Matter of the Investigation of Lead-Covered Cables and the Potential Associated Health Risks*, 23-01574, [26] for the purpose of requesting that 246 telecom firms and small local phone companies provide maps, lists and any other information to identify the location of lead-sheathed cables in the state.

134.    Multiple telecom firms and companies resisted the requests, arguing that the DPS was seeking documents and information that purportedly contained proprietary trade secrets.

---

[24] *See* Press Release *"Governor Hochul Directs State Agencies to Investigate Old Lead-Covered Cables Left in Communities by Telecommunication Companies"* (July 20, 2023). Available at https://www.governor.ny.gov/news/governor-hochul-directs-state-agencies-investigate-old-lead-covered-cables-left-communities.

[25] *See Congressman Pat Ryan Demands Verizon and AT&T Clean Up Their Mess, Remove Lead Cables from Hudson Valley and Across United States*. Available at https://patryan.house.gov/media/press-releases/congressman-pat-ryan-demands-verizon-and-att-clean-their-mess-remove-lead.

[26] See *In the Matter of the Investigation of Lead-Covered Cables and the Potential Associated Health Risks*, 23-01574, https://documents.dps.ny.gov/public/MatterManagement/CaseMaster.aspx?MatterCaseNo=23-01547&CaseSearch=Search, last accessed 9/02//2024.

39

**43**

135.    In the meantime, the Verizon Defendants commenced a media blitz to take on the public relations crisis caused by their own actions and inaction. On July 26, 2023, Verizon's CEO attempted to minimize the company's lead footprint and negligence by stating that "lead infrastructure makes up a small percentage of our copper network, and we began phasing away from installing new lead cable by the 1950s.[27]" Verizon's CFO, Tony Skiadas, stated that

> We still have some legacy lead sheath cable in our copper network. As a result of the age of this infrastructure and the history of the industry, records are incomplete as to exactly how much of the cable at our network has led sheathing…
>
> However, to give you a sense of the scale of the infrastructure we are talking about, our copper network is comprised of less than 540,000 miles of cable, roughly half of which is aerial, and lead sheath cable makes up a small percentage of our copper network. This number excludes the network elements previously owned by MCI and XO Communications because we are still reviewing the historical records of those companies.[28]

136.    Verizon refused to acknowledge the potential costs to remove the lead-sheathed cables from its network, or discuss "specifics around employees" that may have suffered lead poisoning, or acknowledge the likelihood that the public was exposed to the lead-sheathed cables.[29] Tellingly, the CFO acknowledged that "the potential for public contact" was a real issue, which the company had allegedly considered previously.

137.    Verizon has been aware of such public contact for years. In 2019, the New York Department of Environmental Protection ("DEP") found[30] that Verizon owned exposed lead-

---

[27] *See* Sustainable Tech Partner, *Verizon Lead Cables FAQ: CEO, CFO Statements About Telecom Network* (July 26, 2023). Available at:: https://sustainabletechpartner.com/news/verizon-lead-cables-faq-ceo-cfo-statements-about-telecom-network/.

[28] *Id*.

[29] *Id.*

[30] *See* Letter from DEP to Verizon Wireline Network Operations, dated January 3, 2019, filed in *Jones, et al v Verizon New York, Inc., et al.,* Index No. 511568/2019, Doc. No. 32. Available at https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=3shw/6N5vKgNlJ/zyuiHgA==

sheathed communications cables in ducts that run through manholes in multiple locations throughout the state, including a residential area in Little Haiti, Brooklyn, New York (40°38'28.8"N 73°56'36.0"W), as depicted below:



138. Exposed lead-sheathed cables were found in the ground at this location – roughly 660 feet from a private high school and within 1,500 feet from three middle schools, a large playground and park – as depicted in the following photographs:

41





139.    The DEP found that copper water service lines were found to be aggressively deteriorated, likely caused by "stray DC currents from buried Verizon-owned lead-sheathed communications cable[s] in terracotta ducts located in the immediate vicinity of the deteriorated piping." The stray current was being emitted by Verizon through abandoned traditional copper telephone wires that were no longer used by homeowners.[31]

140.    On July 26, 2023, AT&T also attempted to sway the public opinion by providing the following public statements[32] by its leadership, namely CEO John Stankey:

a. "it's well understood that lead-clad cables are used broadly in our nation's infrastructure today. From power cables to telecommunication cables lead has used to protect interior wires from exposure to the elements, because lead is very stable and it doesn't rust. The practice is long been known and its risks of exposure to those in close contact to it has been regulated by Federal and State authorities for decades."

b. "lead-clad cables are so durable that they continue to be used in our power grid, in our railway systems and in our industry and some of these cables still provide important customer voice and data services, including connecting 911 service, fire alarms, and other central monitoring stations."

c. "longstanding science have given us no reason to believe these cables pose a public health risk. In our own prior testing which we shared publicly confirms the established science…."

---

[31] *Id* at 1.

[32] *See* Sustainable Tech Partner, *AT&T Lead-Clad Cables FAQ: CEO John Stankey Statements About Telecom Network* (July 26, 2023). Available at: https://sustainabletechpartner.com/news/att-lead-clad-cables-faq-ceo-john-stankey-statements-about-telecom-network/.

43

**47**

141.    On July 28, 2023, nonprofit organization Brookings published an article[33] as part of its mission to conduct in-depth, nonpartisan research to improve policy and governance at local, national, and global levels. Brookings concluded that millions of Americans could be affected by thousands of miles of toxic, lead-sheathed telephone cables, also stating that:

> The level of health and safety risks depend on how the cables are deployed. One theory holds the risk associated with cables contained inside buried conduits is different from cable buried directly in the ground or cable hung from poles. This, coupled with how removing the cables may release lead, suggests the need to prioritize sites of remediation that also take into consideration issues such as proximity to schools, playgrounds, hospitals, and other areas containing vulnerable individuals.
>
> In short, the initial first step is to map where and how the lead cables are deployed and then prioritize the various types of installations for remediation, if necessary.

142.    This initial first step would be taken by the DPS, in an investigation to identify the lead-sheathed cables in New York. Multiple Defendants admitted to installing, maintaining, servicing, owning, and/or operating lead-sheathed cables in the state, but refused to properly identify the location of such toxic cables despite their obligations under Environmental Conservation Law (ECL) §§ 27-1305, 27-1307 and 27-1309.

143.    Through multiple filings in 2023, all Defendants made admissions to the DPS that they installed, maintained, services, owned and/or operated lead covered cables in New York State, including (but not limited to) the following:

a.    The Verizon Defendants have publicly acknowledged[34] that they own lead containing cable that has been abandoned in New York. However, these Defendants refused to

---

[33] *See* Brookings, *Toxic lead telephone lines: Searching for solutions* (July 28, 2023). Available at: https://www.brookings.edu/articles/toxic-lead-telephone-lines-searching-for-solutions/.

[34] *See* Verizon, *Verizon reports lead test results, continues to work with EPA*. Available at: https://www.verizon.com/about/news/verizon-reports-lead-test-results-continues-work-epa.

cooperate with the DPS's investigation, alleging that *all* information requested in the investigation constitutes trade secrets, confidential commercial information and/or critical infrastructure information that is exempt from disclosure under the Freedom of Information Law (FOIL). The Verizon Defendants refused to provide any information whatsoever, including the *number of miles* for lead-sheathed or non-lead-sheathed cables they owned or abandoned in New York.[35]

b. The AT&T Defendants admitted that currently, approximately 690 miles of lead cable remain in place. AT&T owns two facilities containing lead and continues to actively use the lead-containing facilities to operate their fiber optic long-distance network. AT&T further submits that a few of the long-distance cable lines buried three to four feet underground are eventually routed above ground to connect to local exchanges; few of those local exchanges would route to populated residential or commercial areas, therefore, unlikely to result in exposure to the public. However, by this logic, AT&T is inadvertently admitting that if cables were routed to populated residential or

---

[35] Verizon has previously disclosed the *retirement* of copper wires in a multitude of locations in New York, including in Suffolk County (Brookhaven) in April of 2024, Counties of Schoharie (Cobleskill), Washington (Cambridge), Oneida (Camden), Cortland (Cortland), St. Lawrence (Gouverneur), Rensselaer (Hoosick Falls), Schenectady (Mariaville), Cayuga (Moravia), Clinton (Plattsburgh) and Oneida (Rome) in February of 2023; Counties of Montgomery (Amsterdam), Jefferson (Alexandria Bay), Schoharie (Cobleskill), Oswego (Cleveland), Clinton County (Dannemora, Peru, Plattsburgh), Herkimer (Dolgeville, Herkimer, Little Falls), Jefferson (Clayton, Evans Mills, Lafargeville, Philadelphia, Theresa, Watertown), Madison (Canastota, Oneida), Oneida (Rome), Rensselaer (Hoosick Falls, Valley Falls), St. Lawrence (Gouverneur, Heuvelton, Morristown, Ogdensburg), Schenectady (Delanson), Schoharie (Central Bridge, Esperance), Washington (Cambridge, Greenwich, Salem), Cortland (Cortland, Groton, Homer, McGraw), Tompkins (Lansing, Mclean, Poplar Ridge, Union Springs), Cayuga (Moravia) and Schenectady (Mariaville) in October of 2022; and the Counties of New York (Queens, Brooklyn, Astoria, Bronx, Corona, Flushing, Forest Hills, Long Island City, Newtown, Richmond Hill), Richmond (Staten Island), Erie (Williamsville), Nassau (Mineola), and Westchester (Mount Vernon) in February of 2017. As stated under the FCC's Rule 51.333, "retirement" does not necessarily mean *removal* pursuant to 47 CFR 51.325(a)(3), but may include disabling, retirement in place or abandonment. *See* Verizon's Public Notices of Copper Retirement under the FCC's Rule 51.333. Available at: https://www.verizon.com/about/sites/default/files/2024-04-25-Verizon-Selden-Shoreham-NY-Copper-Retirement-Notice-2024-02-A-NY.pdf (April 25, 2024); https://www.verizon.com/about/sites/default/files/2023-02-21-Verizon-NY-Copper-Retirement-Notice-2023-01-A-NY.pdf and https://www.verizon.com/about/sites/default/files/2023-02-21-Verizon-NY-Copper-Retirement-Notice-Exhibit-A-2023-01-A-NY.pdf (February 13, 2023); and https://www.verizon.com/about/sites/default/files/2-28-17CopperRetIDNo2017-01-B-NY.pdf (February 28, 2017).

**49**

commercial areas then exposure would have been likely. AT&T also identified two long-distance network facilities in White Plains and Tully, New York that are associated with its lead-containing long distance network; two central office locations in Albany and Buffalo, New York, where AT&T is now a tenant; and three central office locations in Airmont, Attica, and Clarksville, New York, sold by AT&T to private entities where "cable ends [were] properly cut off and capped." AT&T also identified cable segments that contain lead in locations from Airmont to Manhattan (1.44 miles), Airmont to Chesterfield, MA (77.93 miles), Airmont to Clarksville (72.1 miles), Clarksville to Chesterfield (32.69 miles), Clarksville to Albany (8.99 miles), Clarksville to Tully (121.39 miles), Tully to Syracuse (9.61 miles), Tully to Attica (102.26 miles), Attica to Buffalo (31.07 miles), Attica to Waterford, PA (131.29 miles), Buffalo to Erie, PA (70.69 miles), Ausable Chasm to Port Kent (3.18 miles), Morrison to Fishkill (18.88 miles), and White Plains to Port Chester (7.45 miles).

c. The Frontier Defendants also have publicly acknowledged, through CEO Nick Jeffery, that some of the 685,000 miles of metallic cabling of its network includes lead cables ("[l]ead cables represent a single-digit percentage of Frontier Communications' roughly 685,000 total miles of metallic cabling in its network…") However, Mr. Jeffery refused to acknowledge the damage that lead cables have caused in New York State, indicating that Frontier has "no reason to believe that lead in Frontier cable has called any health or environmental harm.[36]" However, similar to the Verizon Defendants, Frontier also refused to provide any information whatsoever, including the *number of*

---

[36] *See* Sustainable Tech Partner, *Lead Cables in Telecom Networks: Frontier Communications' CEO Statement* (August 10, 2023). Available at: https://sustainabletechpartner.com/vertical-market/telecom-services-sustainability/lead-cables-in-telecom-networks-frontier-communications-ceo-statement/.

46

**50**

*miles* for lead-sheathed or non-lead-sheathed cables they owned or abandoned in New York.

d. The Consolidated Communications Defendants admitted that they own aerial lead-containing cables above land in sixteen locations that are "[n]ot in service, but not yet removed." These locations include an estimated 18,778 feet of cable in the municipalities of Portland, Pomfret, and Westfield (Defendant Chautauqua and Erie Telephone Corporation) and 31,140 feet of cable in the municipalities of Berlin, Austerlitz, Spencertown, Nassau, Schodack, North East, Chatham and Pine Plains (Defendant Taconic Telephone Corporation). The Consolidated Communications Defendants effectively abandoned these lead-sheathed cables.

e. Defendant Windstream purportedly submitted to the DPS "detailed information and . . . data available in a file format compatible with the GIS system" as well as a file named "Windstream Lead Cable" which consists of "revised data [sent] via the Aspera mySend data transfer site." Windstream has admitted to maintaining underground lead copper cables in New York ("most cable appears to be underground in conduit within the state") based on a "preliminary analysis of its network records, validat[ing] information in some of those records through field visits, and interview[ing] field operations staff with knowledge of [its] existing network in New York." Windstream provided information to the DPS, stating that the cables "may be lead-clad." Defendant Windstream effectively abandoned these lead-sheathed cables in the ground in this state.

f. Defendant Trumansburg admitted that it owns lead-containing copper cables in two locations that currently serve customers: "McLallen Street, Trumansburg NY, between

47

**51**

Cayuga Street and E. Seneca Road: 4,191' aerial and 55' buried . . . [and] W. Main Street, Trumansburg NY between Union Street and Salo Drive: 1,691' aerial and 55' buried." However, it also admitted that it owns lead-containing copper cable in three locations that serve *no* customers whatsoever, including "Agard Road, Town of Ulysses, between NYS RTE 96 and Jacksonville Road: 4,895' aerial . . . Trumansburg Road (NYS RTE 96), Town of Ulysses, between Cold Springs Road and Jacksonville Road: 2,778' aerial . . . [and] NYS RTE 96, Town of Romulus, between NYS RTE 414 and County Road 129: 8,556' aerial." Defendant Trumansburg effectively abandoned these lead-sheathed cables.

g.  Defendant Dunkirk admitted that it owns 7,250 feet of lead-containing aerial and buried cables, with the following description:

> "5001 CABLE (Copper)
> Starting location: 40 temple St Fredonia NY 14063
> Type: Underground (In conduit) for 100' out of C.O. aerial the remaining
> Path/distance (1): Main cable travels due East on Temple Street for approx. 1700' until dead ending at the intersection of Water Street & Liberty Street.
> Path/distance (2): cable splits off (1) into east alley (By Valentines Bar) for approx. 550' dead ending at Eagle Street.
>
> 5002 CABLE (Copper)
> Starting location: 40 temple St Fredonia NY 14063
> Type: Underground for 100' (In conduit) out of C.O. aerial the remaining
> Path/distance (1): Main cable travels East on Temple Street for approx. 4000' until dead ending at the intersection of Water Street & Howard Street.
> Path/distance (2): Cable splits off (1) into east alley (Valentines Bar) for approx. 800' and dead ends at Eagle Street & Norton Place.

144.    Defendants have not taken steps to remove these cables, prioritize their removal, or coordinate proper remediation of the public nuisance they caused or maintained in New York.

48

**52**

145.     As stated by Congressman Pat Ryan in 2023, "[f]or decades, big corporations have polluted our rivers and our drinking water, always putting their profit above the health and safety of our community. This latest failure by Verizon and AT&T is no different… It is absolutely unacceptable that their negligence is now making it dangerous for our kids to even go to the playground. They need to clean up their mess and safely remove these cables immediately.[37]

146.     In 2023, Mr. Ryan specifically demanded that Defendants explain how they "plan on addressing the environmental and public health issues posed by both aerial and submarine cables? What is the plan for remediation and will they provide remediation, including removal of all lead-sheathed cables, to any location that has any level of lead including the lead cables near the Wappingers Falls, NY playground and other locations in New York?"[38] These questions have never been properly addressed by Defendants, either in response to the Congressman's letter or in subsequent meetings.[39]

147.     Mr. Ryan assembled a team of lead experts to locate lead cables in Hudson Valley, finding such cables in Middletown, New Windsor and Poughkeepsie.

