# Exhibit A

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

## MONROE DIVISION

**In re:  LUMEN TECHNOLOGIES, INC.**       **CIV. ACTION NO. 3:23-1290**
**SECURITIES LITIGATION  II**

                                               **JUDGE TERRY A. DOUGHTY**

                                               **MAG. JUDGE KAYLA D. MCCLUSKY**

### REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are two

motions filed by Defendants, a motion to dismiss for failure to state a claim upon which relief

can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6) [doc. # 36] and a motion to

take judicial notice of various materials for purpose of the motion to dismiss [doc. # 38], and a

related motion to strike [doc. # 46] filed by Plaintiffs.  The motions are opposed.  For reasons

detailed below, IT IS ORDERED that the motion to strike [doc. # 46] is denied and the motion to

take judicial notice [doc. # 38] is GRANTED IN PART and DENIED IN PART.  Furthermore,

IT IS RECOMMENDED that the motion to dismiss be GRANTED.

### Background

From a relative high of $41.25 per share on September 8, 2014, the ten-year trajectory of

Lumen Technologies, Inc., f/k/a CenturyLink ("Lumen" or the "Company")'s stock price has

been markedly downward.[1]  For example, on November 8, 2018, July 7, 2023, and October 2,

2023, Lumen's stock price closed at $14.89, $2.19, and $1.39, respectively, before finally

---

[1] *See* https://finance.yahoo.com/quote/LUMN/ (last visited on March 5, 2025).  The Court may
take judicial notice of stock prices.  *Linenweber v. Sw. Airlines Co.*, 693 F.Supp.3d 661, 674
(N.D. Tex. 2023) (citing *Catogas v. Cyberonics*, 292 F. App'x 311, 316 (5th Cir. 2008)).

bottoming out at \$.98 per share on November 1, 2023.[2]  In the latter half of 2024, Lumen's stock

accorded beleaguered shareholders a modicum of relief when it briefly rebounded as high as ten-

fold off its lows, before settling back down into the five-dollar range where it remains today.  *Id*.

By then, however, long-suffering Lumen shareholders had initiated not one, but two putative

class action securities fraud cases against Lumen and its senior executives.

On March 3, 2023, affected shareholders filed suit to certify a putative class on behalf of

all persons and entities who had purchased or acquired Lumen stock between **September 14,**

**2020,** and **February 7, 2023**.  *See In Re:  Lumen Technologies, Inc. Securities Litigation*, Civ.

Action No. 23-0286 (W.D. La.)  ("*Lumen I*").  The suit sought to recover damages stemming

from alleged misleading statements made by Lumen and its senior management related to the

rollout and implementation of Lumen's Quantum Fiber brand.  *Id*.  Following delays for briefing

and to tend to the demands of other cases on its docket, the Court eventually granted defendants'

Rule 12(b)(6) motion and dismissed the suit on October 30, 2024.  *Id*.

Meanwhile, on September 15, 2023, a little over six months after *Lumen I*,  an affected

shareholder(s) commenced this latest putative federal securities class action to recover damages

on behalf of all persons and entities ("Plaintiffs") that purchased or otherwise acquired Lumen

securities between **November 8, 2018**, and **October 31, 2023** (the "Class Period").  Named

Defendants include  Lumen; Kate Johnson, Lumen's President and Chief Executive Officer

("CEO") since November 7, 2022 ("Johnson"); Chris Stansbury, Lumen's Executive Vice

President ("EVP") and Chief Financial Officer ("CFO") since April 4, 2022 ("Stansbury"); Jeff

K. Storey, Lumen's former President and CEO from May 23, 2018, until November 7, 2022

---

[2] https://finance.yahoo.com/quote/LUMN/history/?period1=322151400&period2=1741132800
(last visited on March 5, 2025).

("Storey"); and Indraneel Dev, Lumen's former EVP and CFO from before the start of the class period until April 1, 2022 (collectively, "Defendants") ("Dev").  (First Amended Class Action Complaint [doc. # 35] ("FAC"), Preamble, ¶¶ 1, 18-23, 42).

Plaintiffs contend that Defendants are liable under federal securities laws because, during the Class Period, Defendants made various statements that were misleading when they failed to disclose that Lumen faced potentially significant civil and regulatory liability from pre-1960 lead-sheathed copper telephone cables that its predecessor-in-interest, AT&T, placed in the ground, underwater, or suspended overhead, for which Lumen assumed responsibility via its acquisition of a former AT&T sub-entity.

On July 9, 2023, following an 18-months-long investigation, the *Wall Street Journal* ("*WSJ*") shined a national spotlight on the issue when it published the first in a series of articles documenting the dangers posed by legacy AT&T lead-sheathed copper telephone cables.  The next day, Lumen's stock fell by almost six percent.  Over the next week, the *WSJ* issued at least five more articles on the topic that caused further erosion of Lumen's stock price.

On August 1, 2023, Chris Stansbury, Lumen's EVP and CFO, admitted that "[w]e began phasing out lead-sheathed cables from our network infrastructure during the 1950s" but "less than 5% of our approximately 700,000-mile copper network contained lead, of which we believe the majority is buried in conduit-based infrastructure."  (FAC, ¶ 234).  The next day, Lumen's stock price declined by almost 12 percent.  *Id.*, ¶ 366.

Stansbury's estimate that *less than* 5% of Lumen's 700,000-mile copper network contains lead is the equivalent of *up to* 34,999 miles of lead-sheathed cable.  Borrowing an estimate of $33.43 per foot to remove buried cables tendered by a remediation expert in a 2016 class action lawsuit filed by Texas landowners against AT&T, *see Cook v. AT&T Corp.*, Civ. Action No. 16-

0542 (S.D. Tex) and discussion, *infra*, Plaintiffs extrapolate that Lumen is facing a contingent

liability of $6.2 billion to remove and remediate the up to 34,999 miles of lead cable that it

currently owns.  (FAC, ¶¶ 5, 194-195, 384).[3]  Plaintiffs further speculate that the cost of removal

could reach as high as $23.3 billion if, instead, one were to use a $126.6 per foot estimate to

remove the lead cable.  *Id*., ¶ 385.[4]  In other words, Lumen's potential liability to remove the

lead-sheathed cables is daunting.

In the wake of the *WSJ* articles, shareholders of AT&T and Verizon filed federal

securities class action lawsuits against their respective companies on July 28 and August 18,

2023.[5]  Sensing an opportunity, Plaintiff John McLemore filed the instant suit against Lumen

and the individual Defendants on September 15, 2023.  (Compl. [doc. # 1]).  As stated above,

Plaintiffs seek to maintain this suit as a class action to recover compensatory damages against

Defendants on their own behalf and on behalf of the Class for violations of Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and

78t(a) and United States Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated

thereunder, 17 C.F.R. § 240.  (FAC [doc. # 35], ¶¶ 1, Prayer).  The suit also seeks an award of

reasonable costs and attorney's fees incurred in the action.  *Id*.

---

[3] This figure does not contemplate 371,000 miles of copper wireline infrastructure that Lumen divested via its 2022 sale of certain legacy assets to Apollo Global Management, Inc., under the brand name, Brightspeed.  (FAC, ¶ 5, 48-50).

[4] Plaintiffs derived this cost per foot estimate from a 2010 projection that "Northeast Utilities Service Company" provided to the EPA to remove 1,200 miles of paper insulated lead cable from its underground electric distribution system.  *Id*.

[5] *See In Re: AT&T Securities Litigation*, Civ. Action No. 24-1196 (N.D. Tex.) and *General Retirement System of the City of Detroit v. Verizon Communications, Inc., et al.*, Civ. Action No. 23-5218 (D. N.J.).  There are pending motions to dismiss in both cases.

On November 14, 2023, Chris Goodwin [doc. # 11], Daniel Safer [doc. # 12], and Michael Glauber [doc. # 13] filed competing motions for appointment as lead plaintiff and approval of selection of counsel.  On December 8, 2023, the Court granted Michael Glauber's motion and appointed him as lead plaintiff in this matter and approved his selection of Pomerantz, L.L.P., as Lead Counsel, together with the O'Bell Law Firm, L.L.C., as Liaison Counsel, for the Class.  (Mem. Order [doc. # 26]).  The competing motions were withdrawn or denied.

On December 28, 2023, the Court entered the parties' proposed scheduling order, which included a February 26, 2024 deadline to file an amended complaint, together with extended briefing deadlines for the anticipated motion to dismiss.  (Order [doc. # 34]).

On February 26, 2024, Lead Plaintiff Michael Glauber and additional Plaintiff John McLemore (collectively, "Plaintiffs") duly filed the FAC.  [doc. # 35].

On April 26, 2024, Defendants filed the instant motion to dismiss for failure to state a claim upon which relief can be granted.  [doc. # 36].  They contemporaneously filed a motion to take judicial notice of various documents for the purpose of the motion to dismiss.  [doc. # 38]. Unfortunately, however, the latter motion was filed nineteen minutes past midnight, and, thus, was docketed as filed on April 27, 2024.  *Id*.

On June 25, 2024, Plaintiffs filed  the instant motion to strike Defendants' motion to take judicial notice on the grounds that it was untimely, seeks to introduce exhibits that are not appropriate for judicial notice, and because it seeks to circumvent page limitations by presenting additional argument in support of the motion to dismiss.  [doc. # 46].

On June 26, 2024, Plaintiffs filed their opposition to Defendants' motion to take judicial notice of certain documents.  [doc. # 50].

On June 27, 2024, Plaintiffs filed their opposition to Defendants' motion to dismiss. [doc. # 52].

On July 17, 2024, Defendants filed their opposition to Plaintiffs' motion to strike. [doc. # 53].

Plaintiffs filed their reply in support of their motion to strike on July 24, 2024. [doc.# 54].

Finally, Defendants filed their reply memoranda in support of their motions to take judicial notice and to dismiss on August 9 and August 12, 2024, respectively. [doc. #s 55 & 58]. Accordingly, briefing on the pending motions is complete; the matter is ripe.[6]

## **Plaintiffs' Allegations**

The facts, at the pleading stage, are drawn from the operative pleading, which, in this case, is the First Amended Class Action Complaint ("FAC").[7] The FAC consists of 165 pages of allegations and pertinent background information, including disclosures from confidential witnesses. The Court will recite or paraphrase provisions of the FAC, generally following the outline employed by Plaintiffs. For brevity's sake, the Court will omit unsupported, conclusory,

---

[6] On January 31, 2025, Plaintiffs' counsel filed a suggestion of death for Lead Plaintiff Michael Glauber. [doc. # 61]. On February 10, 2025, Defendants filed a response to the suggestion of death, stating that a new qualified lead plaintiff should be appointed in place of the deceased Mr. Glauber, who apparently passed away in November 2024. [doc. # 62]. In light of the undersigned's recommended disposition of the pending motion to dismiss, *see* discussion, *infra*, Plaintiffs may file an appropriate motion to substitute or appoint a new lead plaintiff, as needed.

[7] An "amended complaint supersedes the original complaint and renders it of no legal effect, unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (citing *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir.1985)). Here, there is no indication that the amended complaint adopted or referenced the earlier pleading. Furthermore, the parties agreed that any motion to dismiss would be directed toward the FAC. *See* Dec. 28, 2023 Order [doc. # 34].

irrelevant, redundant, or cumulative allegations. Nonetheless, the Court has familiarized itself
with the entire pleading and Plaintiffs' thorough and exhaustive contentions.

## A.    Overview

Previously known as CenturyLink, Lumen is a large telecommunications company based
in Monroe, Louisiana. (FAC, ¶ 32). Unlike its peers, AT&T and Verizon, Lumen primarily has
focused on wireline services, i.e., services based on physical cable plant, as opposed to mobile or
wireless technology. *Id.* Since its formation in 1968, Lumen grew to become the third largest
wireline telecommunications company in the United States by acquiring other major wireline
providers or their cable assets, including Pacific Telecom, Embarq, Verizon, Qwest, and Level 3.
*Id.,* ¶¶ 32-41.

By the start of the Class Period in 2018, Lumen owned an extensive network of "legacy"
copper telephone cables, as well as a separate network of newer, high-speed fiber optic cable.
*Id.,* ¶¶ 46-47. Lumen was required by law to maintain its copper wire assets in certain locations.
To introduce competition to the telecommunications market following the breakup of the Bell
System in 1994, Congress passed the Telecommunications Act of 1996 (the Telecommunications
Act"), which substantially amended the Communications Act of 1934, the primary federal law
governing telecommunications in the United States. Among other things, the
Telecommunications Act required incumbent wireline companies, each referred to as an
incumbent local exchange carrier ("ILEC"), to not only maintain their copper wireline network,
but also open it to any other companies wishing to use it. *Id*., ¶ 48.

In October 2022, Lumen divested almost 400,000 miles of its "legacy" assets in 20 states,
including Louisiana, via sale to the private equity firm, Apollo Global Management, Inc.

("Apollo"), under the brand name, Brightspeed.  (FAC, ¶ 5, 49-50).  Even so, Lumen still retained approximately 700,000 miles of copper cable.  *Id.,* ¶ 111.

Since before the start of the Class Period, Lumen has proclaimed that being a good "corporate citizen" is one of its top priorities and, to that end, has maintained an Environment, Health & Safety and Sustainability framework as part of its Environmental, Social, and Government ("ESG") program.  (FAC, ¶ 52).  This framework focuses on six key areas, including, among others, "environmental compliance and management," "occupational health and safety," and "waste."  *Id.*

Lumen's Environmental, Health & Safety Department ("EHS") is the business unit charged with responsibility for carrying out each of the elements of the Company's Environmental Health & Safety and Sustainability framework.  (FAC, ¶ 53).  Since 2015, Lumen has published an annual ESG report highlighting its ESG efforts for its stakeholders and the communities in which it operates.  Before 2019, the report was known as the Corporate Social Responsibility ("CSR") report.  *Id.*, ¶ 54.

**B.      Lead Is a Well-Known Toxin Extremely Harmful to Human Health**

Lead is a brittle heavy metal that can release unnoticeable particles on contact.  (FAC, ¶¶ 56, 59).  In this form, lead is a potent neurotoxin that can cause major damage to nearly every major body system in humans.  *Id.*, ¶ 60.  Exposure of this type can produce a range of severe health conditions, including impaired cognition, organ failure, coma, birth defects, and, in extreme cases, death.  *Id.*, ¶ 62.  Children are acutely vulnerable.  *Id.*, ¶ 63.

Due to its unique physical properties, lead was used ubiquitously as a common industrial material until its dangers became better understood in the mid-twentieth century.  *Id.*, ¶¶ 58, 66.

Since the 1970s, the U.S. government has taken a series of well-known steps to protect the public from lead and to eradicate its continued use.  Among other things, it banned the use of lead in residential paint, gasoline, and pipes used in public water systems.  *Id.*, ¶¶ 67-68, 72, 75. Through these measures, the dangers of lead have become widespread public knowledge and there is almost universal public consensus that lead is extremely harmful to human health.  *Id.*, ¶ 76.

Nevertheless, lead still remains in certain industries.  *Id.*, ¶ 77. As such, the Occupational Safety and Health Administration, better known as "OSHA," has promulgated stringent occupational safety standards for workers who handle lead.  *Id.,* ¶¶ 78-82. These standards set rules on exposure limits, monitoring, employee training, compliance controls, and personal protective equipment ("PPE").  *Id.*  It is recognized that occupational exposure is one of the leading causes of lead poisoning.  *Id.*, ¶ 77.

Lead is also harmful to plants and wildlife and poses a threat to surrounding communities when released into the environment.  *Id.*, ¶¶ 86-87.  As such, there are several laws that govern the handling or disposal of lead, including the Resource Conservation and Recovery Act of 1976 ("RCRA").  *Id.*, ¶ 88.  Lead is classified as a "hazardous waste" under the RCRA, along with arsenic and mercury.  *Id.*, ¶ 89.  The Environmental Protection Agency ("EPA") has broad power under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), also known as the "Superfund" law, to investigate and order the cleanup of any toxic waste that is released into the environment, including lead.  *Id.*, ¶ 91.

In short, lead has been recognized as a harmful environmental contaminant for decades. *Id.*, ¶ 93.

**C.      The Lead in Lumen's Copper Network**

Until it was phased out in the 1950s, lead was the industry standard protective covering, or "sheathing," for telephone cables and used pervasively by the companies that built out the nation's telephone network, including, most notably, those in the Bell System.  (FAC, ¶¶ 95-96, 99- 102).  In fact, by the 1950s, approximately 90% of all telecommunications wire was sheathed in lead and, thus, foundational to the prolific growth of the telecommunications industry and its wireline network.  *Id*., ¶ 96.  Lumen added lead-covered cables to its network by acquiring wireline assets from the so-called, "Baby Bells," created by the federal government's breakup of the Bell System in 1984 or otherwise owning companies that operated prior to the phase out of lead.  *Id.*, ¶¶ 98, 105.  Specifically, Lumen acquired (i) Pacific Telecom in 1997, including the telephone lines that it recently had purchased from US WEST; (ii) regional copper wire access lines from Verizon in 2002; and (iii) Qwest in 2011, including all of the copper wireline assets that it inherited from US WEST.  *Id*.

Even after the Brightspeed transaction, Lumen retained up to 34,999 miles of lead-covered cable spread across its nationwide network of copper telephone cables.  *Id.*, ¶ 111. Frontline workers tasked with maintaining this network frequently encountered lead cables across the geographies where Lumen operates, especially in the oldest parts of its network that envelop densely populated metropolitan areas, including Denver, Las Vegas, Minneapolis, Portland, Salt Lake City, Seattle, and elsewhere.  *Id.*, ¶¶ 107-09.  This ancient hardware sits in piles in underground vaults, hangs on utility poles overhead, and runs directly into residential buildings.  *Id.*

### D.    Lumen's Practices Were Inconsistent with its ESG Goals

Before the start of the Class Period, the majority of Lumen's revenues derived from products and services that relied on its copper telephone lines, like local and long-distance calling and DSL internet access.  (FAC, ¶¶ 40, 45).  However, its revenues were progressively declining as demand for these legacy services subsided with the proliferation of higher-speed alternatives like wireless and highspeed internet. *Id.*, ¶ 40.  On November 1, 2017, Lumen completed a $34 billion transaction to acquire Level 3 Communications, Inc., a leading provider of fiber optic services to business, or "enterprise," clients.  *Id.*, ¶ 41.

