# Exhibit A

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

**MONROE DIVISION**

In re: LUMEN TECHNOLOGIES, INC. **CIV. ACTION NO. 3:23-1290**
SECURITIES LITIGATION II

           **JUDGE TERRY A. DOUGHTY**

          **MAG. JUDGE KAYLA D. MCCLUSKY**

## J U D G M E N T

The Report and Recommendation of the Magistrate Judge [Doc. No. 63] having been considered, together with the Objections filed by Plaintiffs, and, after a *de novo* review of the record, finding that the Magistrate Judge's Report and Recommendation is correct,

**IT IS ORDERED, ADJUDGED, AND DECREED** that Defendants' Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted [Doc. No. 36] is **GRANTED**, and that Plaintiffs' claims against all Defendants are hereby **DISMISSED, WITH PREJUDICE**, in their entirety.  FED. R. CIV. P. 12(b)(6).

MONROE, Louisiana, this 31st day of March 2025.

              _____
              **TERRY A. DOUGHTY**
              **UNITED STATES DISTRICT JUDGE**

# Exhibit B

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **STICHTING PENSIOENFONDS METAAL EN TECHNIEK**, *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **VERIZON COMMUNICATIONS, INC.**, *et al.*, <br><br> **Defendants.** | **Case No. 23–cv–05218–ESK–AMD** <br><br><br> **OPINION** |

**KIEL, U.S.D.J.**

**THIS MATTER** is before the Court on defendants' motion to dismiss (Motion) (ECF No. 58) the corrected amended class action complaint (Complaint) (ECF No. 57 (Compl.)).  Defendants filed a brief (ECF No. 58–1 (Mov. Br.)) and declaration with exhibits (ECF No. 58–2) in support of the Motion.  Plaintiffs filed an opposition (ECF No. 61 (Opp'n)) to the Motion, to which defendants filed a reply (ECF No. 70 (Reply)).[1]

For the following reasons, the Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

Defendant Hans Vestberg has served as the chief executive officer of defendant Verizon Communications Inc. (Verizon) since August 2018 and as the chairman of the board of directors since March 2019. (Compl. ¶ 28.) Defendant Matthew Ellis served as Verizon's chief financial officer from November 2016 to May 2023.  (*Id.* ¶ 29.)  Defendant Kyle Malady served as

---

[1] Defendants also advised the Court of Magistrate Judge Kayla D. McClusky's report and recommendation in *In re: Lumen Technologies, Inc. Securities Litigation II*, which is pending before the Western District of Louisiana.  (ECF No. 73.)  Plaintiffs filed a response to same.   (ECF No. 74.)

Verizon's executive vice president and chief technology officer in its Global Networks & Technology Group from 2019 to March 2023, at which point he was appointed executive vice president and CEO of Verizon's Business Group. (*Id.* ¶ 30.) Defendant James Gowen is Verizon's chief sustainability officer and senior vice president of Global Supply Chain. (*Id.* ¶ 31.) Defendant Anthony Skiadas served as Verizon's senior vice president, controller, and principal accounting officer until he replaced Ellis as Verizon's executive vice president and chief financial officer in May 2023. (*Id.* ¶ 32.)

Plaintiffs filed the Complaint on April 24, 2024 on behalf of a putative class of persons and entities who purchased or otherwise acquired publicly traded Verizon securities between October 30, 2018 and July 26, 2023. (Compl. ¶ 1.) Plaintiffs assert two counts, pleading violations under: (1) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Security Exchange Commission Rule 10b–5 (SEC Rule 10b–5)); and (2) Section 20(a) of the Exchange Act.

Plaintiffs allege that defendants violated Section 10(b) and SEC Rule 10b–5 by knowingly and/or recklessly concealing that Verizon owned and abandoned hundreds of miles of copper cables encased with lead, which brought enormous risk and financial exposure to Verizon and its shareholders because of the serious health effects to humans of lead exposure. (*Id.* ¶¶ 437–443.) Plaintiffs reference a series of "bombshell" articles in the Wall Street Journal (WSJ) that were published in July 2023 concerning its investigation of Verizon's lead cables. (*Id.* ¶ 235.) The articles reported that Verizon had "inherited" the lead cables through acquisitions of the former "Baby Bell" companies, and that the lead cables were "leaching lead into the environment" and causing some of it employees to have adverse health effects. (*Id.* ¶ 6.) Despite Verizon's knowledge about the potential harm of the lead cables to the environment and its employees, it allegedly "largely abandoned its network of

lead cables." (*Id.*)  Former Verizon employees confirmed that Verizon purposely abandoned lead cables.  (*Id.* ¶¶ 94–97.)

Following the publication of the WSJ articles, the value of Verizon's securities dropped significantly.  (*Id.* ¶ 10.)  Plaintiffs allege that although defendants' "long kn[ew] that its copper network includes lead-sheathed cables" and the "enormous risks at play" from its ownership and abandonment of those cables, they failed to disclose this risk to investors.  (*Id.* ¶¶ 13, 15.)

Plaintiffs set forth five categories of material, misrepresentations made by defendants.  Each category is addressed in Section III.

## II.  STANDARD

### A.  <u>Motion to Dismiss</u>

When considering a motion to dismiss a complaint for failure to state a claim under Federal Rule Civil Procedure (Rule) 12(b)(6), courts must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the non-moving party.  *Makky v. Chertoff*, 489 F. Supp.2d 421, 429 (D.N.J. 2007).  A motion to dismiss may be granted only if the plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests that make such a claim plausible on its face.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  Although Rule 8 does not require "detailed factual allegations," it requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the sufficiency of a complaint, a court must take three steps. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  "First, it must 'tak[e] note of the elements [the] plaintiff must plead to state a claim.'"  *Id.* (alterations in original) (quoting *Iqbal*, 556 U.S. at 675).  "Second, it should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679.)

3

Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (alterations in original) (quoting *Iqbal*, 556 U.S. at 679). "[A] complaint's allegations of historical fact continue to enjoy a highly favorable standard of review at the motion-to-dismiss stage of proceedings." *Id.* at 790.

### B.    Rule 9(b)

"Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002). Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016) (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d at 217). Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This heightened standard is designed to "ensure that defendants are placed on notice of the 'precise misconduct with which they are charged, and to safeguard defendants against spurious charges' of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir.1984)).

