IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| IN RE AT&T INC. SECURITIES LITIGATION | § § § § § § | Civil Action No. 3:24-CV-01196-N |

## <u>MEMORANDUM OPINION AND ORDER</u>

This Order addresses Defendants AT&T Inc., Randall Stephenson, John Stankey, Pascal Desroches, John Stephens, and Jeffrey McElfresh's (collectively, "Defendants") motion to dismiss [70]. Because the Court concludes that Lead Plaintiffs Teachers' Retirement System of the City of New York, New York City Employees Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, and Board of Education Retirement System of the City of New York (collectively, "Plaintiffs") have failed to state a claim under the rigorous requirements of the Public Securities Litigation Reform Act ("PSLRA"), the Court grants the motion and dismisses all claims without prejudice. The Court further grants Plaintiffs leave to amend their complaint within thirty days of this Order.

## I. ORIGINS OF THE DISPUTE

This is a putative class action under federal securities law on behalf of all persons and entities, other than Defendants, that purchased or otherwise acquired AT&T Inc. ("AT&T") securities between July 28, 2018, and July 26, 2023 (the "Class Period"). *See*

Pls.' First Am. Compl. ¶ 1 [64] ("FAC").[1]  On July 9, 2023, the Wall Street Journal ("WSJ") published an exposé titled "America Is Wrapped in Miles of Toxic Lead Cables" that stated "AT&T, Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead . . . .  As the lead degrades, it is ending up in places where Americans live, work and play."  *Id.* ¶ 241.  The story further reported that the telecom companies knew about the lead cables, their risks, and the potential for lead to leach into the environment but failed to act on these potential risks or take efforts to monitor the cables. *Id.*

Historically, the use of lead-lined transmission cables was an industry standard practice.  *Id.* ¶ 115.  By 1978, it was recognized that lead-lined cables were in wide use across the country, although they were no longer being used in new installations.  *See id.* ¶ 118.  As of July 2023, AT&T still owned approximately 200,000 miles of lead cables around the country, about one-third of which is located on aerial utility poles or underwater. *Id.* ¶ 125.  The other two-thirds are either buried or located within conduit.  *Id.*  Frontline AT&T workers from various geographies report encountering lead cables that tend to be concentrated in older urban areas such as Dallas and Milwaukee.  *See id.* ¶ 123.  One worker estimates that roughly 80% of the cables in Dallas, including those used on aerial utility poles, are covered in lead.  *Id.*  In Chicago, most of the aerial cables are found in heavily populated neighborhoods.  *Id.*  WSJ investigators tested samples from various areas near lead lined cables, including 130 underwater cable sites, a playground, and in front of

_____

[1] For purposes of this motion, the Court assumes the truth of all well-pleaded facts in the FAC.

a school. FAC ¶ 241. All of these samples contained lead that seemingly leached from the cables. *Id.* The WSJ team found that aerial lead cables run alongside more than one hundred schools, while more than one thousand schools are within a one-half of a mile of an underwater lead cable. *Id.*

AT&T stock fell 2.18% the day after the WSJ story first broke. *Id.* ¶ 399. After additional reporting raised alarm over AT&T's potential exposure for the lead cables, AT&T stock further declined to its lowest level since March 1993. *See id.* ¶¶ 406–07. Plaintiffs bring this lawsuit under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 against AT&T and several of its executives. *Id.* ¶¶ 485–91. Plaintiffs allege that various statements about AT&T's efforts to retire its old telecom lines were materially false or misleading as to the risks AT&T faced from this widespread and deteriorating network of lead-lined cables. *See id.* ¶ 278. Plaintiffs also assert a claim under Section 20(a) of the Securities and Exchange Act against Stephenson, Stankey, Stephens, Desroches, and McElfresh (collectively, "Individual Defendants") as control persons of AT&T. *Id.* ¶¶ 492–97.

### A. Statements on Cost Savings

Over the course of the class period, Defendants made several statements about how retiring the old copper transmission lines would help reduce costs. *See, e.g.*, *id.* ¶¶ 281, 290, 293, 295, 304–06, 317. Plaintiffs contend these statements are false or materially misleading in that they fail to apprise investors of the fact that AT&T's shutdown strategy,

involving leaving lead-lined wires in place, was likely to expose AT&T to significant and costly scrutiny, liability, and reputational harm. *Id.* ¶ 280.

### B.  Statements on Environmental Stewardship

Next, Defendants made several statements about AT&T's commitment to responsible waste management, and specifically the proper disposal of hazardous wastes. *See, e.g.*, *id.* ¶¶ 331, 336, 343.  Plaintiffs contend these statements are false or materially misleading because they fail to disclose the existence of the lead-lined cables, that they are being left in place, and that they are known to leach lead into the environment. *Id.* ¶ 332.

### C.  Statements on Employee Health and Safety

Next, Defendants made statements about AT&T's commitment to complying with environmental, health, and safety ("EHS") laws, training employees on EHS, and continuously evaluating EHS compliance.  *See, e.g.*, *id.* ¶¶ 361–62, 368–70.  Plaintiffs contend that these statements are materially false or misleading because they fail to reveal that many employees who worked on lead-lined cables did not receive appropriate lead safety trainings, AT&T did not implement controls to ensure proper EHS compliance, and the work performed on these cables released lead into the environment without proper abatement protocols. *Id.* ¶ 363.

