**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

IN RE AT&T INC. SECURITIES
LITIGATION

Case No. No. 3:24-cv-01196-N

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ..........................................................................................................................1

BACKGROUND AND PROCEDURAL HISTORY.....................................................................3

    A.    The FAC Brought Well-Supported Claims Against Defendants.............................3

    B.    The Court Held That the FAC Adequately Alleged Several Misstatements but Failed to Plead Scienter for Them ..................................................................5

    C.    The Amendments Cure the Defects and Add New Scheme Claims........................6

ARGUMENT...................................................................................................................................7

I.     PLAINTIFFS STATE A SECTION 10(B) CLAIM FOR MISSTATEMENTS ................7

    A.    Plaintiffs Adequately Allege Misstatements and Omissions of Material Fact ........7

        1.    The Statements on Waste Disposal Remain Actionable.............................7

        2.    The Statements on Cost Savings Remain Actionable.................................8

    B.    Plaintiffs Plead Facts That Raise a Strong Inference of Scienter .........................12

        1.    The Amendments Remedy the Group Pleading Issues in the FAC...........13

        2.    Plaintiffs Continue to Plead Compelling Individualized Motives.............15

        3.    The Individualized Facts Raise a Strong Inference of Scienter.................16

        4.    Plaintiffs Adequately Plead Scienter for AT&T.......................................22

II.    PLAINTIFFS STATE A SECTION 10(B) CLAIM FOR SCHEME LIABILITY ...........22

    A.    Plaintiffs Allege Deceptive Conduct ....................................................................23

    B.    Plaintiffs Raise a Strong Inference of Scienter......................................................24

    C.    Defendants Cannot Dispute All Other Elements are Satisfied ..............................25

III.   PLAINTIFFS STATE A CONTROL PERSON CLAIM UNDER SECTION 20(A).......25

CONCLUSION..............................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)..................................................................................................9, 25

*Borteanu v. Nikola Corp.*,
    2023 WL 11017679 (D. Ariz. Dec. 8, 2023) ...............................................................23, 25

*In re BP p.l.c. Sec. Litig.*,
    922 F. Supp. 2d 600 (S.D. Tex. 2013) ..........................................................................14, 15

*In re Cassava Scis., Inc. Sec. Litig.*,
    2023 WL 3442087 (W.D. Tex. May 11, 2023) ..................................................................9, 10

*In re Concho Res. Inc. Sec. Litig.*,
    2023 WL 2297425 (S.D. Tex. Feb. 23, 2023) ................................................................10, 21

*In re Danimer Sci., Inc. Sec. Litig.*,
    2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023) .........................................................................13

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) ...................................................................................................12

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
    514 F. Supp. 3d 942 (S.D. Tex. Jan. 19, 2021)......................................................................24

*Gebhardt v. ConAgra Foods, Inc.*,
    335 F.3d 824 (8th Cir. 2003) ..................................................................................................12

*Gen. Elec. Co. v. Jackson*,
    595 F. Supp. 2d 8 (D.D.C. 2009), *aff'd*, 610 F.3d 110 (D.C. Cir. 2010) ................................12

*Goodson v. Nasco Healthcare Inc.*,
    2024 WL 4829487 (N.D. Tex. Nov. 19, 2024)........................................................................9

*Halford v. AtriCure, Inc.*,
    2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)........................................................................11

*Heinze v. Tesco Corp.*,
    971 F.3d 475 (5th Cir. 2020) ...................................................................................................11

*Highland Cap. Mgmt., L.P. v. Highland Cap. Mgmt. Servs., Inc.*,
    2021 WL 7540296 (N.D. Tex. Dec. 7, 2021) ........................................................................8, 9

*Lee v. Active Power, Inc.*,
    29 F. Supp. 3d 876 (W.D. Tex. 2014)......................................................................................22

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)..................................................................................11

*Lorenzo v. SEC*,
    587 U.S. 71 (2019)..............................................................................................................23

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ........................................................................................10, 12

*In re Lumen Techs., Inc. Sec. Litig. II*,
    2025 WL 978229 (W.D. La. Mar. 14, 2025) ....................................................................12, 18

*Malouf v. SEC*,
    933 F.3d 1248 (10th Cir. 2019) ...........................................................................................23

*Masel v. Villarreal*,
    924 F.3d 734 (5th Cir. 2019) ...............................................................................................20

*McLemore v. Lumen Techs., Inc.*,
    No. 25-30264 (5th Cir. 2025) ..............................................................................................18

*McNamara v. Bre-X Mins. Ltd.*,
    197 F. Supp. 2d 622 (E.D. Tex. 2001).....................................................................................9

*In re Netsolve, Inc. Sec. Litig.*,
    185 F. Supp. 2d 684 (W.D. Tex. 2001)..................................................................................20

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) ........................................................................................ *passim*

*Peck v. Asset Mgmt. Assocs., LLC*,
    2018 WL 6573116 (N.D. Tex. Oct. 12, 2018)..........................................................................8

*Ret. Sys. of Gov't of Virgin Is. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)................................................................................................19

*Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019) ...............................................................................................16

*SEC v. Das*,
    2011 WL 4375787 (D. Neb. Sept. 20, 2011)...........................................................................13

*SEC v. Jaitley*,
    2023 WL 9105678 (W.D. Tex. Nov. 13, 2023).......................................................................25

*SEC v. Johnson*,
    986 F.3d 63 (1st Cir. 2021)..................................................................................................16

*SEC v. Mueller*,
  2024 WL 400897 (W.D. Tex. Jan. 11, 2024) ..............................................................23

*SEC v. Rio Tinto*
  *plc*, 41 F.4th 47 (2d Cir. 2022)................................................................................23

*SEC v. Sequential Brands Grp., Inc.*,
  2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021).........................................................24

*SEC v. Verges*,
  716 F. Supp. 3d 456 (N.D. Tex. Feb. 9, 2024) ........................................................22

*SEC v. World Tree Fin., LLC*,
  43 F.4th 448 (5th Cir. 2022) .....................................................................................9

*In re Sioux, Ltd. Sec. Litig.*,
  914 F.2d 61 (5th Cir. 1990) ......................................................................................9

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
  365 F.3d 353 (5th Cir. 2004) ..............................................................................13, 22

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014) ...............................................................................16, 18

*Stichting Pensioenfonds Metaal en Techniek v. Verizon Commc'ns, Inc.*,
  775 F. Supp. 3d 826 (D.N.J. 2025) ...........................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..................................................................................................12

*Utah Ret. Sys. v. McCollum*,
  2023 WL 8649878 (5th Cir. Dec. 14, 2023) ............................................................15

*In re Walmart Inc. Sec. Litig.*,
  151 F.4th 103 (3d Cir. 2025) ....................................................................................11

*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)............................................................23

*Yoshikawa v. Exxon Mobil Corp.*,
  2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)............................................... *passim*

*Yoshikawa v. Exxon Mobil Corp.*,
  2023 WL 5489054 (N.D. Tex. Aug. 24, 2023)....................................................22, 23

*Yoshikawa v. Exxon Mobil Corp.*,
  2024 WL 3802997 (N.D. Tex. Aug. 12, 2024)....................................................22, 25

**Rules**

17 C.R.F. § 240.10b-5.................................................................................... *passim*

Fed. R. Civ. P. 15...............................................................................................2, 25

