**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| IN RE AT&T INC. SECURITIES LITIGATION | Case No. No. 3:24-cv-01196-N |

**APPENDIX IN SUPPORT OF
PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

Court-appointed lead plaintiffs Teachers' Retirement System of the City of New York, the New York City Employees Retirement System, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, and the Board of Education Retirement System of the City of New York (collectively, "Plaintiffs") submit this Appendix in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss Second Amended Class Action Complaint

| Exhibit | Description | Pages |
|---|---|---|
| N/A | Declaration of Justin D. D'Aloia | n/a |
| A | Archived version of AT&T's Waste Management Issue Brief, archived by the Wayback Machine on August 26, 2024 | 1-12 |
| B | Archived version of AT&T's Circularity Issue Brief, archived by the Wayback Machine on April 25, 2025 | 13-24 |
| C | Chart, Individual Defendants' Incentive Compensation as a % of Base Salary (SAC) | 25-26 |
| D | Complaint for Declaratory and Injunctive Relief and Civil Penalties, as filed in *California Sportfishing Alliance v. Pacific Bell Telephone Company*, No. 2:21-cv-00073 (E.D. Ca. Jan. 14, 2021) | 27-49 |
| E | First Amended Complaint for Declaratory and Injunctive Relief and Civil Penalties, as filed in *California Sportfishing Alliance v. Pacific Bell Telephone Company*, No. 2:21-cv-00073 (E.D. Ca. Apr. 7, 2021) | 50-69 |
| F | AT&T's *Conformity with ISO 14001 Environmental Management Systems* | 70-74 |

Dated:  November 14, 2025

Respectfully submitted,

**POMERANTZ LLP**

 /s/ *Jeremy A. Lieberman*
Jeremy A. Lieberman
Justin D. D'Aloia
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Plaintiffs and Lead Counsel for
the Class*

**THE BRISCOE LAW FIRM**

 /s/ *Willie C. Brisco*
Willie C. Briscoe
12700 Park Central Drive, Suite 520
Dallas, Texas  75251
Telephone: (972) 521-6868
Facsimile: (281) 254-7789
wbriscoe@thebriscoelawfirm.com

*Local Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| IN RE AT&T INC. SECURITIES LITIGATION | Case No. 3:24-cv-01196-N |

**<u>DECLARATION OF JUSTIN D. D'ALOIA</u>**

I, Justin D'Aloia, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.     I am a partner at Pomerantz LLP, counsel for court-appointed lead plaintiffs Teachers' Retirement System of the City of New York, the New York City Employees Retirement System, the New York City Police Pension Fund, the New York City Fire Department Pension Fund, and the Board of Education Retirement System of the City of New York (collectively, "Plaintiffs"), and I am admitted to practice before this Court.  I have personal knowledge of the matters set forth herein and, if called upon, would testify thereto.

2.     Attached as Exhibit A is a true and correct copy of an archived version of AT&T's Waste Management Issue Brief, downloaded on November 12, 2025, using the "Wayback Machine," found at http://web.archive.org.  According to the Wayback Machine, this version of the Issue Brief was archived on August 26, 2024.

3.     Attached as Exhibit B is a true and correct copy of an archived version of AT&T's Circularity Issue Brief, downloaded on November 12, 2025, using the "Wayback Machine," found at http://web.archive.org.  According to the Wayback Machine, this version of the Issue Brief was archived on April 25, 2025.

4.     Attached as Exhibit C is a chart summarizing the allegations from paragraphs 443, 480, 482, 484, and 486 of the Second Amended Class Action Complaint.  [Dkt. 91.]

1

5.      Attached as Exhibit D is a true and correct copy of the Complaint for Declaratory and Injunctive Relief and Civil Penalties, as filed in *California Sportfishing Alliance v. Pacific Bell Telephone Company*, No. 2:21-cv-00073 (E.D. Ca. Jan. 14, 2021).

6.      Attached as Exhibit E is a true and correct copy of the First Amended Complaint for Declaratory and Injunctive Relief and Civil Penalties, as filed in *California Sportfishing Alliance v. Pacific Bell Telephone Company*, No. 2:21-cv-00073 (E.D. Ca. Apr. 7, 2021).

7.      Attached as Exhibit F is a true and correct copy of *Conformity with ISO 14001 Environmental Management Systems*, published by AT&T.  According to the Wayback Machine, this document was available on AT&T's website during the Class Period.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14 day of November, 2025.

                                        */s/ Justin D. D'Aloia*

                                        Justin D. D'Aloia

# EXHIBIT A

1



https://sustainability.att.com/priority-topics/waste-management    Go    MAY    AUG    DEC

11 captures
17 May 2023 - 21 Mar 2025

◄ 26 ► 
2023  2024  2025    ▼ About this capture

**AT&T** | Sustainability Reporting

⌂ > Priority Topics > Waste Management



# Waste Management



**Sustainability Accounting Standards Board Disclosures**

TC-TL-440a.1

**United Nations Sustainable Development Goals Disclosures**

3, 8, 11, 12

**United Nations Global Compact Disclosures**

8



# Issue Summary

AT&T is committed to reducing our consumption, reusing more of the materials we consume, finding more ways to recycle and handling waste safely.

**Side Navigation** ⌄



2

# Our Goals & Progress

## Landfill Diversion

Reduce the amount of U.S. waste we send to landfill by 30% (2019 base year) by the end of 2030.

### Progress: Reduction of 19.9% [1]

Waste sent to landfill totaled 114,167 tons in 2023. This represents a reduction of 28,303 tons from our 2019 base year (142,470 tons). [2]



# Waste Management Data

| [3] [4] | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Total domestic waste managed by AT&T (tons) [5] | 202,529 | 211,379 | 179,421 | 178,659 |
| Total waste recycled/reused (tons) | 73,264 | 83,136 | 70,345 | 63,438 |
| Percent total waste recycled/reused | 36.2% | 39.3% | 39.2% | 35.5% |
| Total waste sent to landfill (tons) | 127,627 | 126,928 | 107,031 | 114,167 |
| **Nonhazardous Waste** | | | | |
| Total domestic nonhazardous waste generated (tons) | 202,479 | 211,345 | 179,076 | 178,626 |
| Total nonhazardous waste recycled (tons) | 73,231 | 83,111 | 70,339 | 63,438 |

3

| 3 4 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| Total nonhazardous waste sent to landfill (tons) | 127,626 | 126,927 | 107,031 | 114,167 |
| Total nonhazardous waste incinerated (tons) | 2.29 | 0.57 | 0.00 | 0.00 |
| Total nonhazardous waste composted (tons) | 824 | 733 | 638 | 818 |
| Other nonhazardous waste, not specified (tons) 6 | 796 | 527 | 1,070 | 204 |
| **Hazardous Waste** 7 | | | | |
| Total domestic hazardous waste generated (tons) | 50.01 | 34.73 | 344.50 | 32.43 |
| Total hazardous waste recycled (tons) | 32.66 | 25.43 | 6.35 | 27.80 |
| Total hazardous waste sent to landfill (tons) | 0.15 | 0.20 | 0.08 | 0.33 |
| Total hazardous waste incinerated (tons) | 0.57 | 0.00 | 0.45 | 0.00 |
| Other hazardous waste, not specified (tons) 8 | 16.62 | 9.10 | 337.62 | 4.30 |

For more information, see our Sustainability Accounting Standards Board Index and Task Force on Climate-related Financial Disclosures Report.



# Our Actions & Impacts

In 2023, AT&T's work to reduce and manage waste included the following:

- Expanding our Wireline Operations program to contract with local recycling vendors. Initially launched by our Asset Recovery team as a pilot, this

4

program has been scaled up to become part of our standard operations. It enables AT&T to recycle Wireline Operations waste more quickly and responsibly while also reducing the need for transportation to distant recycling facilities. The program contributed to a 97.63% landfill diversion rate for our Wireline Operations. [9]

- Removing and recycling 6,000 retired plastic reels from our operations in the Southwest. Working cross-functionally and with our transportation and recycling partners, this effort kept 240,000 pounds of plastic out of landfills.

- To improve data accuracy and compliance in our supply chain, our Environment, Health & Safety (EHS) team supported our mobility and fleet vendors'—and their supporting vendors'—alignment with AT&T processes and practices. We also continue to upload shipping documents from our fleet and mobility vendors into our internal waste tracking system, increasing data availability regarding total waste generated by AT&T. This supports more accurate reporting of our waste data and helps us better identify waste diversion solutions.

# Governance

Our operations generate general solid waste, hazardous waste, regulated waste and e-waste. Our approach to waste management involves reuse and recycling programs and other initiatives to reduce our overall waste footprint. Several organizations across our operating companies lead our waste recycling and management programs, including:

- **Real Estate:** Our Global Real Estate organization manages general solid waste at our corporate facilities and works with our waste vendors to measure waste and implement programs that encourage waste reduction, recycling and composting.

- **Environment, Health & Safety:** Our EHS team manages hazardous and other regulated waste generated by various AT&T operations, including the Construction and Engineering, Technical Field Services, and Mobility business units. EHS also provides guidance to our various business units regarding the recycling of batteries and e-waste and the management of other regulated wastes.

- **Supply Chain:** Two teams address supply-chain-related waste. Our Global Supply Chain team works with several e-waste recyclers to manage

electronics recycling. And the Supply Chain Asset Recovery and Sustainability team focuses on the recycling and potential resale of high-volume common materials within our internal network operations.

# Solid Waste

We continually work to reduce the environmental impacts of our waste. It is a challenging endeavor. As our workforce has grown in office occupancy, our solid waste footprint increased by 8.4%, to 134,349 tons of general solid waste in 2023. [1]

2023 highlights regarding solid waste include:

- **Recycling:** Our diversion rates with haulers decreased in 2023 by 0.5%. [1] A total of 20,581 tons was recycled, resulting in a general solid waste diversion rate of 14.3%.

- **Improving Data Accuracy:** Accurate and timely data is the first step to effectively managing waste. We continued using our internal waste tracking system to track data. To improve data accuracy and compliance in our supply chain, our EHS team supported our mobility and fleet vendors'—and their supporting vendors'—alignment with AT&T processes and practices. We also continue to upload shipping documents from our fleet and mobility vendors into our internal waste tracking system, increasing data availability regarding total waste generated by AT&T. This effort supports more accurate reporting of our waste data in the future and helps us better identify waste diversion solutions.

- **Minimizing Plastic Waste:** AT&T works to reduce the amount of plastic used in our operations. Where plastic waste is identified in our waste stream, we work with our vendors to recycle plastic responsibly and sustainably. For example, in 2023, one of our distribution centers engaged a new recycling vendor that enabled the recycling of over 240,000 pounds of plastic reels. In 2023, plastic waste accounted for 1.3% of our solid waste generation.

- **Diverting Office Furniture:** In 2023, we continued our Zero Waste Furniture Program, which aims to divert 90% or more of AT&T's surplus office furniture from landfill, including office desks, tables, file cabinets, chairs, modular panels and office partitions. Our disposition strategy is to reuse, resell, donate or recycle. In 2023, the program achieved a 96.78% diversion rate, including recycling 493.1 tons, reselling 250.1 tons and donating 154.3

6

tons.

- **Smart Trash Sorting:** In 2023, we became the first company in Texas to use a new artificial intelligence (AI) smart trash-sorting system. The system was trialed in the AT&T headquarters cafeteria, where employees engaged with it more than 210,000 times in 2023, helping to increase overall recycling accuracy by 24%. In 2024, we will expand the trial to include a more robust AI system on select headquarters floors.

- **Food Waste:** Between July and December of 2023, our headquarters cafeteria donated over 500 pounds of food to a local food pantry.

# Hazardous & Other Regulated Waste

AT&T's primary hazardous waste includes compressed gas cylinders, aerosol cans, acidic wastes, batteries, contaminated soils and contaminated liquids. We responsibly manage these materials and aim to comply with applicable environment, health and safety laws and regulations. In 2023, AT&T managed 20,861 tons of regulated waste, which includes hazardous and nonhazardous waste. We recycled 19,888 tons of this waste and sent less than 4% of hazardous waste to landfill. [1]

Our approach to hazardous waste and other regulated waste includes:

- **Minimization Efforts:** To minimize the impacts of hazardous waste, we first look to reduce the amount generated. If hazardous waste is generated, our focus is recycling, and we have implemented recycling programs for batteries and aerosol cans to divert those waste streams from landfill. Where there is no recycling or reuse option, hazardous waste is physically treated, incinerated or disposed of in an appropriate landfill as a last resort.

- **Procedures & Tracking:** We have procedures for managing and disposing of hazardous waste. We continue to manage our data collection systems and processes so that records for hazardous and other regulated waste disposal are gathered in one place for comprehensive tracking. This helps to ensure compliance and improve the accuracy of waste reporting and metrics for our business units that directly hire vendors to manage this waste.

# Asset Recovery

7

The AT&T Wireline Transformation and Asset Recovery group establishes practices that minimize the environmental impact of our company-generated waste and e-waste. Scrap materials processed by Asset Recovery include copper and fiber-optic telecommunications wire and central office equipment. Materials are dismantled, sorted and baled by commodity in preparation for sale or recycling.

Asset Recovery's approach includes:

- **R2 Certification:** Asset Recovery works with our contracted vendors, who are R2-certified, to recover and recycle network infrastructure assets. The R2 certification is a comprehensive global certification awarded to facilities that adhere to responsible electronics recycling standards.

- **Fiber-Optic Cable & Waste Diversion:** As described above, Asset Recovery diverts fiber-optic cable and related waste from landfill by processing it for use in other applications.

- **Domestic Waste Diversion:** In 2023, Asset Recovery handled 17,814 tons of domestic U.S. operational waste and kept 17,393 tons of these materials from landfill. [9]

- **Waste Incineration:** Waste Asset Recovery incinerated is done so for energy recovery.

- **Removing Our Waste:** When AT&T vacates facilities and outside plant infrastructure, our teams remove regulated materials and coordinate with vendors to recycle and dispose of the materials in an appropriate manner. Our material removal process varies by site to adhere to local waste removal regulations and guidelines.

## E-Waste

AT&T seeks to keep more electronic materials out of landfill through reuse programs. We believe electronic devices should be reused, refurbished or recycled, and we encourage our customers to participate in our e-waste reduction efforts. Our internal electronic device waste, as well as assets and materials managed by our Asset Recovery group, are responsibly recycled with R2-certified vendors. We follow the [Restriction of Hazardous Substances in Electrical and Electronic Equipment Directive](#) and the [Waste from Electrical and Electronic Equipment Directive](#) for electronic waste disposal.

