**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| IN RE AT&T INC. SECURITIES LITIGATION | Case No. 3:24-cv-01196-N |

**REPLY IN SUPPORT OF MOTION TO DISMISS
<u>SECOND AMENDED CLASS ACTION COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

I.      The Opposition confirms that the SAC must be dismissed. ............................................... 1

II.     The dismissal should be with prejudice, as the purported TAC is futile. ........................... 1

A.      Plaintiffs still haven't pleaded scienter for the Section 10b-5(b) claim.................. 2

1.      Plaintiffs fail to plead scienter for unattributed corporate statements. ....... 2

2.      Plaintiffs provide no other basis for a strong inference of scienter............. 3

3.      Malone's purported scienter cannot be imputed to AT&T. ........................ 7

B.      The TAC's proposed scheme-liability claim is futile in multiple respects. ............ 8

1.      The TAC can't relabel its failed misrepresentation claim as a viable
scheme-liability claim. ............................................................................. 8

2.      The TAC's other "deceptive conduct" cannot support scheme liability. .... 9

3.      The TAC fails to plead scienter as to Arnoldi, Korte, or Malone. ............ 10

CONCLUSION................................................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Borteanu v. Nikola Corp.*,
2023 WL 11017679 (D. Ariz. Dec. 8, 2023) ...............................................................................9

*Budde v. Glob. Power Equip. Grp., Inc.*,
2017 WL 6621540 (N.D. Tex. Dec. 27, 2017) .............................................................................8

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
565 F.3d 200 (5th Cir. 2009) ......................................................................................................4

*Ho v. Flotek Indus., Inc.*,
248 F. Supp. 3d 847 (S.D. Tex. 2017) .........................................................................................5

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010).......................................................................................7

*In re BP p.l.c. Sec. Litig.*,
922 F. Supp. 2d 600 (S.D. Tex. 2013) .........................................................................................2

*In re Danimer Sci., Inc. Sec. Litig.*,
2023 WL 6385642 (E.D.N.Y. Sept. 30, 2023) ............................................................................2

*In re Dell Inc., Sec. Litig.*,
591 F. Supp. 2d 877 (W.D. Tex. 2008).......................................................................................8

*In re Lumen Techs., Inc. Sec. Litig. II*,
2025 WL 978229 (W.D. La. Mar. 14, 2025) ...............................................................................3

*In re Parmalat Sec. Litig.*,
414 F. Supp. 2d 428 (S.D.N.Y. 2006).........................................................................................9

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008).........................................................................................3

*In re Tupperware Brands Corp. Sec. Litig.*,
2021 WL 6755476 (M.D. Fla. Aug. 9, 2021) .............................................................................7

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022).........................................................................................8

*In re XL Fleet Corp. Sec. Litig.*,
2022 WL 493629 (S.D.N.Y. Feb. 17, 2022)...............................................................................9

ii

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ..................................................................................4, 8

*Jacobowitz v. Range Res. Corp.*,
  596 F. Supp. 3d 659 (N.D. Tex. 2022) ......................................................................4

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  2023 WL 8750398 (E.D.N.Y. Dec. 19, 2023) ...........................................................2

*Lee v. Active Power, Inc.*,
  29 F. Supp. 3d 876 (W.D. Tex. 2014)........................................................................7

*Linenweber v. Sw. Airlines Co.*,
  693 F. Supp. 3d 661 (N.D. Tex. 2023) ..................................................................8, 10

*Malouf v. SEC*,
  933 F.3d 1248 (10th Cir. 2019) .................................................................................9

*N. Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*,
  936 F. Supp. 2d 722 (N.D. Tex. 2013) ......................................................................2

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) .............................................................................4, 5, 7

*Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
  935 F.3d 424 (5th Cir. 2019) .....................................................................................5

*S.E.C. v. Das*,
  2011 WL 4375787 (D. Neb. Sept. 20, 2011) .............................................................2

*Sanders v. AVEO Pharm., Inc.*,
  2015 WL 1276824 (D. Mass. Mar. 20, 2015)............................................................5

*Sec. & Exch. Comm'n v. Rio Tinto*
  *plc,* 41 F.4th 47 (2d Cir. 2022)................................................................................8