148.     The screening level for lead in soil at residential properties was previously 400 parts per million (ppm). The EPA now advises that the presence of lead in soil or sand at levels 200 ppm is reason enough to remediate the soil. At residential properties with multiple sources of lead

---

[37] *See* Press Release by Congressman Pat Ryan, *Congressman Pat Ryan Demands Verizon and AT&T Clean Up Their Mess, Remove Lead Cables from Hudson Valley and across United States* (July 20, 2023). Available at: https://patryan.house.gov/media/press-releases/congressman-pat-ryan-demands-verizon-and-att-clean-their-mess-remove-lead.

[38] Ibid.

[39] *See* USTelecom Association's response to Congressman Ryan (July 26, 2023). Available at: https://patryan.house.gov/sites/evo-subsites/patryan.house.gov/files/evo-media-document/2023.07.26-ust-response-to-rep-ryan-final.pdf.

49

**53**

exposure, the EPA says it will generally use 100 ppm as its screening level. The EPA says communities often face multiple sources of lead exposure, including in drinking water.

149. In August of 2023, Mr. Dawson from consulting group, CCG Consulting, wrote[40] about the July 12, 2024, *Telecompetitor* article, noting that "I doubt that anybody even knows the location of most abandoned buried cables. It's likely that the old hard-copy blueprints of copper networks are long forgotten or lost."

150. On September 11, 2023, Verizon published an article[41] stating that

> "The findings of Verizon's investigation conducted at Wappingers Falls, New York are consistent with the New York State Department of Health's conclusion that soil lead levels near Verizon's cable in Temple Park are generally similar to lead levels in background samples and do not pose a public health risk. At each location tested at Wappingers Falls, the average soil lead level is lower than the residential soil lead threshold levels of 400 mg/kg set by the New York State Department of Environmental Conservation. And at three of the four sampling units nearest to the lead sheathed cable, the average lead concentration in soil is less than or equal to background lead levels at that location."

151. The EPA announced on January 17, 2024, that it "lowered recommended screening levels and strengthened guidance for cleaning up lead-contaminated soil in areas where children live, learn, and play." For 30 years, the screening levels had been 400 parts per million (ppm). Currently, the level is 100 ppm where other localized sources of lead exposure are present such as lead-based paint, lead service lines (LSLs), or an area that does not meet lead air standards. For other areas, the level is 200 ppm.

---

[40] *See* Doug Dawson*, Unveiling the Lead Legacy: Addressing the Challenges of Abandoned Telephone Cables* (August 02, 2023). Available at: https://circleid.com/posts/20230802-unveiling-the-lead-legacy-addressing-the-challenges-of-abandoned-telephone-cables

[41] *See* Verizon, *Verizon reports lead test results, continues to work with EPA* (September 11, 2023). Available at: https://www.verizon.com/about/news/verizon-reports-lead-test-results-continues-work-epa

152.    In justifying the change, EPA estimated that at 200 ppm, five young children out of one hundred living, learning, and playing around the soil are expected to have blood lead levels of 5 micrograms/deciliter (µg/dL) or greater with a geometric mean of 2.3 µg/dL.[1] At 100 ppm, the blood lead levels would drop to 3.5 µg/dL and 1.7 µg/dL respectively. For context, CDC uses 3.5 µg/dL to identify children with higher levels of lead in their blood compared to most children.[2]

153.    The EPA announced a landmark decision to crack down on the sources of toxic lead exposures, the first time that the EPA lowered the acceptable screening levels for lead in decades. Congressman Ryan renewed his call for Verizon and AT&T to disclose the locations of the cables and commit to robust lead soil testing in the contaminated locations.

154.    On March 11, 2024, Jack Caravanos and others published a research letter entitled "Measurement of Soil Lead Levels Adjacent to Lead-Sheathed Communications Cables," exploring lead exposure from aerial terrestrial and submarine lead sheathed communications cables (LSCCs) and discussing the 209 XRF readings taken in suburban New York (and others in suburban New Jersey and rural Pennsylvania), which resulted in lead concentration in soil from areas immediately below aerial cables that were "substantially higher" than background levels.[42] The resulting frequency distribution of lead was depicted as such:

---

[42] Available at: https://ehp.niehs.nih.gov/doi/10.1289/EHP14086



155.    As discussed in the article, "[a]n analysis of the lateral distribution of soil lead levels directly under the New York LSCC site was taken at the New York site. Eight of the 13 transect sites showed a clear decrease in soil Pb level within a few feet off the aerial cable centerline. The average drop-off in Pb levels was ~35%. This seems to confirm the primary contamination point was directly below the suspended cable.[43]"

156.    The article concludes, as follows, with regards to childhood lead exposure:

> The main finding of this study was that lead from existing LSCCs can be transported from the cables and contaminate surrounding soil and dust. This contamination, in residential areas, has high potential to result in childhood lead exposure. According to the US EPA's Integrated Exposure Update and Biokinetic Lead Exposure Model, children exposed to a residential level of ~325 ppm in soil would yield a blood lead level of 35 μg/L, equal to the current Centers for Disease Control and Prevention (CDC) reference level (3.5μg/dL). The US EPA has recently lowered its guideline regarding levels of lead in soil for residential properties from 400 to 200mg/kg (or ppm)

157.    On March 14, 2024, the United States Securities and Exchange Commission ("SEC") sent a letter to Verizon regarding the Association of BellTel Retirees Inc.'s proposal for

---

[43] *Id.*

52

the telecom company to "undertake a comprehensive independent study and publicly release an independent report that demonstrates the Company has assessed all potential sources of liability related to lead-sheathed cables, including a comprehensive mapping of the locations impacted and conclusions on the potential cost of remediation, along with the most responsible and cost-effective way to prioritize the remediation of sites that pose a risk to public health." Verizon sought to exclude this proposal from its proxy materials for the upcoming annual meeting of security holders, in order to avoid disclosing a full inventory and location of lead-containing aerial and buried cables.

158.    In March of 2024, Congressman Ryan brought together local elected officials, environmental advocates, and concerned community members to address the growing threat of toxic lead-sheathed cables abandoned throughout the Hudson Valley. After discovering several hundred feet of abandoned cables in Orange County (Cornwall, Middletown and New Windsor), along with additional lead-sheathed cables in Ulster County (City of Kingston[44]), Town of Wappinger (Wappingers Falls) and Dutchess County (City of Poughkeepsie), the group called on Verizon and AT&T to publicly disclose the locations of all such hazardous cables in New York. The corrosion of aging lead-based infrastructure, including cables and pipes, poses a significant risk to human health, as toxic lead can leach into the environment. Lead exposure is linked to serious health issues, such as neurological damage in children and cardiovascular, kidney, and reproductive problems in adults. Since no amount of lead exposure is safe, and the toxin can accumulate in bones and teeth over time, its presence remains a major concern.

159.    Defendant Verizon has stated that it was "taking these concerns regarding lead-sheathed cables very seriously," adding that "there are many lead-sheathed cables in our network

---

[44] Upon information and belief, abandoned lead-sheathed cables have been identified on the ground on the rail trail from Kingston to Route 209 South. The trail is near the Hudson River and other surface water sources.

Case 3:24-cv-01196-N   Document 77   Filed 12/10/24   Page 61 of 165   PageID 959

(and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide.[45]"

160.    However, Verizon has acknowledged serious health risks related to copper cables in its October 2023 10-Q filing with the U.S. Securities and Exchange Commission, stating:

> There have been recent media reports alleging that certain lead sheathed copper cables that are part of our copper-based network infrastructure may present public health or environmental risks in areas where those facilities are deployed. These allegations could result in government investigations, legislative or regulatory actions, litigation, penalties and other liability, remediation and compliance costs or negative operational impacts. In addition, we are currently subject to lawsuits related to these allegations, and additional legal proceedings and other contingencies may arise in the future. Our insurance policies may not cover or may not be sufficient to fully cover the costs of these claims. Accordingly, we may incur substantial expenses as a result of these allegations, which cannot be reasonably estimated at this time but could be material.[46]

161.    One of Verizon's investors, Parnassus Investments, stated publicly in April of 2024 that, despite the *Wall Street Journal* investigation, it invested in Verizon because it "believed that Verizon had less exposure than other telecoms because it was early to upgrade its network to fiber and had already divested much of its copper footprint . . . [and] knew that lead-sheathed cables likely represented a small portion of its overall footprint.[47]"

162.    Notwithstanding, the full scope of all Defendants' lead footprint is significant in New York, including the communities governed by Plaintiff and Class Members.

---

[45] *See* Futurism, *Old Phone Cables Appear to Be Contaminating US Soil and Water With Lead* (July 11, 2023). Available at: https://futurism.com/phone-cables-soil-water-lead.

[46] *See* Verizon Communications, Inc.'s Form 10-Q filing before the SEC, located at: https://quotes.quotemedia.com/data/downloadFiling?webmasterId=104600&ref=317820291&type=PDF&formType=10-Q&formDescription=General+form+for+quarterly+reports+under+Section+13+or+15%28d%29&dateFiled=2023-10-26&cik=0000732712

[47] *See* Parnassus Investments, *Verizon and Toxic Lead Cable Risk.* Available at: https://www.parnassus.com/featured-articles/verizon_and_toxic_lead_cable_risk

**58**

163.    Defendants (a) permitted, caused and/or contributed to the contamination of Plaintiff's soil, water sources or supply wells; (b) may be vicariously responsible for entities or persons who permitted, caused and/or contributed to the contamination of Plaintiff's soil, water sources or supply wells; and/or (c) may be successors in interest to entities or persons who permitted, caused and/or permitted , contributed to the contamination of Plaintiff's soil, water sources or supply wells.

164.    The infrastructure owned, operated and managed by Defendants includes a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water. Defendants improperly installed, maintained, serviced, owned and/or operated lead-sheathed cables or failed to timely perform necessary and reasonable response and remedial measures to releases of lead and/or their chemical precursors into the environment in which Plaintiff's soil, water supplies and well exist.

165.    All Defendants are aware of these risks, as evidenced by their public statements and refusals to cooperate with the DPS's investigation or other investigations.

166.    For years, Defendants have been aware of the incidence of high blood lead levels in children in New York state.

167.    The New York Department of Health's Heavy Metals Registry collects occupational blood levels for the entire state. In 2014, there was an average of 26.6 per 100,000 employed persons 16+ years of age in Ulster County and 34.5 per 100,000 employed persons 16+ years of age in Dutchess County (where the Town of Wappinger is located) with elevated blood levels. These results were higher than the New York state rate of 23.4.[48]

---

[48] See Healthy Capital District Initiative's Capital Region, Mohawk and Hudson Valley DSRIP, *Community Needs Assessment* (December 2014). Available at: https://www.health.ny.gov/health_care/medicaid/redesign/dsrip/pps_applications/docs/albany_medical_center_hospital/3.8_albany_med_cna.pdf

FILED: NEW YORK COUNTY CLERK 11/12/2024 02:07 PM | INDEX NO. 160566/2024
NYSCEF DOC. NO. 2 | RECEIVED NYSCEF: 11/12/2024

Case 3:24-cv-01196-N    Document 77    Filed 12/10/24    Page 63 of 165    PageID 961

168.     A 2011-2018 study by New York DOH demonstrated that, for years, Ulster County had the highest incidence of high blood lead levels in children, ranging from 6.7 per 1000 children to 16.4 per 1000 children in 2014, as depicted below:



**Figure 34**

Incidence of High Blood Lead Level per 1,000 Children (< 72 Months) Tested, 2011-2018

|  | Three-Year Average | | | | | | | Single-Year | |
|---|---|---|---|---|---|---|---|---|---|
|  | Dutchess | Orange | Putnam | Rockland | Sullivan | Ulster | Westchester | NYS excl NYC | NYS |
| 2011 | 6.4 | 8.1 | 0.8* | 3.1 | 9.8 | 6.7 | 3.9 | 7.2 | 4.6 |
| 2012 | 6.7 | 8.7 | 0.8* | 3.7 | 10.8 | 10.6 | 4.3 | 7.5 | 4.3 |
| 2013 | 6.1 | 9.5 | 1.3* | 3.7 | 7.9 | 12.8 | 4.3 | 11.6 | 5.9 |
| 2014 | 7.3 | 10.5 | 1.3* | 3.9 | 6.0 | 16.4 | 4.8 | 9.0 | 5.0 |
| 2015 | 5.0 | 7.0 | 1.8* | 2.7 | 6.8 | 13.1 | 3.9 | 9.8 | 4.2 |
| 2016 | 6.0 | 4.5 | 2.6* | 2.2 | 10.0 | 12.5 | 4.0 | 6.0 | 3.7 |
| 2017 | 4.7 | 4.0 | 2.7* | 2.2 | 10.2 | 9.0 | 3.5 | 6.9 | 4.1 |
| 2018 | 6.0 | 4.7 | 3.4 | 2.2 | 8.6 | 8.4 | 3.5 | 6.5 | 3.6 |

*: Fewer than 10 events in the numerator, therefore the rate/percentage is unstable.
Note: This includes children newly identified with a confirmed elevated blood lead level of 10 µg/dL or greater per 1,000 children among children less than 72 months tested in the given time frame.
Three-year averages for counties and single-year estimates for NYS excluding NYC and NYS.
Source: NYSDOH Community Health Indicator Reports (CHIRS), 2021
https://webbi1.health.ny.gov/SASStoredProcess/guest?_program=/EBI/PHIG/apps/chir_dashboard/chir_dashboard&p=it&ind_id=Cg28

169.     For years, Ulster County maintained a campaign to "Get the Lead Out" pertaining to the high blood levels in children based on major sources of exposure known at the time, including paint, dust, toys and properties built before 1978.[49] Ulster County has worked tirelessly

---

[49]     *See* Ulster County Childhood Lead Poisoning Prevention Program. Available at: https://ulstercountyny.gov/health/ulster-county-childhood-lead-poisoning-prevention-program

**60**

to remove lead from its communities, including $20 million in its budget for lead hazard removal, including recently from aging rental homes.[50]

170.    Recently, after three years of litigation, on September 18, 2024, the defendant Pacific Bell Telephone Company (now AT&T) agreed to settle the matter of *California Sportfishing Protection Alliance v Pacific Bell Telephone Company,* 21-00073-JDP (E.D. California), by removing 8 miles of lead-containing telecommunications cables in Lake Tahoe, California, which contain over 120,000 pounds of lead conduit/sheathing. However, said defendant has refused to admit that that the cables pose any risk to human health or the environment.

### B.  LEAD POSES SIGNIFICANT HEALTH RISKS

171.    Lead exposure can cause catastrophic health effects to humans, including damage to an individual's central nervous system, brain, kidneys, and cardiovascular system. For example, lead exposure can cause reduced kidney function, decreased blood hemoglobin, neuropathy, neurological problems, decreased cognitive function, and hearing and speech problems.

172.    Lead exposure can also cause reproductive problems, including loss of sex drive, decreased fertility, infertility, reduced fetal growth, miscarriage, still birth, and premature birth. According to a recent study from health economists Daniel Grossman of West Virginia University and David Slusky of Kansas University, the fertility rate in Flint, Michigan, dropped precipitously after the city decided to switch to lead-poisoned Flint River water in 2014.

173.    Lead exposure can also cause gastrointestinal symptoms, bowel changes, lung disease, muscle weakness, thyroid issues, cramps, hyperactivity, learning problems, changes in behavior or personality, headaches, vomiting, fatigue, irritability, mood changes, anemia,

---

[50] *See* Spectrum News article, *Funding will help Ulster County remove lead from dozens of rental homes*, March 17, 2024. Available at: https://spectrumlocalnews.com/nys/central-ny/news/2024/03/27/ulster-county-to-start-on-removing-lead-from-dozens-of-homes

abdominal pain, muscle and joint pain, constipation, trouble sleeping, trouble concentrating, memory problems, and numbness in feet or legs.

174.    Lead is also classified as a probable human carcinogen by the International Agency for Research on Cancer (IARC).

175.    Lead is so harmful to humans that ingestion of lead can cause seizures, coma and even death.

176.    There is no level of exposure to lead that is known to be without harmful effects, and there is no known safe blood concentration.