On November 8, 2018, Storey announced a new strategic direction for Lumen which involved winding down its copper-based services and becoming a leading provider of fiber optic technology as part of an ongoing "digital transformation."  *Id.*, ¶ 115.  One key "pillar" of this vision was taking costs out of the legacy business and managing it for cash.  *Id.*, ¶¶ 382, 408.  This decision was based on Storey taking a "hard look" on whether Lumen should be in the "consumer fiber business" and the "consumer copper business."  *Id.*, ¶ 408.  Storey decided that they should manage copper for cash in markets where that made sense and invest in fiber where that made sense.  *Id.*

Consistent with the goal of establishing itself as a next generation leader, in mid-2019, CenturyLink enhanced its sustainability reports to provide more robust disclosures around its corporate citizenship and ESG initiatives.  *Id.*, ¶ 54.  Then, in 2020, CenturyLink officially rebranded as "Lumen" as part of its ongoing plan to transform into a leader for the "4th Industrial Revolution."  *Id.*, ¶ 43.

During the Class Period, Defendants regularly spoke about Lumen's "digital transformation" program and touted its ESG efforts.  Call after call, they told investors that they

were "replacing" legacy infrastructure with fiber and that doing so would yield substantial cost savings. *Id.*, ¶¶ 260-83. Meanwhile, in its ESG disclosures, Lumen represented that it was "actively making choices to lessen [its] environmental impact" and had programs in place to "ensure the appropriate disposition of hazardous waste." *Id.*, ¶¶ 305-35. It even specified that it "recycles telecommunications equipment," such as "copper wire." *Id.*

However, multiple confidential witnesses, who were frontline workers for Lumen/CenturyLink testified that Lumen was not "recycling" or "replacing" the lead cables in its copper network once retired; rather, it was retiring or abandoning the cables in place. *Id.*, ¶¶ 383, 117-123. According to the anonymous frontline workers, the decision to abandon the cables in place was not about safety, but always motivated by financial considerations. *Id.*, ¶¶ 118, 123.

The Company also repeatedly touted its commitment to providing a workplace "free" from hazards. *Id.*, ¶¶ 284-304. As part of this commitment, Lumen said that it regularly reviews "safety performance" to identify gaps that need improvement. *Id.*

Again, however, multiple confidential witnesses, who were frontline workers for Lumen/CenturyLink, stated that Lumen had no control measures in place to ensure adherence to lead safety protocols and no efforts to enforce safety guidelines. *Id.*, ¶¶ 113-14. Consequently, there was rampant noncompliance with the OSHA lead standard, exposing Lumen's workforce to lead poisoning. *Id.*

**E.     Indications that Lumen Was Aware of the Dangers Posed by Lead-Sheathed Cables**

Since 2010, Lumen has reported its retirement of copper wireline to the Federal Communications Commission ("FCC"). *Id.* ¶¶ 182-88. "Retirement" under the FCC regulations, includes "removing or disabling." *Id.*[8]

At a 2010 symposium held by the Environmental, Health & Safety Communications Panel ("EHSCP"),[9] a senior manager of EHS at AT&T gave a presentation titled, "Lead Exposure in Outside Plant Operations," in which he discussed EHS concerns raised by continued use and/or abandonment of such cables. *Id.*, ¶¶ 125-137. One of the slides from the conference cautioned that "[s]ome older metropolitan areas may still have over 50% lead cable." *Id.* The presentation explained that a variety of lead-based compounds can "leach" to the surface of the sheathing over time and become "airborne," posing a risk to employees working on the cable and the surrounding environment. *Id.* Another slide emphasized that "soils retained between 83 and 98 percent of the released lead **within 2 inches**" from such cables. *Id.* Over the years, various Lumen EHS managers have attended EHSCP events and/or participated on EHSCP committees. *Id.*

In late 2012, a CenturyLink technician in Minnesota began feeling physical discomfort following work in a manhole that contained a lead-filled telecommunications cable. (FAC,

---

[8] In all likelihood, however, the focus of the rule is to monitor the effect that the retirement of copper transmission lines has on the ability of ILECs to provide telecom services. *See* ¶¶ 182-188, 48.

[9] EHSCP is a consortium of communications environmental, health, and safety professionals dedicated to promoting employee safety and health and preventing accidents throughout the communications industry. (FAC, ¶ 125). As of **2011**, its "member companies" included Alcatel-Lucent, AT&T, CenturyLink, Ericsson, Cincinnati Bell, NextG Networks, Sprint Nextel, T-Mobile, Verizon, Verizon Wireless, and Windstream Communications. *Id.*

¶145-163). Blood samples from the worker and his children showed elevated levels of lead in their blood. *Id.* A confidential witness confirmed that CenturyLink did not perform air monitoring as required by the OSHA lead standard. *Id.* When the matter was brought to the attention of a CenturyLink EHS senior manager, the manager took the position that the lead might have come from a non-work source(s). *Id.* Accordingly, the worker filed a complaint with the Minnesota Occupational Safety and Health Administration ("MNOSHA"). *Id.*

On July 9, 2013, following an investigation, MNOSHA cited CenturyLink for ten violations of the lead standard, which it classified as "serious." *Id.* MNOSHA required CenturyLink to abate the conditions and pay a $21,600 penalty. *Id.* On September 10, 2013, CenturyLink and its union agreed to a settlement proposed by MNOSHA that required CenturyLink to administer a lead abatement program to bring it into compliance with the OSHA lead standard. *Id.* By November 2013, CenturyLink and its union agreed to a nationwide expansion of the lead abatement program established by the MNOSHA Settlement Agreement. *Id.*

Defendants, Storey, Dev, Johnson, and Stansbury were aware of dangers posed by lead because, over the years, they were required to acknowledge receipt of EPA-approved pamphlets detailing the dangers of lead paint associated with the sale/purchase of older residences. *Id.*, ¶¶ 374-81.

From 2010 through at least 2020, Lumen filed reports with the EPA disclosing that a total of three, out of its 250 *facilities* that handled hazardous waste, contained lead. *Id.*, ¶¶ 174-81.

**F.   Two Cases Filed Against AT&T Show that Lumen was Aware of Liability Stemming from Abandoned Lead-Covered Cables**

On March 1, 2016, six Texas landowners filed a putative class action against AT&T, seeking "damages for pollution of their land," among other things. (FAC, ¶¶ 193-196); *Cook v.*

*AT&T Corp.*, Civ. Action No. 16-00542 (S.D. Tex.) (the "Texas Action").  According to the

Texas Action, in the 1950s, the plaintiffs and other landowners granted AT&T's predecessor an

easement to lay its lead cables along their properties.  *Id*.  Thereafter, AT&T's predecessor

"buried a six-inch cable within the easement."  *Id*.

The Texas Action alleged that the lead cables were still on the plaintiffs' land, but were

in disrepair and had been cut in multiple places.  *Id*.  The suit further claimed that,

> [t]he buried cable "contains lead . . . Corrosion of the lead sheath on this type of
> cable is a mechanism that can result in lead being released to the environment.  Such
> corrosion is a common occurrence with older cables, especially when the cable is
> cut or damaged.  Cables of the type used on [p]laintiffs' property require routine
> inspection and maintenance.  If the cover surrounding the lead is damaged, the lead
> will contaminate the immediate area.  The Environmental Protection Agency has
> stringent rules for the storage and disposal of lead.

The plaintiffs added that the lead cable coverings were "badly damaged" and that the lead was

"directly contacting the soil" on their land.  *Id*.  Moreover, the lead cable was continuing to

deteriorate and "contaminate the subsurface of the [p]laintiffs' real property."  *Id*.

Although plaintiffs in the Texas Action survived summary judgment, they later

voluntarily dismissed their claims in February 2020.  *Id*.

On January 14, 2021, an environmental group called California Sportfishing Protection

Alliance filed suit against Pacific Bell Telephone Company ("Pac Bell"), an AT&T subsidiary in

the United States District Court for the Eastern District of California.  *See Cal. Sportfishing

Protection Alliance v. Pac. Bell Tel. Co.*, Civ. Action No. 21-0073 (E.D. Cal.) (the "Lake Tahoe

Action") (FAC, ¶¶ 197-201).  The lawsuit asserted claims under the RCRA and the California

State Drinking Water and Toxic Enforcement Act of 1986 ("Prop 65").  *Id*.  According to the

complaint, there were/are approximately 41,600 feet (approximately 7.9 miles) of lead cables

owned by Pac Bell located at the bottom of Lake Tahoe:   "The inner portion of each cable

consists of a lead jacket with walls approximately 0.25 inches thick. . . . Each foot in length of the cables contains approximately 3.3 pounds of lead." *Id*.

The Lake Tahoe Action alleged that these lead-sheathed cables have been abandoned and left to decay away in the water of Lake Tahoe. *Id*. A portion of the lead cables were removed and tested to determine if the cables were likely to leach lead into the Lake Tahoe water. *Id*. Based on testing results, "[a] *reasonable inference* . . . can be drawn . . . that lead in the [c]ables is being disseminated into the aquatic environment of Lake Tahoe, and that humans and wildlife who make contact with, or who drink, Lake Tahoe water are exposed to the toxic heavy metal, lead." *Id*. (emphasis added).

In September 2021, the parties in the Lake Tahoe Action agreed on a proposed consent decree that required Pac Bell to "pursue any necessary approvals required for the removal of the Cables and to remove them so long as the removal costs do not exceed $1.5 million." *Id*.

By the time of the *WSJ* exposé in July 2023, however, Pac Bell still had not removed the underwater cables. Once the story was released, AT&T informed the court that it no longer wished to abide by the consent decree. *Id*. AT&T explained that "in 2021, [it had] agreed to remove [the lead cables in Lake Tahoe] simply to avoid the expense of litigation." *Id*. Instead, it now proposed that, "the parties should agree to maintain these cables in place to permit further analysis by any qualified and independent interested party, including the EPA, and allow the safety of these cables to be litigated with objective scientific evidence rather than sensationalized media coverage." *Id*.

16

G.    The Wall Street Journal Articles and Subsequent Disclosures

On July 9, 2023, the *Wall Street Journal* ("*WSJ*" or "Journal") published an article titled,

"America is Wrapped in Miles of Toxic Lead Cables." (FAC, ¶ 218). The article reported, in

pertinent part, that,

> AT&T, Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.

> \*        \*        \*

> Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency.

> \*        \*        \*

> For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.

> \*        \*        \*

> In response to the Journal's reporting, AT&T, Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. They said they follow regulatory safety guidelines for workers dealing with lead.

> \*        \*        \*

> American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water. For underwater cables, steel cords sometimes surround the lead for further protection.

> When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

> With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

*     *     *

> The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, **and dropped within a few feet—a sign the lead was coming from the cable, experts said**.
>
> **The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors**.

*     *     *

> Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." **Other experts said covering the cables and the area around them could reduce the risk**.

(FAC, ¶ 218) (emphasis added). The next day, Lumen's stock closed down almost six percent. *Id.*, ¶ 353.

By the evening of July 9, 2023, the United States Telecom Association ("USTelecom"), an industry trade association for telecommunications-related businesses, had created a website to dispute the environmental and public health impacts of lead cables, titled, "Telecom Cable Facts." (FAC, ¶ 223). Among other things, the site declared in bold letters, **"[w]e have not seen, nor have U.S. regulators identified, evidence that legacy lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue**." *Id*. It added that, "[t]he presen[ce] of lead in soil, sediment, or water is not sufficient to conclude that the source of lead is telecom cables." *Id*. Furthermore, "[r]isks associated with legacy lead-sheathed telecom cables are mitigated by the nature of the material, their location, coatings on them, conduits

18

surrounding them, and other factors" and most "are generally in locations that minimize the potential for public contact." *Id*. Finally, the site asserted that, "in some situations, telecom cables are appropriately left in place when no longer in current use and may stand by to be used if and when needed," as "with many other types of infrastructure, such as rail lines or pipelines." *Id*.

The *WSJ's* story took many—including those intimately familiar with the telecommunications industry—by surprise. (FAC, ¶ 219). *Fierce Telecom*, a publication dedicated to the telecommunications industry, ran a story on July 10, 2023, about the *WSJ*'s report, stating that "**the lead-covered telco cables seem to have flown under the radar, until now**." *Id*. Analyst Craig Moffett of SVB MoffettNathanson, who covered the industry for more than 20 years said, "we had never previously encountered the topic of lead in telecom networks." *Id*. Four former FCC Chairs told the Journal that they were unaware of lead in legacy copper wire networks. *Id*.

On July 11, 2023, USTelecom provided a statement to the *WSJ*, declaring that, "[w]e have not seen, nor have regulators identified, evidence that legacy lead-sheathed telecom cables are a leading cause of lead exposure or the cause of a public health issue." (FAC, ¶ 224).

After the close of trading on July 11, 2023, the *WSJ* published another story in its series on lead cables titled, "Lawmakers Demand Telecom Firms Act on Toxic Lead Cables After WSJ Investigation." *Id*., ¶ 354. That article revealed that a number of Congressmen were demanding that the owners of the lead telecom cables take immediate action to protect Americans and revealed that regulators were evaluating enforcement options. *Id*. The article stated, in part,

> [t]he Federal Communications Commission, which regulates telecom companies, said it has reached out to the EPA and the White House Council on Environmental Quality about the issues raised by the Journal's report and stands "ready to assist addressing these public health concerns."

> "We take seriously the concerns raised about potential lead exposure from communications lines—including the infrastructure that first connected so many remote and rural parts of the country," an FCC spokesperson said.  "We are currently looking into what authorities may exist under the Communications Act to address this issue."

*Id*.  On this news, Lumen's stock fell one and one-half percent from $2.07 on July 11, 2023 to close at $2.04 on July 12, 2023.  *Id*., ¶ 356.

On July 14, 2023, the business section of the *WSJ*, published a report entitled, "AT&T, Other Telecom Stocks Sink After WSJ Investigation on Toxic Lead Cables," which estimated that it could cost the industry as much as $59 billion to clean up the lead cables and specifically identified Lumen as one of the most exposed, behind only AT&T and Verizon.  *Id*., ¶ 357.  On this news, Lumen's stock price declined 10.2 percent to close at $1.85 on July 14, 2023.  *Id*.

On the morning of July 17, 2023, the *WSJ* released yet another article entitled, "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables."  *Id*. ¶ 359. The article stated, in pertinent part,

> [t]hree environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies. In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.

*Id*.  On this news, Lumen's stock price declined a little over eight percent to close at $1.70 for the day.  *Id*., ¶ 360.

On the morning of July 18, 2023, the *WSJ* reported that "[s]maller carriers" including "Lumen have seen their shares plunge 34% and 22%, respectively, on worries about their larger reliance on wireline services" since the Journal's report first ran on July 9, 2023.  *Id*.

Also on July 18, 2023, *Fierce Telecom* ran a story that contained a quote from a Lumen spokesperson which confirmed for the first time that the Company was "working with outside experts to prioritize and sequence our investigative efforts, including site testing and implementation of science-based steps where advisable." *Id*., ¶ 361.  Lumen's stock closed at $1.62, a drop of 4.71 percent.  *Id*., ¶ 362.

After the close of trading on July 26, 2023, the *WSJ* released another article in its lead cable series titled, "Justice Department and EPA Probe Telecom Companies Over Lead Cables," stating, in pertinent part,

> [t]he Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead- sheathed telecom cables across the U.S.
>
> \*        \*        \*
>
> The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days. Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.

*Id*., ¶ 363.

On August 1, 2023, at its first earnings call since the exposé, Stansbury, Lumen's EVP and CFO, stated that ""[w]e began phasing out lead-sheathed cables from our network infrastructure during the 1950s" but "less than 5% of our approximately 700,000-mile copper network contained lead, of which we believe the majority is buried in conduit-based infrastructure."  (FAC, ¶ 234).

That same day, Lumen released its quarterly report on Form 10-Q with the SEC for the second quarter of 2023, which revealed that its lead-clad cables posed a previously undisclosed

risk of loss to investors: "[i]n the past we acquired companies that installed lead-sheathed cables several decades ago, or operated certain manufacturing companies in the first part of the 1900s. Under applicable environmental laws, we could be responsible for environmental liabilities arising from the historical operations of our predecessors." *Id.*, ¶ 366. The next day, Lumen's stock price declined by almost 12 percent. *Id.*

On October 31, 2023, Lumen released its quarterly report on Form 10-Q with the SEC for the third quarter of 2023, stating that,

> [o]ur network includes some residual lead-sheathed copper cables installed years ago. These lead-sheathed cables constitute a small portion of our network. **Due to recent media coverage of potential health and environmental risks associated with these cables**, we anticipate incurring certain investigative costs. We also may include other costs from related proceedings, including litigation, regulatory initiatives, and remediation.

*Id.* ¶ 368 (emphasis added). The next day, Lumen's stock price dropped 32.8 percent to close at its Class Period and all-time low. *Id.*

### Motion to Dismiss Standard and Extrinsic Documents

Defendants seek dismissal of Plaintiffs' claims pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. However, "[a] dismissal for failure to plead fraud with particularity under Rule 9(b) is treated as a dismissal for failure to state a claim under Rule 12(b)(6)." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997) (citation omitted). Furthermore, in a securities case, a Rule 12(b)(6) motion must consider not only the strict pleading requirements of Rule 9(b), but also that of the Private Securities Litigation Reform Act. *Hall v. Rent-A-Ctr., Inc.*, Civ. Action No. 16-0978, 2017 WL 6398742, at *6 (E.D. Tex. Oct. 19, 2017), *R&R adopted,* 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) (citations omitted). Accordingly, the Court will begin with a recitation of the usual Rule 12(b)(6) standard and then address the ancillary motions.