### C.  <u>Private Securities Litigation Reform Act (PSLRA)</u>

"The PSLRA establishe[s] heightened pleading requirements for a plaintiff to meet in order to plead a cause of action successfully in class actions alleging securities fraud."  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013).  Pursuant to the PSLRA, a complaint must "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'"  *Id.* at 241–42 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)).

Both provisions of the PSLRA pleading standard echo the requirements set forth in Rule 9(b) and require that facts be pleaded "with particularity."  *Id.* n.3.  Although the "PSLRA replaced [Rule] 9(b) as the applicable pleading standard in private securities class actions," Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements" of the PSLRA.  *Id.*; *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009) (noting that this standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story").  Section 78u–4(b)(1) also adds the requirement that where "an allegation regarding [a defendant's] statement or omission is made on information or belief," plaintiffs must "state with particularity all facts on which that belief is formed"; that is, they must describe the sources of information with particularity, including "the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information those sources convey."  *Id.*; *see* 15 U.S.C. §78u–4(b)(1).

As to the second element, the PSLRA's approach for pleading scienter deviates from Rule 9(b), which allows plaintiffs to plead the scienter element generally.  *Avaya, Inc.*, 564 F.3d at 253.  Under the PSLRA, the court must evaluate whether all of the facts in the complaint when taken collectively give

Case 1:23-cv-05218-ESK-AMD   Document 77   Filed 03/31/25   Page 6 of 30 PageID:
Case 3:24-cv-01196-N   Document 89   Filed 04/24/25   Page 9 of 35   PageID 1331
2046

rise to a "strong inference of scienter"—not whether any individual allegation viewed in isolation meets that standard. *Tellabs*, 551 U.S. at 323. In determining whether the pleaded facts give rise to a strong inference of scienter, the court must "take into account plausible opposing inferences." *Id.* This involves a comparative inquiry that evaluates how likely one conclusion is as compared to others, in light of the pleaded facts. *Id.* Thus, the court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. *Id.* at 324. Although the inference that the defendant acted with scienter need not be irrefutable, the inference must be more than merely "reasonable" or "permissible." *Id.* A complaint will survive only if a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

## III. DISCUSSION

### A. Section 10(b) and SEC Rule 10b–5

Section 10(b) makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact" not misleading in the light of the circumstances it was made. 17 C.F.R. § 240.10b–5(b). The Supreme Court has implied a private cause of action from the text and purpose of [S]ection 10(b). *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011); *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Accordingly, to state a securities fraud claim pursuant to Section 10(b) and SEC Rule 10b–5, a plaintiff "must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or

6

omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council*, 754 F.3d at 167.

Moreover, "the omission of a fact can make a statement of opinion ... even if literally accurate, misleading to the ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 187 (2015); *see also City of Warren Police and Fire Ret. Sys. v. Prudential Fin.*, 70 F. 4th 668, 685 (3d Cir. 2023) ("*Omnicare*'s framework for evaluating opinion falsity applies to claims under [Section] 10(b) for violations of [SEC] Rule 10b–5."). This standard does not "allow investors to second-guess inherently subjective and uncertain assessments" nor is it "an invitation to Monday morning quarterback an issuer's opinions." *Omnicare*, 575 U.S. 175, 186. However, an opinion statement is misleading if it: (1) "was not sincerely believed when made;" (2) "contains an expressly embedded, untrue factual assertion;" or (3) "reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police and Fire Ret. Sys.*, 70 F. 4th at 686.

Defendants claim that plaintiffs' Section 10(b) and SEC Rule 10b–5 claims fail because the challenged statements and opinions are not misleading and the Complaint fails to sufficiently allege scienter.   (Mov. Br. pp. 27, 28.)

### B.   Material Misrepresentations or Omissions

#### 1.   Verizon's Loss Reserves for Environmental Matters

On October 30, 2018, Verizon's quarterly financials for the third quarter of fiscal year 2018 contained the following statement:

> *Reserves have been established to cover environmental matters relating to discontinued businesses and past telecommunications activities.* These reserves include funds to address contamination at the site of a former Sylvania facility in Hicksville, NY, which had processed nuclear fuel rods in the 1950s and 1960s.   In September

7

> 2005, the Army Corps of Engineers (ACE) accepted the site into its Formerly Utilized Sites Remedial Action Program. As a result, the ACE has taken primary responsibility for addressing the contamination at the site. An adjustment to the reserves may be made after a cost allocation is conducted with respect to the past and future expenses of all of the parties. Adjustments to the environmental reserve may also be made based upon the actual conditions found at other sites requiring remediation.

(Compl. ¶ 309.)

Plaintiffs allege that the italicized portion of this statement was materially false and/or misleading because Verizon did not "set aside reserves" to cover remediating its lead cables, and the statement omitted that Verizon had "tens of thousands of miles of lead cables" in the environment that would cost over $1 billion to remediate. (*Id.* ¶¶ 310, 311.)

Defendants, however, contend that the statement does not satisfy the three prongs of *City of Warren Police and Fire Retirement System* because: (1) there is no specific allegation in the Complaint that anyone at Verizon believed that reserves were needed for lead-sheathed cables; (2) plaintiffs do not allege the statement was untrue; and (3) the allegations in the Complaint do not show the nature of the reserve-setting process, "so there is necessarily no specific allegation that it was unreasonable or improperly followed, let alone that any maker of these statements had any such information that they should have disclosed, but did not." (Mov. Br. pp. 41, 42.) Plaintiffs counter that the second prong applies because the statements concerning loss reserves "includes the embedded fact that Verizon had analyzed and accounted for risks associated with its lead-sheathed cable network, and set aside reserves related to it," which was untrue. (Compl. ¶ 309; Opp'n p. 39.) Plaintiffs further argue that the third prong applies because by omitting in the statement that it had a "massive lead-sheathed cable infrastructure," Verizon rendered the statement materially misleading. (Opp'n p. 39.)

First, the Complaint does not identify any portion of the statement that is an expressly "untrue factual assertion." *See City of Warren Police and Fire Ret. Sys.*, 70 F. 4th at 686. The statement does not *expressly* represent that reserves were established for removal of lead-sheathed cables. Plaintiffs' argument assumes that the statement refers to reserves covering environmental matters for *all* "past telecommunications activities," including lead-sheathed cables. (Compl. ¶ 309.) The statement is, however, not that expansive.