### D.  Risk Statements

Finally, Defendants made multiple statements about risks that could impact AT&T's business, including risks that "[n]etwork service enhancements . . . may not occur as scheduled or at the cost expected" or that failure to manage and execute AT&T's "business transformation initiatives" could adversely affect AT&T's financial condition or

competitive position. *See, e.g.*, *id.* ¶¶ 384, 387. Plaintiffs contend these statements are false or misleading because they did not disclose the existence of, or risks associated with, the lead-lined cables and therefore that the risk of not completing network upgrades at the expected cost was more than hypothetical. *Id.* ¶ 386.

Defendants now move to dismiss all claims against them for failure to state a claim. Defs.' Mot. 1 [70].

## II. LEGAL STANDARDS

### A. Rule 12(b)(6)

When deciding a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995). A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To meet this "facial plausibility" standard, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012). But a plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

In ruling on a Rule 12(b)(6) motion, a court generally limits its review to the face of the pleadings, accepting as true all well-pleaded facts and viewing them in the light most favorable to the plaintiff. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). However, a court may also consider documents outside of the pleadings if they fall within certain limited categories. First, a "court is permitted . . . to rely on 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.'" *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). Second, a "written document that is attached to a complaint as an exhibit is considered part of the complaint and may be considered in a 12(b)(6) dismissal proceeding." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007). Third, a "court may consider documents attached to a motion to dismiss that 'are referred to in the plaintiff's complaint and are central to the plaintiff's claim.'" *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)). Finally, in "deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994); *see also, e.g., Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (stating, in upholding district court's dismissal pursuant to Rule 12(b)(6), that the "district court took appropriate judicial notice of publicly-available documents and transcripts produced by the FDA, which were matters of public record directly relevant to the issue at hand").

### B. Rule 9(b)

Section 10(b) claims are subject to Rule 9(b), which requires that plaintiffs alleging fraud or mistake state their claims with particularity. *Owens v. Jastrow*, 789 F.3d 529, 534–35 (5th Cir. 2015). Specifically, plaintiffs must set forth the "who, what, when, where, and how" of the events constituting fraud or mistake. *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). Plaintiffs also must "distinguish among those they sue and enlighten each defendant as to his or her particular part in the alleged fraud." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) (emphasis omitted). Allegations against defendants as a group, without more specific connections between an individual defendant and an allegedly fraudulent act, should be disregarded. *Owens*, 789 F.3d at 537–38. Other inference-based allegations, such as pleading based on a defendant's position or common knowledge alone are similarly too vague. *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432–33 (5th Cir. 2002); *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 432 (S.D. Tex. 2020), *aff'd*, 858 F. App'x 162 (5th Cir. 2021) (unpub.).

Conditions of a person's mind may be alleged generally, FED. R. CIV. P. 9(b), and the particularity standard may be relaxed where "the facts relating to the alleged fraud are peculiarly within the perpetrator's knowledge." *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 385 (5th Cir. 2003). But courts pay careful attention to allegations made on information and belief to ensure this exception is not misused as a "license to base claims of fraud on speculation and conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (quoting *Wexner v. First*

*Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).  The "complaint must set forth a factual basis for such belief."  *Willard*, 336 F.3d at 385.

### C.  Section 10(b), Rule 10b-5, and the PSLRA

Section 10(b) of the Securities and Exchange Act, codified at 15 U.S.C. § 78j(b), empowers the Securities and Exchange Commission to prescribe rules and regulations to protect the public from manipulative and deceptive securities practices.  Rule 10b-5, implementing Section 10(b), makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Violations require scienter, which is a "mental state embracing intent to deceive, manipulate, or defraud."  *Mun. Emps.' Ret. Sys. v. Pier 1 Imps., Inc.*, 935 F.3d 424, 429–30 (5th Cir. 2019) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007)).  "Both intent and 'severe recklessness' are sufficient."  *Id.* at 430 (quoting *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)).  There is "considerable overlap among the subsections of the Rule," *Lorenzo v. SEC*, 587 U.S. 71, 80 (2019), but subsection (b) focuses on false statements and omissions, whereas scheme liability under (a) and (c) concerns conduct.  *See SEC v. Mapp*, 240 F. Supp. 3d 569, 585

(E.D. Tex. 2017); *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *18 (D.N.J. 2020). Thus, pleading each type of claim varies only slightly.

The elements of a private Rule 10b-5(b) claim are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss. *Owens*, 789 F.3d at 535 (citing *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009)). Similarly, Rule 10b-5(a) and (c) claims "require allegations 'that the defendant (1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase of sale, and (4) that the defendant's actions caused the plaintiff's injuries.'" *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701, 720 (N.D. Tex. 2018) (quoting *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 678 n.45 (S.D. Tex. 2006)).

The PSLRA further heightens the pleading requirements in two ways. First, plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Second, plaintiffs must, "with respect to each act or omission . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A). The latter "alters the usual contours of a Rule 12(b)(6) ruling" by requiring courts to "take into account plausible inferences opposing as well as supporting

a strong inference of scienter." *Cotter v. Gwyn*, 2016 WL 4479510, at *6 (E.D. La. 2016) (quoting *Lormand*, 565 F.3d at 239). When viewing the allegations holistically, the inference must be "cogent and compelling, not merely reasonable or permissible, in light of other explanations." *Id.* (cleaned up).