**Other Authorities**

32 Moore's Federal Practice § 34.1 (3d ed. 1997)........................................................12

**TABLE OF DEFINED TERMS**

| Defined Term | Definition | Cross Reference |
|---|---|---|
| AT&T | AT&T Inc. | SAC at 1 |
| Baby Bells | Seven independent regional operating companies formed in connection with the breakup of the Bell System in 1984 | SAC ¶ 54 |
| Bell System | The monopoly of local telephone operating companies operated by Legacy AT&T | SAC ¶ 52 |
| CEO | Chief Executive Officer | SAC ¶ 18 |
| CERCLA | The Comprehensive Environmental Response, Compensation, and Liability Act of 1980 | SAC ¶ 123 |
| Class | All persons or entities other than Defendants that purchased or otherwise acquired AT&T securities during the Class Period | SAC ¶ 1 |
| Class Period | July 28, 2018 to January 11, 2024, both dates inclusive | SAC ¶ 1 |
| CSR Report | Corporate sustainability and responsibility report | SAC ¶ 73 |
| Defendants | AT&T and the Individual Defendants | SAC at 1 |
| Desroches | Defendant Pascal Desroches | SAC ¶ 21 |
| DIRECTV | DirecTV, LLC | SAC ¶ 60 |
| DOJ | U.S. Department of Justice | SAC ¶ 11 |
| EHS | Environmental, health, and safety | SAC ¶ 37 |
| EPA | Environmental Protection Agency | SAC ¶ 11 |
| ESG | Environmental, social, and governance | SAC ¶ 71 |
| Exchange Act | The Securities Exchange Act of 1934 | SAC ¶ 1 |
| Exhibits | Exhibits attached to the accompanying Declaration of Justin D. D'Aloia | n/a |
| FAC | First Amended Class Action Complaint for Violations of the Federal Securities Laws | Dkt. 64 |
| FCC | Federal Communications Commission | SAC ¶ 195 |
| GPC | The Goveranance and Policy Committee of AT&T's Board | SAC ¶ 81 |
| Individual Defendants | Defendants Stephenson, Stankey, Stephens, Desroches | SAC at 1 |
| Issue Brief | ESG disclosures published by AT&T on topics identified as most important by its stakeholders | SAC ¶ 75 |
| Lake Tahoe Action | *California Sportfishing Protection Alliance v. Pacific Bell Telephone Company*, 2:21-cv-00073 (E.D. Cal.) | SAC ¶ 220 |
| McElfresh | Defendant Jeffrey S. McElfresh | SAC ¶ 22 |
| MTD | Defendants' Motion to Dismiss Second Amended Class Action Complaint and Brief in Support | Dkt. 95 |
| Order | Memorandum Opinion and Order | Dkt. 90 |
| Plaintiffs | Teachers' Retirement System of the City of New York, the New York City Employees Retirement System, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, and the Board of Education Retirement System of the City of New York | SAC at 1 |
| PSLRA | Private Securities Litigation Reform Act of 1995 | n/a |

| RCRA | The Resource Conservation and Recovery Act of 1976 | SAC ¶ 119 |
|---|---|---|
| SAC | Second Amended Class Action Complaint for Violations of the Federal Securities Laws | Dkt. 91 |
| SEC | U.S. Securities and Exchange Commission | SAC at 1 |
| Stankey | Defendant John T. Stankey | SAC ¶ 20 |
| Stephens | Defendant John  J. Stephens | SAC ¶ 19 |
| Stephenson | Defendant Randall L. Stephenson | SAC ¶ 18 |
| Superfund | Informal name for CERCLA | SAC ¶ 123 |
| TAC | Third Amended Class Action Complaint for Violations of the Federal Securities Laws | Dkt. 96 |
| WarnerMedia | Warner Media, LLC | SAC ¶ 61 |
| *WSJ* | *Wall Street Journal* | SAC ¶ 3 |

## **INTRODUCTION**

There is real fraud here.  In July 2023, the *WSJ* shocked everyone—law makers, regulators, and investors alike—when it revealed that AT&T left a sprawling web of obsolete copper telephone cables across the United States that were covered in highly toxic lead, dangerous amounts of which accumulated on or in nearby homes, schools, and sources of public drinking water.[1]  Within weeks, the DOJ and EPA launched investigations.  AT&T later confessed that there were ***200,000 miles*** of the cables remaining in its network, including over ***65,000 miles*** hanging in busy cities, like Dallas.  As investors absorbed this news, AT&T's stock price plunged to its lowest level in three decades.

During the Class Period, AT&T ***chose*** to abandon this toxic trash as it was displaced by a new network of fiber optic lines.  After spending $175 billion to enter the media and entertainment business, AT&T's cash use came under intense scrutiny and Defendants decided to "reclaim" unused copper cable for resale but, as before, they continued to pass over the sections wrapped in lead.  Defendants kept this brazen and high-risk practice a secret for obvious reasons.

In July 2025, the Court held that the First Amended Complaint [Dkt. 64] ("FAC") adequately alleged that several groups of statements were false or misleading, including those touting the cost benefits of retiring copper as AT&T moved to fiber and others in the "Issue Brief" accompanying its annual ESG report assuring that all regulated material was removed and recycled from retired copper cables.  But the Court held that the FAC's scienter allegations were insufficient because the Issue Briefs were not attributed to anyone other than AT&T and the inference of scienter for the remaining statements was "slightly" less persuasive than the opposing inference because the facts showed that Defendants only knew of isolated, abstract risks as opposed to any "widespread" risk.  It also held that the FAC did not contain any facts support a "scheme" claim under SEC Rule 10b-5.

---

[1] All capitalized terms have the same meaning ascribed to them in the Second Amended Class Action Complaint for Violations of the Federal Securities Laws, filed July 16, 2025 [Dkt. 91] (the "SAC"), as reproduced in the Table of Abbreviations set forth above.  Citations to "Ex." refer to the exhibits attached to the accompanying Declaration of Justin D. D'Aloia.  Unless otherwise noted, all internal citations are omitted, and all emphasis is added.

The SAC added new facts that cured these defects.  But, sure enough, Defendants protested in their motion to dismiss [Dkt. 95] ("MTD") that the same issues persisted.  In response, Plaintiffs exercised their one-time right to amend under Rule 15(a)(1) and filed the Third Amended Complaint [Dkt. 96] ("TAC") to interpose new facts learned since filing the SAC that put the lie to Defendants' baseless arguments and confirm that Plaintiffs state meritorious claims for securities fraud.

Together, the amendments make clear that AT&T's two CEOs, Randall Stephenson and John Stankey, personally authorized the Issue Briefs and chose to refer to them in AT&T's ESG reports; lead cables were left to rot in place because it was too costly to safely remove them; Defendants knew the *full extent* of defunct lead cables AT&T left to decompose across the country as it pulled out copper for resale even though they were on notice lead was a toxic contaminant that needed to be recycled; and, as such, it was painfully apparent that this covert practice posed substantial risks to AT&T on an immense scale.  If the difference between the competing inferences was "slight" before, they certainly sit in equipoise—if not invert to a substantial degree—now.

Plaintiffs also bring new scheme claims against several actors who helped facilitate the fraud, including John Malone, the expert who designed AT&T's lead policies and confided in colleagues lead cables were abandoned because "AT&T didn't want to spend the money to do the right thing."

In the MTD, Defendants ask this Court to infer there was never any risk because no one else raised concerns over AT&T's practice and none have come to pass.  That logic is bogus.  No one outside AT&T raised concerns because no one knew.  And it is unsurprising the risks have not yet "come to fruition."  A Superfund investigation—which the EPA has confirmed is moving forward—is an extraordinarily prolonged process.  It will likely be a decade or more until AT&T is called upon to finance the cleanup of its mess.  AT&T should not benefit from that bottleneck.

The MTD should be denied in its entirety so discovery can commence without further delay.

## BACKGROUND AND PROCEDURAL HISTORY

### A.    The FAC Brought Well-Supported Claims Against Defendants

Plaintiffs filed the FAC on July 8, 2024.  [Dkt. 64.]  The FAC brought claims against Defendants under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5(b) for making false and misleading statements between July 28, 2018, and July 26, 2023.  ¶¶ 485-97.  As detailed therein, the claims arose from the failure to disclose that AT&T chose to actively abandon in place the parts of its vast "legacy" network of old copper telephone cables that were wrapped in lead, a severely dangerous toxin, as it transitioned to a new network made of fiber optic cables.  *Id.* ¶¶ 2-12.

Until it was phased out in the 1950s, lead was the standard protective "sheathing" for copper telephone cables and used by the Bell System to build the nation's telephone network.  *Id.* ¶¶ 115-17.  As a Baby Bell, AT&T had lead cables in its network since the outset and continued to add more as it acquired other Baby Bells.  *Id.* ¶¶ 119-20.  Indeed, AT&T admitted in July 2023 that there was ***200,000 miles*** remaining, including over ***65,000 miles*** exposed on poles and underwater.  *Id.* ¶ 125.

This is no trivial matter.  Lead releases undetectable particles which slowly accumulate in the body and can cause catastrophic damage, sometimes fatal.  *Id.* ¶¶ 84-87.  In fact, lead sheathing was phased out in the 1950s for that very reason.  *Id.* ¶ 3.  Since then, the federal government has taken a series of well-known steps to ban its continued use in paint, gasoline, and water systems.  *Id.* ¶¶ 90-96.  For similar reasons, the handling of lead is highly regulated under applicable environmental laws, including the principal federal law governing the disposal of hazardous waste, the RCRA.  *Id.* ¶¶ 106-13.  Lead is subject to the RCRA because it has been classified by the EPA as a "toxic" waste, a type of material that "may be able to leach from waste and pollute groundwater."  *Id.* ¶ 110.