To learn more about our product recycling and reuse efforts and our

8

sustainable packaging efforts, please visit our [Product Life Cycle](#) issue brief. For information about recycling AT&T devices, visit our [device recycling website](#).

### Transport & Storage

We continued identifying and contracting with more vendors located closer to our waste streams. This shift has enabled us to recycle more materials while also reducing the need for transportation to distant recycling facilities. We also store recycled batteries and e-waste in nearby warehouses until we can transport them to a U.S.-based smelter, so that we can make maximum-capacity trips to improve efficiency.



# Our Path Forward

We are committed to managing our waste generation and increasing diversion from landfill. After struggling to make meaningful improvements in waste diversion, we're now engaging property management specialists who are expected to drive more impactful results across AT&T facilities and operations. Meanwhile, we will continue identifying and contracting with vendors located in closer proximity to our waste streams to reduce emissions resulting from the transportation of AT&T waste.



# Additional Resources

- [AT&T device recycling website](#)

- [Restriction of Hazardous Substances in Electrical and Electronic Equipment Directive](#)

- [Waste Electrical and Electronic Equipment Directive](#)

---

1   Data is inclusive of AT&T operations (U.S. only).

2    AT&T recalculated the baseline for our landfill diversion goal because of new agreements with vendors. This update reduces some of the progress AT&T has made toward landfill diversion but focuses on the amount where AT&T has more operational control.

3    AT&T's total waste and recycling figures represent cumulative waste from AT&T's U.S. e-waste, general solid waste, furniture recycling, paper shredding, asset recovery and regulated (hazardous and nonhazardous) waste programs. Please note that waste data may not be complete due to the challenge of getting all business unit (BU) direct vendor hires to upload final shipping documents to the central waste tracking system.

4    Data (2020–2023) is inclusive of AT&T operations (U.S. only). Data has been restated to not include Vrio, Xandr or WarnerMedia. Starting in 2022, data does not include DIRECTV.

5    Data includes total waste recycled/reused and total waste sent to landfill, as well as total waste composted, and total waste managed through other means.

6    This category represents nonhazardous waste for which data on the management method was unavailable. AT&T is continually updating the vendor submittal process to integrate enhanced waste reporting metrics into contracts.

7    2022 "total domestic hazardous waste generated" and "other hazardous waste, not specified" increased due to disposal of disinfectant.

8    This category consists of hazardous waste for which the waste management vendors did not report the final disposal method, primarily because they were consolidated with wastes from other companies at the treatment, storage and disposal facilities prior to final disposition. Our EHS Waste team is continually working with those vendors to report the final disposition of AT&T hazardous waste more accurately.

9    Data covers the central offices of AT&T's wireline, longlines and DIRECTV business, as well as outside plant and some mobility locations in the contiguous U.S.

---

Last Updated: 8/2/2024



# Related Key Topics



**Climate Change & Greenhouse Gas Emissions**



**Energy Management**



**Environment, Health & Safety Compliance**



**Product Life Cycle**



**Responsible Supply Chain**



**Water Management**

**View All Key Topics**

AT&T | Sustainability Reporting

Join the conversation using **#ATTimpact**

**Corporate Responsibility**

**Back to Top** ^

Privacy Notice     Terms of Use     Accessibility     Contact Us

Subscribe to AT&T; News     Your Privacy Choices

© 2024 AT&T; Intellectual Property. All rights reserved.

11

12

# EXHIBIT B

13

https://sustainability.att.com/priority-topics/circularity    Go    MAR    APR **25** 2025    JUL

6 captures
25 Apr 2025 - 8 Aug 2025    2024    2025    2026    ▼ About this capture

 **AT&T**

Corporate Responsibility

⌂ > Key Topics > Circularity



# Circularity

Reducing waste and advancing recovery and recycling to minimize cost and material use.

Click through to learn about our 2024 impact in action. For detailed circularity data, please see our corporate responsibility KPI webpage.

ⓘ  Please note that 2024 data is estimated. Final values will be available in Q2 2025

> **Sustainability Accounting Standards Board Disclosures**
>
> TC-TL-440a.1



# Why It Matters: The Global Context

Side Navigation ⌄  ake-make-dispose approach to material use is resulting in t~~~ quick ~~~~~~~ of natural resources. In contrast, wider adoption of a circular

economy could extend the useful life of materials through reuse, recovery and recycling. Not only will this reduce virgin resource use; it also has the potential to [cut municipal waste by over 40% by 2050](#) and [reduce emissions by 39%](#).



# Our Approach

We are moving to better embrace circularity, aiming to maintain the highest utility and value of our assets and products while reducing electronic and operational waste. Guided by the framework published by the Circular Electronics Partnership, we are developing a roadmap that will guide us in driving circular economies for mobility devices, broadband devices and network equipment. This roadmap is meant to encourage a full life cycle approach to circularity and focus our attention on the areas where we have influence, as well as those where we have direct control.

**Our Influence: Circular Resources and Design**

- Resource and materials inputs

- Design and production

**Our Control: Recovery of Products and Equipment**

- Sales and use

- Collection

- Reverse logistics and recovery

Beyond devices and network equipment, we are also committed to managing operational waste, with a goal to reduce U.S. waste to landfill by 30% from 2019 through the end of 2030.

# Our Influence: Circular Resources and Design

## Resource and Materials Inputs

15

We are working to encourage a more circular approach to resource and material use in our supply chain. As an initial step, we have incorporated updates into our Supplier Citizenship and Sustainability Clause, which encourages our suppliers to implement and maintain quantifiable, time-bound emissions-reduction strategies, in line with industry best practices and international standards. This includes exploring and adopting innovative technologies and practices to reduce emissions across their operations and product/service life cycles. Additionally, through the EcoVadis platform, we are reviewing supplier performance across environment, labor and human rights, ethics and sustainable procurement. We expect this comprehensive approach to enable us to more accurately calculate our footprint and strategize reduction efforts.

Learn more about how we're using EcoVadis in our [Responsible Supply Chain issue brief](#).

## Design and Production

- **Devices and Equipment:** Most of our products are manufactured by suppliers, and we encourage them to design devices that consider end-of-life impacts. This involves engaging them on shared sustainability expectations through our [Principles of Conduct for Suppliers](#). We have updated our sustainability contract clause to emphasize the importance of adopting circular materials in product design, encouraging suppliers to pursue practices like circular materials use, AI implementation, alternative fuel sources and green energy procurement. We also encourage suppliers to pursue [TL 9000](#) certification, which includes sustainability requirements related to design and life cycle models. We expect device manufacturers to adhere to best-in-class energy-efficiency practices, analyzing life cycle performance to estimate energy impacts and inform enhanced energy management features. For example, our handset device manufacturers design smartphones that optimize battery standby and usage time without compromising user experience.

- **Packaging:** We support packaging suppliers to embed circularity considerations further into product packaging they create for us, assessing key metrics like energy and water use, emissions and waste to understand where there is room for improvement. We have achieved 100% recyclability for consumer device packaging and aim to use 100% recycled materials when shipping orders directly to customers.

16

# Our Control: Recovery of Products and Equipment

## Sales and Use

- **Devices:** Promoting the sale and use of products that keep resources in use for as long as possible is central to achieving our circularity roadmap. We strive to optimize the product use phase by offering device upgrades, insurance and trade-up programs for mobility devices. We continue to share information with consumers on the social and environmental impact of phone and tablet devices we sell. Through the AT&T Eco-Rating system, original equipment manufacturers (OEMs) [1] can assess and share product performance against 20 performance criteria across five attributes:

  - Substances of concern

  - Environmentally preferred materials

  - Energy efficiency and charging

  - End-of-life recycling

  - Environmentally and socially responsible policies and disclosures

- **Network equipment:** AT&T collaborates with peers through the Global System for Mobile Communications Association (GSMA), which has working groups focused on consumer device and network equipment recycling.

## Collection

- **Devices:** Customers can return their old devices when upgrading. They can also return devices with our trade-in program, through which they can access rewards to apply toward their bill, a new device or accessories. If devices have no trade-in value, customers can mail them to us for recycling. Customers' broadband internet devices can also be refurbished or recycled by booking an appointment with an AT&T technician to remove old equipment, or by mailing equipment in. When collecting devices, we prioritize protecting customers' privacy, including removing any customer-saved data. We offer customers detailed information about wiping data from their returned devices.

- **Network Equipment:** Whenever our network assets need to be replaced,

we recover as many waste materials as possible and maintain a team dedicated to responsibly handling equipment, scrap and surplus material generated through our wireline operations.

## Reverse Logistics and Recovery

- **Devices:** Where possible, we refurbish or resell returned devices. We also distribute refurbished devices to people affected by the digital divide. Where devices can't be used in their entirety, we extract reusable components for incorporation into new products. We strive to recycle remaining plastics and metals responsibly and require that our U.S. device recycling and salvage vendors maintain R2 certification, confirming adherence to responsible electronics recycling standards.

- **Network Equipment:** Our Wireline Transformation and Asset Recovery team works with R2-certified contracted vendors. We process scrap materials like copper and fiber-optic telecommunications wire, dismantling, sorting and baling materials by commodity for resale or recycling. Where asset waste can't be recovered for reuse or recycling, we incinerate it for energy recovery.

  - **Copper:** As customers continue to leave our copper networks, 100% of the copper we reclaim is recycled.

- **Batteries:** We use lead-acid batteries in some operations, primarily for network facility back-up power systems. As such, they are essential to delivering the reliable, resilient service our customers expect. When batteries reach their end of useful lives, we aim to recycle them for reuse. Recognizing concerns around exporting lead-acid batteries from the U.S. to locations where lower standards can significantly impact environmental safety and public health, we are shifting away from vendors that may export lead-acid batteries used in our operations. We continuously review and monitor vendors to ensure they understand and comply with our requirements.

# Addressing Operational Waste

We are working to minimize the waste and material impacts of our offices and manufacturing sites. Our approach involves reuse and recycling programs and other initiatives to reduce our overall waste footprint. In many locations, including across our Dallas headquarters campus, we provide recycling and

18

composting bins to encourage employees to responsibly dispose of their waste.

We store recycled batteries and e-waste in nearby warehouses before transporting them in bulk to a U.S.-based smelter to maximize trip efficiency. We ensure internal electronic device waste is recycled with R2-certified vendors, following the [Restriction of Hazardous Substances in Electrical and Electronic Equipment Directive](#) and the [Waste from Electrical and Electronic Equipment Directive](#).

Data tracking is central to an effective waste management approach, which is why we maintain an internal waste tracking system. We upload shipping documents from our fleet and mobility vendors, increasing data availability regarding total waste generated by AT&T.

## Hazardous and Regulated Waste

We responsibly manage hazardous and regulated materials in compliance with applicable environment, health and safety (EHS) laws and regulations. AT&T's primary hazardous waste includes:

- Compressed gas cylinders
- Aerosol cans
- Acidic wastes
- Batteries
- Contaminated soils
- Contaminated liquids

When it comes to minimizing hazardous waste, our first step is to reduce the volume generated. Step two is recycling, and we have implemented recycling programs for batteries and aerosol cans. Where reduction, recycling or reuse isn't feasible, we physically treat, incinerate or dispose of hazardous waste in an appropriate landfill as a last resort.

We maintain records for hazardous and other regulated waste disposal in one centralized place to help ensure compliance and improve the accuracy of waste reporting and metrics.

19

# Circularity Governance

Across AT&T, several internal organizations lead waste recycling and management programs, including:

- **Circularity Working Group:** Convenes three times a year to record the results of current circularity practices and identify new opportunities to enhance efforts. The group has a short-term goal to provide a comprehensive overview of the life cycles of our products, components and materials while highlighting work being done to generate revenue and savings through refurbishment, reuse and recycling efforts.

- **Global Real Estate Team:** Manages vendors at AT&T facilities to optimize waste, recycling and composting programs. We work with our real estate management companies to identify over-serviced locations to minimize unnecessary truck rolls and reduce waste.

- **EHS Team:** Manages hazardous and other regulated waste generated by operations. Also provides guidance to business units regarding battery and e-waste recycling and the management of other regulated waste.

- **Global Supply Chain Team:** Manages electronics recycling in coordination with e-waste recyclers.

- **Supply Chain Asset Recovery and Sustainability Team:** Manages recycling and potential resale of common, high-volume materials from internal network operations.

# Stakeholder Engagement

To support our circularity efforts, we partner strategically with like-minded peers through industry organizations such as:

- **Cellular Telecommunications and Internet Association (CTIA)**: AT&T collaborated with CTIA working groups to create the Guidelines for Wireless Device and Accessory Packaging and the refined industry standard for used wireless device grading.

- **Circular Electronics Partnership (CEP):** AT&T joined CEP to drive collective action on global circular electronics initiatives.

- **Global enabling Sustainability Initiative (GeSI):** AT&T is a member of GeSI's Circular Economy Working Group.

20

- **GSMA:** AT&T participates in GSMA's Climate Action Taskforce on device circularity, focused on consumer device equipment recycling.

- **Joint Alliance for CSR (JAC):** AT&T sits on the JAC Board of Directors, reinforcing our commitment to supply chain sustainability.

- **Small Network Equipment Voluntary Agreement:** AT&T participates in the agreement to help collectively reduce the energy demands of in-home internet equipment. Under the agreement, the average weighted power of each category of new small network equipment relative to broadband speed delivered had decreased annually since 2015, achieving an 89% overall reduction in 2023.



# Our 2024 Impact in Action

| Topic | Goal | Progress |
|---|---|---|
| Landfill Diversion | Reduce the amount of U.S. waste we send to landfill by 30% (2019 base year) by the end of 2030. | **Reduction of 11%.** Waste sent to landfill totaled 126,771 tons in 2024. This represents a reduction of 15,699 tons from our 2019 base year (142,470 tons). [2] |

# Giving Consumer Devices a Second Life

In 2024, we recovered nearly 12.5 million consumer devices, including nearly 9.1 million mobility devices and nearly 3.1 million broadband devices. This included more than 5.7 million devices returned through our trade-in program. As well as giving valuable materials a second life, through the refurbishment and recycling process we avoided more than 730,000 metric tons of $CO_2e$ compared to if those devices were new.