*SEC v. Mueller*,
  2024 WL 400897 (W.D. Tex. Jan. 11, 2024) ............................................................9

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
  552 U.S. 148 (2008)...................................................................................................9

*Takata v. Riot Blockchain, Inc.*,
  2023 WL 7133219 (D.N.J. Aug. 25, 2023) ...............................................................8

*Yoshikawa v. Exxon Mobil Corp.*,
  2022 WL 4677621 (N.D. Tex. Sept. 29, 2022)..............................................4, 6, 7, 10

iii

The Opposition all but concedes that the SAC adds no facts to cure the FAC's fatal defects, largely reprising arguments this Court already rejected.  Plaintiffs signaled the SAC's deficiencies by improperly filing the TAC in response to defendants' motion to dismiss.  As explained in defendant's motion to strike, Dkt. 97, the TAC should be stricken.   But plaintiffs' reliance on the TAC only underscores the futility of their new allegations—a scattershot set of conclusory, inconsequential allegations paired with a last-ditch "scheme" theory that alters nothing.  Neither the SAC nor the TAC pleads a strong inference of scienter, so both fail to overcome this Court's prior dismissal order and accordingly fail to adequately plead securities fraud.  Dismissal with prejudice is warranted.

## I.    The Opposition confirms that the SAC must be dismissed.

Plaintiffs effectively admit the SAC can't survive dismissal.  Unable to defend it, they scrambled to file their putative TAC—without consent or leave—and now rely heavily on that improper pleading to oppose defendants' motion.  The reason is plain: the SAC's so-called "new facts" (at 6) do nothing to address—much less cure—the fatal defects this Court identified.  They simply repackage the same deficient scienter theories the Court already rejected.[1]  Given plaintiffs' own treatment of the SAC as a dead letter, the Court should dismiss it.

## II.    The dismissal should be with prejudice, as the purported TAC is futile.

The improperly filed TAC doesn't cure the FAC's fatal defects, either.  Its scienter allegations demonstrate that even the putative *fourth* complaint fails to plead an actionable misrepresentation claim.[2]  And plaintiffs' last-ditch scheme theory fares no better.  Because the

---

[1]    *Compare, e.g.*, SAC ¶¶ 466–68 (more allegations about the disposal of lead batteries), *with* Dkt. 90, at 17 (knowledge about "lead-acid batteries" "does not show" scienter with respect to "the lead-lined cables at issue here"); *compare also, e.g.*, SAC ¶¶ 155–56 (alleging that employees "in AT&T's EHS group … brought [concerns] to AT&T's attention and people did not address it"), *with* Dkt. 90, at 13 (rejecting similar "group" allegations that "fail to make any connection between those facts and any Individual Defendant's mental state").

[2]    Defendants focus on the dispositive scienter defects in plaintiffs' pleadings, but lack of falsity remains an

1

TAC is futile, the Court should dismiss the SAC with prejudice.

### A.    Plaintiffs still haven't pleaded scienter for the Section 10b-5(b) claim.

#### 1.    Plaintiffs fail to plead scienter for unattributed corporate statements.

Plaintiffs' attempt to attribute the Issue Briefs' waste-disposal statements to an individual defendant disregards their own allegations and invents others never pleaded.  ***First***, the Court already held the CSRs' marginal notes are a "*far cry from adopting or reasserting* the statements in the Issue Briefs."  Dkt. 90, at 13 (emphasis added).[3]  Labeling the Issue Briefs an "integral" "extension" of the CSRs (at 14) doesn't cure plaintiffs' failure to plead "specific factual allegations linking the individual to the statement at issue."  Dkt. 90, at 12 (quoting *Southland*).[4]

***Second***, plaintiffs' assertion (at 14) that AT&T's Board, including its CEO, gave "formal authorization and approval" for "*the Issue Briefs*" bears no resemblance to what's actually pleaded. The TAC alleges instead that the Board "delegated" "oversight of all external ESG reporting" to a committee that did not include the CEO.  TAC ¶ 90.  And even then, they allege only that AT&T's Chief Sustainability Officer "discuss[ed] topics" with that committee, which, in turn, "report[ed] its activities to the Board."  *Id.*[5]  Contrary to plaintiffs' suggestion (at 14), that's miles from Board

---

independent ground for dismissal as explained in defendants' motion.  *See* Dkt. 95, at 17–25.