177.    The Environmental Protection Agency ("EPA"), Food and Drug Administration ("FDA"), the World Health Organization ("WHO"), Centers for Disease Control and Prevention ("CDC"), and the American Medical Association ("AMA") have all independently stated that there is no safe level of lead in a human body: (a) the EPA has stated that "the Maximum Containment Level Goal for lead is zero," which EPA set "based on the best available science which shows there is no safe level of exposure to lead"[51]; (b) the FDA has stated that "there is no known identified safe blood lead level"[52]; (c) the WHO has likewise stated that "[t]here is no known 'safe' blood lead concentration"[53]; (d) the CDC have found that "no safe blood lead level has been identified"[54]4; and (e) the AMA has stated that "we know that there is no safe level of lead."[55]

178.    The WHO's 2021 update of the public health impact of chemicals estimates that nearly half of the two million lives lost to known chemicals exposure in 2019 were due to lead

---

[51] EPA, Basic Information about Lead in Drinking Water, (August 13, 2020).
[52] Welch, Teresa, Lead Found in 20% of Baby Food, Report Says, (June 19, 2017).

[53] WHO, Lead Poisoning and Health, (August 23, 2019).

[54] CDC, National Biomonitoring Program, Factsheet, (July 12, 2013).

[55] AMA, AMA Adopts New Policies to Prevent Future Lead Poisoning, (June 14, 2016).

58

exposure. Lead exposure is estimated to account for 21.7 million years lost to disability and death (disability-adjusted life years) worldwide due to long-term effects on health, with 30% of the global burden of idiopathic intellectual disability, 4.6% of the global burden of cardiovascular disease and 3% of the global burden of chronic kidney diseases.

179.    Humans can be exposed to lead through occupational and environmental sources. For example, lead exposure can result from inhalation of lead particles or ingestion of lead-contaminated dust, water and food.

180.    The body accumulates lead over a lifetime and normally releases it very slowly.

181.    The effects of lead exposure are long lasting. Even without further exposure, lead can stay in the blood for months and be stored in bones and teeth for decades.

182.    Individuals exposed to toxic lead may not develop lead-related conditions, or show lead-related symptoms, until years after the lead exposure. For example, although lead can stay in the blood for months, it can be distributed to and stored in bones and teeth for decades. Lead stored in bones and other mineralizing tissues can remain inert for many years and then be released back into circulation at a later date, damaging soft tissue and causing lead-related conditions at that time.

183.    The absorption and biological fate of lead, once it enters the human body, depends on a variety of factors. The blood carries only a small fraction of total lead body burden, and serves as the initial receptacle of absorbed lead, distributing it throughout the body, making it available to other tissues. Absorbed lead that is not excreted is exchanged primarily among three compartments: blood; mineralizing tissues (e.g., bones and teeth); and soft tissues (e.g., liver, kidneys, lungs, brain, spleen, muscles, and heart).

59

**63**

184.    Blood lead level is a widely used measure of exposure. Blood-lead-level tests, however, do not measure total body burden of lead and instead tend to be more reflective of recent or ongoing exposures.

185.    Mineralizing tissues (e.g., bones and teeth) carry the majority of total lead body burden in both adults and children. Lead in mineralizing tissues is not uniformly distributed. It tends to accumulate in bone regions undergoing the most active calcification at the time of exposure.

186.    Inert components of mineralizing tissues can store lead for decades. Under certain circumstances, however, previously inert lead will leave the bones and reenter the blood and soft tissue organs. Bone-to-blood lead mobilization can be unpredictable, but it increases during periods of: advanced age; broken bones; chromic disease; hyperthyroidism; immobilization (e.g., bedridden); kidney disease; lactation; menopause; physiologic stress; and pregnancy (lead in bone is released into the blood during pregnancy and becomes a source of exposure to the developing fetus). Consequently, the normally inert pool of lead in the body poses a special risk because it is a potential endogenous source of lead that can maintain exposure to the toxic effects of lead long after exposure has ended.

187.    Sometimes individuals exposed to lead have no symptoms. Other times, symptoms caused by lead exposure will not appear right away. When symptoms do occur, they may develop over weeks or months, and may flare up sporadically at irregular times.

188.    Symptoms or health effects can appear in the absence of significant current exposure because lead from past exposures can be stored in the body for decades. Thus, it is important that individuals with historical lead exposure receive special medical monitoring to, among other things, evaluate whether the patient has potential lead poisoning, examine current or

60

**64**

past lead exposures, look for other factors that affect the biokinetics of lead (such as poor nutrition, advanced age, broken bones, chromic disease, hyperthyroidism, immobilization (e.g., bedridden), kidney disease, lactation, menopause, physiologic stress, and pregnancy), and rule out lead poisoning as a cause of unexplained seizures or coma or any of the other conditions with which it is associated.

189.    Lead's catastrophic effects are indisputable. According to the EPA, "[y]oung children, infants, and fetuses are particularly vulnerable to lead because the physical and behavioral effects of lead occur at lower exposure levels in children than in adults. A dose of lead that would have little effect on an adult can have a significant effect on a child. In children, low levels of exposure have been linked to damage to the central and peripheral nervous system, learning disabilities, shorter stature, impaired hearing, and impaired formation and function of blood cells."

190.    According to the World Health Organization, "lead affects children's brain development resulting in reduced intelligence quotient (IQ), behavioral changes such as shortening of attention span and increased antisocial behavior, and reduced educational attainment. Lead exposure also causes anemia, hypertension, renal impairment, immunotoxicity and toxicity to the reproductive organs. The neurological and behavioral effects of lead are believed to be irreversible."

191.    Populations at higher risk for lead exposure include children from low-income households, children less than six years old, immigrant and refugee children from less developed countries, pregnant people, and adults working in industries that expose them to lead.[56]

---

[56] *See* , page 81. Available at: https://www.montefiorenyack.org/sites/default/files/2022%20REGIONAL%20Community%20Health%20Needs%20Assessment.pdf.

192.     Lead is so harmful that, according to the EPA, "ingestion of lead can cause seizures, coma and even death."[57]

193.     The effects of lead exposure are long lasting. The EPA has explained that, "[l]ead can accumulate in our bodies over time, where it is stored in bones along with calcium. During pregnancy, lead is released from bones as maternal calcium is deployed to help form the bones of the fetus. Lead can also cross the placental barrier exposing the fetus to lead. This can result in serious effects to the mother and her developing fetus, including: reduced growth of the fetus [and] premature birth."

194.     Lead is also harmful to adults. The EPA warns that "[a]dults exposed to lead can suffer from: Cardiovascular effects, increased blood pressure and incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive problems (in both men and women)." The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning—typically chelation therapy—as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

### C.  EXPOSURE TO DEFENDANTS' LEAD-SHEATHED CABLES PUTS THE PUBLIC AT A HEIGHTENED RISK OF DEVELOPING FUTURE LEAD-RELATED CONDITIONS

195.     The public's exposure to Defendants' lead-sheathed cables creates a uniquely high risk of lead exposure and the onset of future lead-related conditions.

196.     According to recent reporting by the *Wall Street Journal*, the lead-sheathed telecommunications cables can have a dusting of silvery lead so soft and thick that people would at times scribble messages in it.

---

[57] *See* U.S. Environmental Protection Agency, *Learn about Lead* (last updated on February 7, 2024). Available at: https://www.epa.gov/lead/learn-about-lead

197.    In many instances, Defendants' aerial cables are attached to the same utility poles that carry other types of utility cables. Workers servicing the cables on the pole must walk on the ground underneath Defendants' lead-sheathed cables, climb up to and over the lead-sheathed cables to access the other cables on the pole, perform their work in very close proximity to the lead-sheathed cables, interact with and touch the lead-sheathed cables, and inhale the air surrounding the lead-sheathed cables.

198.    A 1980 Mount Sinai study of 90 cable splicers found that the average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, six splicers had a blood-lead level of 40 or more micrograms per deciliter, half of them had symptoms, and 29% reported central nervous system symptoms. The study found that those with higher levels of lead in their bodies had more central nervous system and gastrointestinal symptoms.

199.    A 2022 Mount Sinai study of 20 Verizon workers found many had lead in their bones. 60% of workers had measurable lead in their shin bones. 45% of workers had lead at or above 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems over time. Only 5% of the workers had an elevated blood-lead level, demonstrating the inadequacy of relying on current blood-level testing to measure legacy lead exposure.

200.    According to the *Wall Street Journal*, which recently published investigative reporting on the impact of lead-sheathed telecommunications cables on occupationally exposed telecommunications workers: (a) a worker who was occupationally exposed to lead telecommunications cables in the Bronx in the 1980s was tested for lead by Nynex, now part of Verizon, and the testing showed significantly elevated levels of lead in his body; (b) multiple workers in the same family who were occupationally exposed to lead-sheathed telecommunications cables while working for AT&T all now have significant health issues that

**67**

can be caused by lead exposure; (c) a 2013 Minnesota OSHA investigation of another successor to the old Bell telephone system, CenturyLink, showed that a worker handling lead was exposed to airborne lead averaging 76 micrograms per cubic meter of air over eight hours, 52% above the regulator's limit; (d) a cable splicer for AT&T reported working at least once a week with aerial or underground lead-sheathed cables, and thereafter had a kidney removed after a resurgence of cancer; and (e) a cable splicer for Southern Bell and Verizon now has chronic headaches, memory loss and difficulty breathing, his wife had two miscarriage, and his daughter suffered from childhood heart problems and has been diagnosed with ADHD, all of which can be linked to occupational lead exposure.

### D. DEFENDANTS WERE AWARE OF THE RISKS PRESENTED BY THE TOXIC LEAD CABLES BUT DID NOT TAKE MEANINGFUL ACTION.

201.    For decades, Defendants and their predecessors, dating back to the old Bell system, have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment.

202.    There were signs at the dawn of the industry that lead could harm workers. Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925 book, *Industrial Poisons in the United States*.

203.    The old Bell system of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers and kept detailed medical records.

204.    Studies from the 1970s and '80s show that employees of the old Bell system who worked with lead cables regularly had high amounts of lead in their blood.

205.    A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers. Based on testing, it estimated that the workers had high blood-lead levels in the range of 24 to 45 micrograms per deciliter.

206.    Blood tests showed high lead levels in cable splicers, who fixed and maintained cables. A 1978 letter between Communications Workers of America union officials said that Defendants' predecessors—corporate affiliates of the Bell Telephone Company and AT&T— have "confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."

207.    According to recent reporting by the *Wall Street Journal*, another worker who worked as a cable splicer for several Bell system companies for 45 years reported that company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after.

208.    Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85, or more than 40%, had levels above 3.5 micrograms per deciliter, which is the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.

209.    According to recent reporting by the *Wall Street Journal*, one worker who retired from Verizon in 2021 after 40 years of working with lead said he raised concerns with managers about routinely pumping out water from manholes that were potentially contaminated with lead, including in front of schools. He said they told him, "If you don't feel safe, we'll send someone else." The worker is quoted as saying: "When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust."

65

**69**

Case 3:24-cv-01196-N     Document 77     Filed 12/10/24     Page 73 of 165     PageID 971

210. AT&T has previously noted the risks from similar lead-sheathed cables dating to the old Bell system in its network, and, over the years, AT&T officials have expressed concern about the risks these cables present to workers.

211. At a gathering of telecom officials more than a decade ago, a senior AT&T manager cautioned the group about a little-known danger crisscrossing the nation. His topic was the toxic lead-covered cables. Weren't these ancient cables gone? "NO," his slide presentation said. "Some older metropolitan areas may still have over 50% lead cable," the slide said, and in some places they posed risks for phone-company workers and the surrounding environment. In the 2010 presentation, the manager acknowledged the environmental impact, saying that "soils retained between 83 and 98 percent of the released lead within 2 inches" from the cables.

212. In a 2013 presentation, the same senior AT&T manager described how workers should be protected in the field, saying "POISON" signs needed to be placed visibly for technicians working with lead, and that workers handling the toxic metal should wear respirator masks and disposable Tyvek coveralls.

213. Notwithstanding their knowledge of the risks associated with the lead-sheathed cables, Defendants have not meaningfully acted on the health risks to the individuals who work, live and play near the cables, or made adequate efforts to assess and dispose of the cables as required by New York law.

**E. LAWMAKERS ARE DEMANDING THAT DEFENDANTS TAKE ACTION TO REMEDIATE THE SIGNIFICANT RISKS POSED BY THEIR TOXIC LEAD CABLES**

214. In response to recent media reporting on the existence of the toxic lead cables, lawmakers are demanding that telecom firms act to ensure that Americans are safe.

66

215. U.S. Senator Edward Markey wrote a letter to USTelecom, the industry group representing telecom companies, including Defendants, that: "This is corporate irresponsibility of the worst kind," and [t]he telecommunications companies responsible for these phone lines must act swiftly and responsibly to ensure the mitigation of any environmental and public health effects, and "[t]he members of USTelecom that are responsible for these lead-sheathed cables have a duty—both civic and legal—to ensure that they do not put Americans in harm's way."

216. U.S. Representative Patrick Ryan said telecom companies should "do the right thing and clean up their mess."

217. U.S. Rep. Frank Pallone, Jr., a ranking member of the House Energy and Commerce committee, said: "There is no safe level of lead exposure—none—which is why I'm so disturbed by these reports of lead cable lines throughout the country," and "[i]t is imperative that these cables be properly scrutinized and addressed."

## F. PLAINTIFF AND CLASS MEMBERS MUST BE MEDICALLY MONITORED FOR FUTURE LEAD-RELATED CONDITIONS

218. Given the substantial risk of toxic lead exposure to individuals residing and working within the communities governed by Plaintiff and Class Members, and the risk that lead stored in their bodies from a prior exposure may not manifest into a lead-related condition for years or decades, Plaintiff and the Class need a program of medical surveillance to monitor the extent and effect of the exposure suffered by these individuals to Defendants' toxic lead-sheathed cables, and to permit the earliest possible diagnosis of illnesses, which could lead to improved outcomes, prolongation of life, relief of pain, and minimization of disability.

219. Defendants provide a health monitoring program, including lead testing, to their own employees, but do not presently pay the cost of medical monitoring for other individuals exposed to lead from their toxic lead-sheathed cables.

## G.  THE AVOIDABLE CRISIS NEEDS TO BE RECTIFIED

220. The telecom companies' abandonment of a sprawling network of cables covered in toxic lead, on poles overhead, in the soil, in buildings, and under water is a public health risk.

221. The damages to Plaintiff include, but are not limited to:

a. Soil Contamination: Leaching lead into the soil causes significant contamination, requiring costly remediation efforts. Plaintiff is entitled to recover the cost of such efforts.

b. Water Contamination: Lead seeping into water bodies (lakes, rivers, groundwater) causes public health hazards, necessitating water treatment and environmental restoration costs. Plaintiff is entitled to recover such costs.

c. Air Contamination (from Aerial Lines): Lead contamination from overhead cables impacts air quality, particularly through lead dust, necessitating air testing and mitigation measures. Plaintiff is entitled to recover the costs of said testing and mitigation measures.

d. Health Monitoring and Treatment: Lead exposure poses serious health risks, especially to vulnerable populations like children, causing the need for costly public health monitoring, blood lead level testing, and medical care for affected residents. Plaintiff is entitled to recover such costs.

e. Long-Term Health Impacts: Chronic exposure to lead causes developmental delays, cognitive impairments, and other health problems, causing the need for costly long-term health care programs and mental health services for affected populations. Plaintiff is entitled to recover such costs.

f. Property Devaluation: Contaminated land, water, and air lead to decreased property values for both public and private properties affected by lead contamination.

g. Tourism and Recreation: Lead contamination that affects recreational areas causes reduced tourism revenue, lost income from parks, fishing, and other outdoor activities.

h. Water Infrastructure: Lead contamination affects public water supplies and may require costly major upgrades to water infrastructure, such as filtration systems, to remove lead. Plaintiff is entitled to recover such costs.

i. Roads and Utility Infrastructure: Lead contamination affects road construction, utility maintenance and other public works, and will require costly reengineering and/or repairing of these projects. Plaintiff is entitled to recover such costs.

j.   Environmental Laws: The presence of lead contamination will require Plaintiff to comply with stringent state and federal environmental regulations and costly permits, testing, and regulatory reporting. Plaintiff is entitled to recover such costs.

k.   Administrative Costs: Plaintiff is entitled to recover the cost of public hearings, environmental impact studies, and additional county staffing to manage the issue.

222.   As herein described, Defendants have created, maintained, or contributed to a substantial interference with the public's right to health and safety, exacerbating the ongoing public health crisis.

223.   New York law permits civil enforcement actions based on such a nuisance.

224.   The misconduct of each Defendant is ongoing and continuous.

225.   Each Defendant's misconduct has resulted in significant ongoing harm and costs to Plaintiff.

226.   Plaintiff believes that abating the public health and safety crisis caused by Defendants' products will require extensive additional resources, including those necessary to (a) develop and execute policies and procedures to locate, recover, and destroy abandoned toxic lead cables, (b) research and implement processes sufficient to identify and trace the abandoned toxic lead cables, and (c) support communities hard hit by the public health crisis.