## A.    Rule 12(b)(6) Standard of Review

The Federal Rules of Civil Procedure sanction dismissal where the plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  A pleading states a claim for relief, *inter alia*, when it contains a "short and plain statement . . . showing that the pleader is entitled to relief . . ." FED. R. CIV. P. 8(a)(2).  Of course, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," that is, a plaintiff must "specify the alleged fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent. *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 349 (5th Cir. 2002) (quoting FED. R. CIV. P. 9(b)) and *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citations omitted).

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).  A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. *Plausibility* does not equate to *possibility* or *probability*; it lies somewhere in between. *See Iqbal,* 556 U.S. at 678. Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *See Twombly*, 550 U.S. at 556.  Although the court must accept as true all factual allegations set forth in the complaint, the same presumption does not extend to legal conclusions. *Twombly*, 550 U.S. at 555.  A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not satisfy Rule 8. *Id*. "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 632 F.3d 148, 153 (5th Cir. 2010) (citation omitted).

23

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. (citation omitted). A well-pleaded complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely. *Twombly*, 550 U.S. at 556. Nevertheless, a court is compelled to dismiss an otherwise well-pleaded claim if it is premised upon an invalid legal theory. *Neitzke v. Williams*, 490 U.S. 319 (1989).

**B.      Motion to Strike**

By this motion, Plaintiffs seek a court order striking:   (1) Defendants' Motion to Take Judicial Notice; (2) the exhibits that are the subject of the foregoing motion; and (3) the appendices attached to Defendants' motion to dismiss. Plaintiffs urge the Court to strike items (1)-(2) because Defendants filed their motion nineteen minutes past midnight of the purported April 26, 2024 deadline and because a significant swathe of the documents that form the basis for the motion to take judicial notice should not be considered by the Court. Plaintiffs contend that the item (3) documents should be stricken because they represent an impermissible backdoor attempt to exceed the page limits for Defendants' motion to dismiss.

While the importance of Court-imposed deadlines and page limits is self-evident, here, Plaintiffs have suffered no more than negligible prejudice. Although other courts may permit such gamesmanship, this Court is not. The undersigned is not inclined to grant a pedantic request for relief to redress *de minimis* transgressions premised upon a 19-minute delay or for purportedly exceeding page limitations via additional appendices when the Court concomitantly had expressed its willingness to permit *both* sides to exceed ordinary page limits. *See* doc. #s 39 & 51 and FED. R. CIV. P. 1 (federal rules should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding). It is always the goal of the undersigned magistrate judge to treat counsel and litigants fairly and equally.

Furthermore,  Plaintiffs ask the Court to strike the exhibits that form the basis for

Defendants' motion to take judicial notice for the same reasons that they opposed Defendants'

motion on the merits.  In other words, Plaintiffs' argument in support of their request to strike

those exhibits is redundant.[10]

For the foregoing reasons, IT IS ORDERED that Plaintiffs' motion to strike [doc. # 46] is

DENIED.[11]

## C.      Motion to Take Judicial Notice

In assessing whether plaintiffs' claims survive a Rule 12(b)(6) motion to dismiss, "the

factual information to which the court addresses its inquiry is limited to the (1) the facts set forth

in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial

notice may be taken under Federal Rule of Evidence 201."  *Walker v. Beaumont Indep. Sch.*

*Dist.*, 938 F.3d 724, 735 (5th Cir. 2019) (citations omitted).  The Court also may consider

documents that a defendant attaches to its motion, so long as the documents are referred to in the

complaint and are central to the plaintiff's claims.  *Id*. (citing, *inter alia*, *Causey v. Sewell*

*Cadillac-Chevrolet, Inc*., 394 F.3d 285, 288 (5th Cir. 2004)); *see also Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must consider the complaint, plus

documents incorporated into the complaint by reference, and matters of which a court may take

---

[10] Plaintiffs contend that striking the exhibits will promote a clear record of the materials that the
Court is considering in support of the motion to dismiss.  Plaintiffs may rest assured, however,
that the undersigned will specify if exhibits are considered.  In this case, they were not.  In any
event, striking a document does not contribute to a clearer record because, even if stricken, the
documents are not erased or scrubbed from the docket.

[11] As this motion is not excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the
merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is
issued under the authority thereof, and in accordance with the standing order of this court.  Any
objection/appeal must be made to the district judge in accordance with Rule 72(a) of the Federal
Rules of Civil Procedure.

judicial notice).  "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated."  *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 499 (5th Cir. 2000). When taking judicial notice, however, the courts generally are limited to recognizing the existence of a document, rather than taking as true potentially disputed factual statements or findings contained within that document, unless the facts themselves satisfy the Rule 201(c) criteria.  *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 831 (5th Cir. 1998).

In their motion to take judicial notice, Defendants ask the Court to consider 37 exhibits. Plaintiffs do not object to fifteen of the exhibits, Exh. #s 3-8, 23, 25-31, & 37, for the limited purpose of identifying what was said to the public, but not for the truth of the matters stated therein.  (Pl. Opp. Brief, pg. 1 [doc. # 50]).

Ultimately, the motion is moot because the Court has not relied on any of the documents submitted by Defendants.  *See* discussion, *infra*.  Nonetheless, the Court will grant the motion as to those documents that are unopposed for the limited purpose of identifying what was said to the public, but otherwise deny the remainder of the motion as moot.  Accordingly,

IT IS ORDERED that Defendants' motion to take judicial notice [doc. # 38] is GRANTED IN PART, as to the unopposed Exhibit #s 3-8, 23, 25-31, & 37.  The motion otherwise is DENIED IN PART, as moot.[12]

---

[12] As this motion is not excepted in 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this ruling is issued under the authority thereof, and in accordance with the standing order of this court.  Any objection/appeal must be made to the district judge in accordance with Rule 72(a) of the Federal Rules of Civil Procedure.

## § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5

**A.     Overview**

Plaintiffs' first count against Defendants is for violations of § 10(b) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b), together with Securities and Exchange Commission

("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  (FAC, ¶¶ 433-441).

Section 10(b) of the Securities Exchange Act provides that,

> [i]t shall be unlawful for any person, directly or indirectly, by the use of any
> means or instrumentality of interstate commerce or of the mails, or of any facility
> of any national securities exchange . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security
> registered on a national securities exchange or any security not so registered . . .
> any manipulative or deceptive device or contrivance in contravention of such
> rules and regulations as the Commission may prescribe as necessary or
> appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

> Pursuant to its rule-making authority, the SEC made it unlawful for anyone:
>
> (a)     To employ any device, scheme, or artifice to defraud,
>
> (b)     To make any untrue statement of a material fact or to omit to state a
> material fact necessary in order to make the statements made, in the light
> of the circumstances under which they were made, not misleading, or
>
> (c)     To engage in any act, practice, or course of business which operates or
> would operate as a fraud or deceit upon any person, in connection with the
> purchase or sale of any security.

17 C.F.R. § 240.10b-5.  "Rule 10b–5 encompasses only conduct already prohibited by § 10(b)."

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008) (citing *United States v.*

*O'Hagan,* 521 U.S. 642, 651 (1997)).

Although, by its terms, the Securities Exchange Act does not authorize a private cause of

action for § 10(b) violations, the Supreme Court has recognized an implied right of action in the

words of the statute and its implementing regulation. *Stoneridge Inv. Partners, LLC*, 552 U.S. at

157 (citing *Superintendent of Ins. of N.Y. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 13, n.9

(1971)). "In a typical § 10(b) private action a plaintiff must prove (1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (citation omitted);

*see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).

In an effort to curb the perceived abuse of federal securities laws by private plaintiffs,[13]

Congress enacted the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Nathenson*

*v. Zonagen, Inc.*, 267 F.3d 400, 406 (5th Cir. 2001). The PSLRA enhanced the particularity

requirements for pleading fraud in two ways. "First, plaintiffs must 'specify each statement

alleged to have been misleading, [and] the reason or reasons why the statement is misleading . .

.' Second, for 'each act or omission alleged' to be false or misleading, plaintiffs must 'state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind.'" *In re: Shaw*, 537 F.3d at 533 (quoting 15 U.S.C. § 78u-4(b)(1)(B)& (2)). Only the

latter requirement alters the usual contours of a Rule 12(b)(6) ruling. *Lormand v. US Unwired,*

*Inc.*, 565 F.3d 228, 239 (5th Cir. 2009). In other words, under Rule 12(b)(6), courts must draw

all reasonable inferences in the plaintiff's favor. *Id.*

However, "for scienter only, as required by the PSLRA, a court must take into account

plausible inferences opposing as well as supporting a strong inference of scienter." *Id.* (citations

and internal quotation marks omitted). Thus, to adequately plead scienter in a § 10(b) action,

---

[13] *E.g.*, "nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and
manipulation by class action lawyers . . ." *Tellabs, Inc.*, 551 U.S. at 320 (citation omitted).

plaintiffs must set forth facts that render "an inference of scienter **at least as likely as any plausible opposing inference**." *Lormand,* 565 F.3d at 250 (citing *Tellabs, Inc..*, 551 U.S. at 324) (emphasis added). Ultimately, the inference of scienter must be "cogent and compelling," not merely "reasonable" or "permissible." *Lormand*, 565 F.3d at 239 (citations omitted). "[W]here there are competing inferences that establish or negate the scienter requirement, 'a tie favors the plaintiff' on a motion to dismiss under 15 U.S.C. § 78u–4(b)(2)." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014).

**B.      The Challenged Elements of Plaintiffs' Claim under Section 10(b) of the Exchange Act and SEC Rule 10b5**

Defendants contend that Plaintiffs fail to adequately plead:   (a) the required strong inference that any Defendant acted with scienter (i.e., fraudulent intent or severe recklessness); (b) the existence of any actionable misstatements or omissions; or (c) loss causation.

First, they argue that Plaintiffs do not satisfy the PSLRA's heightened standard for pleading scienter (i.e., fraudulent intent), which requires Plaintiffs to establish a "cogent and compelling" inference that each Defendant knew, or was severely reckless in not knowing, that the Company should have disclosed a significant financial exposure caused by health or environmental risks relating to lead-sheathed cables

Second, Defendants assert that the alleged misstatements in the FAC are non-actionable because none of them address the topic of lead-sheathed cables, and, therefore, the supposed omission of information about those cables did not render the statements misleading. Defendants further maintain that all of the statements are either immaterial puffery, accurate statements of historical fact, forward-looking statements protected by the PSLRA's safe harbor, or nonactionable opinion statements.

Finally, Defendants argue that Plaintiffs fail to adequately plead the existence of

"corrective disclosures" that revealed the supposed fraud and caused them losses.  The *WSJ* articles did not contain any revelations about Lumen's lead-sheathed cables.  Moreover, Lumen's subsequent disclosures that the negative attention from the articles might generate legal actions are statements about future risks related to lead-sheathed cables and did not inform investors that the Company's prior assessments about the risks it faced were incorrect.

The Court will set forth generally applicable law regarding actionable misstatements or omissions, scienter, and loss causation, before proceeding to analyze the sufficiency of Plaintiffs' allegations.

        i)        <u>Material Misrepresentations or Omissions</u>

"Commission Rule 10b–5 forbids, among other things, the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Lormand*, 565 F.3d at 238 (citing 17 C.F.R. § 240.10b–5). "To prevail on a § 10(b) claim, a plaintiff must show that the defendant made a statement that was '*misleading* as to a *material* fact.'" *Matrixx Initiatives, Inc.,* 563 U.S. at 38 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action." *Lormand*, 565 F.3d at 248 (citations omitted).  Under Rule 10b-5, a defendant has a duty to speak the full truth when that defendant elects to speak on a matter.  *Id*. at 249 (citing *Rubinstein v. Collins*, 20 F.3d 160, 170 (5th Cir. 1994)).  In other words, "[o]nce the defendants engaged in public discussions . . . they had a duty to disclose a 'mix of information' that is not misleading." *Oklahoma Firefighters Pension & Ret. Sys. v. Six Flags Entm't Corp.*, 58 F.4th 195, 217 (5th Cir. 2023) ("*In re:  Six Flags*") (citing *Lormand*, at 248-49).

Although the duty to disclose does not extend to every fact or assumption underlying a prediction, the defendant must disclose "material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand*, 565 F.3d at 249.  Therefore, "[t]o warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Lormand*, 565 F.3d at 249 (quoted sources and internal quotation marks omitted).

Nonetheless, a "claim of incomplete disclosure is actionable only if what [defendants] said is misleading. [I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re: Shaw*, 537 F.3d at 541 (citations and internal quotation marks omitted).  Furthermore, some statements constitute "non-actionable puffery," if they are "of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (citation omitted).

Defendants also contend that, "[a] claim of securities fraud may not be based on accurate statements of historical facts."  (Defs. M/Dismiss, Memo., pgs. 30-31) (quoting *In re MCI Worldcom, Inc. Sec. Litig.*, 191 F.Supp.2d 778, 784 (S.D. Miss. 2002).  However, when, as here, the claim is based on alleged material omissions, the statements must be analyzed in context. *See* discussion, *infra*.

The PSLRA also contains a safe harbor provision that precludes liability for written or oral forward-looking statements, which are defined as,

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

31

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

15 U.S.C. §§ 78u-5(c), 78u-5(i)(1)(A)-(C).[14]

Under the PSLRA's safe harbor provision, a defendant is not liable if "(1) the statement is identified as forward-looking and 'is accompanied by meaningful cautionary statements'; or (2) the statement is 'immaterial'; or (3) the plaintiff fails to plead that the statement 'was made with actual knowledge . . . that [it] was false or misleading.'" *In re: Six Flags*, 58 F.4th at 210 (citing, *inter alia*, § 78u–5(c)(1)(A)–(B)). In other words,

> [t]he safe harbor has two independent prongs: one focusing on the defendant's cautionary statements and the other on the defendant's state of mind. Under the first prong, there is no liability if, and to the extent that, the forward-looking statement is: (i) "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (ii) "immaterial." Under the second prong, there is no liability if the plaintiff fails to prove that the statement (i) if made by a natural person, was made with actual knowledge that the statement was false or misleading, or (ii) if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading.

*Southland Sec. Corp.*, 365 F.3d at 371–72 (internal citations omitted).[15]

---

[14] "[F]orward-looking statements that are included in a financial statement prepared in accordance with GAAP are excluded from the safe-harbor provision." *Padilla v. Cmty. Health Sys., Inc.*, Civ. Action No. 19-0461, 2022 WL 3452318, at *37 (M.D. Tenn. Aug. 17, 2022) (citing, *inter alia*, 15 U.S.C. § 78u5(b)(2)(A)).

[15] Oral statements can qualify for the safe harbor:

(A) if the oral forward-looking statement is accompanied by a cautionary statement-
(i) that the particular oral statement is a forward-looking statement; and

"The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors." *Id.* at 372 (citation omitted). A "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg*, 758 F.3d at 691 (citations omitted). "Each statement that benefits from the safe harbor must be addressed individually." *Lormand*, 565 F.3d at 245 (citations omitted).

Even if forward-looking statements are not protected by meaningful cautionary language, they "may still qualify for safe harbor protection if Plaintiff fails to plead facts demonstrating the statements were made with 'actual knowledge' that they were misleading." *In re: Six Flags*, 58 F.4th at 212 (citations omitted). The Fifth Circuit has yet to determine whether the safe harbor's scienter standard of "actual knowledge" for forward-looking statements encompasses severe recklessness. *Id.*, at 214. However, "liability for a forward-looking statement must satisfy a more demanding standard than for current statements." *Id.* Therefore, "[l]iability arises only

---

(ii) that the actual results might differ materially from those projected in the forward-looking statement; and

(B) if--
(i) the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;
(ii) the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and
(iii) the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

15 U.S.C. § 78u-5(c)(2).

upon proof of *knowing falsity* because the provision explicitly specifies that a defendant must have made the statement with 'actual knowledge' of its falsity." *Id*. (emphasis added).

      ii)      <u>Scienter</u>

Scienter is defined as an "intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Investments LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (quoted source omitted). Severe recklessness "comprises solely those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id*. (citation omitted).[16] "[P]leading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *In re: Shaw*, 537 F.3d at 535 (citation omitted). Likewise, "'general allegations and conclusory statements, such as stating [defendants] knew . . . adverse material' do not contribute to a strong inference of scienter." *Id*. (quoted source omitted).[17] Attempts to allege scienter based upon defendants' experience in the industry is analogous to alleging scienter premised upon a

---

[16] Although the Fifth Circuit has held that the PSLRA did not eliminate "severe recklessness" as a basis for scienter generally under § 10(b)/Rule 10b-5, the Court did suggest that for forward-looking statements, Congress modified the scienter definition by requiring plaintiffs to demonstrate that defendants' had "actual" knowledge. *Nathenson*, 267 F.3d at 409; *cf. Southland Securities Corp*, (court analyzed defendants' forward-looking statements, and found that plaintiffs failed to allege facts demonstrating actual knowledge or severe recklessness).

[17] In fact, the Fifth Circuit has more than once remarked that "rote conclusory allegations that the defendants 'knowingly did this' or 'recklessly did that' fail to meet the heightened pleading requirements of Rule 9(b)." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1019 (5th Cir. 1996) (citation omitted).

defendant's position in the company -- which does not suffice.  *Abrams v. Baker Hughes Inc.*,

292 F.3d 424, 432 (5th Cir. 2002).[18]

"[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state

with particularity facts giving rise to a strong inference that the defendant acted with the required

state of mind.'" *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200,

208 (5th Cir. 2009) (quoting *Tellabs,* 551 U.S. at 326)).  Moreover, the Fifth Circuit has rejected

the "group pleading approach to scienter." *Id*.  Instead, courts must look to

> the state of mind of the individual corporate official or officials "who make or issue
> the statement (or order or approve it or its making or issuance, or who furnish
> information or language for inclusion therein, or the like) rather than generally to
> the collective knowledge of all the corporation's officers and employees acquired
> in the course of their employment.