Second, the third prong is not met because the allegations in the Complaint do not satisfy the PRSLA's "particularity" requirement. The Complaint alleges that the statement is misleading because if Verizon had set aside reserves, "it would have been required under [Accounting Standards Codification] 450 to disclose the amount of reserves … set aside for the remediation of its lead cables, but it did not." (*See id.* ¶ 310.) There is nothing in the statement that can be interpreted as a representation that Verizon set aside reserves for remediating the lead-cables.

Third, under *Omnicare*, plaintiffs "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." 575 U.S. at 194. Because plaintiffs say nothing about the reserve setting process and the basis for the opinion, they fail to "identify particular (and material) facts going to [that] basis." *Id.*

Accordingly, the statement about loss reserve for environmental matters is not actionable.

### 2.   Converting Legacy Copper Cables into Fiber and the Associated Costs

During Verizon's third quarter earnings call on October 20, 2021, Brett Feldman, an analyst at Goldman Sachs, asked Ellis:

> If you don't mind as a quick follow-up there around the cost point.   Those of us who live in regions that have Fios know that sometimes you can get Fios or maybe down the street, you can't. Are you kind of completing the communities?   *In other words, are you going to be at the point where you can finally rip out all this legacy infrastructure?* Is that what you meant by the cost savings?

(Compl. ¶ 312).   Ellis then replied:

> Well, that's absolutely part of it.   Now we're going to be all the way there.   That's a long-term goal for us.   But certainly, *as you replace in a certain location copper with fiber, there's a good benefit from a cost standpoint.*   In addition to the revenue step-up opportunities you get with that customer base.   So it's a win-win on both sides of the P&L there.

(*Id.* ¶ 312.)

On November 17, 2021, Ellis stated at the Morgan Stanley European Technology Media & Telecom Conference:

> But then also in continuing to -- our *project of replacing copper in the [incumbent local exchange carriers] footprint with fiber* obviously gives us an opportunity to sell Fios into those consumer and business locations, also gives us the opportunity to pull out the copper that is expensive to operate.   Certainly not -- the equipment on that has -- also has higher emissions than some of the newer equipment, too.   So *from a green standpoint, it's also a benefit, too.*

(*Id.* ¶ 315.)

During the same conference, Ellis stated:

> But we expect to do north of 400,000 open-for-sale each year for at least the next 2 to 3 years, and then we'll see where it goes from there.   So it continues to be an

> opportunity to expand the Fios footprint within our existing [incumbent local exchange carriers] space *and not just get the revenue opportunities from expanding the size of the Fios customer base, but also some cost benefits and green benefits from removing some of the copper network at the same time.*

(*Id.* ¶ 318.)

On March 3, 2022, during Verizon's investor day, attended by Ellis, Vestburg, and Malady, Malady stated:

> But fundamentally, we picked fiber a long, long time ago. And now we're seeing that we're able to update that and still use the money we sunk in 20 years ago, right, because we can just upgrade the electronics and continue to push the technology up.   So to [Ellis]'s point too, it also helps us in 2 ways.   It allows us to drive more revenue, *but it also allows us to take out the old equipment, the old copper stuff and get people on new things.*   So we're going to keep moving.
>
> We are also in a unique position in this respect because of our early start with our fiber builds.  Fiber to new locations is pivotal both in and out of footprint.   However, *upgrading our existing copper plant to fiber in footprint is also very important to us.   We have upgraded 4.5 million circuits off of copper and on to fiber.*   And at the same time, we've converted 36 central offices to all fiber, *retiring the copper plant entirely in those locations.   And we are seeing annual operational savings of about $180 million from this program.*   And this figure will continue to grow as we convert more and more customers and more and more COs.   The savings are in part driven by a reduction in technician dispatches and maintaining the network and supporting customers. Additionally, *we see savings because of energy from converting the copper to fiber.*

(*Id.* ¶ 320.)

On March 7, 2024, Ellis attended the Morgan Stanley Tech Media Telecom Conference and stated: "The great thing as we do that roughly 0.5 million

11

premises a year, you get the open for sale opportunity, but you're also getting

*the benefit of retiring copper network as well."* (*Id.* ¶ 322.)

On March 15, 2023, in an interview, Gowen stated:

> [Y]ou're absolutely right … the business case for sustainability is incredibly important and *it's looking at … sustainability from a TCO perspective a total cost of ownership* it goes right back to a supply chain and sourcing and really business case 101. [H]ow do you look at the impacts of any new product any new technology *when we went through … through my time here from a copper to fiber migration what is the cost to pull that copper out what is the absolute home run benefit of putting fiber in not only from a speed resiliency and things like that but it's that it's that long time … it's that long-term mindset* that is so so important when you're looking at business case cases you know it's interesting when you think about *what we've been able to do here at Verizon and I think about the way we operate a responsible sourcing you know we think about everything from human rights to ethical conduct to making sure we protect the environment* that's through our RFP process that's through our negotiation process that's where our supplier contracts you know and then we take it to the next step okay how do you take that to the next step and you start to look at the risk because everything we do at Verizon from a supply chain perspective or really from a business perspective looks at the end-to-end risk ."

(*Id.* ¶ 324.)

On May 23, 2023, Malady stated during an interview:

> Verizon also has a large landline presence. And we have a lot of copper still out there that people still use. And *we can use our wireless asset now to replace some of the old legacy copper which is very inefficient and in the day of [Environmental, Social, and Governance] [(]ESG[)] and trying to save energy and make sure all the resources you have you use them wisely we can move some of those old copper things onto the wireless network at low bandwidth things. There is just a whole range of solutions we're going to be able to bring to the table for old legacy things that are*

> *out there that are that are inefficient* with … with this new fixed wireless offer.

(*Id.* ¶ 326.)

Plaintiffs allege that these italicized-statements by Ellis, Malady, and Gowen concerning savings associated with converting legacy copper cables into fiber were materially false and/or misleading because, although the statements reference the positive environmental and fiscal effects of the conversion, the statements omitted that the legacy copper cables were encased with toxic lead and would cost Verizon billions of dollars to safely replace.   (*See id.* ¶¶ 313, 314, 316, 317, 321, 323, 325, 327.)