### D.  Section 20(a)

Section 20(a) of the Securities and Exchange Act "makes those who control others who violate section 10(b) jointly and severally liable 'unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.'" *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 791 (S.D. Tex. 2012) (quoting 15 U.S.C. § 78t(a)). Thus, adequately pleading a primary violation is a prerequisite to stating a control person claim. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 221 (5th Cir. 2023). Additionally, plaintiffs must allege "that the controlling person had actual power over the controlled person and induced or participated in the alleged violation." *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d at 791. But unlike Rule 10b-5 claims, section "20(a) claims are subject only to the pleading requirements of Rule 8, not the heightened requirements of Rule 9(b)." *Id.* Once plaintiffs have pled a primary violation with sufficient particularity, they "need only provide the defendant fair notice of the [control person] claim and the basis of the allegations." *Id.* (citing *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 620 (5th Cir. 1993)).

III.  **THE COURT GRANTS DEFENDANTS' MOTION TO DISMISS BECAUSE PLAINTIFFS' ALLEGATIONS FAIL TO CREATE A STRONG INFERENCE OF SCIENTER**

To state a valid claim under Rule 10b-5, Plaintiffs must allege facts giving rise to a strong inference that the Defendants acted with intent to deceive, manipulate, or defraud, or severe recklessness. *Pier 1*, 935 F.3d at 429–30. Here, Defendants argue that Plaintiffs have failed to meet this high bar for multiple reasons including the use of impermissible group pleading and offering weak, generalized allegations of motive. Defs.' Mot. 8. Reviewing the complaint, the Court agrees.

### A.  *Plaintiffs Rely on Improper Group Pleading*

Plaintiffs must "distinguish among those they sue and enlighten *each defendant* as to his or her particular part in the alleged fraud." *Southland*, 365 F.3d at 365 (emphasis in original). Allegations against the Defendants as a group, without more specific connections between an Individual Defendant and an allegedly fraudulent statement, should be disregarded. *Owens*, 789 F.3d at 537–38. Scienter must be shown as to each Defendant, and group allegations "are not properly imputable as to any particular defendant." *Id.* at 537. Here, Plaintiffs rely on allegations that (1) are statements found in unsigned "Issue Briefs" attributed only to AT&T; and (2) attribute knowledge of various facts to a group or to nondefendant individuals. These allegations are insufficient to support an inference of scienter as to any defendant.

First, the challenged statements that come from AT&T's "Issue Briefs" fail to support scienter because they are not attributed or connected to any individual speaker. Across seventy-two paragraphs of the complaint, Plaintiffs challenge specific statements

alleged to be materially false or misleading.  Thirty-five of these challenged statements are found in Issue Briefs published on the AT&T website.  *See* FAC ¶¶ 329–31, 335–37, 341–43, 345–47, 349–51, 357–59, 361–62, 364–66, 368–70, 372–74, 376–78, 380–82.   In reciting each of these statements, the complaint does not attribute or connect any of them to an Individual Defendant — only to AT&T.  *See id.*  Accordingly, these statements are not actionable because they fail to draw the requisite connection needed to establish scienter.  *See Southland*, 365 F.3d at 365 (requiring "specific factual allegations link[ing] the individual to the statement at issue").

Plaintiffs argue that these Issue Briefs are, in fact, attributed.  Pls.' Resp. 25.  However, the Court disagrees.  Plaintiffs point to the fact that AT&T issues a yearly Corporate Sustainability Report ("CSR"), each of these CSRs contains an introductory letter from AT&T's CEO, and they also refer readers to the Issue Briefs.  *See id.*  However, the fact that the CSRs contain an introductory letter by the CEO (Stephenson or Stankey) may not even make the core statements within the CSRs attributable to the CEO, much less the statements within the obliquely referenced Issue Briefs.  *See Southland*, 365 F.3d at 366 (stating corporate scienter as to a statement is shown by the state of mind of the individual making it, ordering or approving it, or furnishing information for inclusion).  And even if the CSRs' statements can be attributed to the CEO, that does not necessarily mean the Issue Briefs are also attributed.  Here, the connections between the CSRs and the Issue Briefs are attenuated at best.  The CSRs discuss various subject matters, and often at the end of a section, include a note in the margin that states something like: "Read more in our Climate

Change issue brief at [URL]." *See, e.g.*, Pls.' Appx. 154 [73-1].[2]  This is a far cry from adopting or reasserting the statements in the Issue Briefs.  And it is not enough for the Court to conclude that the introducing CEO ordered or approved everything in the Issue Briefs based on these minor references.  Accordingly, the issue briefs are unattributed and are therefore not sufficient to support a strong inference of scienter for any Defendant.

Second, many other allegations in the complaint attribute knowledge of facts to groups of people or lower-level employees — not Individual Defendants — and therefore do not raise an inference of scienter.  The FAC frequently refers to groups like "leadership," the "EHS group," "AT&T" generically, and other nonspecific referents.  *See, e.g.*, FAC ¶¶ 124, 143, 149, 197.  These allegations, when taken as true, paint a picture of what happened "on the ground" at AT&T with regard to the lead-lined cables.  But they fail to make any connection between those facts and any Individual Defendant's mental state, as required to state a claim for securities fraud.  *See In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 651 (S.D. Tex. 2021) ("The plaintiffs cannot simply point to the fact that some other person at the corporation knew of facts that make the statement misleading and impute that knowledge to the speaker.").  Accordingly, without such a connection, these allegations do not support a strong inference of scienter here.

---

[2] The Court may consider the contents of the CSRs at this stage because they are explicitly referenced in the complaint.  *See* FAC ¶ 68 (describing statements in the 2018 CSR); ¶ 71 (stating the CSRs expressly refer investors to the Issue Briefs).