Nevertheless, the lead-covered copper cables remained in use by AT&T.  *Id.* ¶ 63.  As demand for high-speed service took off, AT&T launched a project in 2014 to build a fully fiber network in the 21 states it served.  *Id.* ¶¶ 64, 139.  By the start of the Class Period, AT&T had

constructed a new network comprising 1 million miles of fiber optic cables. *Id.* ¶ 66.

Yet, as they were displaced by fiber, AT&T chose to retire the lead cables by simply vacating them across the country. *Id.* ¶¶ 140-43. AT&T doubled down on this practice after its cash management came under scrutiny. By September 2019, John Stankey and Jeff McElfresh were tasked with identifying $10 billion in savings to address concerns raised by investors after AT&T spent $175 billion to acquire DIRECTV and WarnerMedia. *Id.* ¶¶ 56, 426-28. Through that review, they decided to "reclaim" retired copper for resale but, as before, those covered in lead were left in place. *Id.* ¶¶ 142, 428-30. The decision was purely financial. *Id.* ¶¶ 140, 144. The two continued to oversee this work through the end of the Class Period. *Id.* ¶ 430.

Defendants not only knew lead cables were abandoned in place but also aware of the dangers they posed. AT&T routinely reported lead as a "hazardous waste" under the RCRA. *Id.* ¶¶ 184-90. Defendants repeatedly certified they understood the human and environmental dangers associated with lead. *Id.* ¶¶ 418-25. They were told by investors that mismanaging lead could expose AT&T to extensive liabilities. *Id.* ¶¶ 166-73. Indeed, AT&T faced lawsuits for abandoning its lead cables, at least one of which, the Lake Tahoe Action, was brought to the attention of Stankey. *Id.* ¶¶ 198-224.

Shockingly, however, Defendants consistently concealed this practice in their disclosures. The FAC alleged that doing so made Defendants' statements on four broad topics false or misleading: (1) the cost benefits of shifting from copper to fiber; (2) AT&T's environmental steward-ship; (3) employee health and safety; and (4) certain risk statements. *Id.* ¶¶ 278-395.

In July 2023, the *WSJ* published a series of stories on lead cables based on an exhaustive 18-month investigation. *Id.* ¶¶ 226-42, 272, 400, 404, 406, 408. The *WSJ* uncovered thousands of miles of decaying lead cables across the country near homes, playgrounds, and parks; environmental contamination exceeding permissible standards near such cables, especially exposed aerial cables;

and extensive evidence showing that the large telecom companies, including AT&T, were fully aware of the environmental and human health hazards posed by these cables. *Id.* ¶¶ 226-42.

News of these cables took everyone by surprise. Senior telecom analysts said they "never" heard of them. *Id.* ¶ 398. Four former chairs of the FCC, the nation's wireline regulator, said they were similarly ***unaware***. *Id.* ¶ 242. Indeed, the *WSJ* investigation began because the reporter who first learned the issue, a telecom expert, "never heard of lead cables." *Id.* ¶ 227. Investors were shocked too. *Id.* ¶ 398. Within weeks, the DOJ and EPA both launched investigations. *Id.* ¶ 256.

The market's reaction was severe: AT&T's stock price sharply declined after each of these disclosures. *Id.* ¶¶ 397-409. All told, it traded down to its lowest level in *30 years*. *Id.* ¶¶ 10, 407.

**B.    The Court Held That the FAC Adequately Alleged Several Misstatements but Failed to Plead Scienter for Them**

On September 6, 2024, Defendants moved to dismiss the FAC for failing to plead a false or misleading statement, scienter, or loss causation. [Dkt. 70.] On June 16, 2025, the Court entered an Order (the "Order") granting the motion without prejudice. [Dkt. 90.] The Court held that the employee safety and risk statements were not false or misleading, but that most of the cost savings statements and the representations in AT&T's Issue Briefs claiming that it removed and recycled all regulated material were actionable based on the facts alleged. Order at 20-30. It also rejected Defendants' loss causation challenge. *Id.* at 19 n.3. The Court granted the motion for failing to plead a strong inference of scienter. *Id.* at 11. Specifically, the Court held that (1) the FAC relied on improper group pleading by failing to attribute the statements in AT&T's Issue Briefs to any party and describing the knowledge of various groups or nonparties; and (2) the individualized allegations for the remaining misstatements, including the motive allegations, failed to raise a strong inference of scienter. *Id.* at 11-19. On balance, the nonculpable inference was "slightly" or "somewhat" more persuasive than the inference of scienter based on the facts in the FAC. *Id.* at 17, 19. Although no

- 5 -

such claims were asserted at the time, the Court, at Defendants' request, also found that the FAC did not plead any facts supporting a claim for "scheme" liability under Rule 10b-5(a) & (c). *Id.* at 30.

### C.    The Amendments Cure the Defects and Add New Scheme Claims

Plaintiffs filed the SAC on July 16, 2025.  [Dkt. 91.]  The SAC repeats nearly all the same allegations in the FAC but adds allegations to address the defects identified by the Court, including new facts which: (1) establish that Stephenson and Stankey were directly involved in the preparation and approval of AT&T's annual CSR Report and its associated Issue Briefs (SAC ¶¶ 72-81); (2) bolster the conclusion that the inference of scienter is at least as likely as the opposing inference (SAC ¶¶ 155-56, 219, 222, 230, 285, 457, 466-68, 495-96); and (3) confirm that the risks hidden by Defendants' fraud have continued to materialize through the present (SAC ¶¶ 275, 286-97, 430-31).

Defendants moved to dismiss the SAC.  [Dkt. 95.]  In response, Plaintiffs exercised their right to amend once as of right and filed the TAC on October 6, 2025 [Dkt. 96], to interpose new facts learned since the SAC was filed which further evince Defendants' scienter, including:

- extensive EHS documentation prepared by John Malone that warned about the extent of lead cables remaining in AT&T's legacy network and their regulated status (¶¶ 173-78);

- detailed reports sent to Defendants specifying the amount of lead cables AT&T abandoned in place as it reclaimed copper for salvage value (¶¶ 227-30);

- shocking admissions by Malone that lead cables were abandoned because senior executives "didn't want to spend the money to do the right thing" (¶¶ 233-35);

- a videorecorded kickoff event in January 2023 attended or viewed by Defendants where a senior executive described lead cables as an "environmental hazard" (¶¶ 261-64); and

- a directive to leave lead cables in place following a meeting with John Stankey soon after AT&T was contacted by the *WSJ* for comment on its story (¶¶ 269-71).

The TAC also asserts scheme claims against several actors within AT&T, including Melissa Arnoldi, Keith Korte, and John Malone, all of whom either approved the Issue Briefs that contained the false statements or were complicit in the fraud.  *Id.* ¶¶ 89, 93, 261-64, 270, 562-69.

## ARGUMENT

### I. PLAINTIFFS STATE A SECTION 10(B) CLAIM FOR MISSTATEMENTS

To state a claim under Rule 10b-5(b), a plaintiff must allege: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection to a security transaction; (4) reliance; (5) economic loss; and (6) loss causation. *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 206 (5th Cir. 2023). Defendants dispute only elements (1) and (2).

#### A. Plaintiffs Adequately Allege Misstatements and Omissions of Material Fact

The Court has already sustained (1) several statements on waste disposal and (2) most of the statements on the cost savings yielded by retiring copper as AT&T transitioned to a new network made of fiber technology. Defendants present no sound reason to depart from those rulings.

##### 1. The Statements on Waste Disposal Remain Actionable

The Court has already held that three statements made in the Waste Management Issue Brief, published as a supplement to AT&T's annual CSR Report, were adequately alleged to be false in the FAC. Order at 27. Specifically, those in FAC ¶¶ 337, 350, 359 in which AT&T represented that "[w]hen AT&T vacates . . . outside plant infrastructure, our teams remove all regulated materials and coordinate with vendors to recycle and dispose of the materials" and that "[h]azardous waste is disposed in landfills, incinerated and recycled." *Id.* As the Court held, those statements were false since "AT&T would vacate wirelines (by ceasing to use them) but instead of removing lead (a regulated material), AT&T would simply leave the wires in place." *Id.* [2] The SAC alleges the same statements are false for the same reasons. SAC ¶¶ 357, 370, 379. Plaintiffs respectfully note that nearly identical statements about the disposal of hazardous waste are also set forth in SAC ¶¶ 363, 367, 371, 378. Nevertheless, Defendants continue to challenge these allegations. MTD at 18-19.