During the year, we piloted a series of initiatives to help more consumers recycle their old devices — particularly those with no value. For example, in partnership with Recycle Global Exchange, we launched a retail store pilot across 20 stores in Seattle, Dallas, Atlanta and Austin to enable customers to recycle old electronics, even if they had no trade-in value. Through in-store

21

collection bins, customers could drop off old phones, tablets and laptops for recycling in the select pilot stores.

Not only did the pilot help reduce waste and emissions associated with sending old tech to landfill; through it, we also delivered a successful consumer engagement campaign with Human-I-T to connect our e-waste and digital divide efforts. To celebrate Earth Month in April, for each pound of e-waste returned to pilot stores by consumers, a refurbished laptop was distributed to communities in need. In total, approximately 725 refurbished laptops were distributed as a result of the campaign. The pilot demonstrated the unique opportunity that exists for customers to make an impact to the digital divide by bringing back more nonvalued devices.

We plan to expand this digital divide commitment-aligned retail store device returns program to more than 100 stores in 2025.

Learn more about how we're bridging the digital divide in our [Digital Divide issue brief](#).

## Reducing Our Packaging Footprint

While most of our packaging is produced by OEMs, during the year, we updated AT&T-produced packaging for phones being sent to customers for insurance claims to more clearly highlight messaging on how to recycle the packaging at its end of life. This messaging now forms part of our brand guidelines to ensure that, wherever products come in our own-branded packaging, consumers know how to responsibly dispose of it.

As of the end of 2024, we have transitioned 89% of our shipping cartons to recycled content in Fort Worth, Texas; York, Pennsylvania; and Rialto, California — up from almost 80% in 2023. For 2024, this represented a transition of nearly 3,000 tons of paper used in packaging to 100% recycled content.

## Recovering Network Equipment Materials

Having launched the Wireline Operations program as a pilot in 2023, today, it is a vital facet of our circularity approach. During 2024, the program contributed to a 98% landfill diversion rate for operational waste recovered by our Wireline Operations Asset Recovery team. [3] This team is responsible for the recovery and processing of AT&T assets from the field as they reach end of life.

22

In total, our Asset Recovery team handled 47,231 tons of domestic U.S. operational waste and kept 46,136 tons from landfill. [3]

## Evolving Lower-Waste Operations

In 2023, we became the first company in Texas to use a new artificial intelligence (AI) smart trash-sorting system. As of 2024, we have three AI-enabled bins across our headquarters, helping increase recycling accuracy by tracking data on recycling, composting and waste for landfill in high-volume areas such as our cafeteria. To continue reaping the benefits of the system, we have extended the contract for another year, with plans to install additional bins in strategic locations.

Throughout 2024, our diversion rates with haulers for operational waste (including materials returned by customers to AT&T facilities or vendors) decreased by 1%. [2] A total of 19,322 tons was recycled, resulting in a general solid waste diversion rate of 13%. We also managed 14,915 tons of regulated waste — comprising both hazardous and nonhazardous waste. We recycled over 8,600 tons of this and sent 1% of hazardous waste to landfill. [2] In total, we diverted 76,467 metric tons of waste from landfill in 2024.

---

[1]    Apple does not participate in the program.

[2]    Data is inclusive of AT&T operations (U.S. only).

[3]    Data covers the central offices of AT&T's wireline and longlines business, as well as outside plant and some mobility locations in the contiguous U.S.

---

Last Updated: 4/23/2025



## Related Key Topics





**Efficiency & Emissions**

**Energy Management**

**Environment, Health & Safety Compliance**

**Natural Resources**

**Responsible Supply Chain**

View All Key Topics



**AT&T**
Corporate Responsibility

Join the conversation using
**#ATTimpact**

Privacy Notice

Terms of Use

Accessibility

Contact Us

Subscribe to AT&T; News

Your Privacy Choices

© 2025 AT&T; Intellectual Property. All rights reserved.

24

# EXHIBIT C

25

**Individual Defendants' Incentive Compensation**
**As a % of Base Salary (SAC)**

| | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| **Stephenson** | 947% | 1,322% | 1,646% | -- | -- |
| **Stephens** | 720% | 852% | 896% | -- | -- |
| **Stankey** | 519% | 519% | 513% | 540% | 575% |
| **Desroches** | -- | -- | -- | 505% | 247% |
| **McElfresh** | -- | -- | 271% | 446% | 496% |

Source:     SAC ¶¶ 443, 480, 482, 484, 486

26

# EXHIBIT D

27

ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
KLAMATH ENVIRONMENTAL LAW CENTER
1125 16th Street, Suite 204
Arcata, CA  95521
Tel: (707) 630-5061
Fax: (707) 630-5064
Email: wverick@igc.org

J. KIRK BOYD (State Bar No. 122759)
LAW OFFICE OF JOHN KIRK BOYD
548 Market St., Suite 1300
San Francisco, CA 94104-5401
Tel: (415) 440-2500
jkb@drjkb.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, <br><br> Plaintiff, <br><br> v. <br><br> PACIFIC BELL TELEPHONE COMPANY, <br><br> Defendant. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B) and California Safe Drinking Water and Toxic Enforcement Act, Cal. Health & Safety Code § 25249.5)** |

//

//

//

Complaint for Declaratory and
Injunctive Relief and Civil Penalties

28

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I. **JURISDICTION AND VENUE**

1. This is a civil suit brought under the citizen suit enforcement provision of the Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B) ("RCRA") and the California Safe Drinking Water and Toxic Enforcement Act of 1986 (codified as Cal. Health & Safety Code § 25249.5 *et seq.* ("Prop 65") against Pacific Bell Telephone Company ("Pac Bell" or "Defendant"). This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to RCRA Section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), 28 U.S.C. § 1331 (an action arising under the laws of the United States), 28 U.S.C. § 1367 (supplemental jurisdiction), Cal. Health & Safety Code §§ 25249.5, 25249.7(a) and (b) (Prop 65 discharge prohibition and citizen enforcement provisions), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2. As required by RCRA and Prop 65, between August 6, 2020 and August 20, 2020, Plaintiff provided Defendant with a written Notice of Violation of Federal Law and Notice of Intent to Begin Citizen Enforcement Action ("Notice Letter"), a true and correct copy of which is attached to this Complaint as **Exhibit A**, and which is incorporated by reference in full. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1). The Notice Letter was provided by certified mail return receipt requested, and by personal service on Defendant's Chief Executive Officer and agent for service of process. Plaintiff mailed a copy of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the California Attorney General, the Acting Director of the California Department of Resources, Recycling and Recovery, and the District Attorneys of the California counties of El Dorado and Placer, pursuant to 40 C.F.R. § 254.2 and Cal Health & Safety Code § 25249.7(d). Attached to the Notice Letter sent to Pac Bell was a summary of Proposition 65 that was prepared by California's Office of Environmental Health Hazard Assessment. In addition, each Notice Letter Plaintiff sent was accompanied by a Certificate of Service attesting to the service of the Notice Letter on each entity which received it. Each of these Notice Letters were delivered to the intended recipients no later than August 27, 2020.

3. More than ninety days have passed since Plaintiff served the Notice Letter on Defendant and the agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.

4. Venue is proper in the Eastern District of California pursuant to RCRA Section 7002(a), 42 U.S.C. § 6972(a) and Cal. Civ. Proc. Code § 393(a), because the sources of the violations are located within this District. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Intra-district venue is proper in Sacramento, California, because the sources of the violations are located in El Dorado and Placer Counties.

## II. <u>INTRODUCTION</u>

5. This Complaint seeks relief for Defendant's ongoing violations of RCRA and the discharge prohibition provisions of Prop 65. Defendant Pac Bell operated two submarine telecommunications cables ("Cables") that traversed portions of Lake Tahoe. These Cables are situated on the bottom of Lake Tahoe and, if measured end-to-end, the total length of the Cables would be approximately 41,600 feet. The two Cables share a similar structure. Each Cable has an outer coating of jute impregnated with tar/bitumens. Inside this jute coating are 0.25 inch steel rods that run the length of the submarine portions of the Cables. These steel rods are meant to protect the inner portion of each Cable. The inner portion of each cable consists of a lead jacket with walls approximately 0.25 inches thick. This lead jacket surrounds the copper strands and is meant to protect them from contact with water. Each foot in length of the Cables contains approximately 3.3 pounds of lead. The portions of the Cables that are at issue in this case – laying on the bottom of Lake Tahoe – therefore contain approximately 137,000 pounds (more than 68 tons) of lead.

6. The Cables are no longer operative. At some point in the past, Defendant replaced the Cables with new, more modern cables, placed either in the same location or routed through a different location. Once a Cable was replaced, it – and all of the lead it contained – was abandoned on the bottom of Lake Tahoe. Both of the Cables at issue in this case have been abandoned. One of the Cables has been cut at one or both ends; both Cables appear to not have been in service for years.

Complaint for Declaratory and
Injunctive Relief and Civil Penalties

3

30

7. Plaintiff has obtained a portion of one of the Cables and has tested it to determine whether the Cables are likely to leach lead into Lake Tahoe. A piece of the Cable approximately 40 centimeters in length was submerged in a plastic container of Lake Tahoe water. A sample was taken of the water after one day and analysis of that sample showed that enough lead had dissolved from the Cable into the water to cause the water to have a concentration of 650 micrograms of lead per liter of water. A second sample of the water was taken after seven days and analysis of that sample showed that enough lead had continued to be dissolved from the Cable to raise the concentration of lead in the water to 1,500 micrograms per liter. A reasonable inference that can be drawn from this data is that lead in the Cables is being disseminated into the aquatic environment of Lake Tahoe, and that humans and wildlife who make contact with, or who drink, Lake Tahoe water are exposed to the toxic heavy metal, lead.

8. Lead is a chemical that is known to the State of California to cause cancer and reproductive toxicity within the meaning of Cal. Health & Safety Code § 25249.8. California Code of Regulations, title 27, section 27001, subparagraphs (b) and (c). Various agencies of California and the United States government – including California's Office of Health Hazard Assessment, the federal Occupational Safety and Health Administration, the federal Department of Health & Human Services and the federal Environmental Protection Agency – have determined that exposure to lead impairs development of the central nervous system in species that have central nervous systems, including birds, fish and mammals, including humans, at blood lead levels as low as can be measured. Each of these agencies has determined that exposure to lead causes sterility in male mammals, including male humans; and the Department of Health & Human Services and the Environmental Protection Agency have both determined that exposure to lead delays the onset of puberty in female mammals, including female humans.

9. Lake Tahoe is a water of the State of California. The Regional Water Quality Control Board for the Lahontan Region ("Regional Board"), as part of its Water Quality Control Plan for the Lahontan Region ("Basin Plan"), has determined Lake Tahoe to be an existing source of municipal and residential water supply. The Basin Plan also states that the Regional Board has determined that the beneficial uses of Lake Tahoe also include wildlife habitat and water contact recreation. Lake Tahoe is thus a water of the State of California for purposes of California Fish & Game Code § 5650 and is a

Complaint for Declaratory and
Injunctive Relief and Civil Penalties

4

31

source of drinking water within the meaning of California Health & Safety Code §§ 25249.5 and 25249.11(d).  People boat on and swim in Lake Tahoe and make physical contact with its waters.  Lake Tahoe is habitat for many species of water fowl, for fish-eating species of birds such as osprey, fishers, eagles, and others members of the *accipitridea* family of birds, for many species of fish, and for marine mammals such as otters.

## III.    THE PARTIES

10.    Plaintiff CSPA is a non-profit public benefit corporation organized under the laws of California, based in Stockton, California.  CSPA is dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters of Lake Tahoe.  Members of CSPA boat on and swim in Lake Tahoe, and drink water drawn from the Lake.  Members of CSPA use Lake Tahoe to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study.  Members of CSPA also work on and in the waters of Lake Tahoe, making physical contact with those waters on a regular basis.  Lead that dissolves from the Cables threatens or impairs each of those uses and/or contributes to such threats and impairments.  For example, lead that dissolves from the Cables is present in Lake Tahoe water.  When CSPA members contact or drink that water, their body burden of lead is increased and they, and/or their children, face a concomitant increased risk of sterility, neurodevelopmental toxicity, cancer, and other physical ailments associated with exposure to lead.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's ongoing failure to comply with RCRA and Prop 65.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities because that relief will significantly reduce lead being discharged from Defendant's Cables into Lake Tahoe.  To further its goals, CSPA actively seeks federal and state agency implementation of state and federal laws that protect the integrity of California waters, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

11.    Pacific Bell Telephone Company ("Pac Bell") is a corporation that provides telecommunication services in California.

Complaint for Declaratory and                              5                                            32
Injunctive Relief and Civil Penalties

12. Pac Bell had the telecommunications Cables denoted in the Notice Letter as Cables A and B (herein referred to as Emerald Bay Cable and 7-Mile Cable, respectively) (including their lead components) installed in Lake Tahoe.

13. Pac Bell owned and operated these two telecommunications Cables as part of its business providing telecommunication services.

## IV. LEGAL BACKGROUND

### A. Resource Conservation and Recovery Act

14. Congress enacted RCRA to provide a remedy for harm caused by disposal of solid waste that may present an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B) authorizes commencement of a civil action to enjoin such disposal of waste. RCRA allows such a civil action to be brought against, "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment transportation or disposal of any solid or hazardous waste which may present in imminent and substantial endangerment to health or the environment."

### B. California's Safe Drinking Water & Toxic Enforcement Act ("Proposition 65")

15. The People of the State of California have declared in Proposition 65 their right "[t]o protect themselves and the water they drink against chemicals that cause cancer, birth defects, or other reproductive harm" and "[t]o secure strict enforcement of the laws controlling hazardous chemicals and deter actions that threaten health and public safety." (Sections 1(a) and (c) of Initiative Measure, Proposition 65.)

16. To accomplish this goal, Proposition 65 prohibits the discharge or release of substances listed by the State of California as causing cancer or reproductive toxicity to sources of drinking water. Cal. Health & Safety Code §25249.5 states, in pertinent part:

> No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water. . . .

17. Proposition 65 provides that any person "violating or threatening to violate" the statute may be enjoined in a court of competent jurisdiction. (Cal. Health & Safety Code §25249.7.) The

Complaint for Declaratory and
Injunctive Relief and Civil Penalties

6

33

phrase "threatening to violate" is defined to mean creating "a condition in which there is a substantial likelihood that a violation will occur." (Cal. Health & Safety Code §25249.11(e).)  Violators are liable for civil penalties of up to $2,500 per day for each violation of the Act. (Cal. Health & Safety Code § 25249.7.)