[3]    Plaintiffs' authorities are inapposite.  *See In re Danimer Sci., Inc. Sec. Litig.*, 2023 WL 6385642, at *6 (E.D.N.Y. Sept. 30, 2023) (statements in *joint press release* attributable); *S.E.C. v. Das*, 2011 WL 4375787, at *5 (D. Neb. Sept. 20, 2011) (attribution when 10-Ks (a) expressly incorporated by reference proxy statements to (b) meet specific 10-K disclosure obligations).  The CSRs' minor references do not come close to incorporation by reference, nor do they justify an inference that the CEO "ordered or approved everything in the Issue Briefs."  Dkt. 90, at 13; *see Kusnier v. Virgin Galactic Holdings, Inc.*, 2023 WL 8750398, at *4 (E.D.N.Y. Dec. 19, 2023) ("simply direct[ing] readers, via hyperlink, to [different] press release for further information" was "insufficient to incorporate it"); *N. Port Firefighters' Pension--Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 742–43 (N.D. Tex. 2013) (company A did not "adopt" company B's "Information Statement", despite company A CEO's letter "refer[ring] shareholders to" it).

[4]    *See In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 632 & n.30 (S.D. Tex. 2013) (emphasizing that company's 2009 Sustainability Review and its "companion" 2009 Sustainability Report were "*different* document[s]").

[5]    Plaintiffs doubly misconstrue *BP*.  *BP*'s rejection of an allegation that a committee "was *required to review*" "material to be placed before shareholders that addresses environmental, safety and ethical performance" compels rejection of plaintiffs' *less specific* allegation of mere "*oversight* of all external ESG reporting."  922 F. Supp. 2d at 631 (emphasis added).  And *BP*'s crediting (while caveating as a "very slender reed") an allegation that a specific challenged publication was "reviewed and discussed" at a particular board meeting on a specific date with the

approval of the Issue Briefs—much less Board "formal approval and authorization" with scienter. Because plaintiffs' *allegations* (as opposed to their newly asserted arguments in a brief) surrounding the Issue Briefs remain unconnected to an individual defendant, they still fail.

### 2.    Plaintiffs provide no other basis for a strong inference of scienter.

**Waste Disposal.**  Even if plaintiffs were able to properly attribute them, plaintiffs' Issue Brief allegations fail to raise a strong, or any, inference of scienter.[6]  Their remarkable claim that mere knowledge that "lead cables were left in place" suffices to show knowledge of specific statutory or regulatory violations (at 16) is wrong.

Plaintiffs fail to allege that any defendant knew in-place lead clad cables supposedly constitute hazardous or regulated waste covered by RCRA.  *See* TAC ¶¶ 389, 395, 409, 417. There's no allegation AT&T has ever been cited for RCRA violations for the cables.  *Cf. In re Lumen Techs., Inc. Sec. Litig. II*, 2025 WL 978229, at *23 (W.D. La. Mar. 14, 2025) ("the risk that the Company failed to comply with applicable … regulations remains, at present, speculative"). Indeed, whether RCRA applies to telecommunication cables or other legacy infrastructure left in place remains contested, even today.  *See* TAC ¶¶ 168, 193 (RCRA is inapplicable unless the material constitutes "solid waste").  Nothing in the TAC shows that *anyone* at AT&T ever knew the cables purportedly violated RCRA (or any other law) or had been told they did (or even that they posed material risks).  The securities laws target knowing falsehoods, not statements reasonably believed to be accurate and only later challenged in hindsight.  *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 272, 281 (S.D.N.Y. 2008) ("Plaintiffs' mere allegation that [company] violated the [regulator's] rules does not give rise to a strong inference that

---

defendant present, *see id.* at 632–33, bears no resemblance to the alleged approval of a *separate* document here.  *Id.*

6    This Court already rejected plaintiffs' motive arguments last time.  *See* Dkt. 73 at 27–28; Dkt. 90 at 14–15.

[defendants] knew that [they] had violated those rules.").