227.   All Defendants herein named caused, maintained, and/or contributed to this crisis for their own profit, and must be held accountable.

69

**73**

## TOLLING / FRAUDULENT CONCEALMENT

228.    Plaintiff asserts all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

229.    The discovery rule applies to toll the running of the statute of limitations until Plaintiff and Class Members knew, or through the exercise of reasonable care and diligence should have known, of facts that Plaintiff and Class Members had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

230.    The nature of Plaintiff's injuries, damages, or their causal relationship to Defendants' conduct was not discovered, and through reasonable care and due diligence could not have been discovered until a date within the applicable statute of limitations for filing Plaintiff's claims.

231.    Plaintiff brings this complaint within the applicable statute of limitations. Specifically, Plaintiff brings this action within the prescribed time limits following Plaintiff's awareness of its risk of injury and Plaintiff's knowledge of the wrongful cause. Prior to such time, Plaintiff did not know and had no reason to know of their injuries and/or the wrongful cause of those injuries.

232.    The running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from relying on any statutes of limitation or repose by virtue of their acts of fraudulent concealment, through affirmative misrepresentations and omissions to Plaintiff. Defendants affirmatively withheld and/or misrepresented facts concerning the health risks presented by their toxic lead cables. As a result of Defendants' misrepresentations and concealment, Plaintiff was unaware and could not have known or have learned through reasonable

70

**74**

diligence, of facts related to Defendants' misrepresentations or omissions, that Plaintiff had been exposed to the risks alleged herein, or that those risks were the direct and proximate result of the wrongful acts and/or omissions of Defendants.

233.    Given Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the risks presented by the lead-sheathed Cables and because Plaintiff could not reasonably have known of these risks, Defendants are estopped from relying on any statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

234.    A reasonably prudent person in Plaintiff's position would not have known, or been placed on inquiry notice, not just of the Defendants' wrongful conduct, but that substantial, non-transient damage had resulted and was capable of ascertainment. Plaintiff did not learn that it had been injured by Defendants' actions, the source of those injuries, or that those injuries were part of a pattern of conduct until only recently, until the *Wall Street Journal* published its article.

235.    This information had never before been made public, nor had it ever before been in Plaintiff's possession, and not otherwise available to Plaintiff previously. Thus, any applicable limitations period began to run not when Defendants committed their wrongful acts, rather but when the damage resulting from Defendants' wrongful acts was sustained and capable of ascertainment by Plaintiff, which did not occur until investigative articles were recently published and Defendants admitted to owning, operating, maintaining lead-sheathed cables in New York.

236.    Defendants are equitably estopped from relying upon a statute of limitations defense and/or any applicable statutes of limitation are equitably tolled because Defendants undertook active efforts to deceive or mislead Plaintiff and the public and to purposefully conceal their unlawful conduct.

237. Plaintiff did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on Plaintiff and Class Members, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

238. Defendants intended that their actions and omissions would be relied upon, including by Plaintiff and Class Members. Plaintiff and Class Members did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

239. Plaintiff and Class Members reasonably relied on Defendants' affirmative statements alleged herein, including those regarding Defendants' commitment to preventing and addressing the abandoned lead-sheathed telecommunications cables.

240. Through their public statements, marketing, and advertising, Defendants' deceptions deprived Plaintiff of actual or presumptive knowledge of facts sufficient to put it on notice of potential claims.

241. Due in large part to their deceptive, intentional, and fraudulent conduct, the full scope of Defendants' wrongful conduct and their central role in the public health crisis has not yet come to light.

## SUCCESSOR LIABILITY

242. To the extent that the wrongful acts or omissions alleged herein were committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omissions because (a) they expressly or impliedly assumed the predecessor's liability, (b) there was a consolidation or merger of predecessor and successor, or (c) the surviving entity was a mere continuation of the predecessor. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a)

72

continuity of ownership; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; (d) continuity of management, personnel, physical location, assets and general business operation of the predecessor, and (e) assumption of an identical or nearly identical name. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## ALTER EGO LIABILITY

243. To the extent that the wrongful acts or omissions alleged herein where committed or omitted by wholly owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (a) they dominated and controlled the wholly owned or majority-owned entity and (b) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## CLASS ACTION ALLEGATIONS

244. Plaintiff brings this action on behalf of a class of all government units in New York State with full legal authority that provide essential services such as public health, law enforcement, and emergency care to their residents – who have been exposed to significant health risks, including damage to the brain, nervous system, and other serious conditions, particularly affecting children, by Defendants' actions and inaction regarding abandoned lead-sheathed telecommunications cables, and who have suffered ongoing harm and a substantial financial

73

burden on their limited resources, costs and damages incurred due to the Defendants' actions in New York (the "Class").

245. The Class satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of CPLR § 901 for maintaining a class action.

246. The Class is so numerous that joinder of all members is impracticable. Upon information and belief, the communities governed by other government units in New York have been affected by abandoned toxic lead cables. Defendants have refused to provide full disclosure of the extent of the abandoned lead-sheathed cables in New York. Because this information is purportedly confidential or consists of trade secrets, the identity of many class members is unknown to Plaintiff, and therefore joinder is impractical.

247. There are numerous questions of fact and law common to the Class. The claims in this action are that Defendants are failing to act in accordance with their policies, procedures and state law. The factual and legal determinations necessary to resolve that dispute are common to the Class.

248. The individual Plaintiff's claims are typical of the claims of the Class. The named Plaintiff is a government unit that provides essential services such as public health, law enforcement, and emergency care to their residents – who have been exposed to significant health risks, including damage to the brain, nervous system, and other serious conditions, particularly affecting children, by Defendants' actions and inaction regarding abandoned lead-sheathed telecommunications cables, and who have suffered ongoing harm and a substantial financial burden on their limited resources, costs and damages incurred due to the Defendants' common policies, practices, and patterns of conduct.

249. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex class action litigation and multidistrict litigation in commercial and environmental claims on behalf of municipalities in New York, among others. There is no conflict between the Plaintiff and the Class.

250. Defendants have acted or have refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

251. There are questions of law and fact raised by the named Plaintiff's claims common to those raised by the Class they seek to represent. Those include:

i. whether lead is toxic;
ii. whether lead-sheathed cables pose serious health risks to the public;
iii. whether Defendants were aware of the existence of the lead-sheathed cables;
iv. whether Defendants were aware of the health risks posed by the lead-sheathed cables to those exposed to the cables;
v. whether Defendants' lead-sheathed cables are solid waste;
vi. whether Defendants' lead-sheathed cables are hazardous waste;
vii. whether Defendants' lead-sheathed cables were abandoned;
viii. whether the lead that has leached off of Defendants' lead-sheathed cables into the surrounding environment is solid waste;
ix. whether the lead that has leached off of Defendants' lead-sheathed cables into the surrounding environment is hazardous waste;
x. whether the lead that has leached off of Defendants' lead-sheathed cables into the surrounding environment was abandoned;
xi. whether medical testing is valuable to the public;
xii. whether the public should be medically monitored to protect against the health risks of lead exposure;
xiii. whether Defendants should be required to create a fund to pay for ongoing medical surveillance and monitoring to pay for ongoing medical surveillance and monitoring of utility workers that Defendants exposed to the lead-sheathed cables;
xiv. whether Defendants should be required to abate lead hazards that they know or should know exist due to their lead-sheathed cables;
xv. whether Defendants' actions constitute negligence per se; and
xvi. whether Defendants should be required to warn Plaintiff about the risks posed by Defendants' cables.

252.    A class action is superior to other available methods for a fair and efficient adjudication of this matter because the prosecution of separate actions by individual Class members would unduly burden the Court and create the possibility of conflicting decisions.

253.    Class action treatment is superior to any alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail.

254.    Individual Class Members' damages are inadequate to justify the costs of prosecuting their claims in any manner other than a class action. No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy. Class Members are readily identifiable from the Defendants' records.

255.    Prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the Defendants.

256.    Without a class action, Defendants would retain the benefit of their wrongdoing and will continue a course of action that will result in further damages to Plaintiff and the Class.

257.    Plaintiff intends to send notice to all members of the Class to the extent required by Article 9 of the CPLR.

258.    The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiff and Class Members to secure redress for injuries sustained and to obtain class-wide abatement relief.

259.     The violations of law and resulting harms alleged by the named Plaintiff are typical of the legal violations and harms suffered by all Class Members.

260.     Plaintiff's Class representatives will fairly and adequately protect the interests of the Plaintiff Class members. Plaintiff's counsel is unaware of any conflicts of interest between the Class representatives and absent Class members with respect to the matters at issue in this litigation; the Class representatives will vigorously prosecute the suit on behalf of the Class; and the Class representatives are represented by attorneys with substantial experience and expertise in complex and class action litigation who have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Class.

261.     The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or one or more of the Defendants.

262.     Defendants have acted or failed to act on grounds generally applicable to Plaintiff, necessitating declaratory and abatement relief for the Class.

263.     Plaintiff reserves the right to seek certification of common questions related to Defendants' knowledge, conduct, and duties.

## CAUSES OF ACTION

### COUNT 1: Negligence (Including Gross Negligence)

264. Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

265. This cause of action is brought by Plaintiff on behalf of the Class (for the purposes of this Count, "Plaintiffs") against Defendants.

266. Defendants owed a general duty to exercise reasonable care in preventing foreseeable harm to Plaintiffs. Defendants knew that the lead cables created a risk of lead exposure to utility pole workers, and Defendants were aware of the severe consequences of lead exposure through the many studies of their own lead-exposed employees and the medical monitoring Defendants conduct of their own lead exposed employees. Defendants had the opportunity and ability to properly store and dispose of the cables and remediate any lead that washed off of the cables into the surrounding environment.

267. Additionally, Defendants undertook, for consideration, to install, and/or maintain, and/or operate, and/or service, lead-sheathed cables in New York that they subsequently abandoned. Based on their undertaking, Defendants had a duty to the public to exercise that degree of care consistent with the degree of knowledge and skill possessed by Defendants.

268. Defendants' duties to Plaintiffs included, but were not limited to, a duty to install and/or maintain and/or operate and/or service and/or dispose of the lead-sheathed cables in such a manner that would not endanger the public health and property; a duty to take other actions consistent with the degree of knowledge and skill possessed by it; a duty to warn the public and other reasonably foreseeable victims of the dangers posed by Defendants' lead-sheathed cables;

78

**82**

INDEX NO. 160566/2024
RECEIVED NYSCEF: 11/12/2024

and/or the duty to properly dispose of the lead-sheathed cables and to not abandon the cables or the lead that has run off the cables into the surrounding environment.

269.    Defendants also have statutory duties under New York law. Pursuant to the New York Environmental Conservation Law (ECL) § 37-0107, "[n]o person shall… release to the environment substances hazardous or acutely hazardous to public health, safety or the environment in contravention of rules and regulations promulgated pursuant hereto." Pursuant to the New York ECL, Defendants had a duty to not endanger public health, safety or the environment by:

> 1… intentionally engag[ing] in conduct which causes the release of a substance acutely hazardous to public health, safety or the environment or the release of a substance which at the time of the conduct he knows to meet any of the criteria set forth in paragraph (b) of subdivision one of section 37-0103 of this chapter when he is aware that such conduct creates a substantial risk of serious physical injury to any person who is not a participant in the crime; or
>
> 2…. knowingly engages in conduct which causes the release of a substance acutely hazardous to public health, safety or the environment or the release of a substance which at the time of the conduct he or she knows to meet any of the criteria set forth in paragraph (b) of subdivision one of section 37-0103 of this chapter and such release causes physical injury to any person who is not a participant in the crime; [or]
>
> 3. With intent to dispose of an acutely hazardous substance, he or she intentionally engages in conduct that causes the unlawful disposal or release of an acutely hazardous substance on any property.

Pursuant to the New York ECL, Defendants had a duty to, among other things, store or dispose of the cables in a manner that does not create a public nuisance or adversely affect the public health, safety and welfare.

270.    The lead-sheathed cables and run-off lead Defendants disposed of throughout New York present an imminent and substantial endangerment to health and the environment. The lead-sheathed cables in aggregate together contain, upon information and belief, many tons of lead. As described throughout this complaint, the lead presents significant health risks to the public,

**83**

elevating the level of lead in the environment surrounding the cables, including children's play areas, to levels far in excess of EPA recommendations.

271.    Lead in the lead-sheathed cables came, and comes into, contact with water from rain, sleet, or snow, which causes the lead to drip onto the soil below, thus causing people who come into physical contact with the water and soil to be exposed to lead. Other animals throughout New York's ecosystems are exposed to lead in similar ways.

272.    There is no level of exposure to lead that is known to be without harmful effects, and there is no known safe blood concentration. Lead exposure can cause catastrophic health effects to humans, including damage to an individual's central nervous system, brain, kidneys, and cardiovascular system. Lead can also cause reproductive problems and is classified as a probable human carcinogen. Lead is also classified as a probable human carcinogen by the IARC. Lead is so harmful to humans that ingestion of lead can cause seizures, coma and even death.

273.    Defendants failed to exercise reasonable care in performing their duties, including failing to reasonably install, and/or maintain, and/or operate, and/or service, lead-sheathed cables, which were unsafe, toxic and unsuitable for human exposure; failing to warn Plaintiffs about the risks posed by Defendants' cables; and failing to reasonably dispose of the lead-sheathed cables and run-off lead and to not abandon them.

274.    Defendants failed to exercise reasonable care for other reasons alleged throughout this Complaint, including ignoring at least several red flags that should have alerted them to the relevant problems.

275.    Defendants' conduct and/or failure(s) to act constitutes gross negligence because they were so reckless that they demonstrated a substantial lack of concern for whether an injury or harm would result.

276. Defendants' conduct was malicious, willful, and wanton as to disregard the Plaintiffs' rights, for the following reasons:

a. Defendants knew that Plaintiffs were relying upon them to provide safe cables that would not expose them to lead.

b. Defendants knew that the failure to reasonably dispose of the lead-sheathed cables posed threats to public health that would result in injury and damages to Plaintiffs.

277. Plaintiffs suffered harm resulting from Defendants' failures to exercise reasonable care.

278. Defendants' failure to exercise reasonable care was the direct and proximate cause of the Plaintiffs' injuries, which were entirely foreseeable.

279. As a direct and proximate result of Defendants' breach of the duties described above, persons residing and working in the communities governed by Plaintiff and Class Members have been exposed to Defendants' toxic-lead cables, have sustained a significantly increased risk of developing the lead-related health problems described in this Complaint, and have suffered and will continue to suffer economic losses and expenses associated with the present need for ongoing medical monitoring.

280. The injuries from which these persons suffer require specialized testing and resultant treatment that is not generally given to the public at large. Thus, the needed monitoring regime is different from that normally recommended in the absence of exposure to this risk of harm.

281. The medical monitoring regime should include, but is not limited to, testing and diagnostic examination that will assist in early detection and diagnosing the catastrophic health effects described in this Complaint. This diagnostic program will facilitate treatment and

81

**85**

interventions that will mitigate the development of, and health effects associated with, the catastrophic health effects described in this Complaint.

282. The available monitoring regime is reasonably necessary according to contemporary scientific principles within the medical community specializing in the diagnosis and treatment of the catastrophic health effects described in this Complaint.

283. By monitoring and testing these persons, to whom Plaintiff and Class Members bear responsibility, the risk that they will suffer long-term injuries, disease, and losses without adequate treatment will be significantly reduced.

284. Plaintiff and Class Members seek creation of a Court-supervised, Defendants-funded medical monitoring program which will facilitate the diagnoses and treatment of these persons for the catastrophic health effects described in this Complaint. The medical monitoring should include a trust fund to pay for the medical monitoring and diagnosis of these persons as frequently and appropriately as necessary.

285. Accordingly, Defendants should be required to establish a medical monitoring program that includes, among other things: (a) establishing a trust fund, in an amount to be determined, to pay for the medical monitoring of everyone who has been exposed to lead from the Defendants' lead-sheathed cables for the purpose of diagnosis, as frequently and appropriately as necessary; and (b) notifying all persons who live or work in the communities governed by Plaintiff and Class Members, in writing, that they may require frequent medical monitoring for the purpose of diagnosis.

## COUNT 2: Negligence Per Se

286. Plaintiff re-alleges and incorporates the allegations contained in the above paragraphs.

287. This cause of action is brought by Plaintiff on behalf of the Class (for the purposes of this Count, "Plaintiffs") against Defendants.