*Id*.  That being said, "the court's job is not to scrutinize each allegation in isolation but to assess

all the allegations holistically." *Tellabs, Inc.*, 551 U.S. at 326.  Likewise, "[i]n determining

whether [plaintiff] has alleged facts sufficient to give rise to a strong inference of scienter, [the

courts] consider the factual allegations contained in the complaint *in toto.*"  *R2 Investments LDC*,

401 F.3d at 643 (citation omitted).

Finally, "[f]ollowing *Tellabs,* courts must discount allegations from confidential

sources," because "[s]uch sources afford no basis for drawing the plausible competing inferences

required by *Tellabs.  In re:  Shaw*, 537 F.3d at 535 (internal citations omitted).  "At the very

least, such sources must be described 'with sufficient particularity to support the probability that

a person in the position occupied by the source . . . would possess the information pleaded.'"  *Id*.

---

[18]  A "bare allegation about industry custom is precisely the type of conclusory allegation that
motivated the heightened pleading standards of Rule 9(b) in the first place." *Lovelace*, 78 F.3d
at 1020.

iii)    Loss Causation

Defendants' motion focuses upon whether Plaintiffs properly alleged facts to satisfy the material misrepresentation or omission and scienter elements of their claims.  However, Defendants also contend that certain misrepresentations or omissions were not related to any "corrective disclosure," as required to support loss causation.  Pursuant to Rule 8(a)(2), plaintiffs are required to allege, in respect to loss causation, a facially "plausible" causal relationship between the fraudulent statements or omissions and plaintiffs' economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiffs' economic loss.  *Lormand*, 565 F.3d at 258 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)).  Thus, "[l]oss causation requires disclosure; defendants in a securities fraud case may not be held liable for a decline in stock price before the fraud is disclosed."  *City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, Civ. Action No. 12-1609, 2013 WL 1100819, at *5 (W.D. La. Mar. 15, 2013) ("LHC Grp., Inc.") (citation omitted).  "[U]ndisclosed information cannot drive down the market price of a stock.  Only information known to the market can cause a loss."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).  "Absent the requirement of causation, Rule 10b-5 would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission."  *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *as corrected on denial of reh'g* (July 13, 1981), *aff'd in part, rev'd in part,* 459 U.S. 375 (1983) (citations omitted).

"[T]o establish loss causation this disclosed information must reflect part of the 'relevant truth'—the truth obscured by the fraudulent statements."  *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009).  In turn, the "test for relevant truth simply

means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Pub. Employees Ret. Sys. of Mississippi, Puerto Rico Teachers Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) (citations omitted).

## C.      Plaintiffs' Allegations of Material Misrepresentations and Omissions Analyzed

Plaintiffs contend that Defendants made false and misleading statements that caused Lumen's shares to trade at artificially inflated prices during the Class Period.  (FAC, ¶ 415).  In their FAC, they identified dozens of alleged misstatements, which they grouped into five categories:   (1) EHS contingencies; (2) the cost benefits of transitioning away from copper cable services; (3) employee health and safety; (4) environmental stewardship; and (5) GAAP (Generally Accepted Accounting Principles) compliance.  (FAC, ¶¶ 253-350).

Defendants argue that the *WSJ* articles barely mention Lumen, much less show that the Company was concealing a significant liability for health and environmental issues.  Further, less than five percent of its legacy copper network contains lead, with most of it secured within buried conduit.  According to Defendants, the only thing the articles actually show is that (a) the public (including Lumen's shareholders) have known for many years that the Company has owned historic lead-sheathed cables; (b) those cables may pose health or environmental risks under certain circumstances; and (c) the extent of those risks, if any, is still unknown and subject to debate.  In other words, the factual allegations in the Complaint affirmatively disprove the existence of fraud because Lumen could not have "hidden" what the FAC concedes investors already knew about lead-sheathed cables.

Plaintiffs argue that the fact that the information was publicly available may affect the reliance element of their claim, i.e., it presents a "truth on the market" defense, but does not

excuse Defendants' scienter.  (Pl. Opp. Brief, pg. 26).  Plaintiffs maintain that even if investors

knew that Lumen owned lead cables in the past, they did not know "(1) that Lumen continued to

own them during the Class Period; (2) the extent of Lumen's lead-clad infrastructure remaining

in Lumen's network; [and] (3) that Lumen decided to abandon those cables across the country as

it transitioned to fiber." *Id*.

Defendants reply that Plaintiffs misunderstand their argument.  Instead, their point is that

"Plaintiffs do not adequately allege that Defendants had any additional or contrary information

apart from what was already known by the public, the sum total of which was patently

insufficient for anyone to 'know' the alleged financial exposure that Plaintiffs now assert based

on unfounded conjecture."  (Defs. Reply Brief, pg. 9).

To a certain extent, the parties are talking past one other.  Therefore, before proceeding to

analyze each statement that Plaintiffs allege to be materially false and misleading, the Court will

pause to try and sort out, according to the FAC, who knew what and when.  The confusion

undoubtedly stems from the fact that there are several aspects to the information disclosed by the

*WSJ* articles.

First, the articles discussed the toxic nature of lead.  However, the toxicity of lead should

not come as news to anyone, let alone a reasonable investor.  By 2018, there was an all but

"universal public consensus" that, at least at a certain level, physical exposure to lead may be

harmful.  *See* FAC, ¶ 76.

Second, the articles disclosed that telecommunications companies historically used lead-

sheathed cables.  While this information may not have been widely known, and, consequently,

came as a surprise to "many," including industry insiders, *see* FAC, ¶ 219, it certainly was not a

secret.  The information was available in the public domain for anyone who cared to look.  *See,
e.g.,* the Texas and Lake Tahoe Actions, FAC, ¶¶ 193-201.

Third, the articles explained that telecommunications companies were abandoning
disused lead-sheathed cables in place.  Again, however, this disclosure, like the last, while not
widely disseminated, was available in the public domain.  *See* the Texas and Lake Tahoe
Actions, FAC, ¶¶ 193-201.  Furthermore, Plaintiffs cannot argue, in good faith, that investors did
not know that Lumen owned legacy AT&T lead-sheathed cables, because, after the initial story
broke, Lumen's stock fell – even though the article made no mention of Lumen.  *See* FAC, ¶
352.

Finally, and most importantly, the articles discussed findings indicating that lead from
these cables, whether buried, submerged, or suspended overhead, was leaching or migrating from
its immediate location and potentially contaminating nearby areas, thereby harming individuals
and the environment.  This last disclosure represented the real revelation that, not only
contradicted the industry's conventional thinking, but also accorded significance and
consequences to the two preceding disclosures.  Stated differently, if, as the *WSJ* investigation
suggested, the lead from the cables migrated significantly, then this had the effect of
undermining the industry's practice of retiring or abandoning the lead-sheathed cables in place.
After all, if the lead remained in place, then exposure could be controlled and limited.

Plaintiffs contend that financial considerations were the motivating force behind Lumen's
decision to abandon the lead-sheathed cables in place.  Given Plaintiffs' estimates of the
incredible costs associated with the removal of lead-sheathed cables from Lumen's network, *see*
FAC, ¶¶ 384-385, one would have to be naïve not to suspect that cost played a role in Lumen's,
and the entire industry's decisions to leave the cables in place.  In fact, as a prudent steward of its

increasingly stressed financial resources, Lumen would have been remiss and derelict in its duty to its shareholders had the cost of removal *not* been a factor in its decision-making process.

However, at least part of the reason it was so costly to remove the cables is precisely because of the need to properly protect workers from exposure, together with the obligation to properly transport and dispose of the highly toxic lead. *See* FAC, ¶ 218 ("former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process").[19]  In short, safety concerns are inextricably intertwined with the cost of removal.

When the *WSJ* published the results of its investigation, it had the effect of unbalancing the industry's extant equation regarding its approach to lead-sheathed cables.  Until then, there was every good reason for Lumen and other industry actors to believe that the lead would remain contained in conduits or otherwise within a few inches of the cables. *See* FAC, ¶ 218.  As such, the decision to leave the cables in place arguably was a sound one that had the effect of not only preserving Company, and, by extension, shareholder, resources in the short term, but also limited the further spread of toxic lead to workers and the environment at large, were it to be removed. In fact, the jury is still out as to what the best course of action is, i.e., removal and remediation or retire the cables in place.  Indeed, Plaintiffs do not allege that the EPA has taken a definitive stance on the matter.

---

[19] In a 1996 article adduced by Plaintiffs, the authors discussed the dangers experienced by recyclers from stripping the lead from copper telecom cable. *American Journal of Industrial Medicine*, "Lead Poisoning in Telephone Cable Strippers:  A New Setting for an Old Problem;" Pl. Opp. Memo., Exh. A [doc. # 45-3].  The authors concluded that "[o]ther aspects of cable processing, including cable pulling, transport and disposal, as well as environmental/household contamination, may put significant numbers of workers and others at risk of lead poisoning . . ." *Id*.

Plaintiffs contend that the two lead-sheathed cable lawsuits filed against AT&T and an AT&T subsidiary, i.e., the *Texas* and *Lake Tahoe Actions*, provided notice to "Lumen Management" that there was a risk Lumen could be liable to property owners or otherwise be made to remediate and remove its lead cable infrastructure. (FAC, ¶¶ 193-201). However, Plaintiffs do not allege any facts to show that any individual Defendant was aware of these cases. Even if they were, the two cases do not confirm a significant threat of liability to Lumen.

For instance, the *Lake Tahoe Action* focused upon an underwater cable. However, Plaintiffs do not allege any facts to show that Lumen has a significant amount of underwater lead-sheathed cables, if any. Moreover, even though the defendant AT&T subsidiary agreed to a consent judgment in the Tahoe Action, it expressly disputed plaintiff's allegations, which it maintained lacked merit. *Lake Tahoe Action*, Civ. Action No. 21-0073 (E.D. Cal. Nov. 5, 2021) (Amend. Consent Decree [doc. # 21]).[20]

As for the *Texas Action*, Plaintiffs tout the fact that the court denied summary judgment, and that the case had been set for trial before plaintiffs abruptly dismissed the suit. *See* FAC, ¶ 196. What Plaintiffs do not disclose, however, is that, per the summary judgment motion, the reported concentration of lead in the field samples was orders of magnitude below the Protective Concentration Levels ("PCL") (19.4 mg/kg out of a PCL of 500 mg/kg), which meant that it posed no risk to human health or the environment. *Texas Action*, Civ. Action No. 16-0542 (S.D. Tex.) (AT&T MSJ [doc. # 76]. This circumstance, together with the district court's perfunctory, three-sentence denial of the MSJ, might help to explain why plaintiffs otherwise inexplicably dismissed their suit, despite having survived the MSJ. *Id.*, doc. # 95.

---

[20] A court may take judicial notice of court pleadings in other cases because they constitute public records. *See Murchison Capital Partners, L.P. v. Nuance Commc'ns, Inc.*, 625 Fed. App'x. 617, 618 n.1 (5th Cir. 2015) (citations omitted).

Subject to the foregoing, the Court will consider the alleged misstatements and omissions identified by Plaintiffs.  At the same time, the Court will address whether Plaintiffs allege facts to show scienter.

      i)      <u>Statements About EHS Contingencies and Risks</u>

**<u>FAC, ¶ 253</u>**

On November 9, 2018, the day after the start of the Class Period, Lumen filed a quarterly report on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q 2018 Form 10-Q"), which expressly incorporated by reference "the risk factors discussed in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."  That filing, in turn, stated as follows in Part I, Item 1A:

> **Risks posed by other regulations**. All of our operations are also subject to a variety of environmental, safety, health and other governmental regulations. ***In connection with our current operations, we use, handle and dispose of various hazardous and non-hazardous substances and wastes.*** In prior decades, certain of our current or former subsidiaries owned or operated, or are alleged to have owned or operated, *manufacturing businesses*, for which we have been notified of certain potential environmental liabilities regarding those past operations. ***We monitor our compliance with applicable regulations or commitments governing these current and past activities***. Although we believe that we are in compliance with these regulations in all material respects, ***our use, handling and disposal of environmentally sensitive materials, or the prior operations of our predecessors, could expose us to claims or actions that could potentially have a material adverse effect on our business, financial condition and operating results.***

The same or substantially similar statements appear on other quarterly or annual reports in 2019-2020.  (FAC, ¶ 254).

Plaintiffs contend that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because Lumen failed to disclose that:

(i) its wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company upon retirement; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement equipment; and, thus, (v) the risk that the company failed to comply with applicable environmental, safety, health and other governmental regulations and commitments was not merely hypothetical. This statement is also false and misleading when made because, far from monitoring its compliance with applicable regulations or commitments, Lumen had no system in place prior to, or during, the Class Period to monitor worker compliance with the OSHA Lead Standard, the MNOSHA Settlement, or its internal guidelines addressing those matters.

(FAC, ¶ 255).

The Court reiterates that, a "claim of incomplete disclosure is actionable only if what [defendants] said is misleading. [I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *In re: Shaw*, 537 F.3d at 541. The crux of Lumen's statement is that it could be exposed "***to claims or actions that could potentially have a material adverse effect on our business, financial condition and operating results.***" That statement, however, did not create an impression that differed materially from the one that actually existed. First, from the statement itself, it is not clear that Lumen even was referring to lead-sheathed cables. Rather, the statement references "manufacturing businesses," which one does not readily associate with a dormant cable. Second, insofar as the statement was broad enough to encompass lead-sheathed cables, it candidly disclosed that there could be claims or actions that *could materially* affect Lumen's business, financial condition and operating results. That is true. Even after the publication of the *WSJ*

articles, Lumen continues to face no more than the specter of unrealized claims or actions that materially could affect its affairs.  In short, the statement was not false or misleading.[21]

Instead, Plaintiffs seem to fault Lumen for speaking of the risk posed by its legacy operations in general terms, but then failing to disclose specific details and the scale of the potential risk that the firm faced from lead-sheathed cables.  However, the Court is not persuaded that, by speaking of general risks from its legacy operations, Lumen opened the door to require disclosure about lead-sheathed cables, in particular.  *See Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (no duty to disclose because defendants' failures to speak did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists.").

Furthermore, "companies are not required to engage in 'self-flagellation' by disclosing unproven allegations." *Veal v. LendingClub Corp.*, 423 F.Supp.3d 785, 806 (N.D. Cal. 2019) (citation omitted).  "Disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("*UBS*") (citations and internal quotation marks omitted).[22]

---

[21] Plaintiffs do not allege any facts to show that, at the time the statements were issued, any "untoward" or "unfavorable" event had occurred.  *See Lormand*, 565 F.3d at 249.

[22] In *UBS*, the company disclosed in an offering that it was involved in multiple legal proceedings and government investigations that could expose the company "to substantial monetary damages and legal defense costs," etcetera.  *UBS*, 752 F.3d at 184.  Nonetheless, the court held, under § 11 of the Securities Act, that the company was not required to admit that it was engaged in an ongoing tax evasion scheme, i.e., the specific details of its alleged wrongdoing.  *Id*.  Further, although the court was addressing liability under § 11 of the Securities Act, it applied the same definition of "materiality" as under § 10(b) of the Exchange Act.  *UBS*, 752 F.3d at 188.

Accordingly, the Court finds that Plaintiffs' proffered reasons for why Lumen's statements were false and misleading do not withstand scrutiny.  While the *WSJ* investigation showed some evidence of dispersed lead from lead-sheathed cables, there has been no definitive agency or court determination that the present risk of migration is extensive enough to warrant the expense, the worker exposure, and the risk of further spread/contamination inherent with any removal/remediation of the cables.  Therefore, the risk that the Company failed to comply with applicable environmental, safety, health, and other governmental regulations remains, at present, speculative.

Plaintiffs further fault Lumen for falsely representing that they were monitoring compliance with applicable regulations or commitments when it had no system in place to monitor the OSHA Lead Standard, the MNOSHA Settlement, or its internal guidelines.  Again, however, it is not evident that Lumen's statement even contemplated lead-sheathed cables.

Finally, there are no plausible facts alleged to suggest that any individual defendant knew, or otherwise was severely reckless in failing to know, that Lumen had thousands of miles of improperly contained lead-sheathed cable, exposing its workers, the public, and the environment to dangerous levels of lead in violation of applicable regulations and laws.  Even if Plaintiffs *had* alleged facts to show that Defendants knew that Lumen had thousands of miles of legacy lead-sheathed cables that had been abandoned in place, they have not alleged facts to support the cogent and compelling inference that Defendants knew that the lead, where it lay, posed a risk to others and the environment.  At minimum, a more plausible inference is that they believed the lead was safe or comparatively stable where it was.  *See Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 432 (5th Cir. 2019) (even if plaintiffs adequately alleged that defendants knew about the company's high inventory, they still had to

allege facts demonstrating an "intent to deceive" or at least "severe recklessness" as to their failure to disclose a markdown risk).

To be sure, Plaintiffs tout warnings by confidential witnesses ("CWs") that were made known to various Lumen ESH managers, but there are no facts alleged to show that any individual Defendant was aware of same. The Court reiterates that scienter cannot be based on the collective knowledge of the corporation's officers and employees acquired in the course of their employment. *Flaherty & Crumrine Preferred Income Fund, Inc.*, 565 F.3d at 208. It also bears repeating that, "scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." *In re: Shaw*, 537 F.3d at 535 (citation omitted).[23] Consequently, Plaintiffs' various "must have known" or "should have known" allegations[24] prove unavailing and do not materially move the needle in favor of their attempt to establish scienter.