Defendants argue that the statements are not actionable because plaintiffs fail to demonstrate with particularity, as required by the PSLRA, how the statements are misleading and whether the mentioning of copper cables in the statements creates an obligation to reveal all facts related to copper cables. (Mov. Br. pp. 42, 43.)   Plaintiffs counter that Ellis, Malady, and Gowen were required to mention lead-sheathed cables when discussing copper cables, and their failure to do so is misleading.   (Opp'n pp. 26–30.)   Plaintiffs also argue that particularity has been met "based upon well-pled allegations of Verizon's own admissions, the revelations in the WSJ series, and the uniform reports of multiple former employees that abandoned lead-sheathed cable was ubiquitous at Verizon sites."   (*Id.* p. 31.)

Here, plaintiffs fail to demonstrate with particularity under the PSLRA how the statements are misleading.   Plaintiffs only allege that Ellis, Malady, and Gowen did not mention that legacy copper cables were encased in lead but do not allege with particularity "how" the omission was misleading.   *See Avaya, Inc.*, 564 F.3d at 253; 15 U.S.C. § 78u–4(b)(1).   Plaintiffs also fail to demonstrate "how" the alleged liability of Verizon's legacy copper cables was so overwhelming that simply omitting this information when discussing the cost saving of the conversion was misleading.   *See Avaya, Inc.*, 564 F.3d at 253.

For example, they do not set forth any allegations comparing the alleged liability of the lead cables with the costs of converting from copper to fiber to support their argument that, essentially, the liability offsets any, if not most, of the cost benefits of the conversion. Plaintiffs do not dispute that converting copper cables into fiber saves Verizon money.

Simply asserting that statements are incomplete is insufficient to plausibility assert a claim under SEC Rule 10b–5. *See Winer Family Trust v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) (finding that a corporation's press release announcing a new business venture with another entity was not misleading, even though the press release omitted that their prior business venture was "disastrous"); *see also Rescue Mission of El Paso, Inc. v. K-Sea Transp. Partners L.P.*, No. 12–00509, 2013 WL 3087078, at *16 (D.N.J. June 14, 2013) (dismissing with prejudice allegations arising from defendant-corporation's cautiously unoptimistic statements to investors concerning the corporation's short term future, which was not actionable because defendant-corporation was "under no duty to provide more dire specifics while disclosing their true, generally positive, fiscal year 2009 results"); SEC Rule 10–b(5) (limiting omission liability to "a material fact necessary in order to make the statements made … not misleading").

The statements concerning Verizon's conversion of legacy cooper cables to fiber are not actionable.

### 3.   <u>Employee Health and Safety</u>

On April 19, 2021, Verizon filed its annual ESG Report which contained the following statement: "Both our Board and senior leadership team recognize that *operating responsibly—promoting* ethical business practices and *the well-being and health of our environment, employees, customers and communities— is fundamental to the long-term success of Verizon*." (Compl. ¶ 328.)

14

On April 2022, Verizon posted on its website its ESG Report for the 2021 calendar year, which states in the "Safety Culture" sub-section: "*We are dedicated to maintaining a safe workplace. We regularly update our health and safety standards, programs and employee training to educate employees about best practices and working safely. Topics include* working roadside, operating aerial lifts, *splicing fiber, climbing poles, handling ladders and installing fiber*." (*Id.* ¶ 330.)

On February 4, 2020, Verizon issued its Environmental, Health, and Safety (EHS) Policy that stated:

> *Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond maintaining compliance with laws, regulations and policies.* Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society.
>
> *Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed, through our … []EHS[] management system and supporting programs, to eliminate hazards and reduce EHS risks.*

(*Id.* ¶ 332.)

On April 19, 2021, Verizon filed its annual ESG report for fiscal year 2020 containing the following statements:

> *We regularly update our employee health and safety programs, including online and instructor-led training to educate employees about best practices and working safely.* Topics include operating aerial lifts, *splicing fiber, climbing poles*, handling ladders and *installing fiber*.
>
> In 2020, our occupational injuries and illnesses rate was 1.02 per 100 employees, well below the Bureau of Labor Statistics telecommunications industry average of 2.4. *We are committed to maintaining a safe workplace and*

> *environmentally responsible work practices*, and we expect
> our suppliers—who play a critical role in our success—to
> share that commitment.

(*Id.* ¶ 336.)

In 2023, Verizon posted on its website its ESG report for calendar year

2022, which stated:

> Safety Culture. *We are dedicated to maintaining a safe*
> *workplace. We regularly update our health and safety*
> *standards, programs and training materials to educate*
> *employees about best practices and working safely. Field-*
> *related trainings include* working roadside, operating
> aerial lifts, *splicing fiber, climbing poles*, handling ladders
> and *installing fiber*. General workplace safety topics
> include ergonomics, psychological safety and personal
> safety online. In 2022, our occupational injuries and
> illnesses rate was 1.1 per 100 employees, well below the
> Bureau of Labor Statistics telecommunications industry
> average of 1.7.    In 2022, Verizon was selected as the EHS
> Daily Advisor recipient of the Best Overall Safety Program
> and Culture award.

(*Id.* ¶ 338.)

Verizon's proxy statements for fiscal years 2022 and 2023 included the

following statement: "*Employee health and safety. Verizon is committed to*

*maintaining a safe workplace and environmentally responsible work practices*,

and we expect our suppliers to share that commitment."    (*Id.* ¶ 340.)

Plaintiffs allege that these italicized-statements about Verizon's concerns

for its employees' health and safety were materially false and/or misleading

because Verizon abandoned thousands of miles of lead-sheathed cables that

harmed its employees while failing to provide protective equipment to those

employees exposed to the lead-sheathed cables.    (*See id.* ¶¶ 329, 331, 333–335.)

Defendants argue that these statements are inactionable, general mission

statements.    (Mov. Br. pp. 45, 46.)    Plaintiffs counter that defendants made

statements about its commitment to employee health and safety while

16

abandoning its lead infrastructure which created dangerous conditions for their workers.   (Opp'n pp. 35, 36.)