MEMORANDUM OPINION AND ORDER – PAGE 13

**B.  The Allegations of Motive are Insufficient to Establish Scienter**

Plaintiffs allege two general motives for suppressing information about lead-lined cables: (1) the need to reduce costs after AT&T "increased its net debt to over $180 billion to acquire two financially disastrous businesses," FAC ¶ 435, and (2) the desire for the executives to increase their incentive compensation, *Id.* ¶ 441.  Neither of these alleged motives are sufficient to create or support an inference of scienter here.

First, the desire to reduce costs is a motivation held by all businesses and is so generic as to not be actionable.  *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 860 (rejecting the use of "universal corporate motives").  The Fifth Circuit has also doubted that even a motive tied to the ultimate survival of the business could establish scienter alone.  *See Owens*, 789 F. 3d at 539.  Here, Plaintiffs allege that the cost reduction initiatives at AT&T were prompted by activist shareholders worried about "a deterioration in the performance of AT&T's stock" — not the ultimate survival of the business as a whole.  *See* FAC ¶ 426.  Accordingly, the cost reduction motive allegations are not enough to create a strong inference of intent to deceive, manipulate, or defraud in this case, even when viewed holistically with the other allegations.

Second, the Fifth Circuit has clearly stated that incentive compensation "can hardly be the basis on which an allegation of fraud is predicated.  On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations." *Tuchman*, 14 F.3d at 1068; *see also Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *6 (N.D. Tex. 2022) (Godbey, C.J.) (noting that "compensation structure arguments . . . cannot create an inference of scienter alone").  And

viewed in the context of the remaining factual allegations, the Court cannot conclude that a motive to increase incentive compensation in this case is strong enough to support or enhance any inference of scienter.

### C. *The Allegations About Each Individual Defendant Fail to Establish Scienter*

Reviewing the remaining allegations as to each Individual Defendant, the Court concludes that the FAC fails to establish the requisite strong inference of scienter to support securities fraud claims. The alleged facts generally establish that the Individual Defendants knew that (1) AT&T was retiring copper wirelines in place, (2) some of these wires contained lead, and (3) lead is generally harmful. But the complaint fails to allege any facts showing the Individual Defendants were aware of any widespread environmental contamination risk or employee health issues that could reasonably result in material risk to the company. Without such belief of material risks (or severe recklessness as to those risks) no inference of scienter is supported.

#### 1. *Defendant Stankey* — The plurality of Plaintiffs' individualized allegations

relate to John Stankey, AT&T's COO from October 2019 through June 2020 and CEO since July 1, 2020. *See* FAC ¶ 20. Plaintiffs allege he made multiple actionable statements about AT&T's transition from copper to fiber and the cost savings the transition was expected to create. Specifically, they challenge statements he made on analyst calls and at conferences as well as statements in 10-K forms he signed. For example, Plaintiffs challenge the following statement in AT&T's 10-K form for fiscal year 2020: "We continue to transform our operations to be more efficient and effective, reinvesting savings into growth areas of the business. We are restructuring businesses, sunsetting legacy networks, . . . and

reassessing overall benefit costs. We expect continued savings from these initiatives." FAC ¶ 285. To establish Stankey's state of mind, Plaintiffs allege that (1) Stankey admitted the use of lead cables was "well understood" and "has long been known" at AT&T; (2) he personally analyzed the legacy network to decide whether to "reclaim" old lines; (3) he knew lead was an environmental toxin; (4) Stankey led the team that decided to "reclaim" the copper wires and therefore must have known AT&T retired lead cables in place; (5) Stankey was told that the careless disposal of lead "can pose reputational and legal risks" to AT&T; and (6) he knew the risks were materializing because of a lawsuit over lead cables in Lake Tahoe. *See* Pls.' Resp. 21–25.

Reviewing these contentions, the Court concludes they are insufficient to raise a strong inference that Stankey knew of or was severely reckless in failing to disclose material risks to AT&T stemming from these lead-lined cables. First, the Court cannot draw an inference of scienter from the allegations that Stankey led the team tasked with reclaiming copper wire. Generally, "it is well established that an officer's position on its own is insufficient to support an inference of scienter." *Yoshikawa*, 2022 WL 4677621, at *3 (citing *Abrams*, 292 F.3d at 433). And while it may seem that leading the team that reclaimed copper would necessarily impart operational knowledge of the reclamation details, the complaint only pleads that Stankey led an "enterprise-wide cost-reduction initiative" of which cutting costs in the wireline business was one element. *See* FAC ¶¶ 426–29. Similarly, the complaint does not plead that Stankey personally analyzed the legacy network — instead Plaintiffs allege he was "fully engaged [in] doing data analysis" across "all aspects of [AT&T's] operations." FAC ¶ 427. Leading a broad-brush cost-

cutting endeavor is the kind of high-level activity executives regularly engage in, and thus does not itself raise a strong inference that Stankey personally knew the details of AT&T's wireline transition project and any material risks that could be associated with it.

And as to the allegation Stankey was told that careless disposal of lead "can pose reputational and legal risks" to AT&T, the complaint pleads this fact in the context of the disposal of lead-acid batteries in 2011. *See* FAC ¶¶ 168–73. This statement does not show that Stankey had any knowledge that the lead-lined cables at issue here were being disposed of carelessly in a way that would create obvious risks to AT&T. And similarly, knowledge of one lawsuit involving lead cables in Lake Tahoe does not establish knowledge of severe risks. Knowledge of one lawsuit in one area, with a disputed factual basis, does not impart knowledge that the entire lead cable network was subject to material risks.