---

[2] In August 2024, *i.e.*, a month after the FAC was filed, AT&T revised its Waste Management Issue Brief to no longer say that "our teams remove *all* regulated materials." Ex. A. Then, in April 2025, after briefing was completed on Defendants' first motion to dismiss, AT&T renamed the topic to "Circularity" and replaced the relevant statement altogether with a new one which said "100% of the copper *we reclaim* is recycled." Ex. B.

As an initial matter, Defendants fail to meet the high bar for reconsideration.  They do not identify a manifest error of law or newly discovered facts.  Instead, they argue that (1) the statements are not specific to lead cables; and (2) there is no support for the conclusion that vacated lead cables constitute hazardous waste.  *Id.*  But both could have raised in their "original motion."  *Highland Cap. Mgmt., L.P. v. Highland Cap. Mgmt. Servs., Inc.*, 2021 WL 7540296, at \*2 (N.D. Tex. Dec. 7, 2021) (Godbey, J.); *see also Peck v. Asset Mgmt. Assocs., LLC*, 2018 WL 6573116, at \*2 (N.D. Tex. Oct. 12, 2018) (Godbey, J.) (denying reconsideration because "litigants are expected to advance their strongest arguments the first time a court considers the case").  Indeed, they raised both arguments to justify dismissal of ***other*** statements in the ***same*** Waste Management Issue Brief.  [Dkt. 70 at 26-27.]

In any case, Defendants' arguments fail on the merits.  As the Court held, the statements specifically refer to "***all*** regulated material" on retired copper cable and lead is undeniably a regulated material.  Order at 27.  Similarly, retired lead is "hazardous waste."  SAC ¶¶ 119-21, 188-93.  Defendants' outcry that the SAC fails to substantiate the contention that abandoned lead cable qualifies as such is mystifying.  It specifies that "abandonment" is equivalent to "disposal" according to ***the EPA***.  *Id.* ¶ 121.  In fact, the TAC recites internal documents which make clear that even AT&T believed that hazardous materials, like "lead sheath," turn into hazardous waste when it is "no longer useful or valuable to its owner."  TAC ¶ 176.  Accordingly, John Malone, AT&T's lead expert, specifically referred to abandoned lead cable as "hazardous waste."  SAC ¶ 168.

### 2.    The Statements on Cost Savings Remain Actionable

The Court also held that most of the statements touting the cost benefits of retiring copper as AT&T transitioned to fiber were false and misleading.  Order at 21-26.  As the Court concluded, "Plaintiffs plead the complete chain of inferences necessary to connect the statements about cost savings to the alleged material liability from lead-lined cables" and are, thus, "misleading."  *Id.* 22-23.  The SAC alleges the same statements are false for the same reasons.  SAC ¶¶ 299-380.  Here too

Defendants spill much ink in an effort to convince the Court that it was wrong.  MTD at 19-25.

As above, Defendants trip at the threshold.  They primarily argue that (1) they had no duty to disclose since lead cables comprised only 10% of the legacy network; (2) many disclosures include accurate statements of historical fact; (3) issuers need not predict future liabilities; (4) the risk of adverse action is speculative.  *Id.* at 19-24.  But they already raised the ***exact same*** arguments in their prior motion.  [Dkt. 70 at 1, 20-21, 24-25].  As this Court has repeatedly held, "rehashing . . . previously denied arguments is not a sufficient reason to reconsider." *Goodson v. Nasco Healthcare Inc.*, 2024 WL 4829487, at *2 (N.D. Tex. Nov. 19, 2024) (Godbey, J.).  Were it otherwise, courts would be subject to "perpetual reexamination of orders." *Highland Cap.*, 2021 WL 7540296, at *1.

The only new argument they lodge is that the SAC fails to allege that the omitted predictions are material.  MTD at 24-25.  But Plaintiffs do not fault Defendants for failing to disclose future liabilities—as in the cases they cite—but, rather, ***existing facts***, *i.e.*, that AT&T left a sprawling web of toxic trash across the United States.  [Dkt. 73 at 9-10, 16.]  Those facts are highly material by any measure but especially the one here.  Facts are material under Rule 10b-5 if there is a "substantial likelihood" a reasonable investor would consider them "important" when investing. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  But this requires a delicate "fact-specific" assessment of the inferences an investor would draw from certain facts that it is properly committed to "the trier of fact." *SEC v. World Tree Fin., LLC*, 43 F.4th 448, 465 (5th Cir. 2022).  Thus, a claim should not be dismissed as a matter of law for lack of materiality unless the omitted facts are "so obviously unimportant . . . that reasonable minds could not differ on the question of their importance." *McNamara v. Bre-X Mins. Ltd.*, 197 F. Supp. 2d 622, 631 (E.D. Tex. 2001); *accord In re Sioux, Ltd. Sec. Litig.*, 914 F.2d 61, 65 (5th Cir. 1990).  The market's severe reaction in response to the truth negates that conclusion. *See In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *8 (W.D.

- 9 -

Tex. May 11, 2023) ("materiality" of omitted facts "supported by the drops in stock price" when truth came out). Indeed, the stock sank in direct response to reports about the *risk* that AT&T could face billions in remediation costs due to the undisclosed facts. SAC ¶¶ 422-27.

Defendants' already-rejected arguments fare no better. The first disregards that Defendants spoke about the benefits of retiring copper in the *parts* of the network that were displaced by fiber. SAC ¶¶ 299-380. And once they chose to speak about the "benefits" of doing so—specifically, the cost savings—they became obligated to disclose "firm-specific adverse facts that affect the validity or plausibility" of that plan. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009). Here, AT&T was deploying fiber in major cities. SAC ¶ 68. Those were the areas with the heaviest concentrations of lead cables (50% or more). *Id.* ¶¶ 132-33. The connection is direct and airtight.

Equally flawed is the tag-along argument some disclosures contained "accurate statements of historical fact." MTD at 24. Defendants identify none, but even if they did, it is "well-settled" that "literal truth" is no defense. *Cassava Scis.*, 2023 WL 3442087, at *8; *see also Six Flags*, 58 F.4th at 218 (disclosure is "measured not by literal truth"). As alleged, the statements gave a gave a "false impression" that no copper cables were retired in a manner that exposed AT&T to "costly scrutiny, liability, and reputational harm," when, in fact, they were. SAC ¶ 300. No more is required. *See In re Concho Res. Inc. Sec. Litig.*, 2023 WL 2297425, at *17 (S.D. Tex. Feb. 23, 2023) (statements misleading when undisclosed facts showed project was "subject to far greater . . . risks" than suggested), *R&R adopted in part & rejected in part*, 2023 WL 4146278 (S.D. Tex. June 23, 2023).

Defendants also continue to blatantly mischaracterize Plaintiffs' claims. As explained above, Plaintiffs already informed Defendants that their claims neither demand clairvoyance nor admissions of guilt but, rather, the facts that exposed AT&T to the *risk* of losses. Yet Defendants continue to claim they do and urge they should be dismissed by cobbling together cases where that was the sole

- 10 -

focus. MTD at 20-22. *In re Walmart Inc. Securities Litigation*, 151 F.4th 103 (3d Cir. 2025), is a prime example. For all the discussion devoted to it, Defendants never identify the statement at issue. That is because it represented "where a liability is reasonably possible and may be material, such matters have been disclosed." *Id.* at 113. Defendants' remaining authority is no different.[3]

Nor is the risk "speculative." MTD at 23. Unlike Defendants' cases, nearly all of which address *risk disclosures* (MTD at 23 n.11), the widespread abandonment of lead cable exposed AT&T to a far greater risk of loss than there otherwise would be because (i) doing so is prohibited by the RCRA; and (ii) lead sheathing, like all lead, is a dangerous contaminant. SAC ¶¶ 119-21. Defendants label the RCRA allegations as "incorrect" (MTD at 3, 13) but fail to explain why, much less address that it is consistent with the position of the EPA. SAC ¶ 121. In any case, Defendants' factual challenge is of no force on a motion where "the Court takes all of Plaintiffs' alleged facts as true." *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at \*14 (N.D. Tex. Sept. 29, 2022) (Godbey, J.) (*Exxon I*). Defendants barely address the second. After all, lead is classified as "toxic" because the EPA has found through studies that it can "leach" hazardous particles and an 18-month investigation by the *WSJ* found that exposed lead cables did just that. SAC ¶¶ 120, 233-50. Indeed, that is exactly what led the EPA to launch its ongoing Superfund investigation. *Id.* ¶¶ 263, 428.[4]

For similar reasons, the repeated contention that no risk has come to pass (MTD at 1, 11, 22, 24) is irrelevant. The federal securities laws do not require "harm to have materialized" from a risk

---

[3] *See Heinze v. Tesco Corp.*, 971 F.3d 475, 482 (5th Cir. 2020) (projections not misleading under SEC Rule 14a-9 for failing to disclose plaintiffs' own "speculative predictions" about future events); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 170-71 (S.D.N.Y. 2015) (party claimed company was "duty bound to disclose the . . . risk" of future regulatory scrutiny); *Halford v. AtriCure, Inc.*, 2010 WL 8973625, at \*10 (S.D. Ohio Mar. 29, 2010) (similar).