## IV.    STATEMENT OF FACTS

18.    Pac Bell, as part of its business of providing telecommunications services in California, installed two telecommunications Cables and routed submarine portions of those Cables through parts of Lake Tahoe.  One of these Cables crosses the mouth of Emerald Bay, with approximately 2,000 feet of cable submerged on the Lake bottom ("Emerald Bay Cable").  A second Cable ran (and remains) submerged for approximately 39,600 feet close to and along the western shore of the Lake ("7-Mile Cable").  More precise geographical coordinates for the location of these Cables are provided in the Notice Letter, appended hereto as **Exhibit A**, and wholly incorporated by reference into this Complaint.

19.    The Cables contain approximately 3.3 pounds of elemental lead per foot.  This lead is confined within the Cable in the form of a crystal matrix.

20.    As time and technology progressed, the copper strands in these Cables became obsolete; cables made of fiber optic strands offered more reliability and much greater capacity.  At a yet to be determined time in the past, Pac Bell replaced the Cables, submerged portions of which are relevant to this action.  When Pac Bell installed new fiber optic cables along the same submarine right of way as the Emerald Bay Cable crossing Emerald Bay, it obtained permission from the California Lands Commission to abandon the older copper-strand-Cable in place, and did so.  The second Cable, the 7-Mile Cable, running along the western shore of the Lake has also been abandoned in place.  The Cables are no longer used for any purpose.

21.    The Cables have not been maintained and have been worn and damaged over time.  The tar-impregnated jute coating can be seen to have been abraded and washed away over certain portions of the Cables.  Boat anchors and debris have torn into parts of the Cables, exposing the lead sheathing that was originally designed to protect the copper strands from contact with water.  The Emerald Bay Cable is cut at one or both ends, exposing the lead sheathing.

22.    When Pac Bell decommissioned the Cables, it generated a waste in the form of the

Complaint for Declaratory and                                    7                                                   34
Injunctive Relief and Civil Penalties

Cables. When Pac Bell abandoned the Cables, it disposed of that waste in the waters of Lake Tahoe.

23. Lake Tahoe water contacts the lead sheathing in the Cables and dissolves the lead, and then distributes the lead throughout Lake Tahoe and its larger environment. Lead is taken up by plants and animals and is thus introduced into the food chain of the larger Lake Tahoe ecosystem, concentrating in organisms as the lead moves up the food chain into higher benthic level organisms. Lake Tahoe is designated as a source of domestic and municipal drinking water.

24. For Californians, Lake Tahoe is a natural wonder, an icon. For more than 150 years, Californians have enjoyed recreating on the Lake, observing the wildlife that thrives in, on and around it. As long ago as 1869, Mark Twain described his fascination with Lake Tahoe in his novel, *The Innocents Abroad*.

25. Lead is a chemical that has long been known to cause neuro-toxicity. In the past decade, federal government agencies published the results of three large scale overviews of the toxicity of lead. These overviews evaluated lead toxicity in light of existing body of peer-reviewed, published research. Lead is especially toxic to the developing nervous system. There are various critical phases of the development of a central nervous system, including, for example, the genesis of synapses and synaptic pruning. Lead has been shown to impair both of these critical functions. Impairment of the genesis of synapses means that the nervous system develops without all of the needed synapses, which affects learning and memory. Impairment of synaptic pruning affects the ability to focus attention and to concentrate. Being able to learn, remember and to concentrate are three key components of what is commonly called intelligence. Not surprisingly, therefore, humans and other animals exposed peri-nataly to lead exhibit impaired performance on tests designed to assess intelligence. Children exposed to lead before age 6 have been shown to lose approximately one point of IQ for each microgram per deciliter increase in their blood lead levels. All three of the federal agencies that conducted these overviews of lead toxicity (The Agency for Toxic Substances and Disease Registry, the Environmental Protection Agency and the National Toxicology Program) concluded that there is sufficient evidence to conclude that exposure to lead in developing humans impairs their short-term memory and executive function – the ability to formulate and execute a plan. Lead has been shown to be toxic in this way at exposure levels as low as can be measured. There is no level of lead exposure that has been shown not

Complaint for Declaratory and                           8                              35
Injunctive Relief and Civil Penalties

to cause neurodevelopmental toxicity.

26.     Lead causes neurodevelopmental toxicity to humans, fish, birds, non-human mammals and all other animals that have central nervous systems.  Human beings, water fowl, birds, marine and other mammals, and fish are exposed to lead that leaches off the Cables into the wider water column of Lake Tahoe.  These exposures occur when these animals and humans make physical contact with Lake Tahoe water, when they drink that water, and when they ingest the flesh of other animals that have ingested lead from the water of Lake Tahoe.  Once ingested, lead is absorbed into the bones and teeth of the exposed animal, and exists in a dynamic equilibrium with the lead in blood cells and blood plasma.  Lead stored in bones and teeth is the major portion of the body burden of lead that most animals carry with them.  Lead stored in bones is released into the blood stream under certain conditions, most often when mammals lactate.  Lead released into the blood stream then perfuses developing nervous tissue, and impairing that development as described in the preceding paragraph.  As such, exposure to lead that has leached off the Cables and into the Lake Tahoe water column may cause imminent and substantial harm to Lake Tahoe-associated humans and wildlife.

## FIRST CLAIM FOR RELIEF
### Violations of RCRA
### 42 U.S.C. § 6972(a)(1)(B)

27.     Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

28.     To further the ends of its telecommunications business, Pac Bell has abandoned the Cables on the bottom of Lake Tahoe.  As such, the Cables are solid waste within the meaning of RCRA and Pac Bell has disposed of them, also within the meaning of RCRA.

29.     The two Cables Pac Bell disposed of on the bottom of Lake Tahoe together contain more than sixty tons of lead.

30.     Lead in the Cables comes into contact with the water of Lake Tahoe, which dissolves the lead, thus causing people who make physical contact with the water to be dermally exposed to lead. This dissolved lead from the cables is also ingested by humans when they drink water from Lake Tahoe or when they eat fish caught in Lake Tahoe.  Other animals in the greater Lake Tahoe ecosystem are

exposed to lead in similar ways.

31.     Lead is neurodevelopmentally toxic in all animals that possess a central nervous system, is toxic to spermatogenesis and sperm health, and delays onset of puberty in female humans and females of many other species.

32.     Because many vulnerable species are exposed to lead from the Cables, Pac Bell's disposal of the Cables on the bottom of Lake Tahoe causes, or may cause, imminent and substantial harm to human health and/or the environment.  Pac Bell's continuing disposal of the Cables on the bottom of Lake Tahoe thus violates 42 U.S.C. § 6972(a)(1)(B).  As such, Pac Bell is subject to an injunction ordering Pac Bell to remove the Cables from Lake Tahoe.

**SECOND CLAIM FOR RELIEF**
**Violations of Proposition 65**
**California Health & Safety Code § 25249.5** *et seq.*

33.     Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

34.     As the immediate result of its business practices, Pac Bell placed the Cables on the bottom of Lake Tahoe.  At all times relevant to this complaint, Pac Bell knew that the Cables contained lead, Pac Bell knew that the lead in the Cables would make contact with the waters of Lake Tahoe.

35.     Lead is confined inside the outer sheathing of the Cables in a crystal matrix of elemental lead in its solid state.  At all times relevant to this complaint, Pac Bell knew that, as a result of contact with Lake Tahoe water, lead in the Cables is dissolved by the Lake Tahoe water and thus escapes from the matrix, and thus from confinement in the interior of the Cables, and enters into the waters of Lake Tahoe in dissolved form.

36.     Lead in both its solid and dissolved forms is a substance listed as known to cause cancer and reproductive toxicity pursuant to California Health & Safety Code § 25249.8 and California Code of Regulations, title 27, section 27001, subparagraphs (b) and (c).

37.     The Regional Water Quality Control Board for the Lahontan Region as part of its Water Quality Control Plan for the Lahontan Region ("Basin Plan"), has determined Lake Tahoe to be an existing source of municipal and residential water supply.  The Basin Plan also has determined that

Complaint for Declaratory and
Injunctive Relief and Civil Penalties

10

37

beneficial uses of Lake Tahoe include wildlife habitat and water contact recreation. Lake Tahoe is thus a water of the State of California for purposes of California Fish & Game Code § 5650 and is a source of drinking water within the meaning of California Health & Safety Code §§ 25249.5 and 25249.11(d).

38. At all times relevant to this complaint, more than nine people have provided service to Pac Bell at the control and direction of that company. In exchange for this service, Pac Bell pays money to those providing it service. As such, at all times relevant to this complaint, Pac Bell has had ten or more employees within the meaning of California Labor Code section 3351, within the meaning of California Code of Regulations, title 27, section 25102, subparagraph (h), and thus within the meaning of California Health & Safety Code section 25249.11, subparagraph (b).

39. Because lead has escaped, is escaping and will continue to escape from the crystal matrix in which the lead is confined in the Cables, thus entering into the waters of Lake Tahoe, and because Pac Bell knew (and knows) this to be the case, Pac Bell has violated, and continues to violate, California Health & Safety Code section 25249.5.

40. As such, pursuant to California Health & Safety Code section 25249.7, subparagraph (a), Pac Bell is subject to an injunction ordering Pac Bell to remove the Cables from Lake Tahoe. Pursuant to California Health & Safety Code section 25249.7, subparagraph (b)(1), Pac Bell is subject to a civil penalty of up to $2,500 for each day of the year preceding the filing of the complaint in this action, and to an additional civil penalty of up to $2,500 per day in the future until Pac Bell stops releasing lead into the waters of Lake Tahoe.

## VI.   RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

a. Declare Pac Bell to have violated and to be in violation of 42 U.S.C. § 6972(a)(1)(B);

b. Enjoin Pac Bell from further and continuing disposal of the Cables where the Cables are in contact with the waters of Lake Tahoe;

c. Enjoin Pac Bell from further and continuing release of lead from the Cables into the waters of Lake Tahoe;

d. Order Defendants to pay civil penalties of $2,500 per day beginning one year before the filing of this complaint and continuing until Pac Bell no longer causes lead to be released from the

Cables into the waters of Lake Tahoe;

      e.  Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by RCRA and California Code of Civil Procedure section 1021.5; and,

      f.  Award any such other and further relief as this Court may deem appropriate.

Dated: January 14, 2021          Respectfully Submitted,

                    LAW OFFICES OF ANDREW L. PACKARD

                    By: /s/ William N. Carlon

                        William N. Carlon
                        Attorney for Plaintiff
                        CALIFORNIA SPORT FISHING
                        PROTECTION ALLIANCE

Complaint for Declaratory and        12         39
Injunctive Relief and Civil Penalties

# EXHIBIT A



August 20, 2020

Ken DaRosa, Acting Director
California Department of
Resources, Recycling and
Recovery
1001 "I" Street
Sacramento, CA 95814

Andrew R. Wheeler,
Administrator
U.S. EPA
1200 Pennsylvania Ave, N.W.
Washington, D.C. 20460

District Attorney
El Dorado County
778 Pacific Street
Placerville, CA 95667

District Attorney
Placer County
10810 Justice Center Dr.,
#240
Roseville, CA 95678

Rhonda J. Johnson, CEO
Pacific Bell Telephone
Company
430 Bush Street
San Francisco, CA 94108

John Busterud, Regional
Administrator
U.S. EPA, Region 9
75 Hawthorne Street
San Francisco, CA 94105

Douglas A. Cannon, CEO
Sierra Pacific Power Company
6100 Neil Road
Reno, NV 89511

Ian Robertson, CEO
Liberty Utilities (CalPeco
Electric) LLC
345 Davis Rd. Suite 100
Oakville L6J 2X1
ON, Canada

Proposition 65 Enforcement
Reporting
Attention Prop 65 Coordinator
1515 Clay St., Suite 2000
Oakland, CA 94612

CT Corporation System
Registered Agent for
Pacific Bell Telephone Company
818 West Seventh St., Ste 930
Los Angeles, CA 90017

Corpservices Company
Registered Agent for
Sierra Pacific Power Company
8301 Florence Ave, #201
Downey, CA 90240

CT Corporation System
Registered Agent for Liberty
Utilities (CalPeco Electric) LLC
818 West Seventh St. Ste 930
Los Angeles, CA 90017

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

> Re:   **Notice of Violations of Federal Law and Notice of Intent to Begin Citizen
> Enforcement Action**

Greetings:

I write on behalf of the California Sportfishing Protection Alliance (hereinafter, "CSPA")
to notify you of violations of federal and California law caused by four submerged cables (the

41

"Cables") that lie abandoned in Lake Tahoe's Emerald Bay and along the west shore of Lake Tahoe. Three of these Cables are submarine telecommunications cables; the other is a submarine power cable. Lake Tahoe is located in the California counties of Placer and El Dorado. These violations have been, and are continuing to be, committed by the "Noticed Parties" described in Section II, below, and, more fully, as the private entities in the attached Service List.

CSPA has conducted an investigation of the Cables, including having divers swim above them and photograph them, to determine the extent to which they discharge lead into Lake Tahoe. Lake Tahoe is an existing source of domestic and municipal drinking water. The Cables vary in size and length with three of them, two telecommunications and one power, crossing along the bottom near the mouth of Emerald Bay, and another one approximately five and a half miles traveling along the west shore of the lake. All of the Cables are damaged and discharging lead into Lake Tahoe.

The Cables are as follows:

**Cable A**.

Cable A is approximately 2000 feet long, submerged in Emerald Bay. The latitude and longitudinal coordinates for the southern endpoint is 38.96421504N -120.08144917W and 38.96482016N -120.08359610W for the northern endpoint. A visual inspection shows that Cable A is a submarine telecommunications type with an outer layer of jute impregnated with bitumens/tar, which covers steel rods that protect the interior of Cable A. Under the steel rods is a thick lead sheath that surrounds strands of copper wrapped in paper. This cable has been cut at both ends. An analysis of the piece of the cut end of Cable A reveals that the Cable contains per foot, 3.39 pounds of lead, 4.15 pounds of steel, 0.71 pounds of petroleum-based tar-impregnated jute and 0.77 pounds of copper. Accordingly, in its 2,000-foot length, Cable A contains approximately 6,780 pounds of lead. A visual inspection of Cable A reveals that not only is the Cable cut at one end, so obviously it is not in working condition, but the Cable is damaged at various places along its length, by boat anchors and in other ways, such that, in these damaged portions, the tar-impregnated jute covering no longer prevents water intrusion into the interior of the Cable.