Plaintiffs contend (at 17) that defendants should have seen a material conflict between AT&T's waste-disposal statements and its retirement practices, based solely on an alleged note in operational reports that some cables were retired in place "for purposes of EHS." The TAC pleads none of this with the requisite particularity. Nor does it "persuasive[ly]" connect the amorphous reports to any individual defendant. *See Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017) (mere receipt of reports does not establish scienter absent allegations defendant read the pertinent information); *Yoshikawa v. Exxon Mobil Corp.*, 2022 WL 4677621, at *9 (N.D. Tex. Sept. 29, 2022) (similar). In any event, the reports' alleged reference that cable retirement was "for purposes of EHS" is more consistent with the inference that AT&T believed that retirement practice—rather than removal—was environmentally *proper*, which means that nothing in "the reports … included information at odds with [AT&T's] public statements." *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 540 (5th Cir. 2008).[7]

Plaintiffs offer no response to defendants' authorities prohibiting "conflat[ion]" of mere knowledge with intent to deceive or severe recklessness, or that "highly unreasonable" conduct reflecting an "extreme" departure from ordinary care. Dkt. 95, at 14 (collecting cases); *see*, *e.g.*, *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 212 (5th Cir. 2009) ("knowledge of omitted facts does not itself establish scienter"). The challenged statements discuss waste disposal generally, not lead-clad cables (or even lead) specifically. Inferring scienter solely from alleged "knowledge that [some] lead cables were left in place" (at 16) would all but

---

[7]    Plaintiffs effectively ask the Court to infer that defendants "parse[d] through [the] data," including the cable sections "[identified] [as] lead" (TAC ¶ 228), and "notice[d] that the data [allegedly] differed from [AT&T's] statements in a material way," *Neiman*, 854 F.3d at 749—even though no defendant is alleged to have possessed *any* particularized knowledge of *any* environmental impropriety. *See also Jacobowitz v. Range Res. Corp.*, 596 F. Supp. 3d 659, 687 (N.D. Tex. 2022) ("without more, allegations of an executive receiving operational reports are insufficient to support a strong inference of scienter").

4

eviscerate the PSLRA's heightened standard.[8]

**Cost Savings.**  None of plaintiffs' recycled allegations—or the Opposition's attempts to reimagine them—comes close to showing that defendants ever had "information or believed that these lead cables were emitting lead into the environment in any widespread way that could pose severe risks to the business."  Dkt. 90, at 17.  Plaintiffs all but ignore this Court's holding.  *See* Dkt. 104, at 18–22.  What little *is* new in the improperly filed TAC is facially futile.

1.    Plaintiffs again invoke (at 18) the allegation that defendants allegedly received operational reports tracking the copper-reclamation initiative.  TAC ¶¶ 227–32.  As explained above, these allegations are deficient—and, at most, suggest only that defendants knew some lead-clad cables were retired in place.  *See* Dkt. 95, at 10–15; Dkt. 90, at 15.  Regardless, that assertion has no bearing on the ultimate issues of liability or scienter.  *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 434 (5th Cir. 2019) ("investors do not allege that any of these reports revealed the information that is relevant here: the existence of significant markdown risk").

2.    The allegation that technical materials about lead were posted on an internal AT&T website accessible to thousands of employees and contractors does nothing to show specific awareness by defendants.  *See* TAC ¶¶ 173–78; *In re BP*, 852 F. Supp. 2d at 817 (rejecting general allegations that access to internal web-based safety database established scienter); *Neiman*, 854 F.3d at 748 (requiring corporate reports to be tied to the speaking executive "in a persuasive way").  The "scope of [the CEO's] position," Dkt. 104, at 20, does not plausibly encompass close review of technical manuals on matters like cable "splicing and repair" or "removal from … conduit," nor "policies and procedures for installing and removing … equipment in AT&T's central office

---

8    *See also Ho v. Flotek Indus., Inc.*, 248 F. Supp. 3d 847, 857 (S.D. Tex. 2017) ("Flotek's actual disclosures are not so blatantly misleading as to be severely reckless."); *In re BP*, 922 F. Supp. 2d at 626–27 (knowledge of omitted information "not enough" absent allegations supporting that defendant "*intended* to confuse the market by omitting it"); *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (similar).

environments." TAC ¶¶ 173–78. Even if he had a "basic understanding of their contents," Dkt. 104, at 20, nothing in those materials would have alerted *anyone* to "information … that these lead cables were emitting lead into the environment in any widespread way" that "could reasonably result in material risk to the company." Dkt. 90, at 15, 17.