288. A presumption of negligence (negligence per se) is established where Defendants' negligence involves the violation of a statute or regulation, where the plaintiff is within the class of persons that the statute or regulation was designed to protect, and the violation is a substantial factor in the plaintiff's harm.

289. Pursuant to New York Environmental Conservation Law (ECL) § 37-0107, it is unlawful to cause or allow the release to the environment of substances hazardous or acutely hazardous to public health, safety or the environment. Through the actions described in this Complaint, Defendants caused or allowed the release of a hazardous substance in violation of the New York ECL. Defendants had a duty to, among other things, store or dispose of the cables in a manner that does not create a public nuisance or adversely affect the public health, safety and welfare.

290. Plaintiffs are within the class of persons this statute was designed to protect the New York ECL was enacted in part to protect individuals—like those in the communities governed by Plaintiff and Class Members—who may come into contact with Defendants' solid and/or hazardous waste, or the environment around them, and be injured.

291. Defendants' violations of these statutes and regulations were substantial factor in exposing these persons to lead and causing their injuries.

## COUNT 3: Common Law Public Nuisance

292.    Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

293.    On November 2021, New York citizens voted overwhelmingly in favor of the New York's Environmental Rights Amendment, also known as Green Amendment, adding a new section 19 to Article I of the New York State Constitution. The Green Amendment provides that: "Each person shall have a right to clean air and water, and to a healthful environment." The Green Amendment allows municipal agencies to integrate the Amendment's principles into their decision-making processes.

294.    This cause of action is brought by Plaintiff on behalf of the Class (for the purposes of this Count, "Plaintiffs") against Defendants.

295.    Defendants, through their past and present business practices, created, exacerbated, and maintained a public nuisance which proximately caused injury to the public, Plaintiff and the Class.

296.    A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568 (1977) (internal citations omitted).

297.    A public nuisance is an unreasonable interference with a right common to the general public. Defendants' conduct has created, contributed to, and maintained an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public,

including the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Class Members. *See Restatement (Second) of Torts* § 821B.

298.    Defendants' acts and omissions, and their widespread pollution in the soil and water sources in the communities governed by Plaintiff and Class Members, have created or contributed, and continue to create and contribute, to a substantial interference with the exercise of a common right of the people living in the communities governed by Plaintiff and Class Members and their surrounding areas, interfering with the use by the public of public spaces, and/or endangering or injuring the property, health, safety or comfort of a considerable number of persons.

299.    Defendants have created, contributed to, and maintained a public nuisance by installing and/or maintaining, and/or operating, and/or servicing, and/or unreasonably disposing of, and/or abandoning lead-sheathed cables, and the lead that has run-off the cables, in ways that unreasonably interfere with the public health, welfare, and safety in the communities governed by Plaintiff and Class Members. Plaintiff and Class Members have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

300.    The interference is unreasonable because Defendants' nuisance-creating conduct:

a.    Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

b.    Was and is proscribed by state laws and regulations at all relevant times; and/or

c.    Is of a continuing nature and, as Defendants know, has had and continues to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

INDEX NO. 160566/2024
RECEIVED NYSCEF: 11/12/2024

301. The significant interference with rights common to the general public is described in detail throughout this Complaint and includes installing, and/or maintaining, and/or operating, and/or servicing, and/or abandoning lead-sheathed cables that are insulated with lead that is unsafe, toxic and unsuitable for human exposure.

302. Defendants are liable for creating, contributing to, and maintaining the public nuisance because their intentional, knowing, reckless, unreasonable, and/or unlawful conduct was a substantial factor in producing the public nuisance and harm to Plaintiff and Class Members.

303. Defendants had control over their conduct in the communities governed by Plaintiff and Class Members, and that conduct has had an adverse effect on rights common to the general public. Defendants controlled the installation, and/or maintenance, and/or operation, and/or servicing, and/or disposal of lead-sheathed cables.

304. It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Plaintiff and Class Members described herein. Defendants knew, or should have foreseen, that their actions and omissions would result in this offense, interference, and/or damage to the public in the exercise of common rights.

305. The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

306. Additionally, Defendants' conduct also created a public nuisance as a matter of New York statute. Pursuant to New York Environmental Conservation Law (ECL) § 37-0107, it is unlawful to cause or allow the release to the environment of substances hazardous or acutely hazardous to public health, safety or the environment. Through the actions described in this Complaint, Defendants caused or allowed the release of a hazardous substance in violation of the New York ECL. Defendants had a duty to, among other things, store or dispose of the cables in a

86

manner that does not create a public nuisance or adversely affect the public health, safety and welfare. Such acts constitute a public nuisance. Through the actions described in this Complaint, Defendants caused or allowed the release of a hazardous substance in violation of the New York ECL, and thus their actions constitute a public nuisance pursuant to that statute.

307. The nuisance created by Defendants' conduct is abatable, yet the offense, interference, and/or damage to the public in the exercise of common rights caused by Defendants' actions and omissions remain unabated.

308. As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiff and Class Members have been damaged.

309. Indeed, the persons who live and work in the geographic areas governed by Plaintiff and Class Members have been specially damaged by the direct exposure to the public nuisance.

310. Defendants' misconduct alleged in this case was ongoing and persistent for many years.

311. Plaintiff and Class Members are entitled to a program of medical monitoring to benefit those who live and work in the communities they govern who have been put at risk as a result of Defendants' misconduct. Plaintiff incorporates by reference the medical monitoring allegations outlined in Count I and Count II.

312. Upon information and belief, as a result, Defendants' conduct unreasonably exposed Plaintiff and Class Members, and those who live and work in the communities they govern, to a risk of harm.

313. Upon information and belief, Defendants market, distribute, promote, manufacture, import and/or sell their products with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

87

314.    Upon information and belief, Defendants' acts are the cause of Plaintiff's and Class Members' past, present, and future injury.

315.    Each Defendant has failed to establish and/or utilize reasonable controls and procedures to prevent the damages described herein.

316.    Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in the communities governed by Plaintiff and Class Members.

## COUNT 4: Restitution

317.    Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

318.    Defendants are and were aware that Plaintiff and Class Members have incurred and will incur costs and expenses in response to the lead contaminants at their geographic areas.

319.    Defendants owe a continuing duty to remedy the harm caused by the lead contaminants in the communities governed by Plaintiff and Class Members, caused by Defendants' actions and inaction.

320.    The costs and expenses incurred and to be incurred by Plaintiff and Class Members in response to the lead contaminants should be borne by Defendants.

321.    Defendants have received a benefit as the result of Plaintiff and the Class Members' actions to investigate and remove the hazardous substances insofar as Defendants should bear the costs and expenses of such investigation and removal.

322.    Defendants have accepted the benefit of Plaintiff and the Class Members' actions to investigate and remove the hazardous substances on the Sites.

88

323. Defendants have failed, and continue to fail, to remedy the harm they caused by their actions and inaction.

324. Because Plaintiff and the Class Members have suffered harm and incurred past costs and will incur future costs and expenses that should be borne by Defendants, Defendants have been unjustly enriched at their expense.

325. An injustice would result if Defendants did not reimburse and make whole Plaintiff and the Class Members for costs and expenses incurred and to be incurred in response to the lead contaminants at the sites at issue.

326. By reason of the foregoing, Defendants are jointly and severally liable to Plaintiff and the Class Members in restitution by law, statute, equity, or otherwise for damages in an amount to be determined at trial.

## COUNT 5: Indemnification

327. Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

328. Defendants have an obligation to the State of New York and the public at large to investigate and remediate the release of hazardous substances at and from their telecommunications cables, including at and around the sites at issue. Such obligation includes the duty to conduct necessary environmental studies, and to remediate and monitor the release of hazardous substances, including the hazardous substances at the sites, in a manner that is protective of human health and the environment.

329. Defendants have not investigated or remediated the hazardous substances at the sites.

330.    Plaintiff and Class Members have performed, and will in the future perform, duties and obligations owed by Defendants to the State of New York to investigate, remove, remediate and monitor the hazardous substances at the sites.

331.    The actions taken and costs incurred by Plaintiff and the Class Members were necessary to ensure the health, safety and welfare of the public and to protect the environment.

332.    Defendants have been, and will be, unjustly enriched by the performance by Plaintiff and the Class Members of duties and obligations of Defendants.

333.    Defendants are liable to Plaintiff and the Class Members for the indemnification of all expenses and costs incurred by them in performing Defendants' duties and obligations at the sites, including but not limited to the costs of investigation, remediation, monitoring, and interest.

## PRAYER FOR RELIEF

Plaintiff, on behalf of itself and the proposed Class, respectfully demand judgment against Defendants, jointly and severally, as to the FIRST, SECOND and THIRD Causes of Action, awarding Plaintiff and Class Members amounts that exceed the jurisdiction of all lower Court and other relief as follows:

i. Certify the Class as described herein under CPLR Article 9 and appoint Plaintiff as the representative of the Class, and Plaintiff's counsel as Lead Counsel for the Class;

ii. Direct that reasonable notice of this action be given to the Class, appoint Plaintiff as the named representative of the Class, and appoint Plaintiff's counsel as Class Counsel;

iii. Enter judgment against each Defendant, and in favor of Plaintiff and the Class;

iv. Award compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff and the Class for all damages;

v. Direct Defendants, jointly and severally, to endow an abatement fund with sufficient capital to eliminate the public nuisance they are responsible for creating, exacerbating, and/or perpetuating, pursuant to New York law;

vi. Award Plaintiff and the Class punitive damages, treble damages, restitution, penalties, costs of suit, including reasonable attorneys' fees, as provided by law;

vii. Grant relief to Plaintiff and the Class declaring that Defendants are liable for legal and/or equitable restitution and ordering Defendants to pay Plaintiff and the Class recompense and damages, including any damages claimed by contractors or any third-party relating to the sites at issue, as well as any judgments, damages, costs,

91

**95**

legal fees or any other expenses arising from or relating to the lead contaminants at the sites;

viii.    Grant relief to Plaintiff and the Class in the form of a medical monitoring program to be funded by Defendants;

ix.    Grant relief to Plaintiff and the Class in the form of abatement for the removal and proper disposal of the lead-sheathed cables in New York and remediation of their environmental impact;

x.    An award of injunctive relief as the Court deems necessary and proper to prevent against future violations of New York law; and

xi.    An award to Plaintiff and Class Members of such further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of itself and the Class, demand a trial by jury on all issues so triable.

Dated: November 12, 2024

**NAPOLI SHKOLNIK**

/s/ Hunter J. Shkolnik
HUNTER J. SHKOLNIK

/s/ Paul J. Napoli
PAUL J. NAPOLI

/s/ Nestor D. Galarza
NESTOR D. GALARZA
NS PR LAW SERVICES
1302 Avenida Ponce de Leon
Santurce, PR 00907
Tel: (787) 493-5088
Fax: (646) 843-7603
Hunter@nsprlaw.com
PNapoli@nsprlaw.com
NGalarza@NSPRLaw.com

/s/ Salvatore C. Badala
SALVATORE C. BADALA
**NAPOLI SHKOLNIK, PLLC**
400 Broadhollow Road, Suite 305
Melville, NY 11747
Tel: (212) 397-1000
SBadala@napolilaw.com

/s/ Shayna E. Sacks
SHAYNA E. SACKS
**NAPOLI SHKOLNIK, PLLC**
360 Lexington Avenue, 11xth Floor
New York, NY 10017
Tel: (212) 397-1000
SSacks@napolilaw.com

*Counsel for Plaintiff*

93

**97**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

——————————————————————X    Index No.:

TOWN OF WAPPINGER, NY, ON BEHALF OF ITSELF
AND ALL OTHERS SIMILARLY SITUATED,

                                        Plaintiff,

               -against-

VERIZON COMMUNICATIONS INC., VERIZON NEW
YORK, INC., MCIMETRO ACCESS TRANSMISSION
SERVICES LLC, MCI COMMUNICATIONS SERVICES
LLC dba VERIZON BUSINESS SERVICES,
METROPOLITAN FIBER SYSTEMS OF NEW YORK,
INC., XO COMMUNICATIONS SERVICES, LLC;
AMERICAN TELEPHONE AND TELEGRAPH
COMPANY, AT&T ENTERPRISES, LLC, AT&T
COMMUNICATIONS OF NEW YORK, INC., SBC LONG
DISTANCE, LLC, TC SYSTEMS, INC.; FRONTIER
TELEPHONE OF ROCHESTER, INC., FRONTIER
COMMUNICATIONS OF SENECA-GORHAM, INC.,
OGDEN TELEPHONE COMPANY, FRONTIER
COMMUNICATIONS OF SYLVAN LAKE, INC.,
FRONTIER COMMUNICATIONS OF AUSABLE
VALLEY, INC., CITIZENS TELECOMMUNICATIONS
COMPANY OF NEW YORK, INC., FRONTIER
COMMUNICATIONS OF AMERICA, INC., FRONTIER
COMMUNICATIONS OF NEW YORK, INC.,
FRONTIER COMMUNICATIONS OF ROCHESTER,
INC.; CHAUTAUQUA & ERIE COMMUNICATIONS,
INC dba CHAUTAUQUA & ERIE TELEPHONE
CORPORATION; CONSOLIDATED
COMMUNICATIONS OF NEW YORK COMPANY dba
TACONIC TELEPHONE CORPORATION;
WINDSTREAM NEW YORK, INC.; ONTARIO &
TRUMANSBURG TELEPHONE COMPANIES dba
TRUMANSBURG TELEPHONE COMPANY, INC.; DFT
COMMUNICATIONS CORPORATION dba DUNKIRK
AND FREDONIA TELEPHONE COMPANY; and DOE
DEFENDANTS 1-20,

                                        Defendants.
——————————————————————X

=================================================================

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

=================================================================

**NAPOLI SHKOLNIK**
NS PR LAW SERVICES
1302 Avenida Ponce de Leon
Santurce, PR 00907

=================================================================

The undersigned attorney hereby certifies, pursuant to 22 NYCRR 130-1.1a that he has read the within papers and that same are not frivolous as that term is defined in 22 NYCRR 130-1.1(c)

/s/ Paul J. Napoli_____
Paul J. Napoli

=================================================================

Service of a copy of the within                                              is hereby admitted.
Dated,                _____

Attorney(s) for

=================================================================

PLEASE TAKE NOTICE:

☐ NOTICE OF ENTRY
that the within is a (certified) true copy of an                duly entered in the office of the
clerk of the within named court on _____200__.

☐ NOTICE OF SETTLEMENT
that an order                          of which the within is a true copy
will be presented for settlement to the HON.                one of the judges of the
within named Court, at                                on
200___ at_____ O'clock ___.M.

Dated, _____

Yours, etc.
**NAPOLI SHKOLNIK**
**NS PR LAW SERVICES**

**99**

# EXHIBIT B

**100**

EFiled: Nov 15 2024 01:42PM EST
Transaction ID 75017153
Case No. 2024-1156-JTL

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| ANAND ROY, derivatively on behalf of AT&T INC. <br><br> Plaintiff, <br><br> vs. <br><br> RANDALL L. STEPHENSON, JOHN T. STANKEY, PASCAL DESROCHES, JOHN STEPHENS, SAMUEL A. DI PIAZZA, JR., SCOTT T. FORD, GLENN H. HUTCHINS, WILLIAM E. KENNARD, DEBRA L. LEE, STEPHEN J. LUCZO, MICHAEL B. MCCALLISTER, BETH E. MOONEY, MATTHEW K. ROSE, CYNTHIA B. TAYLOR, LUIS A. UBIÑAS, and GEOFFREY Y. YANG, <br><br> Defendants, <br><br> and <br><br> AT&T INC., <br> Nominal Defendant. | C.A. No.   2024-1156 <br><br><br> **REDACTED - PUBLIC VERSION** |

## PLAINTIFF'S VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**101**

John C. Phillips, Jr. (#110)
Megan C. Haney (#5016)
**Phillips, McLaughlin & Hall, P.A.**
1200 North Broom Street
Wilmington, Delaware 19806-4204
(302) 655-4200
*Counsel for Plaintiff*

A public version of this document will be filed on or before:  November 15, 2024

102

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| ANAND ROY, derivatively on behalf of AT&T INC.<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>RANDALL L. STEPHENSON, JOHN T. STANKEY, PASCAL DESROCHES, JOHN STEPHENS, SAMUEL A. DI PIAZZA, JR., SCOTT T. FORD, GLENN H. HUTCHINS, WILLIAM E. KENNARD, DEBRA L. LEE, STEPHEN J. LUCZO, MICHAEL B. MCCALLISTER, BETH E. MOONEY, MATTHEW K. ROSE, CYNTHIA B. TAYLOR, LUIS A. UBIÑAS, and GEOFFREY Y. YANG,<br><br>　　　　Defendants,<br><br>　　and<br><br>AT&T INC.,<br>　　　　Nominal Defendant. | C.A. No. |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Anand Roy ("Plaintiff"), through his attorneys, derivatively and on behalf of Nominal Defendant AT&T Inc. ("AT&T" or the "Company"), files this Verified Shareholder Derivative Complaint against Randall L. Stephenson ("Stephenson"), John T. Stankey ("Stankey"), Pascal Desroches ("Desroches"),

1

**103**

John Stephens ("Stephens"), Samuel A. Di Piazza, Jr. ("Di Piazza"), Scott T. Ford ("Ford"), Glenn H. Hutchins ("Hutchins"), William E. Kennard ("Kennard"), Debra L. Lee ("Lee"), Stephen J. Luczo ("Luczo"), Michael B. McCallister ("McCallister"), Beth E. Mooney ("Mooney"), Matthew K. Rose ("Rose"), Cynthia B. Taylor ("Taylor"), Luis A. Ubiñas ("Ubiñas"), and Geoffrey Y. Yang ("Yang") (collectively, the "Individual Defendants," and together with AT&T, the "Defendants") for breaches of their fiduciary duties as directors and officers of AT&T, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets.