Finally, Plaintiffs do not attribute the allegedly false and misleading statement to any individual Defendant. As discussed above, the Fifth Circuit has "rejected the group pleading approach to scienter and instead looks to the state of mind of the individual corporate official or officials "who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) . . ." *In re: Shaw*, 537

---

[23] The fact that Plaintiffs resort to alleging that Defendant, Kate Johnson, once toured a telecommunications museum that housed a display containing a timeline with historic telecom cables, only serves to underscore Plaintiffs' lack of facts regarding scienter. *See* FAC, ¶ 97.

[24] *E.g.*, Lumen's obligation to protect workers (FAC, ¶ 373), Defendants' presumed knowledge of dangers posed by lead paint (FAC, ¶¶ 374-381), Defendants' alleged ability to access an engineering database that could disclose whether cables were lead-sheathed (FAC, ¶¶ 388-393), regular Company reviews of data on cable retirement (FAC, ¶¶ 394-396), Defendants, Storey and Johnson's platitudes on ESG awareness (FAC, ¶¶ 400-402), and Stansbury's month-long review of legacy revenue (FAC, ¶¶ 403-404).

F.3d at 533.  Furthermore, the Fifth Circuit has not endorsed the concept of corporate scienter

that is recognized by some other circuits.  *Neukranz v. Conestoga Settlement, LLC*, Civ. Action

No. 19-1681 2023 WL 2555551, at *6, n.6 (N.D. Tex. Mar. 16, 2023) (citations omitted).  In any

event, the corporate scienter exception is extremely narrow and was created "for situations in

which an announcement is issued that is so 'dramatic' that it 'would have been approved by

corporate officials sufficiently knowledgeable about the company to know that the

announcement was false.'"  *Id*. (citations omitted).   Plaintiffs have not established those

circumstances here.

### FAC, ¶ 256

On March 11, 2019, Lumen filed its 2018 Form 10-K, which was signed by Defendants

Storey and Dev.  The 2018 Form 10-K stated as follows:

> [f]rom time to time ***we may incur environmental compliance and remediation expenses, mainly resulting from owning or operating prior industrial sites or operating vehicle fleets or power supplies for our communications equipment***.  Although we cannot assess with certainty the impact of any future compliance and remediation obligations or provide you with any assurances regarding the ultimate impact thereof, ***we do not currently believe that future environmental compliance and remediation expenditures will have a material adverse effect on our financial condition or results of operations. For additional information, see "Risk Factors—Risks Relating to Legal and Regulatory Matters—Risks posed by other regulation" in Item 1A of Part I of this report and Note 17—Commitments, Contingencies and Other Items included in Item 8 of Part II of this report.***

The same or substantially similar statement appears on Lumen's 2019 Form 10-K.  (FAC, ¶

258).

Plaintiffs contend that the statements in bold and italicized were false and misleading

because (i) the "Risks posed by other regulation" disclosure set forth in Item 1A of Part I of that

filing was itself false and misleading for all the reasons set forth in ¶ 255; and (ii) Note 17—

Commitments, Contingencies and Other Items to the consolidated financial statements failed to

disclose that the lead cables owned by the Company gave rise to a loss contingency as set forth in ¶ 348.  (FAC, ¶¶ 257, 259).

The Court finds that these statements were not false and misleading by omission for many of the same reasons set forth in the discussion of the ¶¶ 253-254 statements.  *See* discussion, *supra*.  Furthermore, the statements plainly addressed prior industrial sites, vehicle fleets, and power supplies -- not lead-sheathed cables.  This same dichotomy applies to Plaintiffs' loss contingency argument.

In addition, there are no facts to raise a strong inference that Defendants, Storey or Dev, knew, or were severely reckless in failing to know, about a material risk of environmental compliance and remediation expenses associated with lead-sheathed cables.

ii)   Statements About Converting Legacy Copper Cables to Fiber and the Associated Cost Savings

**FAC, ¶ 260**

On November 8, 2018, Lumen held a conference call with analysts to discuss its financial results for the quarter ended September 30, 2018.  During his prepared remarks, before opening the floor to questions from analysts, Defendant, Dev, stated:

> [f]rom the third quarter 2018, capital expenditures were $665 million. . . . In addition, ***we put in place a capital governance process comprised of senior leaders of the company to ensure all investments are in line with business and financial objectives.*** The financial rigor and discipline led to several decisions to redirect investments. ***One example is our decision to minimize investment in our copper-based plant for the consumer business***. However, we are ramping up investments in our fiber footprint for consumer to complement our micro-targeting strategy.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because they spoke about the benefits of shifting investment from copper to fiber cables from the perspective of the Company's "financial objectives," but failed to disclose

that:  (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company upon retirement; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions; and, thus, (v) it was reasonably likely that the Company would incur substantial costs in connection with legislative actions, regulatory enforcement, investigative efforts, removal, remediation, litigation, and/or related penalties.  In addition, Lumen has admitted that (i) the lead cables it has owned since the outset of the Class Period gives rise to a loss contingency under ASC 450 that needs to be disclosed in its SEC filings as described more fully in ¶ 235; (ii) it has been "engaged" with the EPA in what the Company refers to as the "early stages" of the investigation initiated by the Agency using its Superfund authority into the environmental risks posed by lead cables as described more fully in ¶ 237; and (iii) it anticipates incurring investigative costs due to the discovery of these lead cables as described more fully in ¶ 238.  (FAC, ¶ 261).

The Court finds that the foregoing statement does not represent an untrue statement of a material fact or an omission of any material fact necessary to make the challenged statement not misleading.  It is difficult to discern how an innocuous statement on ensuring that investments are in line with business and financial objectives, together with a stated intent to minimize investment in the "copper-based plant," somehow gives rise to a duty to discuss an unrealized risk from lead-sheathed cables that the Company had every reason to believe, *at that time*, were comparatively safe where they lay.  In other words, there is little-to-no connection between the

statement and the alleged omission.  Moreover, it certainly was not reasonably foreseeable, at the time, that the Company would incur substantial costs associated with removal, remediation, litigation, and/or penalties, because there was a reasonable basis to believe that the cables were safe, in place.  Once the *WSJ* investigation revealed studies indicating that lead migrated from the cables, *then* it became more likely that Lumen ran a risk of removal, remediation, litigation, and/or penalties, which undoubtedly is why Lumen included this information in its post-*WSJ* articles disclosures.

In addition, Plaintiffs do not allege any facts to raise the strong inference that Dev knew, or was severely reckless in failing to know, about a material risk of environmental compliance and remediation expenses associated with lead-sheathed cables, to the extent that he even knew about them at all.

### **FAC ¶ 262**

On February 13, 2019, Lumen held a conference call with analysts to discuss its financial results for the quarter and full year ended December 31, 2018.  On this call, Defendant, Storey, described the cost savings associated with moving away from copper cable-based services:

> [f]or the Wholesale business, we expect to see much of what we've seen over the past few years, generally declining but predictable revenue . . . Although there are a lot of things we can do to manage the Consumer business for cash, we are always open to evaluating other ways to maximize shareholder return from these assets. *A big part of our story for 2019 is our focus on transformation. Our operational model is based on decades-old legacy systems and processes, which deliver a lower customer experience and a higher cost to serve than we want. We believe we can transform the experience and simultaneously greatly improve the cost structure*. But whether you're talking about investing for growth or investing to transform our company, as I've said many times before, our focus is always on generating significant free cash flow per share. We will carry that focus into 2019 and beyond. We have a lot of work ahead, but we believe our asset base, our focus and our financial strength give us good reasons to be excited about the future.

Plaintiffs contend that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about how moving away from "legacy systems," which includes Lumen's copper-based infrastructure, and that it will "greatly improve the cost structure." (FAC, ¶ 263).

As the Court appreciates the matter, however, Plaintiffs' argument overlooks the distinction between fixed or sunk costs and variable costs. The lead-sheathed cables represent fixed costs that were present whether or not Lumen continued to utilize the copper cables. Consequently, discussions regarding operational cost savings from transitioning away from copper lines have no bearing on the sunk cost for that small portion of Lumen's copper lines that are sheathed in lead. In any event, as Defendants point out in their brief, Lumen's copper network is not coextensive with lead-sheathed cables because less than five percent of Lumen's copper network contains lead. *See* FAC, ¶ 234.

Consequently, the Court finds that the statement in FAC, ¶ 262 does not represent an untrue statement of a material fact or an omission of any material fact necessary to make the challenged statement not misleading. Furthermore, Plaintiffs do not allege any facts to raise the strong inference that Storey knew, or was severely reckless in failing to know, about a material risk of environmental compliance and remediation costs associated with lead-sheathed cables, to the extent that he even knew about them at all. *See* discussion, *supra*.

**FAC, ¶ 264**

On February 25, 2019, Defendant, Storey, attended the Morgan Stanley Technology, Media & Telecom Conference hosted by Morgan Stanley analyst, Simon William Flannery.

Asked about "the interplay between the legacy product sets and the strategic product sets" in terms of "transition," Storey replied,

> [t]hat's going to occur for a while. But it's also something, as an industry, that we're very good at. If you look at our company, CenturyLink, we have had a number of legacy products that have traded over time . . . ***And, so, we are very good at cannibalizing our products and services and augment them—augmenting them and replacing them with others—meanwhile taking cost out faster than revenues decline. And, so, we'll continue to do that with legacy services***. It's early still to before I can tell you where that bottoms out and where it starts to climb, but we've been pretty good as an industry and very good as a company.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraph above were false and misleading when made or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about the benefits of transitioning away from "legacy systems," which includes Lumen's copper-based infrastructure, in terms of reducing "costs." (FAC, ¶ 265). Plaintiffs further argue that the statements were false and misleading when made because Lumen's lead-encased cables were not being "traded" or "replaced," but, rather, abandoned in place to decay away over time. *Id*. Plaintiffs conclude that the statements gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner which would create costly scrutiny, liability, and reputational harm. *Id*.

The Court disagrees. The statement does not necessarily mean that Lumen was *physically* trading or replacing copper with fiber. No reasonable investor would have been misled by that statement. Copper and, more specifically, lead-sheathed copper, is not mentioned at all. As far as taking cost out faster than revenues decline, the statement clearly refers to variable or operating cost savings because the fixed cost of any lead-sheathed copper remains present, regardless of a shift to fiber.

Accordingly, the Court finds that the statement in FAC, ¶ 264 does not represent an untrue statement of a material fact or an omission of any material fact necessary to make the challenged statement not misleading.   Furthermore, Plaintiffs do not allege any facts to raise the strong inference that Storey knew, or was severely reckless in failing to know, about a material risk of environmental compliance and remediation costs associated with lead-sheathed cables, to the extent that he even knew about them at all.  *See* discussion, *supra*.

**FAC, ¶ 266**

On February 12, 2020, Lumen held a conference call with analysts to discuss its financial results for the quarter and full year that ended December 31, 2019, during which Storey stated:

> *[w]e've prioritized fiber deployment for consumers over previous investments in copper-based technologies like bonding and vectoring*. We now have enabled more than 2 million fiber households, a number we expect to continue to grow. And we're making it easier for our consumer customers to access these networks by standardizing our product set and enabling a digital environment. That digital environment allows customers to immediately initiate service using automated and seamless provisioning processes. *In turn, this lowers our cost to operate and improves our customer experience. This type of transformation creates a virtuous cycle. We optimize our capabilities to reduce costs*, which drives a better customer experience; and happy customers buy more and churn less.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about the benefits of transitioning away from "copper-based technologies," in terms of reducing "costs."  (FAC, ¶ 267).  Plaintiffs contend that these statements gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm.  *Id*.

The Court disagrees.  Plaintiffs continue to conflate variable or operating costs with fixed or sunk costs and attempt to equate copper lines with lead-sheathed copper lines, when the latter represents less than five percent of the former.

For these reasons, and as further detailed above, the Court finds that the statement in FAC, ¶ 266 does not represent an untrue statement of a material fact or an omission of any material fact necessary to make the challenged statement not misleading.   Furthermore, Plaintiffs do not allege any facts to raise the strong inference that Storey knew, or was severely reckless in failing to know, about a material risk of environmental compliance and remediation costs associated with lead-sheathed cables, to the extent that he even knew about them at all.  *See* discussion, *supra*.

## FAC, ¶ 268

On February 25, 2021, Lumen filed its annual report on Form 10-K for the full year ended December 31, 2020 (the "2020 Form 10-K"), which was signed by Defendants, Storey and Dev.  The 2020 Form 10-K included the following statement about the Company's rebranding and new segments,

> [a]s part of the recent Lumen rebranding, we refined our marketing approach to better align with our customer base. Lumen is the name of our company and our flagship brand for serving the enterprise and wholesale markets. We also launched our Quantum Fiber brand and reconfirmed the importance of our expansive CenturyLink platform name. Quantum Fiber is our brand for providing fiber-based services to small business and residential customers. ***Our CenturyLink brand covers our mass-marketed legacy copper-based services, managed for optimal cost and efficiency.***

The same statement appears in Lumen's annual report on Form 10-K for the full year ended December 31, 2021 (the "2021 Form 10-K").  (FAC, ¶ 269).

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made or omitted to state material facts

necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about Lumen's "copper-based services" being managed to optimize "cost."  (FAC, ¶ 270). Plaintiffs add that the statements gave the false impression that Lumen's copper-based services would not be managed in a fashion that would create costly scrutiny, liability, and reputational harm.  *Id*.

The Court disagrees.  Plaintiffs continue to confuse variable or operating costs with fixed or sunk costs and attempt to equate copper cables with lead-sheathed copper cables, when the latter represents less than five percent of the former.  There is no reason to discuss speculative fixed costs when the Company is discussing variable costs.  Furthermore,  Lumen had every reason to believe that the lead-sheathed cables were safe where they lay.

For these reasons, and as further detailed above, the Court finds that the statements in FAC, ¶¶ 268-269 do not represent untrue statements of a material fact or constitute an omission of any material fact necessary to make the challenged statement not misleading.   Furthermore, Plaintiffs do not allege any facts to support the strong inference that Storey or Dev knew, or were severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables, to the extent they even knew of lead-sheathed cables at all. *See* discussion, *supra*.

## FAC, ¶ 271

On August 5, 2020, Lumen held a conference call with analysts to discuss its financial results for the quarter ended June 30, 2020.  Asked about "the pace at which certain legacy services roll off" and "your ability to take legacy costs out" as the digital transformation accelerates, Defendant Storey, responded as follows:

> [s]o, a big part of the digital transformation is new opportunities for us as our customers are adapting to virtual reality and augmented reality and really the fourth

industrial revolution. And, so, that's good opportunity for us. There are certainly products that are declining, and we see that, and we'll continue to see that. But I don't think that—and there are aspects of our—helping our customers evolve in digital transformation that could affect those products. But my goal is not only to help CenturyLink—existing CenturyLink customers go out and transform digitally, but it's my goal to go out and get other companies' customers to digitally transform. And that brings new business to us. It brings the profitable, high-margin business that we're focused on to the company. And, so, yes, is there some aspect of it that can harm our legacy? ***Yes, but there's far more opportunity for us than downside.***

**FAC, ¶ 272**

Defendant Dev added immediately thereafter:

I think just to add to Jeff's is—***and yes, we can take cost out faster on the legacy platforms***—it helps with our network simplification, it helps in terms of how we rightsize our real estate portfolio. So yes, we can do that to offset any impact from higher erosion on legacy products. But the key point, like Jeff mentioned, is we've never seen it be like-for-like.

Plaintiffs allege that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about the benefits of moving away from legacy services as part of the digital transformation in terms of reducing "costs." (FAC, ¶ 273). Plaintiffs add that the statements gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner which would create costly scrutiny, liability, and reputational harm. *Id*.

The Court disagrees for reasons explained previously. *See* discussion, *supra*. The statements in FAC, ¶¶ 271-272 do not represent untrue statements of a material fact or constitute an omission of any material fact necessary to make the challenged statement not misleading. Furthermore, Plaintiffs do not allege any facts to support the strong inference that Storey or Dev knew, or were severely reckless in failing to know, about a material risk of liability or

reputational harm associated with lead-sheathed cables, to the extent they even knew of lead-sheathed cables at all.  *See* discussion, *supra*.

**FAC, ¶ 274**

On September 15, 2020, Defendant, Storey, participated in the Goldman Sachs Communacopia Conference hosted by equity analyst Brett Joseph Feldman, who noted that ILECs appear to grapple with "cost associated with maintaining legacy services, which are typically in some state of decline" and asked whether the COVID-19 pandemic "accelerate[s] your ability to start addressing some of those structural legacy costs and take them out more quickly."  Storey responded,

> ***Yes. We see that on both sides of the equation, on the revenue side and on the cost side.*** My expectation of our team is that we go out and that we help accelerate the transition, the digital transformation that our customers are going through. We bring them to new technologies. But we also go out and accelerate the digital transformation of people that are not our customers today. And, so, we will continue to bring new products and services, new platforms online to bring those customers to us, and ***we'll continue to focus on taking out costs for the businesses that are declining. We've proven we're very good at really both sides of that and want to continue to drive both sides of that.***

Plaintiffs contend that the statements identified in bold and italicized text in the paragraph above were false and misleading when made or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about the benefits of transitioning away from "legacy systems," which includes Lumen's copper-based infrastructure, in terms of reducing "costs."  (FAC, ¶ 275).  Plaintiffs assert that the statements gave the false impression that Lumen's legacy services—including those that relied on copper cables—would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm.  *Id*.

The Court disagrees for the same reasons set forth in response to ¶ 268.  *See* discussion,

*supra*.

**FAC, ¶ 276**

On May 19, 2021, Lumen hosted a virtual webcast of its annual stockholders meeting,

during which senior management responded to questions submitted by investors in advance.  In

response to a question about "current revenue trajectory," Defendant Storey stated:

> [a]ll revenues are not the same, and we are seeing a natural evolution that plays out
> time and time again in our industry. Our legacy revenues are declining, but that is
> as expected ***for new technologies will be again replacing legacy solutions***. On the
> other hand, we're generally growing where we make new fiber investments. Not
> the right, [sic] I believe we need to, but fiber investments are growing. That's why
> we've put our investments in those solutions that we feel offer the greatest
> opportunity for sustainable growth, such as edge computing and adaptive
> networking to replace the churn we are seeing in our legacy products.