"[V]ague and general statements of optimism 'constitute no more than "puffery" and are understood by reasonable investors as such.'"   *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (quoting *Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428 n.14 (3d Cir. 1997)).   Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material: there is no "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."   *Id.* (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).   Material information in a statement is "information that would be important to a reasonable investor in making his or her investment decisions." *In re Lucent Technologies, Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 543 (D.N.J. 2002) (quoting *Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1425).

Verizon's statements about its employees' health and safety are "general and non-qualitative statements" that are vague and thus, cannot be actionable. *Mallozi v. Innovative Industrial Properties, Inc.*, No. 22–2359, 2023 WL 6121499, at *11 (D.N.J. Sept. 19, 2023); *Fan v. StoneMor Partners LP*, 927 F.3d 710, 716 (3d Cir. 2019) (holding that vague and general statements of optimism "are non-actionable precisely because they are not material—a reasonable investor would not base decisions on such statements").   A reasonable investor would understand that these statements are in the nature of "puffery" and support Verizon's goals to promote employee well-being and to protect the environment.[2]   *See In re Advanta Corp. Sec. Litig.*, 180 F.3d at 538.

---

[2] Because the statements are "puffery" and thus, immaterial, the statements are protected by the PSLRA's safe harbor provision.   This provision states that "forward looking statements" are protected "provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the

The statements referring to employee training to educate workers about safety including management systems, "splicing fiber," and "installing fiber" (Compl. ¶¶ 330, 332, 336, 338), are more specific because they refer to the steps Verizon used to advance its goals.   Statements emphasizing the strength of a particular business operation, such as Verizon touting its employee safety programs and statistics demonstrating employee safety, "may be actionable as securities fraud, where those operations are in reality deficient."   *See Hall v. Johnson & Johnson*, No. 18–01833, 2019 WL 7207491, *16 (D.N.J. December 27, 2019).   While Verizon's statements about safety measures for its employees may be important to a reasonable investor, plaintiffs fail to assert any facts demonstrating that the statements are misleading. *See In re Lucent Technologies, Inc. Sec. Litig.*, 217 F. Supp. 2d at 543.   Accordingly, the statements about employee health and safety are not actionable.

### 4.    **Disposal of E-Waste**

On March 18, 2019, Verizon issued the statement: "*We continue to work to reduce the environmental impact of our products through: … recycling, refurbishing and/or reusing our products*, including the responsible management of out-of-service lead batteries."   (Compl. ¶ 343.)

On April 19, 2021, Verizon filed its annual ESG Report containing the following statement:

> Our goal is to divert as much e-waste as possible from landfills by reusing or responsibly recycling materials. Our priority is to reuse electronics internally.   When that is not possible, we market these materials for reuse through approved vendors or work with partners to recycle them responsibly.   *Verizon defines e-waste as electronic products and parts*, such as cell phones, chargers, set-top

---

plaintiff fails to show the statement was made with actual knowledge of its falsehood." *See In re Wilmington Trust Sec. Litig.*, 852 F. Supp. 2d 477, 489–90 (D. Del 2012) (quoting *Avaya, Inc.*, 564 F.3d at 254).

> boxes, *network equipment* and batteries, *that are at the end
> of their useful life* and/or have been returned by customers.

(*Id.* ¶ 347.)

In its 2021 and 2022 ESG Report, Verizon made the following statement regarding its handling of waste:

> *Verizon's recycling practices exceed regulatory mandates.
> We engage e-waste vendors that manage our waste in
> accordance with high industry standards for
> environmental stewardship such as R2 or e-Stewards.*
> Our practice is to require lead-acid batteries from our U.S.
> operations to be sent to Verizon-approved recycling
> facilities in the U.S. or Canada and to require vendors to
> provide certificates of recycling for the batteries. We
> regularly audit facilities, including battery smelters, that
> manage Verizon's hazardous or regulated waste.

(*Id.* ¶ 350.)

Verizon's 2022 ESG Report included the following statement under a section titled "E-waste: reducing, reusing and recycling":

> *Verizon defines electronic waste, or e-waste, as electronic
> products and component parts that are at the end of their
> useful life* and/or have been returned by customers. E-
> waste generated by our business operations includes cell
> phones, chargers, set-top boxes, network equipment,
> batteries and associated plastic components. *In 2022,
> Verizon reused or recycled approximately 43.4 million
> pounds of e-waste, including 1.6 million pounds of plastic
> and 2.7 million pounds of lead-acid batteries.*

(*Id.* ¶ 352.)

Plaintiffs allege that these italicized-statements about the disposal of e-waste were materially false and/or misleading because Verizon failed to also state that it had abandoned thousands of miles of lead-sheathed cables that harmed the environment and exposed Verizon to enormous liability. (*See id.* ¶¶ 344–346, 348, 349, 351, 353, 354.)

Defendants argue that these statements are aspirational goals that are not actionable, the allegations relating to the statement is not sufficiently

particularized, and plaintiffs do not dispute the statistics in the statements. (Mov. Br. pp. 46–49.)   Plaintiffs, however, contend that the statements are actionable because they specify how Verizon would achieve its goals.   (Opp'n pp. 33, 34.)   Plaintiffs also claim that because Verizon mentioned "e-waste" in their statements, Verizon was also required to discuss lead-sheathed cables. (*Id.* p. 34.)

With respect to the statements at paragraphs 343 and 347 of the Complaint, I agree with plaintiffs that these statements are not entirely "general" and "aspirational."   Although they include aspirational parts, such as Verizon continuing "to work to reduce the environmental impact of" its products and that Verizon's "goal [was] … to divert as much e-waste as possible" (Compl. ¶ 347), one statement (*id.* ¶ 343) references an example of how Verizon is working to reduce the environmental impact of its products, and the other statement (*id.* ¶ 347) defines the types of "e-waste" that Verizon seeks to recycle, thus, making these statements "material."   *See In re Lucent Technologies, Inc. Sec. Litig.*, 217 F. Supp. 2d at 543.   However, plaintiffs again failed to present any arguments demonstrating that these statements/opinions (Compl. ¶¶ 343, 347) are misleading.