Thus, regardless of whether Stankey knew in the abstract that lead was a hazard to the environment or to AT&T's employees, the complaint fails to allege Stankey was ever provided information or believed that these lead cables were emitting lead into the environment in any widespread way that could pose severe risks to the business. Reviewing the complaint holistically, the Court cannot say there is a strong inference of intent to defraud or severe recklessness as to Stankey — instead, the Court recognizes the at least slightly more persuasive inference that Stankey truthfully believed AT&T's wireline transformation would reduce costs and had no information that would give notice of severe risks in that effort.

**2. Defendant McElfresh —** Plaintiffs also challenge a number of statements about the copper transition from Jeffrey McElfresh, AT&T's COO since April 2022 and the CEO

of AT&T Communications before that.  *See* FAC ¶ 22.  Similar to Stankey, McElfresh made multiple statements about the expected cost savings coming from AT&T's efforts to retire its copper wireline network.  For example, Plaintiffs challenge the following statement McElfresh made on March 11, 2022, at an AT&T Analyst & Investor Day:

> I've mentioned simplicity and focus.  These are good ways to think about what we're doing to transform our legacy or copper network footprint and all the fixed and variable costs that go along with running and maintaining a very large copper network . . . .  Reducing the legacy fixed cost and associated trailing expenses and migrating these customers to fiber and 5G solutions maintains our margins . . . .  This program is in the early days of gaining scale, and we're getting to the point where the cost savings are materializing . . . . These actions not only drive cost efficiencies, but they're opening up more opportunity that is meaningful for our future.

FAC ¶ 304.  And in support of scienter, Plaintiffs assert the same theories as for Stankey — that McElfresh knew about the retire-in-place strategy, knew that the cables had lead, and knew that lead was generally harmful.  *See* Pls.' Resp. 21–24.  However, for the same reasons as discussed for Stankey, the allegations here fail to create a strong inference of scienter.  Taken together, the FAC's allegations do not show that McElfresh had any intent to defraud or deceive, or even severe recklessness.  Instead, just as for Stankey, the Court finds it more persuasive that McElfresh truthfully believed the copper transition initiatives would lead to cost savings and had no reason to believe there was any severe risk to AT&T's business from that project.

      *3.*    ***Defendants Desroches, Stephens, and Stephenson*** **—** Plaintiffs further challenge some statements by Defendants Pascal Desroches, John Stephens, and Randall Stephenson that relate to the copper transition or statements of risks.  *See* FAC ¶¶ 287, 297,

308, 315 (Desroches); ¶¶ 285, 301 (Stephens); ¶ 384 (Stephenson and Stephens).  Each of these statements has to do with the potential cost savings associated with transitioning away from copper cable products.  *See id.*  And Plaintiffs rest their theories of scienter for these defendants on even fewer allegations than those applicable to Stankey or McElfresh.  *See, e.g.*, Pls.' Resp. 24 ("Desroches provided frequent and detailed disclosures about the cost benefits of removing copper, showing he had 'substantial familiarity' with the topic." (citation omitted)); FAC ¶ 426 (noting Stephenson stated he would personally oversee the "enterprise-wide cost-reduction initiative").  For the same reasons already discussed, the Court does not find a strong inference that these defendants had any intent to defraud, deceive, or manipulate or acted with severe recklessness as to any risks to AT&T's business.  The complaint's allegations instead lead the Court to conclude that the competing inference is at least somewhat more plausible.

Then, because the Court concludes that the Complaint fails to plausibly allege scienter as to any Individual Defendant, the Court must also then conclude that scienter is lacking for the corporate defendant, AT&T.  *See Southland*, 365 F.3d at 366 (stating courts should look at the "state of mind of the individual" who makes the statement in determining corporate scienter).  The Court accordingly dismisses all claims against all defendants for failure to allege scienter. [3]

---

[3] In addition to asserting lack of scienter, falsity, and materiality, Defendants argue that certain statements must be dismissed under the five-year statute of repose codified in 28 U.S.C. § 1658(b).  *See* Defs.' Mot. 31.  However, the Court declines to dismiss on this basis.  For the 2017 form 10-K, Plaintiffs allege the misstatements were later incorporated by reference in future documents.  *See* FAC ¶ 385.  Having been reasserted within the repose period, the claims based on the substance of these statements are not blocked by the

# IV. FALSITY AND MATERIALITY

Rule 10b-5 makes unlawful "any untrue statement of a material fact" or omission of a material fact when otherwise the statement is misleading. 17 C.F.R. § 240.10b-5. A fact is material if there is a substantial likelihood that a reasonable investor would have placed significance on the withheld or misrepresented information. *Southland*, 365 F.3d at 362 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988)). To satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standards, Plaintiffs must set forth why a statement is false or misleading. *See id.* While materiality "typically presents a mixed question of fact and law," making it ultimately "a decision for the jury," *In re Venator Materials*, 547 F. Supp. 3d at 655, Plaintiffs cannot survive a motion to dismiss without setting forth facts that make materiality at least plausible. *Lormand*, 565 F.3d at 257 ("Asking for such plausible grounds to infer the element of a claim *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal that the elements of the claim existed." (emphasis in original) (quoting *Twombly*, 550 U.S. at 556) (cleaned up)). Defendants argue