[4] In a footnote, Defendants accuse Plaintiffs of disregarding that the EPA found that there were "no immediate threats to the health of people nearby" at the sites identified by the *WSJ*, according to three webpages they improperly cite for their truth. MTD at 23 n.13. But it is Defendants who are misusing the facts. As those webpages make clear, that was solely for purposes of whether "*immediate* EPA response action" was needed in August 2023. EPA, *California and Coal Center Lead*, https://response.epa.gov/site/site_profile.aspx?site_id=16127 (last visited Nov. 14, 2025). And, as AT&T is well-aware, the EPA later decided to move ahead with a "multi-step" Superfund review because testing at those sites still exceeded EPA lead limits for children. SAC ¶¶ 279-80. Indeed, EPA officials have confirmed that long-term "remediation actions" were being discussed with cable owners as recent as September 2024. *Id.* ¶ 288.

"for a statement to be materially misleading." *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949 (9th Cir. 2023); *Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 831 (8th Cir. 2003) ("just because a hidden risk does not materialize doesn't mean its concealment cannot hurt investors" once true facts are revealed). Adhering to that rule is especially appropriate here. CERCLA authorizes the EPA to either (1) use "Superfund" money to cleanup a site and then file an action to recover its costs once remediation is complete or (2) issue an administrative order compelling a responsible party to cleanup a site on its own. *See Gen. Elec. Co. v. Jackson*, 595 F. Supp. 2d 8, 11 (D.D.C. 2009), *aff'd*, 610 F.3d 110 (D.C. Cir. 2010). But it can take a ***decade*** or more for either to take place. *Id.* at 32 (crediting expert testimony showing an "average eight year lag-time between identification of a . . . site and issuance of [an order]"); *see also* 32 Moore's Federal Practice § 34.1 (3d ed. 1997) ("[I]t can take many years—an average of 11.4 years—to complete a cleanup."). And this is no run-of-the-mill cleanup. It will likely be years before AT&T feels the consequence of its actions. [5]

### B.    Plaintiffs Plead Facts That Raise a Strong Inference of Scienter

Scienter is a state of mind that includes "severe recklessness." *Lormand*, 565 F.3d at 251. To qualify as "strong" under the PSLRA, the inference of scienter need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). It need only be "at least as compelling as any opposing inference" drawn from the facts alleged. *Id.* Thus, a "a tie" among competing inferences "favors the plaintiff." *Six Flags*, 58 F.4th at 214. The Court previously found that the nonculpable inference was "slightly" or "somewhat" more compelling based solely on the individualized facts alleged in the FAC. Order at 17, 19. The amendments verify that the inference of scienter far exceeds any other.

---

[5] The holdings Defendants cite from other lead cable cases (MTD at 21) are limited to their facts. In *Lumen*, the court found that the inference of scienter was not as strong as the inference that "the cables were safe, in place." *In re Lumen Techs., Inc. Sec. Litig. II*, 2025 WL 978229, at *26 (W.D. La. Mar. 14, 2025). And the case against Verizon was focused the amount of its liability because the volume of lead cables it owns is orders of magnitude less than AT&T. *Stichting Pensioenfonds Metaal en Techniek v. Verizon Commc'ns, Inc.*, 775 F. Supp. 3d 826, 842 (D.N.J. 2025); *see also* SAC ¶¶ 136, 258.

### 1.    The Amendments Remedy the Group Pleading Issues in the FAC

In its Order, the Court held that the FAC relied on impermissible "group" allegations which must be "disregarded" under Fifth Circuit law by (1) failing to attribute the statements in the Issue Briefs to any party other than AT&T; and (2) describing the knowledge of groups or non-party employees. Order at 11-13. The amendments remedy these two issues.

**First**, the SAC now makes clear that, as CEO, Stephenson and Stankey personally reviewed and approved the full "content" of every CSR Report issued during the Class Period, each of which expressly referred to AT&T's Issue Briefs for more information. SAC ¶¶ 76, 80. Defendants do not dispute that the CSR Reports are properly attributed to them. MTD at 6. Instead, they insist that the Court already decided they did not approve the Issue Briefs by approving the Report. *Id.* Not so.

In its Order, the Court observed that one does not "necessarily" follow the other and ruled that it could not conclude, on the facts before it, that a CEO who approved an ***introductory letter*** "ordered or approved everything in the Issue Briefs" referenced later in the Report. Order at 12-13. Plaintiffs now allege that Stephenson and Stankey approved the ***entirety*** of the Report and, thus, all later references to the Issue Briefs. SAC ¶ 80. In fact, the 2022 CSR Reports all stated that "copper wire" was recovered for "sale or recycling" (*id.* ¶¶ 374-75) and included, next to that, a hyperlink to the Issue Brief on Waste Management containing the waste disposal misstatements. [Dkt. 73 at 25.]

The Fifth Circuit has instructed that statements made by other parties can be "attribute[d]" to defendants if they are "adopted by the defendants . . . in some way" to imply they are "in accordance with the company's views." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 373 (5th Cir. 2004). One who chooses to directly refer to statements in another publication for further information does just that. *See, e.g.*, *In re Danimer Sci., Inc. Sec. Litig.*, 2023 WL 6385642, at *5-6 (E.D.N.Y. Sept. 30, 2023) (issuer that "links" to press release by another company adopts statements as its own); *SEC v. Das*, 2011 WL 4375787, at *6 (D. Neb. Sept. 20, 2011) (disclosures on executive

- 13 -

compensation from proxy referenced in 10-K attributed to officers who signed 10-K). In addition, the SAC also specifies that AT&T has repeatedly emphasized that the Issue Briefs are an integral part, and an extension, of the CSR Report. SAC ¶ 76. This is a far cry from an attempt to infer approval based on the approval of a *distinct* report *three years* after the one at issue, as in the case Defendants rely on, *In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 631 (S.D. Tex. 2013) ("*BP III*").

**Second**, and separately, Plaintiffs plead that Stephenson and, later, Stankey were part of the group that gave ultimate "authorization and approval" for the Issue Briefs. SAC ¶ 81. In an artfully worded footnote, Defendants posit that the SAC fails to "link" either to the Issue Briefs since neither was on the "committees" with oversight for them. MTD at 7 n.3. That argument is paper thin.

As alleged, AT&T's *Board* has long been responsible for all its external ESG reporting, including, specifically, the Issue Briefs. SAC ¶¶ 72, 80-81. During the Class Period, the committee now known as the GPC oversaw the preparation of the Issue Briefs at the Board's request. *Id.* ¶ 81. But the buck did not stop there. The "formal authorization and approval" for those publications was given by the Board, which at all times included Stephenson or Stankey as CEO. *Id.* ¶¶ 18, 20, 81.

If anything, Defendants' sole authority, *BP III*, highlights the adequacy of these allegations. There, the court found the mere allegation that a committee had broad responsibility for reviewing "material to be placed before shareholders that addresses [EHS] performance" did not necessarily mean that it reviewed a sustainability report that was not filed with the SEC. 922 F. Supp. 2d at 631. In contrast, Plaintiffs specify that the GPC and the Board oversaw the preparation of, and approved, *the Issue Briefs*. *BP III* also declined to hold that a corporate report was attributable to a committee "as a group" without any allegation of "who served on [it]." *Id.* However, the court went on to hold that another report was properly linked to the CEO because the Board "reviewed" it, and he was a member of the Board at the time. *Id.* at 632-33. As the court put it, "Plaintiffs have done all they

- 14 -

can be expected to do, pre-discovery, to demonstrate a tangible connection." *Id.* at 633. So too here.