**Cable B.**

Cable B is approximately five and a half miles long. It is submerged along the west shore of Lake Tahoe with the latitude and longitudinal coordinates for the southern end point of 38.94396945N -120.06913414W and 39.00944887N -120.11311122W for the northern endpoint. Cable B appears on close visual inspection to be of the same size, type and character as Cable A. At various points along its more than 5.5-mile length, Cable B has been damaged by boat anchors and has frayed on submerged rocks to the point that the lead sheath is directly exposed

to lake water. Based on an estimated 3.39 pounds per foot, the submerged portion of Cable B contains approximately 89,500 pounds of lead.

**Cable C.**

Cable C is approximately 2,000 feet long and submerged in Emerald Bay with latitude and longitudinal coordinates of 38.96105015N -120.08387085W for the southern end point and 38.96478251N -120.09067881W for the northern endpoint. A close visual inspection reveals that the Cable is a telecommunication cable of a submarine type. At various points it has been damaged by boat anchors and has frayed on submerged rocks to the point that the lead sheath is directly exposed to lake water. It appears to be unworkable and abandoned. Cable C is smaller in diameter than Cable A or Cable B. Nevertheless, it is estimated that the submerged portion of Cable C contains thousands of pounds of lead.

**Cable D.**

Cable D is approximately 2,000 feet long and submerged in Emerald Bay with latitude and longitudinal coordinates for the southern end point of 38.96125614N -120.08451815W and 38.96439289N -120.09007347W for the northern endpoint. A close visual inspection of Cable D reveals that it is a power cable and it is cut at both ends with the ends pulled away from the shore and left in deeper water. The GPS coordinates for the northern cut-end are 38.964735N -120.09058444W. The cable is also severely damaged at several places along its length and, thus, is no longer being used. Cable D is a submarine power cable with a lead sheath surrounding the inner core of copper wire. The Cable is approximately the same diameter as Cables A and B. Based upon this and visual inspection of Cable D, it is estimated that Cable D also contains approximately 3.39 pounds of lead per foot. Accordingly, it is estimated that the submerged portion of Cable D contains 6,780 pounds of lead.

CSPA submerged a sample of Cable A in a plastic container filled with Lake Tahoe water. After 24 hours, a sample was taken of the water and sent to a state-certified laboratory for analysis, which showed that enough lead had leached from the piece of the Cable to bring the concentration of lead in the water to 650 micrograms per liter. After seven days, another sample of the water was taken and sent to the same laboratory for analysis, which showed that the concentration of lead in the water had risen to 1,500 micrograms per liter. This is evidence that lead is leaching from the Cables into Lake Tahoe. Since the Cables have similar composition, based on these findings, it is reasonable to infer that they are all presently discharging lead into Lake Tahoe well beyond established limits for safety.

Lead is a substance that causes neurodevelopmental toxicity, reproductive toxicity (including sterility and delayed onset of puberty in females) and cancer in humans and other animals. Lead is known, pursuant to 27 Cal. Code Regs. section 27001, subsections (b) and (c), to cause cancer developmental and reproductive toxicity in both males and females. This letter

CSPA, RCRA & P65 Notice of Violations and Intent to Sue
August 5, 2020
Page 4

begins the process by which CSPA will seek available remedies under the federal Resource Conservation and Recovery Act ("RCRA") and California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"). CSPA will pursue these remedies to have the abandoned/discarded Cables removed from Lake Tahoe and disposed of in a way that they may no longer pose an imminent danger of substantial harm to human health, the health of other animals and the environment. Removal will prevent the ongoing discharge and release of lead into the waters of Lake Tahoe, a source of drinking water. CSPA will further seek civil penalties for Proposition 65 violations.

## I.      **The Noticing Party**

CSPA is a non-profit association dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters of Lake Tahoe. CSPA's main office is at 3536 Rainier Avenue, Stockton, California, 95204. CSPA's telephone number is (209) 464-5067. In addition to other California counties, members of CSPA reside in Placer and El Dorado Counties. CSPA members utilize the waters of Lake Tahoe for recreation and work in, on and around Lake Tahoe. Members of CSPA drink water that comes from Lake Tahoe.

## II.      **The Noticed Parties**

Pacific Bell Telephone Company ("Pac Bell" or "Noticed Party") is a corporation that provides telecommunication services in California. Pac Bell at one time had the telecommunications Cables A, B and C (including their lead components) installed in Lake Tahoe. Pac Bell owned and operated the Cables A, B and C as part of its business providing telecommunication services. Cables A, B and C are no longer used. Pac Bell abandoned the Cables A, B and C in place on the bottom of Lake Tahoe and had at least one of these Cables cut at both ends in Lake Tahoe as part of that abandonment. For each of these three Cables, this Notice pertains to the Cables themselves, their lead sheathing, and the lead that dissolves off the sheathing and is discharged and released into the water of Lake Tahoe. Pac Bell is in violation of the Resource Conservation and Recovery Act ("RCRA") and the discharge to drinking water provisions of Proposition 65.

Sierra Pacific Power Company ("NV Energy" or "Noticed Party") provides electrical power to consumers in East Central California and Nevada. As part of its electrical utility service, Sierra Pacific Power Company owned and operated Cable D, and had it installed in Lake Tahoe. Later it had both ends of the cable cut and moved to a deeper portion of Emerald Bay where they could not be as easily seen. In this manner, Sierra Pacific abandoned/discarded/disposed of the cable leaving it to leach lead into Emerald Bay. This Notice pertains to Cable D itself, its lead sheathing, and the lead that dissolves off the sheathing and is discharged and released into the water of Lake Tahoe. NV Energy is in violation of the RCRA and the discharge to drinking water provisions of Proposition 65.

44

Liberty Utilities (CalPeco Electric), LLC is an electric utility company. In 2011, NV Energy assigned its lease for Cable D to California Pacific Electric Company, LLC ("CalPeco Electric"). CalPeco Electric was acquired by Liberty Utilities, LLC in 2012 and is now named, Liberty Utilities (CalPeco Electric), LLC (a "Noticed Party"). As part of its business of holding the lease from the State Lands Commission for Cable D, Liberty Utilities, LLC is thus responsible for the abandonment and discard of Cable D on the bottom of Lake Tahoe, is continuing its abandonment of Cable D on the bottom of Lake Tahoe, and continues to discharge and release lead from Cable D into Lake Tahoe waters. Liberty Utilities (CalPeco Electric) has been doing so each day for at least the past five years and will continue to do so each day into the future until Cable D is removed from the bottom of LakeTahoe is disposed of properly. Liberty Utilities (CalPeco Electric), LLC is in violation of the RCRA and the discharge to drinking water provisions of Proposition 65.

## III.    Factual Background: The Problem with Abandoning the Cables in Lake Tahoe

As discussed above, the submerged Cables have been cut or damaged, which has allowed water to intrude into the Cables. In addition, inspection of the submerged part of the Cables shows that as part of the damage to the Cables, sections of the tar-impregnated jute have virtually disappeared, leaving the steel protective rods exposed, and in some places severed. This means that in sections of the Cables that have been damaged in this way, lake water intrudes into the Cables and contacts the lead sheathing. It has been shown that when Lake Tahoe water contacts the lead sheathing in the Cable, the water dissolves lead from the sheathing. This lead-laden water then mingles with the larger body of Lake Tahoe water, polluting it with lead. Because the Noticed Parties have discarded/abandoned and disposed of the Cables in the manner they have, the Cables continuously discharge and release lead – a toxic heavy metal – into the local aquatic environment, which is a source of drinking water within the meaning of California Health & Safety Code section 25249.5.

The disposal and abandonment of the Cables in Lake Tahoe, and the subsequent and continuing discharge of lead from the Cables into Lake Tahoe poses a significant threat to the health of persons and to the local environment, including fish and wildlife. Not only is lead toxic to humans, it is also toxic to birds, fish and mammals. Numerous members of the public are exposed daily to lead from the Cables when they swim, boat and dive in Lake Tahoe and when they drink water drawn from Lake Tahoe, or eat fish caught in Lake Tahoe. The lead also increases the body burdens of lead in the fish, birds and mammals that live in or on Lake Tahoe and/or feed on prey that live in or on Lake Tahoe. These increased lead body burdens cumulatively subject humans and animals to significant health risks.

## IV. Specific Permits, Standards, Regulations, Conditions, Requirements or Orders Violated

### A. RCRA Standard Violated

With regard to RCRA, this Notice pertains to the Noticed Parties' violations of 42 U.S.C. § 6972(a)(1)(B), which provides that:

> Any person may commence a civil action on his own behalf – against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

For purposes of RCRA, the Noticed Parties have contributed and are contributing to the past, present and future storage and disposal of solid waste, to wit the Cables and their lead sheathing, in a way that may present an imminent and substantial endangerment to health and the environment.

### B. Provisions of Proposition 65 that are Being Violated

With regard to Proposition 65, this Notice pertains to the Noticed Parties' violations of Cal. Health & Saf. Code § 25249.5, which provides that:

> No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

The Noticed Parties cut the Cables and abandoned them, and left damaged Cables in Lake Tahoe. They did this as part of their business selling telecommunication services and electrical utility service in California and Nevada. As the Cables sit abandoned on the bottom of Lake Tahoe, they continuously discharge and release lead – a chemical known to the State of California to cause cancer and reproductive toxicity – into the waters of Lake Tahoe. Each Noticed Party employs ten or more persons and is thus a "person in the course of business" for purposes of California Health & Safety Code section 25249.11(b).

Pursuant to the Basin Plan for the Lahontan Region, Lake Tahoe has been designated an existing source of domestic and municipal water supply. As such, Lake Tahoe is a source of

46

drinking water within the meaning of California Health & Safety Code section 25249.11(d). The Noticed Parties' business practice of leaving the Cables abandoned on the bottom of Lake Tahoe is thus a continuous violation of California Health & Safety Code section 25249.5 because the Cables continuously discharge and release lead into Lake Tahoe waters.

### C.     The Activity that Constitutes the Violations

This notice of intention to file a citizen suit pertains to the Cables, which lie discarded, abandoned and disposed of on the bottom of Lake Tahoe in Placer and El Dorado Counties, California. The Cables continuously discharge and release lead into the waters of Lake Tahoe. Humans and wildlife utilize Lake Tahoe and, in doing so, are exposed to the lead that the abandoned Cables discharge and release into the waters of Lake Tahoe.

Lead has long been known to be a potent neurotoxin. There is an extensive toxicological literature that demonstrates that exposure to lead causes sterility in male humans and other mammals. There is an extensive toxicological literature that demonstrates that exposure to lead delays the onset of puberty in female humans and other mammals. Exposure to lead has been shown to kill aquatic bird life. Lead is toxic to fish and, basically, any animal that has a central nervous system. There is an extensive toxicological literature that demonstrates that pre-natal exposure to lead impairs the development of the central nervous systems of humans and other animals. Lead does this at levels of exposure as low as can be measured. Lead's toxic effect on the developing nervous system does so according to a supralinear curve, which means that lower levels of exposure do proportionately more harm to the developing nervous system than higher levels of exposure. There is an extensive toxicological literature that demonstrates that for each one microgram per deciliter rise in the concentration of lead in blood of a human between conception and six years of age, there is a corresponding loss of approximately one IQ point. There is no level of exposure to lead known to science that does not cause harm to humans and other animals.

### V.     The Persons Responsible for Violating RCRA and Proposition 65

The Noticed Parties are each responsible for violating RCRA and Proposition 65 as further described in this letter.

### A.     Dates of Violation of RCRA, 42 U.S.C. § 6972(a)(1)(B)

Lead has been discharged and released from the lead sheathing of the Cables into the waters of Lake Tahoe every day since the Noticed Parties cut the Cables and abandoned them on the bottom of Lake Tahoe and left them damaged on the bottom knowing they were damaged. Lead will continue to be discharged and released from the lead sheathing of the Cables into the waters of Lake Tahoe, thus presenting an imminent and substantial endangerment to health and the environment that has occurred every day for at least the past five years and will continue every day into the future until the Noticed Parties remove the Cables from Lake Tahoe and properly dispose of them. Accordingly, the Noticed Parties have been violating this RCRA

CSPA, RCRA & P65 Notice of Violations and Intent to Sue
August 5, 2020
Page 8

provision continuously for at least the past five years.  Thus, the dates of violation to which this Notice pertains are each and every single day dating back at least five years from the date of this letter and continuing each day into the future until the abandoned Cables have been removed from Lake Tahoe and disposed of in a responsible manner.

### B.      Dates of Violation of Proposition 65

The Cables have discharged and released lead into the waters of Lake Tahoe every day for at least the past year preceding the date of this Notice letter.  The Cables will all continue to discharge and release lead into the waters of Lake Tahoe each and every day into the future until the Noticed Parties remove the Cables from Lake Tahoe and properly dispose of them.  The dates of violation of Health and Safety Code section 25249.5 are each day over at least the past year, plus every day into the future until the abandoned Cables have been removed from Lake Tahoe.