Plaintiffs never allege any defendant actually knew of a potential RCRA violation, yet they insist defendants should have pieced one together—even though no court or agency has more than two years after the media reports that led to this case—from technical materials stating only that "retired lead had to be recycled." Dkt. 104, at 19. Those materials do not concern retired lead-clad cables at all, let alone suggest any problem with that practice. Directing that lead sheathing from *removed* cables be "recycled" rather than "thrown in the trash" is not the same as requiring AT&T to remove cables upon retirement. *See* TAC ¶¶ 174–76. And noting that "lead *can be* classified as hazardous waste" is very different from and has nothing to do with declaring retired cables hazardous waste that must be disposed of under RCRA. *Id.* ¶ 175 (emphasis added). The materials were simply "practices, procedures, and job aids" for technicians handling cable work. Dkt. 104, at 20. They show nothing more—and certainly not scienter.

**3.** Finally, the TAC offers no particularized basis to think busy C-suite executives reviewed videos of "kickoff event[s]" merely because the "media relations team" invited "all employees in the chain of command" to watch them. TAC ¶ 264; *see* Dkt. 104, at 20. As with the TAC's other supposed new "facts," this is a textbook deficient "access to information" allegation. *See Exxon*, 2022 WL 4677621, at *6. Plus, a purported finance executive's statement disclaiming the environmental justification for the very action that plaintiffs contend should have occurred (cable removal) is the opposite of scienter. TAC ¶ 262. If anything, this vignette only reinforces that AT&T believed its practices were sound, despite the misguided criticisms later leveled in the

6

*Journal* articles.[9]

Ultimately, as with the SAC, nothing in the TAC alleges that defendants knew of any material risks during the putative class period. *See* Dkt. 95, at 10–15.

### 3. Malone's purported scienter cannot be imputed to AT&T.

Plaintiffs' belated attempt (at 22) in the TAC to use isolated statements by Malone to fabricate AT&T's scienter fails. The TAC *does not plead* that Malone "furnished the offending language for the *very* Issue Briefs at issue or otherwise approved them." Dkt. 104, at 22. It alleges only that he "was *one of* the subject matter experts who provided information for *EHS-related Issue Briefs*." TAC ¶ 93 (emphasis added). That doesn't show he was an expert for the specific Issue Briefs at issue, much less that he supplied the challenged statements.[10] *See id.* ¶ 89 (Issue Briefs were "prepared with input from subject matter experts and business unit approvers across the company"). And while plaintiffs allege he was a lead expert, *see id.* ¶ 173, the challenged statements were not specific to lead.

On the merits, plaintiffs wholly fail to plead that Malone—who "is not an executive and is several levels removed from the employees at the top of the reporting structure who interact with investors"—had any "intent to defraud the public" or "initiate company-wide fraud." *Exxon*, 2022 WL 4677621, at \*9. Nor do the TAC's other allegations remotely support Malone's scienter.[11]

---

[9] Even if this alleged opinion were construed otherwise, the TAC nowhere alleges that any defendant adopted or even knew of it. *See, e.g.*, *Neiman*, 854 F.3d at 752 ("The fact that others disagreed with Defendants' assessments … does not indicate that Defendants' assessments were not truly or reasonably held.") (collecting cases).

[10] *Compare Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 882 (W.D. Tex. 2014) ("no debate" that employee "furnished information for … the false statements"), *with In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 728 (W.D. Tex. 2010) (requiring "specific factual allegations" showing employee "provided the information, drafted the language, or authorized its inclusion"); *see also In re Tupperware Brands Corp. Sec. Litig.*, 2021 WL 6755476, at \*4 (M.D. Fla. Aug. 9, 2021) (plaintiffs must "detail [employee's] role in preparing the [challenged] statements").