Plaintiff asserts the following based on personal knowledge and information gathered through investigations by Plaintiff's attorneys. These investigations encompassed a thorough review of various sources, including but not limited to public documents of the Defendants, statements and announcements made by them, filings with the United States Securities and Exchange Commission ("SEC"), press releases concerning AT&T, legal filings, news reports, analyses by securities experts, information obtained through Plaintiff's Demand for Inspection of Books and Records of AT&T under 8 Del. C. § 220, and data readily available online and elsewhere. The Plaintiff is confident that substantial evidence supporting these claims exists and will be presented during the discovery process.

2

**104**

**NATURE OF THE ACTION**

1.     This shareholder derivative action addresses misconduct by AT&T's directors and officers from March 1, 2020, through July 27, 2023 (the "Relevant Period").

2.     AT&T is a multinational telecommunication company that provides telecom and broadband services to consumers worldwide. It is incorporated in Delaware, and its principal offices are in Dallas, Texas.

3.     Throughout the Relevant Period, the Company represented that it complied with environmental, health, and safety regulations. It also claimed dedication to employee welfare, environmental protection, and community well-being by providing necessary resources.

4.     However, in July of 2023, investigative articles by *The Wall Street Journal* ("*WSJ*") disclosed that such statements were materially false and misleading, and failed to disclose adverse facts throughout the Relevant Period and that the Company owned toxic lead-covered cables throughout the country that were degrading and leaching into soil and groundwater, posing severe risks to public health and the environment (the "Lead Cable Misconduct"). Consequently, the company's stock price experienced a significant decline.

5.     Specifically, Defendants neglected to disclose: (1) the presence of toxic lead-covered cables causing harm and substantial risk; (2) the cables' erosion

3

**105**

and environmental contamination, posing significant health risks; (3) impending litigation, penalties, and reputational damage due to the cables; (4) awareness of the cable-related damage and risks, yet failure to disclose; (5) inadequate internal controls; and (6) unreasonably making materially false and misleading statements about the Company's business, operations, and prospects.

6.     Furthermore, the Individual Defendants also breached their fiduciary duties by not rectifying these false and misleading statements and omissions.

7.     The Individual Defendants further breached their fiduciary duties by authorizing the Company to repurchase its own stock at artificially inflated prices. From March 2020 through July 2023, the Company repurchased approximately 124 million shares of its own stock for more than $3.4 billion. However, the repurchased stock was only worth $14.24 per share (the adjusted price at the close of trading on July 27, 2023), causing the Company to overpay for the shares by at least $1.7 billion.

8.     Further, the Individual Defendants failed to maintain adequate internal controls and participated in and facilitated the Lead Cable Misconduct.

9.     Considering the Individual Defendants' misconduct, for which a securities fraud class action lawsuit was commenced (the "Securities Class Action") and investigations by the Justice Department and the EPA, the need to

4

106

address the Lead Cable Misconduct, conduct internal investigations, implement adequate internal controls, losses from corporate asset mismanagement, and losses due to the Individual Defendants' unjust enrichment, the company faces an obligation to spend tens of millions of dollars. The company suffered substantial harm due to the Individual Defendants' reckless breaches of fiduciary duty and other misconduct.

10.     Given the Company's directors breaches of fiduciary duty, collective engagement in fraud and misconduct, involvement in the Lead Cable Misconduct, the likelihood of liability in this derivative action and the Securities Class Action, and their lack of disinterestedness and independence, a majority of the Company's Board of Directors (the "Board") cannot impartially consider a demand to initiate litigation against themselves on behalf of the company.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction as Delaware as the wrongs complained of herein entered Delaware, AT&T is incorporated in this Delaware, has conducted business in Delaware, and Defendants' actions have had an effect in Delaware.

12.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have. AT&T is named

5

**107**

solely as a nominal party.

## PARTIES

**Plaintiff**

13.    Plaintiff is a shareholder of AT&T. Plaintiff has continuously held shares of AT&T common stock since March 1, 2017.

**Nominal Defendant AT&T**

14.    AT&T is a Delaware corporation with principal offices at 208 South Akard St., Dallas, Texas, 75202. AT&T common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "T."

**Defendant Stephenson**

15.    Defendant Stephenson began working for the Company in 1982 and served as the Company's Chief Executive Officer ("CEO") and Chairman from May 9, 2007, to June 30, 2020, and as the Executive Chairman of the Company's Board from July 1, 2020, until he retired on January 21, 2021. He also served as the Company's Chief Operating Officer ("COO") from 2004 to 2007 and Chief Financial Officer ("CFO") from 2001 to 2004. According to the Schedule 14A, the Company filed with the SEC on March 22, 2022 (the "2022 Proxy Statement"), as of December 31, 2021, Stephenson beneficially owned 2,763,054 shares of AT&T common stock worth approximately $44.7 million.

6

**108**

16.    For 2021, Stephenson received $16,345,499 in total compensation, including $125,768 in salary, $2,967,114 in pension value and nonqualified deferred compensation earnings, and $13,252,617 in other compensation. For 2020, Stephenson received $29,154,628 in total compensation, including $900,000 in salary, $20,999,989 in stock awards, $2,250,000 in non-equity incentive plan compensation, $3,763,883 in pension value and nonqualified deferred compensation earnings, and $1,240,756 in all other compensation.

**Defendant Stankey**

17.    Defendant Stankey has served as the Company's CEO since July 1, 2020, and as a Company director since 2020. He also served as the Company's President and COO from October 2019 through June 2020. According to the Company's Schedule 14A filed with the SEC on April 4, 2023 (the "2023 Proxy Statement"), as of December 31, 2022, Stankey beneficially owned 676,451 shares of AT&T stock worth approximately $11.6 million.

18.    For 2022, Stankey received $22,915,526 in total compensation, including $2,400,000 in salary, $13,499,988 in stock awards, $5,320,000 in non-equity incentive plan compensation, $1,264,319 in pension value, and nonqualified deferred compensation earnings, and $431,219 in all other compensation. For 2021, Stankey received $24,820,879 in total compensation, including $2,400,000 in salary, $13,420,341 in stock awards, $6,888,000 in non-

7

**109**

equity incentive plan compensation, $1,468,869 in a change in pension value and nonqualified deferred compensation earnings, and $643,669 in other compensation. For 2020, Stankey received $21,020,917 in total compensation, including $2,050,000 in salary, $13,499,999 in stock awards, $3,250,000 in non-equity incentive plan compensation, $1,411,950 in pension value, and nonqualified deferred compensation earnings, and $808,968 in all other compensation.

**Defendant Desroches**

19.     Defendant Desroches has served as the Company's Senior Executive Vice President and Chief Financial Officer ("CFO") since April 2021. According to the 2023 Proxy Statement, as of December 31, 2022, Desroches beneficially owned 337,220 shares of AT&T stock worth approximately $5.8 million.

20.     In 2022, Desroches received $11,752,507 in compensation, including $1,250,000 in salary, $7,499,993 in stock awards, $2,612,500 in non-equity incentive plan compensation, and $390,014 in other compensation. For 2021, Desroches received $11,745,133 in compensation, including $1,250,000 in salary, $5,999,990 in stock awards, $3,382,500 in non-equity incentive plan compensation, and $1,112,643 in other compensation.

**Defendant Stephens**

21.     Defendant Stephens served as the Company's Senior Executive Vice

8

**110**

President and CFO from 2011 until his retirement on March 31, 2021. According to the 2022 Proxy Statement, as of December 31, 2021, Stephens beneficially owned 837,995 shares of AT&T stock worth approximately $13.5 million.

22.    For 2021, Stephens received $4,145,305 in compensation, including $318,460 in salary, $830,250 in non-equity incentive plan compensation, $831,607 in pension value and nonqualified deferred compensation earnings, and $2,164,988 in other compensation. For 2020, Stephens received $16,137,145 in total compensation, including $1,145,833 in salary, $250,000 in bonuses, $10,750,008 in stock awards, $2,025,000 in non-equity incentive plan compensation, $1,059,686 in pension value and nonqualified deferred compensation earnings, and $906,618 in other compensation.

**Defendant Di Piazza**

23.    Defendant Di Piazza served as a Company director from 2015 until he resigned in April 2022. Before his resignation, he served as Chairperson of the Audit Committee and as a member of the Executive Committee and the Public Policy and Corporate Reputation Committee.

24.    For 2022, Di Piazza received $336,297 in compensation, including $56,667 in cash and $279,630 in other compensation. For 2021, Di Piazza received $405,000 in compensation, including $170,000 in cash, $220,000 in stock awards, and $15,000 in other compensation. For 2020, Di Piazza received $405,000 in

9

**111**

compensation, including $170,000 in cash, $220,000 in stock awards, and $15,000 in other compensation.

**Defendant Ford**

25.     Defendant Ford has served as a Company director since 2012. He also serves as Chairperson of the Corporate Development and Finance Committee and as a member of the Executive Committee and the Human Resources Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Ford beneficially owned 81,319 shares of AT&T common stock worth approximately $1.4 million.

26.     For 2022, Ford received $390,583 in compensation, including $160,000 in cash, $220,000 in stock awards, and $10,583 in other compensation. For 2021, Ford received $380,000 in compensation, including $160,000 in cash and $220,000 in stock awards. For 2020, Ford received $380,000 in compensation, including $160,000 in cash and $220,000 in stock awards.

**Defendant Hutchins**

27.     Defendant Hutchins has served as a Company director since 2014. He also serves as Chairperson of the Governance and Policy Committee and as a member of the Corporate Development and Finance Committee and the Executive Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Hutchins beneficially owned 167,651 shares worth approximately $2.8 million.

10

**112**

28.     For 2022, Hutchins received $396,885 in compensation, including $158,750 in cash, $220,000 in stock awards, and $18,135 in other compensation. For 2021, Hutchins received $375,000 in compensation, including $155,000 in cash and $220,000 in stock awards. For 2020, Hutchins received $405,974 in compensation, including $151,250 in cash, $220,000 in stock awards, and $34,724 in other compensation.

**Defendant Kennard**

29.     Defendant Kennard has served as a Company director since 2014 and as the Chairman of the Board since January 2021. He also serves as Chairperson of the Executive Committee and as a Governance and Policy Committee member.

30.     For 2022, Kennard received $688,161 in compensation, including $440,000 in cash, $220,000 in stock awards, and $28,161 in all other compensation. For 2021, Kennard received $675,000 in compensation, including $440,000 in cash, $220,000 in stock awards, and $15,000 in other compensation. For 2020, Kennard received $375,000 in compensation, including $140,000 in cash, $220,000 in stock awards, and $15,000 in other compensation.

**Defendant Lee**

31.     Defendant Lee served as a Company director from 2019 until she resigned in April 2022. Before her resignation, she was a member of the Corporate Governance and Nominating Committee and the Public Policy and Corporate

11

**113**

Reputation Committee.

32.    For 2022, Lee received $340,551 in compensation, including $46,667 in cash and $293,884 in other compensation. For 2021, Lee received $360,000 in compensation, including $140,000 in cash and $220,000 in stock awards. For 2020, Lee received $375,000 in compensation, including $140,000 in cash, $220,000 in stock awards, and $15,000 in other compensation.

**Defendant Luczo**

33.    Defendant Luczo has served as a Company director since 2019. He also serves as a member of the Audit Committee and the Corporate Development and Finance Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Luczo beneficially owned 500,000 AT&T stock worth approximately $8.6 million.

34.    For 2022, Luczo received $360,000 in compensation, including $140,000 in cash and $220,000 in stock awards. For 2021, Luczo received $360,000 in compensation, including $140,000 in cash and $220,000 in stock awards. For 2020, Luczo received $360,000 in compensation, including $140,000 in cash and $220,000 in stock awards.

**Defendant McCallister**

35.    Defendant McCallister has served as a Company director since 2013. He also serves as a member of the Audit Committee and the Human Resources

12

**114**

Committee. According to the 2023 Proxy Statement, as of December 31, 2022, McCallister beneficially owned 59,594 shares of AT&T stock worth approximately $1 million.

36.    For 2022, McCallister received $378,486 in compensation, including $140,000 in fees earned, $220,000 in stock awards, and $18,486 in other compensation. For 2021, McCallister received $372,894 in compensation, including $140,000 in cash, $220,000 in stock awards, and $12,894 in other compensation. For 2020, McCallister received $375,000 in compensation, including $140,000 in cash, $220,000 in stock awards, and $15,000 in other compensation.

**Defendant Mooney**

37.    Defendant Mooney has served as a Company director since 2013. She also serves as Chairperson of the Human Resources Committee and as a member of the Executive Committee and the Governance and Policy Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Mooney beneficially owned 28,700 shares of AT&T stock worth approximately $495,075.

38.    For 2022, Mooney received $415,000 in total compensation, including $165,000 in cash, $220,000 in stock awards, and $30,000 in other compensation. For 2021, Mooney received $396,495 in compensation, including $165,000 in cash, $220,000 in stock awards, and $11,495 in other compensation.

13

**115**

For 2020, Mooney received $400,000 in compensation, including $165,000 in cash, $220,000 in stock awards, and $15,000 in other compensation.

**Defendant Rose**

39.      Defendant Rose has served as a Company director since 2010. He also serves as a member of the Corporate Development and Finance Committee and the Human Resources Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Rose beneficially owned 208,050 shares of AT&T stock worth about $3.5 million.

40.      For 2022, Rose received $401,809 in compensation, including $146,667 in cash, $220,000 in stock awards, and $35,142 in other compensation. For 2021, Rose received $427,099 in compensation, including $165,000 in cash, $220,000 in stock awards, and $42,099 in other compensation. For 2020, Rose received approximately $451,732 in compensation, including $220,000 in cash, $220,000 in stock awards, and $11,732 in other compensation.

**Defendant Taylor**

41.      Defendant Taylor has served as a Company director since 2013. She also serves as Chairperson of the Audit Committee and as a member of the Executive Committee. According to the 2023 Proxy Statement, as of December 31, 2022, Taylor beneficially owned 5,718 shares of AT&T stock worth about $98,636.

14

**116**

42.    For 2022, Taylor received $415,944 in compensation, including $162,500 in cash, $220,000 in stock awards, and $33,444 in other compensation. For 2021, Taylor received $365,000 in compensation, including $140,000 in cash, $220,000 in stock awards, and $5,000 in other compensation. For 2020, Taylor received $365,000 in compensation, including $140,000 in cash, $220,000 in stock awards, and $5,000 in other compensation.

**Defendant Ubiñas**

43.    Defendant Ubiñas has served as a Company director since 2021. He also serves as a member of the Audit Committee and the Governance and Policy Committee.

44.    For 2022, Ubiñas received $375,000 in compensation, including $140,000 in cash, $220,000 in stock awards, and $15,000 in other compensation. For 2021, Ubiñas received $336,995 in compensation, including $81,667 in cash, $186,247 in stock awards, and $69,081 in other compensation.

**Defendant Yang**

45.    Defendant Yang served as a Company director from 2016 until he resigned in April 2022. Before his resignation, he served as a member of the Corporate Development and Finance Committee and the Human Resources Committee.