Plaintiffs assert that the statement identified in bold and italicized text in the paragraph

above was false and misleading when made, or omitted material facts necessary to make it not

misleading, because Lumen's lead-encased cables were not being "replaced" with "new

technologies," but, rather, abandoned in place to decay away over time.  (FAC, ¶ 277).  The

statement purportedly gave the false impression that Lumen's legacy services—including those

that relied on copper cables—would not be phased out in a manner that would create costly

scrutiny, liability, and reputational harm, when, in fact, they were.  *Id*.

The Court disagrees.  The statement does not necessarily mean that Lumen was

*physically* trading or replacing copper with fiber.  Moreover, the statement does not reference

copper, let alone the less than five percent of Lumen's copper cables that were lead-sheathed.  In

short, no reasonable investor would have been misled by that statement.

In addition, Plaintiffs do not allege any facts to support the strong inference that Storey

knew, or was severely reckless in failing to know, about a material risk of liability or reputational

harm associated with lead-sheathed cables -- to the extent he even knew of lead-sheathed cables

at all.  *See* discussion, *supra*.

**FAC, ¶ 278**

On February 9, 2022, Lumen hosted a conference call with analysts to discuss its

financial results for the quarter and year ended December 31, 2021.  While fielding a question

from an analyst about the Company's leverage, Defendant, Dev, stated:

> [o]n the leverage, Nick, if you look at 2020, we were at about roughly around 3.6x.
> 2021, we exited about 3.6x, and we paid down about $6 billion of debt since we
> announced our deleveraging plans, $7 billion since the close of the Level 3
> transaction. The key point is I think we've been pretty good about calibrating our
> leverage to the business profile. So even though we're divesting a fair amount of
> legacy revenues, we haven't really levered up. If you think about Quantum Fiber,
> that's going to be a high-growth business and infrastructure business. So you
> always have to think about de-averaging our leverage and think about whether that's
> appropriate going forward. Our view right now is the 3.6x is probably a good
> assumption. Now we have said that it will be roughly in that zip code. So any
> quarter-over-quarter, you might see some fluctuations. But until the business profile
> changes significantly, we don't see the need to change that at this point. ***And like
> Jeff has mentioned several times, we're going through an investment cycle***. And
> it truly is a discrete project. ***It is upgrading our copper network to fiber and it's a
> long-lived asset***. And, so, as we do that, we're okay with the leverage fluctuating a
> little bit as we fund that build.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraph

above were false and misleading when made, or omitted material facts necessary to make them

not misleading, because Lumen's lead-encased cables were not being "upgrad[ed]" with "fiber,"

but, rather, bypassed by fiber and abandoned in place to decay away over time.  (FAC, ¶ 279).

Furthermore, the statement(s) gave the false impression that Lumen's legacy services—including

those that relied on copper cables—would not be phased out in a manner that would create costly

scrutiny, liability, and reputational harm, when, in fact, they were.  *Id*.

The Court disagrees.  Lumen's copper *network* was being upgraded to fiber.  As the

Court appreciates it, fiber was/is an upgrade i.e., an improvement, from copper for both the

customer and the Company. Dev did not purport to discuss what happened with old lead-sheathed copper cables, nor was he obligated to do so for reasons already discussed ad nauseum. *See* discussion, *supra*.

In addition, Plaintiffs do not allege any facts to support the strong inference that Dev knew, or was severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables -- to the extent he even knew of lead-sheathed cables at all. *See* discussion, *supra*.

## FAC, ¶ 280

On February 7, 2023, Lumen hosted a conference call with analysts to discuss its financial results for the quarter and full year ended December 31, 2022. In response to a question about the ability to begin removing "legacy fixed costs" in rural areas, Stansbury stated,

> when you look at our existing footprint, we've obviously still got a lot of areas that are rural. And as we've said, our plans for Quantum are dense urban areas and major metros, and that remains. We're not going to be looking to run fiber to lower density areas because the numbers just don't make sense. As it relates to those areas, though, they—their overall performance has been more stable than the 20 states that we've sold. So the performance there has been good. *We will manage that very closely for things like* rates and *costs as time goes on. But at this point, those are assets that are attractive to us, and we'll continue to manage them closely*.

Plaintiffs contend that the statement(s) identified in bold and italicized text in the paragraph above was false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about managing Lumen's "legacy" assets to control "costs." (FAC, ¶ 281). Instead, Plaintiffs maintain that the statements gave the false impression that Lumen's legacy assets, including its copper-based network infrastructure, would not be managed in a fashion that would create costly scrutiny, liability, and reputational harm, when, in fact, they were. *Id*.

While Stansbury purportedly was asked about "legacy fixed costs" in rural areas, he responded by stating that, because of costs, Lumen did not plan to run fiber to the rural areas. Instead, Lumen would manage them for rates and costs, which, at that time, were attractive. In other words, he seems to be saying that Lumen still was making money on the legacy copper lines. Therefore, while he was asked about fixed costs, Stansbury provided a non-responsive answer that discussed the operating profitability of the legacy copper lines. No reasonable investor would have been misled by Stansbury's pivot to explain why the legacy business continued to make sense. The fixed costs associated with the copper network were sunk costs, no matter whether Lumen continued to utilize the network to make money, or not.

In addition, Plaintiffs do not allege any facts to raise the strong inference that Stansbury knew, or was severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables – insofar as he even knew of lead-sheathed cables at all. *See* discussion, *supra*.

**FAC, ¶ 282**

On February 23, 2023, Lumen filed its annual report on Form 10-K for the full year ended December 31, 2022 (the "2022 Form 10-K"), which was signed by Defendants, Johnson and Stansbury. The 2022 Form 10-K offered the following description of Lumen's business segments:

[w]e conduct our operations under the following three brands:

- "Lumen," which is our flagship brand for serving the enterprise and wholesale markets
- "Quantum Fiber," which is our brand for providing fiber-based services to residential and small business customers
- ***"CenturyLink," which is*** our long-standing brand for providing mass-marketed legacy copper-based services, ***managed for optimal cost and efficiency.***

Plaintiffs contend that the statements identified in bold and italicized text in the paragraph above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 261 insofar as they speak about Lumen's "copper-based services" being managed to optimize "cost." (FAC, ¶ 283). To the contrary, these statements purportedly gave the false impression that Lumen's copper-based services would not be managed in a fashion which would create costly scrutiny, liability, and reputational harm, when, in fact, they were. *Id*.

The Court disagrees. Plaintiffs continue to conflate fixed with variable costs. They also mistakenly equate copper cables with lead-sheathed copper cables, when the latter represents less than five percent of the former. Even if Johnson and Stansbury were talking about lead-sheathed cables, they were managing them for optimal cost and efficiency by leaving them where they lay, when, at that time, there was every reason to believe that was a safe course of action.

In addition, Plaintiffs do not allege any facts to raise the strong inference that Johnson or Stansbury knew, or were severely reckless in failing to know, about a material risk of liability or reputational harm associated with lead-sheathed cables – insofar as they even knew of lead-sheathed cables at all. *See* discussion, *supra*.

iii)    Statements About Employee Health and Safety

**FAC, ¶ 284**

Scheduled to coincide with Earth Day, on April 22, 2019, Lumen released its CSR Report for 2018 (the "2018 ESG Report"), stating that,

> CenturyLink recognizes the importance of providing employees with a safe and healthful workplace. ***We are committed to preventing occupational injuries and illnesses through our robust safety management systems***.

Plaintiffs assert that the statement identified in bold and italicized text in the paragraph above was false and misleading when made or omitted material facts necessary to make them not misleading.  (FAC, ¶ 285). They contend that Lumen was not committed to "preventing occupational injuries and illness" for employees who worked with lead and did not maintain "robust safety management systems" for such workers because, as detailed more fully above, during the Class Period:  (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead; (ii) this form of sheathing was known to release lead particles into the air when disturbed through physical contact; (iii) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions or protective equipment; (iv) many workers were not given any advance notice that the job they were sent out to perform would involve a lead cable; and (v) Lumen neither implemented any controls to reasonably assure that employees who worked with lead complied with its policies and procedures for doing so nor had any system in place to monitor worker compliance with the OSHA Lead Standard, the MNOSHA Settlement and related side agreements, or its internal guidelines on such topics.  *Id*.

The Court disagrees.  Insofar as Plaintiffs contends that the statement is inconsistent with the 2013 MNOSHA Settlement, the challenged statement (made in 2018), says that "[w]e *are* committed . . ." (emphasis added) -- not that we *were* or *always have been* committed to worker safety.  Therefore, the statement was not false or misleading because it does not purport to address past practices.

Insofar as Plaintiffs rely on statements from CWs for its claims that Lumen was not taking proper precautions for its workers in the years following the 2013 MNOSHA Settlement, *e.g.*, in the 2019 time period, *see* FAC, ¶¶ 113-114, they have not alleged facts to plausibly allege

63

that there was a public disclosure regarding these alleged practices from that period.  Of course,

until the fraud is disclosed, defendants cannot be held liable for a decline in the stock price.  *See*

*LHC Grp., Inc.*, 2013 WL 1100819, at \*5; *Alaska Elec. Pension Fund*, 572 F.3d at 230 (only

information known to the market can cause a recoverable loss).

Furthermore, Plaintiffs do not allege facts to support the strong inference that any

individual Defendant knew, or was severely reckless in failing to know, at the time, that Lumen

purportedly was exposing its workers to unreasonable levels of lead without proper safety

equipment and monitoring procedures.[25]

**FAC, ¶ 286**

On approximately April 22, 2020, Lumen released its ESG Report for 2019 (the "2019

ESG Report"), stating as follows,

> ***CenturyLink is committed to providing a healthy and safe workplace for our
> employees*** and others who visit our facilities. ***CenturyLink's safety management
> system is designed to drive continuous improvement in safety performance by
> incorporating "risk-based thinking" into our prioritization of health and safety
> objectives and organizational safety goals***.

**FAC, ¶ 287**

The same section of the 2019 ESG Report included the following representation: ***[t]he***

***CenturyLink EHS, Risk Management and Operations teams continuously monitor safety***

***performance to evaluate opportunities to eliminate or reduce the risks of workplace hazards.***

Plaintiffs contend that the statements identified in bold and italicized text in the

paragraphs above were false and misleading when made, or omitted material facts necessary to

make them not misleading, because Lumen purportedly was *not* committed to "providing a

---

[25] Plaintiffs allege that the information was made known to Lumen's EHS leaders.  *See* FAC, ¶¶
172-173.  However, none of the EHS leaders is an individual Defendant.

healthy and safe workplace" for employees who worked on lead cables and did not have systems in place to "drive continuous improvement" in safety for those workers or "continuously monitor safety performance" for those workers for the reasons set forth in ¶ 285.  (FAC, ¶ 288).

The Court disagrees with Plaintiffs' arguments for the same reasons specified for ¶ 284. *See* discussion, *supra*.  Furthermore, the statement that CenturyLink was committed to a healthy and safe workplace represents immaterial, non-actionable corporate cheerleading, puffery, or vague statement of optimism.  *See In re SolarWinds Corp. Sec. Litig.*, 595 F.Supp.3d 573, 587 (W.D. Tex. 2022), *opinion clarified,* 2022 WL 3699429 (W.D. Tex. Aug. 19, 2022); *Bhangal v. Hawaiian Elec. Indus., Inc.*, Civ. Action. No. 23-4332, 2024 WL 4505465, at *12 (N.D. Cal. Oct. 15, 2024) (statements such as, "[s]afety is our number one priority . . .," and the like, are not actionable) (citations omitted).  Also, the statement that "safety performance" included "risk-based thinking" is not false or misleading because it was consistent with certain allegations in the FAC that there was a reasonable basis for the Company to believe that leaving the cables in place would reduce further exposure to workers.  *See, e.g.*, FAC, ¶ 234.

**FAC, ¶ 289**

On May 6, 2020, Lumen hosted a conference call with analysts to discuss its financial results for the quarter ended March 31, 2020, during which Storey stated, "I'm very proud of our employees and ***we will continue to keep their health and safety as our top priority***."

Plaintiffs contend that the statement identified in bold and italicized text in the foregoing paragraph was false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 285.  (FAC, ¶ 290).

The Court disagrees for the same reasons specified for ¶ 284.  *See* discussion, *supra*. Furthermore, the statement constitutes  immaterial, non-actionable corporate cheerleading, puffery, or a vague statement of optimism.  *See* discussion, *supra*.

**FAC, ¶ 291**

In September 2020, Lumen revamped its website in connection with its name change and new image.  By no later than September 27, 2020, Lumen published an "Environment" page in the "Corporate Responsibility" section of its official website, representing that,

**Occupational Health and Safety**

> ***We are committed to providing a healthy and safe workplace for our employees*** and others who visit our facilities.  ***Our safety management system is designed to drive continuous improvement in safety performance by incorporating "risk-based thinking" into our prioritization of health and safety objectives and organizational safety goals***.

Plaintiffs assert that the statements identified in bold and italicized text above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen was *not* committed to "providing a healthy and safe workplace" for employees who worked on lead cables and did not have any systems in place to "drive continuous improvement" in safety for those workers for all the reasons set forth in ¶ 285.  (FAC, ¶ 292).

In addition to rejecting Plaintiffs' argument for the same reasons specified for ¶ 284, the Court finds that the statements plainly represent non-actionable corporate cheerleading, puffery, or vague statements of optimism.  *See* discussion, *supra*.

**FAC, ¶ 293**

On February 25, 2021, Lumen filed its 2020 Form 10-K, which contained a new disclosure on its stakeholder value creation strategies:

Health & Wellness

We believe a healthy, engaged and high performing workforce is part of our competitive advantage. We want all of our employees to thrive, and we ***regularly re-evaluate how to best support our employees' wellness, health and safety through benefits and resources***. Our current benefit and wellness programs drive engagement that positively impacts our culture, job satisfaction, recruiting and retention programs. In response to the COVID-19 pandemic, we expanded our physical, mental, and family health programs and informational outreach.

**FAC, ¶ 294**

The same statements as those quoted in the preceding paragraph were made in Lumen's 2021 Form 10-K.

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen purportedly did *not* "regularly re-evaluate" how best to support the "health and safety" of employees who worked on lead cables for all the reasons set forth in ¶ 285.  (FAC, ¶ 295)

The Court rejects Plaintiffs' arguments because the statements provide that Lumen reevaluates its employees' wellness, health, and safety *through benefits and resources*.  Plaintiffs do not allege any facts in the FAC to suggest that Lumen did not revaluate benefits and resources available to workers.  The Court also fails to see how Lumen's reevaluation of worker health and safety *through benefits and resources* somehow opened the door to require Lumen to talk about physical safety protections, or the alleged lack thereof, for workers.  Moreover, there was no disclosure as required to support loss causation.

Finally, Plaintiffs do not allege facts to support the strong inference that any individual Defendant knew, or was severely reckless in failing to know, at the time, that Lumen purportedly

was exposing its workers to unreasonable levels of lead without proper safety equipment and

monitoring procedures.  *See* discussion, *supra*.

**FAC, ¶ 296**

On April 22, 2021, Lumen released its ESG Report for 2020 (the "2020 ESG Report"),

which stated, in pertinent part,

> *[t]he health and safety of our employees and business partners is a top priority for Lumen. We are committed to providing a workplace free of recognized hazards*. Our environment, health and safety (EHS) team oversees our OHS program, *focusing on continuous improvement by incorporating "risk-based thinking" into our organizational safety goals, prioritization of health and safety objectives, and safety management systems*.

**FAC, ¶ 297**

The same section of the 2020 ESG Report included the following representation:

> [w]e have implemented occupational health and safety management systems for employees in . . . North America . . . *Our environment, health and safety team and relevant business units implement these systems and perform periodic reviews to identify and achieve improvements in overall safety performance*.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraphs

above were false and misleading when made, or omitted material facts necessary to make them

not misleading, because Lumen was, in fact, *not* committed to "providing a workplace free of

recognized hazards" for employees who worked on lead cables and did *not*, in fact, have systems

in place to drive "continuous improvement" in safety for those workers or "perform periodic

reviews" to identify further safety improvements for those workers for all the reasons set forth in

¶ 285.  (FAC, ¶ 298).

The Court rejects Plaintiffs' arguments for the same reasons set forth relative to ¶¶ 284

and 287.  *See* discussion, *supra*.

**FAC, ¶ 299**

On November 4, 2022, Lumen released its ESG Report for 2021 (the "2021 ESG

Report"), which stated, in pertinent part,

> *[p]roviding a safe and healthy working environment for our people, partners and visitors is of paramount importance. We are committed to workplaces that are free of recognized hazards . . . We design our safety management systems to drive continuous improvement by incorporating "risk-based thinking" into our organizational objectives and goals*.

**FAC, ¶ 300**

The same section of the 2021 ESG Report included the following representations:

> *[o]ur environment, health and safety (EHS), risk management and operations teams continuously monitor safety performance to evaluate opportunities to eliminate or reduce the risk of workplace hazards*. We have implemented Occupational health and safety (OHS) management systems in . . . North America . . . *We carry out periodic reviews to identify and achieve improvements in overall safety performance*.

Plaintiffs argue that the statements identified in bold and italicized text in the paragraphs

above were false and misleading when made, or omitted material facts necessary to make them

not misleading, because Lumen was, in fact, *not* committed to "providing a workplace free of

recognized hazards" for employees who worked on lead cables and did not, in fact, have systems

in place to drive "continuous improvement" in safety for those workers or "continuously monitor

safety performance" to identify further safety improvements for those workers for all the reasons

set forth in ¶ 285.  (FAC, ¶ 301).

The Court rejects Plaintiffs' arguments for the reasons set forth relative to ¶¶ 284 and

287.  *See* discussion, *supra*.