As to the statement at paragraph 350 of the Complaint, the statement is not sufficiently particular.   Plaintiffs allege that Verizon violated regulatory mandates by allowing its lead-sheathed cables to filter into and damage the surrounding environment. (Compl. ¶ 351.) However, plaintiffs fail to "identify particular (and material) facts going to the basis for the issuer's opinion" by failing to allege which regulatory mandates defendants did not adhere too.   *See Omnicare*, 575 U.S. at 194.

Similarly, the statement at paragraph 352 of the Complaint does not "allege with particularity the reasons why giving accurate statistics about recycling e-waste generally and other specific categories of e-waste was

misleading in context." (Reply p. 18) (internal quotation marks omitted); *See also* (Mov. Br. p. 49.) Plaintiffs also failed to dispute this argument in their opposition brief.

### 5.  Generally Accepted Accounting Principles (GAAP)

Defendants represented that Verizon's financial statements were prepared in accordance with GAAP. (*See* Compl. ¶¶ 372, 374, 376, 378, 380.) Plaintiffs allege that the statements on Verizon's financial statements were materially false and/or misleading because defendants failed to disclose the scope of Verizon's lead-sheathed cable network, the public health concerns associated with lead contamination, federal and state regulations concerning lead contamination, the known contamination caused by lead cables, Verizon's neglect of those cables, and the exposure of Verizon's employees to the lead cables. (*See id.* ¶¶ 373, 377.) Plaintiffs argue that: (1) Verizon's statements posited an "embedded fact" that Verizon "did not face contingent liabilities related to its lead-sheathed cables, when it did"; and (2) the statements "omitted mention of lead-sheathed cables and issued no qualifying statement." (Opp'n pp. 39, 40.) In reply, defendants note that: (1) the statements did not "expressly" state that Verizon "did not face contingent liabilities related to its lead-sheathed cables"; and (2) the Complaint "says nothing about the process for assessing GAAP" compliance and therefore, "fails to identify particular (and material) facts" concerning the statements omission of lead-sheathed cables. (Reply p. 19.)

I agree with defendants. None of the statements expressly state that Verizon had not faced contingent liabilities related to its lead-sheathed cables. And although plaintiffs allege that defendants violated GAAP, plaintiffs did not allege the process of GAAP compliance. Thus, plaintiffs did not demonstrate the "how" because it does not plausibly allege how Verizon's failing to mention

lead-sheathed cables in their statements violates GAAP.   *See Avaya, Inc.*, 564
F.3d at 253; 15 U.S.C. §78u–4(b)(1).

### C.   <u>Scienter</u>

"Scienter is a 'mental state embracing intent to deceive, manipulate, or
defraud,' and requires a knowing or reckless state of mind."   *Avaya, Inc.,* 564
F.3d at 252 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976)).
The PSLRA's scienter standard "requires plaintiffs to allege facts giving rise to
a 'strong inference' of 'either reckless or conscious behavior.'"   *Id.* at 267
(quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 534-35).   A reckless
statement is one "involving not merely simple, or even inexcusable negligence,
but an extreme departure from the standards of ordinary care, and which
presents a danger of misleading buyers or sellers that is either known to the
defendant or is so obvious that the actor must have been aware of it."   *Id.* at
267 n.42 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535).   "'[C]laims
essentially grounded on corporate mismanagement' do not adequately plead
recklessness."   *Id.* (alteration in original) (quoting *In re Advanta Corp. Sec.
Litig.*, 180 F.3d at 540).

A "strong inference" of scienter is one that is "cogent and at least as
compelling as any opposing inference of nonfraudulent intent."   *Id.* at 267
(quoting *Tellabs*, 551 U.S. at 324).   It is more than "merely 'reasonable' or
'permissible.'"   *Tellabs*, 551 U.S. at 324.   To make this determination, a court
must "weigh the 'plausible nonculpable explanations for the defendant's
conduct' against the 'inferences favoring the plaintiff.'"   *Avaya, Inc.*, 564 F.3d
at 267 (quoting *Tellabs*, 551 U.S. at 324).   However, "[t]he inference that the
defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun'
genre, or even the most plausible of competing inferences."   *Tellabs*, 551 U.S.
at 324 (quoting *Fidel v. Farley*, 392 F.3d 220, 227 (2004)).   "The pertinent
question is 'whether all of the facts alleged, taken collectively, give rise to a

strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Avaya, Inc.*, 564 F.3d at 267-68 (quoting *Tellabs*, 551 U.S. at 323). "Omissions and ambiguities 'count against inferring scienter.'" *Id.* at 268 (quoting *Tellabs*, 551 U.S. at 326). "Motive and an opportunity to commit fraud" are just a factor in this analysis. *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 534–35. In sum, "[a] complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323.

In support of their claim that the allegations in the Complaint fail to demonstrate that defendants made statements with scienter, defendants argue that the: (1) allegations fail to allege any motive by defendants to defraud plaintiffs which counters an inference of scienter; (2) allegations do not show that any of the defendants knowingly committed fraud or acted with extreme recklessness; and (3) inference that defendants lacked scienter is more plausible than an inference that defendants acted with scienter. (Mot Br. pp. 32–39.)

In opposition, plaintiffs assert five arguments to establish that defendants asserted statements with scienter. Corporate liability for securities fraud is only imputed from the corporation's agents when corporations "do not have their own state of mind." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 630 (D.N.J. 2023) (quoting *Smallen v. the W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020)). Thus, plaintiffs must show that the Complaint alleges that at least one of the individual defendants made statements with scienter for scienter to impute to Verizon. *See id.*

For the reasons indicated below, I find that all five of plaintiffs' arguments are meritless. I agree with defendants that plaintiffs' failure to allege motive helps counter an inference of scienter and even when considering "all of the

23

facts alleged, taken collectively" an inference that defendants lacked scienter is more plausible than an inference that defendants made statements with scienter.   *See Avaya, Inc.*, 564 F.3d at 269, 272 (*Tellabs*, 551 U.S. at 323).   As a result, scienter is not imputed to Verizon.

### 1.   <u>Verizon's Replacement of Lead-Sheathed Cables</u>

Plaintiffs argue that Verizon's abandonment of lead-sheathed copper cables across the United States and the "massive scope" of liability associated with those cables demonstrates that defendants "knew or recklessly disregarded that they were misrepresenting and/or omitting material, adverse facts in their public statements regarding replacing copper with FIOS." (Opp'n pp. 42, 43.)   They further claim that defendants knowingly and/or recklessly failed to account for the liabilities associated with the lead cables due to Verizon's statement concerning loss reserves and contingencies.   (*Id.* pp. 43, 44.)   Defendants counter that plaintiffs made no allegation that any individual defendants received information concerning the potential liability of the lead-sheathed cables.   (Reply p. 8.)