---

statute. And for the July 2018 EHS Issue Brief, there is a dispute of fact over the publication date that is not appropriate for decision on a motion to dismiss. *See* Pls.' Resp. 18 (noting the Issue Brief gives only an "updated" date, and that date is within the repose period). Defendants further challenge whether Plaintiffs have adequately pled loss causation for any bond transactions because "there is no allegation that the price of any of the bonds dropped." *See* Defs.' Mot. 32. However, Plaintiffs sufficiently allege that they "acquired AT&T securities at artificially inflated prices," these securities dropped in price in the fallout of the WSJ report, and that caused loss to Plaintiffs. *See* FAC ¶¶ 16, 468. The allegations do not limit the definition of "AT&T securities" to just common stock, and the use of the broad term is sufficient to put Defendants on notice that all AT&T securities are in play. Accordingly, the Court declines to dismiss on this basis.

that Plaintiffs have not carried their burden to set forth facts demonstrating that some statements and omissions they challenge were both false and material.  *See* Defs.' Mot. 19–20.

## A.  Statements on Cost Savings Are Actionable

Plaintiffs challenge numerous statements by the various defendants about expected cost savings from the transition away from copper, and the reclamation of that copper material.  *See, e.g.*, FAC ¶ 295 (challenging statement by Stankey that AT&T is "taking cost out of the business based on fiber replacement to old infrastructure"); ¶ 293 (challenging McElfresh's statement that decommissioning copper network "takes cost out and helps grow margin").  Over the course of these statements, the Individual Defendants at AT&T repeatedly touted that their initiatives for retiring, replacing, or reclaiming copper wireline would help reduce AT&T's overall cost burden.  Plaintiffs allege these statements are false and misleading because:

> these statements gave the false impression that AT&T's legacy infrastructure would not be phased out in a manner that would create costly scrutiny, liability, and reputational harm, but failed to disclose that: (i) its legacy wireline network contained hundreds of thousands of miles of cables covered in toxic lead sheathing in aerial and underground locations across the United States; (ii) this form of sheathing was known to leach lead particles into the surrounding environment over time or otherwise release lead particles when disturbed through physical contact; (iii) many such cables were abandoned in place and no longer maintained by the Company thereafter; (iv) workers routinely performed service on such cables in a manner that released lead particles into the air without proper abatement precautions; and, thus, (v) it was reasonably likely that the Company would incur substantial costs in connection with legislative actions, regulatory enforcement, investigative

> efforts, removal, remediation, litigation, and/or related
> penalties.

FAC ¶ 280.  Defendants argue that these, and other statements like it, cannot be false or materially misleading because they are statements of opinion, Plaintiffs fail to explain how certain facts being omitted made them misleading, and because they are protected by the PSLRA's safe harbor.  Defs.' Mot. 21–25.  However, viewing the complaint in the light most favorable to the Plaintiffs, the Court concludes that these statements are actionable.

First, Plaintiffs do plead with sufficient particularity how the challenged statements are false or misleading.  As quoted above, Plaintiffs plead the complete chain of inferences necessary to connect the statements about cost savings to the alleged material liability from lead-lined cables.  *See* FAC ¶ 280.  This is sufficiently particular to survive this motion to dismiss.

Second, these statements about cost savings of the copper transition are mostly not opinions.  "An opinion is a belief, a view, or a sentiment which the mind forms of persons or things," while a "fact is a thing done or existing or an actual happening."  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) (cleaned up).  Many of the challenged statements about cost savings are not shrouded in language like "I believe" that could transform them into opinions.  When discussing the state of AT&T's business, Defendant Stankey matter-of-factly stated "we are taking cost out of the business based on fiber replacement to old infrastructure."  FAC ¶ 295.  This is plainly not an opinion, but a statement about what is actually happening in the business's books at that moment in time.  Thus, this statement is an actionable statement of fact.  Other

statements like "[w]e are . . . sunsetting legacy networks" are also phrased not as opinions but statements of current happenings. *See* FAC ¶ 285. And as recited above, Plaintiffs plead a sufficient inferential chain explaining why they believe this statement is misleading. Accordingly, many of the statements about the copper transition are actionable fact statements.[4] However, even when viewed in the light most favorable to Plaintiffs, some of the challenged statements fail to state any "thing done or existing or an actual happening" and therefore must be dismissed on this basis.[5] For example, Stankey's statement that "we believe we can further accelerate cost take-outs as we progress through the year . . . [p]art of this entails transforming our network as we ultimately replace our copper services," FAC ¶ 323, is much closer to a statement of personal opinion, not a statement of fact and is therefore not actionable.

Third, these statements about cost savings are not protected by the PSLRA safe harbor. The safe harbor provision protects some forward-looking statements, and it has two independent prongs. First, Defendants will not be held liable for immaterial statements or for forward-looking statements that are identified as such and are accompanied by cautionary language. 15 U.S.C. § 78u-5(c)(1)(A). Second, to evade the safe harbor, plaintiffs must properly plead that the forward-looking statement was made with actual knowledge that it was false and misleading. *Id.* § 78u-5(c)(1)(B). Unlike with the scienter requirement, severe recklessness does not suffice. The safe harbor provision is

---

[4]*See* FAC ¶¶ 281, 283, 285, 287, 289, 290, 291, 293, 295, 297, 299, 301, 302, 304, 305, 308, 312, 315, 317, 318, 320, 321, 324, 326, 327.
[5]*See* FAC ¶¶ 279, 306, 310, 313, 323.