**Third**, Plaintiffs have not previously relied on allegations that refer to employee groups or nonparties to establish Defendants' scienter, as evidenced by their previous briefing. [Dkt. 73.] Nevertheless, the TAC asserts a new scheme claim against John Malone, who is the "non-defendant" that is the primary subject of the allegations Defendants criticize. MTD at 7 (citing SAC ¶¶ 157-87).

### 2.    Plaintiffs Continue to Plead Compelling Individualized Motives

As in the FAC, Plaintiffs allege Defendants had ample motive to conceal AT&T's 200,000-mile environmental mess (1) given the extraordinary cleanup cost and (2) to protect their outsized incentive compensation. SAC ¶¶ 469-86. Defendants argue in passing that the Court already rejected both. MTD at 9. Defendants misunderstand the allegations and misread the Court's rulings.

Regarding the first, the Court found that the need to cut costs was prompted here by "activist shareholders," not AT&T's survival. Order at 14. Plaintiffs respectfully submit that misconstrues their allegations. The cost-cutting initiative may explain why AT&T continued to (or, more likely, doubled down on) abandoning in place but not why it chose to ***conceal*** it. That was prompted by the desire to avoid exposing a nationwide environmental hazard—a motive that remains with or without the cost initiative. As pled, the cost to remove just the exposed cables was ***billions*** of dollars. SAC ¶ 473. This motive is bolstered by the fact that Malone was repeatedly told by senior executives before the cost initiative began to abandon lead in place due to the ***cost*** of removal. TAC ¶¶ 234-35.

Further, the Court did not—and could not—reject the second. In its most recent securities decision, the Fifth Circuit held that incentive compensation typically cannot supply a proper motive for the very reasons stated by the Court but ***can*** when "the potential bonus is extremely high." *Utah Ret. Sys. v. McCollum*, 2023 WL 8649878, at *4 (5th Cir. Dec. 14, 2023). The bonuses Defendants received, ranging from 247% to 1,646% of base pay (Ex. C), far exceed the range the Fifth Circuit sustained in another recent case. *See Six Flags*, 58 F.4th at 215 (300% to 600% of base pay provide

- 15 -

motive). Accordingly, the Court held only that this motive could not "create an inference of scienter *alone*" and analyzed it with Plaintiffs' other allegations. Order at 14-15. It should continue to do so.

### 3. The Individualized Facts Raise a Strong Inference of Scienter

Under Fifth Circuit law, severe recklessness arises when there is "a danger of misleading buyers or sellers which is either known" or "so obvious that the defendant must have been aware." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). Thus, scienter exists when defendants are "aware of facts that . . . render [their] statements misleading." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 430 (5th Cir. 2019) (*Pier 1*). Indeed, this is widely regarded as "classic evidence of scienter." *SEC v. Johnson*, 986 F.3d 63, 74 (1st Cir. 2021).

**Waste Disposal**. Seizing on language from the Court's Order, Defendants insist there can be no scienter for *any* statement absent facts showing that the lead cables posed "severe risks" to AT&T. MTD at 8, 10-16. But this sweeping assertion flouts settled law and the text of the Order.

As their own cases state, what is needed to plead scienter turns on the "facts that . . . render [the] statements misleading." *Pier 1*, 935 F.3d at 430; *Exxon I*, 2022 WL 4677621, at *7 (scienter requires "facts suggesting [party] was informed of the issues that . . . made his statements false"). The Court held that the waste disposal statements in the Issue Brief were false because AT&T left lead cables in place instead of removing the regulated material. Order at 27. There was no element of risk involved. Thus, Plaintiffs need only establish knowledge that lead cables were left in place.

The Court already found that the facts alleged in the FAC establish that Defendants knew that "(1) AT&T was retiring copper wirelines in place" and "(2) some of these wires contained lead." Order at 15. However, it held that was not enough to show Defendants were aware of a material risk having already determined that the Issue Briefs were unattributed and must be "disregarded." *Id.* Hence the Court's focus on the *cost savings* statements by each Defendant in the ensuing analysis. Now that the Issue Briefs are properly attributed to Stephenson and Stankey, the Court's previous

- 16 -

finding provides all that is needed to establish their scienter for the waste disposal statements.

In any case, the TAC contains powerful new allegations confirming that Stephenson and Stankey knew the *full extent* of lead cables AT&T abandoned across the nation. Both received regular reports which detailed the amount of unused copper wireline "left in place," and specified the parts covered in lead, as part of AT&T's project to reclaim unused copper cables, launched in early 2020. TAC ¶¶ 227-29. This not an instance of mere "access" to contradictory information. *Exxon I*, 2022 WL 4677621, at* 6. As pled, these reports contained information that was essential to carry out their work on AT&T's cost reduction initiative. TAC ¶ 229. Indeed, that is why the reports were sent directly to them. Further, Stankey needed to review the reports to substantiate his bonus (which he received), and his subsequent statements confirm that he stayed informed about the progress of AT&T's copper reclamation through the end of the Class Period. *Id.* ¶¶230-32.[6]

Further, both undeniably knew lead was a regulated material. Stephenson penned a written response to a shareholder proposal on lead batteries which described lead as a "hazardous waste." SAC ¶¶ 463. The shareholder proposal itself—which Stephenson and Stankey read—arose from the disposal of lead batteries in countries with less stringent *regulations* for lead. *Id.* ¶¶ 458-60, 464. Unsurprisingly, and consistent with his past work in operations, Stankey later volunteered that lead has been "regulated . . . for decades" and that AT&T has had relationships with "regulators" with respect to lead "for a very long time." *Id.* ¶¶ 436, 438-39. Indeed, the reports they received reported the lead cables AT&T left behind for purposes of EHS, which Stankey admitted was the group within AT&T that handles "regulated" materials. TAC ¶¶ 228, 473; *see also id.* ¶ 93 (role of EHS).

Defendants' sole response—that there is no allegation that either thought lead cables were "unknown" to the public (MTD at 10-11)—carries no weight. The Fifth Circuit has made clear that

---

[6] There is no credible basis to dispute the source of these facts. CW23 worked on AT&T's copper reclamation project through July 2023 and, thus, was directly in a position to possess them. These allegations also corroborate, and are consistent with, the account of CW5, who worked in Dallas through 2021, and was repeatedly told by managers that the decision to retire lead cables in place was a "cost saving measure" put in place by the "CEO." SAC ¶¶ 27, 153.

whether parties "actually believed" their misstatements is "irrelevant" to the recklessness analysis. *Spitzberg*, 758 F.3d at 686.  More fundamentally, whether the public knew of lead cables in general (and it most certainly did not) is inapposite.[7]  Stephenson and Stankey sanctioned Issue Briefs which assured that all regulated material on any such cables was removed upon retirement, and they did so with full knowledge that was untrue.  Defendants do not, and cannot, claim *that* was public.

**Cost Savings**.  The Court recognized that the facts in the FAC showed that Defendants knew "lead is generally harmful" but determined that they failed to establish that Defendants were "aware of any widespread environmental contamination risk . . . that could reasonably result in material risk to the company."  Order at 15.  The new allegations cast those facts in an entirely different light.

*Stephenson, Stankey, McElfresh*.  Like Stephenson and Stankey, McElfresh also received the reports detailing the full extent of obsolete lead cables that AT&T littered in cities and towns across the country.  TAC ¶¶ 227-29.  And, like Stankey, McElfresh made later statements that provided detailed information directly from the reports, confirming he read them.  *Id.* ¶¶ 231-32.

All three knew this was inconsistent with lead disposal standards.  There is no debate they all knew from the shareholder proposal, if not common knowledge, that due to its severe toxicity lead is subject to stringent disposal requirements in the United States.  SAC ¶¶ 108, 458-64.  Instead, the debate centers on if this is properly considered "abstract" knowledge about lead batteries that has *no bearing* on "the lead-lined cables at issue here."  MTD at 11.  A fair reading of the facts leaves no room for that conclusion.  Consistent with the RCRA, the shareholder proposal was premised on the need to *recycle* used lead batteries, and the response approved by Stephenson specified that AT&T required "its battery-removal vendors to provide a certificate of recycling" for that reason.  SAC ¶¶ 458-60, 463.  In fact, Stephenson later reported AT&T was sued under waste disposal laws for

---

[7] Notably, the holding Defendants cite in *Lumen* had nothing to do with scienter but rather was an impermissible finding of fact about what the public knew, which is now at the heart of an appeal in that matter.  *McLemore v. Lumen Techs., Inc.*, No. 25-30264.  However meritorious that conclusion was based on the facts in that case, the record here is crystal clear that the public had *no idea* about the lead cables, much less that they were abandoned.  *See supra* p. 5.

failing to recycle lead batteries. *Id.* ¶¶ 466-67. Thus, all three knew retired lead had to be recycled, and that AT&T was not doing so on a widespread basis. Nor is this conjecture: it aligns with the guidance for lead sheathing in policies designed by AT&T's lead expert, John Malone. TAC ¶ 175.