### VI.      Full Name, Address and Telephone Number of the Person Giving Notice

The full name, address and telephone number of the person providing this Notice is:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainer Avenue
Stockton, CA 95204
(209) 464-5067

### VII.      Name, Address and Telephone Numbers of Noticing Party's Counsel

William Verick
Klamath Environmental Law Center
1125 16th Street, Suite 204
Arcata, CA 95521
(707) 630-5061

Brian Acree
Law Offices of Brian Acree
331 "J" Street, Suite 200
Sacramento, CA 95814
(916) 505-6861

Andrew Packard
William Carlon
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060

Kirk Boyd
Law Offices of Kirk Boyd
548 Market Street, Suite 1300
San Francisco, CA 94104
(415) 440-2500

CSPA would be happy to discuss effective remedies for the violations referenced in this Notice.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate these discussions immediately so that a resolution may be reached before the end of the

Case 3:24-cv-01196-N Document 10-1 Filed 12/12/25 Page 53 of 78 PageID 2569
Case 2:21-cv-00073-JDP Document 1 Filed 01/14/21 Page 22 of 22

60-day notice period (for the Proposition 65 violations alleged here) and 90-day notice period (for the RCRA violations alleged here).  Please contact counsel if you have any questions or would like more information

Cordially,

William Verick

# EXHIBIT E

ANDREW L. PACKARD (State Bar No. 168690)
WILLIAM N. CARLON (State Bar No. 305739)
LAW OFFICES OF ANDREW L. PACKARD
245 Kentucky Street, Suite B3
Petaluma, CA 94952
Tel: (707) 782-4060
Fax: (707) 782-4062
andrew@packardlawoffices.com
wncarlon@packardlawoffices.com

WILLIAM VERICK (State Bar No. 140972)
KLAMATH ENVIRONMENTAL LAW CENTER
1125 16th Street, Suite 204
Arcata, CA 95521
Tel: (707) 630-5061
Fax: (707) 630-5064
Email: wverick@igc.org

J. KIRK BOYD (State Bar No. 122759)
LAW OFFICE OF JOHN KIRK BOYD
548 Market St., Suite 1300
San Francisco, CA 94104-5401
Tel: (415) 440-2500
jkb@drjkb.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, <br><br> Plaintiff, <br><br> v. <br><br> PACIFIC BELL TELEPHONE COMPANY, <br><br> Defendant. | Case No.2:21-cv-00073-MCE-JDP <br><br> **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B)** |

First Amended Complaint for Declaratory and
Injunctive Relief and Civil Penalties

51

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   <u>JURISDICTION AND VENUE</u>

1.   This is a civil suit brought under the citizen suit enforcement provision of the Federal Resource Conservation and Recovery Act, 42 U.S.C. § 6972(a)(1)(B) ("RCRA") against Pacific Bell Telephone Company ("Pac Bell" or "Defendant").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to RCRA Section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), 28 U.S.C. § 1331 (an action arising under the laws of the United States) and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.   As required by RCRA, between August 6, 2020 and August 20, 2020, Plaintiff provided Defendant with a written Notice of Violation of Federal Law and Notice of Intent to Begin Citizen Enforcement Action ("Notice Letter"), a true and correct copy of which is attached to this Complaint as **Exhibit A**, and which is incorporated by reference in full.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1).  The Notice Letter was provided by certified mail return receipt requested, and by personal service on Defendant's Chief Executive Officer and agent for service of process.  Plaintiff mailed a copy of the Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the California Attorney General, the Acting Director of the California Department of Resources, Recycling and Recovery pursuant to 40 C.F.R. § 254.2.  Each of these Notice Letters were delivered to the intended recipients no later than August 27, 2020.

3.   More than ninety days have passed since Plaintiff served the Notice Letter on Defendant and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.

4.   Venue is proper in the Eastern District of California pursuant to RCRA Section 7002(a), 42 U.S.C. § 6972(a) because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to

First Amended Complaint for Declaratory and Injunctive Relief and Civil Penalties          2          52

Plaintiff's claims occurred in this District. Intra-district venue is proper in Sacramento, California, because the sources of the violations are located in El Dorado and Placer Counties.

## II.      INTRODUCTION

5.      This Complaint seeks relief for Defendant's ongoing violations of RCRA. Defendant Pac Bell operated two submarine telecommunications cables ("Cables") that traversed portions of Lake Tahoe. These Cables are situated on the bottom of Lake Tahoe and, if measured end-to-end, the total length of the Cables would be approximately 41,600 feet. The two Cables share a similar structure. Each Cable has an outer coating of jute impregnated with tar/bitumens. Inside this jute coating are 0.25 inch steel rods that run the length of the submarine portions of the Cables. These steel rods are meant to protect the inner portion of each Cable. The inner portion of each cable consists of a lead jacket with walls approximately 0.25 inches thick. This lead jacket surrounds the copper strands and is meant to protect them from contact with water. Each foot in length of the Cables contains approximately 3.3 pounds of lead. The portions of the Cables that are at issue in this case – laying on the bottom of Lake Tahoe – therefore contain approximately 137,000 pounds (more than 68 tons) of lead.

6.      The Cables are no longer operative. At some point in the past, Defendant replaced the Cables with new, more modern cables, placed either in the same location or routed through a different location. Once a Cable was replaced, it – and all of the lead it contained – was abandoned on the bottom of Lake Tahoe. Both of the Cables at issue in this case have been abandoned. One of the Cables has been cut at one or both ends; both Cables appear to not have been in service for years.

7.      Plaintiff has obtained a portion of one of the Cables and has tested it to determine whether the Cables are likely to leach lead into Lake Tahoe. A piece of the Cable approximately 40 centimeters in length was submerged in a plastic container of Lake Tahoe water. A sample was taken of the water after one day and analysis of that sample showed that enough lead had dissolved from the Cable into the water to cause the water to have a concentration of 650 micrograms of lead per liter of water. A second sample of the water was taken after seven days and analysis of that sample showed that enough lead had continued to be dissolved from the Cable to raise the concentration of lead in the water to 1,500 micrograms per liter. A reasonable inference that can be drawn from this data is that lead in the Cables is being disseminated into the aquatic environment of Lake Tahoe, and that humans and wildlife

First Amended Complaint for Declaratory and
Injunctive Relief and Civil Penalties

3

53

who make contact with, or who drink, Lake Tahoe water are exposed to the toxic heavy metal, lead.

8.      Lead is a chemical that is known to the State of California to cause cancer and reproductive toxicity within the meaning of Cal. Health & Safety Code § 25249.8.  California Code of Regulations, title 27, section 27001, subparagraphs (b) and (c).  Various agencies of California and the United States government – including California's Office of Health Hazard Assessment, the federal Occupational Safety and Health Administration, the federal Department of Health & Human Services and the federal Environmental Protection Agency – have determined that exposure to lead impairs development of the central nervous system in species that have central nervous systems, including birds, fish and mammals, including humans, at blood lead levels as low as can be measured.  Each of these agencies has determined that exposure to lead causes sterility in male mammals, including male humans; and the Department of Health & Human Services and the Environmental Protection Agency have both determined that exposure to lead delays the onset of puberty in female mammals, including female humans.

9.      Lake Tahoe is a water of the State of California.  The Regional Water Quality Control Board for the Lahontan Region ("Regional Board"), as part of its Water Quality Control Plan for the Lahontan Region ("Basin Plan"), has determined Lake Tahoe to be an existing source of municipal and residential water supply.  The Basin Plan also states that the Regional Board has determined that the beneficial uses of Lake Tahoe also include wildlife habitat and water contact recreation.  People boat on and swim in Lake Tahoe and make physical contact with its waters.  Lake Tahoe is habitat for many species of water fowl, for fish-eating species of birds such as osprey, fishers, eagles, and others members of the *accipitridea* family of birds, for many species of fish, and for marine mammals such as otters.

## III.     THE PARTIES

10.      Plaintiff CSPA is a non-profit public benefit corporation organized under the laws of California, based in Stockton, California.  CSPA is dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters of Lake Tahoe.  Members of CSPA boat on and swim in Lake Tahoe, and drink water drawn from the Lake.  Members of CSPA use Lake Tahoe to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study.  Members of CSPA also work on and in the waters of Lake Tahoe, making physical

First Amended Complaint for Declaratory and          4          54
Injunctive Relief and Civil Penalties

contact with those waters on a regular basis. Lead that dissolves from the Cables threatens or impairs each of those uses and/or contributes to such threats and impairments. For example, lead that dissolves from the Cables is present in Lake Tahoe water. When CSPA members contact or drink that water, their body burden of lead is increased and they, and/or their children, face a concomitant increased risk of sterility, neurodevelopmental toxicity, cancer, and other physical ailments associated with exposure to lead. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's ongoing failure to comply with RCRA. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities because that relief will significantly reduce lead being discharged from Defendant's Cables into Lake Tahoe. To further its goals, CSPA actively seeks federal and state agency implementation of state and federal laws that protect the integrity of California waters, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

11. Pacific Bell Telephone Company ("Pac Bell") is a corporation that provides telecommunication services in California.

12. Pac Bell had the telecommunications Cables denoted in the Notice Letter as Cables A and B (herein referred to as Emerald Bay Cable and 7-Mile Cable, respectively) (including their lead components) installed in Lake Tahoe.

13. Pac Bell owned and operated these two telecommunications Cables as part of its business providing telecommunication services.

## IV.   LEGAL BACKGROUND

### Resource Conservation and Recovery Act

14. Congress enacted RCRA to provide a remedy for harm caused by disposal of solid waste that may present an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B) authorizes commencement of a civil action to enjoin such disposal of waste. RCRA allows such a civil action to be brought against, "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment transportation or disposal of any solid or hazardous waste which may present in imminent and substantial endangerment to health or the environment."

First Amended Complaint for Declaratory and           5                                    55
Injunctive Relief and Civil Penalties

## V.    STATEMENT OF FACTS

15.    Pac Bell, as part of its business of providing telecommunications services in California, installed two telecommunications Cables and routed submarine portions of those Cables through parts of Lake Tahoe.  One of these Cables crosses the mouth of Emerald Bay, with approximately 2,000 feet of cable submerged on the Lake bottom ("Emerald Bay Cable").  A second Cable ran (and remains) submerged for approximately 39,600 feet close to and along the western shore of the Lake ("7-Mile Cable").  More precise geographical coordinates for the location of these Cables are provided in the Notice Letter, appended hereto as **Exhibit A**, and wholly incorporated by reference into this Complaint.

16.    The Cables contain approximately 3.3 pounds of elemental lead per foot.  This lead is confined within the Cable in a crystal matrix.

17.    As time and technology progressed, the copper strands in these Cables became obsolete; cables made of fiber optic strands offered more reliability and much greater capacity.  At a yet to be determined time in the past, Pac Bell replaced the Cables, submerged portions of which are relevant to this action.  When Pac Bell installed new fiber optic cables along the same submarine right of way as the Emerald Bay Cable crossing Emerald Bay, it obtained permission from the California Lands Commission to abandon the older copper-strand-Cable in place, and did so.  The second Cable, the 7-Mile Cable, running along the western shore of the Lake has also been abandoned in place.  The Cables are no longer used for any purpose.

18.    The Cables have not been maintained and have been worn and damaged over time.  The tar-impregnated jute coating can be seen to have been abraded and washed away over certain portions of the Cables.  Boat anchors and debris have torn into parts of the Cables, exposing the lead sheathing that was originally designed to protect the copper strands from contact with water.  Cable A is cut at both ends, exposing the lead sheathing.

19.    When Pac Bell decommissioned the Cables, it generated a waste in the form of the Cables.  When Pac Bell abandoned the Cables, it disposed of that waste in the waters of Lake Tahoe.

20.    Lake Tahoe water contacts the lead sheathing in the Cables and dissolves the lead, and then distributes the lead throughout Lake Tahoe and its larger environment.  Lead is taken up by plants and animals and is thus introduced into the food chain of the larger Lake Tahoe ecosystem,

Case 2:21-cv-00073-MCE-JDP Document 6 Filed 04/09/21 Page 7 of 19

concentrating in organisms as the lead moves up the food chain into higher benthic level organisms. Lake Tahoe is designated as a source of domestic and municipal drinking water.

21. For Californians, Lake Tahoe is a natural wonder, an icon. For more than 150 years, Californians have enjoyed recreating on the Lake, observing the wildlife that thrives in, on and around it. As long ago as 1869, Mark Twain described his fascination with Lake Tahoe in his novel, *The Innocents Abroad*.

22. Lead is a chemical that has long been known to cause neuro-toxicity. In the past decade, federal government agencies published the results of three large scale overviews of the toxicity of lead. These overviews evaluated lead toxicity in light of existing body of peer-reviewed, published research. Lead is especially toxic to the developing nervous system. There are various critical phases of the development of a central nervous system, including, for example, the genesis of synapses and synaptic pruning. Lead has been shown to impair both of these critical functions. Impairment of the genesis of synapses means that the nervous system develops without all of the needed synapses, which affects learning and memory. Impairment of synaptic pruning affects the ability to focus attention and to concentrate. Being able to learn, remember and to concentrate are three key components of what is commonly called intelligence. Not surprisingly, therefore, humans and other animals exposed perinatally to lead exhibit impaired performance on tests designed to assess intelligence. Children exposed to lead before age 6 have been shown to lose approximately one point of IQ for each microgram per deciliter increase in their blood lead levels. All three of the federal agencies that conducted these overviews of lead toxicity (The Agency for Toxic Substances and Disease Registry, the Environmental Protection Agency and the National Toxicology Program) concluded that there is sufficient evidence to conclude that exposure to lead in developing humans impairs their short-term memory and executive function – the ability to formulate and execute a plan. Lead has been shown to be toxic in this way at exposure levels as low as can be measured. There is no level of lead exposure that has been shown not to cause neurodevelopmental toxicity.

23. Lead causes neurodevelopmental toxicity to humans, fish, birds, non-human mammals and all other animals that have central nervous systems. Human beings, water fowl, birds, marine and other mammals, and fish are exposed to lead that leaches off the Cables into the wider water column of

First Amended Complaint for Declaratory and Injunctive Relief and Civil Penalties                7                                    57

Lake Tahoe.  These exposures occur when these animals and humans make physical contact with Lake Tahoe water, when they drink that water, and when they ingest the flesh of other animals that have ingested lead from the water of Lake Tahoe.  Once ingested, lead is absorbed into the bones and teeth of the exposed animal, and exists in a dynamic equilibrium with the lead in blood cells and blood plasma.  Lead stored in bones and teeth is the major portion of the body burden of lead that most animals carry with them.  Lead stored in bones is released into the blood stream under certain conditions, most often when mammals lactate.  Lead released into the blood stream then perfuses developing nervous tissue, and impairing that development as described in the preceding paragraph.  As such, exposure to lead that has leached off the Cables and into the Lake Tahoe water column may cause imminent and substantial harm to Lake Tahoe-associated humans and wildlife.

**FIRST CLAIM FOR RELIEF**
**Violations of RCRA**
**42 U.S.C. § 6972(a)(1)(B)**

24.     Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

25.     To further the ends of its telecommunications business, Pac Bell has abandoned the Cables on the bottom of Lake Tahoe.  As such, the Cables are solid waste within the meaning of RCRA and Pac Bell has disposed of them, also within the meaning of RCRA.

26.     The two Cables Pac Bell disposed of on the bottom of Lake Tahoe together contain more than sixty tons of lead.

27.     Lead in the Cables comes into contact with the water of Lake Tahoe, which dissolves the lead, thus causing people who make physical contact with the water to be dermally exposed to lead.  This dissolved lead from the cables is also ingested by humans when they drink water from Lake Tahoe or when they eat fish caught in Lake Tahoe.  Other animals in the greater Lake Tahoe ecosystem are exposed to lead in similar ways.

28.     Lead is neurodevelopmentally toxic in all animals that possess a central nervous system, is toxic to spermatogenesis and sperm health, and delays onset of puberty in female humans and females of many other species.