[11] The TAC seizes on a stray soundbite, alleging Malone said AT&T preferred to leave cables "undisturbed" because removal with adequate protocols was costly and AT&T "didn't want to spend the money to do the right thing" or "on anything [it] didn't have to." TAC ¶¶ 234–35. The "right thing" plainly referred to the method of removal—not a criticism of leaving cables in place—and Malone's purported remark that AT&T did not "have to" spend money coheres with the obvious inference that AT&T believed retiring cables in place was lawful and posed no material risks.

### B.    The TAC's proposed scheme-liability claim is futile in multiple respects.

Plaintiffs disregarded the Court's directive to "separately plead a scheme-liability claim" in the SAC, Dkt. 90, at 30, and now attempt—in the TAC—to retrofit their existing allegations into a new scheme-liability claim against different defendants.  That belated attempt is futile.

#### 1.    The TAC can't relabel its failed misrepresentation claim as a viable scheme-liability claim.

As this Court and others have held, while "scheme liability [can be] premised on conduct relating to misstatement[s]," it requires fraudulent "conduct *beyond* the disputed statements and omissions themselves."  *Exxon II*, 2023 WL 5489054, at *9 (emphasis added); *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) ("an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination").  It can't extend to "those who merely *facilitate the preparation* of [alleged] misstatements."  *Exxon II*, 2023 WL 5489054, at *9 (emphasis added).  Courts routinely reject efforts to repackage failed misrepresentation claims into scheme-liability claims without separate deceptive conduct, like "dissemination of misstatements" or "falsification of internal documents."  *Id.*[12]

The TAC fits that worn-out mold.  It tacitly concedes Arnoldi, Korte, and Malone were not "makers" of the Issue Brief statements by omitting them from the Rule 10b-5(b) claim.  TAC ¶¶ 554–61.  And despite alleging no "dissemination" or distinct fraudulent conduct related to the

---

Such vague allegations, susceptible to many (innocent) interpretations, cannot support scienter.  *See Shaw Grp.*, 537 F.3d at 538; *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008); *Budde v. Glob. Power Equip. Grp., Inc.*, 2017 WL 6621540, at *3 (N.D. Tex. Dec. 27, 2017).

[12]    *See, e.g.*, *Linenweber v. Sw. Airlines Co.*, 693 F. Supp. 3d 661, 687–88 (N.D. Tex. 2023) (rejecting claim when "Plaintiffs do not identify any fraudulent or deceptive acts by Defendants other than purportedly misleading statements"); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 248–49 (S.D.N.Y. 2022) ("Where the only fraudulent conduct that is alleged is the making of a false statement to the investing public, a defendant in a private civil action is either liable as a maker under Rule 10b–5(b) or is not liable to investors at all."); *Takata v. Riot Blockchain, Inc.*, 2023 WL 7133219, at *11 (D.N.J. Aug. 25, 2023) ("Where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected the [plaintiff's] attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'") (collecting cases).

challenged statements, the TAC claims Arnoldi and Malone are liable for "scheme liability" because they "*caused AT&T* to misstate the manner in which it disposed of retired copper plant" in the Issue Briefs. *Id.* ¶ 564. This alleged causal connection stems from their status as "subject matter experts" whose "input" helped "prepar[e]" the Issue Briefs (in Malone's case) and "senior officers" whose interim "approval" was "required" for the Issue Briefs to go to "AT&T's CSR Steering Committee" (in Arnoldi's case). *Id.* ¶¶ 89, 564 (emphasis added). Those hopelessly vague allegations violate not only Rule 9(b)[13] but also the prohibition on repackaging misrepresentation claims as scheme-liability claims against "those who merely facilitate the preparation of [alleged] misstatements." *Exxon II*, 2023 WL 5489054, at *9.

The Opposition cites *Exxon II* and *Rio Tinto* (at 23 & n.10) but refuses to grapple with the anti-repackaging rule they announce. It instead turns to inapposite cases—mostly out of circuit and/or pre-dating *Rio Tinto*—involving deceptive conduct *apart* from mere involvement in preparing the challenged statements.[14] None of that authority can paper over the futility of the TAC's improperly relabeled "scheme liability" claim.