46.    For 2022, Yang received $311,631 in compensation, including

15

**117**

$46,667 in cash and $264,964 in other compensation. For 2021, Yang received $371,410 in compensation, including $140,000 in cash and $220,000 in stock awards. For 2020, Yang received $360,000 in compensation, including $140,000 in cash and $220,000 in stock awards.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

47.     The Individual Defendants were obligated to act in the Company and its shareholders' best interests, ensuring equitable benefits for all shareholders. Given their roles as AT&T officers, directors, and fiduciaries and their authority to govern the Company's affairs, they bore fiduciary responsibilities of trust, loyalty, good faith, and due care toward AT&T and its shareholders. They were obligated to oversee and manage AT&T in a manner characterized by fairness, honesty, and equity.

48.     Each Individual Defendant owed a fiduciary duty of loyalty, good faith, and diligent care in administering and overseeing the Company. The Individual Defendants wielded authority over the actions contested herein. The behaviors of the Individual Defendants, subject to complaint herein, constitute deliberate and culpable breaches of their obligations as directors and officers of AT&T. Their actions lack good faith and demonstrate a reckless disregard for their duties towards the Company and its shareholders, with full awareness of the

16

**118**

potential for significant harm to the Company.

49.    As senior executive officers and directors of a publicly traded company, the Individual Defendants were obligated to prevent the dissemination of inaccurate and false information concerning the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of materially false information regarding the Company. They had a duty to disclose all pertinent information to ensure that the Company's stock price was based on accurate information. Additionally, they were responsible for ensuring the Company's adherence to applicable laws.

50.    The Individual Defendants were obligated to (a) prudently supervise the Company's management, policies, practices, and internal controls; (b) ensure the Company operated diligently, honestly, and in compliance with relevant laws, regulations, and its Code of Ethics; (c) efficiently conduct the Company's affairs to enhance its business performance and asset value; (d) promptly address imprudent or unsound conditions within the Company; (e) maintain accurate records and reports of the Company's business affairs and promptly investigate discrepancies; (f) establish and uphold an effective system of controls to ensure legal compliance and accuracy in statements and filings; (g) exercise reasonable

17

**119**

control over the Company's statements and reports; (h) avoid personal gain at the Company's expense; and (i) provide complete and accurate disclosure of all material facts in Company reports.

51.     Each of the Individual Defendants owed a duty of loyalty to AT&T and its shareholders and to prioritize AT&T's and its shareholders' interests ahead of their own and refrain from using their position for personal benefit while managing the Company.

52.     Each Individual Defendant had access to non-public adverse information about the Company and exercised control over the wrongful acts described herein, including public statements made by AT&T, and operated under such agency.

53.     In perpetrating the wrongful acts, the Individual Defendants engaged in a concerted effort and conspired together, pursuing a common course of conduct to further their wrongdoing.

54.     The purpose and outcome of the conspiracy were to enable and conceal their unlawful violations, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; obscure adverse information about the Company; and artificially inflate the Company's stock price.

18

**120**

55.    The Individual Defendants executed this conspiracy by causing the Company to conceal material facts, failing to correct the misrepresentations, and violating applicable laws. Since the Board authorized these actions, each Individual Defendant who is a director of AT&T was a direct, necessary, and substantial participant in the conspiracy.

56.    Each Individual Defendant provided substantial assistance and abetted the wrongs alleged herein. By aiding in the commission of these misdeeds, each Individual Defendant acted with knowledge of the primary wrongdoing, directly participating in or substantially facilitating its completion and understanding their contribution to its continuation.

57.    Throughout the Relevant Period, each Individual Defendant acted as the agent of every other Individual Defendant, and AT&T continuously acting within the scope of such agency.

## CODE OF ETHICS AND AUDIT COMMITTEE CHARTER

58.    The Company's Board adopted the Code of Ethics to promote complete, fair, accurate, timely, and understandable disclosure, ensure compliance with applicable laws and regulations, protect the Company's interests, including corporate opportunities, assets, and confidential information, and deter wrongdoing.

19

**121**

59.     The Code of Ethics requires all directors, officers, and employees of the Company to be familiar with and adhere to the Code.

60.     The Individual Defendants violated the Code of Ethics by failing to oversee the Lead Cable Misconduct, issuing materially false and misleading statements to the public, and facilitating and concealing their own wrongdoing, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. Additionally, the Individual Defendants failed to adhere to laws and regulations, conduct business honestly and ethically, and properly report violations of the Code of Ethics.

61.     The Company also retains an Audit Committee Charter (the "Charter"). The Charter requires the Audit Committee (the "Committee") appointed by the Board of Directors to assist the Board in overseeing the Company's financial statements, the auditor's qualifications, the performance of the Company's internal audit and independent auditors, compliance; and enterprise risk management, including privacy and data security. The Charter also requires the Committee to prepare and include the report required by the SEC in the Company's proxy statement for the Stockholders' Annual Meeting.

62.     The Charter grants the Committee the authority to retain independent legal, accounting, or other advisors and mandates the Committee to evaluate its

20

**122**

performance and share the assessment with the Corporate Governance and Nominating Committee and with management and the independent auditor before filing the Company's Form 10-K with the SEC, the annual audited financial statements.

63.    Additionally, the Charter obliges the Committee to review all significant accounting or financial statement matters, such as press releases, financial information, earnings guidance, rating agencies, and issues related to audit work, and to review disclosures made to the Committee by the Company's Officers during their certification process for the Form 10-K and Forms 10-Q about significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees with a substantial role in the Company's internal control over financial reporting.

64.    The Committee is also tasked with dealing with complaints received by the Company regarding accounting and submissions regarding questionable accounting or auditing matters and to discuss with management and the independent auditor any correspondence with regulators or governmental agencies and any reports known to AT&T's executive officers that raise significant issues regarding the Company's financial statements or accounting policies.

21

**123**

65.     In breach of the Charter, Defendants Luczo, McCallister, Taylor, and Ubiñas failed to adequately review and discuss the Company's quarterly earnings press releases; to adequately exercise their risk management and risk assessment functions, including as each related to the Lead Cable Misconduct; and to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE LEAD CABLE MISCONDUCT

66.     Throughout the Relevant Period, through its website and SEC filings, the Company assured the public of its compliance with environmental, health, and safety regulations and was dedicated to the well-being and safety of its employees and the environment and communities the Company serves.

67.     However, in a series of investigative articles, the *WSJ* reported that that AT&T maintained an extensive network of lead-covered cables across the U.S., underwater, underground, and on poles overhead, that were deteriorating and releasing lead into the soil and groundwater, posing a significant risk to the public. At more than four dozen locations tested by the *WSJ*, lead levels exceeded the EPA safety recommendations.

68.     The *WSJ* detailed the health risks linked with lead exposure and that doctors say that "no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development." Moreover,

22

**124**

the *WSJ* detailed the risks, including "behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults[.]" The *WSJ* reported that many children show high lead levels in their blood, likely attributable to aging lead cables.

69.    During the *WSJ*'s investigation, lead was also discovered moving away from the cables, polluting nearby beaches and tainting communities' drinking water.

70.    The July 9 Article revealed that AT&T knew about the health risks associated with its lead-covered cables and that AT&T was aware that lead was leaching into the environment but took no meaningful action to address the health risks to the surrounding communities.

71.    Several former Company employees interviewed by the *WSJ* disclosed that abandoning lead cables was the Company's "standard operating procedure." Indeed, the July 12 Article represented that more than a decade ago, a senior AT&T manager acknowledged that the lead-covered cables "posed risks for phone company workers and the surrounding environment." The article also revealed that AT&T "knew their employees working with lead regularly had high amounts of the metal in their blood," yet cleanup was repeatedly delayed.

72.    Moreover, the July 12 Article reported that Company officials had

23

**125**

expressed concerns over potential worker exposure to lead, noting that lead exposure involved risks of "kidney issues, heart disease, and reproductive problems in adults."

73.    Despite being aware of the danger posed by its lead cables, AT&T failed to remediate the problem or disclose the risk, thereby continuing to risk its employees' and the communities' health and safety.

**False and Misleading Statements**

*March 2020 Environmental, Health, and Safety Policy Update*

74.    In March 2020, the Company updated its website's Environmental, Health, and Safety Policy. The policy misleadingly stated that the Company is committed to supporting employees in meeting their environment, health, and safety obligations by providing necessary and appropriate training, job aids, and resources to prevent environmental, health, and safety incidents at our operations and responding quickly to protect employees and the public should they occur, and engage and communicate with relevant stakeholders, including employees, about opportunities to address environment, health and safety performance. However, these statements were misleading as AT&T owned lead-covered cables, which created a significant risk of harm to the Company's employees, the public, and the environment.

*2020 10-K*

24

**126**

75.    On February 25, 2021, AT&T filed its 2020 annual report on Form 10-K with the SEC (the "2020 10-K"), which was signed by Defendants Stankey, Stephens, Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Taylor, and Yang. Stankey and Stephens also signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX").

76.    The 2020 10-K stated that the Company provides its employees access to flexible and convenient health and welfare programs and workplace accommodations, prioritizes self-care, and emphasizes wellness.

### 2021 Proxy Statement

77.    On March 11, 2021, the Company filed the 2021 Proxy Statement with the SEC. The 2021 Proxy Statement was approved by the Individual Defendants and contained several materially false and misleading statements and omissions.

78.    The 2021 Proxy Statement called for shareholders to approve the reelection of some of Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Yang to the Board and executive compensation on an advisory basis.

79.    The 2021 Proxy Statement affirmed that the Board is responsible for overseeing policies and procedures for assessing and managing risk. Management is responsible for addressing and managing the Company's risk exposures,

25

**127**

including adopting risk management policies and procedures and informing the Board of the most significant risks and plans for managing those risks.

80.     The 2021 Proxy Statement was materially false and misleading because the Code of Ethics was not followed, as the Individual Defendants had participated in and/or facilitated the Company's participation in the Lead Cable Misconduct; made or caused the Company to make the numerous false and misleading statements and omissions; and failed to report Code of Ethics violations. Further, the 2021 Proxy Statement was materially false and misleading as the Board did not properly perform its oversight functions.

81.     The 2021 Proxy Statement also failed to disclose that the Company owns toxic lead-covered cables throughout the United States, which were degrading and leaching into the environment, posing significant health and environmental risks; AT&T is exposed to substantial risks of litigation, regulatory enforcement, penalties, and reputational damage; and failed to maintain internal controls.

82.     As a result of the Individual Defendants causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted to reelect them to the Board, thereby allowing them to continue breaching their duties to the Company.

26

**128**

### *2021 10-K*

83.     On February 16, 2022, AT&T filed its 2021 annual report on Form 10-K with the SEC (the "2021 10-K"), signed by Defendants Stankey, Desroches, Di Piazza, Ford, Hutchins, Kennard, Lee, Luczo, McCallister, Mooney, Rose, Taylor, Ubiñas, and Yang. Stankey and Desroches also signed certifications pursuant to SOX.

84.     The 2021 10-K stated that the Company provides its employees with access to flexible and convenient health and welfare programs and workplace accommodations, prioritizes self-care, and emphasizes wellness.

### *2022 Proxy Statement*

85.     On March 22, 2022, pursuant to Section 14(a) of the Exchange Act, the Company filed the 2022 Proxy Statement with the SEC. The 2022 Proxy Statement was solicited by the Individual Defendants and contained various materially false and misleading statements and omissions.

86.     The 2022 Proxy Statement called for shareholders to approve the reelection of the Individual Defendants to the Board and executive compensation on an advisory basis.

87.     The 2022 Proxy Statement affirmed that the Board is responsible for overseeing policies and procedures for assessing and managing risk. Management is responsible for addressing and managing the Company's risk exposures,

27

**129**

including adopting risk management policies and procedures and informing the Board of the most significant risks and plans for managing them.

88.    The 2022 Proxy Statement was materially false and misleading because the Code of Ethics was not followed, as the Individual Defendants had participated in and/or facilitated the Company's participation in the Lead Cable Misconduct; made or caused the Company to make the numerous false and misleading statements and omissions; and failed to report Code of Ethics violations. Further, the 2022 Proxy Statement was materially false and misleading as the Board did not properly perform its oversight functions.

89.    The 2022 Proxy Statement also failed to disclose that the Company owns toxic lead-covered cables throughout the United States, which were degrading and leaching into the environment, posing significant health and environmental risks; AT&T is exposed to substantial risks of litigation, regulatory enforcement, penalties, and reputational damage; and failed to maintain internal controls.

90.    As a result of the Individual Defendants causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted to reelect each of them to the Board, thereby allowing them to continue breaching their duties to the Company.

**130**

*2022 10-K*

91.    On February 13, 2023, AT&T filed its 2022 annual report on Form 10-K with the SEC (the "2022 10-K"), which was signed by Defendants Stankey, Desroches, Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Taylor, and Ubiñas. Stankey and Desroches also signed certifications pursuant to SOX.

92.    The 2022 10-K stated that investors and other stakeholders were increasingly focused on environmental issues and that concern over climate change or other environmental, social, and governance matters may cause increased legal and regulatory requirements to reduce the company's environmental impact.

93.    The 2022 10-K stated that the Company provides its employees with access to flexible and convenient health and welfare programs and workplace accommodations, prioritizes self-care, and emphasizes wellness.

*2023 Proxy Statement*

94.    On April 3, 2023, the Company filed the 2023 Proxy Statement with the SEC. The 2023 Proxy Statement was approved by the Individual Defendants and contained various false and misleading statements and omissions.

95.    The 2023 Proxy Statement called for shareholder approval of the reelection of the Director Defendants to the Board, executive compensation, and frequency of vote on executive compensation.

29

**131**

96.     The 2023 Proxy Statement was materially false and misleading because the Code of Ethics was not followed, as the Individual Defendants had participated in and/or facilitated the Company's participation in the Lead Cable Misconduct; made or caused the Company to make the numerous false and misleading statements and omissions; and failed to report Code of Ethics violations. Further, the 2023 Proxy Statement was materially false and misleading as the Board did not properly perform its oversight functions.

97.     The 2023 Proxy Statement also failed to disclose that the Company owns toxic lead-covered cables throughout the United States, which were degrading and leaching into the environment, posing significant health and environmental risks; AT&T is exposed to substantial risks of litigation, regulatory enforcement, penalties, and reputational damage; and failed to maintain internal controls.

98.     As a result of Individual Defendants causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted to reelect them to the Board, thereby inadvertently permitting them to continue breaching their duties to the Company.

### Environmental, Health & Safety Compliance Update

99.     On June 8, 2023, the Company updated its Environmental, Health & Safety Compliance Section on its website, stating that it was in compliance with

30

**132**

applicable environmental, health, and safety laws and regulations regarding its operations and that it was developing and maintaining proper systems to protect the environment and its employees.

100.   The AT&T Code of Business Conduct states that the Company is committed to operating and providing products and services in an environmentally responsible and sustainable manner. And that the Company follows all applicable environmental laws and regulations and that it follows the best practices to minimize environmental impact.

101.   The above statements were materially false and misleading and failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose to shareholders and investors that (1) the presence of toxic lead-covered cables causing harm and substantial risk; (2) the cables' erosion and environmental contamination, posing significant health risks; (3) impending litigation, penalties, and reputational damage due to the cables; (4) awareness of the cable-related damage and risks, yet failure to disclose; (5) inadequate internal controls; and (6) unreasonably making materially false and misleading statements about the Company's business, operations, and prospects.

**The WSJ Exposes the Truth**

102.   On July 9, 2023, the *WSJ* published the first of several investigative

31

133

articles that exposed its findings from an ongoing investigation into the toxic lead-covered cables owned by the Company. The July 9 Article, "America is Wrapped in Miles of Toxic Lead Cables," revealed that phone companies had laid toxic lead cables decades ago, and thousands were left behind, creating a significant health hazard.

103.    The July 9 Article revealed that telecom companies knew about the lead-covered cables and the potential risks of exposure to workers and that lead was potentially leaching into the environment but did not act meaningfully to address the health risks to the surrounding communities. It continued, "Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development." The Article further stated that lead can stay in the blood for months and in bones and organs longer. Disclosing that symptoms include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart, and reproductive problems in adults.

104.    Regarding "The Known Risks" and AT&T's knowledge of the lead cables and their likely environmental and health impacts, the July 9 Article stated that "AT&T said in a 2010 presentation about employee safety at an industry conference. "Some older metropolitan areas may still have over 50% lead cable."

32

**134**

It further revealed that the Company considered the potential cost and environmental impact of removing the cables daunting. Yet, it decided to keep the discussion internal and didn't try to quantify the problem or speak to the economics overall.

105.   Regarding the effects these lead cables had on drinking water, the July 9 Article stated that in its testing at Lake Tahoe, lead was found near the cables and moving away from the severed Emerald Bay cable toward the beach. Samples also ranged from nearly five times the EPA limit for drinking water to more than eight times. It continued that a young child swimming for an hour in water and swallowing some of it, with lead content equivalent to that measured by the *WSJ*, could add 7.4 micrograms per deciliter of lead to their blood.