**FAC, ¶ 302**

On February 23, 2023, Lumen filed its 2022 Form 10-K, stating, in pertinent part, that,

Health & Wellness

*[w]e are committed to promoting the health, safety and well-being of our employees, business partners and global communities*. We want all of our employees to thrive, and *we regularly re-evaluate how to best support our employees' well-being through benefits and resources*. We design our current benefit and wellness programs to drive engagement that positively impacts our culture, job satisfaction, recruiting and retention programs.

**FAC, ¶ 303**

In addition, the 2022 Form 10-K stated, in relevant part:

Occupational Health and Safety: The EHS team conducts risk assessments, reviews safety incident data and monitors health and safety legislation to develop policies and procedures designed to minimize safety hazards and support compliance with applicable laws and regulations. *We carry out periodic reviews to identify steps designed to improve overall safety performance*.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, because Lumen was, in fact, *not* committed to promoting the "health, safety and well-being" of employees who worked on lead cables for all the reasons set forth in ¶ 285. (FAC, ¶ 304).

These statements, and Plaintiffs' associated argument(s), simply represent more of the same. Therefore, the Court rejects Plaintiffs' arguments for the reasons set forth relative to ¶¶ 284 and 287. *See* discussion, *supra*.

iv)    Statements About Environmental Stewardship

**FAC, ¶ 305**

By no later than the start of the Class Period, CenturyLink maintained a "CenturyLink and the Environment" page in the "Community" section of its official website, which represented, in pertinent part,

*CenturyLink is actively making choices to lessen our impact on the environment*, while offering our customers solutions that enable them to do the same. Our goal is to help ensure the long-term health of our environment, joining with consumers and

businesses who are focusing on ways to promote and practice the intelligent use of resources.

Plaintiffs contend that the statements identified in bold and italicized text in the foregoing paragraph were false and misleading when made, or omitted to state material facts necessary to make them not misleading, because Lumen failed to disclose that: (i) its wireline network contained tens of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company upon retirement; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions. (FAC, ¶ 306). Plaintiffs add that, far from "actively making choices to lessen our impact on the environment," the Company made a series of decisions that disregarded its impact on the environment. *Id*.

The Court disagrees with Plaintiffs for reasons stated previously. At the time that Lumen made the statement, it had reasonable grounds to believe (and still does) that leaving the lead-sheathed cables where they lay has less of an impact on the environment than disturbing and removing the lead, which could spread contamination throughout the environment. Consequently, the statement was not misleading and Lumen had no obligation to discuss lead-sheathed cables at all. Furthermore, the statement plainly represents non-actionable corporate cheerleading, puffery, or vague statements of optimism. *See* discussion, *supra* and *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F.Supp.3d 300, 315–16 (S.D.N.Y. 2024) (non-actionable puffery: "across the company, across the globe, all of our employees are embracing ESG . . . one of the key aspects of ESG is managing risks . . .").

Finally, Plaintiffs do not allege facts to support the strong inference that any individual

Defendant knew, or was severely reckless in failing to know, at the time, that Lumen purportedly

was exposing its workers to unreasonable levels of lead without proper safety equipment and

monitoring procedures.  *See* discussion, *supra*.

## FAC, ¶ 307

Lumen released its 2018 ESG Report on April 22, 2019, stating that,

[t]he CenturyLink Waste Minimization and Recycling Program diverts millions of pounds of electronic and communications equipment from landfills each year. ***CenturyLink recycles telecommunications equipment and many other items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents. CenturyLink Recycled more than 3,450 metrics tons of these materials in 2018.

Plaintiffs assert that the statement identified in bold and italicized text in the paragraph

above was false and misleading when made, or omitted material facts necessary to make them

not misleading, for all the reasons set forth in ¶ 306 and because it gave the false impression that

Lumen properly disposed of its copper wire cables upon retirement.  (FAC, ¶ 308).

The Court disagrees.  According to the FAC, more than 95 percent of Lumen's legacy

copper wire was not lead-sheathed, and there is no indication, and certainly no public disclosure,

that Lumen was not recycling non-lead-sheathed copper.  Therefore, Plaintiffs do not plausibly

allege loss causation.  *See* discussion, *supra*.  Furthermore, Lumen did not purport to say that it

recycled *all* of its copper wire.  In short, no reasonable investor would have been misled by the

statement or omission.

Finally, Plaintiffs do not allege facts to raise the strong inference that any individual

Defendant knew, or was severely reckless in failing to know, at the time, that Lumen failed to

recycle its lead-sheathed copper cables or that it was unreasonable (from an environmental or

social perspective) to leave those cables where they lay in conduits, on water bottoms, or suspended overhead.  *See* discussion, *supra*.

**FAC, ¶ 309**

On April 8, 2020, Lumen filed a definitive proxy statement for 2020 on Form DEF14A (the "2020 Proxy Statement"), stating that, ***"[r]esponsible corporate citizenship has long been a part of our governance and business strategy and continues to be a key priority for our Board and management team."***

**FAC, ¶ 310**

The same statement from the preceding paragraph was made in Lumen's proxy statement for 2021 filed on Form DEF14A on April 7, 2021 (the "2021 Proxy Statement").

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306 and because they gave the false impression that Lumen would not make business decisions that disregarded the environment and the communities in which it operates.  (FAC, ¶ 311).

The Court disagrees.  The statements represent non-actionable corporate cheerleading, puffery, or vague statements of optimism.  *See* discussion, *supra*.  Furthermore, at the time the statements were issued, Lumen had reasonable grounds to believe that the safest approach was to leave the lead-sheathed cables where they lay.  Accordingly, the statements were not false or misleading.

In any event, Plaintiffs allege no facts to support the strong inference that any individual Defendant knew, or was severely reckless in failing to know, that Lumen's treatment of retired

lead-sheathed cables was not a responsible course of action – to the extent any individual

Defendant was aware of lead-sheathed cables at all.  *See* discussion, *supra*.

### FAC, ¶ 312

Lumen's 2019 ESG Report was released on April 22, 2022, and included a note from

Defendant, Storey, stating that,

> [i]n addition to the fundamental positive contributions our services make for people around the world, ***we have very intentionally committed to growing our business in an ethical and sustainable manner***. Through our actions, our goal is to make our employees, business partners and communities proud of our innovative and quality services, the unwavering integrity of our business ethic, our deep commitment to being a good employer, ***our respect for the environment, and our ongoing support of the communities where we live and work. . . . Being a good corporate citizen is a priority for CenturyLink.*** Thank you for your interest in learning how we ethically support sustainability and social responsibility in our communities.

### FAC, ¶ 313

The 2019 ESG Report continued to represent that CenturyLink was a responsible

corporate citizen:  ***"[r]esponsible corporate citizenship has long been a part of our governance***

***and business strategy and continues to be a key priority for our Board and management***

***team."***

Plaintiffs assert that the statements identified in bold and italicized text in the foregoing

paragraphs were false and misleading when made, or omitted material facts necessary to make

them not misleading, for all the reasons set forth in ¶ 306 and because they gave the false

impression that Lumen would not make business decisions that disregarded the environment and

the communities in which it operates.  (FAC, ¶ 314).

The Court disagrees.  The statements represent non-actionable corporate cheerleading,

puffery, or vague statements of optimism.  *See* discussion, *supra.*  Furthermore, at the time the

statements were issued, Lumen had reasonable grounds to believe that the safest approach was to

leave the lead-sheathed cables where they lay, which is consistent with its professed ethical duty to the environment.  Accordingly, the statement were not false or misleading.

In any event, Plaintiffs allege no facts to support the strong inference that Storey or any other individual Defendant knew, or was severely reckless in failing to know, that Lumen's treatment of retired lead-sheathed cables was not a responsible course of action – to the extent any individual Defendant was aware of lead-sheathed cables at all.  *See* discussion, *supra*.

**FAC, ¶ 315**

> The 2019 ESG Report stated, in pertinent part,

> CenturyLink is committed to establishing and enhancing internal waste management programs and initiatives to reduce waste through minimization, reuse, and recycling. ***These programs and initiatives are also intended to ensure the appropriate disposition of hazardous wastes***. The EHS team assists in determining waste management methods, submitting annual reports to regulatory agencies regarding disposal, and auditing disposal facilities for environmental compliance.

> \*    \*    \*

> The CenturyLink Waste Minimization and Recycling Program diverts millions of pounds of electronic and communications equipment from landfills each year. ***CenturyLink recycles telecommunications equipment and many other items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps, fleet oil and solvents. Recycling data is captured in the "Targets and metrics" table below.

Plaintiffs contend that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306 and because they gave the false impression that Lumen properly disposed of its copper wire cables upon retirement when it did not. (FAC, ¶ 316).

The Court disagrees for the same reasons set forth in response to ¶ 307.  *See* discussion, *supra*.

**FAC, ¶ 317**

By no later than September 27, 2020, Lumen published an "Environment" page in the

"Corporate Responsibility" section of its official website, representing that,

**Environmental Compliance and Management**

We are focused on complying with applicable environmental regulatory requirements. ***Our environmental management systems (EMS) help us identify and mitigate the environmental impacts of our operations***, drive continuous improvement and facilitate regulatory compliance.

* * *

**Waste Management**

Lumen is committed to establishing and enhancing internal waste management programs and initiatives to reduce waste through minimization, re-use, and recycling. ***Our waste management programs and initiatives are also intended to ensure the appropriate disposition of hazardous wastes and to reduce waste through managing product-end-of-life, which includes recycling and reuse of electronic and communications equipment.***

Plaintiffs contend that the statements identified in bold and italicized text in the

paragraphs above were false and misleading when made, or omitted material facts necessary to

make them not misleading, for all the reasons set forth in ¶ 306 and because the statements gave

the false impression that Lumen properly disposed of its copper wire cables upon retirement

when it did not.  (FAC, ¶ 318).

The Court disagrees with Plaintiffs for the same reasons that the alleged misstatement in

¶ 307 is not actionable.  *See* discussion, *supra*.

**FAC, ¶ 319**

On April 22, 2021, Lumen released its 2020 ESG Report, stating that,

***[r]esponsible corporate citizenship has long been a part of the way we do business***, and our Lumen brand launch created the perfect platform for enhancing our sustainability program.

76

\*    \*    \*

***Responsible corporate citizenship is a key priority for our Board and
management team***.

Plaintiffs assert that the statements identified in bold and italicized text in the above-

paragraphs were false and misleading when made, or omitted material facts necessary to make

them not misleading, for all the reasons set forth in ¶ 306, and because they gave the false

impression that Lumen would not make business decisions that disregarded the environment and

the communities in which it operates.  (FAC, ¶ 320).

The Court disagrees with Plaintiffs for the same reasons it found that the alleged

misstatements contained in ¶¶ 309-310 are not actionable.  *See* discussion, *supra*.

## FAC, ¶ 321

The 2020 ESG Report stated that,

[e]nvironmental stewardship is inherent in our Lumen purpose. ***We actively review
the impact of our operations to make choices to reduce our environmental
footprint***. We believe our commitment to environmental sustainability promotes
the financial health of our business, the quality of service we provide and value
creation for our employees, communities, customers and investors. Our EHS team
oversees and executes the company's EHS and environmental sustainability
visions, which are available to all employees on the Lumen intranet.

## FAC, ¶ 322

The 2020 ESG Report further stated,

[w]e are reducing waste through minimization, re-use, and recycling. ***Our internal
waste management programs and initiatives also focus on the appropriate
disposition of hazardous wastes***. Our EHS team implements waste management
methods, submits annual reports to regulatory agencies regarding disposal and
audits disposal facilities for environmental compliance.

\*    \*    \*

We divert millions of pounds of electronic and communications equipment from
landfills each year. ***We recycle telecommunications equipment and many other
items such as*** batteries, wood poles, electronics, ***copper wire***, fluorescent lamps,

fleet oil and solvents. Lumen recycled more than 3,509 metric tons of these materials in 2020.

Plaintiffs contend that the foregoing statements identified in bold and italicized text were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because they gave the false impression that Lumen properly disposed of its copper wire cables upon retirement when it did not.  (FAC, ¶ 323).

The Court disagrees with Plaintiffs for the same reasons it determined that the alleged misstatement in ¶ 307 was not actionable.  *See* discussion, *supra*.

### FAC, ¶ 324

On April 8, 2022, Lumen filed its definitive proxy statement for 2022 on Form DEF14A (the "2022 Proxy Statement"), stating that,

> [e]nvironmental stewardship is inherent in our Lumen purpose.  ***We actively review the impact of our operations and make choices to reduce our environmental footprint***.  We believe our commitment to environmental sustainability promotes the financial health of our business, the quality of service we provide and value creation for our employees, communities, customers and investors.  Our EHS team oversees and executes the company's EHS and environmental sustainability visions, which are available to all employees on the Lumen intranet.

Plaintiffs maintain that the statement identified in bold and italicized text in the foregoing paragraph was false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because, far from "actively making choices to lessen our impact on the environment," the Company made a series of decisions that disregarded its impact on the environment.  (FAC, ¶ 325).

The Court disagrees with Plaintiffs for the same reasons it determined that the alleged misstatements in ¶¶ 309-310 are not actionable.  *See* discussion, *supra*.

**FAC, ¶ 326**

On November 4, 2022, Lumen released its 2021 ESG Report, stating that,

***Responsible corporate citizenship is the foundation of our business***.

\*       \*       \*

***Responsible corporate citizenship has long been a part of the way we do business***.

Plaintiffs contend that the statements identified in bold and italicized text in the

paragraphs above were false and misleading when made, or omitted material facts necessary to

make them not misleading, for all the reasons set forth in ¶ 306, and because the statements gave

the false impression that Lumen would not make business decisions that disregarded the

environment and the communities in which it operates.  (FAC, ¶ 327).

The Court rejects Plaintiffs' arguments for the same reasons identified in response to the

alleged misstatements in ¶¶ 309-310.  *See* discussion, *supra*.

**FAC, ¶ 328**

Lumen stated in its 2021 ESG Report that,

[g]ood corporate environmental stewardship is important to Lumen. ***As well as
reducing our own environment footprint***, we are working to build an efficient
global network to help reduce the emissions of our customers.

**FAC, ¶ 329**

The 2021 ESG Report further stated,

[t]o reduce our environmental impact, we establish and maintain effective waste
management programs and initiatives that focus on reducing waste through
minimization, re-use, and recycling. ***Our approach is also designed to ensure that
hazardous waste is appropriately disposed***. Our EHS collaborates with various
business units to implement and optimize waste management methods, policies and
procedures.

\*       \*       \*

Each year, we divert millions of pounds of electronic and communications
equipment away from landfills. ***We recycle telecommunications equipment and***

*items such as* batteries, wood poles, electronics, *copper wire*, fluorescent lamps, fleet oil and solvents.

Plaintiffs assert that the statements identified in bold and italicized text in the paragraphs above were false and misleading when made, or omitted material facts necessary to make them not misleading, for all the reasons set forth in ¶ 306, and because they gave the false impression that Lumen properly disposed of its copper wire cables upon retirement.  (FAC, ¶ 330).

The Court rejects Plaintiffs' arguments for the same reasons detailed in response to the misstatement alleged in ¶ 307.  *See* discussion, *supra.*

## FAC, ¶ 331

On February 23, 2023, Lumen filed its 2022 Form 10-K, signed by Johnson, which read, in pertinent part,

> our Environment, Health and Safety ("EHS") team is responsible for overseeing and implementing our EHS and environmental sustainability initiatives.

> The EHS program framework focuses on seven key areas:

> • Waste: *We are committed to* reusing and recycling products, minimizing material use and carefully managing our waste.  Each year, we divert millions of pounds of electronic and communications equipment from landfills.  *We recycle telecommunications equipment*, and our modem/router takeback program allows customers to return their equipment, which are then either reused or sent to an R2-certified recycler.

Plaintiffs contend that the statement identified in bold and italicized text in the foregoing paragraph above was false and misleading when made, or omitted material facts necessary to make it not misleading, for all the reasons set forth in ¶ 306, and because it gave the false impression that Lumen properly disposed of its copper wire cables upon retirement.  (FAC, ¶ 332).

The Court disagrees with Plaintiffs' arguments for the same reasons detailed in response to the alleged misstatement set forth in ¶ 307.  *See* discussion, *supra.*

**FAC, ¶ 333**

On April 5, 2023, Lumen filed a definitive proxy statement for 2022 on Form DEF14A

(the "2022 Proxy Statement"), stating, in pertinent part, that,

> [w]e have implemented occupational health and safety management systems for
> employees in our North America and Europe, Middle East and Africa (EMEA)
> regions. ***Our environment, health and safety team and relevant business units
> implement these systems and perform periodic reviews designed to identify and
> achieve improvements in overall safety and performance.***

**FAC, ¶ 334**

> The 2022 Proxy Statement further stated, that,

> ***[w]e are committed to environmental stewardship***, knowing that sustainability
> promotes the health of both our planet and our business and creates value for our
> customers, employees, suppliers, communities and investors. ***In addition to
> reducing our own environment footprint***, we are working to build an efficient
> global network to help reduce the emissions of our customers.

Plaintiffs contend that the statements identified in bold and italicized text in the

paragraphs above were false and misleading when made, or omitted material facts necessary to

make them not misleading, for all the reasons set forth in ¶ 306, and because far from "actively

making choices to lessen our impact on the environment," the Company made a series of

decisions that disregarded its impact on the environment.  (FAC, ¶ 335).