Here, the "massive scope" of liability exceeding $1 billion that plaintiffs allege in the Complaint is required to remove lead-sheathed cables (Compl. ¶ 314), does not demonstrate that Ellis, Malady, or Gowen, who made the statements (*id.* ¶¶ 312, 315, 318, 320, 322, 324, 326), had personal knowledge that $1 billion was required to replace the lead-sheathed cables.

To the extent plaintiffs argue that in omitting that the copper cables were encased with lead makes Ellis, Malady, and Crowen's statements reckless, plaintiffs fail to sufficiently allege that the "danger of misleading buyers or sellers" was "so obvious" that they "must have been aware of it."   *See Avaya, Inc.*, 564 F.3d at 267 n.42 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 535).   When plaintiffs attempt to establish scienter through circumstantial

evidence of recklessness, the strength of the circumstantial allegations must be even greater. *Nat'l Junior Baseball League v. Pharmanet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 553 (D.N.J. 2010). Throughout the Complaint, plaintiffs generally allege that the copper cables were encased with lead. In doing so, plaintiffs essentially assert that Ellis, Malady, and Gowen should have been aware of the substantial, potential liablity from the lead-sheathed cables when making statements related to the benefits of converting from copper cables to fiber cables. (*See* Compl. ¶¶ 312, 315, 318, 320, 322, 324, 326.)

However, although they are Verizon executives and the allegations concerning the presence of lead-sheathed cables raises an inference of scienter, that inference is not as compelling as an inference that Ellis, Malady, and Gowen acted without scienter. *See Avaya, Inc.*, 564 F.3d at 267–68. When assessing "plausible nonculpable explanations" for Ellis, Malady, and Gowen's statements (Compl. ¶¶ 312, 315, 318, 320, 322, 324, 326), they simply referenced the economic and environmental benefits of transitioning from copper cables to fiber cables. *See Avaya, Inc.*, 564 F.3d at 267 (quoting *Tellabs*, 551 U.S. at 324). Furthermore, plaintiffs do not allege that transitioning from copper to fiber is not environmentally beneficial. Plaintiffs fail to allege that Ellis, Malady, or Gowen had a motive to defraud when making statements related to converting cables into fiber, which is a factor to consider when determining whether a speaker asserted a statement with scienter. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d at 534–35. And omissions count against inferring scienter. *See Avaya, Inc.*, 564 F.3d at 268.

With respect to plaintiffs' arguments that Verizon's statements in its quarterly financials concerning loss reserves were misleading, Verizon is a corporation and does "not have their own state of mind." *See Roofer's Pension Fund*, 687 F. Supp. 3d at 630. And even if those statements were asserted by any of the individual defendants, plaintiffs have not alleged in the Complaint

that Verizon's audited financial statements related to loss reserves were amended. *See Ortiz v. Canopy Growth Corporation*, 537 F. Supp. 3d 621, 678 (D.N.J. 2021) (stating that an approval of financial statements by an independent auditor "weighs heavily against scienter").

### 2. Verizon Implementing FIOS Network and Replacing Existing Copper Infrastructure

Plaintiffs claim that the "content and context" of statements made by Ellis, Malady, and Gowen (*see* Compl. ¶¶ 312, 315, 318, 320, 322, 324, 326) were misleading and show scienter because they stated that Verizon would replace its existing copper infrastructure while omitting that the infrastructure was encased with lead. (Opp'n pp. 44, 45.) Defendants reply that the "content and context" of the statements reflect "nothing specific to lead-sheathed cables, but instead referred to the fiscal and environmental benefits of replacing copper cable with fiber-optic cable, which is more energy efficient." (Reply p. 9.)

I agree with defendants for the reasons stated in section III.B.1. The "content and context" of these statements show that an inference that Ellis, Malady, and Gowen made the statements without scienter is more compelling than an inference that they did. *See Avaya, Inc.*, 564 F.3d at 267-68.

### 3. Verizon's Cable Infrastructure is its Core Operation

Plaintiffs assert once again that Verizon's cables were sheathed with lead and because cable infrastructure is Verizon's "core operation and chief business driver since the early 2000s," scienter arises due to defendants' failure to raise the toxicity of those cables. (Opp'n pp. 45, 46.) Defendants counter that Verizon's wireless service is the core operation of the business. (Reply p. 10.) Defendants further claim that even if lead-sheathed cables were Verizon's core operation, plaintiff failed to sufficiently allege an inference of scienter under the core business doctrine. (*Id.* pp. 10, 11.)

The core operations doctrine provides that when misrepresentations and omissions involve "'core matters of central importance" to the corporate defendant, "a 'core operations inference' supports scienter." *Avaya, Inc.*, 564 F.3d at 268. But "a corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter." *Rahman*, 736 F.3d at 247. Rather, there must be "some additional allegations of specific information conveyed to management and related to fraud." *Id.* Here, plaintiffs claim that Verizon's core business operation is its cabling infrastructure. (Opp'n p. 45.) The parties dispute that cabling is Verizon's core business operation. Notwithstanding whether that is true, plaintiffs fail to demonstrate scienter.

As referenced above, the allegations in the Complaint inferring scienter onto Ellis, Malady, and/or Gowen is not as compelling as an inference that they acted without scienter. The core operations doctrine on its own is not sufficient to establish scienter. *In re: Enzymotec Sec. Litig.*, No. 14–05556, 2015 WL 8784065, at *18 (D.N.J. Dec. 15, 2015). Moreover, plaintiffs fail to allege that there was "specific information conveyed to management and related to fraud." *See Rahman*, 736 F.3d at 247. Plaintiffs also do not allege in the Complaint that defendants Ellis, Malady, and/or Gowen specifically received information related to the alleged liability of the lead-sheathed copper cables and nonetheless omitted that information in their statements concerning the cost benefits of removing copper cables and implementing fiber cables. Thus, plaintiffs' reliance on the core operations doctrine to impute scienter onto Ellis, Malady, and Gowen because the substance of their statements involved cabling, a core operation, falls short. *See Nat'l Junior Baseball League*, 720 F. Supp. 2d at 556 ("[I]t is not automatically assumed that a corporate officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest

that the officer had knowledge of the fact in question."); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d at 539 (rejecting "allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading").

### 4.   Individual Defendants have Knowledge that Contradicted their Statements

Plaintiffs contend that the individual defendants are high ranking officers within Verizon who had access to information related to lead-sheathed cables and must have had knowledge of complaints by a union concerning deteriorated lead cables. (Opp'n pp. 47, 48). While plaintiffs assert the individual defendants contradicted their statements (*id.*), defendants argue that that the statements were not contradictory, but even if they were, the mere access to information contradicting their statements is insufficient to support scienter. (Reply p. 11.) Concerning the union complaints, defendants argue that defendants "would have no reason to think that these public filings reflected a risk of liability, let alone one so large as to be material to Verizon in light of its over \$130 billion in annual revenue." (*Id.*)

In addition to the reasons set forth in prior sections rejecting plaintiffs' argument that an inference of scienter is as compelling as an inference that scienter is not present, the individual defendants merely having access to information related to Verizon's lead-sheathed cables is insufficient to show scienter. *See Roofer's Pension Fund*, 2018 WL 3601229, \*19 (finding that defendants merely having access to publicly available reports is not as compelling as a competing inference that defendants did not act with scienter).

### 5.   Individual Defendants' Duty to Monitor

Plaintiffs argue that the individual defendants "were responsible for monitoring Verizon's adherence to regulations and compliance with environmental and worker safety laws as they related to potential toxic effects

stemming from its lead-sheathed cables." (Opp'n p. 48.) Defendants claim that "there is no allegation that anyone at Verizon, any other company, or the efficient market believed that the well-known existence of lead-sheathed cables—including those abandoned in place—created a risk of material liability." (Reply p. 12.) Here, plaintiffs claim that because the individual defendants had a duty to monitor Verizon's compliance with lead-sheathed cables, they had knowledge that the lead-sheathed cables created enormous liability to Verizon and its investors.

Plaintiffs' claim is entirely speculative. As stated above, the Complaint does not allege that any of the individual defendants had actual knowledge of the liability associated with lead cables, that they believed the liability was so material that omitting information relating to it would be misleading, and nevertheless omitted that information.

### D. Section 20(a)

Plaintiffs also assert claims for control person liability under Section 20(b) against defendants Vestberg, Ellis, Malady, Gowen, and Skiadas. (Compl. ¶¶ 447–457.) "Section 20(a) … imposes joint and several liability on any individual who exercises control over a 'controlled person' who violates Section 10(b)." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (quoting 15 U.S.C. § 78t(a). The three elements to this claim are: "(1) the defendant controlled another person or entity; (2) the controlled person or entity committed a primary violation of the securities laws; and (3) the defendant was a culpable participant in the fraud." *Id.* Thus, "liability under Section 20(a) is contingent upon sufficiently pleading an underlying violation of Section 10(b) by the controlled person." *Id.*

Because plaintiffs failed to sufficiently plead a violation of Section 10(b) against defendants, plaintiffs' Section 20(a) claim cannot survive. *See id.*

29

## IV.   CONCLUSION

The complaint will be dismissed without prejudice as to all defendants. Plaintiffs are granted leave to file a third amended complaint within 21 days of this Opinion.   If plaintiffs file another amended complaint, plaintiffs must assert *all* their allegations as to misrepresentation and scienter of the speaker/defendant of a particular statement(s) immediately following the statement(s) plaintiffs allege violate Section 10(b) and Rule 10-5(b).   *See OFI Asset Management v. Cooper Tire & Rubber*, 834 F.3d 481, 491–493 (3d Cir. 2016) (affirming a district court's decision to grant a motion to dismiss the complaint and direct plaintiff in an amended complaint to focus plaintiff's arguments on five specific allegations of misstatements, and stating that district courts have substantial discretion to manage complex disputes and that the complaint in question presented "an extraordinary challenge for application of the highly particularized pleading standard demanded by the PSLRA.") Like the Complaint, plaintiffs shall group similar statements into sections and assert their allegations related to misrepresentation and scienter proceeding those statements.   Plaintiffs may reference prior allegations when alleging, following the statements in question, that the allegation supports a finding of scienter and/or misrepresentation.   In sum, plaintiffs must connect their allegations of scienter and misrepresentation with statements made by a particular defendant.   An appropriate order will accompany this opinion.

*/s/ Edward S. Kiel*
**EDWARD S. KIEL**
**UNITED STATES DISTRICT JUDGE**

Date: March 31, 2025

# Exhibit C

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| STICHTING PENSIOENFONDS METAAL EN TECHNIEK, *et al.*,<br><br>**Plaintiffs,**<br><br>v.<br><br>VERIZON COMMUNICATIONS, INC., *et al.,*<br><br>**Defendants.** | Case No. 23–cv–05218–ESK–AMD<br><br><br>**ORDER** |

**THIS MATTER** having come before the Court on defendants' motion to dismiss (Motion) (ECF No. 58) the corrected amended class action complaint (Complaint) (ECF No. 57); and plaintiffs having filed an opposition to the Motion (ECF No. 61), to which defendants filed a reply in further support of the Motion (ECF No. 70); and for the reasons stated in the accompanying opinion,

**IT IS** on this   **31st** day of **March 2025**   **ORDERED** that:

1.   The Motion is **GRANTED.** Plaintiff's claims are **dismissed without prejudice**.

2.   Plaintiffs are granted leave to file by **April 21, 2025** an amended complaint that cures the deficiencies noted in the accompanying opinion.  To the extent plaintiff seeks to amend the complaint beyond the scope of the Court's opinion, plaintiff must file a motion for leave to amend. *See* Fed. R. Civ. Pro. 15; L. Civ. R. 15.1.  If plaintiffs do not file an amended pleading in the allotted time the Complaint will be dismissed with prejudice.

3.   The Clerk of the Court is directed to terminate the Motion at ECF No. 58.


_/s/ Edward S. Kiel_
EDWARD S. KIEL
UNITED STATES DISTRICT JUDGE