MEMORANDUM OPINION AND ORDER – PAGE 23

"disjunctive"; it may apply even when a plaintiff adequately alleges that the speaker had such knowledge if meaningful cautionary language was provided, and it also may apply even without that language if the plaintiff fails to allege facts sufficient to satisfy the second prong. *Carlton v. Cannon*, 184 F. Supp. 3d 428, 453 (S.D. Tex. 2016). To qualify for the safe harbor provision, forward-looking statements must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially" from those described. 15 U.S.C. § 78u-5(c)(1)(A). Courts must determine how each statement is "specifically and meaningfully" protected. *Lormand*, 565 F.3d at 245. Boilerplate cautionary language does not suffice. *Id.* at 244–45.

Here, many of the challenged statements are not sufficiently forward looking to trigger the safe harbor. As pled by the Plaintiffs, many of the challenged statements on cost savings present the cost-savings idea as a present happening. *See, e.g.*, FAC ¶ 293 (stating "as of today, we're probably about 2,000 square miles of our copper network that's been decommissioned . . . and that takes cost out that helps grow margin"). Statements like this are not forward looking, because they convey information about present circumstances of which the truth is discernible at the time the statement is made. *See Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 591 (N.D. Tex. 2004) (Godbey, J.); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014) (noting that a "mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present").

Then, those statements that could be viewed as purely forward looking do not include sufficient cautionary language. The cautionary language proffered by defendants

is entirely boilerplate. *See, e.g.*, Defs.' Mot. Ex. H, at Appx. 34 [70-1] ("First, just reminding everybody of the safe harbor. Some of the information we'll discuss is subject to risks and uncertainties and refer to our website for more information."). This is a far cry from the challenged statements being "specifically and meaningfully protected." *See Lormand*, 565 F.3d at 245. And even the more detailed cautionary language in the 10-K forms is still functionally a boilerplate "litany of generally applicable risk factors," as opposed to a "realistic description of the risks applicable to the particular circumstances." *See id.* (quoting *Southland*, 365 F.3d at 372). For example, the 2020 Form 10-K employs the following language when discussing potential risks from lawsuits:

> We have in the past been, and may in the future be, named as a defendant in lawsuits, claims and other legal proceedings that arise in the ordinary course of our business based on alleged acts of misconduct by employees. These actions seek, among other things, compensation for alleged personal injury (including claims for loss of life), workers' compensation, employment discrimination, sexual harassment, workplace misconduct, wage and hour claims and other employment-related damages, compensation for breach of contract, statutory or regulatory claims, negligence or gross negligence, punitive damages, consequential damages, and civil penalties or other losses or injunctive or declaratory relief. The outcome of any allegations, lawsuits, claims or legal proceedings is inherently uncertain and could result in significant costs, damage to our brands or reputation and diversion of management's attention from our business.

Defs.' Mot. Ex. B, at Appx. 8. Defendants refer to this provision in arguing that cost-savings statements are protected. *See* Defs.' Mot. 23. This language, listing numerous categories of different possible lawsuit natures and legal claims, even simply stating "statutory or regulatory claims," is so broad as to be boilerplate. Because there is not

MEMORANDUM OPINION AND ORDER – PAGE 25

adequate cautionary language from which the Court can say the challenged statements are specifically and meaningfully protected, the Court concludes the PSLRA safe harbor does not apply to the statements about cost savings from the copper transition.

### B. Some Statements on Environmental Stewardship Are Actionable

Next, Defendants argue that the challenged statements about environmental stewardship are not actionable because they are either immaterial or they are not alleged to be false. The Court generally agrees.

First, many of the challenged statements in this category are simply generalized positive goals that are therefore immaterial. For example, Plaintiffs challenge the following statement found in an Issue Brief: "We are committed to reducing waste in our operations and responsibly handing the waste that we produce." FAC ¶ 329. This is a vague, optimistic statement that amounts to little more than puffery or corporate cheerleading and is therefore immaterial. *See In re BP p.l.c. Sec. Litig*, 852 F. Supp. 2d at 748. This, and each statement like it in the FAC, must therefore be dismissed for failing to plead materiality.[6]

Next, many of the statements refer to AT&T's general environmental initiatives, and as pled, do not purport to apply these general initiatives to every part, or any particular part, of AT&T's wireline network practices. For example, Plaintiffs challenge the statement that AT&T "manage[s] programs to reclaim and divert high-value network resources such as copper telecommunications wire." FAC ¶ 331. Plaintiffs argue that this statement is

---

[6] *See* FAC ¶¶ 329, 333, 335, 339, 341, 345, 349, 353, 357.

misleading because it fails to disclose the existence of the lead-lined cables along with the retire-in-place strategy and attendant environmental risks. *Id.* ¶ 332. However, despite these allegations, the statement that AT&T manages reclamation programs is not alleged to be literally false, nor does it purport to say AT&T reclaims *all* its copper wire. Accordingly, this statement, and others like it, fail to plead falsity.[7] *See In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 620 (S.D. Tex. 2018) ("Allegations that Plains was ineffective in implementing its policies . . . do not make the general statements describing Plains's policies and priorities actionably misleading.").

However, three of the challenged environmental statements are sufficient to survive this motion to dismiss. Specifically, Plaintiffs challenge the statement: "When AT&T vacates facilities and outside plant infrastructure, our teams remove all regulated materials and coordinate with vendors to recycle and dispose of the materials in an appropriate manner." FAC ¶¶ 350, 359. They further challenge the statement: "Hazardous waste is disposed in landfills, incinerated and recycled." FAC ¶ 337. These statements are plausibly alleged to be false, as Plaintiffs claim that AT&T would vacate wirelines (by ceasing to use them) but instead of removing lead (a regulated material), AT&T would simply leave the wires in place while knowing they were likely to leach lead into the environment. *See* FAC ¶ 332. At this stage, these allegations are sufficient to establish falsity for these statements.

---

[7] *See* FAC ¶¶ 330, 331, 336, 342, 343, 346, 347, 351, 354, 355, 358.

### C.  Statements on Employee Health and Safety Are Not Actionable

Next, Defendants argue that the challenged statements about employee health and safety are not actionable because they are neither false nor material.  Defs.' Mot. 27–28.  The Court agrees.  First, like with the environmental allegations, many of the statements here are nothing more than generalized positive goals or corporate cheerleading.  *See, e.g.*, FAC ¶ 361 (challenging statement that AT&T is "committed to complying with all applicable environment, health and safety laws and regulations and to maintaining and improving management systems throughout the company").  Statements like this are immaterial and therefore do not support a securities fraud claim.[8]  Then, the remaining statements are nothing more than assertions that AT&T trains its employes on EHS topics and that AT&T monitors its EHS performance on a regular basis.  *See, e.g.*, FAC ¶ 366 (stating "we evaluate our EHS performance through regular reviews and internal and external audits").  While Plaintiffs allege these statements are false based on the specific failures of EHS programs related to lead cables, Plaintiffs do not plead that AT&T had no EHS training or engaged in no EHS performance monitoring.  Without such allegations, these statements fail to allege a false statement of material fact.[9]  *See In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d at 620.

### D.  Statements on Potential Risks Are Not Actionable

Finally, Defendants argue that the challenged statements about potential risks are not actionable because Defendants owed no duty to disclose potential investigations before

---

[8] *See* FAC ¶¶ 361, 364, 368, 372, 376, 380.
[9] *See* FAC ¶¶ 362, 365, 366, 369, 370, 373, 374, 377, 378, 381, 382.

they began. The Court agrees. Plaintiffs challenge various risk disclosure statements by Defendants. *See, e.g.*, FAC ¶ 393 ("Unfavorable litigation or governmental investigation results could require us to pay significant amounts or lead to onerous operating procedures. We are subject to a number of lawsuits both in the United States and foreign countries . . . ."). Plaintiffs argue these statements are false or misleading because "AT&T was already defending several lawsuits arising from its use and/or abandonment of lead-covered cables" and therefore the risks were more than hypothetical. *See* FAC ¶ 386. However, the Court concludes that these statements fail to support a securities fraud claim. To be actionable, forward-looking statements must be false when made. *See Southland*, 365 F.3d at 378. And statements can be misleading where they take presently materializing risks and pose them as a mere hypothetical future risk. *See Marcus v. J.C. Penney Co.*, 2015 WL 5766870, at *3 (E.D. Tex. 2015). But in the above statement, AT&T specifically disclosed that it was presently subject to lawsuits, but that the unknown future outcome may be onerous. Thus, the above statement and those like it were not false when made, because they were warning about future risks that had not yet materialized — the outcome of litigation.[10]

And similarly, the remaining statements, which generally warn that network enhancements may not occur with the expected level of cost, are not actionable either. As discussed in the sections about scienter, there is no sufficient allegation that would permit the inference that any Defendant knew of or believed in a material risk to AT&T's business

---

[10] *See* FAC ¶¶ 390, 391, 393, 394.

MEMORANDUM OPINION AND ORDER – PAGE 29

from the lead-lined cables. And there is no plausible allegation that during the class period there were any significant, unexpected costs materializing from the wireline transition project. Accordingly, the asserted risk statements about future potential costs were not false when made and therefore not actionable.[11]

### V. THE COURT GRANTS THE MOTION TO DISMISS THE SCHEME-LIABILITY CLAIM

In addition to asserting a misstatement claim under Section 10(b) and Rule 10b-5, Plaintiffs also passingly reference a scheme-liability claim. *See* FAC ¶ 486. Defendants move to dismiss this claim, and Plaintiffs did not make any argument in response that is specific to a scheme-liability claim. *See* Defs.' Mot 30–31. Additionally, the Court notes that Rule 10(b) requires Plaintiffs to separately plead a scheme-liability claim if it is in any way distinct from their misstatement claim. *Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 687 (N.D. Tex. 2023). Because Plaintiffs have not provided any argument to the contrary, and the Court sees no distinct alleged facts supporting a scheme liability claim, the Court dismisses this claim without prejudice.

### VI. THE COURT GRANTS THE MOTION TO DISMISS THE CONTROL PERSON CLAIM

Plaintiffs finally assert a control person claim under Section 20(a) of the SEC act. *See* FAC ¶¶ 492–97. However, having dismissed all other substantive claims, the Court concludes that no sufficient primary violation is adequately pled for a Section 20(a) claim to remain. *See Linenweber*, 693 F. Supp. 3d at 688. Thus, the Court dismisses Plaintiff's control-person claim without prejudice.

---

[11] *See* FAC ¶¶ 384, 385, 387, 388.

## CONCLUSION

For the reasons stated above, the Court grants Defendants' motion to dismiss and dismisses all Plaintiffs' claims without prejudice. The Court further grants Plaintiffs leave to amend their complaint within thirty (30) days of the date of this Order. If Plaintiffs do not amend their complaint within thirty days, the Court will dismiss all claims with prejudice without further notice.

Signed June 16, 2025.

_____

David C. Godbey
Chief United States District Judge