Separately, all three knew from the property disclosures they signed—which were not directly addressed in the Court's previous Order—that lead paint was an environmental contaminant. SAC ¶¶ 441-47. Contrary to Defendants' rhetoric (MTD at 11), this too carries over to lead cables. The toxicology of lead is not alleged to change based on the material it rests in. If anything, solid lead items, like lead sheathing, pose an even ***greater*** danger than lead blended in a nontoxic material like paint. Thus, all three knew lead was an environmental hazard in any form. These allegations take on even greater significance since they knew AT&T was abandoning lead cable in major cities, where the toxic cables often hung fully exposed on utility poles. TAC ¶¶ 77, 141-43, 162.

The Court previously found that Stankey's knowledge of the Lake Tahoe Action—which alleged that AT&T violated the RCRA by abandoning lead cable there (SAC ¶ 220)—was insufficient to establish he knew about a widescale risk because it was limited to "one lawsuit in one area, with a disputed factual basis." Order at 17.[8] That is no longer the case. Disputed or not, Stankey was on notice others could bring like claims for the vast expanse of lead cables AT&T abandoned elsewhere, or that the suit could draw attention to a broader issue. Indeed, the Lake Tahoe Action is precisely what presaged the *WSJ*'s investigation and subsequent reporting. TAC ¶ 256. What is more, notice of the suit was given to the ***head of the EPA***. *Id.* ¶ 241. Indeed, the first page of the two complaints filed in early 2021 all specifically said so. *See* Exs. D, E.

Stephenson and Stankey also repeatedly professed their commitment to AT&T's all-

---

[8] Defendants' attack the new allegation that Stankey personally spoke with a contact at the League to Save Lake Tahoe about the Lake Tahoe Action on the ground that it postdates the Class Period (MTD at 14-15) but that misses the point. It substantiates the already well-pled allegation that Stankey previously spoke to the League about the suit in 2021 (SAC ¶ 226). *See Emps.' Ret. Sys. of Gov't of Virgin Is. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ([A]llegations concerning activity in one period can support an inference of similar circumstances in [another] period.").

- 19 -

important ESG efforts.  SAC ¶¶ 436-37, 487-89.  Defendants dismiss this as an improper "must have known" allegation (MTD at 15-16) but the case they rely on says only that courts should refrain from inferring scienter from "an officer's position on its own."  *Exxon I*, 2022 WL 4677621, at *3 (citing *Abrams*).  In the TAC, Plaintiffs allege that the EHS group maintained a variety of policies and job aids detailing the environmental dangers of lead and the need to recycle lead sheathing, which were made available on an internal EHS website to all employees, even Stephenson and Stankey.  TAC ¶¶ 174-78.  As CEO of AT&T, both were ***personally responsible*** for "its [EHS] management system."  *Id.* ¶ 473.  According to a document available on AT&T's website throughout the Class Period, "[t]he documents that define and support AT&T's EH&S management system are on the EH&S website" and "are primarily in the forms of practices, procedures, and job aids."  Ex. F at 3.  As such, a review of the materials on the EHS website—or a basic understanding of their contents—was "within the scope of [their] position."  *Exxon I*, 2022 WL 4677621, at *6.  Plaintiffs therefore do not attempt to infer scienter from their executive role alone but, rather, sound evidence supporting such an inference.  *See Masel v. Villarreal*, 924 F.3d 734, 752 (5th Cir. 2019); *see also In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (similar).

In any case, Stankey and McElfresh were on notice that lead cables were harmful to the environment by no later than January 2023.  As detailed in the TAC, at a widely-attended kickoff event held in January 2023 for senior managers in Network Operations and Finance, an executive admitted that lead cables were an "environmental hazard."  TAC ¶¶ 261-62.[9]  Because it was so important, this event was recorded, and a video was sent to all senior officers with responsibility for those functions "three to five days later" for them to watch.  *Id.* ¶ 264.  A former IT executive recalled the video from this event and confirmed that it was sent to Stankey for that reason.  *Id.*

---

[9] That the executive who made this comment did so on a comparative basis is of no consequence.  John Malone designed policies to ensure the safe removal of lead cable.  TAC ¶ 178.  More fundamentally, the statements confirmed that the cables were "already" an environmental hazard in in their present location.  *Id.* ¶¶ 261.

- 20 -

Try as they may to argue otherwise (MTD at 17), these facts give rise to an unmistakable risk that AT&T could face considerable costs correcting or defending its actions and, hence, losses on an enormous scale. To claim Stephenson, Stankey, and McElfresh did not appreciate the *risk* strains credulity. Indeed, news of AT&T's practice prompted several government investigations, including a Superfund investigation by the EPA and a civil inquiry by the DOJ into its *knowledge* of the environmental risks posed by lead cables. SAC ¶ 263. That these investigations remain ongoing (SAC ¶ 280, TAC ¶ 288) is "relevant" to the scienter analysis. *Exxon I*, 2022 WL 4677621, at *4.

*Stephens, Desroches*. The inference that Stephens and Desroches were aware of the lead cables and that they were retired in place is supported by the core operations doctrine. Four factors guide the inquiry, including: (1) a company's size; (2) if the matter at issue was "critical to the company's continued vitality"; (3) if the omitted information would be "readily apparent" to the speaker; and (4) the internal consistency of the public statements. *Six Flags*, 58 F.4th at 219. Plaintiffs allege the last three. SAC ¶¶ 490-94. Defendants half-hearted challenges (MTD at 16) all fail. Because no single factor is dispositive, such allegations can "contribute" to a scienter inference for executives of a large company. *See Six Flags*, 58 F.4th at 219. Throughout the Class Period, one of AT&T's core strategies was saving money as it invested heavily in fiber. SAC ¶¶ 492-93. This became its *sole* focus after its media assets were sold in 2022. *Id.* Thus, what AT&T chose to do with retired copper was of great interest to executives during that time. *Six Flags*, 58 F.4th at 219 (problems at China parks representing 3% of revenue likely known by executives when international licensing was "important aspect of future growth"); *Concho Res.*, 2023 WL 2297425, at *17 (importance of "transition" to new business strategy supports inference). Furthermore, AT&T's accounting group booked charges in excess of $1 billion for retired copper—an amount unlikely to be reported without scrutiny by Stephens or Desroches—based on its *salvage value* (SAC ¶¶ 453-

- 21 -

56), "implying they knew details" on that topic. *Six Flags*, 58 F.4th at 219. Indeed, recent statements by Desroches confirm his familiarity with the practice. SAC ¶ 457.

In any case, their knowledge of the decision to abandon lead cables, and the risks that posed, is apparent for many of the same reasons described above, including their knowledge of (1) the shareholder proposal on lead batteries (SAC ¶ 464); (2) information in property disclosures (SAC ¶ 444); and (3) the admissions made during the January 2023 kickoff event (TAC ¶¶ 261-64).

### 4.    Plaintiffs Adequately Plead Scienter for AT&T

In this Circuit, a corporation has scienter if anyone who made or participated in the creation of a false statement has scienter. *Southland*, 365 F.3d at 366. Thus, Plaintiffs plead scienter for AT&T to the extent they do so for any Individual Defendant. But scienter may also be imputed from those who "furnish information for inclusion" in a false statement or otherwise "approve it." *Id.*; *see also Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 881-85 (W.D. Tex. 2014) (scienter can be imputed from employees who give information for false statement even if they are not the "maker"). Indeed, the Court recognized this in *Exxon I*, 2022 WL 4677621, at *9. But unlike the party there, Malone either furnished the offending language for the ***very*** Issue Briefs at issue or otherwise approved them as such. *See* Point II.B. Accordingly, his scienter may be imputed to AT&T.

## II.    PLAINTIFFS STATE A SECTION 10(B) CLAIM FOR SCHEME LIABILITY

Whereas Rule 10b-5(b) prohibits "deceptive *statements*," Rule 10b-5(a) & (c) prohibit "deceptive *conduct*." *SEC v. Verges*, 716 F. Supp. 3d 456, 466 (N.D. Tex. Feb. 9, 2024). To state a claim under Rule 10b-5(a) & (c), plaintiff must allege: (1) a deceptive act; (2) scienter; (3) an effect on the market or a connection to a security transaction; and (4) loss causation. *Yoshikawa v. Exxon Mobil Corp.*, 2023 WL 5489054, at *3 (N.D. Tex. Aug. 24, 2023) (Godbey, J.) (*Exxon II*). This Court has also held that reliance may also be required. *See Yoshikawa v. Exxon Mobil Corp.*, 2024 WL 3802997, at *4 (N.D. Tex. Aug. 12, 2024) (Godbey, J.) (*Exxon III*).

Defendants attack the SAC for failing to present any facts supporting a scheme claim. MTD at 25. Having gathered the necessary facts, Count II of the TAC asserts a new scheme claims against AT&T, Arnoldi, Korte, and Malone for engaging in conduct to conceal AT&T's illicit practice from the public and, thus, maintain its carefully curated image as an ESG pioneer and avoid shining a light on an environmental indiscretion of immense proportions.

### A.     Plaintiffs Allege Deceptive Conduct

As the Supreme Court has explained, subsections (a) & (c) "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). Plaintiffs' claim arises from two types.

**First**, Malone and Arnoldi blessed statements in AT&T's Issue Briefs they knew to be untrue. Consistent with *Lorenzo*, this Court has held that scheme liability extends to those who disseminate false statements made by others. *Exxon II*, 2023 WL 5489054, at *9. Parties that authorize or fail to correct false statements in public disclosures made by others certainly qualify. *See Malouf v. SEC*, 933 F.3d 1248, 1254-55, 1259-61 (10th Cir. 2019) (party who "reviewed" SEC filings and "took no steps to remedy [the] misstatements" is liable under *Lorenzo*); *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *7 (S.D.N.Y. Feb. 17, 2022) (same for party who prepared "false reports . . . passed on to investors" in disclosures that others were liable for as the "maker").[10] Here, Malone and Arnoldi approved EHS-related Issue Briefs as part of AT&T's review process. TAC ¶¶ 89, 93. The waste disposal statements appeared in the Issue Brief on Waste Management, a topic at the core of EHS. *Id.* ¶ 93. Furthermore, those statements addressed the removal of regulated material from retired copper, the ***very*** subject of Malone's expertise. *Id.* ¶¶ 173-74. Likewise, Arnoldi was the senior officer in the EHS reporting line and, separately, led the group that reclaimed

---

[10] *See also SEC v. Mueller*, 2024 WL 400897, at *20 (W.D. Tex. Jan. 11, 2024) (party with "authority over the language" in false disclosure liable under *Lorenzo*); *Borteanu v. Nikola Corp.*, 2023 WL 11017679, at *19 (D. Ariz. Dec. 8, 2023) (same for parties that participated in creation of video in which other party made misstatements). *SEC v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022), cited in Defendants' recent filing [Dkt. 103 at 6], is not to the contrary. *Rio* simply held parties cannot be liable for scheme liability if their only conduct is "a collection of misstatements and omissions" that give rise to misstatement liability. *Id.* at 53-54. Indeed, *Rio* emphasized it was a "narrow" and "limited" ruling. *Id.*

retired copper. *Id.* ¶¶ 23, 93, 229; *see also id.* ¶¶ 46, 50 (reporting lines from EHS to Arnoldi).

**Second**, Arnoldi and Korte took affirmative steps to suppress information about AT&T's illicit practice. Personnel under their supervision took down all signs showing AT&T was the owner of the cables at Lake Tahoe. TAC ¶ 254. Both were visibly upset after a finance colleague supporting network operations admitted during a kickoff event in January 2023 that lead cables were an "environmental hazard." TAC ¶¶ 262-63. That this colleague was swiftly removed from their post strongly suggests they played a role. *Id.* Similarly, Korte sent a directive to all managers in Network Operations to continue to abandon in place following a meeting with Stankey and Arnoldi soon thereafter. *Id.* ¶ 270. This too supports scheme liability. *See Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 951, 954 (S.D. Tex. Jan. 19, 2021) (conduct to "conceal adverse material information" and "retaliate[]" is deceptive); *SEC v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2021) (same when group "covered up" evidence of impairment). So does AT&T's extensive use of confidentiality agreements to silence senior officers from speaking about it (TAC ¶¶ 534-35). *See Anadarko*, 514 F. Supp. at 951.

### B.      Plaintiffs Raise a Strong Inference of Scienter

Defendants cannot credibly dispute Malone's scienter. He designed AT&T's national lead cable programs and authored extensive documentation noting their widespread presence in AT&T's legacy network as well as their regulated status. TAC ¶¶ 25, 173-78. In this capacity, Malone was fully aware AT&T actively abandoned unused lead cables for cost reasons. He admitted as much in conversations with colleagues and designed policies to address this decomposing hardware. *Id.* ¶¶ 177, 233-35. Worse still, Malone knew that the lead sheathing could "leach" deadly particles over time. *Id.* ¶¶ 177, 189. As such, he expressed deep misgivings about the abandonment, confiding in colleagues that "AT&T didn't want to spend the money to do the right thing." *Id.* ¶¶ 234-35.

So too for Arnoldi and Korte. Both received the reports described above (p. 17) detailing the

- 24 -

extent of lead cables abandoned by AT&T as it reclaimed copper. *Id.* ¶¶ 227-30. Indeed, Korte was in the same reporting line as Arnoldi and boasted that he oversaw the "sunset [of] legacy products as we transition from copper to . . . fiber." *Id.* ¶¶ 24, 93, 228. Korte also knew lead-based objects were subject to specialized waste disposal laws. *Id.* ¶ 507. Lest there be any doubt, both also led the kickoff event in January 2023 where a colleague doing work on lead cables described them an "environmental hazard" and confirmed that AT&T's practice was to abandon in place. *Id.* ¶ 262.

### C.    Defendants Cannot Dispute All Other Elements are Satisfied

**First**, the deceptive conduct has a clear connection to the purchase of AT&T's securities. The inaccurate Issue Briefs were ***directly*** "communicated to the public," forming an even stronger connection than that in *Exxon III*, 2024 WL 3802997, at \*4. Similarly, parties who "hid[e] negative information . . . presumably cause investors to over-value [company] securities." *Borteanu*, 2023 WL 11017679, at \*18; *SEC v. Jaitley*, 2023 WL 9105678, at \*9 (W.D. Tex. Nov. 13, 2023) (similar).

**Second**, scheme claims can invoke the presumptions of reliance in *Basic* and *Affiliate Ute*. *Exxon III*, 2024 WL 3802997, at \*4. Because the deceptive acts enabled public misstatements or suppressed negative information from becoming public, both apply (TAC ¶¶ 540-43). *Id.*

**Third**, Defendants have abandoned any loss causation challenge to the Rule 10b-5(b) claim after the court rejected their previous arguments. Order at 19 n.3. The scheme claim relies on the same disclosures. It follows *a fortiori* that Defendants have no loss causation challenge to it either.

### III.    PLAINTIFFS STATE A CONTROL PERSON CLAIM UNDER SECTION 20(A)

Conceding control, Defendants move to dismiss Plaintiffs' control person claim solely for failure to plead a primary violation. MTD at 25. Plaintiffs do so for all the reasons detailed above.

### CONCLUSION

For all the foregoing reasons, the MTD should be denied in its entirety. If the Court grants the MTD, Plaintiffs respectfully request leave to amend under Fed. R. Civ. P. 15(a)(2).

Dated:  November 14, 2025

Respectfully submitted,

**POMERANTZ LLP**

**THE BRISCOE LAW FIRM**

 */s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Justin D. D'Aloia
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jdaloia@pomlaw.com

 */s/ Willie C. Brisco*
Willie C. Briscoe
12700 Park Central Drive, Suite 520
Dallas, Texas  75251
Telephone: (972) 521-6868
Facsimile: (281) 254-7789
wbriscoe@thebriscoelawfirm.com

*Counsel for Plaintiffs and Lead Counsel for the Class*

*Local Counsel for Plaintiffs*