First Amended Complaint for Declaratory and             8                                    58
Injunctive Relief and Civil Penalties

29. Because many vulnerable species are exposed to lead from the Cables, Pac Bell's disposal of the Cables on the bottom of Lake Tahoe causes, or may cause, imminent and substantial harm to human health and/or the environment. Pac Bell's continuing disposal of the Cables on the bottom of Lake Tahoe thus violates 42 U.S.C. § 6972(a)(1)(B). As such, Pac Bell is subject to an injunction ordering Pac Bell to remove the Cables from Lake Tahoe.

## VI.   RELIEF REQUESTED

Wherefore, CSPA respectfully requests that this Court grant the following relief:

    a. Declare Pac Bell to have violated and to be in violation of 42 U.S.C. § 6972(a)(1)(B);

    b. Enjoin Pac Bell from further and continuing disposal of the Cables where the Cables are in contact with the waters of Lake Tahoe;

    c. Enjoin Pac Bell from further and continuing release of lead from the Cables into the waters of Lake Tahoe;

    d. Order Pac Bell to undertake measures to remediate the release of lead resulting from Pac Bell's disposal of Cables in the waters of Lake Tahoe.

    e. Award Plaintiff's costs and fees (including reasonable attorney, witness, and consultant fees) as authorized by RCRA; and,

    f. Award any such other and further relief as this Court may deem appropriate.

Dated: April 7, 2021                Respectfully Submitted,

                                LAW OFFICES OF ANDREW L. PACKARD

                                By: /s/ Andrew L. Packard

                                  Andrew L. Packard
                                  Attorneys for Plaintiff
                                  CALIFORNIA SPORTFISHING
                                  PROTECTION ALLIANCE

# EXHIBIT A



August 6, 2020

Ken DaRosa, Acting Director
California Department of
Resources, Recycling and
Recovery
1001 "I" Street
Sacramento, CA 94814

Rhonda J. Johnson, CEO
Pacific Bell Telephone
Company
430 Bush Street
San Francisco, CA 94108

Proposition 65 Enforcement
Reporting
Attention Prop 65 Coordinator
1515 Clay St., Suite 2000
Oakland, CA 94612

Andrew R. Wheeler,
Administrator
U.S. EPA
1200 Pennsylvania Ave, N.W.
Washington, D.C. 20460

John Busterud, Regional
Administrator
U.S. EPA, Region 9
75 Hawthorne Street
San Francisco, CA 94105

CT Corporation System
Registered Agent for
Pacific Bell Telephone Company
818 West Seventh St., Ste 930
Los Angeles, CA 90017

District Attorney
El Dorado County
778 Pacific Street
Placerville, CA 95667

Douglas A. Cannon, CEO
Sierra Pacific Power Company
6100 Neil Road
Reno, NV 89511

Corpservices Company
Registered Agent for
Sierra Pacific Power Company
8301 Florence Ave, #201
Downey, CA 90240

District Attorney
Placer County
10810 Justice Center Dr.,
#240
Roseville, CA 94678

Ian Robertson, CEO
Liberty Utilities (CalPeco
Electric) LLC
345 Davis Rd. Suite 100
Oakville L6J 2X1
ON, Canada

CT Corporation System
Registered Agent for Liberty
Utilities (CalPeco Electric) LLC
818 West Seventh St. Ste 930
Los Angeles, CA 90017

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

> **Re:** **Notice of Violations of Federal Law and Notice of Intent to Begin Citizen
> Enforcement Action**

Greetings:

I write on behalf of the California Sportfishing Protection Alliance (hereinafter, "CSPA")
to notify you of violations of federal and California law caused by four submerged cables (the

61

"Cables") that lie abandoned in Lake Tahoe's Emerald Bay and along the west shore of Lake Tahoe. Three of these Cables are submarine telecommunications cables; the other is a submarine power cable. Lake Tahoe is located in the California counties of Placer and El Dorado. These violations have been, and are continuing to be, committed by the "Noticed Parties" described in Section II, below, and, more fully, as the private entities in the attached Service List.

CSPA has conducted an investigation of the Cables, including having divers swim above them and photograph them, to determine the extent to which they discharge lead into Lake Tahoe. Lake Tahoe is an existing source of domestic and municipal drinking water. The Cables vary in size and length with three of them, two telecommunications and one power, crossing along the bottom near the mouth of Emerald Bay, and another one approximately five and a half miles traveling along the west shore of the lake. All of the Cables are damaged and discharging lead into Lake Tahoe.

The Cables are as follows:

**Cable A**.

Cable A is approximately 2000 feet long, submerged in Emerald Bay. The latitude and longitudinal coordinates for the southern endpoint is 38.96421504N -120.08144917W and 38.96482016N -120.08359610W for the northern endpoint. A visual inspection shows that Cable A is a submarine telecommunications type with an outer layer of jute impregnated with bitumens/tar, which covers steel rods that protect the interior of Cable A. Under the steel rods is a thick lead sheath that surrounds strands of copper wrapped in paper. This cable has been cut at both ends. An analysis of the piece of the cut end of Cable A reveals that the Cable contains per foot, 3.39 pounds of lead, 4.15 pounds of steel, 0.71 pounds of petroleum-based tar-impregnated jute and 0.77 pounds of copper. Accordingly, in its 2,000-foot length, Cable A contains approximately 6,780 pounds of lead. A visual inspection of Cable A reveals that not only is the Cable cut at one end, so obviously it is not in working condition, but the Cable is damaged at various places along its length, by boat anchors and in other ways, such that, in these damaged portions, the tar-impregnated jute covering no longer prevents water intrusion into the interior of the Cable.

**Cable B.**

Cable B is approximately five and a half miles long. It is submerged along the west shore of Lake Tahoe with the latitude and longitudinal coordinates for the southern end point of 38.94396945N -120.06913414W and 39.00944887N -120.11311122W for the northern endpoint. Cable B appears on close visual inspection to be of the same size, type and character as Cable A. At various points along its more than 5.5-mile length, Cable B has been damaged by boat anchors and has frayed on submerged rocks to the point that the lead sheath is directly exposed

CSPA RCRA & P65 Notice of Violations and Intent to Sue
August 5, 2020
Page 3

to lake water.  Based on an estimated 3.39 pounds per foot, the submerged portion of Cable B contains approximately 89,500 pounds of lead.

**Cable C.**

Cable C is approximately 2,000 feet long and submerged in Emerald Bay with latitude and longitudinal coordinates of 38.96105015N -120.08387085W for the southern end point and 38.96478251N -120.09067881W for the northern endpoint.  A close visual inspection reveals that the Cable is a telecommunication cable of a submarine type. At various points it has been damaged by boat anchors and has frayed on submerged rocks to the point that the lead sheath is directly exposed to lake water.  It appears to be unworkable and abandoned.  Cable C is smaller in diameter than Cable A or Cable B.  Nevertheless, it is estimated that the submerged portion of Cable C contains thousands of pounds of lead.

**Cable D.**

Cable D is approximately 2,000 feet long and submerged in Emerald Bay with latitude and longitudinal coordinates for the southern end point of 38.96125614N -120.08451815W and 38.96439289N -120.09007347W for the northern endpoint.  A close visual inspection of Cable D reveals that it is a power cable and it is cut at both ends with the ends pulled away from the shore and left in deeper water. The GPS coordinates for the northern cut-end are 38.964735N -120.09058444W.  The cable is also severely damaged at several places along its length and, thus, is no longer being used.  Cable D is a submarine power cable with a lead sheath surrounding the inner core of copper wire.  The Cable is approximately the same diameter as Cables A and B. Based upon this and visual inspection of Cable D, it is estimated that Cable D also contains approximately 3.39 pounds of lead per foot.  Accordingly, it is estimated that the submerged portion of Cable D contains 6,780 pounds of lead.

CSPA submerged a sample of Cable A in a plastic container filled with Lake Tahoe water.  After 24 hours, a sample was taken of the water and sent to a state-certified laboratory for analysis, which showed that enough lead had leached from the piece of the Cable to bring the concentration of lead in the water to 650 micrograms per liter.  After seven days, another sample of the water was taken and sent to the same laboratory for analysis, which showed that the concentration of lead in the water had risen to 1,500 micrograms per liter.  This is evidence that lead is leaching from the Cables into Lake Tahoe.  Since the Cables have similar composition, based on these findings, it is reasonable to infer that they are all presently discharging lead into Lake Tahoe well beyond established limits for safety.

Lead is a substance that causes neurodevelopmental toxicity, reproductive toxicity (including sterility and delayed onset of puberty in females) and cancer in humans and other animals.  Lead is known, pursuant to 27 Cal. Code Regs. section 27001, subsections (b) and (c), to cause cancer developmental and reproductive toxicity in both males and females.  This letter

begins the process by which CSPA will seek available remedies under the federal Resource Conservation and Recovery Act ("RCRA") and California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"). CSPA will pursue these remedies to have the abandoned/discarded Cables removed from Lake Tahoe and disposed of in a way that they may no longer pose an imminent danger of substantial harm to human health, the health of other animals and the environment. Removal will prevent the ongoing discharge and release of lead into the waters of Lake Tahoe, a source of drinking water. CSPA will further seek civil penalties for Proposition 65 violations.

## I.      The Noticing Party

CSPA is a non-profit association dedicated to the preservation, protection and defense of the environment, wildlife and natural resources of California waters, including the waters of Lake Tahoe. CSPA's main office is at 3536 Rainier Avenue, Stockton, California, 95204. CSPA's telephone number is (530) 464-5067. In addition to other California counties, members of CSPA reside in Placer and El Dorado Counties. CSPA members utilize the waters of Lake Tahoe for recreation and work in, on and around Lake Tahoe. Members of CSPA drink water that comes from Lake Tahoe.

## II.      The Noticed Parties

Pacific Bell Telephone Company ("Pac Bell" or "Noticed Party") is a corporation that provides telecommunication services in California. Pac Bell at one time had the telecommunications Cables A, B and C (including their lead components) installed in Lake Tahoe. Pac Bell owned and operated the Cables A, B and C as part of its business providing telecommunication services. Cables A, B and C are no longer used. Pac Bell abandoned the Cables A, B and C in place on the bottom of Lake Tahoe and had at least one of these Cables cut at both ends in Lake Tahoe as part of that abandonment. For each of these three Cables, this Notice pertains to the Cables themselves, their lead sheathing, and the lead that dissolves off the sheathing and is discharged and released into the water of Lake Tahoe. Pac Bell is in violation of the Resource Conservation and Recovery Act ("RCRA") and the discharge to drinking water provisions of Proposition 65.

Sierra Pacific Power Company ("NV Energy" or "Noticed Party") provides electrical power to consumers in East Central California and Nevada. As part of its electrical utility service, Sierra Pacific Power Company owned and operated Cable D, and had it installed in Lake Tahoe. Later it had both ends of the cable cut and moved to a deeper portion of Emerald Bay where they could not be as easily seen. In this manner, Sierra Pacific abandoned/discarded/disposed of the cable leaving it to leach lead into Emerald Bay. This Notice pertains to Cable D itself, its lead sheathing, and the lead that dissolves off the sheathing and is discharged and released into the water of Lake Tahoe. NV Energy is in violation of the RCRA and the discharge to drinking water provisions of Proposition 65.

Liberty Utilities (CalPeco Electric), LLC is an electric utility company. In 2011, NV Energy assigned its lease for Cable D to California Pacific Electric Company, LLC ("CalPeco Electric"). CalPeco Electric was acquired by Liberty Utilities, LLC in 2012 and is now named, Liberty Utilities (CalPeco Electric), LLC (a "Noticed Party"). As part of its business of holding the lease from the State Lands Commission for Cable D, Liberty Utilities, LLC is thus responsible for the abandonment and discard of Cable D on the bottom of Lake Tahoe, is continuing its abandonment of Cable D on the bottom of Lake Tahoe, and continues to discharge and release lead from Cable D into Lake Tahoe waters. Liberty Utilities (CalPeco Electric) has been doing so each day for at least the past five years and will continue to do so each day into the future until Cable D is removed from the bottom of LakeTahoe is disposed of properly. Liberty Utilities (CalPeco Electric), LLC is in violation of the RCRA and the discharge to drinking water provisions of Proposition 65.

### III.     Factual Background: The Problem with Abandoning the Cables in Lake Tahoe

As discussed above, the submerged Cables have been cut or damaged, which has allowed water to intrude into the Cables. In addition, inspection of the submerged part of the Cables shows that as part of the damage to the Cables, sections of the tar-impregnated jute have virtually disappeared, leaving the steel protective rods exposed, and in some places severed. This means that in sections of the Cables that have been damaged in this way, lake water intrudes into the Cables and contacts the lead sheathing. It has been shown that when Lake Tahoe water contacts the lead sheathing in the Cable, the water dissolves lead from the sheathing. This lead-laden water then mingles with the larger body of Lake Tahoe water, polluting it with lead. Because the Noticed Parties have discarded/abandoned and disposed of the Cables in the manner they have, the Cables continuously discharge and release lead – a toxic heavy metal – into the local aquatic environment, which is a source of drinking water within the meaning of California Health & Safety Code section 25249.5.

The disposal and abandonment of the Cables in Lake Tahoe, and the subsequent and continuing discharge of lead from the Cables into Lake Tahoe poses a significant threat to the health of persons and to the local environment, including fish and wildlife. Not only is lead toxic to humans, it is also toxic to birds, fish and mammals. Numerous members of the public are exposed daily to lead from the Cables when they swim, boat and dive in Lake Tahoe and when they drink water drawn from Lake Tahoe, or eat fish caught in Lake Tahoe. The lead also increases the body burdens of lead in the fish, birds and mammals that live in or on Lake Tahoe and/or feed on prey that live in or on Lake Tahoe. These increased lead body burdens cumulatively subject humans and animals to significant health risks.

## IV. Specific Permits, Standards, Regulations, Conditions, Requirements or Orders Violated

### A. RCRA Standard Violated

With regard to RCRA, this Notice pertains to the Noticed Parties' violations of 42 U.S.C. § 6972(a)(1)(B), which provides that:

> Any person may commence a civil action on his own behalf – against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

For purposes of RCRA, the Noticed Parties have contributed and are contributing to the past, present and future storage and disposal of solid waste, to wit the Cables and their lead sheathing, in a way that may present an imminent and substantial endangerment to health and the environment.

### B. Provisions of Proposition 65 that are Being Violated

With regard to Proposition 65, this Notice pertains to the Noticed Parties' violations of Cal. Health & Saf. Code § 25249.5, which provides that:

> No person in the course of doing business shall knowingly discharge or release a chemical known to the state to cause cancer or reproductive toxicity into water or onto or into land where such chemical passes or probably will pass into any source of drinking water, notwithstanding any other provision or authorization of law except as provided in Section 25249.9.

The Noticed Parties cut the Cables and abandoned them, and left damaged Cables in Lake Tahoe. They did this as part of their business selling telecommunication services and electrical utility service in California and Nevada. As the Cables sit abandoned on the bottom of Lake Tahoe, they continuously discharge and release lead – a chemical known to the State of California to cause cancer and reproductive toxicity – into the waters of Lake Tahoe. Each Noticed Party employs ten or more persons and is thus a "person in the course of business" for purposes of California Health & Safety Code section 25249.11(b).

Pursuant to the Basin Plan for the Lahontan Region, Lake Tahoe has been designated an existing source of domestic and municipal water supply. As such, Lake Tahoe is a source of

66

drinking water within the meaning of California Health & Safety Code section 25249.11(d). The Noticed Parties' business practice of leaving the Cables abandoned on the bottom of Lake Tahoe is thus a continuous violation of California Health & Safety Code section 25249.5 because the Cables continuously discharge and release lead into Lake Tahoe waters.

### C.      The Activity that Constitutes the Violations

This notice of intention to file a citizen suit pertains to the Cables, which lie discarded, abandoned and disposed of on the bottom of Lake Tahoe in Placer and El Dorado Counties, California. The Cables continuously discharge and release lead into the waters of Lake Tahoe. Humans and wildlife utilize Lake Tahoe and, in doing so, are exposed to the lead that the abandoned Cables discharge and release into the waters of Lake Tahoe.

Lead has long been known to be a potent neurotoxin. There is an extensive toxicological literature that demonstrates that exposure to lead causes sterility in male humans and other mammals. There is an extensive toxicological literature that demonstrates that exposure to lead delays the onset of puberty in female humans and other mammals. Exposure to lead has been shown to kill aquatic bird life. Lead is toxic to fish and, basically, any animal that has a central nervous system. There is an extensive toxicological literature that demonstrates that pre-natal exposure to lead impairs the development of the central nervous systems of humans and other animals. Lead does this at levels of exposure as low as can be measured. Lead's toxic effect on the developing nervous system does so according to a supralinear curve, which means that lower levels of exposure do proportionately more harm to the developing nervous system than higher levels of exposure. There is an extensive toxicological literature that demonstrates that for each one microgram per deciliter rise in the concentration of lead in blood of a human between conception and six years of age, there is a corresponding loss of approximately one IQ point. There is no level of exposure to lead known to science that does not cause harm to humans and other animals.

### V.      The Persons Responsible for Violating RCRA and Proposition 65

The Noticed Parties are each responsible for violating RCRA and Proposition 65 as further described in this letter.

### A.      Dates of Violation of RCRA, 42 U.S.C. § 6972(a)(1)(B)

Lead has been discharged and released from the lead sheathing of the Cables into the waters of Lake Tahoe every day since the Noticed Parties cut the Cables and abandoned them on the bottom of Lake Tahoe and left them damaged on the bottom knowing they were damaged. Lead will continue to be discharged and released from the lead sheathing of the Cables into the waters of Lake Tahoe, thus presenting an imminent and substantial endangerment to health and the environment that has occurred every day for at least the past five years and will continue every day into the future until the Noticed Parties remove the Cables from Lake Tahoe and properly dispose of them. Accordingly, the Noticed Parties have been violating this RCRA

Case 3:24-cv-01196-N Document 14-1 Filed 11/14/25 Page 72 of 78 PageID 2588
Case 2:21-cv-00079-MCE-JDP Document 6 Filed 04/07/21 Page 18 of 19

provision continuously for at least the past five years.  Thus, the dates of violation to which this Notice pertains are each and every single day dating back at least five years from the date of this letter and continuing each day into the future until the abandoned Cables have been removed from Lake Tahoe and disposed of in a responsible manner.

### B.  Dates of Violation of Proposition 65

The Cables have discharged and released lead into the waters of Lake Tahoe every day for at least the past year preceding the date of this Notice letter.  The Cables will all continue to discharge and release lead into the waters of Lake Tahoe each and every day into the future until the Noticed Parties remove the Cables from Lake Tahoe and properly dispose of them.  The dates of violation of Health and Safety Code section 25249.5 are each day over at least the past year, plus every day into the future until the abandoned Cables have been removed from Lake Tahoe.

### VI.  Full Name, Address and Telephone Number of the Person Giving Notice

The full name, address and telephone number of the person providing this Notice is:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance
3536 Rainer Avenue
Stockton, CA 95204
(209) 464-5067

### VII.  Name, Address and Telephone Numbers of Noticing Party's Counsel

William Verick
Klamath Environmental Law Center
1125 16th Street, Suite 204
Arcata, CA 95521
(707) 630-5061

Brian Acree
Law Offices of Brian Acree
331 "J" Street, Suite 200
Sacramento, CA 95814
(916) 505-6861

Andrew Packard
William Carlon
Law Offices of Andrew L. Packard
245 Kentucky Street, Suite B3
Petaluma, CA 94952
(707) 782-4060

Kirk Boyd
Law Offices of Kirk Boyd
548 Market Street, Suite 1300
San Francisco, CA 94104
(415) 440-2500

CSPA would be happy to discuss effective remedies for the violations referenced in this Notice.  If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate these discussions immediately so that a resolution may be reached before the end of the

CSPA, RCRA & P65 Notice of Violations and Intent to Sue
August 5, 2020
Page 9

60-day notice period (for the Proposition 65 violations alleged here) and 90-day notice period (for the RCRA violations alleged here). Please contact counsel if you have any questions or would like more information

Cordially,

William Verick

# EXHIBIT F

70

Conformity with ISO 14001 Environmental Management Systems

AT&T developed a combined Environment, Health and Safety (EH&S) Management System, which is designed to use elements of ISO 14001 EMS standard and applies to Environment, Health and Safety Programs. AT&T does not maintain external registrations or certifications with external registrars for this management system.

## AT&T Environment, Health and Safety Management System

| ISO 14001 EMS Element | Programs Implementing Management System Elements | |
|---|---|---|
| 4.1 General | EH&S Policy | Signed by AT&T Chairman and CEO, R. Stephenson, available on AT&T's internet applies to all AT&T entities |
| 4.1 Planning | 4.1.1 Evaluation of Environmental Aspects. | The EH&S Leadership team consults periodically with the Legal Department to discuss future programs and risks regarding compliance programs. The evaluation includes an assessment of regulatory requirements, existing compliance programs, past and present research of effects (including literature review). This exercise has been extended to occupational health and safety aspects. The Citizenship and Sustainability (C&S) team conducts similar analyses of environmental programs that are beyond regulatory requirements. |
| | 4.1.2 Legal and Other Requirements | EH&S Technical Support directs the EH&S "leg/reg" process, which tracks and evaluates new and proposed regulation and legislation. Formal comments to legislators and regulators are developed if appropriate, in collaboration with AT&T's External and Legislative Affairs. Where appropriate based on the new or proposed regulation or legislation, EH&S Technical Support develops or revises programs, which in turn are deployed by the Strategic Compliance Partners to the business units ("BUs"), as necessary to address new and modified requirements. |
| | 4.1.3 Objectives and Targets | Based on information from 4.1.1 and 4.1.2 above, as well as direction from the Executive Environmental Council, the EH&S Leadership team develops the objectives and targets for the EH&S organization, as part of AT&T's performance management program, "e-performance." Progress towards achievement of goals is evaluated quarterly by EH&S associates and supervisors. Each year the EH&S Leadership, through the Strategic Compliance Partners and Business Unit EH&S Coordinators, tailors the objectives and targets into BU-specific EH&S Plan Targets, which are tracked annually for completion. |
| | 4.1.4 EMS program | The EH&S program is described on AT&T's internal EH&S website. All internal guidance documents and the online Compliance Data Management System modules can be accessed via the company intranet. Each business unit has an EH&S Plan Target document through which it implements key BU-specific requirements and responsibilities. |

71

| 4.3 Implementation and Operation | 4.3.1 Structure and Responsibility | In addition to the Environment, Health & Safety (EH&S) policy signed by AT&T's Chairman and CEO, R. Stephenson. Our Executive Environmental Council, which is comprised of senior leaders from across AT&T's business units, AT&T has an Environment, Health & Safety compliance staff, whose organizational structure is organized around the Plan, Do, Check, Act model.  This organizational structure includes:<br><br>• <u>Technical Support</u>: Develops EH&S programs to comply with legal requirements.<br>• <u>Field Support:</u> Assesses business unit EH&S compliance; performs over 1000 EH&S assessments and reviews throughout the year with approximately 300 being conducted at randomly selected facilities.<br>• <u>Compliance Data Management:</u> Implements certain centralized compliance activities, such as permitting or registration of tanks, water and air emission sources.<br>• <u>EH&S Information Systems:</u> Develops and updates the Compliance Data Management System (CDMS). The CDMS is used to manage environmental activities related to, among other things fuel tanks, air emissions, water quality, incident management, hazardous materials, hazardous waste, occupational safety and health, and DOT compliance.<br>• <u>Strategic Compliance Partners:</u> Works with business units (via Business Unit EH&S Coordinators in key BUs) on systemic opportunities for EH&S improvement.<br><br>In each of these groups, AT&T has specialized professionals who serve as incident managers. These individuals manage regulatory inspections as well as any unexpected EH&S-related emergencies by working with the site personnel and others in the BUs. |
| | 4.3.2 Training, Awareness and Competence | EH&S has extensive (over 100) regulatory and awareness training courses and job aids available to employees through the online system known as AT&T Learning Solutions. These training programs include tests of knowledge, acknowledgments of completion, and feedback. The business unit (BU) EH&S Plan Target documents contain matrices that identify which courses employees who perform certain functions in each BU must take. AT&T Learning Solutions provides tracking of training completion by each of AT&T's approximately 280,000 employees. |
| | 4.3.3 Communication | There is a multilayered approach to communication about environmental, safety and health issues, including 1.  Executive Environmental Council meetings and briefings; 2. BU EH&S Coordinator meetings and routine collaboration through the Strategic Compliance Partners; 3. AT&T Insider, AT&T's internal website; 4. AT&T EH&S website, including a monthly EH&S newsletter. |

72

| | 4.3.4. Environmental Management System Documentation | The documents that define and support AT&T's EH&S management system are on the EH&S website. They are primarily in the forms of practices, procedures, and job aids. The Compliance Data Management System (CDMS) is an online system that is the backbone for data management, tracking, and recordkeeping, which includes modules for the Waste Tracking System (WTS), Inventory Management System (IMS), Incident Tracking System (ITS), petroleum storage tank, permitting, and water modules. OREMIS is the data management system for air pollution sources. SHARPs and DOTTs are the systems that AT&T uses for safety administration and DOT compliance, respectively. |
|---|---|---|
| | 4.3.5 Document Control | AT&T uses the EHS-100 Internal Operating Procedure for document classification, format, approval and routing processes, and document control. |
| | 4.3.6 Operational Control | Several layers of operational control exist. The AT&T EH&S documents provide documentation of the roles, responsibilities, actions, and reporting required of AT&T Business Units and the EH&S Organization. |
| | 4.3.7 Emergency Preparedness and Response | In addition to the corporate-wide Business Continuity Program, the EHS 500 series of practices documents the procedures for responding to regulatory incidents, spills and other EH&S emergencies. Emergency and regulatory incidents are required to be reported to the EH&S Hotline and tracked on the Incident Tracking System (ITS) module in the CDMS. Veteran members of the EH&S organization act as incident managers in the event of emergencies. EH&S Field Support investigates or assists the business units (Bus) in the investigation of key incidents and accidents at the site-level. EH&S has a key role in the AT&T Disaster Recovery process for large-scale actions to restore telecommunications service to communities hit by natural or manmade disasters. |
| 4.4 Checking and Corrective Action | 4.4.1 Monitoring and Measurement | All objectives and targets set forth in as goals in the eperformance system are developed as SMART metrics and progress is tracked on a quarterly basis. Implementation of the elements of the business units' EH&S Plan Target documents are also tracked quarterly. The Compliance Data Management teams monitor, verify, and conduct quality assurance and quality control on the Compliance Data Management System's (CDMS) data. Field Support and California Environmental Site Managers conduct over 1000 inspections and investigations per year to monitor the compliance of sites with EH&S programs and to provide feedback to business units to update equipment and chemical inventories. |
| | 4.4.2 Nonconformance and Corrective and Preventive Actions | The Incident Tracking System (ITS) system is used to document corrective actions in event of emergencies and incidents. The Activity and the EH&S Assessment tracking systems track corrective actions from Field Support inspections and site investigations. CDMS contains an audit tracking module for management system audits conducted on EH&S programs. Nonconformance and corrective actions are escalated to the EH&S Leadership team, BU EH&S Coordinators, BU directors and other managers, as appropriate to ensure timely resolution. |
| | 4.4.3 Records | All paper records are maintained in conformance with corporate Records Inventory |

73

| | | |
|---|---|---|
| | | Management (RIM) guidelines. CDMS provides online recordkeeping for compliance and of property assessments performed to satisfy the "all appropriate inquiry" ASTM standard. |
| | 4.4.4 Environmental Management Systems Audits | AT&T's EMS is subject to three different types of periodic programmatic audits. (1) The EHS 900 series of practices follows the ISO 1401x series for the completion of management system audits. Each fall, the EH&S auditors inform the EH&S Leadership of their audit schedule for the following year. All audit protocols, documentation, and tracking are developed in accordance with the EHS 900 series. (2) AT&T centralized internal audit staff audits a wide range of AT&T compliance activities, including one or two environmental topics per year. (3) In California, audits are conducted by 3rd party auditors, as required under a Consent Judgment entered into with the State of California in February 2006. |
| 4.5 Management Review | | The Executive Environmental Council (EEC) receives updates on compliance to minimize risk to the corporation. Periodically, the EH&S Leadership team in collaboration with the Legal Department evaluates EH&S programs (based on data collected from reviews, audits, new regulatory requirements, etc.) and develops strategies and plans to improve the management system and compliance programs as part of the organizational goals and EH&S plans. |

74