> **2.    The TAC's other "deceptive conduct" cannot support scheme liability.**

Scheme liability requires investors to detrimentally "rely upon" a defendant's "own deceptive conduct," *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159–60 (2008). The TAC fails to identify such conduct by Arnoldi, Malone, or Korte, alleging only:

---

[13]    A scheme-liability claim requires plaintiffs to "specify, with particularity, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed and what effect the scheme had on the securities at issue." *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 432 (S.D.N.Y. 2006). The TAC stops conspicuously short of alleging Malone authored or Arnoldi approved the *specific challenged statements* here.

[14]    *See Malouf v. SEC*, 933 F.3d 1248, 1254–55 (10th Cir. 2019) (defendant misled chief compliance officer and consultant by failing to disclose conflict); *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *4 (S.D.N.Y. Feb. 17, 2022) (defendant "instructed employees to record [fraudulent] sales opportunities without a reasonable basis"); *SEC v. Mueller*, 2024 WL 400897, at *20 (W.D. Tex. Jan. 11, 2024) (defendant "was responsible for disseminating the challenged representations"); *Borteanu v. Nikola Corp.*, 2023 WL 11017679, at *19 (D. Ariz. Dec. 8, 2023) (defendants "create[d] a counterfeit demonstration").

- that "signage" indicating the Lake Tahoe cables "were installed or operated by Pac Bell" "had been removed" by *unnamed persons* amidst a lawsuit through which Pac Bell had already *publicly agreed* to remove the cables.  TAC ¶¶ 252, 254.

- that an employee who claimed *removing* the cables would be "more" of "an environmental hazard" than leaving them in place was "moved into a different position," *id.* ¶ 262–63, without alleging whether (a) Arnoldi or Korte ordered the move or (b) the employee was demoted (rather than promoted), or how (c) that internal "move" could possibly have deceived any *investor*.

- that Korte internally affirmed AT&T's practices about retiring cables in place, an *operational* allegation that has nothing to do with deception.  *See, e.g.*, *Linenweber*, 693 F. Supp. 3d at 687–88 ("Defendants' alleged safety issues and regulatory violations are not themselves fraudulent or deceptive.").

- that AT&T—not Arnoldi, Korte, or Malone—"generally" has "separation" agreements with "officers … that prohibit[] them from speaking about pending litigation," TAC ¶ 257, which is the exact same "broad speculation" about "[n]ondisclosure agreements [that] are legal and quite common" that this Court rejected in *Exxon*, 2022 WL 4677621, at *4.

Those scattered, irrelevant, and conclusory allegations confirm the scheme claim's futility.

### 3.   The TAC fails to plead scienter as to Arnoldi, Korte, or Malone.

The TAC's attempt to plead scienter as to Arnoldi, Korte, or Malone (and, by imputation, AT&T) is equally futile.  It identifies no cognizable motive for them.  It points to Malone's alleged policies and comments about "do[ing] the right thing" regarding the mechanics, hazards, and costs associated with the process for safely *removing* cables, TAC ¶¶ 173–78, 233–34, while remaining conspicuously silent on what matters—whether he knew *retiring cables in place* implicated any RCRA scrutiny or material environmental risks.  For Arnoldi and Korte, the TAC musters only the counterproductive claim that they heard an employee's opinion that removing cables would be "more" hazardous than leaving them in place.  *Id.* ¶¶ 262–63.  The only inference to be drawn is that these purported defendants—like the rest of the telecom industry—rationally believed retiring cables in place was proper and that AT&T "didn't have to" remove them.  *Id.* ¶ 235.

### CONCLUSION

The Court should dismiss the SAC with prejudice and deny leave to amend.

10

Dated: December 19, 2025

Respectfully Submitted,

**BAKER BOTTS L.L.P.**

*/s/ Amy Hefley*
Amy Hefley
Kirstie Wallace
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1270
amy.hefley@bakerbotts.com
kirstie.wallace@bakerbotts.com

John B. Lawrence
2001 Ross Avenue, Suite 900
Dallas, Texas 75201
Telephone: (214) 953-6500
Facsimile: (214) 661-6503
john.lawrence@bakerbotts.com

James J. Beha II (admitted *pro hac vice*)
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
jim.beha@bakerbotts.com

*Counsel for Defendants*

11