106.   Regarding the finding of lead-covered cables along the Mississippi River, the July 9 Article stated that a reading "showed lead in the sediment next to the smashed cable and splice box at 2,850 and 2,880 parts per million, respectively— both seven times the EPA guideline for play areas." The water samples showed high levels of lead.

107.   On July 10, 2023, the *WSJ* followed up with an article entitled "Bayou Teche is an Epicenter of America's Lead Cable Problem." The July 10 Article outlined the lead contamination process and that tests linked the lead found

**135**

in the soil to the cables, indicating it likely didn't come from another source. The lead levels exceeded the level the EPA recommends taking action for drinking water, and residents were unaware of the lead and related dangers.

108.    Following this news, AT&T stock fell $0.34, or 2.178%, from closing at $15.61 per share on July 7, 2023, to close at $15.27 on July 10, 2023.

109.    On July 12, 2023, the *WSJ* published another article, "What AT&T and Verizon Knew About Toxic Lead Cables." The July 12 Article stated that a senior AT&T manager had cautioned about a little-known danger of the lead-covered cables crisscrossing the nation that posed severe risks to the environment and that AT&T knew about the health risks to their workers and the environment for decades and had expressed concern regarding the dangers. Yet, it did not take any meaningful action to address it.

110.    On July 14, 2023, the *WSJ* published an article entitled "I Was Really Sick, and I Didn't Know From What," which detailed the stories of AT&T employees and the dangers they faced due to their dealings with lead cables. The article stated that "[s]ome of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure."

111.    In the July 14 Article, several former and current Company

34

**136**

employees were interviewed regarding health issues they had experienced due to exposure to lead while working at AT&T. The article quoted an AT&T cable splicer saying, "[l]ead was taught to me out in the field. There was no formal training, and we felt it was not a danger since everyone worked on it with no mask." The employee filed a workers' compensation case against AT&T, arguing that her work caused medical troubles, including kidney cancer. AT&T denied her claim.

112.    Another AT&T employee was quoted saying that "she couldn't get pregnant and had anemia, severe anxiety, and brain fog, plus kidney-related ailments," conditions and ailments that are associated with lead exposure.

113.    The *WSJ* further reported that a senior AT&T manager noted the environmental impact of lead exposure in a 2010 Company presentation. In 2013, that same employee noted that AT&T workers working with lead should be protected in the field through warning signs and that workers handling the toxic metal should wear protective gear. However, the Company failed to implement any protective action or inform its employees about the dangers of lead exposure.

114.    AT&T dismissed the findings as "anecdotal, non-evidence-based linkages to individuals' health symptoms," saying those symptoms "could be associated with a vast number of potential causes." The article also detailed

35

**137**

numerous stories from numerous of the Company's employees who had experienced significant health issues associated with lead exposure.

115. Following this news, AT&T stock dropped by $0.62, or 4.1%, from closing at $15.12 per share on July 13, 2023, closing at $14.50 on July 14, 2023.

116. On July 17, 2023, *investing.com* published an article discussing analysts who had downgraded AT&T due to the lead-covered cables, including JPMorgan, Citi, and Goldman Sachs.

117. On July 17, 2023, the *WSJ* also published an article discussing environmental groups that had contacted the EPA to investigate the lead cables and protect the public from their dangers. The *WSJ* also published an article addressing the continued declines in AT&T's stock following the WSJ reports on the lead cables.

118. Following this news, AT&T stock fell by $0.97, or 6.689%, from a closing price of $14.50 per share on July 14, 2023, to close at $13.53 on July 17, 2023.

119. On July 26, 2023, the *WSJ* published an article entitled "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article stated that the Justice Department and EPA were investigating the health and environmental risks stemming from a sprawling network of toxic lead-sheathed

36

**138**

telecom cables across the U.S.

120.   Following this news, AT&T stock fell $0.38, or 2.55%, from a closing price of $14.89 per share on July 26, 2023, closing at $14.51 on July 27, 2023. As a result of the Lead Cable Misconduct, in July of 2023, AT&T's market cap dropped as much as $18 billion.

**AT&T's Internal Documents Confirm the Company's Negligence**

121.   ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████

122.   ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████

123.   ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

37

████████████████████████████████████████████████
████████████████████████

139



124.

125.

126.

38



127.

128.

## WRONGFUL STOCK REPURCHASES

129.    Additionally, the Individual Defendants caused the Company to repurchase its own stock at artificially high prices during the Relevant Period. The Company spent more than $3.4 billion to repurchase over 100 million shares of its common stock.

130.    According to the Company's quarterly reports on Form 10-Q filed

39

141

with the SEC through July 27, 2023, between March 1, 2020, and June 30, 2023, the Company purchased tens of millions of shares of its own common stock for prices significantly higher than their actual value. The Company's stock was worth only $14.24 per share, and the Company paid significantly more during the Relevant Period through multiple purchases, overpaying for its shares by approximately $1.7 billion.

## DAMAGES TO AT&T

131. As a direct result of the Individual Defendants' conduct, AT&T has already lost and will continue to lose tens of millions of dollars, including, but not limited to, legal fees, costs, and other payments to resolve or to satisfy judgments related to the Securities Class Action and other actions, and fees to lawyers, accountants, and investigators in connection thereto.

132. Such losses include the Company's overpayment of over $1.7 billion for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the materially false statements addressed above.

133. The expenses also include, but are not limited to, implementing measures to address the Lead Cable Misconduct; fees, costs, and payments associated with the Justice Department's and EPA's investigations and civil inquiries into the Company arising from the Lead Cable Misconduct and amounts paid to lawyers, accountants, and investigators in connection thereto; fees, costs,

40

**142**

and any payments for resolution of or to satisfy judgments associated with lawsuits filed against the Company or the Individual Defendants based on the Lead Cable Misconduct and other allegations of misconduct and amounts paid to lawyers, accountants, and investigators in connection thereto.

134. Expenses also include costs incurred in any internal investigations regarding legal violations, defending any investigations or legal actions brought against the Company due to its legal violations, and payments of any fines or settlements associated with said violations.

135. As a direct result of the Individual Defendants' conduct, AT&T's reputation has been tarnished, and its goodwill has been negatively affected. Consequently, the stock will suffer from a liar's discount because of the misrepresentations made by the Individual Defendants.

## DERIVATIVE ALLEGATIONS

136. Plaintiff brings this action derivatively and for the benefit of AT&T to redress injuries suffered as a result of the Individual Defendants' breaches of their fiduciary duties to AT&T, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and the aiding and abetting thereof.

137. Plaintiff is and has been, at all relevant times, a shareholder of AT&T. Plaintiff will adequately and fairly represent the interests of AT&T in enforcing and prosecuting its rights, and, to that end, has retained competent counsel,

41

**143**

experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND IS EXCUSED AS FUTILE

138.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

139.   A pre-suit demand on the Board of AT&T would be futile and is therefore excused. At the time of this complaint, the Board consists of the following ten individuals: Defendants Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Stankey, Taylor, and Ubiñas (the "Director Defendants"). Plaintiff is only required to allege demand futility as to five of the ten Director Defendants on the Board at the time of this complaint.

140.   Demand is excused as to all of the Director Defendants because they all face a substantial likelihood of liability as a result of the Lead Cable Misconduct, to cause the Company to make materially false and misleading statements and omissions, and at the same time, to cause the Company to overpay by more than $1.7 billion for repurchases of its own stock, all of which renders the Director Defendants unable to be impartial and to investigate and decide whether to pursue action against themselves and the other perpetrators of the Lead Cable Misconduct.

141.   In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in causing the Company to

42

**144**

engage the Lead Cable Misconduct and causing the Company to make the materially false and misleading statements alleged herein. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the above, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is thus futile and excused.

142.    Additional reasons that demand on Defendants Stankey, Ford, Hutchins, Kennard, Luczo, McCallister, Mooney, Rose, Taylor, and Ubiñas are stated below.

143.    Defendant Stankey has served as the Company's CEO and as a member of the Board since 2020. The Company provides Stankey with his principal occupation for which he receives handsome compensation and is thus a non-independent director. As CEO, Stankey is ultimately responsible for the Lead Cable Misconduct and all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he signed in the 2020, 2021, and 2022 10-Ks—for which he also signed SOX certifications. As the Company's highest officer, he conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarded his

43

**145**

duty to monitor internal controls over reporting and engagement in the schemes and consciously disregarded his duty to protect the Company. Stankey is also a defendant in the Securities Class Action. Therefore, Stankey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and excused.

144. Defendant Ford has served as a Company director since 2012. He also serves as Chairperson of the Corporate Development and Finance Committee and as a member of the Executive Committee and the Human Resources Committee. Ford has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarding his duty to monitor such controls over reporting and engagement in the schemes and consciously disregarded his duty to protect corporate assets. Therefore, Ford breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and excused.

145. Defendant Hutchins has served as a Company director since 2014. He also serves as Chairperson of the Governance and Policy Committee and as a member of the Corporate Development and Finance Committee and the Executive

44

**146**

Committee. Hutchins has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes and to protect the Company. Therefore, Hutchins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and excused.

146. Defendant Kennard has served as a Company director since 2014. Kennard also serves as the Independent Chairman of the Board, as Chairperson of the Executive Committee, and as a member of the Governance and Policy Committee. Kennard has received and continues to receive compensation for his position. As a trusted Company director, he conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes and to protect the Company. Therefore, Kennard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and excused.

147. Defendant Luczo has served as a Company director since 2019. He also serves as a member of the Audit Committee and the Corporate Development

45

**147**

and Finance Committee. Luczo has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes and to protect the Company. Therefore, Luczo breached his fiduciary duties, faces a substantial likelihood of liability, and is not independent or disinterested; thus, demand upon him is futile and excused.

148. Defendant McCallister has served as a Company director since 2013. He also serves as a member of the Audit Committee and the Human Resources Committee. McCallister has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes and to protect the Company. Therefore, McCallister breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and excused.

149. Defendant Mooney has served as a Company director since 2013. She also serves as Chairperson of the Human Resources Committee and as a member

46

**148**

of the Governance and Policy Committee and the Executive Committee. Mooney has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect the Company. Therefore, Mooney breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon her is futile and excused.

150.    Defendant Rose has served as a Company director since 2010. He also serves as a member of the Corporate Development and Finance Committee and the Human Resources Committee. Rose has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes and to protect the Company. Therefore, Rose breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and excused.

47

149

151.    Defendant Taylor has served as a Company director since 2013. She also serves as Chairperson of the Audit Committee and as a member of the Executive Committee. Taylor has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Lead Cable Misconduct and the false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duty to protect the Company. Therefore, Taylor breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon her is futile and excused.

152.    Defendant Ubiñas has served as a Company director since 2021. He also serves as a member of the Audit Committee and the Governance and Policy Committee. Ubiñas has received and continues to receive compensation for his role. As a trusted Company director, he conducted little, if any, oversight of the Lead Cable Misconduct and the false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes and to protect the Company. Therefore, Ubiñas breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus, demand upon him is futile and excused.

48

**150**

153.    Additional reasons that demand is futile on the Board are stated below.

154.    Each of the Director Defendants solicited the false and misleading 2021, 2022, and 2023 Proxy Statements, which resulted in their reelection to the Board. Furthermore, each Director Defendant signed, and thus personally made, the false and misleading statements and omissions in the 2020 10-K, 2021 10-K, and 2022 10-K.

155.    Each of the Director Defendants, individually and collectively, faces a substantial likelihood of liability due to their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $1.7 billion for its own common stock during the Relevant Period. As alleged herein, the Director Defendants were aware or should have been aware of the misinformation being distributed by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

156.    Defendants Luczo, McCallister, Taylor, and Ubiñas (the "Audit Defendants") served as members of the Audit Committee during the Relevant Period. In violation of the Charter, the Audit Defendants failed to adequately

49

**151**

review and discuss the Company's Forms 10-K; failed to adequately exercise their risk management and risk assessment functions, including regarding the Lead Cable Misconduct; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Defendants further breached their fiduciary duties, are not disinterested, and demand upon them is futile and excused.

157. In violation of the Code of Ethics, the Director Defendants engaged in or permitted the schemes to cause the Company to engage in the Lead Cable Misconduct, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and Delaware Law. In violation of the Code of Ethics, the Director Defendants failed to avoid conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; prevent the Company from participating in the Lead Cable Misconduct; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director Defendants face a substantial likelihood of liability, and

50

**152**

demand is thus futile.

158.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their duty violations under the Company's Charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot exercise independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as futile.

159.    The acts complained of herein constitute violations of fiduciary duties owed by AT&T's officers and directors, and these acts are incapable of ratification.

160.    Thus, for the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Breach of Fiduciary Duties

51

**153**

161.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

162.    Each Individual Defendant owed the Company the duty to exercise candor, good faith, and loyalty in the management and administration of AT&T's business and affairs.

163.    Each Individual defendant violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

164.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of AT&T.

165.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Lead Cable Misconduct.

166.    In breach of their fiduciary duties owed to AT&T, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) the Company owns cables throughout the United States which are covered in toxic lead and which harm AT&T employees and non-employees alike; (2) the

52

**154**

lead cables were degrading and leaching into the environment, posing a significant risk to health and the environment; (3) due to the foregoing, AT&T faces significant risks of litigation, regulatory enforcement and penalties, and reputational harm; (4) the Company knew about the damage and risks presented by its lead cables but failed to disclose them; (5) the Company failed to maintain internal controls; and (6) in light of the above, the Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

167.   The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

168.   Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

169.   In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

170.   The Individual Defendants had actual or constructive knowledge that

53

**155**

they had caused the Company to engage in the Lead Cable Misconduct and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the Lead Cable Misconduct and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the Lead Cable Misconduct and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of AT&T's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

171. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

172. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, AT&T has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

173. Plaintiff, on behalf of AT&T, has no adequate remedy at law.

**SECOND CLAIM**
**Unjust Enrichment**

54

**156**

174.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, AT&T.

176.    The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from AT&T that was tied to the performance or artificially inflated valuation of AT&T or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

177.    Plaintiff, as a shareholder and a representative of AT&T, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

178.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

### THIRD CLAIM
### Abuse of Control

55

**157**

179.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence AT&T, for which they are legally responsible.

181.    As a direct and proximate result of the Individual Defendants' abuse of control, AT&T has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, AT&T has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

182.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

**FOURTH CLAIM**
**Gross Mismanagement**

183.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

184.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties concerning prudently managing the assets and business of AT&T in a manner consistent with the operations of a publicly held

56

**158**

corporation.

185. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, AT&T has sustained and will continue to sustain significant damages.

186. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

187. Plaintiff, on behalf of AT&T, has no adequate remedy at law.

### FIFTH CLAIM
### Waste of Corporate Assets

188. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees to the detriment of the shareholders and the Company.

190. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused AT&T to waste valuable corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries by the Department of Justice and the EPA, and to lose financing from investors and business from

**159**

future customers who no longer trust the Company and its products.

191.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

192.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

193.    Plaintiff, on behalf of AT&T, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor and against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of AT&T and that Plaintiff is an adequate representative of AT&T;

(b)    Declaring that the Individual Defendants have breached and aided and abetted the breach of their fiduciary duties to AT&T;

(c)    Determining and awarding to AT&T the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing AT&T and the Individual Defendants to take all necessary actions to reform and improve AT&T's corporate governance and

58

**160**

internal procedures to comply with applicable laws and to protect AT&T and its shareholders from a repeat of the damaging events described herein, including but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the subsequent actions as may be necessary to ensure proper corporate governance policies:

1.  proposals to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.  a provision to permit the shareholders of AT&T to nominate at least five candidates for election to the Board; and

3.  proposals to ensure effective oversight of compliance with applicable laws, rules, and regulations.

(e)  Awarding AT&T restitution from the Individual Defendants and each of them;

(f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses;

59

**161**

and

(g)    Granting such other and further relief as the Court may deem just and

proper.

Dated: November 12, 2024                    Respectfully submitted,

**PHILLIPS, MCLAUGHLIN & HALL, P.A.**

*/s/ John C. Phillips, Jr.*
John C. Phillips, Jr. (No. 110)
Megan C. Haney (No. 5016)
1200 North Broom Street
Wilmington, DE 19806
302-655-4200
jcp@pmhdelaw.com
mch@pmhdelaw.com

**BRONSTEIN, GERWITZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, New York 10165
917-697-8209
peretz@bgandg.com
eitank@bgandg.com

60

**162**