The Court rejects Plaintiffs' arguments for the same reasons detailed in response to the

alleged misstatements in ¶¶ 312-313.  *See* discussion, *supra*.

     v.      <u>Statements About GAAP Compliance</u>

**FAC, ¶ 347**

In the 2018 and 2019 Form 10-Ks, plus each of the 10-Q Forms for 2019 through the

third quarter of 2020,  Defendants Lumen, Storey, and Dev stated, "***[o]ur consolidated financial***

***statements are prepared in accordance with U.S. generally accepted accounting principles***."

**FAC, ¶ 349**

In the 2020 and 2021 Form 10-Ks, Defendants Lumen, Storey, and Dev, stated, ***"[o]ur consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles*.**"  Similarly, in the 2022 Form 10-K, Defendants Lumen, Johnson, and Stansbury stated, ***"[o]ur consolidated financial statements are prepared in accordance with U.S. generally accepted accounting principles*.**"   Lumen also made a similar statement in its quarterly reports on Form 10-Q for the first quarter of 2021 through the first quarter of 2023, to wit:  "***our unaudited interim consolidated financial statements provided herein have been prepared in accordance with the instructions for Form 10-Q*.**"

Plaintiffs assert that the statements identified in bold and italicized text in the preceding paragraphs were materially false or misleading each time they were made, or otherwise omitted to state material facts necessary to make them not misleading, because Defendants failed to disclose Lumen's risk of loss related to its lead-sheathed copper cable network which was reasonably possible to occur based on the foregoing facts, including:  (i) the scope of Lumen's lead-sheathed cable network which spanned over 37 states for tens of thousands of miles; (ii) the acute public health concerns associated with lead contamination; (iii) the extensive federal and state regulation holding private actors liable for lead contamination and remediation; (iv) the known contamination caused by lead-sheathed cables as acknowledged by industry officials; (v) Lumen's neglect of its lead-sheathed cable network; (vi) the systemic exposure of Lumen employees to lead; and, (vii) Lumen's widespread failures to protect its employees from dangers of lead exposures.  (FAC, ¶ 348).  Plaintiffs also cite to Lumen's supposed knowledge of the *Lake Tahoe Action*, as of January 2021.  *Id*., ¶ 350.

The Court notes that all financial statements filed with the SEC, including those appearing on the quarterly Form 10-Q reports, must be prepared in accordance with GAAP. (FAC, ¶ 247) (citing 17 C.F.R. § 210.4-01(a)(1)).  Any financial statement filed with the SEC that is not presented in accordance with GAAP is presumed to be misleading, despite any footnotes or other disclosures to the contrary.  *Id*. (citing 17 C.F.R. § 210.4-01(a)(1)).

GAAP refer to those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time promulgated by the Financial Accounting Standards Board ("FASB").  (FAC, ¶ 248).  The FASB has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC").  *Id*.

"ASC 450 addresses loss contingencies."  *In re Perrigo Co. PLC Sec. Litig.*, 435 F.Supp.3d 571, 582 (S.D.N.Y. 2020).  A loss contingency is defined as an "existing condition, situation, or set of circumstances involving uncertainty as to possible loss to an entity that will ultimately be resolved when one or more future events occur or fail to occur."  *Id*. (quoting ASC 450-20-20).  "Loss contingencies can include actual or possible claims, as well as pending or threatened litigation."  *Sec. & Exch. Comm'n v. RPM Int'l, Inc.*, 282 F.Supp.3d 1, 19 (D.D.C. 2017) ("*RPM*").

"The applicable accounting standards set out different rules for claims that *have been asserted* and those that *have yet to be asserted*."  *Id*. (emphasis added).  For a claim that has been asserted, the loss contingency must be disclosed if there is "at least a reasonable possibility" that a loss may be incurred, even if the amount cannot be reasonably estimated.  *Id*. (citing ASC 450–20–50–2, 3, & 5).  A loss contingency is reasonably possible, in turn, if the likelihood that it will occur "is more than remote but less than likely."  *Id*. (citing ASC 450–20–20).

On the other hand, disclosure is not required for unasserted claims "if there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment" unless: (1) "[i]t is considered probable that a claim will be asserted," *and* (2) "[t]here is a reasonable possibility that the outcome will be unfavorable."  *Id*. (quoting ASC 450–20–50–6); *see also Steinberg v. Schmitt Indus., Inc.*, Civ. Action No. 22-1533, 2024 WL 1007879, at *6 n.2 (D. Or. Feb. 2, 2024), *R&R adopted,* 2024 WL 1912537 (D. Or. Apr. 27, 2024) (citations omitted).

Plaintiffs assert that Lumen's exposure during the Class Period was massive and included regulatory risk/scrutiny, litigation risks, operational risks, remediation risks, and the risk of severe reputational harm.  (FAC, ¶ 337, 339-344).  They assert that because Lumen faced at least a "reasonable possibility" of loss related to potential removal and litigation costs associated with its lead cable network, it was required under ASC 450 to disclose the potential loss and to provide an estimate of the loss or otherwise state that it was not estimable.  *Id*., ¶¶ 338, 344.

In their brief, Plaintiffs contend that ASC-450-20-50-6 is inapplicable because the losses alleged in the FAC arise from contingencies other than legal claims, such as environmental remediation.  (Pl. Opp. Memo., pg. 17, n.3).  The Court disagrees.  Whether the risks associated with Lumen's lead-sheathed cables are characterized as regulatory, operational, remedial, reputational, or the costs of litigation, it was not unreasonable for Lumen to take the position that they arise from claims or regulatory assessments, which means that the risk had to be disclosed only if it was probable that a claim would be asserted *and* there was a reasonable possibility that the outcome would be unfavorable.  *See* ASC-450-20-50-6.  However, neither of those circumstances were present here.

Plaintiffs argue that Lumen has recognized that it should have disclosed these potential losses earlier because it added a new disclosure to its quarterly report filed on August 1, 2023.

(FAC, ¶¶ 235, 345).  However, the August 1, 2023 quarterly report was the first report after the *WSJ*'s articles were published in July 2023, which was the first time that potential claimants were made aware of possible claims or an assessment, thereby triggering the disclosure obligation.  Rather than supporting earlier disclosure of the loss contingency, Lumen's recognition of the loss contingency after the stories broke is consistent with its prior accounting practices.

Plaintiffs also point to class actions filed by Verizon utility workers for exposure to lead-sheathed aerial cables as further evidence that Lumen needed to disclose the risk of loss related to public health and operational risks.  *See* FAC, ¶ 341.  Again, however, these suits were not filed until mid-August and September 2023, *after* publication of the *WSJ* articles and the resulting outcry.  By then, of course, Lumen already had disclosed the loss contingency in its August 1, 2023 10-Q.

Plaintiffs again trumpet the *Texas* and *Tahoe Actions* as evidence of litigation risks that Lumen should have appreciated.  (FAC, ¶ 342).  As discussed previously, however, those cases did not demonstrate a serious potential liability from lead-sheathed cables.  *See* discussion, *supra*.  In any event, prior to the *WSJ* articles there was no manifestation by a potential claimant of an awareness of a possible claim or assessment against *Lumen*.  *See* ASC-450-20-50-6.  As discussed previously, prior to the investigation conducted by the *WSJ*, as revealed in the July 2023 articles, there was no indication that the lead-sheathed cables posed a hazard to the public or the environment where they lay.  To be sure, in 2013-2014, there was evidence that workers might be exposed to unsafe levels of lead, but, following the MNOSHA Settlement, Lumen reasonably believed that proper precautions were in place.[26]

---

[26] The CWs allege that Lumen was not adhering to safe or best practices during the Class Period.

Finally, Plaintiffs allege no facts to support the strong inference that any individual

Defendant knew, or was severely reckless in failing to know, that Lumen was required by GAAP

to show a contingent loss stemming from its practice of retiring its legacy lead-sheathed cables in

place.  *See In re Diebold Nixdorf, Inc., Sec. Litig.*, Civ. Action No. 19-6180, 2021 WL 1226627,

at *14 (S.D.N.Y. Mar. 30, 2021) ("no allegations that there were any internal reports"--or any

other documents, analyses, or data for that matter--"that suggested that the failure to take an

impairment charge earlier was an incorrect application of accounting principles, much less an

error so grievous that it . . .  rose to the level of fraud.") (citation omitted).  In fact, allegations of

GAAP violations or accounting irregularities, without evidence of "corresponding fraudulent

intent," are insufficient to state a securities fraud claim.  *Novak v. Kasaks,* 216 F.3d 300, 309 (2d

Cir. 2000) (citations omitted).

    vi)    <u>Summation</u>

The Court finds no material misrepresentation or omissions stemming from Defendants'

statements set forth in ¶¶ 253-350.  Considering the absence of any material misrepresentations

or omissions, there also are no facts to support a "cogent and compelling" inference of scienter,

either individually or holistically.

**D.**    **Additional Evidence of Scienter**

Having determined that Plaintiffs do not allege facts to show plausibly that any

Defendant made a statement that was misleading as to a material fact, the Court need not reach

---

However, there is no indication that this issue was brought to the attention of any individual
Defendant.  Moreover, Plaintiffs do not refer to any claims filed with regulatory agencies or civil
complaints filed by Lumen workers against their employer.

Plaintiffs' additional evidence of scienter.  However, having proceeded this far, the Court briefly

will address these additional arguments.[27]

     i)        <u>Core Operations Theory</u>

Plaintiffs contend that the individual Defendants' knowledge of the practices at issue in

this case may be inferred from the fact that Lumen's copper wire infrastructure was a key piece

of its business.  *See* FAC, ¶¶ 405-408.  The Fifth Circuit has recognized that, although an

officer's position with a company does not suffice to infer scienter, "special circumstances,"

combined with the officer's position, may result in a strong inference of scienter.  *In re: Six

Flags*, 58 F.4th at 219 (citing *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v.

Diodes, Inc.*, 810 F.3d 951, 958-959 (5th Cir. 2016)).  Pertinent factors that "might tip the

scales" include "(1) the company's size; (2) whether the transaction at issue was critical to the

company's continued vitality; (3) whether the misrepresented information would have been

readily apparent to the speaker; and (4) whether the defendant's statements were internally

inconsistent with one another."  *Id.* (citation and internal quotation marks omitted).

Applying the foregoing factors to the case at hand, Plaintiffs concede that Lumen is a

large company.  (Pl. Opp. Brief, pgs. 27-28).  Furthermore, while Plaintiffs again try to equate

Lumen's entire copper line network with its lead-sheathed copper lines, they gloss over the fact

that lead-sheathed copper represent less than five percent of Lumen's copper lines.  *See*

discussion, *supra*.  Moreover, Plaintiffs continue to mix the cost of removing the lead-sheathed

cables with the cost of operating them, when it has yet to be determined that the lead even needs

to be removed, and, even if were so, it represents a fixed cost.

---

[27] The Court already has acknowledged and rejected Plaintiffs other claimed evidence of
scienter.  *See* discussion, *supra*.

The Court also has not recognized any information that was misrepresented or omitted or any statements made by a Defendant that were internally inconsistent. Therefore, the Court finds that Plaintiffs' core operations theory does not provide support for a strong inference of scienter.

### ii)     Powerful Economic Incentives

Plaintiffs argue that, given the estimated cost to remove the lead-sheathed cables, Defendants had a powerful economic incentive, a/k/a motive, to suppress information concerning its lead-covered cables. *See* FAC, ¶¶ 382-387. Motive is a critical, but non-essential component of a successful claim for securities fraud. *Mun. Employees' Ret. Sys. of Michigan v. Pier 1 Imports, Inc.*, 935 F.3d 424, 431 (5th Cir. 2019) ("Pier 1 Imports") (citation omitted). "A failure to show motive means that 'the strength of the circumstantial evidence of scienter must be correspondingly greater.'" *Id*. (citations omitted). "To demonstrate motive, plaintiffs must show concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Id*. (citations and internal quotation marks omitted).

However, allegations of motives that are universal to corporations and their officers, *e.g.*, personal economic benefit, do not suffice to establish an inference of fraud under Rule 9(b). *Flaherty & Crumrine Preferred Income Fund, Inc.*, 565 F.3d at 213 (collecting cases) (desire to complete a financially successful tender offer does not suffice). Similarly, the desire to maintain a high credit rating is universally held among corporations and their executives and, thus, does not contribute significantly to an inference of scienter. *In re: Shaw*, 537 F.3d at 544 (citation omitted). While the Fifth Circuit has recognized that the need to complete a "crucial" $129 billion merger will provide a company with a motive to inflate its financial results,[28] those

---

[28] *Goldstein v. MCI WorldCom*, 340 F.3d 238, 250 (5th Cir. 2003).

circumstances are not present here where there was no crucial merger or any facts to suggest that any individual Defendant was aware of a potential need to remove lead-sheathed cables and the scope of the issue.  *See* discussion, *supra*.  Accordingly, the Court rejects Plaintiffs' economic incentives argument as a basis for supporting an inference of scienter.

      iii)      <u>Certifications Pursuant to the Sarbanes-Oxley Act of 2002</u>

Plaintiffs contend that scienter may be inferred from the fact that the individual Defendants certified pursuant to the Sarbanes-Oxley Act of 2002 that they were "responsible for establishing and maintaining disclosure controls and procedures," which ensures that material information relating to the registrant is made known to them.  (FAC, ¶¶ 409-412).

"Under the Sarbanes–Oxley Act, senior executives of public companies must certify the accuracy of quarterly and annual financial reports."  *In re:  Shaw*, 537 F.3d at 544–45 (citing 15 U.S.C. § 7241(a)).  However, "a Sarbanes–Oxley certification, standing alone, is not indicative of scienter."  *Id*. (citation omitted).   Instead, there must be "facts establishing that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other red flags, that the financial statements contained material misstatements or omissions."  *Id.* (citation and internal quotation marks omitted).  Plaintiffs have not made the requisite showing here.

**E.**      **Loss Causation**

The Court's having determined that the FAC does not plausibly allege a material misrepresentation or a cogent and compelling inference of scienter, the Court need not reach remaining issues of loss causation raised by Defendants.  *Crutchfield v. Match Grp., Inc.*, 529 F.Supp.3d 570, 603–04 (N.D. Tex. 2021) (citing *Owens v. Jastrow*, 789 F.3d 529, 546 (5th Cir. 2015)).

**Section 20(a) of the Securities Exchange Act of 1934**

In Count II of the FAC, Plaintiffs allege violations of Section 20(a) of the Exchange Act against the individual Defendants.  (FAC, ¶¶ 442-450).  Section 20(a) of the Securities Exchange Act of 1934,[29] extends liability to any person who "controls" a person who is subject to primary liability under the respective statutory scheme.  Under the act, "controlling person" liability requires, "(1) a primary violation by a controlled person; and (2) direct or indirect control of the primary violator by the defendant."  *See Trendsetter Investors, LLC v. Hyperdynamics Corp.*, 2007 WL 172627, at *14-15  (S.D. Tex. Jan. 18, 2007) (discussing liability under § 20(a)) (citation omitted).  Status or position alone does not automatically confer controlling person liability.  *Dennis v. General Imaging, Inc.*,  918 F.2d 496, 509 (5th Cir. 1990).  Rather, the controlling person must have at least exercised some influence over the direction of the firm.  *Id*.

However, "[c]ontrol person liability is secondary only and cannot exist in the absence of a primary violation."  *Southland Sec. Corp.*, 365 F.3d at 383 (citation omitted).  Because the FAC fails to state a claim for primary liability under the 1934 Act, *see* discussion, *supra*, there can be no controlling party liability under § 20(a), and dismissal of the § 20(a) claim is required.  *In re:  Shaw*, 537 F.3d at 545.

---

[29]  Section 20(a) states that

> [e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

**Conclusion**

Following an 18-months-long investigation, the *Wall Street Journal* published a series of

sensationalist articles regarding studies which had shown that lead was migrating from lead-

sheathed cables, installed as part of the nation's telephone network through the first half of the

last century.  The revelation took many—including those intimately familiar with the

telecommunications industry—by surprise.  (FAC, ¶ 219).  Realizing an opportunity to

potentially recoup some losses in the wake of Lumen's years long stock price decline, Plaintiffs,

via counsel, seized upon several shoots of circumstantial evidence to expertly craft the latest

securities actions against Lumen and its officers.  However, Plaintiffs' effort, like the last, falls

short.

As the FAC effectively concedes, until the *Wall Street Journal* published the findings of

its investigation, the telecom industry had every good reason to believe that the best practice was

to leave the lead in place, undisturbed.  Obviously, the *WSJ* exposé and the ensuing public and

regulatory outcry materially changed the industry's prior calculus.  Try as they might, however,

Plaintiffs do not allege facts to show plausibly that Defendants made any material

misrepresentations or omissions.

At the end of the day, the Court is left with the inexorable conviction that Plaintiffs are

attempting to assert a non-cognizable "fraud by hindsight" securities claim.  *See City of Pontiac

Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) (allegations of

"fraud by hindsight" are not cognizable).  However, "[c]orporate officials need not be

clairvoyant; they are only responsible for revealing those material facts reasonably available to

them."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).  Ultimately, the Court is unable to

infer any ill motive or intent stemming from alleged failures to disclose a risk that Defendants

did not recognize the Company faced while discussing no more than tangentially related issues, or as part of a broader, all-encompassing category, and/or in general, aspirational tones.

Accordingly, the undersigned finds that Plaintiffs do not state a plausible claim for relief against Defendants.  Stated differently, there is no reasonable expectation that discovery will reveal evidence to support the myriad missing elements of their claims.  *See Twombly*, 550 U.S. at 556.[30]

For the reasons stated,

IT IS ORDERED that Plaintiffs' motion to strike [doc. # 46] is DENIED.

IT IS FURTHER ORDERED that Defendants' motion to take judicial notice [doc. # 38] is GRANTED IN PART and DENIED IN PART, as detailed in the body of this decision. Furthermore,

IT IS RECOMMENDED that Defendants' motion to dismiss for failure to state a claim upon which relief can be granted [doc. # 36] be GRANTED and that Plaintiffs' claims against all Defendants be DISMISSED WITH PREJUDICE, in their entirety.  FED. R. CIV. P. 12(b)(6).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a

---

[30] To the extent that the undersigned has expanded upon the grounds for dismissal urged by Defendants, the instant report and recommendation provides adequate notice to the parties. *Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir. 1998); *Alexander v. Trump*, 753 Fed. App'x. 201, 208 (5th Cir. 2018) (the R&R provided both notice and an opportunity to respond).

final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 14th day of March, 2025.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE